# **<u>EXHIBIT 1</u>**



Ackley, Charles
DIF case #14-1480

DEFENDANT'S
EXHIBIT NO. 31
FOR IDENTIFICATION
DATE:        RPTR:



## DEPARTMENT OF FINANCIAL SERVICES

## DIVISION OF INSURANCE FRAUD

INVESTIGATIVE SUMMARY REPORT

# CHARLES ACKLEY

# CASE NUMBER:  14-1480

Florida Department of Financial Services
1400 West Commercial Boulevard
Suite 135
Fort Lauderdale, FL  33309
(954) 958-5402

Prepared by:

Wendy Unger
Detective

BRCOSA000002



DEPARTMENT OF FINANCIAL SERVICES

DIVISION OF INSURANCE FRAUD

## MEMORANDUM

DATE:    February 16, 2015

**DFS Case Number:**   14-1480

TO:     ASA John Paul
        Seventeenth Judicial Circuit

FROM:    Wendy Unger
         Detective

SUBJECT:   Charles Ackley

Below is the Department of Financial Services, Fraud Division Investigative Cost Summary for **DFS Case Number 14-1480**.

At such time as this defendant is convicted or is offered a plea agreement, in addition to full restitution to all victims, we respectfully request the defendant be required to pay our investigative costs pursuant to the provisions of F.S.S. 938.27, as itemized below:

**Detective Time:**
    23.0 Hours @ $28.32 per hour..........................................................$     651.36

**Lieutenant Time:**
    2.0 Hours @ $34.82 per hour............................................................$      69.64

**Analyst Time:**
    1.0 Hour @ $21.22 per hour ............................................................$      21.22

**Transcription Costs:**
    (Ackley interview) ...........................................................................$     210.00

**TOTAL ESTIMATED INVESTIGATIVE COST:** ...................$     **952.22**

**Restitution**
    (Statement of Loss CNA)…………………………………………$    39,485.07

BRCOSA000003

## <u>TABLE OF CONTENTS</u>

                                                                        <u>PAGE #</u>

DESCRIPTION OF SUBJECT ....................................................................................... 01

PREDICATION ...................................................................................................... 02

SYNOPSIS OF FACTS ............................................................................................ 02

TIMELINE OF EVENTS…………………………………………………………………..02

CONCLUSION ....................................................................................................... 05

WITNESS LIST ..................................................................................................... 06

EXHIBIT LIST ...................................................................................................... 07

## <u>DESCRIPTION OF SUBJECT</u>

**NAME:**                          Charles Albert Ackley

**RACE:**                          White

**SEX:**                            Male

**DATE OF BIRTH:**                 April 24, 1962

**HEIGHT:**                         5'11"

**WEIGHT:**                        170

**EYES:**                           Hazel

**HAIR:**                           Brown

**HOME ADDRESS:**                  1182 SE 2nd Ave.
                                   Deerfield Beach, FL 33441

**SOCIAL SECURITY #:**

**FLORIDA D/L #:**                 A240-141-62-144-0/Suspended

1

## PREDICATION

This case was referred to the Division of Insurance Fraud by CNA Insurance Company's Law Enforcement Liaison, Special Investigator Andrew Bryant. Fraud COPS Tip Inquiry Number: T14-2547. (Claim File-Exhibit #6, to include Statement of Loss from CNA; Exhibit #6A is a CD of the complete file, followed by a portion of the file printed-explanation included) DIF case number 14-1480 generated for case.

## SYNOPSIS OF FACTS

On **September 8, 2014**, the Division of Insurance Fraud began the criminal investigation of allegations that Charles Ackley of 1182 SE 2nd Ave. Deerfield Beach, FL 33441, committed insurance fraud by attesting to false, incomplete and misleading information concerning the facts of an injury he purportedly sustained from a trip and fall on September 24, 2012. The incident occurred at the Pine Ridge Square Shopping Plaza at 4633 N. University Dr. in Coral Springs, FL. In pursuing his injury claim against the insured, Equity One Inc. (the management company of the property at the time of the incident), Mr. Ackley gave sworn testimony (April 25, 2013) describing the extent of his injuries and his physical limitations as a result of his trip and fall. Video surveillance conducted on three different days in July of 2013 by an investigator hired by the insurance company for Equity One, show Mr. Ackley engaged in physical activity in direct contradiction of his claim of injury, most notably riding a bicycle as a means of transportation. In a subsequent deposition conducted on November 19, 2013, Ackley was asked if his physical limitations and injuries had improved since the time of his first deposition in April 2013. Ackley stated his condition had not improved and he continues to be unable to perform daily tasks. When asked directly if he has tried riding a bicycle, Ackley responded he has tried but he can't. The question is repeated and he stated he cannot recall.

## TIMELINE OF EVENTS

Charles Ackley alleges that on **September 24, 2012,** he tripped and fell on a metal bracket/anchor affixed to the concrete of a sidewalk in the Pine Ridge Square Shopping Plaza. As a result of his fall Mr. Ackley is claiming he suffered bodily injury that is permanent within a reasonable degree of medical probability, resulting in pain and suffering, disability, mental anguish, lost wages, loss of capacity for the enjoyment of life, inconvenience, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a preexisting condition (Exhibit #1-no. 13 of Complaint). At the time of the incident Equity One was the management company of the Pine Ridge Square property and was insured by National Fire Insurance Company of Hartford (National Fire).

On **October 15, 2012** Steven Phillips, Esq. sent notice to Equity One that he represented Mr. Ackley regarding a claim of injury from a trip and fall at their managed property.

**November 7, 2012**: Charles Ackley files suit in the 17th Judicial Circuit Court of Florida, Broward County.

**On April 25, 2013** Mr. Ackley is deposed and gives sworn testimony in Deerfield Beach, Fl (Exhibit #2). During his deposition, Ackley describes preexisting injuries and medical conditions he suffered from prior to the trip and fall incident at Pine Ridge Square. Ackley testified he was

2

able to do some activities but as a result of the injury of September 24, 2012, his ability to perform daily activities has been significantly diminished. He stated he can't do anything but sit and lay down. He goes on to say he cannot walk and had to sell his car to pay household bills. (Exhibit #2, Pg. 98; 18-25)

National Fire contracted with EMSI Investigative Services of Jacksonville, FL, to conduct surveillance to determine the activities and abilities of claimant Ackley (Exhibit #3-Investigative Report; Exhibit #3A-DVD #1; Exhibit #3B-DVD #2). On **July 18, 2013** Investigator David Battle conducted surveillance and videotaped Ackley ride a bicycle from his residence to the Winn Dixie Shopping Plaza located at 1019 Federal Hwy in Deerfield Beach. Ackley is seen bouncing on the seat of the bicycle, reaching down to scratch his leg while riding, and riding with one hand on the handle bars. At one point he turns his torso in a twisting motion, all while pedaling the bike in inclement weather.

**On July 19, 2013** Investigator Battle conducted surveillance at the Ackley residence. Ackley is observed exiting his residence with a dog on a leash and he's carrying a skate board. Ackley gets on the skateboard and the dog pulls him around the corner of Ackley's residential block. On the other side of the block the surveillance camera captures Ackley stepping off and on the skateboard, walking along the roadside, bending down to pet the dog, then getting back on the skateboard as the dog pulls him toward his residence.

On **July 21, 2014** surveillance was conducted once again. The videotaped footage shows Ackley riding his bike from his residence while a woman walks along side him. While the two are walking/riding they appear to flag over a male who is also riding a bike. Both men get off their respective bikes and the woman hands the second man something from the bag she is carrying. The three of them start walking in the direction Ackley and the woman was headed. After a brief while Ackley mounts his bike, takes the bike the other male is walking, and guides that bike alongside the bike he is riding. When Ackley gets to a bus stop he picks up the bike he was guiding with his right hand to maneuver it up against a pole where he placed the bike he was riding. The second male leaves the area on foot, and Ackley and the female stay at the bus stop until the woman leaves on a bus. Ackley leaves the bus stop in the same manner he arrived; riding one bike and holding onto the second bike with his right hand guiding it down the street/sidewalk. Ackley continues in this manner from a bus stop to his residence. At his residence Ackley is seen picking up both bicycles, one under each arm, and carrying them to the rear of the house from the carport.

A short time later Ackley is videotaped pacing back and forth up and down the sidewalk and driveway in front of his residence, while speaking in the phone.

Later the same day Ackley is seen on the bicycle he steered to his house earlier. He appears to be testing the bike out as he mounts the bike and bounces up and down several times on the seat. While standing on the peddles he stretches his body back over the rear wheel while holding onto the handle bars. Ackley gets off the bike, adjusts the seat, then gets back on the bike. He rides in a couple of circles in front of his residence, and then rides the bike to the carport.

The same afternoon Ackley leaves his residence on his bike with a backpack on his back. He rides to the Circle K Store located at 4791 Dixie Hwy. Pompano Beach, FL. While enroute to the store Ackley is observed riding the bike over curbs, standing on the bike peddles in order to peddle faster. He continues standing and sitting alternately all the while peddling the bicycle.

3

BRCOSA000007

Once at the store Ackley takes the bike and flips it upside down resting it on its handle bars and seat, then enters the store. When he exists the store he flips the bike back over and maneuvers the bike from the front of the store while holding a drink. Ackley loiters in the area for the better part of an hour all the while standing and sitting, walking and bending, talking on the phone and stepping on and off the curb. At one point he is leaning back as he sits and when he sits back up he doesn't use his arms to assist in sitting up. He eventually gets back on his bike and after meeting with someone in a parking lot, rides his bike back to his residence.

On **November 19, 2013** Charles Ackley gave sworn testimony in West Palm Beach, FL (Exhibit #4). In his deposition Ackley was asked if, since the time of his first deposition, his physical limitations and condition had changed. He is asked if he can do anything other than lay down, as he stated in his first deposition. He replies he can't work; he's tried (Exhibit #4, pg. 99). He states he can't stand or sit for very long. He says that without a cane he can't stand for more than a few minutes (Exhibit #4, pg. 101). The question is posed; what can Mr. Ackley do on his best day, the days he's experiencing the least amount of limitations caused by his condition. His response is he can go to the store. But he can't walk (Exhibit #4, pg. 102). Ackley discusses how he has tried to regain some activities since the last deposition. He tried to walk his dog but he can't. He can however, stand on a skateboard and have his dog pull him (Exhibit #4, pg. 102 & 103). He says he tried to have his dog pull him a couple of times on the skateboard but it didn't work out. He is asked, "So your dog did not pull you?" He replies, "No, no it just didn't work." (Exhibit #4, pg. 104) Ackley is asked if he has tried riding a bicycle. He replies, "Yes, and it does not work-I can't. I can't do anything." (Exhibit #4, pg. 113)

On **October 21, 2014** Lt. Spirn and I responded to the Ackley residence. There we met with Charles Ackley and he agreed to speak with us. We covertly recorded our conversation (Exhibit #5). Mr. Ackley invited us to sit on his front porch with him.

Once Mr. Ackley understood the reason for our conversation he was asked what activities he is able to engage in since the incident. He states that he can barely work. When asked what kind of work, he stated making deliveries. But he can't even do that anymore.

When asked what his typical day is like Mr. Ackley stated that he gets up, the kids go off to school, his wife goes off to work, then he does whatever needs to be done around the house. He went on to say that his days are not very long. Sometimes he goes out sometimes he doesn't. He further stated, he can't really walk; if he walks for any period of time it really hurts.

When the investigators stated he must not be able to even bike around, he replied that it doesn't feel good; he can't do it for very long.

Mr. Ackley was asked if there had been any change in his physical abilities from the time he gave his first deposition to when he gave the second deposition. He stated there was no significant change. He stated he can ride a bike but when he does it's not for a very long period of time. There are days he says he has to be reminded that he got hurt. On those days he says he will jump on the skateboard and walk the dogs. Nothing has changed in his activity he just can't do anything for very long. As long as he's not using his leg, the lower abdominal muscle, he can physically do things, but he can't continually do them. Mr. Ackley stated everything he does is almost the same except he can't do it for very long and it hurts. Not all the time, not constant.

He stated he has good and bad days. The limitation is the pain. Everyday use of his leg is limited due to the pain. And the pain is not going to go away. The pain is not as acute as it was.

On **October 22, 2014** I was seeking further identifiers on Ackley for the SAO's presentation. While conducting various checks a local check on Ackley found that he has an active Broward

4

County Warrant for FTA, Traffic. This warrant was not entered in N/FCIC a day earlier when he had been interviewed.

The warrant information revealed that Ackley had been driving a vehicle and was stopped by the Coconut Creek Police Department on August 20, 2014. He was cited for driving with a suspended license, unlawful tag, and tag expired more than 10 months. During the interview with Ackley on October 21, 2014, he explained how as a result of the slip and fall he cannot drive a vehicle. He said the pain experienced by taking his foot off and on the gas and brake while driving, precludes him from being able to operate a vehicle.

While these misrepresentations are not material to those Ackley purported in his deposition for which charges are being filed, these misleading statements show an on-going course of deception perpetrated in the furtherance of Ackley's claim.

## CONCLUSION

Charles Ackley alleges he was injured in a trip and fall incident at a shopping plaza in Coral Springs, in September of 2012. In November of 2012 Mr. Ackley filed suit in Circuit Court in Broward County. Ackley was deposed in April of 2013. At his deposition Mr. Ackley claimed the trip and fall had significantly diminished his ability to do daily activities. He stated he can't do anything but sit and lay down. He goes on to say he cannot walk and had to sell his car to pay household bills.

National Fire Insurance of Hartford held the insurance policy for the property the slip and fall occurred on. In July of 2013 National Fire contracted with EMSI Investigative Services of Jacksonville, FL, to conduct surveillance to determine the activities and abilities of claimant Ackley. On July 18, 19, and 21, 2013 Charles Ackley was videotaped riding a bike as a means of transportation, riding a skateboard, and walking up and down the sidewalk and driveway in front of his residence. He is seen carrying bicycles, walking on and off a curb, sitting down on a curb, leaning back and sitting back up without the assistance of his arms, and getting up from a seated position. All these activities are performed with no outward sign of struggle.

In November of 2013 Charles Ackley gave sworn testimony in West Palm Beach, FL. During his deposition he was asked if the limitations to his physical activity have changed since his first deposition. Ackley stated they had not; he can't sit or stand for very long and he can't stand for very long without a cane. When asked if he has tried riding a bicycle, he stated he had tried and it doesn't work-he can't; he can't do anything.

On October 21, 2014 affiant interviewed Ackley. Ackley stated he can't really walk; if he walks for any period of time it really hurts. Ackley was asked if there had been any change in his physical abilities from the time he gave his first deposition to when he gave the second deposition. He stated there was no significant change. He stated he can ride a bike but when he does it's not for a very long period of time.

Based upon the above investigation, probable cause exists to believe that Charles Ackley committed insurance fraud by causing any written ($300,000.00 Demand Letter) or oral statement (Deposition) as part of, or in support of, a claim for payment (>$340,000.00) or other benefit pursuant to an insurance policy, knowing that such statements contained any false, incomplete, or misleading information concerning any fact or thing material to such claim; in Broward County, Florida in violation of F.S.S. 817.234 Insurance Fraud, a 1st Degree Felony.

BRCOSA000009

# WITNESS LIST

**Wendy Unger**
Detective
Division of Insurance Fraud
1400 W. Commercial Blvd. #135
Ft. Lauderdale, FL  33309
Wendy.Unger@myfloridacfo.com
Office: (954) 958-5445 / Cell:
*Lead investigator.*

**Stacey Spirn**
Lieutenant
Division of Insurance Fraud
1400W. Commercial Blvd. #135
Ft. Lauderdale, FL  33309
Stacey.Spirn@myfloridacfo.com
Office: (954) 958-5420   /   Cell:
*Can testify to statements made by Ackley during interview at his home-Exhibit #5*

**Andrew Bryant**
Law Enforcement Liaison
National Fire Insurance Company of Hartford
333 Wabash Ave.
Chicago, IL  60604
Andrew.Bryant@cna.com
Office: (312) 822-6337
*Provided claim file from CNA. Provided Statement of Loss and Business Record Certification Exhibit 6*

**David Battle**
Investigator
EMSI Investigative Services
9485 Regency Blvd.
Jacksonville, FL 32225
dbattle@icsmerrill.com
Office: (888) 932-7364 / Cell:
*Conducted surveillance on claimant and filed report to that effect. Provided copies of videos of surveillance and swore to copies of video provided under this cover, as true renditions of the events he recorded.*

6

# **EXHIBITS LIST**

**EXHIBIT #1** .............Copy of Complaint Filed in Florida Circuit Court

**EXHIBIT #2** .............Transcription of Ackley Deposition of April 25, 2013

**EXHIBIT #3** .............Confidential Investigative Summary of Private Investigator

**EXHIBIT #3A**...........DVD Video #1 of Surveillance from EMSI Investigative Services

**EXHIBIT #3B**...........DVD Video #2 of Surveillance from EMSI Investigative Services

**EXHIBIT #4** .............Transcription of Ackley Deposition of November 19, 2013

**EXHIBIT #5** .............Transcription of Ackley Interview with Police

**EXHIBIT #6** .............Claims File from National Fire Insurance Company

**EXHIBIT #6A**...........CD of Claim File, excerpt of claim files

BRCOSA000011

*DFS Division of Insurance Fraud*

## *ACISS Case Master Report  14-1480*

Date Initiated  09/08/2014

### Primary Information

| | |
|---|---|
| Department: | **DEPARTMENT OF FINANCIAL SERVICES** |
| Division: | **DIRECTOR OFFICE** |
| Region: | **SOUTH CENTRAL REGION** |
| Squad: | **PLANTATION SQUAD (RF)** |
| Lead LEO: | **Unger, Wendy (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud)** |
| Type Of Case: | **COMMERCIAL** |
| Case Sub Type: | **SLIP & FALL** |
| Case Description: | **Charles Ackley Comm/Slip & Fall *Palm Beach** |
| Case Priority: | **5.0** |
| Total Time: | **25:00** |

### Related Tips

| Tip Number | Tip Date | Occurred Date | Status | Description |
|---|---|---|---|---|
| T14-2547 | 02/28/2014 14:50 | 11/19/2013 00:00 | CLOSED - CASE INITIATED: | Charles Ackley Comm/Slip & Fall *Palm Beach |

### Case Status

| | |
|---|---|
| Case Status: | **OPEN PRESENTED** |
| Case Status Date: | **11/05/2014** |

### Restitution Data

| Type | Total Amount |
|---|---|
| **Investigative Costs Requested** | $952.22 |
| **Restitution Requested** | $39,485.07 |

BRCOSA000012

DFS Division of Insurance Fraud

## ACISS Case Origination Report  14-1480

Report Date:  09/08/2014

### Primary Information

| | |
|---|---|
| Report Number: | **14-1480** |
| Report Date: | **09/08/2014** |
| Type Of Report: | **Case Origination** |
| Description: | **Charles Ackley Comm/Slip & Fall *Palm Beach** |
| Occurence From: | **09/08/2014 00:00** |
| Occurence To: | **09/08/2014 00:00** |
| Source Of Info: | **Andrew Bryant** |
| Reporting LEO: | **Spirn, Stacey (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud)** |
| Approval Status: | **Approved** |
| Approved Date: | **09/08/2014** |
| Approved By: | **Spirn, Stacey (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud)** |

### Synopsis

From Tip T14-2547:
**Primary Information**

**Tip Number:: T14-2547**
**Occurred County:: PALM BEACH**
**Occurred Date::: 11/19/2013 12:00:00 AM**
**Fraud Type:: Commercial Insurance**

**Summary**

On September 24, 2012, claimant Charles Ackley allegedly tripped and fell over mailbox anchoring brackets in the concrete at the Pine Ridge Shopping Center at 4633 N. University Drive, Coral Springs, Florida.    Equity One Inc. ("insured") managed the Pine Ridge Shopping Center and was insured at the time under a general liability policy with National Fire Insurance Company of Hartford ("National Fire"), which is a CNA company.  Ackley has subsequently pursued a claim with National Fire in relation to his claimed injuries from the alleged trip and fall.

In pursuing his claim, Ackley gave sworn testimony on two occasions describing the extent of his injuries and his physical limitations.  National Insurance investigated Ackley's claims.   This investigation resulted significant video surveillance evidence of Ackley engaged in various physical activities in direct contradiction to his sworn testimony.

The sworn statements by Ackley contain apparent false, incomplete and misleading information concerning facts material to this claim.   Therefore, pursuant to Florida statute ? 626.989, or other applicable authority, National Fire is referring this matter to your agency for investigation, and referral for prosecution if warranted, of Charles Ackley for violations of Florida law.
Claim

On October 15, 2012, attorney Steven Phillips sent notice to Equity One, Inc. that he represented Charles Ackley regarding a claim for injuries resulting from an alleged trip and fall that occurred at the Pine Ridge Shopping Center at 4633 N. University Drive, Coral Springs, Florida on September 24, 2014.   In this correspondence, the claimant requested a copy of Equity One's insurance policy.

On November 7, 2012, Ackley filed suit against Equity One in the 17th Judicial Circuit of Florida (Broward County) under case number 12-31439.    Ackley alleges that on September 24, 2014 he tripped and fell over mailbox anchors that were in the walkway at the shopping center.  Ackley further alleges that he suffered permanent bodily injury as a result of this fall.  Ackley's complaint demands payment for damages in excess of $15,000.

In his subsequent depositions, Ackley testified to his inability to work or perform normal daily activities due extensive pain involving his chest, legs, upper body, and a hernia, stating "every aspect of my being is affected."  (Trans 4/25/13, p. 84)

BRCOSA000013

*DFS Division of Insurance Fraud*

### ACISS Case Origination Report  14-1480

Report Date:  09/08/2014

---

**Synopsis - Continued**

**Ackley First Deposition - April 25, 2013**

On April 25, 2013, Ackley gave sworn testimony during his deposition at 700 West Hillsboro Boulevard, Deerfield Beach, Florida (Broward County).   During this deposition, Ackley testified to his past and current medical conditions.   Ackley described how he had suffered a gunshot wound to the chest several years before this claim, and the subsequent medical problems resulting from the gunshot wound.

Ackley testified that before the September 24, 2013 incident, he was able to do some activities, despite ongoing medical conditions.  However, since the alleged trip and fall, his ability to perform daily activities was significantly reduced.  Ackley testified (p. 98):

Q.? ?And what about now?
A.? ?I can't do anything.
Q.? ?What do you do every day?
A.? ?Nothing, just nothing - sitting, nothing,?laying down.
Q.? ?You don't watch TV, you don't do anything with ?your kids, play games, you don't go out to dinner?
A.? ?I can't walk. We had to sell our car to pay?the bills.
April

**Surveillance**

**July 18, 2013**

On July 18, 2013, video taped surveillance was obtained of Ackley at and near his residence at 1182 SE 2nd Ave, Deerfield Beach, Florida.  At approximately 10:44 am, Ackley was observed leaving his residence on a bicycle, riding the bicycle without assistance.   Several minutes later, Ackley arrived on his bicycle at the Winn Dixie grocery store at 1019 South Federal Highway, in Deerfield Beach.   After exiting the grocery store, Ackley rode his bicycle out of the area and back to his residence.

**July 19, 2013**

On July 19, 2013 at approximately 8:58 am, Ackley exited his residence and brought a bicycle from the carport to the rear of his residence.   Ackley was also captured on video tape as he utilized a skateboard to ride with a dog on a leash around the neighborhood block before returning home.

**July 21, 2013 (AM)**

On July 21, 2013 at approximately 8:43 am, Ackley was video taped as he rode his bicycle.  Ackley left his residence on the bicycle, and he was accompanied by a woman who was on foot.  Ackley rode slowly while the woman walked beside him.  Ackley met with another male and engaged in what appeared to be the purchase of another bicycle.  After completing the apparent purchase, Ackley and female continued to a bus stop where the female entered a bus.  Ackley now had both bicycles.  Ackley rode back to his residence on his bicycle, holding the handle bars of the second bicycle at his side and steering both bicycles as he peddled.

During this surveillance on July 21, 2013, Ackley lifted both bicycles off the ground and carried them at the same time, carrying each bicycle in a separate hand.

**July 21, 2013 (PM)**

On July 21, 2013 at approximately 12:20 pm, video taped surveillance captured Ackley as he rode his bicycle away from his residence traveling to the Circle K store at 4791 Dixie Highway, Pompano Beach (approximately 1.3 miles distance).   Ackley was wearing a backpack during this trip.   At the store, Ackley lifted the bike to turn it upside down.

After exiting the store, Ackley brought the bike down and moved it to the side of the store.   After meeting briefly with an unknown individual, Ackley returned to residence, riding his bike.

**Ackley Second Deposition ? November 19, 2013**

BRCOSA000014

*DFS Division of Insurance Fraud*

## ACISS Case Origination Report  14-1480

Report Date:  09/08/2014

---

**Synopsis - Continued**

On November 18, 2013, Ackley gave sworn testimony during his second deposition at 324 North Lakeside Court, West Palm Beach, Florida (Palm Beach County).    During this second deposition, Ackley was asked about his limitations and daily activities since the first deposition of April 25, 2013.

Ackley testified that he was still not working, stating "I will never work again." (p. 94).    Ackley described how his condition has not improved and he was still suffering pain as a result of the accident.

In discussing his daily activities, Ackley was asked about his dog pulling him on a skateboard.   Ackley testified that he tried this because it is easier to stand in one spot than to walk due to his pain that is excruciating on bad days (p. 105).    Despite video taped evidence of Ackley going around the block with the dog while on the skateboard, Ackley testified that he performed this activity for just "10 or 20 feet" (p. 104).

Ackley testified that he has not been able to do arm curls since the accident (p. 111).  However, Ackley clearly curls his arms to carry two bicycles at the same time on July 21, 2013.

When asked if he has done any kind of exercise, Ackley testified, "I can't" (p. 117), despite the above evidence of bicycle riding.

Finally, Ackley was asked directly about riding a bicycle (p. 113):

    Q:   Have you tried riding a bike?
    A:   Yes, and it does not ? I can't.  I can't do anything.
    Q.   Have you tried riding a bike.
    A.   I do not recall.  I do not recall if I did or if I didn't.

This evolving and changing response to the question about riding a bike shows a continuing intent to provide false, incomplete and misleading information.

Florida Statutes

? 817.234  False and fraudulent insurance claims
(1)(a) A person commits insurance fraud punishable as provided in subsection (11) if that person, with the intent to injure, defraud, or deceive any insurer:
1. Presents or causes to be presented any written or oral statement as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy or a health maintenance organization subscriber or provider contract, knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim.

Loss to National Fire

To date, National Fire has incurred $28,712.34 in losses due to out-of-pocket expenses in investigating and defending this claim.

Attachments

To assist in your review, the following documents are attached to this submission:

    1.   Surveillance report of July 23, 2013
    2.   Deposition transcript of November 19, 2013

Summary

The evidence in this matter shows the Charles Ackley provided apparent false, incomplete and misleading material information in support of his claim.  When given the opportunity to provide truthful and complete testimony, Ackley failed to do so, in suspected violation of Florida Insurance Fraud law.

Therefore, National Fire is submitting this matter to your agency for investigation and referral for prosecution as warranted. Please feel free to contact me directly to discuss this matter or to request materials from our claim files.

---

BRCOSA000015

*DFS Division of Insurance Fraud*

### ACISS Case Origination Report  14-1480

Report Date:  09/08/2014

---

**Synopsis - Continued**

Sincerely,

Andrew B. Bryant, JD
Law Enforcement Liaison
Special Investigations Unit at CNA

**Reporting Individual Information**

Victim/Witness Type:: SIU/Insurance Company
Victim/Witness Name:: Bryant, Andrew
Business Name:: CNA Insurance
Office Telephone:: 3128226337
Cell:: 7085288770
E-Mail Address: andrew.bryant@cna.com
Mailing Address:: 333 S. Wabash Ave
: Chicago, IL 60604
Preferred Contact Type:: Email
Preferred Contact Time:: 9-5

**Suspect - Person Believed to Have Committed Fraud**

Suspect Name:: Ackley, Charles
SSN::
DOB:: 04/24/1962
Mailing Address:: 1182 SE 2ND AVE
: DEERFIELD BEACH, FL 33441
Claiming Injury?: Y
Suspect Involvement?: Alleges trip/fall on insured property

**Claim Information**

Have any payments been made on this claim:: N
Policy Number:: 5082680450
Claim Number:: E2906093
Date of Lost/Injury:: 9/24/2012 12:00:00 AM
Date of Suspected Fraudulent Activity, if different than Date of Loss:: 11/19/2013
Total Amount Paid:: 0
Total Claim or Loss Exposure?:: 55,000
Was Initial Claim Recorded?:: N
Name of Adjuster:: Virginia Fisher
Adjuster Contact Number:: 404-531-3411
Street Address of Location Loss:: 4633 N. University Dr.
: Coral Springs, FL 33067
County of Loss:: BROWARD

**Insurance Carrier**

Insurance Carrier: CNA
Carrier (Mailing Address): 333 S, Wabash
Carrier (City): Chicago
Carrier (State): IL

---

BRCOSA000016

*DFS Division of Insurance Fraud*

## ACISS Case Origination Report  14-1480

Report Date:  09/08/2014

---

**Synopsis - Continued**

Carrier (Zip): 60604

**Nature of Suspected Fraudulent Activity**
Nature of Fraud: Faked/Exaggerated Loss

**Information Developed to Confirm Suspicion**

Information Developed: Deposition/Sworn Testimony; Video Surveillance;

**Insured Information**

Business Name: Equity One Inc
Business FEIN/License Number:
Last Name: De Antoni
First Name: Alexandra
Office Telephone: (786) 528-1457
Fax Telephone:
E-Mail Address: abeantoni@equityone.net
Mailing Address:

**Supporting Evidence**

List: Claimant gave sworn testimony in two depositions on April 25, 2013 and November 19, 2013. Ackley denied or concealed ability to perform various physical activities including riding a bike. (See attached detailed summary)
Documents: Deposition transcripts.
Supporting Evidence: Video surveillance (see attached detailed summary

**********************************
DETAILED CLAIM INFO FROM ISO CLAIM REPORT:

Record Type: Property/Casualty Claim        ISO File Number: 0H003272435
   Date of Loss: 09/24/2012 12:01
   Type of Policy: Commercial Liability General
Location of Loss: PINE RIDGE SQUARE
            4633 N UNIVERSITY DRIVE
            : CORAL SPRINGS, FL 33067-460
Loss Description: MCU.  CLMT TRIPPED OVER BRACKETS LEFT FROM REMOVAL
   ISO Received: 10/18/2012
Insurer Received: 10/17/2012
      Company: CONTINENTAL CASUALTY CO (CNA INS GRP)
      Contact: FISHER,VIRGINIA - (404) 531-3411
      Address: 333 S WABASH AVE
            : CHICAGO, IL 60604
   Claim Number: E29060931
   Policy Number: GL5082680450
Inception Date: 12/31/2011
Expiration Date: 12/31/2012
   Involved Party: Claimant
-->      Name: ACKLEY,CHARLES
      Address: 1182 SE 2ND AVE

BRCOSA000017

DFS Division of Insurance Fraud

## ACISS Case Origination Report  14-1480

Report Date:  09/08/2014

**Synopsis - Continued**

: DEERFIELD BEACH, FL 33441-680
    DOB: 04/24/1962
    Gender: Male
Injury/Damage: NOT IDENTIFIED
Coverage/Loss: Liability / Bodily Injury
    : (OPEN)
    Contact: FISHER,VIRGINIA - (404) 531-3411

    SSN:      (SSN ISSUED    FL/1977-1977)
    *** More matches on this SSN outside this report ***
Involved Party: Insured
    Name: EQUITY ONE INC
    Address: 1600 NE MIAMI GARDENS DR
    : NORTH MIAMI, FL 33179-490

City: North Miami Beach
State: FL
ZIP Code: 33179

Claimant Information

Last Name or Unknown: Ackley
First Name or Unknown: Charles
Middle Name:
SSN:
DOB: 04/24/1962
Mailing Address: 1182 SE 2nd Ave
City: Deerfield Beach
State: FL
ZIP Code: 33441

******************************
DETAILED CLAIM INFO FROM ISO CLAIM REPORT:

    Record Type: Property/Casualty Claim    ISO File Number: 0H003272435
    Date of Loss: 09/24/2012 12:01
    Type of Policy: Commercial Liability General
Location of Loss: PINE RIDGE SQUARE
        4633 N UNIVERSITY DRIVE
    : CORAL SPRINGS, FL 33067-460
Loss Description: MCU.  CLMT TRIPPED OVER BRACKETS LEFT FROM REMOVAL
    ISO Received: 10/18/2012
Insurer Received: 10/17/2012
        Company: CONTINENTAL CASUALTY CO (CNA INS GRP)
        Contact: FISHER,VIRGINIA - (404) 531-3411
        Address: 333 S WABASH AVE
        : CHICAGO, IL 60604
    Claim Number: E29060931
    Policy Number: GL5082680450
    Inception Date: 12/31/2011
    Expiration Date: 12/31/2012
    Involved Party: Claimant
-->    Name: ACKLEY,CHARLES
        Address: 1182 SE 2ND AVE

BRCOSA000018

*DFS Division of Insurance Fraud*

## ACISS Case Origination Report  14-1480

Report Date:  09/08/2014

---

**Synopsis - Continued**

```
        : DEERFIELD BEACH, FL 33441-680
        DOB: 04/24/1962
      Gender: Male
Injury/Damage: NOT IDENTIFIED
Coverage/Loss: Liability / Bodily Injury
        : (OPEN)
      Contact: FISHER,VIRGINIA - (404) 531-3411

        SSN:              (SSN ISSUED    FL/1977-1977)
        *** More matches on this SSN outside this report ***
Involved Party: Insured
      Name: EQUITY ONE INC
      Address: 1600 NE MIAMI GARDENS DR
        : NORTH MIAMI, FL 33179-490
```

---

**Subject #1 - LOCATION OF EVENT #1 - Pine Ridge Shopping Center**

*Primary Information*

| | |
|---|---|
| Record Type: | **BUSINESS** |
| Subject Name: | **Pine Ridge Shopping Center** |
| Juvenile: | **No** |

*Related Addresses*

| Address | Relationship |
|---|---|
| 4633 N University Dr,  Coral Springs,  FLORIDA , USA | PERMANENT |

---

**Subject #2 - SUBJECT #1 - EQUITY ONE INC**

*Primary Information*

| | |
|---|---|
| Record Type: | **BUSINESS** |
| Subject Name: | **EQUITY ONE INC** |
| Juvenile: | **No** |

*Related Addresses*

| Address | Relationship |
|---|---|
| 3577 Lake Emma Rd,  LAKE MARY,  FLORIDA 32746 , USA | PERMANENT |

---

**Subject #3 - COMPLAINANT #1 - CNA Ins (Valley Forge Ins Company)**

*Primary Information*

| | |
|---|---|
| Record Type: | **DFS INSURANCE COMPANY NAME** |
| Subject Name: | **CNA Ins (Valley Forge Ins Company)** |
| Juvenile: | **No** |

---

**Subject #4 - SUBJECT #1 - NATIONAL FIRE INSURANCE COMPANY OF HARTFORD**

*Primary Information*

| | |
|---|---|
| Record Type: | **DFS INSURANCE COMPANY NAME** |
| Subject Name: | **NATIONAL FIRE INSURANCE COMPANY OF HARTFORD** |

---

BRCOSA000019

*DFS Division of Insurance Fraud*

## ACISS Case Origination Report  14-1480

Report Date:  09/08/2014

---

### Subject #4 - SUBJECT #1 - NATIONAL FIRE INSURANCE COMPANY OF HARTFORD - Continued

**Primary Information - Continued**

| | |
|---|---|
| Juvenile: | No |

---

### Subject #5 - SUSPECT #1 - Ackley, Charles

**Primary Information**

| | |
|---|---|
| Race: | UNKNOWN |
| Record Type: | PERSON |
| Subject Name: | Ackley, Charles |
| Sex: | MALE |
| Birth Date: | 04/24/1962 |
| Age: | 52 YEAR(S) |
| Juvenile: | No |

**Related Addresses**

| Address | Relationship |
|---|---|
| 822 NW 67th Ave,  Plantation,  FLORIDA 33317 , USA | Home Address |

---

### Record Status Information

| | |
|---|---|
| Record Origination Operator: | Spirn, Stacey (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud) |
| Record Origination Date: | 09/08/2014 10:41 |
| Last Update Operator: | Spirn, Stacey (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud) |
| Last Update Date: | 09/08/2014 10:42 |

---

| Reporting LEO | Date | Supervisor | Date |
|---|---|---|---|
| Spirn, Stacey (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud) | | Spirn, Stacey (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud) | 11/3/2014 |
| | | | |

ACISS software licensed by DFS Division of Insurance Fraud

BRCOSA000020

*DFS Division of Insurance Fraud*

## ACISS Investigative Supplement Report  14-1480/1

Report Date:  10/10/2014

### Primary Information

| | |
|---|---|
| Report Number: | **14-1480/1** |
| Report Date: | **10/10/2014** |
| Type Of Report: | **Investigative Supplement** |
| Description: | **Claim File** |
| Occurence From: | **10/10/2014 00:00** |
| Occurence To: | **10/10/2014 00:00** |
| Reporting LEO: | **Unger, Wendy (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud)** |
| Approval Status: | **Approved** |
| Approved Date: | **10/16/2014** |
| Approved By: | **Spirn, Stacey (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud)** |

### Narrative

Attached is a copy of the claim file regarding claimant Charles Ackley. Ackley is alleging that on September 24, 2012 he tripped and fell over a mailbox anchoring in the Pine Ridge Shopping Center at 4633 N. University Drive, Coral Springs, FL. Ackley is claiming injury due to the negligence of the management company, Equity One. Claim file was received from Andrew Bryant, SIU Law Enforcement Liaison for CNA-the parent company of National Fire Insurance Company of Hartford; the general liability carrier for the shopping plaza.

On November 7, 2012 Ackley filed suit against Equity One in the 17th Judicial Circuit of Florida and has been deposed regarding his lawsuit. The insurance company has conducted surveillance on the claimant, on different occasions. The Insurance provider is denying claim based on the surveillance and asserts that Mr. Ackley has provided false, incomplete and misleading material information in support of his claim.

### Record Status Information

| | |
|---|---|
| Record Origination Operator: | **Unger, Wendy (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud)** |
| Record Origination Date: | **10/10/2014 15:22** |
| Last Update Operator: | **Spirn, Stacey (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud)** |
| Last Update Date: | **10/16/2014 10:19** |

| Reporting LEO | Date | Supervisor | Date |
|---|---|---|---|
| Unger, Wendy (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud) | | Spirn, Stacey (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud) | 11/3/2014 |
| | | | |

BRCOSA000021

*DFS Division of Insurance Fraud*

## ACISS Investigative Supplement Report  14-1480/2

Report Date:  10/22/2014

### Primary Information

| | |
|---|---|
| Report Number: | **14-1480/2** |
| Report Date: | **10/22/2014** |
| Type Of Report: | **Investigative Supplement** |
| Description: | **Interview and Transcription Request** |
| Occurence From: | **10/22/2014 00:00** |
| Occurence To: | **10/22/2014 00:00** |
| Reporting LEO: | **Unger, Wendy (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud)** |
| Approval Status: | **Approved** |
| Approved Date: | **10/24/2014** |
| Approved By: | **Spirn, Stacey (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud)** |

### Subject #1 - SUSPECT #1 - Ackley, Charles

*Primary Information*

| | |
|---|---|
| Race: | **UNKNOWN** |
| Record Type: | **PERSON** |
| Subject Name: | **Ackley, Charles** |
| Sex: | **MALE** |
| Birth Date: | **04/24/1962** |
| Age: | **52 YEAR(S)** |
| Juvenile: | **No** |

*Related Addresses*

| Address | Relationship |
|---|---|
| **822 NW 67th Ave,  Plantation,  FLORIDA 33317 , USA** | Home Address |

### Narrative

**10/21/2014**    Lt. Spirn and I responded to the Ackley residence where we met with Charles Ackley. He agreed to speak with us and we covertly recorded the conversation. Ackley made no statements that would exonerate him from his misrepresentations regarding his second deposition. He did not waiver from his insistence that the slip and fall incident was responsible for the further diminishment of his ability to work and do day-to-day activities (he was receiving SSI disability prior to the incident, according to Mr. Ackley).

   Transcription request was generated for the conversation and the presentation for the case was initiated. Case to be presented in Palm Beach County to ASA Ryan Kelley.

BRCOSA000022

*DFS Division of Insurance Fraud*

## ACISS Investigative Supplement Report 14-1480/2

Report Date: 10/22/2014

| Record Status Information | |
|---|---|
| Record Origination Operator: | Unger, Wendy (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud) |
| Record Origination Date: | 10/22/2014 09:14 |
| Last Update Operator: | Spirn, Stacey (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud) |
| Last Update Date: | 10/24/2014 13:47 |

| Reporting LEO | Date | Supervisor | Date |
|---|---|---|---|
| Unger, Wendy (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud) | | Spirn, Stacey (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud) | 11/3/2014 |
| | | | |

BRCOSA000023

*DFS Division of Insurance Fraud*

## ACISS Investigative Supplement Report  14-1480/3

Report Date:  10/23/2014

### Primary Information

| | |
|---|---|
| Report Number: | **14-1480/3** |
| Report Date: | **10/23/2014** |
| Type Of Report: | **Investigative Supplement** |
| Description: | **Review of video, report, affidavit, with PI** |
| Occurence From: | **10/22/2014 00:00** |
| Occurence To: | **10/22/2014 00:00** |
| Reporting LEO: | **Unger, Wendy (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud)** |
| Approval Status: | **Approved** |
| Approved Date: | **10/24/2014** |
| Approved By: | **Spirn, Stacey (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud)** |

### Subject #1 - INVESTIGATOR #1 - Battle, David

*Primary Information*

| | |
|---|---|
| Race: | **WHITE** |
| Record Type: | **PERSON** |
| Subject Name: | **Battle, David** |
| Sex: | **MALE** |
| Juvenile: | **No** |

*Employment Information*

| | |
|---|---|
| Employed: | **Yes** |
| Occupation: | **Field Investigator** |

### Narrative

On October 22, 2014 Private Investigator David Battle responded to the DIF office at 1400 W. Commercial Blvd. Ft. Lauderdale. Mr. Battle is employed by EMSI Investigative Services out of Jacksonville, FL. EMSI was contracted by National Fire Insurance Company to do an investigation on claimant Charles Ackley. On July 18, 19 and 21, 2013 Mr. Battle conducted surveillance on Charles Ackley at his residence in Deerfield Beach, FL. Video was recorded on all three days and Mr. Battle submitted the videotapes and a Confidential Investigative Report to his company reflecting the results of the surveillance. Mr. Battle responded to the DIF office to view the video and report I had received from National Fire in the claim file for this case.

I played the two DVD's I received in the claim file and Mr. Battle stated they were his work product. I showed Mr. Battle a copy of the Confidential Investigative Report I had received in the claim file with ICS his company's letterhead and he replied he had produced the report. Mr. Battle signed an affidavit to that affect.

Attached to this report are the signed affidavit and a timeline delineating the events of this case; presentation preparation is under way.

### Record Status Information

| | |
|---|---|
| Record Origination Operator: | **Unger, Wendy (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud)** |
| Record Origination Date: | **10/23/2014 08:07** |
| Last Update Operator: | **Spirn, Stacey (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud)** |
| Last Update Date: | **10/24/2014 13:49** |

BRCOSA000024

*DFS Division of Insurance Fraud*

## ACISS Investigative Supplement Report  14-1480/3

Report Date:  10/23/2014

| Reporting LEO | Date | Supervisor | Date |
|---|---|---|---|
| Unger, Wendy (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud) | | Spirn, Stacey (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud) | 11/3/2014 |
| | | | |

BRCOSA000025

*DFS Division of Insurance Fraud*

## ACISS Investigative Supplement Report  14-1480/4

Report Date:  10/27/2014

### Primary Information

| | |
|---|---|
| Report Number: | **14-1480/4** |
| Report Date: | **10/27/2014** |
| Type Of Report: | **Investigative Supplement** |
| Description: | **Background invest, warrant check, report** |
| Occurence From: | **10/22/2014 00:00** |
| Occurence To: | **10/22/2014 00:00** |
| Reporting LEO: | **Unger, Wendy (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud)** |
| Approval Status: | **Approved** |
| Approved Date: | **10/27/2014** |
| Approved By: | **Spirn, Stacey (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud)** |

### Subject #1 - SUSPECT #1 - Ackley, Charles

*Primary Information*

| | |
|---|---|
| Race: | **UNKNOWN** |
| Record Type: | **PERSON** |
| Subject Name: | **Ackley, Charles** |
| Sex: | **MALE** |
| Birth Date: | **04/24/1962** |
| Age: | **52 YEAR(S)** |
| Juvenile: | **No** |

*Related Addresses*

| Address | Relationship |
|---|---|
| 822 NW 67th Ave,  Plantation,  FLORIDA 33317 , USA | Home Address |

### Narrative

On October 21, 2014 Lt. Spirn and I responded to Charles Ackley's residence in Deerfield Beach. Prior to the interview an N/FCIC check was conducted on Ackley. Ackley has a criminal history and is a convicted felon. There was however, no wants or warrants for Ackley in N/FCIC.

On October 22, 2014 I requested an analyst assist as Ackley's license has been suspended for over a decade and I was seeking further identifiers for the SAO's presentation. While conducting various checks, Analyst Bonita Taitt ran a local check on Ackley and found that he had an active Broward County Warrant for FTA, Traffic. This warrant was not entered in N/FCIC the previous day.

The warrant information revealed that Ackley had been driving and was stopped by the Coconut Creek Police Department on August 20, 2014. He was cited for driving with a suspended license, unlawful tag, and tag expired more than 10 months. During the interview with Ackley on October 21, 2014, Ackley explained how as a result of the slip and fall he cannot drive a vehicle. He said the pain experienced by taking his foot off and on the gas and brake while driving, precludes him from being able to operate a vehicle. There was a minivan in the driveway of the residence when Lt. Spirn and I were there. I asked Ackley specifically if he drove the vehicle in his driveway. He stated that vehicle had not moved in months.

While these misrepresentations and misleading answers are not material to those Ackley purported in his deposition for which charges are being filed, these statements show an on-going course of deception perpetrated by Ackley in the furtherance of his claim.

BRCOSA000026

*DFS Division of Insurance Fraud*

## ACISS Investigative Supplement Report 14-1480/4

Report Date: 10/27/2014

| Record Status Information | |
|---|---|
| Record Origination Operator: | Unger, Wendy (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud) |
| Record Origination Date: | 10/27/2014 07:45 |
| Last Update Operator: | Spirn, Stacey (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud) |
| Last Update Date: | 10/27/2014 11:08 |

| Reporting LEO | Date | Supervisor | Date |
|---|---|---|---|
| Unger, Wendy (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud) | | Spirn, Stacey (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud) | 11/3/2014 |
| | . | | |

BRCOSA000027

*DFS Division of Insurance Fraud*

### ACISS Supervisory Presentation Review Report  14-1480/5

Report Date:  10/31/2014

---

**Primary Information**

| | |
|---|---|
| Report Number: | **14-1480/5** |
| Report Date: | **10/31/2014** |
| Type Of Report: | **Supervisory Presentation Review** |
| Description: | **Supervisor Review - Ackley** |
| Occurence From: | **10/31/2014 00:00** |
| Occurence To: | **10/31/2014 00:00** |
| Reporting LEO: | **Spirn, Stacey (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud)** |
| Approval Status: | **Approved** |
| Approved Date: | **10/31/2014** |
| Approved By: | **Spirn, Stacey (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud)** |

---

**Narrative**

**Supervisory Presentation Review Check List**

1. Is there a crime?                                      X    YES

2. Did the crime occur within the statute of limitations?           X     YES

3. Is there jurisdiction?                                  X    YES

4. Are exhibits relevant?                                 X    YES

5. Is there sufficient probable cause?                       X    YES

6. Were all applicable statements taken?                     X    YES

7. Is the case properly documented in ACISS?                  X    YES

8. Were all relevant exhibits/documents reviewed?              X    YES

9. Does supervisor approve the PC Affidavit or case summary?        X    YES

Comments:

---

**Record Status Information**

| | |
|---|---|
| Record Origination Operator: | **Spirn, Stacey (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud)** |
| Record Origination Date: | **10/31/2014 14:02** |
| Last Update Operator: | **Spirn, Stacey (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud)** |
| Last Update Date: | **10/31/2014 14:04** |

---

| Reporting LEO | Date | Supervisor | Date |
|---|---|---|---|
| Spirn, Stacey (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud) | | Spirn, Stacey (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud) | 11/3/2014 |
| | | | |

---

BRCOSA000028

*DFS Division of Insurance Fraud*

## *ACISS Presentation Report  14-1480/6*

Report Date:  11/03/2014

### Primary Information

| | |
|---|---|
| Report Number: | **14-1480/6** |
| Report Date: | **11/03/2014** |
| Type Of Report: | **Presentation** |
| Description: | **Charles Ackley presented in*Palm Beach County for Commercial Fraud** |
| Occurence From: | **11/03/2014 00:00** |
| Occurence To: | **11/03/2014 00:00** |
| Reporting LEO: | **Unger, Wendy (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud)** |
| Approval Status: | **Approved** |
| Approved Date: | **11/03/2014** |
| Approved By: | **Spirn, Stacey (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud)** |

### Synopsis

On November 5, 2014, the investigative summary was presented to ASA Ryan Kelley in Palm Beach County for prosecution.

### Subject #1 - SUSPECT #1 - Ackley, Charles

*Primary Information*

| | |
|---|---|
| Race: | **UNKNOWN** |
| Record Type: | **PERSON** |
| Subject Name: | **Ackley, Charles** |
| Sex: | **MALE** |
| Birth Date: | **04/24/1962** |
| Age: | **52 YEAR(S)** |
| Juvenile: | **No** |

*Related Addresses*

| Address | Relationship |
|---|---|
| 822 NW 67th Ave,  Plantation,  FLORIDA 33317 , USA | Home Address |

### Restitution Data

| Type | Amount | Date | Court |
|---|---|---|---|
| **Investigative Costs Requested** | 952.22 | 11/03/2014 | FIFTEENTH JUDICIAL CIRCUIT |
| **Restitution Requested** | 39485.07 | 11/03/2014 | FIFTEENTH JUDICIAL CIRCUIT |

### Record Status Information

| | |
|---|---|
| Record Origination Operator: | **Unger, Wendy (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud)** |
| Record Origination Date: | **11/03/2014 08:05** |
| Last Update Operator: | **Spirn, Stacey (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud)** |
| Last Update Date: | **11/03/2014 10:40** |

BRCOSA000029

*DFS Division of Insurance Fraud*

## ACISS Presentation Report  14-1480/6

Report Date:  11/03/2014

| Reporting LEO | Date | Supervisor | Date |
|---|---|---|---|
| Unger, Wendy (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud) | | Spirn, Stacey (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud) | 11/3/2014 |
| | | | |

BRCOSA000030

*DFS Division of Insurance Fraud*

## ACISS Investigative Supplement Report  14-1480/7

Report Date:  11/03/2014

### Primary Information

| | |
|---|---|
| Report Number: | **14-1480/7** |
| Report Date: | **11/03/2014** |
| Type Of Report: | **Investigative Supplement** |
| Description: | **transcription of Ackley interview with DIF** |
| Occurence From: | **10/21/2014 00:00** |
| Occurence To: | **10/21/2014 00:00** |
| Reporting LEO: | **Unger, Wendy (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud)** |
| Approval Status: | **Pending** |

### Subject #1 - SUSPECT #1 - Ackley, Charles

*Primary Information*

| | |
|---|---|
| Race: | **UNKNOWN** |
| Record Type: | **PERSON** |
| Subject Name: | **Ackley, Charles** |
| Sex: | **MALE** |
| Birth Date: | **04/24/1962** |
| Age: | **52 YEAR(S)** |
| Juvenile: | **No** |

*Related Addresses*

| Address | Relationship |
|---|---|
| 822 NW 67th Ave,  Plantation,  FLORIDA 33317 , USA | Home Address |

### Narrative

Responded to APEX transcriptions to pick up the Ackley interview from October 21, 2014. Report was scanned and attached to ACISS.

### Record Status Information

| | |
|---|---|
| Record Origination Operator: | **Unger, Wendy (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud)** |
| Record Origination Date: | **11/03/2014 11:06** |
| Last Update Operator: | **Unger, Wendy (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud)** |
| Last Update Date: | **11/03/2014 11:15** |

| Reporting LEO | Date | Supervisor | Date |
|---|---|---|---|
| Unger, Wendy (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud) | | Spirn, Stacey (DFS / PLANTATION SQUAD (RF) / DFS Division of Insurance Fraud) | 11/3/2014 |
| | | | |

BRCOSA000031

*DFS Division of Insurance Fraud*

## ACISS Tip Information  T14-2547

Entry Date:  02/28/2014 14:50

### Primary Information

| | |
|---|---|
| Tip Number: | T14-2547 |
| Tip or Task: | TIP |
| Entry Date: | 02/28/2014 14:50 |
| Call Taker: | FORM, WEB (DFS / ADMINISTRATIVE UNIT / DFS Division of Insurance Fraud) |
| Brief Description: | Charles Ackley Comm/Slip & Fall *Palm Beach |
| Reporters Name: | Andrew Bryant |
| Reporters Business Phone: | (312) 822-6337 |
| Reporters Address: | 333 S. Wabash Ave, Chicago, IL  60604 |
| Occurred Date: | 11/19/2013 00:00 |
| Tip Source: | Insurance Company |
| Tip Class: | PALM BEACH |
| Tip Type: | COMMERCIAL |
| Tip Sub-Type: | SLIP & FALL |
| Tip Status: | CLOSED - CASE INITIATED: |
| Tip Status Date: | 09/08/2014 00:00 |
| Related Case: | 14-1480 |

### Tip Information

#### Primary Information

**Tip Number:: T14-2547**
**Occurred County:: PALM BEACH**
**Occurred Date::: 11/19/2013 12:00:00 AM**
**Fraud Type:: Commercial Insurance**

**Summary**

On September 24, 2012, claimant Charles Ackley allegedly tripped and fell over mailbox anchoring brackets in the concrete at the Pine Ridge Shopping Center at 4633 N. University Drive, Coral Springs, Florida.   Equity One Inc. ("insured") managed the Pine Ridge Shopping Center and was insured at the time under a general liability policy with National Fire Insurance Company of Hartford ("National Fire"), which is a CNA company.  Ackley has subsequently pursued a claim with National Fire in relation to his claimed injuries from the alleged trip and fall.

In pursuing his claim, Ackley gave sworn testimony on two occasions describing the extent of his injuries and his physical limitations.   National Insurance investigated Ackley's claims.   This investigation resulted significant video surveillance evidence of Ackley engaged in various physical activities in direct contradiction to his sworn testimony.

The sworn statements by Ackley contain apparent false, incomplete and misleading information concerning facts material to this claim.   Therefore, pursuant to Florida statute ? 626.989, or other applicable authority, National Fire is referring this matter to your agency for investigation, and referral for prosecution if warranted, of Charles Ackley for violations of Florida law.
Claim

On October 15, 2012, attorney Steven Phillips sent notice to Equity One, Inc. that he represented Charles Ackley regarding a claim for injuries resulting from an alleged trip and fall that occurred at the Pine Ridge Shopping Center at 4633 N. University Drive, Coral Springs, Florida on September 24, 2014.   In this correspondence, the claimant requested a copy of Equity One's insurance policy.

On November 7, 2012, Ackley filed suit against Equity One in the 17th Judicial Circuit of Florida (Broward County) under case number

BRCOSA000032

*DFS Division of Insurance Fraud*

## ACISS Tip Information  T14-2547

Entry Date:  02/28/2014 14:50

---

**Tip Information - Continued**

12-31439.    Ackley alleges that on September 24, 2014 he tripped and fell over mailbox anchors that were in the walkway at the shopping center.  Ackley further alleges that he suffered permanent bodily injury as a result of this fall.   Ackley's complaint demands payment for damages in excess of $15,000.

In his subsequent depositions, Ackley testified to his inability to work or perform normal daily activities due extensive pain involving his chest, legs, upper body, and a hernia, stating "every aspect of my being is affected." (Trans 4/25/13, p. 84)

Ackley First Deposition - April 25, 2013

On April 25, 2013, Ackley gave sworn testimony during his deposition at 700 West Hillsboro Boulevard, Deerfield Beach, Florida (Broward County).   During this deposition, Ackley testified to his past and current medical conditions.   Ackley described how he had suffered a gunshot wound to the chest several years before this claim, and the subsequent medical problems resulting from the gunshot wound.

Ackley testified that before the September 24, 2013 incident, he was able to do some activities, despite ongoing medical conditions.  However, since the alleged trip and fall, his ability to perform daily activities was significantly reduced.  Ackley testified (p. 98):

Q.? ?And what about now?
A.? ?I can't do anything.
Q.? ?What do you do every day?
A.? ?Nothing, just nothing - sitting, nothing,?laying down.
Q.? ?You don't watch TV, you don't do anything with ?your kids, play games, you don't go out to dinner?
A.? ?I can't walk. We had to sell our car to pay?the bills.
April

Surveillance

July 18, 2013

On July 18, 2013, video taped surveillance was obtained of Ackley at and near his residence at 1182 SE 2nd Ave, Deerfield Beach, Florida.   At approximately 10:44 am, Ackley was observed leaving his residence on a bicycle, riding the bicycle without assistance.  Several minutes later, Ackley arrived on his bicycle at the Winn Dixie grocery store at 1019 South Federal Highway, in Deerfield Beach.  After exiting the grocery store, Ackley rode his bicycle out of the area and back to his residence.

July 19, 2013

On July 19, 2013 at approximately 8:58 am, Ackley exited his residence and brought a bicycle from the carport to the rear of his residence.  Ackley was also captured on video tape as he utilized a skateboard to ride with a dog on a leash around the neighborhood block before returning home.

July 21, 2013 (AM)

On July 21, 2013 at approximately 8:43 am, Ackley was video taped as he rode his bicycle.  Ackley left his residence on the bicycle, and he was accompanied by a woman who was on foot.  Ackley rode slowly while the woman walked beside him.  Ackley met with another male and engaged in what appeared to be the purchase of another bicycle.  After completing the apparent purchase, Ackley and female continued to a bus stop where the female entered a bus.  Ackley now had both bicycles.  Ackley rode back to his residence on his bicycle, holding the handle bars of the second bicycle at his side and steering both bicycles as he peddled.

During this surveillance on July 21, 2013, Ackley lifted both bicycles off the ground and carried them at the same time, carrying each bicycle in a separate hand.

July 21, 2013 (PM)

On July 21, 2013 at approximately 12:20 pm, video taped surveillance captured Ackley as he rode his bicycle away from his residence traveling to the Circle K store at 4791 Dixie Highway, Pompano Beach (approximately 1.3 miles distance).  Ackley was wearing a backpack during this trip.  At the store, Ackley lifted the bike to turn it upside down.

---

BRCOSA000033

DFS Division of Insurance Fraud

## ACISS Tip Information  T14-2547

Entry Date:  02/28/2014 14:50

---

**Tip Information - Continued**

After exiting the store, Ackley brought the bike down and moved it to the side of the store.   After meeting briefly with an unknown individual, Ackley returned to residence, riding his bike.

Ackley Second Deposition ? November 19, 2013

On November 18, 2013, Ackley gave sworn testimony during his second deposition at 324 North Lakeside Court, West Palm Beach, Florida (Palm Beach County).    During this second deposition, Ackley was asked about his limitations and daily activities since the first deposition of April 25, 2013.

Ackley testified that he was still not working, stating "I will never work again." (p. 94).   Ackley described how his condition has not improved and he was still suffering pain as a result of the accident.

In discussing his daily activities, Ackley was asked about his dog pulling him on a skateboard.   Ackley testified that he tried this because it is easier to stand in one spot than to walk due to his pain that is excruciating on bad days (p. 105).   Despite video taped evidence of Ackley going around the block with the dog while on the skateboard, Ackley testified that he performed this activity for just "10 or 20 feet" (p. 104).

Ackley testified that he has not been able to do arm curls since the accident (p. 111).  However, Ackley clearly curls his arms to carry two bicycles at the same time on July 21, 2013.

When asked if he has done any kind of exercise, Ackley testified, "I can't" (p. 117), despite the above evidence of bicycle riding.

Finally, Ackley was asked directly about riding a bicycle (p. 113):

    Q:   Have you tried riding a bike?
    A:   Yes, and it does not ? I can't.  I can't do anything.
    Q.   Have you tried riding a bike.
    A.   I do not recall.  I do not recall if I did or if I didn't.

This evolving and changing response to the question about riding a bike shows a continuing intent to provide false, incomplete and misleading information.

Florida Statutes

? 817.234  False and fraudulent insurance claims
(1)(a) A person commits insurance fraud punishable as provided in subsection (11) if that person, with the intent to injure, defraud, or deceive any insurer:
1. Presents or causes to be presented any written or oral statement as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy or a health maintenance organization subscriber or provider contract, knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim.

Loss to National Fire

To date, National Fire has incurred $28,712.34 in losses due to out-of-pocket expenses in investigating and defending this claim.

Attachments

To assist in your review, the following documents are attached to this submission:

    1.   Surveillance report of July 23, 2013
    2.   Deposition transcript of November 19, 2013

Summary

The evidence in this matter shows the Charles Ackley provided apparent false, incomplete and misleading material information in

BRCOSA000034

*DFS Division of Insurance Fraud*

## ACISS Tip Information  T14-2547

Entry Date:  02/28/2014 14:50

---

**Tip Information - Continued**

support of his claim.  When given the opportunity to provide truthful and complete testimony, Ackley failed to do so, in suspected violation of Florida Insurance Fraud law.

Therefore, National Fire is submitting this matter to your agency for investigation and referral for prosecution as warranted. Please feel free to contact me directly to discuss this matter or to request materials from our claim files.

Sincerely,

Andrew B. Bryant, JD
Law Enforcement Liaison
Special Investigations Unit at CNA

Reporting Individual Information

Victim/Witness Type:: SIU/Insurance Company
Victim/Witness Name:: Bryant, Andrew
Business Name:: CNA Insurance
Office Telephone:: 3128226337
Cell::
E-Mail Address:: andrew.bryant@cna.com
Mailing Address:: 333 S. Wabash Ave
: Chicago, IL 60604
Preferred Contact Type:: Email
Preferred Contact Time:: 9-5

Suspect - Person Believed to Have Committed Fraud

Suspect Name:: Ackley, Charles
SSN::
DOB:: 04/24/1962
Mailing Address:: 1182 SE 2ND AVE
: DEERFIELD BEACH, FL 33441
Claiming Injury?: Y
Suspect Involvement?: Alleges trip/fall on insured property

Claim Information

Have any payments been made on this claim:: N
Policy Number:: 5082680450
Claim Number:: E2906093
Date of Lost/Injury:: 9/24/2012 12:00:00 AM
Date of Suspected Fraudulent Activity, if different than Date of Loss:: 11/19/2013
Total Amount Paid:: 0
Total Claim or Loss Exposure?:: 55,000
Was Initial Claim Recorded?:: N
Name of Adjuster:: Virginia Fisher
Adjuster Contact Number:: 404-531-3411
Street Address of Location Loss:: 4633 N. University Dr.
: Coral Springs, FL 33067
County of Loss:: BROWARD

Insurance Carrier

BRCOSA000035

*DFS Division of Insurance Fraud*

## ACISS Tip Information  T14-2547

Entry Date:  02/28/2014 14:50

---

**Tip Information - Continued**

Insurance Carrier: CNA
Carrier (Mailing Address): 333 S, Wabash
Carrier (City): Chicago
Carrier (State): IL
Carrier (Zip): 60604


**Nature of Suspected Fraudulent Activity**
Nature of Fraud: Faked/Exaggerated Loss


**Information Developed to Confirm Suspicion**

Information Developed: Deposition/Sworn Testimony; Video Surveillance;



**Insured Information**

Business Name: Equity One Inc
Business FEIN/License Number:
Last Name: De Antoni
First Name: Alexandra
Office Telephone: (786) 528-1457
Fax Telephone:
E-Mail Address: abeantoni@equityone.net
Mailing Address:


**Supporting Evidence**

List: Claimant gave sworn testimony in two depositions on April 25, 2013 and November 19, 2013. Ackley denied or concealed ability to perform various physical activities including riding a bike. (See attached detailed summary)
Documents: Deposition transcripts.
Supporting Evidence: Video surveillance (see attached detailed summary

*****************************
DETAILED CLAIM INFO FROM ISO CLAIM REPORT:


Record Type: Property/Casualty Claim        ISO File Number: 0H003272435
  Date of Loss: 09/24/2012 12:01
 Type of Policy: Commercial Liability General
Location of Loss: PINE RIDGE SQUARE
            4633 N UNIVERSITY DRIVE
            : CORAL SPRINGS, FL 33067-460
Loss Description: MCU.  CLMT TRIPPED OVER BRACKETS LEFT FROM REMOVAL
  ISO Received: 10/18/2012
Insurer Received: 10/17/2012
        Company: CONTINENTAL CASUALTY CO (CNA INS GRP)
        Contact: FISHER,VIRGINIA - (404) 531-3411
        Address: 333 S WABASH AVE
            : CHICAGO, IL 60604
  Claim Number: E29060931
  Policy Number: GL5082680450
 Inception Date: 12/31/2011

BRCOSA000036

*DFS Division of Insurance Fraud*

## *ACISS Tip Information  T14-2547*

Entry Date:  02/28/2014 14:50

---

**Tip Information - Continued**

Expiration Date: 12/31/2012
Involved Party: Claimant
-->     Name: ACKLEY,CHARLES
    Address: 1182 SE 2ND AVE
      : DEERFIELD BEACH, FL 33441-680
      DOB: 04/24/1962
    Gender: Male
    Injury/Damage: NOT IDENTIFIED
Coverage/Loss: Liability / Bodily Injury
      : (OPEN)
    Contact: FISHER,VIRGINIA - (404) 531-3411

      SSN          (SSN ISSUED    FL/1977-1977)
      *** More matches on this SSN outside this report ***
Involved Party: Insured
    Name: EQUITY ONE INC
    Address: 1600 NE MIAMI GARDENS DR
      : NORTH MIAMI, FL 33179-490


City: North Miami Beach
State: FL
ZIP Code: 33179


Claimant Information

Last Name or Unknown: Ackley
First Name or Unknown: Charles
Middle Name:
SSN:
DOB: 04/24/1962
Mailing Address: 1182 SE 2nd Ave
City: Deerfield Beach
State: FL
ZIP Code: 33441


*******************************
DETAILED CLAIM INFO FROM ISO CLAIM REPORT:

    Record Type: Property/Casualty Claim     ISO File Number: 0H003272435
    Date of Loss: 09/24/2012 12:01
   Type of Policy: Commercial Liability General
Location of Loss: PINE RIDGE SQUARE
        4633 N UNIVERSITY DRIVE
      : CORAL SPRINGS, FL 33067-460
Loss Description: MCU.  CLMT TRIPPED OVER BRACKETS LEFT FROM REMOVAL
   ISO Received: 10/18/2012
Insurer Received: 10/17/2012
     Company: CONTINENTAL CASUALTY CO (CNA INS GRP)
     Contact: FISHER,VIRGINIA - (404) 531-3411
     Address: 333 S WABASH AVE
      : CHICAGO, IL 60604
   Claim Number: E29060931
   Policy Number: GL5082680450
   Inception Date: 12/31/2011

---

BRCOSA000037

*DFS Division of Insurance Fraud*

## *ACISS Tip Information  T14-2547*

Entry Date:  02/28/2014 14:50

### Tip Information - Continued

Expiration Date: 12/31/2012
Involved Party: Claimant
-->     Name: ACKLEY,CHARLES
    Address: 1182 SE 2ND AVE
        : DEERFIELD BEACH, FL 33441-680
        DOB: 04/24/1962
    Gender: Male
    Injury/Damage: NOT IDENTIFIED
    Coverage/Loss: Liability / Bodily Injury
        : (OPEN)
    Contact: FISHER,VIRGINIA - (404) 531-3411

    SSN.              (SSN ISSUED    FL/1977-1977)
        *** More matches on this SSN outside this report ***
Involved Party: Insured
    Name: EQUITY ONE INC
    Address: 1600 NE MIAMI GARDENS DR
        : NORTH MIAMI, FL 33179-490

### Current Forward/Assignment

| | |
|---|---|
| Assigned To: | Spirn, Stacey (DFS Division of Insurance Fraud) |
| Department: | DEPARTMENT OF FINANCIAL SERVICES |
| Assigned By: | Padich, Ted (DFS / WEST PALM BEACH SQUAD 1 (GIF) / DFS Division of Insurance Fraud) |
| Assignment Date/Time: | 03/05/2014 15:12 |
| Priority: | 5.0 |
| Response Due Date: | 06/13/2014 |

### Related Subjects

| Name | Type | Sex | Race | DOB | Relationship |
|---|---|---|---|---|---|
| Ackley, Charles | PERSON | MALE | UNKNOWN | 4/24/1962 | SUSPECT |
| CNA Ins (Valley Forge Ins Company) | DFS INSURANCE COMPANY NAME | --- | --- | --- | COMPLAINANT |
| EQUITY ONE INC | BUSINESS | --- | --- | --- | SUBJECT |
| NATIONAL FIRE INSURANCE COMPANY OF HARTFORD | DFS INSURANCE COMPANY NAME | --- | --- | --- | SUBJECT |
| Pine Ridge Shopping Center | BUSINESS | --- | --- | --- | LOCATION OF EVENT |

BRCOSA000038

# EXHIBIT 1

BRCOSA000039

IN THE CIRCUIT COURT OF THE 17th
JUDICIAL CIRCUIT OF FLORIDA, IN
AND FOR BROWARD COUNTY,
FLORIDA

CASE NO.: 12 - 31439



CHARLES ACKLEY,

          Plaintiff,

vs.

IRT CORAL SPRINGS, LLC
and EQUITY ONE, INC.,

          Defendants.

_____/

## COMPLAINT

The Plaintiff, CHARLES ACKLEY, sues the Defendants, IRT CORAL SPRINGS,

LLC and EQUITY ONE, INC., and says:

1.      This is an action for damages which exceed the sum of FIFTEEN THOUSAND

($15,000.00) DOLLARS.

2.      At all times material hereto the Plaintiff, CHARLES ACKLEY, was and is a

resident of Broward County, Florida.

3.      At all times material hereto, the Defendant, IRT CORAL SPRINGS, LLC (herein

IRT), was and is a foreign limited liability company organized to do and doing business

in Broward County, Florida with a principal place of business located at 1600 N.E.

Miami Gardens Drive, Miami, FL 33179.

4.      At all times material hereto, the Defendant, EQUITY ONE, INC. (herein EQUITY

ONE), was and is a foreign profit corporation organized to do and doing business in

Broward County, Florida with a principal place of business located at 1600 N.E. Miami

Gardens Drive, Miami, FL 33179.

BRCOSA000040

ACKLEY v. IRT CORAL SPRINGS, LLC and EQUITY ONE, INC.
Complaint
Page 2 of 4

5.     On or about September 24, 2012, Defendant, IRT, owned and maintained real property located at 4601-4695 N. University Drive, Coral Springs, Broward County, Florida commonly known as Pine Ridge Square.

6.     On September 24, 2012, Defendant, EQUITY ONE, was an owner of and/or the agent or property manager for Defendant IRT responsible for managing and maintaining the real property located at 4601-4695 N. University Drive, Coral Springs, Broward County, Florida and commonly known as Pine Ridge Square.

7.     On September 24, 2012, Defendants, IRT and EQUITY ONE, were responsible for maintaining the sidewalk on the above described property as depicted on the photograph attached as Exhibit A.

8.     On or about September 24, 2012, the Plaintiff, CHARLES ACKLEY, was a customer and business invitee on Defendant's property.

9.     At all times material hereto Defendants, IRT and EQUITY ONE, owed a duty to the Plaintiff, CHARLES ACKLEY, and other customers and business invitees similarly situated to keep the property and premises in a reasonably safe condition and to protect the Plaintiff from dangers which the business or its employees were or should have been aware of.

10.    Defendants, IRT and EQUITY ONE had a duty to warn invitees, including Plaintiff, of any unsafe and unreasonably dangerous conditions of which it created, knew or should have known about in the exercise of reasonable care.

ACKLEY v. IRT CORAL SPRINGS, LLC and EQUITY ONE, INC.
Complaint
Page 3 of 4

11.    At all times material hereto the Defendants, IRT and EQUITY ONE , failed to conform to the above mentioned duties in one or more, but not limited to, the following:

    a.    The Defendants negligently maintained the premises in that they carelessly and negligently maintained the sidewalk located adjacent to the building on the subject property.  The negligent maintenance of their premises created a hazardous condition which caused Plaintiff to fall.

    b.    The Defendants, through their employees, agents or servants negligently maintained the premises in that they carelessly and negligently maintained the sidewalk located adjacent to the building on its property by leaving multiple anchors mounted to the concrete and sticking up above the surface of the sidewalk after removing mailboxes and/or other items from the sidewalk on or before September 24, 2012.  This negligent maintenance of their premises created a hazardous condition which caused Plaintiff to fall.

    c.    The Defendants were negligent in that they failed to place any warning, guard, barricade or notice of any kind on or around the subject sidewalk to warn of the multiple anchors mounted to the concrete and sticking up above the surface of the sidewalk which Defendants were aware of or should have been aware of so that, as a result, a dangerous condition existed and as a result the Plaintiff fell.

    d.    The Defendants failed to exercise reasonable care under all of the relevant surrounding circumstances.

12.    The negligent condition was created by the Defendants their agents, employees or servants, known to Defendants or had existed for a sufficient length of time so that

ACKLEY v. IRT CORAL SPRINGS, LLC and EQUITY ONE, INC.
Complaint
Page 4 of 4

Defendants should have known of it by virtue of the location of the hazardous condition.

13.    As a result, Plaintiff suffered bodily injury that is permanent within a reasonable degree of medical probability, resulting pain and suffering, disability, mental anguish, lost wages, loss of capacity for the enjoyment of life, inconvenience, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a preexisting condition.  These are either permanent or continuing in nature and Plaintiff will suffer these losses in the future.

WHEREFORE, the Plaintiff, CHARLES ACKLEY, demands Judgment for damages against the Defendants, IRT CORAL SPRINGS, LLC and EQUITY ONE, INC., jointly and severally, and further demands trial by jury.

DATED on this _1st_ day of November, 2012.

PINCUS & CURRIER LLP
324 North Lakeside Court
West Palm Beach, FL 33407
E-Mail:       SPhillips@wprclaw.com
Telephone:  (561) 868-1340
Facsimile:   (561) 366-1310

By: _____
Steven B. Phillips
Florida Bar No. 893374

# EXHIBIT 2

BRCOSA000044

**Page 1**

```
1        IN THE CIRCUIT COURT OF THE SEVENTEENTH
            JUDICIAL CIRCUIT IN AND FOR
2            BROWARD COUNTY, FLORIDA
3
4   CHARLES ACKLEY,
5        Plaintiff,
6   v.              CASE NUMBER
                     CACE12031439(21)
7   EQUITY ONE (Florida Portfolio),
8   INC.
9        Defendant.
    ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
10
11           DEPOSITION OF
12           CHARLES ACKLEY
13   TAKEN ON BEHALF OF THE DEFENDANT
14           April 25, 2013
15         1:10 p.m. - 3:35 p.m.
16       700 West Hillsboro Boulevard
           Building 3, Suite 112
17        Deerfield Beach, Florida
18
19
20
21
22
23       Gail Hmielewski, Court Reporter
24
25
```

**Page 2**

```
1        APPEARANCES OF COUNSEL
2
3   On behalf of the Plaintiff:
4        PINCUS & CURRIER, LLP
          STEVEN B. PHILLIPS, ESQUIRE
5        324 North Lakeside Court
          West Palm Beach, Florida  33407
6        561-868-1340
          561-366-1310  Fax
7        sphillips@wprclaw.com
8
9   On behalf of the Defendant:
10       LAW OFFICE OF LORRAINE LESTER
          ROSALIND R. MILIAN, ESQUIRE
          Suite 2500
11       8100 Southwest Tenth Street
          Plantation, Florida  33324
12       954-424-4660
          866-696-7828  Fax
13       rosalind.milian@cna.com
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1            INDEX OF EXAMINATION
2   WITNESS:
3   Charles Ackley
4                         Page
5   DIRECT EXAMINATION              4
    By Ms. Milian
6
7            - - -
8
9          INDEX TO EXHIBITS
10
11  Defendant's    Description      Page
    Exhibit
12   A       Interrogatories,        8
             Composite
13
14   B       Composite of Photos     9
15
16
17       (The original exhibits were retained by
    Attorney Milian.)
18
19
20
21
22
23
24
25
```

**Page 4**

```
1        Deposition of Charles Ackley
2             April 25, 2013
3
4        CHARLES ACKLEY, having been first duly sworn,
5   was examined and testified as follows:
6             DIRECT EXAMINATION
7   BY MS. MILIAN:
8        Q.  Please state your name.
9        A.  Charles Albert Ackley.
10       Q.  Mr. Ackley, I'm Rosalind Milian and I represent
11  Equity One.  I'm here to ask you some questions about
12  your case.
13            On the way in here, you mentioned that you're
14  under medication which may be affecting you?
15       A.  In the morning it's really groggy.  I just have
16  to catch up with my brain, that's all.
17       Q.  When did you take medication?
18       A.  When I first woke up.
19       Q.  And that's the last time?
20       A.  I'm fine, I've been up.
21       Q.  You mentioned that the medication makes you
22  unclear?
23       A.  No, my thinking is as sharp as a tack, I'm just
24  groggy.
25       Q.  What medication are you taking today?
```



CHARLES ACKLEY
ACKLEY VS.  EQUITY ONE

April 25, 2013
5—8

Page 5

1    A.   Percocet, Coreg, and what was the other nerve
2  one?  It's a horrible drug.
3    Q.   Neurontin?
4    A.   Neurontin, and a sedative - Klonopin, I think
5  they're called.
6    Q.   What's that for?
7    A.   It's when I don't take the pain medicine and if
8  I'm sleeping --  The nerve, if I move a certain way, the
9  nerve will scratch and it will wake me up and sleeping
10  helps me get through it.
11    Q.   And you've taken all of these medications
12  today?
13    A.   I take them every day, Ma'am.
14    Q.   And the last time you took them was this
15  morning?
16    A.   Um-hum.
17    Q.   Yes?
18    A.   Yes.
19    Q.   Have you ever given a deposition before?
20    A.   Years and years ago.  I got hit by a cab in New
21  York.  Other than that, no.
22    Q.   I just want to go through some of the ground
23  rules of the deposition.
24    A.   Okay.
25    Q.   I'll be asking the questions.  You need to wait

Page 6

1  until I finish speaking before answering.  Sometimes
2  you're going to think that you know what I'm about to
3  finish asking you and you might interrupt me, but you
4  should really wait until I finish my question.
5    A.   I will.
6    Q.   Also, you need to give verbal responses.  You
7  can't give an um-hum or a head shake or anything like
8  that --
9    A.   Understood.
10    Q.   -- because the court reporter can't take that
11  down.
12    A.   Okay.
13    Q.   Don't tell me anything that you've spoken to
14  your attorney about, that's between you and your
15  attorney.
16       If you don't understand something I ask you,
17  let me know, because if you answer the question, I'm
18  going to presume that you understood.
19       You're under oath and it's important that you
20  understand the question or at least let me know if you
21  don't understand the question so I can rephrase my
22  question if necessary.
23       Also, I may ask you something that you may not
24  remember or that you may not know the answer to.  I'm
25  not asking you to guess.  If you choose to guess, that's

Page 7

1  up to you, you just might want to state for the record
2  that you're guessing.
3    A.   Okay.
4    Q.   It's okay to say you don't know, it's okay to
5  say you don't recall, okay?  Again, if you answer the
6  question, I'm going to assume that you recalled or that
7  you had personal knowledge of the question, okay?
8    A.   Understood.
9    Q.   You're able to understand my questions --
10    A.   Yes, Ma'am.
11    Q.   -- clearly and you think you'll be able to
12  respond clearly?
13    A.   Yes, um-hum.
14    Q.   All right.  I'm going to start out by showing
15  you interrogatories that I propounded to you and the
16  responses that are dated February 21st, 2013.  They're
17  on separate pages, so go ahead and look at both of
18  these.
19       Your responses are unsigned.  You didn't sign
20  any answers to interrogatories?
21    A.   I don't remember if I did.  No, I don't think I
22  did.
23       MR. PHILLIPS:  No, you didn't.
24       THE WITNESS:  No, I don't think I did.
25    Q.   (By Ms. Milian)  Go ahead and look these over

Page 8

1  and tell me if they are truthful.  Well, first of all
2  tell me if those are your responses to the
3  interrogatories.
4       THE WITNESS:  These are what we went through on
5  the phone, correct, Steve?  Steve, these are what we
6  went through over the phone?
7       MR. PHILLIPS:  Yes.
8    A.  Yeah.
9       MR. PHILLIPS:  You know what?  I don't think I
10  got a cert. page for you.  I apologize for that,
11  Rosalind, because I didn't realize that.
12       THE WITNESS:  These last six months have
13  been --
14    Q.   (By Ms. Milian)  Are those your responses to.
15  the interrogatories?
16    A.   They are.  Everything's in order.
17       MR. PHILLIPS:  You can treat them as if they're
18  signed and we'll get a signature for them.
19    Q.   (By Ms. Milian)  Are all of the responses
20  truthful and accurate?
21    A.   Yes.
22       MS. MILIAN:  Okay, I'm going to attach this as
23  Defendant's Composite Exhibit A.
24       (Defendant's Composite Exhibit A was marked for
25  identification.)

CHARLES ACKLEY
ACKLEY VS. EQUITY ONE

April 25, 2013
9–12

Page 9

1    MS. MILIAN: While we're marking exhibits, the
2  only other exhibit I'll be marking today is
3  Composite Exhibit B, which is photographs which I
4  received from your attorney's office, which I've
5  numbered 1 through 26 for easy reference.
6    (Defendant's Composite Exhibit B was marked for
7  identification.)
8    Q.  (By Ms. Milian)  Mr. Ackley, your date of birth
9  is April 24th, 1962?
10   A.  Yes.
11   Q.  So you just turned 51 yesterday.
12   A.  Yes.
13   Q.  Happy birthday.
14   A.  Thank you.
15   Q.  If you look at Number 3 of your answers to
16  interrogatories, is that your correct Social Security
17  number?
18   A.  Yes, Ma'am.
19   Q.  Okay.  What is your current address?
20   A.  8977 Wiles Road, it's W-i-l-e-s.
21   Q.  That's in Coral Springs?
22   A.  Yes, Ma'am, 33067.
23   Q.  Is that a house?
24   A.  Apartment.
25   Q.  What is the apartment number?

Page 10

1    A.  2-305.
2    Q.  Do you live there with anyone?
3    A.  Yes.  I live there with my common-law wife and
4  my two kids.
5    Q.  So you are not married?
6    A.  Well, we were married in France, but we haven't
7  gotten married here yet.
8    Q.  What's your wife's name?
9    A.  Fabienne.
10   Q.  And her last name?
11   A.  Choukroun, it's C-h-o-u-k-r-o-u-n.
12   Q.  C-h-o-u --
13   A.  -- k-r-o-u-n.
14   Q.  Is she French?
15   A.  Yeah.
16   Q.  And you have two children?
17   A.  Yes, Ma'am.
18   Q.  How old are your children?
19   A.  Eleven and twelve.
20   Q.  Do you have any children that don't live with
21  you?
22   A.  Yes.  I have three more, but they're up and
23  gone, they're grown.  They're from another relationship.
24   Q.  Okay.  And how long have you been at the Wiles
25  Road address?

Page 11

1    A.  Almost two years.
2    Q.  Where did you live before that?
3    A.  We were living in New York City, and before
4  that, Paris.
5    Q.  How long were you in New York?
6    A.  Three years - two years.  I'm sorry, two years.
7    Q.  And you're down here at the Wiles Road address
8  for two years?
9    A.  Um-hum.
10   Q.  How long did you live in France?
11   A.  Oh, off and on for eight or nine years.
12   Q.  You're not currently employed, right?
13   A.  No, Ma'am.
14   Q.  And let me just confirm you are not making a
15  claim for past or future wage loss?
16   A.  No, Ma'am.  I haven't gotten to that yet.
17   Q.  What does that mean?
18   A.  I was working my way back up into the work
19  force. The gunshot wound and the open heart was bad and
20  it took me awhile to get on my feet again.  I was
21  starting to work again a day here and a day there and
22  eventually I would have been able to leave SSI behind.
23   Q.  Okay.  You're talking about you're collecting
24  Social Security disability, right?
25   A.  That's it.

Page 12

1    Q.  Now, again, let me confirm, because you just
2  indicated that you were starting --
3    MR. PHILLIPS:  For the record, there's no wage
4   claim, past or future.
5    THE WITNESS:  There's no wage claim past or
6   future.
7    MR. PHILLIPS:  What he was telling you was his
8   intention was he was working towards getting back.
9    THE WITNESS:  I was trying to get off SSI.
10   MR. PHILLIPS:  It would be speculative, any
11   wage claim.
12   Q.  (By Ms. Milian)  Okay.  When were you last
13  employed?
14   A.  2007.
15   Q.  And what was your employment?
16   A.  Security management.
17   Q.  Were you self-employed or did you work for a
18  company?
19   A.  I worked for - on contract for two, actually -
20  DynCorp and Blackwater.
21   Q.  And what did you do?
22   A.  I was a security consultant, body guard,
23  baby-sitter, that sort of thing.
24   Q.  And why did you stop working?
25   A.  Gunshot wound to the chest.



CHARLES ACKLEY
ACKLEY VS. EQUITY ONE

April 25, 2013
13—16

Page 13

1    Q. Okay. Now, that was a gunshot wound that you
2  suffered in the service?
3    A. I was a contractor.
4    Q. A contractor for what kind of --
5    A. A contractor for the State Department.
6    Q. Now, this gunshot wound you suffered to your
7  chest?
8    A. Um-hum.
9      MR. PHILLIPS: Yes?
10     THE WITNESS: Yes, Ma'am.
11    Q. (By Ms. Milian) And that was back in 2007?
12    A. November of 2007.
13    Q. And as a result of that injury, you became
14  disabled?
15    A. Yes, Ma'am.
16    Q. In what manner?
17    A. My heart, my EF went below 20. My left lung
18  had completely deflated. I was in the hospital about
19  six months. At that point I was completely disabled, I
20  couldn't even get out of bed. That took about six
21  months of rehab. It took about two years to get back on
22  my feet.
23    Q. Where were you hospitalized?
24    A. In Paris.
25    Q. What hospital?

Page 14

1    A. Oh, Ma'am, I could not tell you that. They
2  moved me from actually two or three different ones. I
3  had to go to a specialist in the end, somewhere in
4  Center City, Paris.
5    Q. Did you treat in the United States at all for
6  this injury?
7    A. Post, yeah, local hospitals here. I haven't
8  had any problems until I got home.
9    Q. What hospital did you treat with in the United
10  States?
11    A. It's all in my medical records.
12    Q. Well, I'm asking you.
13    A. Well, there's quite a few. There's Northwest,
14  there's Broward, there's Coral Springs.
15    Q. Coral Springs Medical Center?
16    A. Yes, Ma'am.
17    Q. Are you currently treating for those injuries?
18    A. No.
19    Q. When did you last treat?
20    A. It's been over a year.
21    Q. Who did you last treat with?
22    A. A doctor at North Broward.
23    Q. What was that doctor's name?
24    A. Oh, he was Hindu, Pakistani. I couldn't
25  pronounce it if I tried. These doctors, I see them for

Page 15

1  five minutes and that's it. You go to your
2  postoperative, another five minutes, that was it. I was
3  on an HMO that was absolutely worthless. Your doctors -
4  it's all inadequate healthcare - you see them for five
5  minutes and that's it.
6    Q. Are you currently treating for any conditions
7  that aren't related to any injuries that you suffered in
8  the accident that we're here for?
9    A. No, Ma'am.
10    Q. You're not treating with a cardiologist or an
11  internist?
12    A. I have a cardiologist that I see infrequently.
13  His name is Julian Brennan.
14    Q. Okay, and I have Julian Berman at Northwest
15  Heart and Health.
16    A. It's not Berman, it's Brennan. It's probably a
17  typo. Good doctor.
18    Q. He's a cardiologist?
19    A. Yes, Ma'am.
20    Q. Okay. It indicates in your answers to
21  interrogatories you saw him in January of 2013?
22    A. Yes, Ma'am.
23    Q. And you're not currently seeing him now?
24    A. I see him next month.
25    Q. How often do you see him?

Page 16

1    A. Whenever I can afford it.
2    Q. Do you have insurance?
3    A. I do, but not with him. The HMO is
4  absolutely - they're just worthless, so I pay for it out
5  of my pocket.
6    Q. Are you on Medicare?
7    A. Medicaid.
8    Q. Okay. You're receiving Social Security
9  Disability, right?
10    A. Yes, Ma'am.
11    Q. And you don't have Medicare in conjunction with
12  your disability?
13    A. I have Medicaid. No, I'm not 65, I'm only 51.
14  Medicaid comes with the SSI. It's unlike SSD.
15     MR. PHILLIPS: I've got clients with both.
16     THE WITNESS: SSD is what you work and put into
17  which is what you get back. SSI is a security
18  supplement.
19     MR. PHILLIPS: Off the record for a second.
20     (Discussion off the record.)
21     MR. PHILLIPS: Let's go back on the record.
22  She's going to ask you questions.
23    Q. (By Ms. Milian) Okay. You have an HMO through
24  Broward Health?
25    A. Um-hum.



BRCOSA000048

CHARLES ACKLEY
ACKLEY VS.  EQUITY ONE

April 25, 2013
17–20

**Page 17**

1   Q. And that's with Medicaid?
2   A. Um-hum.
3     MR. PHILLIPS: Yes?
4     THE WITNESS: Yes.
5   Q. (By Ms. Milian) Do you have any other
6 insurance?
7   A. None.
8   Q. So you pay Dr. Brennan for his treatment?
9   A. My last visit, yes, Ma'am.
10   Q. And how often do you see him?
11   A. Whenever I feel the need.  My heart "defibs" a
12 lot faster than it should.  I have a defibrillator.
13 Thank God it hasn't gone off, but there are days when my
14 arm is tight, it's tingling, there are times I have to
15 go.
16   Q. Are you claiming that any of your heart
17 problems are related to the fall from September 24th,
18 2012?
19   A. No.
20   Q. Are you treating with any other doctors for any
21 other condition, injury, illness that is not related to
22 this September 24th fall?
23   A. No.
24   Q. Okay.  You treat at Broward Health in Coral
25 Springs --

**Page 18**

1   A. Yes, Ma'am.
2   Q. -- with Dr. Ghebrial?
3   A. Yes, Ma'am.
4   Q. And what is that for?
5   A. I had an episode with my heart.  I have less
6 than half of a heart, so there are times when it just
7 works a little too hard and it sometimes gives up.
8   Q. Now, Dr. Ghebrial is someone who is treating
9 you for --
10   A. He's not treating me regularly, no, it was just
11 for an ER visit.
12   Q. Okay.
13   A. I do not have a primary.
14   Q. Okay.  Does your wife work?
15   A. Yes, Ma'am.
16   Q. What does she do?
17   A. She's a salesperson.
18   Q. Where?
19   A. Aventura Mall.  I'm not sure.  She just
20 switched jobs.  She had to quit to take care of me for
21 the last six months.  She had to look for new work.
22   Q. Okay.  She's not making a claim in this matter?
23   A. Not really, no, I mean, outside of --
24     MR. PHILLIPS: I haven't made a consortium
25 claim at this point.

**Page 19**

1     THE WITNESS: I guess we'll get to that later.
2   Q. (By Ms. Milian) Are you anticipating your wife
3 will file a loss of consortium claim?
4     MR. PHILLIPS: At this point, no.
5   A. I don't know.  I don't know how it works.
6     MR. PHILLIPS: At this point, no.
7   Q. (By Ms. Milian) Now, you're saying she had to
8 quit a job to take care of you for six months?
9   A. Yeah.
10   Q. What job did she quit?
11   A. She was working as a salesperson at a mall in
12 Pompano Beach.
13   Q. Where was she working?
14   A. I don't remember the name of the store.  The
15 Festival Flea Market, there's an antique store there.
16 She was a manager there.
17   Q. When did she quit that job?
18   A. Right after the accident, early November.
19   Q. Why did she quit?
20   A. To take care of me.
21   Q. To do what?
22   A. Basically everything.
23   Q. Like what sorts of things?
24   A. Okay, I couldn't get out of bed.  Sometimes I
25 had to go to the bathroom in the bed.  That had to be

**Page 20**

1 cleaned up.  Shall I go on?
2   Q. Yes.
3   A. Every aspect of my life from walking, sitting
4 down, eating, everything, was affected by it.
5   Q. She had to feed you?
6   A. She had to get me to the table.
7   Q. How about bathing?
8   A. That was a whole other subject.  Baths, and I
9 hadn't taken a shower for three months.  I had to lay
10 down in the tub.
11   Q. Now, she had to do this for how long a period
12 of time?
13   A. Three months, I guess three months.
14   Q. Three months from when to when?
15   A. From November to February, maybe.
16   Q. November to February 2013?
17   A. Yes, Ma'am.
18   Q. And where is she working now, what store?
19   A. It's somewhere in Aventura Mall.
20   Q. You don't know the name of the store?
21   A. I haven't been there yet.
22   Q. When did she start working there?
23   A. A month ago, two months ago.
24   Q. About March?
25   A. Approximately, yeah.  One of her co-workers,



BRCOSA000049

CHARLES ACKLEY
ACKLEY VS. EQUITY ONE

April 25, 2013
21–24

Page 21

1 one of her friends from the French Embassy opened up a
2 boutique and they hired her.
3    Q.  Do you drive?
4    A.  No, I do not.
5    Q.  How did you get here today?
6    A.  A friend took me.  I mean, I drove prior to
7 this, but as of now I'm not, no.
8    Q.  Do you have a valid Florida driver's license?
9    A.  Yes, I do.  It might be expired, but --
10    Q.  Do you have it with you?
11    A.  I have a -- I was at the Kentucky Derby and I
12 lost my license and I had to get this one as a
13 replacement and I haven't had a chance to get a new one.
14    Q.  You have a Kentucky driver's license?
15    A.  Yeah.  I was baby-sitting a client for the
16 Kentucky Derby and we had an excellent night of drinking
17 and we ended up in places we never thought we would, me
18 on top of the cab.  It was a fun night, but I lost my
19 wallet and had to have that replaced.  The Kentucky
20 Derby's a wild time.  I was baby-sitting Ashton Kutcher.
21    Q.  Do you own a car?
22    A.  I did.  We had to sell it.
23    Q.  When did you last own a car?
24    A.  February.
25    Q.  This year?

Page 22

1    A.  Yes, Ma'am.
2    Q.  Why did you sell it?
3    A.  To pay the bills.
4    Q.  Is Social Security your only source of income?
5    A.  Yes, Ma'am.
6    Q.  And how much do you get per month?
7    A.  Seven hundred.
8    Q.  When did it start?
9    A.  August of 2010.
10    Q.  What kind of vehicle did you own?
11    A.  Nissan Maxima.
12    Q.  Does your wife drive?
13    A.  No, she does not.
14    Q.  And how does she get to work?
15    A.  I take her.  Now she takes a bus.
16    Q.  How do you take her?  You said you take her?
17    A.  I took her up until this and now she takes a
18 bus, or the train, actually.  It's a rather long
19 commute.
20    Q.  What's your highest grade in school?
21    A.  Twelfth.
22    Q.  And you were a contractor for the State
23 Department.  Did you otherwise serve in the military?
24    A.  Basically it's paramilitary.  The State
25 Department contracts agents to work abroad under the

Page 23

1 State Department.  We're basically just like a truck
2 driver, a cook, a plumber, except we carry.  We were
3 soldiers.
4    Q.  And were you stationed somewhere?
5    A.  Several places.  Some of them I'm not ready to
6 discuss.
7    Q.  Where were you when you suffered the gunshot
8 wound?
9    A.  The Kunar Province, Afghanistan.
10    Q.  And when did you last work as a contractor?
11    A.  2007 as a professional contractor.  After that
12 I had administrative duty training marines.  That was
13 one of the reasons I was in Kentucky.  I was trying to
14 kill two birds with one stone.
15    Q.  How long, during what period of time were you
16 doing that?
17    A.  Oh, 2008 through 2010.
18    Q.  You were in Kentucky in 2012, right?
19    A.  No.
20    Q.  The license was issued 2012.
21    A.  No, it's 2011.  June of 2012, but I wasn't
22 working, I was just there for the Derby.
23    Q.  Oh, I see.
24    A.  That's how I got the job.
25    Q.  So did you live in Kentucky?

Page 24

1    A.  For a short period of time, but I wasn't
2 living, living.  I was working there on the base, that's
3 it.
4    Q.  And that was on the marine base?
5    A.  Army base.
6    MR. PHILLIPS:  That was Knox, probably, right?
7    THE WITNESS:  Yeah, Fort Knox.  They changed
8 quite a bit, they're bringing in marines and --
9    Q.  (By Ms. Milian)  You have no other disability
10 from any other source?
11    A.  No, Ma'am.
12    Q.  Okay.  Have you ever been convicted of a
13 felony?
14    A.  Yes, Ma'am, I have.
15    Q.  When was that?
16    A.  1999.
17    Q.  And what was that for?
18    A.  Criminal mischief, controlled substance, and
19 what was the other?  It's been so long.  Criminal
20 mischief, controlled substance, and there was one more,
21 I forgot what it was.  No, it was an added charge, is
22 what it was.  It was something that the state added on,
23 but it all stemmed from one incident.  It was a bad time
24 for me.
25    Q.  Have you been convicted of any other crimes?



CHARLES ACKLEY
ACKLEY VS. EQUITY ONE

April 25, 2013
25–28

Page 25

1    A.  No.
2    Q.  Have you ever been a party to a lawsuit?
3    A.  No.
4        THE WITNESS:  Well, Steve, about the --
5    Q.  (By Ms. Milian)  Your attorney can't answer,
6    you cannot consult.
7    A.  I bit down on a piece of glass in a restaurant
8    and they saw it and they had to call in, they said it
9    was good tooth money.  There was no lawsuit filed.
10       MR. PHILLIPS:  That was just a claim?
11       THE WITNESS:  Yeah, it was a claim.
12   Q.  (By Ms. Milian)  That's my next question.  Have
13   you had any claims?
14   A.  Yeah, just that one.
15   Q.  Just that one?
16   A.  Um-hum.
17   Q.  And they paid you your dental bill?
18   A.  Um-hum.
19       MR. PHILLIPS:  Yes?
20       THE WITNESS:  Um-hum.
21       MR. PHILLIPS:  Yes, not um-hum, yes.
22   Q.  (By Ms. Milian)  You have to answer verbally.
23   A.  I'm so sorry.  Yes, Ma'am.  Forgive me.
24       MR. PHILLIPS:  We'll retrain you before you
25   leave here.

Page 26

1        THE WITNESS:  I'm new at this.
2    Q.  (By Ms. Milian)  Have you had any accidents or
3    injuries after September 24th, 2012?
4    A.  No, Ma'am.
5    Q.  No falls or anything?
6    A.  No.
7    Q.  Now, prior to September 24th, 2012, you had the
8    gunshot wound, okay, and you had to have surgery for
9    that?
10   A.  Twice.
11   Q.  And what was the surgery, what were the
12   surgeries?
13   A.  Open heart surgery.  They had to do a bypass on
14   what's called the widow-maker, the main artery, and then
15   they had to go back in because some idiot left part of
16   the bullet next to my lung, which then deflated my lung
17   so they had to go back in.
18   Q.  And where were these surgeries?
19   A.  In France.  Where on my body or location?
20   Q.  What hospital?
21   A.  I don't remember the hospital, Ma'am.  It was
22   in France.
23   Q.  They were both in France?
24   A.  Yes.
25   Q.  Do you speak French?

Page 27

1    A.  Yes, somewhat.  My Spanish is better.
2    Q.  Did you have any other hospitalizations prior
3    to September 24th, 2012?
4    A.  No, Ma'am.  Well, yeah, with the heart, which
5    I've already explained.  Other than that, no, Ma'am.
6    Q.  All right.  Have you had any other heart
7    surgeries other than in France?
8    A.  No, Ma'am.
9    Q.  What other hospital admissions did you have
10   relating to your heart before September 24th?
11   A.  I just told you - Broward Health, Northwest,
12   Coral Springs, and I believe that's it.
13   Q.  Did you treat at Holy Cross?
14   A.  Yeah.  That's where the surgery was done, but
15   that wasn't my heart, that was for the - I had to have
16   emergency surgery there.
17       MR. PHILLIPS:  It's from this case, the fall.
18       THE WITNESS:  That's from this case.
19   Q.  (By Ms. Milian)  You went to have emergency
20   heart surgery as a result of this case?
21   A.  No, Ma'am, I had to have emergency surgery
22   because of this case.
23   Q.  I'm showing that you treated at Holy Cross back
24   in October of 2010 for chest pain.
25   A.  I don't know.  I don't recall that.

Page 28

1    Q.  Do you recall an incident where you were at a
2    casino and you almost blacked out?
3    A.  That was at Northwest.
4    Q.  That was at Northwest Medical Center?
5    A.  That's the hospital I went to, yes, because it
6    was the closest one.  It was right down the street.
7    Q.  What did they do for you there?
8    A.  Kept me overnight and - actually kept me a
9    couple days.
10   Q.  Did they indicate what was wrong?
11   A.  Stress.
12   Q.  When else did you treat at Northwest?
13   A.  I can't recall, Ma'am.
14   Q.  I also show Holy Cross records of March 3rd,
15   2012 with complaints of chest pain.
16   A.  March 3rd of 2012?
17   Q.  You were in Paris at a funeral and you flew
18   home and went directly to the hospital?
19   A.  At Holy Cross?
20   Q.  Yes.
21   A.  No, that's not -- No, Ma'am.
22   Q.  Okay.  Well, I'm showing there's a history that
23   you went to an emergency room on March 3rd, 2012.  Do
24   you recall that?
25   A.  It may have been -- Yes.  I don't recall it



BRCOSA000051

Page 29

1  being Holy Cross.
2      Q.  What hospital was it?
3      A.  Ma'am, I can't recall.
4      Q.  Did you have surgery?
5      A.  No, Ma'am.
6      Q.  Did they do a catheterization?
7      A.  They went in and looked, yes, they did.
8      Q.  An angiogram or angio --
9      A.  Um-hum.  That was Northwest, that was at
10  Northwest.
11     Q.  It was at Northwest?
12     A.  Yeah.  Excuse me, North Broward put the stent
13  in, North Broward.
14     Q.  North Broward Medical Center?
15     A.  Yes, Ma'am.
16     Q.  And when did you have the stent placed?
17     A.  June of last year.
18     Q.  June of 2012?
19     A.  Yes, Ma'am.
20     Q.  Did you have a primary care doctor back in
21  March of 2012?
22     A.  I did.  Her name was Lilian Beer.
23     Q.  Lilian Beer?
24     A.  Um-hum, like the beverage.
25     Q.  Let me see if she's on here.  She's not on your

Page 30

1  list.  Where is she located?
2      A.  She's got to be in there somewhere.  She was my
3  primary for three or four months when I finally did
4  locate her and get to see her.
5      Q.  Where is she located?
6      A.  Off of University Drive.
7      MR. PHILLIPS:  Is that Lilian Beer?
8      THE WITNESS:  Lilian or Lilia.
9      Q.  (By Ms. Milian)  Okay, she's located off
10  University Drive, but do you have an address --
11     A.  No, Ma'am.
12     Q.  -- or a city?
13     A.  Coral Springs.  You tend not to remember these
14  things.  I hadn't planned on -- I wasn't going to
15  continue to see her.
16     Q.  And when did you stop seeing her?
17     A.  Sometime last year.
18     Q.  Why did you stop seeing her?
19     A.  Because she was worthless.  She did absolutely
20  nothing for me.  She did nothing.
21     Q.  Okay.  Go ahead and look at your answers to
22  interrogatories and tell me if there's any other doctors
23  that you've seen prior to --
24     A.  I haven't.
25     Q.  -- September 24th, 2012.

Page 31

1      MR. PHILLIPS:  Just look at them and see if
2  there's anybody.
3      Q.  (By Ms. Milian)  Dr. Beer is not on there and
4  you just mentioned her, so --
5      A.  She should be, but I stopped seeing her long
6  before this incident happened.
7      MR. PHILLIPS:  Was she part of Broward Health?
8      THE WITNESS:  Um-hum.
9      MR. PHILLIPS:  There's a whole bunch of doctors
10  in Broward Health, that we didn't itemize out all
11  those doctors.
12     THE WITNESS:  Actually, when I went to her
13  office, I actually didn't see her.  I saw her nurse
14  practitioner.
15     Q.  (By Ms. Milian)  So there's no one else on this
16  list --
17     A.  No, Ma'am.
18     Q.  -- or that's not on this list that you've seen?
19     A.  Um-um.
20     Q.  Okay.  Other than for your heart, have you seen
21  doctors for anything else prior to September 24th?
22     A.  Just my cardiologist.
23     Q.  Have you had any accidents or injuries other
24  than the gunshot wound prior to September 24th, 2012?
25     A.  I don't -- Yeah, quite a few, but they're

Page 32

1  irrelevant but I'll explain them to you.  Two gunshot
2  wounds to the right leg, one to the elbow, one to the
3  forehead, and one to the chest.
4      Q.  When did you have gunshot wounds to your right
5  leg?
6      A.  Nigeria.
7      Q.  That was while you were in the service?
8      A.  Contracting.
9      Q.  How about your forehead?
10     A.  Same place.
11     Q.  When did you have the right leg injuries?
12     A.  God, late '90s.
13     Q.  Did you get treatment?
14     A.  Yeah, short and sweet.
15     Q.  Where?
16     A.  Short and sweet right there on the spot and
17  then I got looked at by the doc when I got back.
18     Q.  Where was that?
19     A.  At the command we were at.  It was a command,
20  it was a mobile command, and then I got back to Germany
21  and then they fixed me up.
22     Q.  What did they do?
23     A.  Just basically put a plug in.  The round was
24  taken out on-site.  They basically cleansed it, cut it,
25  and they put a plug in until it healed.


BRCOSA000052

CHARLES ACKLEY
ACKLEY VS. EQUITY ONE

April 25, 2013
33–36

Page 33

1  Q.  Did you treat stateside for that?
2  A.  No, Ma'am.
3  Q.  How about for your elbow?
4  A.  It was - basically, it was done in Eastern
5  Europe.  That's as much as I can tell you.
6  Q.  Did you receive treatment stateside for that --
7  A.  No, Ma'am, I didn't.
8  Q.  -- or for the forehead wound?
9  A.  The forehead wound was basically a scratch -
10  same place, Eastern Europe.
11  Q.  Have you had any motor vehicle accidents?
12  A.  No, Ma'am.
13  Q.  Slip-and-falls?
14  A.  Never.
15  Q.  Okay.  The medications that you mentioned
16  you're taking today, are those all the medications that
17  you take at this time?
18  A.  I take Plavix and aspirin for my heart.
19  Q.  You don't take Plavix every day?
20  A.  Yes, Ma'am, I have to.
21  Q.  So did you take that today?
22  A.  Um-hum.
23  MR. PHILLIPS:  Yes?
24  THE WITNESS:  Yes, Ma'am.  I'm sorry, forgive
25  me.

Page 34

1  Q.  (By Ms. Milian)  And aspirin?
2  A.  Yes, Ma'am.
3  Q.  And how are you getting paid?
4  A.  How am I getting paid?
5  Q.  I'm sorry, how are you paying for the
6  medications?
7  A.  Medicaid.
8  Q.  Do you use any kind of assistive devices at
9  this time, like a cane?
10  A.  When necessary, yeah.  Not always, it's just,
11  when I cycle the medication, there are days when I need
12  it.
13  Q.  How often do you use a cane?
14  A.  Two or three times a week.
15  Q.  Do you use any other assistive devices?
16  A.  No, Ma'am.
17  Q.  Did anyone prescribe or recommend the cane?
18  A.  No, Ma'am.
19  Q.  Are there any particular activities that you do
20  that necessitate you using a cane?
21  A.  I'm sorry?
22  Q.  Do you use a cane to walk?
23  A.  Yes, Ma'am.
24  Q.  Okay.
25  A.  To walk, stabilize myself, to -- Basically

Page 35

1  it's the leg I don't have.
2  Q.  What are you talking about?  I mean, the
3  record's not clear.  What do you mean by the leg you
4  don't have?
5  A.  I can't use my leg in certain instances and the
6  cane helps me get from Point A to Point B.  It helps me
7  get into a chair, it helps me get out of a chair - every
8  aspect of my movement.
9  Q.  You can't use which leg?
10  A.  My right leg, Ma'am.
11  Q.  And you said in certain instances.  What are
12  those instances?
13  A.  Every aspect of my life, I need to use the
14  cane.  On certain days I cannot walk without it.
15  Q.  Every aspect of your life is vague.  Can you be
16  specific about what?
17  A.  I can't walk without my cane.
18  MR. PHILLIPS:  Just let me help for a second.
19  She's asking for under what circumstances do you
20  have to use the cane, what's bothering you and why
21  you have to --
22  THE WITNESS:  When I don't take the medication.
23  Q.  (By Ms. Milian)  Let me clear something up.
24  Again, your attorney can't assist you, your attorney can
25  make objections for the record.  If you don't understand

Page 36

1  what I'm asking you, then go ahead and tell me you don't
2  understand.
3  A.  There are days when I do not take that
4  medication that I have to use the cane to walk, to get
5  upstairs - everything I do, I need the cane.
6  Q.  So that's when you don't take the meds?
7  A.  Yes, Ma'am.
8  Q.  So you don't take the medications every day?
9  A.  I can't, Ma'am.
10  Q.  Now, what medications are you --
11  A.  The opiates.
12  Q.  Let me finish.
13  A.  Um-hum.
14  Q.  What medications are you referring to that
15  you're saying you don't take every day?
16  A.  The opiates.
17  Q.  What medications?
18  A.  The Percocet and the Neurontin, both.  They
19  have to be managed.
20  Q.  How often do you take them?
21  A.  Two, three days a week, then I stop and I wait
22  a few days, then I resume.
23  Q.  How many days are you off?
24  A.  Two to three, sometimes four, depending on the
25  way I feel.



BRCOSA000053

CHARLES ACKLEY
ACKLEY VS. EQUITY ONE

April 25, 2013
37–40

Page 37

1  Q.  And on every day that you don't take the
2  medications, you need a cane to walk?
3  A.  (Witness nods.)
4  Q.  Yes?
5  A.  Every day I do not take the medications, I need
6  the cane.
7  Q.  Who is managing these medications?
8  A.  Me.
9  Q.  Do you have a doctor --
10  A.  Yes.
11  Q.  -- that's managing the medications?
12  A.  His name is Dr. Kereira (phonetic).
13  MR. PHILLIPS:  Pereira.
14  THE WITNESS:  Pereira.
15  MR. PHILLIPS:  He just started seeing him.
16  Q.  (By Ms. Milian)  Dr. Parra at Broward Surgical
17  Associates?
18  A.  That was my surgeon.
19  MR. PHILLIPS:  He just recently saw him since
20  those were done.
21  Q.  (By Ms. Milian)  Okay.  Where is Dr. Pereira?
22  A.  He's located on University Drive.
23  THE WITNESS:  What's the address?
24  MR. PHILLIPS:  7171 North University Drive,
25  Tamarac, and Pereira is P-e-r-e-i-r-a.

Page 38

1  MS. MILIAN:  What is his first name?
2  MR. PHILLIPS:  Eugene.
3  Q.  (By Ms. Milian)  What kind of doctor is he?
4  A.  I think he's an M.D., an orthopedic surgeon, I
5  think.  I'm not real sure.  I've seen him twice.
6  Q.  When did you start seeing him?
7  A.  March 12th of last month, I think.
8  Q.  Were you referred to him?
9  A.  No, I found him.  I was doing a list for my
10  doctors and my attorneys gave me lists and I called to
11  see who could take an LOP and I found one.
12  Q.  He's treating you under an LOP?
13  A.  Yes, Ma'am.  He really wasn't referred to me by
14  anyone.
15  MR. PHILLIPS:  For the record, though, I didn't
16  give you a list for this guy --
17  THE WITNESS:  No.
18  MR. PHILLIPS:  -- because I don't know this
19  guy.
20  THE WITNESS:  We were at a loss to try to find
21  a doctor.
22  Q.  (By Ms. Milian)  Now, you're saying that on the
23  days you don't take medications, you can't walk without
24  the cane?
25  A.  No, Ma'am.

Page 39

1  Q.  Can you do anything without the cane?
2  A.  Very little, and I mean very little.  I mean, I
3  can sit down, I can sit in a chair.
4  Q.  Let's talk about the accident, September 24th.
5  A.  Okay.
6  Q.  Okay?
7  MS. MILIAN:  Well, let's go off the record one
8  second.
9  (Discussion off the record.)
10  Q.  (By Ms. Milian)  Okay, Mr. Ackley, your
11  allegation is the accident occurred on September 24th,
12  2012, right?
13  A.  Yes, Ma'am.
14  Q.  What day of the week was that?
15  A.  I don't know.  I don't know.  I don't remember
16  exactly what day it was.
17  Q.  Do you know what time of day it was?
18  A.  Between eight and ten.
19  Q.  A.M.?
20  A.  P.M.
21  Q.  This was at night?
22  A.  Yes, Ma'am.
23  Q.  Okay.  And the location was where?
24  A.  Pine Ridge Plaza.
25  Q.  At Pine Ridge Plaza?

Page 40

1  A.  The back parking lot, back sidewalk, the
2  sidewalk that leads to the back parking lot.
3  Q.  Okay.  Near what stores?
4  A.  There's a salon on the corner, there's a
5  chiropractor right next-door, there's a pizza place, a
6  jewelry shop, Mexican restaurant, Bed Bath & Beyond,
7  Marshalls.
8  Q.  You say near the back parking lot.  What stores
9  were near that part of the parking lot?
10  A.  The salon actually faces the back parking lot.
11  Q.  Okay.
12  A.  It's just an entrance to the shopping center.
13  Q.  Were there any lighting issues?
14  A.  No, it was well-lit.  I mean, as far as, I
15  mean --
16  Q.  Do you know what the sources of lighting were?
17  A.  I believe they were overhead lights.
18  Q.  Okay.  Did you drive to the plaza?
19  A.  No, we walked.  The gate to our community is
20  like 40 feet, so we just - I take the kids over there.
21  Fresh Market has the best ice cream, so I take the kids
22  over to get ice cream.
23  Q.  So you were with your kids on the date of the
24  accident?
25  A.  Yes, Ma'am.



BRCOSA000054

CHARLES ACKLEY
ACKLEY VS.  EQUITY ONE

April 25, 2013
41—44

Page 41

1    Q.   Okay.  And this is your 11 and 12-year-old?
2    A.   Um-hum.
3         MR. PHILLIPS:  Yes?
4         THE WITNESS:  Yes.
5    Q.   (By Ms. Milian)  What are their names?
6    A.   Carla and Jordan.
7    Q.   Okay.  So you live next to Pine Ridge Plaza?
8    A.   Yes, Ma'am.
9    Q.   Do you always go in the same way?
10   A.   Not always.  I have a little 11-year-old girl,
11   she likes to walk around and walk in front to see if she
12   could drag me in all the time, so we don't go in the
13   same way all the time, no.
14   Q.   What other areas of the plaza do you enter
15   through?
16   A.   You can go in through this way.
17   Q.   I don't know what you mean by this way.
18   A.   You can enter through this way.  This is the
19   back.  And if you come this way, it would be, say, going
20   north, the north end of the shopping center.
21   Q.   All right.  You're referring to what I marked
22   as Composite Exhibit B, Picture Number 1.  When you say
23   this is the back, are you referring to the area where
24   the handicap ramp is?
25   A.   Yeah.  This is the entrance right here, this is

Page 42

1    the salon, that's the chiropractor, this is the Mexican
2    restaurant.
3    Q.   So you're saying the salon is on the side of
4    the picture where we see this dark wall?
5    A.   It's right there.
6    Q.   And the chiropractor is on the left?
7    A.   Um-hum.
8    Q.   I guess behind the wall?
9    A.   Um-hum.
10        MR. PHILLIPS:  Yes?
11        THE WITNESS:  Yes.  I thought I said yes.
12        MR. PHILLIPS:  You said um-hum.
13   Q.   (By Ms. Milian)  Now let me show you Picture
14   Number 4, okay?  This community we see in the background
15   behind the handicap ramp, is that your community?
16   A.   This is where I live, yes, Ma'am.
17   Q.   So when you enter the community, why --  When
18   you enter the mall, if that's your community, why would
19   you enter through --
20   A.   The gate to get there --  I live in a gated
21   community.  Instead of walking a quarter-mile down to
22   the road, they give us a key to enter the gate to get
23   into the shopping center.  The gate was put there
24   purposely for the shopping center.
25   Q.   So from the gate, the front gate of your

Page 43

1    community, it takes you to what part of the shopping
2    center?
3    A.   Right to the back of it, and you can either go
4    left or you can go right.
5    Q.   I'm not understanding.  Does it take you from
6    the front gate of your community or does it take you to
7    this area of the shopping center that's shown on this
8    picture on the --
9    A.   Right behind here is where the gate is located.
10   Q.   Okay.  So what's the most direct path from your
11   community to get into the plaza?
12   A.   That one.
13   Q.   All right.  Well, you said the gate is located
14   behind --  What you're referring to is this wall, I
15   guess, where the chiropractor is located?
16   A.   Yes, Ma'am.
17   Q.   Let me show you another picture.  Okay, let's
18   look at Picture Number 3, all right?  Is this Pine Ridge
19   Plaza?
20   A.   (Witness nods.)
21   Q.   Now, this wellness center, is that the
22   chiropractor you're referring to?
23   A.   (Witness nods.)
24        MR. PHILLIPS:  Yes?
25        THE WITNESS:  Yes.

Page 44

1    Q.   (By Ms. Milian)  Yes?
2    A.   Yes, yes, yes.
3    Q.   So where is the gate in relationship to where
4    the wellness center is?
5    A.   The gate is in the back, it's in the back.  If
6    you come, if you go through here and you walk to the end
7    of the buildings --
8         MR. PHILLIPS:  For the record, when you say go
9    through here, are you referring to the walkway
10   between the chiropractor and the salon?
11        THE WITNESS:  Yes.  Yes.
12        MR. PHILLIPS:  Okay.
13   Q.   (By Ms. Milian)  So you are referring to the
14   area by where the handicap spot is --
15   A.   Yes, Ma'am.
16   Q.   -- that takes you directly to your gate?
17   A.   Yes, Ma'am.
18   Q.   Then why would you ever enter the plaza from
19   any other way?
20   A.   I just told you.  I have an 11-year-old
21   daughter.  There's a beauty salon, it's called Gunta
22   (phonetic), and she tries to get me - every single day
23   when we do go, she tries to get me in to buy her new
24   eyeshadow, new eyeliner.
25   Q.   It's on the same side as the Pizza Carousel?



BRCOSA000055

CHARLES ACKLEY
ACKLEY VS. EQUITY ONE

April 25, 2013
45–48

Page 45

1  A.  Yes, Ma'am.
2  Q.  But on the corner?
3  A.  It's on this corner.
4  Q.  So why wouldn't you come in through the back
5  entrance from your gate and then just walk down this
6  isle towards the wellness center and the pizza place to
7  get to the beauty salon?
8  A.  Sometimes we go this way and walk this way,
9  because usually we're going to either Fresh Market,
10  we're going to Marshalls, so we would take the most
11  direct route.
12  Q.  Okay.  Prior to September 24th, you had been to
13  this plaza, then, right?
14  A.  Yes, Ma'am.
15  Q.  How many times?
16  A.  Once or twice a week.
17  Q.  And why do you go there?
18  A.  Groceries, things I need to live.  I'll go to
19  Bed Bath & Beyond, I'll go get pizza, I'll go to
20  Fresh Market, Marshalls, whatever.
21  Q.  Now, this is once to twice per week for how
22  long a period that you were going there?
23  A.  I've been living there for over a
24  year-and-a-half.
25  Q.  So is it once to twice per week for a

Page 46

1  year-and-a-half?
2  A.  Yeah, about that.  Sometimes we didn't go at
3  all.  I mean, it wasn't a daily ritual.
4  Q.  Okay.  On the date of your accident, was it
5  raining?
6  A.  No, Ma'am.
7  Q.  Was it wet?
8  A.  No, Ma'am.
9  Q.  Were there any substances on the ground?
10  A.  No, Ma'am.
11  Q.  All right.  Now, let me have you look at these
12  pictures and tell me if there are pictures in this
13  pile - I got these from your attorney - that depict the
14  scene of where your accident occurred, and since I
15  numbered them, go ahead and refer to the pictures by
16  number.
17  A.  Okay.  One, two, three, I can see part of it,
18  anyway; four, five --
19  Q.  Hold on, I'm sorry.  Can you go back and refer
20  to the numbers of the pictures?
21  A.  Well, I was putting them in chronological
22  order.
23  Q.  They're all numbered, so make sure you've got
24  the numbers right.
25  A.  Yeah, I did.  One, two.

Page 47

1  Q.  That's not three.  Here.
2  MR. PHILLIPS:  He didn't say three.
3  THE WITNESS:  Three is here.  It's out of
4  order.
5  MR. PHILLIPS:  These are the ones he set aside.
6  THE WITNESS:  I'm doing this like this.
7  Q.  (By Ms. Milian)  Oh, I see.
8  A.  Four, five, six, seven, eight, nine, ten,
9  eleven - twelve, excuse me.
10  MR. PHILLIPS:  Strike 11, it's 12.
11  THE WITNESS:  And 13, 14, 15, 16, 17, 18, 19,
12  20, 21, 22, 23, 24, yeah, 25, and that does it.
13  Q.  (By Ms. Milian)  Did you take those
14  photographs?
15  A.  My wife took two, I think the EMS took several,
16  and outside of that, I have no idea who took photos.
17  Q.  Did you take any of the photos?
18  A.  Did I take any?  No.
19  Q.  Do you know which two your wife took?
20  A.  Not really.  I'm not really sure.  I know she
21  took a before-and-after picture.
22  Q.  And you're saying EMS took photos?
23  A.  Yeah, they even made a note at the bottom of
24  their accident report.
25  Q.  Do you know what photos EMS took?

Page 48

1  A.  I don't know.
2  Q.  Were you present when --
3  A.  He took them right on his camera, right there.
4  Q.  I'm sorry?
5  A.  He had a camera and he took them right there.
6  Q.  Were you present when any of the photos were
7  taken?
8  A.  Yeah, I was laying down.  Yeah, I was there.
9  Q.  Okay, for the ones that EMS took?
10  A.  Yeah.
11  Q.  But you don't know which?
12  A.  I have no idea.
13  MR. PHILLIPS:  They're not in this group, I
14  don't have them.
15  THE WITNESS:  At that point, I really didn't
16  care.
17  Q.  (By Ms. Milian)  You were not present for the
18  ones your wife took?
19  A.  No, I was already at the hospital.
20  Q.  And how would your wife have known where to
21  take photos?
22  A.  She was with me.
23  Q.  I thought you said you were with your two
24  children?
25  A.  I just said I was with my family.



CHARLES ACKLEY
ACKLEY VS.  EQUITY ONE

April 25, 2013
49–52

Page 49

1    Q.  Okay, I understand you were with your two
2  children.  You were also with your wife?
3    A.  My family, yes.
4    Q.  Were you with anyone else?
5    A.  No, Ma'am.
6    Q.  So she didn't take photos that night?
7    A.  I went to the hospital.  She took pictures that
8  night.  The EMS asked her to do so, so she did so.
9    Q.  Okay.  Did you hear that conversation?
10    A.  I didn't exactly hear it, but she told me.  I
11  was laying on the sidewalk, partially on the sidewalk.
12    Q.  Okay.  Now, are you able to identify from these
13  photos whether the scene is depicted on the date of your
14  accident from any of these photos?
15    A.  Yeah, all the ones that I numerically placed,
16  all these.
17    Q.  Okay.
18      MR. PHILLIPS:  You need to listen to her
19    question.
20    A.  I'm sorry, I didn't understand.
21    Q.  (By Ms. Milian)  Well, let's look at Number 1.
22  Go ahead and look at Number 1.  Is that what it looked
23  like on the date of your accident?
24    A.  No.  What was here, what was right here was a
25  box of some sort, it was a brown box.  Before, I

Page 50

1  remember it was like way out in front and you had to
2  walk way around.
3      MR. PHILLIPS:  She's asking, on the day you
4    fell, tell her what it was like when you fell, if
5    you think any of these photos depict the day you
6    fell.
7      THE WITNESS:  None.  There was a box here.
8    Q.  (By Ms. Milian)  So none of the photos here
9  depict what it looked like on the day you fell?
10    A.  No.  Wait a minute.  No, I take that back.  I
11  take that back.  I'm looking back in retrospect about
12  the brown box.  This is how it looked when I fell.
13    Q.  Okay, you're pointing to Picture Number 1,
14  right?  Okay.  Now, the brown box you're referring to,
15  that existed, is that correct, these mailboxes that are
16  in Picture Number 1?
17    A.  This was before when I fell.  The other brown
18  box, that was not there.
19    Q.  The mailboxes that are depicted in Picture
20  Number 1 were there on the day you fell?
21    A.  This was here, the one they removed.
22    Q.  That's like a yes or no.  You're pointing to
23  the mailboxes that are in Picture Number 1, these beige
24  mailboxes?
25    A.  Right.

Page 51

1    Q.  That was there?
2    A.  This was there.
3    Q.  On the day you fell?
4    A.  Right.
5    Q.  Okay.  And this is exactly how the scene looked
6  on the day you fell that's depicted in Picture Number 1?
7    A.  Yes.
8    Q.  All right.  Are there any other photos that
9  depict the condition of the property on the day you
10  fell?
11    A.  Not that I'm aware of, outside the EMS
12  pictures.  Outside that, I don't know.
13    Q.  Okay.  Can I see these for a second, the ones
14  you identified?  Picture Number 24, do you know what
15  that's a picture of?
16    A.  It looks like a sidewalk.
17.    Q.  Do you know where that was taken?
18    A.  Yeah, this was taken where I fell.  I can see
19  the scratch marks.
20    Q.  These like white chalk marks, scratch marks?
21    A.  Evidently it's where they pulled the box out.
22    Q.  Do you know that for sure --
23    A.  No.
24    Q.  -- what those white lines represent?
25    A.  That was an assumption.

Page 52

1    Q.  Okay, I'm asking if you know.
2    A.  No, Ma'am.
3    Q.  So do you know where Picture Number 24 was
4  taken?
5    A.  From what it looks like, I'd -- A sidewalk.
6    Q.  Do you know what part of the property that
7  sidewalk is on?
8    A.  Well, there's not much to go by.  It looks like
9  it's next to the handicap zone.
10    Q.  So is no your answer?
11    A.  Yeah.
12    Q.  How about Number 22?  Do you know where this
13  picture was taken?
14    A.  In the area I had my - in the area where the
15  accident was.
16    Q.  And how can you tell?
17    A.  Actually, it would really be hard to tell.
18  You're showing me a piece of concrete.
19    Q.  Exactly.  I'm showing you pictures that I
20  received from your attorney's office, so I'm asking you,
21  okay?
22      MR. PHILLIPS:  There are other ones, there are
23    other ones you can look at.  If you need to look at
24    the other ones to explain, you can.
25    Q.  (By Ms. Milian)  Well, right now how about

BRCOSA000057

CHARLES ACKLEY
ACKLEY VS. EQUITY ONE

April 25, 2013
53–56

Page 53

1  Number 20?  What number is that?
2     A.  Twenty.
3     Q.  Okay.  Do you know where that was taken?
4     A.  I don't know exactly where on the sidewalk it
5  was taken, I do not.  It would have to correspond with
6  the other photos.
7     Q.  Looking at the other photos, then, can you tell
8  where 20, 22, and 24 were taken?
9     A.  All right.
10     Q.  These are not trick questions, Mr. Ackley.  I'm
11  just looking at pieces of sidewalk that could have been
12  taken anywhere, which is why I'm asking.
13     A.  Well, that couldn't have been taken anywhere.
14  This looks like that goes there, but there's no line.
15  Now, this looks like --
16     MR. PHILLIPS:  You can see them, you can match
17     them up.
18     THE WITNESS:  All right, these two are same.
19     Okay, so what do you want me to --  Please again
20     explain what it is you want me to say and do.
21     Q.  (By Ms. Milian)  All right.  I asked you, if
22  you look at 20, 22, and 24 --
23     A.  Um-hum.
24     Q.  -- all right, these are just pictures of
25  sidewalk, okay?  That doesn't tell me anything, so I am

Page 54

1  asking you, okay, and while you have it in your hand --
2  Well, no, that's a little more clear.
3     Just looking at 20, 22, and 24, those are
4  pictures of sidewalk?
5     A.  Um-hum.
6     Q.  I'm asking you if you know --
7     A.  This is where the --
8     Q.  Let me finish.  I'm asking if you know where
9  those pictures were taken that are in 20, 22, and 24.
10     A.  I recognize the surroundings.  Yes, it's where
11  I fell, but when you give me things like this, it's hard
12  to tell where it's taken.
13     Q.  That's what I got from your office, from your
14  attorney's office, so I'm asking you do you know where
15  22 was taken?
16     A.  I know where this was taken.  This one, I don't
17  know.  I mean, aside from lying on the cement, I imagine
18  this was taken here.  I mean, to tell you, I mean --
19     Q.  And you're imagining, you're assuming?
20     A.  Ma'am, this is all I can do.  I mean, really?
21     MR. PHILLIPS:  You can match them all up.  I
22     mean, this is taking forever.  Let's go off the
23     record for a second.
24     (Discussion off the record.)
25     MS. MILIAN:  Let's go back on.

Page 55

1     Q.  (By Ms. Milian)  So what are you referring to?
2     A.  Chair, rust spot, chair, rust spot, line, rust
3  spot.
4     Q.  So you're comparing Pictures 2 and 20, right,
5  and you're saying that what you're looking at where the
6  bench is in 2, where there's a little rust spot --
7     A.  It's the only way you're going to identify that
8  piece of sidewalk.
9     Q.  Let me finish the question, okay?  -- is the
10  same rust spot and piece of sidewalk that's in 20?
11     A.  I can't say that for sure.
12     Q.  Okay, you pulled out Picture Number 6.  What is
13  Picture Number 6 a picture of?
14     MR. PHILLIPS:  Which one is six?  What does
15     that show?  Tell her what that one is.
16     A.  Pretty much the whole story, that's what it
17  shows.  This is really redundant.
18     Q.  (By Ms. Milian)  Okay, Mr. Ackley --
19     A.  Yes, Ma'am.
20     Q.  I'm going to go on and continue to ask my
21  questions.
22     A.  Yes, Ma'am, by all means.
23     Q.  You say that's the whole story and it's
24  redundant --
25     A.  Well, Ma'am, you're asking me questions that

Page 56

1  are relatively --
2     MR. PHILLIPS:  You have to explain what this
3  shows.
4     THE WITNESS:  Okay, this shows where the
5  accident happened.  You can identify this piece of
6  concrete.
7     MR. PHILLIPS:  For the record, that's the
8  photograph that has Number 6 on it.
9     THE WITNESS:  This I cannot, because all you're
10  showing me --
11     Q.  (By Ms. Milian)  Now that we got an answer to
12  my former question finally, let's talk about Number 6.
13  You say that's where the accident happened.  You also
14  testified that Number 1 depicts the scene on the day it
15  happened, right?  Do Number 1 and Number 6 match up?  Is
16  the property in the same condition in Photo Number 1 as
17  it is in Photo Number 6?
18     A.  Yeah.  There's nothing different about it.
19     Q.  Okay.
20     A.  I mean, there's nothing different about it.
21     Q.  So in Photo 6, the mailboxes that we're looking
22  at, the beige mailboxes, were there on the property, we
23  just don't see them in Photo Number 6, right?
24     A.  But you do see them here.
25     Q.  Okay.  And you picked out Number 14.  Keep



BRCOSA000058

CHARLES ACKLEY
ACKLEY VS.  EQUITY ONE

April 25, 2013
57–60

Page 57

1 Number 6 handy, we're going to talk about it.
2     You picked out Number 14.  Is Number 14, does
3 that picture look like what the scene looked like on the
4 day you fell?
5   A.  Yes.
6   Q.  All right.  Well, in Number 6 we're looking at
7 an area of sidewalk that looks like it has -- There's
8 something on the concrete, right, in Number 6?
9   A.  Um-hum.
10     MR. PHILLIPS:  Yes?  You have to say yes.
11     THE WITNESS:  Yes, yes, yes.
12   Q.  (By Ms. Milian)  Do you see that in Number 14?
13   A.  No, I don't.
14   Q.  And yet Number 14 is what it looked like on the
15 day you fell?
16   A.  Okay, now I see where you're going with this.
17 Now I get it, okay.  This was a before picture and this
18 was the after picture.  When the EMS took the pictures,
19 they located the management, they simply promptly
20 removed these.
21   Q.  On the day you fell?
22   A.  The day after I fell.  Yes, my wife went back
23 and took pictures again.  Miraculously, these were gone.
24   Q.  You need to answer the questions as they get
25 asked.

Page 58

1   A.  I just did.
2     MR. PHILLIPS:  First of all, if he knows when
3 these were taken, because these were taken much
4 later.
5   Q.  (By Ms. Milian)  Do you know when Picture 14
6 was taken?
7   A.  No, I don't.
8   Q.  And you don't know who took it?
9   A.  But I do know it was taken after the accident,
10 okay?
11   Q.  How do you know that if you don't know when it
12 was taken?
13   A.  Because my wife went the next day and took
14 pictures.  I have witnesses that will testify these
15 things sat there for a week.  They even went to
16 management.
17   Q.  How do you know the brackets were gone the next
18 day?
19   A.  Because my wife told me.  She took pictures and
20 it's still on my phone, date and time recorded.
21     MR. PHILLIPS:  That's these photos.  The wife
22 took these photos.  You can depose her.
23     MS. MILIAN:  When you say these photos, can
24 you --
25     MR. PHILLIPS:  It's six and seven.

Page 59

1     MS. MILIAN:  And there's another one?
2     THE WITNESS:  All the brackets were removed.
3     MR. PHILLIPS:  No, those weren't taken by the
4 wife.
5     MS. MILIAN:  There's no question pending,
6 you're getting ahead of yourself.
7     MR. PHILLIPS:  Just hang tight.  He's fine.
8 The only photographs that his -- I don't see any
9 other ones that were taken by his wife.  It's not
10 these.
11     MS. MILIAN:  These are out of order now, that's
12 it.
13     MR. PHILLIPS:  Oh, there it is.  These right
14 here - six, seven, and eight were the ones.
15   Q.  (By Ms. Milian)  Okay.  Mr. Ackley, since
16 you're the one testifying, are you able to verify six,
17 seven, and eight were taken by your wife?
18   A.  Yes.
19   Q.  And those are the ones taken on your phone?
20   A.  Yes.
21   Q.  And you have your phone with you today?
22   A.  I don't have it with me, she has it.
23 Actually -- No, she has the phone.
24   Q.  And that was the next day, she took those
25 pictures?

Page 60

1   A.  The very next day.  Yeah, we had to go back
2 and --
3   Q.  Were you in the hospital?
4   A.  Yes, Ma'am, I was.
5   Q.  You weren't present when she took them, then?
6   A.  No, I was not, but she had her phone, our
7 phone - family phone.
8   Q.  Okay.  And what is that phone number she took
9 the pictures from?
10   A.  I have it.  I don't recall it.  I use another
11 phone.  I get a free phone through my benefits, so I
12 basically use that one.  It's free.
13   Q.  You don't know the number?
14   A.  I don't know it offhand.
15   Q.  Do you still have the same phone?
16   A.  I have the same phone.  My daughter uses it as
17 an alarm clock.
18   Q.  What company do you have this phone with?
19   A.  It's a Samsung model and it's with MetroPCS.
20   Q.  Okay.  Where were you coming from on the day of
21 your accident?
22   A.  My home.
23   Q.  Okay.  And what were you doing before you went
24 to Pine Ridge Plaza?
25   A.  I was waiting for my children and wife to get



BRCOSA000059

CHARLES ACKLEY
ACKLEY VS.  EQUITY ONE

April 25, 2013
61–64

Page 61

1  home so we could decide what we were going to have for
2  dinner and we had dinner and we were going to Fresh
3  Market to get ice cream.
4      Q.   Did you have a late dinner?
5      A.   Pretty much, yeah.
6      Q.   Did you have any alcoholic drinks in the 24
7  hours before you fell?
8      A.   No, Ma'am.
9      Q.   Did you have any alcoholic beverages in the 12
10 hours before you fell?
11     A.   No, Ma'am.
12     Q.   Were you taking any medication in the 12 hours
13 before you fell?
14     A.   No, Ma'am.
15     Q.   None at all?
16     A.   None.
17     Q.   I'm going to go back to Picture Number 1.  Can
18 you tell me how you - where you entered the plaza in
19 Picture Number 1?
20     A.   Right here.
21     Q.   So by the yellow part, right?
22     A.   Right in here.
23     Q.   All right.  Now, you don't have a picture that
24 depicts the scene on the date of your accident that had
25 mailboxes in them?

Page 62

1      A.   Just this one.
2          MR. PHILLIPS:  No.  No, we don't.  I'm just
3  trying to save some time here.  I'm telling you we
4  don't.
5      Q.   (By Ms. Milian)  Are you sure that these beige
6  mailboxes were there --
7      A.   Um-hum.
8      Q.   -- on the day you fell?
9      A.   Um-hum.
10         MR. PHILLIPS:  Yes?
11     Q.   (By Ms. Milian)  Yes?
12     A.   Yes.
13     Q.   When was the last time you had entered the
14 plaza from that same spot before the day you fell?
15     A.   Maybe a week prior.
16     Q.   Had you been there at all that same week, the
17 day before?
18     A.   No.  No, it had been some days, maybe even a
19 week.
20     Q.   And how about how many times out of the one or
21 two times a week that you go there do you enter from
22 where the mailboxes are?
23     A.   Once, maybe twice a week, once - mostly on
24 Tuesdays.
25     Q.   All right.  Were there any different mailboxes

Page 63

1  there before the date of your accident?
2      A.   Before the date of my accident, there was a
3  number of mailboxes there - boxes or something, I wasn't
4  sure what they were for - and I didn't really pay much
5  attention to them.
6      Q.   Were they in the same spot as the ones that are
7  in Picture Number 1?
8      A.   I can't recall.
9      Q.   Were they a different color?
10     A.   One was dark brown.
11     Q.   How many were there?
12     A.   There was just one, then there were two, then
13 there was just this one.
14     Q.   Okay.  Do you know when these beige mailboxes
15 went in?
16     A.   I have no idea.
17     Q.   You don't know how long they were there?
18     A.   No, I don't go through there all that much.
19     Q.   Well, you said you go there about once or twice
20 a week.
21     A.   Ma'am, that's not all that much.
22     Q.   And were there mailboxes of a different type?
23     A.   I can't recall.
24     Q.   Can you describe how the fall occurred?  And go
25 ahead and refer to the picture if you want.

Page 64

1      A.   I was just walking with my family, just
2  walking, talking, just as I would every other day.  The
3  next thing, I landed on the ground hard.  I stood up,
4  more out of embarrassment than anything else, and a
5  stabbing pain literally dropped me right back down to
6  the ground and that's where I stayed until EMS showed
7  up.
8      Q.   How did you fall?
9      A.   My foot got hooked on this damn thing, and even
10 when I got up I couldn't find --
11         MR. PHILLIPS:  Your foot got hooked on what?
12         THE WITNESS:  One of these.
13         MR. PHILLIPS:  You're referring to what
14 photograph?
15         THE WITNESS:  Number 6.  Excuse me.
16     Q.   (By Ms. Milian)  So your foot got hooked,
17 you're saying there's more than one in this photo?
18     A.   There's like two of them, two or three of them.
19     Q.   Where do you see two or three of them in
20 Number 6?  Because that's a more wide-angle picture.
21     A.   There was one here, there was one here, and one
22 here.
23     Q.   Here doesn't help me.
24     A.   Just say there's two there.
25         MR. PHILLIPS:  How many are in the photograph?



BRCOSA000060

CHARLES ACKLEY
ACKLEY VS. EQUITY ONE

April 25, 2013
65–68

Page 65

1    THE WITNESS: Two.
2    MR. PHILLIPS: Okay.
3    Q.  (By Ms. Milian) Now, what are these?
4    A.  I don't have a clue, all I know is they weren't
5    supposed to be there.
6    Q.  And you know that how?
7    A.  Obviously.
8    Q.  Okay. We're looking at a piece of metal
9    something in the foreground of Picture Number 6, right?
10   You don't know what that is?
11   A.  I don't have a clue.
12   Q.  It looks like there's some sort of an outline
13   of something by where that is.
14   A.  Um-hum.
15   Q.  Do you know what that's an outline of?
16   A.  I guess it's the box or whatever they had
17   there. I don't pay attention to things that don't
18   concern me.
19   Q.  Okay. So you don't know what was there?
20   A.  I'm assuming it was another P.O. box.
21   MR. PHILLIPS: He's already told you several
22   times he thought it was a mailbox, but he wasn't
23   sure exactly what it was used for.
24   Q.  (By Ms. Milian) Okay. Now, you're saying over
25   like on this direct vertical line in Picture Number 6,

Page 66

1    there's another one of those?
2    A.  There could be, Ma'am. By this, this could be
3    that one. What you have here does absolutely nothing.
4    I mean, what you see in that picture, there are two. To
5    be quite frank, that's enough. It only took one.
6    Q.  If you want to continue the commentary, or you
7    can just answer my question.
8    MR. PHILLIPS: He answered the question.
9    THE WITNESS: I have a right to say it in
10   those terms.
11   Q.  (By Ms. Milian) There's a piece of metal in
12   Picture Number 7, Mr. Ackley?
13   A.  Yes, Ma'am.
14   Q.  I'm looking at a piece of metal that looks like
15   it's bolted to the ground in Number 7.
16   A.  Um-hum.
17   Q.  Do you know what that is?
18   A.  Ma'am, I don't have a clue.
19   Q.  It looks like it's on a crack in the sidewalk.
20   Do you see that?
21   A.  No, Ma'am, I don't. I see this. I see this,
22   but these are before-and-after pictures, okay? So what
23   you see, you can misconstrue what may be before or what
24   may be after.
25   Q.  Before and after what?

Page 67

1    A.  These things were removed the following
2    morning, so --
3    Q.  They were removed the following morning, so
4    what time did your wife take pictures?
5    A.  I don't know, but I will be glad to relay it to
6    my attorney and, I mean --
7    Q.  Can you just answer my question?
8    A.  I did.
9    Q.  We need to go with you answering my question.
10   A.  I did.
11   Q.  Do you see a crack in the sidewalk in Picture
12   Number 7?
13   A.  Yes, Ma'am.
14   Q.  Do you see that crack in the sidewalk in
15   Picture Number 6?
16   A.  Yes, right here.
17   Q.  Okay. That's what you think is the crack in
18   the sidewalk in 6? Let's look at Number 8. Here it is.
19   It looks like that's a piece of metal in Number 8 over
20   by a crack in the sidewalk, right?
21   A.  Um-hum.
22   Q.  Is that the same as Number 7?
23   A.  Um-hum.
24   Q.  Do you know?
25   A.  It looks like it.

Page 68

1    Q.  Okay. So it might be two pictures of the same
2    thing?
3    A.  Um-hum.
4    MR. PHILLIPS: Yes?
5    THE WITNESS: Yes. Sorry.
6    Q.  (By Ms. Milian) So the vertical line that goes
7    from the first piece of metal in Picture Number 6 in the
8    foreground of the picture, vertically up to what looks
9    like a second piece of metal, you're saying that that's
10   a crack in the sidewalk?
11   A.  I have no idea what it is. I mean, I didn't
12   lay the foundation.
13   Q.  Okay. Where were you looking just before you
14   fell?
15   A.  As I usually do, in front of me.
16   Q.  And as you enter the property from this yellow
17   handicap area in Picture Number 1, you're walking
18   towards this --
19   A.  I'm walking this way.
20   Q.  You're walking towards this area where the
21   bench is, right?
22   A.  Um-hum.
23   MR. PHILLIPS: Yes?
24   THE WITNESS: Yes, Ma'am. .
25   Q.  (By Ms. Milian) So did you see that metal



CHARLES ACKLEY
ACKLEY VS. EQUITY ONE

April 25, 2013
69–72

Page 69

1  piece --
2  A. No, Ma'am.
3  Q. -- in front of you --
4  A. No, Ma'am.
5  Q. -- as you were walking?
6  A. No, Ma'am.
7  Q. Were you looking in that direction?
8  A. No, Ma'am.
9  Q. Well, what direction were you looking in?
10  A. Straight ahead.
11  Q. Okay. And so if you were walking towards that
12  metal piece -- Strike that.
13     Can you tell me where in Picture Number 1 that
14  metal piece would have been?
15  A. Where it would have been?
16  Q. Yes. We don't see it in Picture Number 1,
17  right?
18  A. Well, I can tell you from this picture where it
19  was.
20  Q. Okay.
21  A. That I can tell you, but from this one I cannot
22  because it's not there.
23  Q. All right. So you can't tell me in
24  relationship to the bench where it was?
25  A. In this picture I can. In this picture I can't

Page 70

1  because it's been removed.
2     MR. PHILLIPS: She's asking if you can estimate
3  in this picture, based on the bench, where it would
4  have been.
5     THE WITNESS: I guess right here, I mean, right
6  in there. I don't really know.
7  Q. (By Ms. Milian) Somewhere between the -- Do
8  you know about how far it was from the bench? Do you
9  know?
10  A. Two, three, four feet, maybe. I don't know.
11  Q. Okay. And now you're walking in that direction
12  and you're looking in that direction?
13  A. I'm looking ahead.
14  Q. And you didn't see it?
15  A. No, of course I didn't see it.
16  Q. Were you talking to anybody?
17  A. No, I was just walking. My kids were behind
18  me, my wife was beside me.
19  Q. And which of these pieces of metal did your
20  foot get caught in?
21  A. I do not know. It took me a second to find
22  them, even the EMS guys couldn't find them at first.
23  Q. Did your wife talk to the EMS guys?
24  A. Very, very, very shortly. It was a very short
25  conversation.

Page 71

1  Q. How about your kids?
2  A. No, not at all. My kids were sent home. My
3  daughter was freaking out.
4  Q. What kind of shoes were you wearing?
5  A. The very ones I have on. Would you care to see
6  them?
7  Q. What kind are they? Let's see.
8  A. Right here.
9  Q. Just closed-toe shoes?
10  A. Um-hum.
11  Q. Loafers?
12  A. Actually, there's the nut I was telling you
13  where it caught my shoe. I mean, it literally grabbed
14  onto it and wouldn't let go.
15  Q. Was your shoe damaged, is that what you're
16  saying?
17  A. No, it just caught it like a hook and it would
18  not let go.
19  Q. What part of your body did you land on?
20  A. My left side.
21  Q. So you didn't fall straight forward?
22  A. No. I tried to - what I tried to do was catch
23  my balance and get my feet back underneath, but it
24  simply didn't work. I didn't have time to put my hands
25  out, I landed on my side.

Page 72

1  Q. So were you facing towards the salon?
2  A. Um-hum.
3     MR. PHILLIPS: Yes?
4     THE WITNESS: Yes. Sorry.
5  Q. (By Ms. Milian) Was there anyone else around?
6  A. Just my family.
7  Q. Was the salon open?
8  A. No, they close early, but everything else was
9  open.
10  Q. Now, the injuries you suffered were to your
11  groin?
12  A. Um-hum.
13     MR. PHILLIPS: Yes?
14     THE WITNESS: Yes.
15  Q. (By Ms. Milian) Did you suffer any injuries to
16  any other part of your body?
17  A. Just some abrasions on my right side and a
18  little bit of an ache in my chest, but other than that,
19  no. And the ache subsided, the abrasions healed. The
20  only thing that was left was --
21  Q. Where did you have abrasions?
22  A. -- on my right side, here.
23     MR. PHILLIPS: Which side?
24     THE WITNESS: My left side, excuse me.
25  Actually you can see (indicating.)



BRCOSA000062

CHARLES ACKLEY
ACKLEY VS. EQUITY ONE

April 25, 2013
73–76

Page 73

1   Q.   (By Ms. Milian)  Your left arm?
2   A.   Yes, Ma'am.
3   Q.   And the only injury you're claiming is the
4   groin injury?
5   A.   Yes, Ma'am.
6   Q.   Now, you were taken by EMS to the hospital,
7   right?
8   A.   Yes, Ma'am.
9   Q.   And who called EMS?
10   A.   My wife.
11   Q.   You said you got up from the ground?
12   A.   And fell right back down.
13   Q.   You got up on your own?
14   A.   Yeah.  Basically I slid myself over to the
15   chair and the EMS helped me on the chair.
16   Q.   So you were on the ground when the EMS arrived?
17   A.   Yes.
18   Q.   And why did you go back down onto the ground?
19   A.   Because I couldn't stand up.
20   Q.   Did you report this to anyone?
21   A.   Yes.
22   Q.   To who?
23   A.   The only people I reported it to was EMS, my
24   doctors, and the property.
25   Q.   Did you go back to the property and speak to

Page 74

1   anybody else that was there?
2   A.   No, I did not.
3   Q.   All right.  You mentioned somebody named Patty
4   as having personal knowledge of this?
5   A.   Yeah, she saw them there.
6   Q.   Now, what's Patty's last name?
7   A.   I didn't ask.
8   Q.   Patty works at the salon?
9   A.   Um-hum.
10   MR. PHILLIPS:  Yes?
11   THE WITNESS:  Yes, Ma'am.
12   Q.   (By Ms. Milian)  All right.  So you mention her
13   as having knowledge, but you don't have her last name?
14   A.   We never discussed it.  I never met the woman
15   in my life.
16   Q.   When did you talk to Patty?
17   A.   Some months ago.
18   Q.   In relation to when your accident occurred,
19   when did you talk to Patty?
20   A.   A couple months after.
21   Q.   And can you tell me how that conversation got
22   initiated?
23   A.   She saw - she heard something, that I was hurt
24   over those, and I quote, over those damn things in
25   ground.  I said you saw them before?  She said, yes, I

Page 75

1   did.
2   Q.   She approached you?
3   A.   Well, she sits on the bench.  She sits out here
4   to smoke and when me and my wife and kids come through
5   we often say hello, a casual hello, a casual good-bye,
6   and that was it.
7   Q.   And she approached you?
8   A.   Well, we approached each other sitting on the
9   bench and she had mentioned something, she saw me
10   limping.  I told her what happened and she told me blah,
11   blah, blah, blah, and she said she had told somebody
12   about them, that sort of thing.
13   Q.   Patty told you that she had told somebody about
14   it?
15   A.   Um-hum.
16   MR. PHILLIPS:  Yes?
17   THE WITNESS:  They're all Haitians there.  They
18   don't speak English, if you talk to any.
19   Q.   (By Ms. Milian)  Who are you talking about?
20   A.   Patty said when she tried to speak with the
21   management, she said they were there and some other
22   things that were wrong and all she got was an um-hum and
23   then they walked away.
24   Q.   Who did Patty say she talked to, the
25   maintenance guy?

Page 76

1   A.   Um-hum.
2   MR. PHILLIPS:  Yes?
3   THE WITNESS:  Yes.
4   Q.   (By Ms. Milian)  So you're saying Patty saw you
5   limping and mentioned it?
6   A.   Um-hum.
7   MR. PHILLIPS:  Yes?
8   THE WITNESS:  Yes.
9   Q.   (By Ms. Milian)  And that's when you told her
10   what had happened?
11   A.   I didn't tell her in detail what had happened,
12   I just said I had an accident, I tripped, and that was
13   it.
14   Q.   Did you tell her where you tripped?
15   A.   Right there.
16   Q.   Did you tell her you tripped on something?
17   A.   Yeah, I told her I tripped on something metal
18   coming out of the sidewalk and she said, yes, I saw
19   those were there and they had been there for some time.
20   Q.   Did she tell you how long they were there?
21   A.   Not exactly, she just said some time.
22   Q.   Did you ask her?
23   A.   No, I did not.
24   Q.   Did some time sound like a long time to you?
25   A.   I can't make that assumption.



BRCOSA000063

CHARLES ACKLEY
ACKLEY VS. EQUITY ONE

April 25, 2013
77—80

Page 77

1   Q.   No?
2   A.   There's no way to answer that.
3   Q.   And she told you that she had told someone that
4   works there --
5   A.   Yes, um-hum.
6   Q.   -- about what?
7   A.   What was in the ground and there were some
8   other issues they were not maintaining or something else
9   that was really irrelevant to me.
10   Q.   What else?
11   A.   I just told you we didn't discuss it because
12   they weren't relevant to what happened, she just said
13   there were some other issues.
14   Q.   Did Patty tell you when she told the
15   maintenance people about this?
16   A.   No, she did not.
17   Q.   Okay. Did you ask her to be a witness in this
18   case?
19   A.   No, I did not, but she said if I needed her,
20   contact her.
21   Q.   And how do you contact her?
22   A.   Well, I have her number at home. I mean, I
23   could easily --
24   Q.   Well, you didn't give me the number in the
25   interrogatories. Is there any reason why you didn't

Page 78

1   provide that?
2   A.   You'll have to discuss that with my attorney.
3   Q.   These are your answers that you verified as
4   truthful and accurate, so --
5   A.   I believe it said in here somewhere that there
6   was a witness that said that they would testify, if I'm
7   not mistaken.
8   Q.   Well, these are your answers.
9   A.   Well, Ma'am, I read it myself.
10   Q.   Okay. And you're saying you do have Patty's
11   phone number?
12   A.   Yes, I do. It's been a long six months.
13   Q.   Please get that information for your attorney.
14       MR. PHILLIPS:  It's whatever the salon number
15   is, so your client has it.
16   Q.   (By Ms. Milian)  She gave you her phone number,
17   but not her last name?
18   A.   It was the number to the salon, I was given a
19   card.
20   Q.   Did the card have her name on it?
21   A.   Evidently it did, she gave it to me.
22   Q.   Do you have that card still?
23   A.   Somewhere in my house.
24   Q.   And she said that if you needed her --
25   A.   Yes.

Page 79

1   Q.   -- that she would what?
2   A.   She would do what she could.
3   Q.   With what exactly, did she say?
4   A.   I didn't ask any further than that.
5   Q.   Was anyone else present when you talked to
6   Patty?
7   A.   No.
8   Q.   And Patty didn't give you the names of anyone
9   that she spoke to --
10   A.   No, Ma'am.
11   Q.   -- with management, right?
12   A.   No, Ma'am.
13   Q.   Why didn't you contact management about the
14   fall?
15   A.   Because I thought better of it.
16   Q.   Why?
17   A.   I didn't want to.
18   Q.   Why not?
19   A.   Because I didn't want to.
20   Q.   And why didn't you want to?
21   A.   I thought it would be redundant, I didn't think
22   anything would come of it.
23   Q.   What do you mean redundant, repetitive?
24   A.   I thought my wounds would heal, but they
25   didn't.

Page 80

1   Q.   And when they didn't, did you seek to talk to
2   anyone there?
3   A.   No, I did not. I hired an attorney when I
4   realized the damages that were done.
5   Q.   Do you know if your wife went to talk to
6   anybody with management?
7   A.   No.
8   Q.   Were you on the phone just prior to falling?
9   A.   No.
10   Q.   Were you carrying anything?
11   A.   No.
12   Q.   As you were approaching the area, did you see
13   the bench?
14   A.   Yes.
15   Q.   Okay.
16   A.   You couldn't help but see the bench.
17   Q.   And you saw the mailboxes?
18   A.   Whether I was looking at them or not, I do not
19   recall.
20   Q.   You don't recall the mailboxes or you --
21   A.   They were next to me. I mean, I'm looking at
22   things that were in front of me.
23   Q.   Was the area under construction?
24   A.   No.
25   Q.   Was any part of Pine Ridge Plaza under



CHARLES ACKLEY
ACKLEY VS. EQUITY ONE

April 25, 2013
81–84

Page 81

1  construction that you know of?
2    A.  They were finishing up way at the opposite end,
3  maybe 200 yards away.
4    Q.  When you were there the week before, when you
5  walked by that area, did it look like it does in
6  Picture 6 with the metal exposed?
7    A.  I don't know.  The first time I saw the metal
8  was when I tripped over it.  I may have gone through
9  there and not ever -- I didn't see it.  I came in from
10  another direction, whatever the case may be, but I did
11  not see those.
12    Q.  Well, you said like about the week before you
13  came through that same direction, right - that same
14  area, right?
15    A.  Um-hum.
16    Q.  Yes?
17    A.  Yeah.
18    Q.  And you don't recall whether there was
19  something there or whether the metal was there?
20    A.  No, Ma'am.
21    Q.  Okay.  Do you have any pictures that depict
22  what the area looked like the very first time you were
23  there?
24    A.  No.
25    Q.  No?  Okay.  So the other box that you said was

Page 82

1  there, the other box or boxes, you don't know when they
2  were removed?
3    A.  No, I don't.
4    Q.  Do you know by whom they were removed?
5    A.  No, I do not.
6    Q.  Okay.  You were taken to what hospital?
7    A.  Coral Springs.
8    Q.  Were you admitted?
9    A.  Yes.
10    Q.  What did they do for you at Coral Springs?
11    A.  Basically gave me a once-over and explained to
12  me what had happened and basically said that I need to
13  get that done as fast as possible, within days, and they
14  let me go home and then it didn't quite take a matter of
15  days before my bowels became strangulated and I had to
16  have an emergency surgery.
17    Q.  All right.
18    A.  They should have admitted me in the hospital
19  then.
20    Q.  Did you go to Holy Cross emergency?
21    A.  Yeah.  Yeah.  I was on my way to do something
22  else and the bulge never went down.  From the moment
23  that it popped, it never went down.
24    Q.  When did the bulge pop?
25    A.  The moment that it happened.

Page 83

1    Q.  And did you ever have --
2    A.  No.
3    Q.  -- a hernia before?  You never had a hernia
4  before?
5    A.  No.
6    Q.  Now, the first place you went was Coral
7  Springs?
8    A.  Um-hum.
9    Q.  And how long were you in Coral Springs for?
10    A.  All night.
11    Q.  You just went overnight?
12    A.  Yes.
13    Q.  So they didn't admit you to the hospital?
14    A.  No.  They said because of my HMO, I needed to
15  consult my doctor to get back in as fast as possible to
16  get everything fixed, because it was dangerous the way
17  it was.
18    Q.  So what did you do after you left Coral
19  Springs?  When did you next get medical treatment?
20    A.  I went home.  The next medical treatment was in
21  the emergency room at Holy Cross.
22    Q.  That was when?
23    A.  November of, what was it, November 5th,
24  something like that.  Three or four days later,
25  something like that.  It was five days later or

Page 84

1  something like that.  I don't recall the exact amount of
2  days.
3    Q.  I show an admission on 10/2/12, 10/2/2012.
4    A.  Okay.  Well, it was just recently at the time
5  that it happened.
6    Q.  You gave a history of chest pain.
7    A.  I always have chest pain.
8    Q.  Okay.
9    A.  And the pain, actually what the pain does, it
10  aggravates, excuse me, it aggravates the shit out of my
11  chest and my defibrillator and it really is an
12  uncomfortable feeling.
13    Q.  How does it do that?
14    A.  The pain, the nerves, it just -- It sucks.
15  Excuse me.
16    Q.  How does --
17    A.  Everything hurts, from my lower leg --  Under
18  my left testicle it feels like I have a pair of pliers
19  and what it does, it goes all the way up to my abdomen,
20  all the way up here.  This entire area is affected.
21    Q.  On your left side?
22    A.  Yes, Ma'am, on my left side.
23    Q.  On your left side?
24    A.  Yes, Ma'am.  Every aspect of my being is
25  affected.

BRCOSA000065

CHARLES ACKLEY
ACKLEY VS. EQUITY ONE

April 25, 2013
85–88

Page 85

1   Q.  You landed on your left side and the hernia was
2   on the right?
3       A.  From what the doctor had told me - and I'm only
4   assuming this, I am not a doctor - but me trying to get
5   my legs up underneath me, I believe when I pulled, I
6   don't know, I'm assuming this, but I tried to get my
7   foot unhitched from this thing and the doctor said that
8   may or may not have been, but he said the injury caused
9   the bulge, the softball-sized bulge that I had.  He said
10  I was lucky it didn't rupture from the trauma.  He said
11  I was a very lucky individual.
12      Q.  Now, at what part of your lower leg does the
13  pain start?
14      A.  It doesn't go all the way to the lower leg, it
15  goes to the thigh right here, all the way underneath,
16  touches my hamstring, goes underneath my right testicle,
17  to where the leg meets the torso.
18      My testicle, the pain is so intense I can't
19  have sex with my wife.  I haven't had sex with my wife
20  in six months.  You have to forgive me, I'm a bit
21  aggravated about that.
22      Q.  And the pain is how often?
23      A.  Constant, it doesn't go away.  I mean, I deal
24  with it.  I found ways of dealing with it, I'm not new
25  to pain, but I'm new to this type of pain.  This is a

Page 86

1   bit unique.
2       Q.  So when you went back to the hospital on
3   October -- Let me go back for a second.
4       What doctor told you that the hernia was caused
5   by the fall?
6       A.  That was Coral Springs that said that.
7       Q.  What doctor?
8       A.  The one that was on duty that night.  It's all
9   on the report - the injury was due to the fall.
10      Q.  On October 2nd you were admitted, right?
11      A.  Yes, Ma'am.
12      Q.  Okay.  And you had tried to reduce the hernia
13  yourself?
14      A.  No.  I mean, they said that - they said if you
15  can get it to go back in, we'll be okay, but it didn't
16  want to do that and they kept me overnight and they said
17  if it was still up there like Mount Everest they were
18  going to do surgery.  They came in, he looked at it and,
19  bam, the next thing, I was in prep and it was done.
20      Q.  And you had surgery, what, October 3rd?
21      A.  Um-hum.
22      Q.  The following day?
23      A.  Yes, Ma'am.
24      Q.  Right?
25      A.  Because they wanted to wait to see if it went

Page 87

1   down.
2       Q.  Well, actually October 4th, two days later?
3       A.  Whenever it was.  I spent one night in --  They
4   wanted to watch me, but the lump refused to go down.
5       Q.  And after the surgery, it didn't get better?
6       A.  The surgery itself, the doctor was phenomenal
7   in what he did, but what he did was either severed the
8   nerves, rearranged them, mixed them in - he did
9   something.
10      Q.  You think the doctor severed a nerve?
11      A.  We don't know yet.
12      Q.  Are you investigating that?
13      A.  There is no way to investigate it until I go
14  back in in October.  We have another surgery set for
15  October to see if we can decompress the nerve, and if
16  that can't be fixed, it has to be cut.
17      Q..  Are you going into surgery again?
18      A.  Absolutely.  I can't live like this.
19      Q.  When is this?
20      A.  Sometime in October.
21      Q.  And this is for a nerve decompression?
22      A.  Um-hum.  The problem lies here.
23      Q.  With whom?
24      A.  Dr. Pereira or one of his staff.
25      Q.  Dr. Parra?

Page 88

1       MR. PHILLIPS:  Pereira.
2       A.  Well, one of the two.
3       Q.  (By Ms. Milian)  You have a Dr. Pereira and a
4   Dr. Parra.
5       A.  Well, I had four doctors.  Dr. Kereira won't do
6   the surgery.
7       MR. PHILLIPS:  Dr. Parra is the other one.
8       Q.  (By Ms. Milian)  Who did the first surgery?
9       A.  Parra.
10      Q.  Has Dr. Pereira told you that you have nerve
11  damage?
12      A.  Oh, yes, absolutely.
13      Q.  Have you had nerve blocks?
14      A.  Oh, yes, several.
15      Q.  Who has done the nerve blocks?
16      A.  I've had three or four, I couldn't name them
17  all.
18      MR. PHILLIPS:  He's had injections.  You guys
19  aren't on the same page.  You're talking medical
20  terms, nerve block, and --
21      Q.  (By Ms. Milian)  You have had injections?
22      A.  I had one nerve block.
23      Q.  Do you know what a nerve block is?
24      A.  Yeah, they find the nerve and they stick the
25  needle in there and they squeeze it to try to make it


BRCOSA000066

CHARLES ACKLEY
ACKLEY VS. EQUITY ONE

April 25, 2013
89–92

Page 89

1  all go away.
2      Q.  And when did you have that done?
3      A.  I had that last week by Dr. Kereira.
4      Q.  Pereira?
5      A.  Pereira, whatever his name is, and then I had
6  several injections prior to that.
7      Q.  Who did the injections?
8      A.  My urologist did it, she did two; and then
9  Dr. Gomez, but he didn't do one; and then I went to a
10  clinic in Boca Raton, I believe it was Dr. Stein.
11      Q.  Did Dr. Gomez do injections?
12      A.  No.  We were going to.  We were going to, but
13  my heart wouldn't allow me to do that.
14      Q.  Who is your neurologist?
15      A.  I don't have one at this point.
16      Q.  Are you saying your urologist?
17      A.  Urologist - not neurologist, urologist.  I
18  called her to see if she would take an LOP because it
19  was two weeks after surgery and the inflammation was so
20  bad.  I have pictures of what my testicles looked like.
21      Q.  Who is your urologist?
22      A.  Mimi something-or-other.  It's in my -- I
23  haven't seen her for months.
24      Q.  What group?
25          MR. PHILLIPS:  It's called like

Page 90

1  Urology-something.  It's a weird last name with a
2  "Z".
3          THE WITNESS:  They gave me some
4  anti-inflammatory that worked, but nothing else did.
5      Q.  (By Ms. Milian)  Okay.  Have you seen a
6  neurologist?
7      A.  Not since then.
8      Q.  Not at all?
9      A.  Um-um.
10      Q.  A neurologist.
11      A.  Neurologist, as in brain, no.  I mean, I was
12  looked at, but that was fine.
13      Q.  So Dr. Pereira has recommended the nerve
14  decompression?
15      A.  Yes.
16      Q.  Is that actually scheduled?
17      A.  No, not yet.  We're going through -- I mean,
18  it's months ahead.  We haven't gotten exactly that far
19  ahead, but we have other things scheduled.
20      Q.  What kind of treatment are you undergoing now?
21      A.  He was vague about it and I'll see him on the
22  17th and I'll go more into that.  I need to have my
23  doctor take me off of the Plavix because I believe --
24  I'm not real sure of what type of surgery or procedure
25  this is going to be.  I don't know yet, I'll find out

Page 91

1  next month.
2      Q.  When you were in hospital in October, did you
3  also treat for chest pain?
4      A.  No.
5      Q.  No?
6      A.  My chest, it was all negative.  It was just
7  from the impact.  I'm held together with wire and I have
8  plates and things in my chest.
9      Q.  You have a defibrillator?
10      A.  And I have small plate, too, because they had
11  to put me back together and it hurt.  When I hit the
12  ground, it just hurt, and I'm sorry to have to say it
13  that way.
14      Q.  When was the last time before today you've
15  treated?
16      A.  As in treated?
17      Q.  Received treatment for this injury.
18      A.  For my heart or my lower abdomen?
19      Q.  For the injury in the accident, your groin.
20      A.  Just last week, last Wednesday.
21      Q.  And that was with Dr. Pereira?
22      A.  Um-hum.
23      Q.  And when is your next appointment?
24      A.  The 17th of May.
25      Q.  With Pereira?

Page 92

1      A.  Yes.
2      Q.  Are you treating with any other doctors --
3      A.  No, Ma'am.
4      Q.  -- at this time --
5      A.  No.
6      Q.  -- for this injury?
7      A.  No, Ma'am..
8      Q.  You're not treating with Dr. Gomez?
9      A.  No, Ma'am.
10      Q.  How long did you treat with Dr. Gomez for?
11      A.  Three months, three or four months.
12      Q.  What doctors are treating you under letters of
13  protection?
14      A.  Just Pereira.
15      Q.  Do you have any outstanding medical bills?
16      A.  Yeah, but I don't know how much it is.
17      Q.  You don't know how much?
18          MR. PHILLIPS:  That's what he's got me for.
19      A.  Yeah, I'm not really good at this, obviously.
20      Q.  (By Ms. Milian)  And Medicaid has paid some of
21  your medicals?
22      A.  Hopefully, yeah.
23          MR. PHILLIPS:  As soon as I get the updated
24  medicals, I'll get them to you.
25          MS. MILIAN:  You don't have the updated

BRCOSA000067

CHARLES ACKLEY
ACKLEY VS. EQUITY ONE

April 25, 2013
93–96

Page 93

1  medicals?
2      MR. PHILLIPS: No.
3      Q.   (By Ms. Milian) All right. You said in your
4  interrogatory responses that you're limited in
5  activities --
6      A.   Yeah.
7      Q.   -- your activity level?
8      A.   (Witness nods.)
9      Q.   What do you mean by that?
10     A.   Well, after the surgery, if I may go into
11  length, if it is okay, when I got hurt I lost about 60
12  pounds and I made it my point to get back to healthy
13  again and, even though I could do some things, I was
14  limited due to my heart.
15     Q.   Beforehand?
16     A.   Yeah. I mean, I wasn't full, 100 percent, but
17  there was some things I could do. I could play a little
18  ball with the kids. I couldn't run up a flight of
19  stairs, that scares the hell out of me. I do a little
20  lifting just to stay in shape.
21         I'm 50, but it was all right, but now I don't
22  have any words for it. Sometimes I'll go in the gym
23  when I have enough energy and I'll sit down and try to
24  do something really light, but whenever my lower torso
25  moves, I can't do it.

Page 94

1      Q.   You belong to the gym?
2      A.   No, no, it's just a little thing in the
3  community. No, I don't.
4      Q.   Did you belong to a gym beforehand?
5      A.   No.
6      Q.   And you said you played some football with the
7  boys?
8      A.   Played football. That was in high school. Oh,
9  God, that was 30 years ago.
10     Q.   Okay. And you said before this accident you
11  did some light weight-lifting in your community gym?
12     A.   Yeah. It wasn't heavy, nothing heavy - I mean,
13  10, 15 pounds. I have stretch marks.
14     Q.   What sort of activities were you able to do
15  before this accident that you can't do now?
16     A.   I could walk, do a little bit of this and a
17  little bit of that.
18     Q.   I need more specifics.
19     A.   I could do arm curls if I'm sitting down - if
20  I'm standing up, forget it - and then I can only do that
21  for so long, basically. I could take walks if I went
22  slow.
23     Q.   How limited were you before the accident? How
24  long could you do arm curls?
25     A.   Very little; very, very little. Now I can't do

Page 95

1  it very long at all - I tried. I'm trying to get on
2  with my life, to deal with this pain, but it's not easy.
3      Q.   What else?
4      A.   I could walk. I mean, I could even throw a
5  football occasionally and it didn't hurt my sternum, but
6  other than that I was no hard-core athlete, no.
7      Q.   So when was the last time before this accident
8  you threw a football?
9      A.   Months.
10     Q.   Was that in a game?
11     A.   No, no, just with the boy.
12     Q.   Okay. Did any doctors give you any limitations
13  on your activities after the accident?
14     A.   They basically didn't have to because I already
15  knew I couldn't do anything, I mean. No, they didn't.
16     Q.   Did you have any hobbies?
17     A.   Fishing.
18     Q.   Fishing?
19     A.   Yeah, that was basically it.
20     Q.   And did you do fishing before the fall?
21     A.   Yes.
22     Q.   How about after?
23     A.   No, Ma'am. With all due respect, I haven't
24  done anything.
25     Q.   Well, when was the last time you fished before

Page 96

1  the fall?
2      A.   A couple of months, maybe.
3      Q.   How often did you fish?
4      A.   As often as I could.
5      Q.   How often?
6      A.   I couldn't tell you the sequence of -- Just
7  whenever I could. It could be one day a week or two
8  days a week, I don't recall.
9      Q.   Did you go out on a boat?
10     A.   No.
11     Q.   Was this off a pier?
12     A.   No, just off the backwater, bass.
13     Q.   Okay. And so why haven't you done that at all
14  since?
15     A.   Can't.
16     Q.   Why?
17     A.   It hurts to walk, it hurts to sit, it hurts to
18  do anything.
19     Q.   Did you go to the movies, things like that
20  before?
21     A.   I haven't done anything.
22         MR. PHILLIPS: Listen to the question.
23     Q.   (By Ms. Milian) Before.
24     A.   Before, yes, I did.
25     Q.   How often did you do that?



BRCOSA000068

CHARLES ACKLEY
ACKLEY VS.  EQUITY ONE

April 25, 2013
97–100

Page 97

1   A.  Twice a month, maybe, if something came up with
2  the kids.
3   Q.  You weren't working for years before this
4  accident, so what did you do seven days a week?
5   A.  I only stopped working December 10th, that's
6  two-and-a-half years ago.  Before that I did work.
7   Q.  December 10th of what year?
8   A.  2010 is when I got my SSI.
9   Q.  Okay.  So you weren't disabled from 2007?
10   A.  No, I was not, only from 2010.
11   Q.  So two years before this occurred, you stopped
12  working?
13   A.  I had an active lifestyle.
14   Q.  What were you doing seven days a week when you
15  weren't working?
16   A.  When I was working, I was working.  When I
17  wasn't working, I was fishing, playing with my kids.
18  Sometimes I rode a bike, but not for long.  I was
19  limited in what I would do.
20   Q.  And limited by what?
21   A.  By my heart.
22   Q.  Did you have medical limitations as far as your
23  activities before the fall?
24   A.  I just told you I did - my heart.
25   Q.  Did a doctor --

Page 98

1   A.  Yes.  Yes, I'm on SSI, Ma'am.
2   Q.  Okay.  What limitations did a doctor give you
3  as far as your activities before the fall?
4   A.  Do everything in moderation, very slowly, very
5  easy, and don't over-exert yourself - just to take it
6  easy.  I went from zero to a hundred, now I go from zero
7  to 25.
8   Q.  What do you mean, zero to 25?
9   A.  I'm giving you a scale of what I was before the
10  gunshot wound.  All-out, I was a good athlete.  I did
11  everything I could, which was quite a bit.  I was quite
12  active until the gunshot wound.  After that, it slowed
13  me down.
14   Q.  So to about a 25 percent capacity, is what
15  you're saying now?
16   A.  Um-hum, um-hum.
17   Q.  And what about now?
18   A.  I can't do anything.
19   Q.  What do you do every day?
20   A.  Nothing, just nothing - sitting, nothing,
21  laying down.
22   Q.  You don't watch TV, you don't do anything with
23  your kids, play games, you don't go out to dinner?
24   A.  I can't walk.  We had to sell our car to pay
25  the bills.

Page 99

1   Q.  You obviously still go to Pine Ridge Plaza.
2   A.  My wife does.  I do occasionally when the
3  medicine - when I have my medicine, yeah.
4   Q.  And do you walk over there?
5   A.  Yeah.
6   Q.  And how often do you go since your fall?
7   A.  Once a week, maybe.  As little as possible,
8  because it hurts.
9   Q.  Do you do the shopping?
10   A.  No, my wife does.  I occasionally carry some of
11  the stuff back.
12   Q.  Do you participate in any activities with your
13  kids?
14   A.  No, not now.  Outside of playing Playstation,
15  that's it.
16   Q.  You do Playstation with them?
17   A.  Um-hum.
18   Q.  Anything else, any board games?
19   A.  That's it.  The last few months have not been
20  real good in our household.  In fact, it's tearing my
21  family apart.
22   Q.  The last few months?
23   A.  The last six months, since this has happened,
24  yeah.
25   Q.  What do you mean by it's tearing your family

Page 100

1  apart?
2   A.  My wife had to quit to take care of me, okay?
3  We've already been through that.  Then when she went
4  back to get her job, she couldn't, so we went without
5  money, we went without anything.  We had to sell our
6  possessions.  My wife's wedding ring was even sold.
7  None of this should have happened.
8   Q.  And that's because she quit her job for six
9  months?
10   A.  She had to.
11   Q.  And that was just to take care of you?
12   A.  Yes.
13   Q.  Okay.  You didn't have anybody else coming in
14  to take care of you?
15   A.  No, Ma'am.  My parents have been dead for some
16  years.  I have no brothers or sisters.  Her family lives
17  in Paris.
18   Q.  Did you have a doctor's recommendation for home
19  healthcare?
20   A.  No, I didn't.
21   Q.  Have you travelled at all since your fall?
22   A.  No, I have not.
23   Q.  How long did your wife have to assist you in
24  bathing?
25   A.  The first couple months, that's for sure.



BRCOSA000069

CHARLES ACKLEY
ACKLEY VS. EQUITY ONE

April 25, 2013
101–104

Page 101

1 After that, after that, I got some -- Pretty much for
2 about the first three months, until I got used to where
3 I could move my leg to where it wouldn't hurt.
4     Q.  So this was about after your surgery for a
5 couple months?
6     A.  Yeah, and then we had the flu on top of it,
7 which is irrelevant but it didn't make things any
8 better.
9     Q.  Everybody in your family got the flu?
10    A.  Everybody, yeah.
11    Q.  All right.  So if she helped you out for a
12 couple of months, why did she not go back to work for
13 six months?
14    A.  I just told you her job wasn't there.
15    Q.  So she had to find a new job?
16    A.  Yes.  Yes.
17    Q.  They didn't have family medical leave where she
18 worked?
19    A.  No.
20        MR. PHILLIPS:  I have to use the rest room.
21        (Recess taken from 3:23 p.m. to 3:30 p.m.)
22        MS. MILIAN:  Okay, back on.
23    Q.  (By Ms. Milian)  Have you had sex with your
24 wife at all since this fall?
25    A.  (Witness shakes head.)

Page 102

1     Q.  Not at all?
2     A.  No.
3     Q.  You haven't even tried?
4     A.  Oh, we tried.
5     Q.  Well, did you tell your doctor that your
6 condition is aggravated when having sex?
7     A.  Yes.
8     Q.  That was in December, right?
9     A.  Just last week I told him, I told every doctor
10 since.
11    Q.  Okay.  So how do you know that if you didn't
12 have sex?
13    A.  What?
14        MR. PHILLIPS:  What was that?
15    Q.  (By Ms. Milian)  How do you know that your
16 condition was aggravated when having sex?
17    A.  Because I tried.  I mean, really.
18    Q.  Okay.  On how many occasions?
19    A.  Wow, you mean -- Okay, I'm not going to answer
20 that.  I just about -- Okay, whenever I felt the mood
21 or tried to be intimate with my wife, I tried and we'll
22 leave that at that.  It doesn't work.  It causes such
23 excruciating pain that it doesn't happen.
24    Q.  Have you ever had like an episode of like
25 light-headedness or dizziness before your fall?

Page 103

1     A.  No.
2     Q.  What about back in October of 2010, when you
3 almost passed out at a casino?
4     A.  It was due to my heart.  I was over-medicated.
5     Q.  And was that over an episode of dizziness?
6     A.  I'm not sure what it was, it's been too long to
7 remember, but I do know for a couple of years they were
8 giving me the wrong medication, but that's been
9 remedied.
10    Q.  How about light-headedness?  Did you have --
11    A.  No.
12    Q.  You never told a doctor that?
13    A.  I may be getting light, I mean, from my heart,
14 but it's only because of the medication that I'm taking
15 now.
16    Q.  How about on the day of your fall?  Was there
17 any dizziness before you fell?
18    A.  Actually, I didn't have any at that time
19 because I just left my HMO, Ms. Lilia Beers.
20    Q.  Right before your fall you didn't have any kind
21 of problems?
22    A.  No.
23    Q.  Difficulty walking?
24    A.  No.
25    Q.  Light-headedness?

Page 104

1     A.  No.
2     Q.  No?  Now, you have a family phone and you have
3 your own phone?
4     A.  We have several phones in the house.
5     Q.  Okay.
6     A.  Each one of us, we just grab one.  There's two
7 kids and us in the house.
8     Q.  So the phone you have with you today is --
9     A.  Is actually my wife's phone.
10    Q.  And that's not the phone she used to take
11 pictures?
12    A.  I will make sure I will get you those pictures.
13    Q.  And she has MetroPCS?
14    A.  Um-hum.
15    Q.  It's a Samsung phone?
16    A.  Um-hum.
17    Q.  Yes?
18    A.  Yes, yes, sorry.
19    Q.  How do your kids get to school?
20    A.  Bus.  One of the reasons -- Yeah, bus, bus.
21    Q.  Do they do any activities, extracurricular
22 activities?
23    A.  Very little.
24    Q.  Why is that?
25    A.  Because of me.



BRCOSA000070

CHARLES ACKLEY
ACKLEY VS. EQUITY ONE

April 25, 2013
105–108

Page 105

1    Q.   Well, why is that?
2    A.   Because I can't do anything with them.
3    Q.   Well, are they in band or do they play sports?
4    A.   No.  One's in fifth grade, one's in seventh
5    grade.  Until we get a car I can't exactly take the boys
6    and go to soccer practice.  I'm not the only one hurting
7    here, it's my entire family.
8    Q.   Did they participate in extracurricular
9    activities before your fall?
10   A.   Yes, they did.
11   Q.   What?
12   A.   Soccer, football.
13   Q.   Who played soccer?
14   A.   Carla and Jordan both.  We were in Weston at
15   the time.
16   Q.   You were living in Weston?
17   A.   Well, they were, yeah.
18   Q.   So that was two years before?
19   A.   Quite a few years back.  I can't remember
20   exactly when.
21   Q.   So they were little?
22   A.   Well, yeah.  They're still little.
23   Q.   And before your fall they were in, what, still
24   in fifth grade and seventh grade or --
25   A.   Last year they were still in the grades they're

Page 106

1    in now, fifth and seventh.
2    Q.   Okay.  So before your fall, like during the
3    summer before your fall, were they doing any activities?
4    A.   Yeah.  We would go swimming.  I used to be a
5    surfer and we would go to the beach occasionally, things
6    like that - family stuff.
7    Q.   You don't go swimming anymore?
8    A.   It's kind of exerting.  Before I would go in,
9    but I just wouldn't go in all day like I used to.
10   Q.   Are you able to swim since your fall?
11   A.   No.
12   Q.   Why not?
13   A.   I can barely walk, let alone swim.
14   Q.   Did you travel before your fall?
15   A.   Now and again, yes, I did.
16   Q.   When was the last time you travelled
17   beforehand?
18   A.   It's been some years, 2008, 2009 - 2008.
19   Q.   Where did you travel?
20   A.   All over the United States.  I had some things
21   I was doing, I went to Chicago, I went to -- I just
22   travelled.
23   Q.   That was when you were still working?
24   A.   Sort of.
25   Q.   Okay.  And France?

Page 107

1    A.   Um-hum.
2    Q.   Yes, you travelled?
3    A.   Um-hum.
4    Q.   Do you still travel to and from France?
5    A.   (Witness shakes head.)
6    Q.   Do you have family in France?
7    A.   My wife does.  All my family are gone except
8    for my children.
9    Q.   How often do you go to France?
10   A.   Once a year, maybe, twice a year, maybe,
11   sometimes.  Lately it's been nil.
12   Q.   When was the last time you were there?
13   A.   A couple years back.  I can't recall exactly
14   when.
15       MS. MILIAN:  Okay, I think I'm done.  Let me
16   just do a quick check about something.  Okay, I
17   don't have anything else.
18       MR. PHILLIPS:  We'll read.  We're done.
19       MS. MILIAN:  I don't need it transcribed at
20   this time.
21       (The deposition concluded at 3:35 p.m.)
22       (Reading and signing of the deposition by the
23   witness has been reserved.)
24
25

Page 108

1              CERTIFICATE
2
3
4
5    THE STATE OF FLORIDA      )
6    COUNTY OF BROWARD         )
7
8
9        I hereby certify that I have read the foregoing
10   deposition by me given, and that the statements
11   contained therein are true and correct to the best of my
12   knowledge and belief, with the exception of any
13   corrections or notations made on the errata sheet, if
14   one was executed.
15
16
17   Dated this_____day of_____2013.
18
19
20
21
22
23   _____
24        Charles Ackley
25



BRCOSA000071

CHARLES ACKLEY
ACKLEY VS. EQUITY ONE

April 25, 2013
109–112

Page 109

```
1   DEPOSITION ERRATA SHEET
2
3
4   Our Assignment Number: 383074
5
6   Case Caption: Charles Ackley v. Equity One
7
8          DECLARATION UNDER PENALTY OF PERJURY
9       I declare under penalty of perjury that I
10  have read the entire transcript of my Deposition taken
11  in the captioned matter or the same has been read to me,
12  and the same is true and accurate, save and except for
13  changes and/or corrections, if any, as indicated by me
14  on the DEPOSITION ERRATA SHEET hereof, with the
15  understanding that I offer these changes as if still
16  under oath.
17      Signed on the ____ day of _____, 2013.
18
19  _____
20      Charles Ackley
21
22
23
24
25
```

Page 110

```
1              DEPOSITION ERRATA SHEET
2   Page No. _____ Line No. _____ Change to: _____
3   _____
4   Reason for change:_____
5   Page No. _____ Line No. _____ Change to: _____
6   _____
7   Reason for change:_____
8   Page No. _____ Line No. _____ Change to: _____
9   _____
10  Reason for change:_____
11  Page No. _____ Line No. _____ Change to: _____
12  _____
13  Reason for change:_____
14  Page No. _____ Line No. _____ Change to: _____
15  _____
16  Reason for change:_____
17  Page No. _____ Line No. _____ Change to: _____
18  _____
19  Reason for change:_____
20  Page No. _____ Line No. _____ Change to: _____
21  _____
22  Reason for change:_____
23  _____
24  SIGNATURE:_____ DATE: _____
25      Charles Ackley
```

Page 111

```
1              DEPOSITION ERRATA SHEET
2   Page No. _____ Line No. _____ Change to: _____
3   _____
4   Reason for change:_____
5   Page No. _____ Line No. _____ Change to: _____
6   _____
7   Reason for change:_____
8   Page No. _____ Line No. _____ Change to: _____
9   _____
10  Reason for change:_____
11  Page No. _____ Line No. _____ Change to: _____
12  _____
13  Reason for change:_____
14  Page No. _____ Line No. _____ Change to: _____
15  _____
16  Reason for change:_____
17  Page No. _____ Line No. _____ Change to: _____
18  _____
19  Reason for change:_____
20  Page No. _____ Line No. _____ Change to: _____
21  _____
22  Reason for change:_____
23  _____
24  SIGNATURE:_____ DATE: _____
25      Charles Ackley
```

Page 112

```
1              CERTIFICATE OF OATH
2
3
4
5
6   THE STATE OF FLORIDA      )
7
8   COUNTY OF BROWARD         )
9
10      CHARLES ACKLEY, personally appeared before me
11  and was duly sworn.
12
13
14      WITNESS my hand and official seal this 16th day
15  of July, 2013.
16
17
18
19  _____
20  Gail Hmielewski
21  Notary Public - State of Florida
22  My Commission No. EE 155809
23  Expires: January 24, 2016
24
25
```



Page 113

1          REPORTER'S DEPOSITION CERTIFICATE

2

3

4    STATE OF FLORIDA )

5    COUNTY OF BROWARD )

6

7          I, Gail Hmielewski, Court Stenographer, State
     of Florida at Large, do hereby certify that the
8    aforementioned witness was by me first duly sworn or
     affirmed to testify the whole truth; that I was
9    authorized to and did report said deposition in
     stenotype; and that the foregoing pages, numbered from 4
10   to 107, inclusive, are a true and correct transcription
     of my shorthand notes of said deposition.

11
           I further certify that said deposition was
12   taken at the time and place hereinabove set forth and
     that the taking of said deposition was commenced and
13   completed as hereinabove set out.

14         I further certify that I am not an attorney or
     counsel of any of the parties, nor am I a relative or
15   employee of any attorney or counsel of any party
     connected with the action, nor am I financially
16   interested in the action.

17         The foregoing certification of this transcript
     does not apply to any reproduction of the same by any
18   means unless under the direct control and/or direction
     of the certifying reporter.

19
           IN WITNESS WHEREOF, I have hereunto set my
20   hand this 16th day of July, 2013.

21

22

23

24   _____
     Gail Hmielewski, Court Stenographer

25



BRCOSA000073

# EXHIBIT 3

BRCOSA000074



**FLORIDA**
DEPARTMENT OF
**FINANCIAL SERVICES**



**Jeff Atwater**
CHIEF FINANCIAL OFFICER
STATE OF FLORIDA

## Affidavit

**Name:** David Battle

**Date:** October 22, 2014

**Address:** EMSI Investigative Services
9485 Regency Square Blvd.
Suite 400
Jacksonville, Fl 32225

**Time:** 1115 hours

**Phone:** (888) 932-7364

**Comments:** David Battle is a contracted investigator assigned to the surveillance of claimant Charles Ackley.

At the above date and time I responded to the Division of Insurance Fraud office located at 1400 W. Commercial Blvd. Ft. Lauderdale, FL 33309. There I viewed two video discs and the Confidential Investigative Report (dated July 23, 2013) included in the presentation prepared by Detective Wendy Unger to the Palm Beach County State's Attorney office. I attest to the veracity of both videos and the report, and swear all three are my work product as produced at the time of my involvement with the investigation.

**I swear or affirm that the above affidavit was completed / approved by me and is true and correct to the best of my knowledge and belief.**

**Sworn to and subscribed to on**
**This** _22_ **day of** _October_ **,20** _14_

_Det Wendy Unger_
**Notary / Law Enforcement Officer conducting**
**Official police investigation. (Ref. Sec. 117.10 F.S.)**

Print Name _DAVID BATTLE_

Signature _(signature)_

BRCOSA000075

**ICS | MERRILL**

*EMSI Investigative Services*

**THIS CONFIDENTIAL REPORT IS SUBMITTED IN ANTICIPATION OF FUTURE LITIGATION.
IT IS AND SHOULD ALWAYS BE CONSIDERED ATTORNEY/CLIENT WORK PRODUCT.**

**CONFIDENTIAL INVESTIGATIVE REPORT**
**July 23, 2013**

| Attn: Lee Janicek | YOUR FILE NO. | E2906093 |
|---|---|---|
| CNA Insurance Co.-FCM | OTHER FILE NO. | Not Provided |
| P. O. Box 8317 | OUR FILE NO. | 201307-1406.1 |
| Chicago, IL  60680 | INSURED | Equity One Inc |
| | SUBJECT/CLAIMANT | Charles Ackley |
| | SSN | |
| | DATE OF LOSS | 9/24/2012 |
| ASSIGNMENT RECEIVED | 7/17/2013 | |
| TYPE OF CLAIM | Accident Claim | |
| REPORTED INJURY | Abdomen | |

| INVESTIGATOR | David Battle |
|---|---|
| ASSIGNMENT | Surveillance |
| OBJECTIVE | To determine the activities and abilities of the claimant |
| STATUS | Final |

| PRELIMINARY INVESTIGATION |
|---|

**Inquiry Review:** The request was carefully reviewed.  An investigative action plan was formulated.

**Data:** An NCR was pulled on the claimant which did not show the reported address.  His last address was in Coral Springs.  No vehicles were found to be associated to the claimant.  Multiple arrests were located and the claimant is reported as a convicted felon for a violent crime.  An arrest search is suggested.

**Satellite and Mapping:** Google Earth was utilized to scout the subject neighborhood for surveillance positions and points of egress.

**Basic Internet Search:** No social networking hits were located for the claimant.  Reverse searches failed to yield viable information regarding the claimant.  The Broward Clerk of Courts yielded one hit. Mugshots.com provided a recent image of the claimant as follows:



BRCOSA000076

Charles Ackley
Page 2 of 11

| | |
|---|---|
| Broward County Case Number: **91010032CF10A** | State Reporting Number: **061991CF010032A88810** |
| Court Type: **Felony** | Case Type: **Felony** |
| Filing Date: **05/28/1991** | Case Status: **Disposed** |
| Court Location: **Central Courthouse** | Judge ID / Name: **Judge, Unassigned** |
| Magistrate ID / Name: **N/A** | BCCN: **0062395** |

Style: **State of Florida Vs. Ackley, Charles**

**Party Detail**

| Party Type | Party Name | Sex | Race | D.O.B. | Attorneys / BarID<br>* Denotes Lead Attorney |
|---|---|---|---|---|---|
| Defendant | Ackley, Charles<br>Ackley, Charles Albert<br>Asher, Charles Neil | Male | White | 04/24/1962 | |
| State | State of Florida | | | | |

**Future Scheduled Hearings**

There is no key date information available for this case.

**Charge Detail**

| Select Charge | Charge | Citation/NTA Number | Status | Offense Date | Statute | Description | Filed On | Filed By |
|---|---|---|---|---|---|---|---|---|
| ○ | 1 | | Disposition Entered | 05/27/1991 | 810.02(1)3 | Burglary Of A Dwelling | 06/14/1991 | Plantation PD |

---

### INVESTIGATIVE SUMMARY

On **Thursday, July 18, 2013,** surveillance was conducted at **1182 SE 2nd Avenue Deerfield Beach, FL.** At 7:01 a.m., the claimant was briefly observed in the doorway. At 9:18 a.m., the claimant was briefly observed in the driveway. At 9:55 a.m., the claimant answered the door to a mail carrier and signed for an item. At 10:08 a.m., the claimant was observed briefly in the driveway. At 10:44 a.m., the claimant departed on a bicycle. He rode to a Winn Dixie grocery store 1019 South Federal Highway Deerfield Beach, FL., which he entered briefly before riding the bicycle back home at 10:55 a.m. At 11:58 a.m., the claimant stood in the doorway and stared at a female walking by the front of his residence.

On **Friday, July 19, 2013,** surveillance was conducted at **1182 SE 2nd Avenue Deerfield Beach, FL**. At 8:04 a.m., the claimant was observed briefly in front of his residence. At 8:58 a.m., the claimant moved his bicycle from the carport to the rear of the residence. At 9:22 a.m., the claimant took a leashed dog around the block in his neighborhood using a skateboard. He returned back inside the residence at 9:27 a.m. At 11:04 a.m., the claimant spoke on a phone in front of the residence. At 11:13 a.m., the claimant was briefly observed in front of the residence. At 12:04 p.m., the claimant was briefly observed in front of the residence. At 12:27 p.m., the claimant spoke on a phone in front of the residence.

On **Sunday, July 21, 2013,** surveillance was conducted at **1182 SE 2nd Avenue Deerfield Beach, FL,** where no vehicles were present. At 8:34 a.m., the claimant departed on a bicycle accompanied by a female on foot. They traveled toward a bus stop where they interacted with another male. The claimant appeared to purchase a second bicycle from the other male. After the female entered the bus the claimant rode one bike while guiding the second back to his residence at 9:09 a.m. At 9:21 a.m., the claimant brought both bikes to the rear of the residence. At 9:25 a.m., the claimant spoke on a phone in front of the residence. At 9:47 a.m., the claimant again spoke on a phone in front of his residence. At 10:08 a.m., the claimant drove the newly purchased bike around his neighborhood. He appeared to be testing it. At 12:20 p.m., the claimant departed on a bike and traveled to a Circle K convenience store at 4791 Dixie Highway, Pompano Beach, FL., where he loitered for a considerable time interacting with other individuals. He engaged in a (unknown type) transaction with another individual before returning back to his residence at 1:19 p.m.

---

### VIDEO DOCUMENTATION

**90 minutes and 59 seconds** of video documentation was obtained during this investigation, of which **81 minutes and 35 seconds** depicts claimant activity.

**https://www.tmgcase.com/mgis2/VideoStream.asp?sid=12759642**

*The hyperlink is active for one (1) year from the date of the report. If you need this link to reactivated, please contact ICS|MERRILL at (888) 932-8364.*

BRCOSA000077

**Charles Ackley**
**Page 3 of 11**

As is customary, the original video data will be securely maintained at our corporate office in Jacksonville, Florida.

## PHYSICAL DESCRIPTION

The claimant can be described as a 51 year old, Caucasian male with the following features: bald hair, 6'0", and approximately 180 lbs.

Addtl Info: Tattoos on front of body. The claimant's provided Date of Birth is 4/24/1962.



  

BRCOSA000078

**Charles Ackley**
**Page 4 of 11**

| RESIDENTIAL ASSESSMENT |
|---|

The Claimant currently resides at the address of **1182 SE 2nd Avenue Deerfield Beach, FL 33441** which is a single story, single family residence of concrete block construction with a car port and no garage. The mail box is attached to the structure near the front door.



| VEHICLES |
|---|

No vehicles were found to be registered to or associated with the claimant. The claimant was noted to ride a bicycle.

| CUSTOMER CONTACT |
|---|

Lee Janicek was updated throughout the surveillance period.

| CONCLUSIONS |
|---|

The claimant rode a bicycle; skate boarded with a dog and was observed walking in front of his residence. When observed, he wore no visible braces or orthopedic support devices. There was no indication to support that the claimant is currently employed.

Should you need any additional assistance to this file, please feel free to contact our Jacksonville, Florida office and it will be addressed immediately.

| ENCLOSURES | None |
|---|---|

## DETAILS OF INVESTIGATION

**Surveillance**
**1182 SE 2nd Avenue**
**Deerfield Beach, FL**
**Thursday, July 18, 2013**

Weather: Cloudy, Rain 80s (F)

6:01 a.m. (Video)
Surveillance was initiated at 1182 SE 2nd Avenue Deerfield Beach, FL where no vehicles were present. A surveillance position was taken where the front of the residence was observable as follows:

**Charles Ackley**
**Page 5 of 11**



6:55 a.m. (Video)
Video was obtained documenting the area and surveillance position.  No claimant activity was observed.

**7:01 a.m. (Video)**
The claimant was briefly observed in the doorway of his residence.



7:56 a.m. (Video)
Video was obtained documenting the area and surveillance position.  No claimant activity was observed.

8:48 a.m. (Video)
Video was obtained documenting the area and surveillance position.  No claimant activity was observed.

**9:18 a.m. (Video)**
The claimant walked toward the street and looked South before returning back to the residence.



**9:55 a.m. – 9:56 a.m. (Video)**
A USPS delivery person knocked on the door which the claimant answered.  They conversed while the claimant appeared to sign for an item.

**Charles Ackley**
**Page 6 of 11**



**10:08 a.m. (Video)**
The claimant was briefly observed in the car port area of the residence.

**10:44 a.m. – 10:47 a.m. (Intermittent Video)**
After departing the residence on a bicycle, the claimant road out of the area.  Mobile surveillance was engaged.



**10:48 a.m. – 10:49 a.m. (Intermittent Video)**
The claimant left his bicycle in front of the Winn Dixie grocery store at 1019 South Federal Highway Deerfield Beach, FL.

**10:51 a.m. – 10:55 a.m. (Intermittent Video)**
After exiting the grocery store the claimant road the bicycle out of the area.



10:55 a.m.
The claimant returned to his residence.

**11:58 a.m. (Video)**
As a female walked by the front of the claimant's residence, he was observed in the doorway staring at her until she was out of view and he returned inside the house.

**Charles Ackley**
**Page 7 of 11**



1:02 p.m. (Video)
Video was obtained documenting the area and surveillance position.  No claimant activity was observed.

2:01 p.m. (Video)
Video was obtained documenting the area and surveillance position.  No further claimant activity was observed and the surveillance was terminated for the day.


**Surveillance**
**1182 SE 2nd Avenue**
**Deerfield Beach, FL**
**Friday, July 19, 2013**

Weather: Partly Cloudy,  80s (F)

7:37 a.m. (Video)
Surveillance was initiated at 1182 SE 2nd Avenue Deerfield Beach, FL where no vehicles were present.

**8:04 a.m. – 8:05 a.m. (Video)**
The claimant was observed briefly in front of the residence.



8:58 a.m. (Video)
Video was obtained after the claimant briefly came into view and brought the bicycle from the car port to the rear of the residence.

**9:22 a.m. - 9:27 a.m. (Intermittent Video)**
After exiting the house with a leashed dog, the claimant utilized a skate board to ride with the dog around his neighborhood block before returning home.

BRCOSA000082

**Charles Ackley**
**Page 8 of 11**



10:45 a.m. (Video)
Video was obtained documenting the area and surveillance position.  No claimant activity was observed.

**11:03 a.m. – 11:05 a.m. (Video)**
The claimant was observed speaking on a phone in front of the residence.



**11:13 a.m. (Video)**
The claimant was briefly observed in front of his residence.

**12:04 p.m. (Video)**
Video was obtained of the claimant as he was briefly observed in front of his residence.



**12:27 p.m. – 12:28 p.m. (Intermittent Video)**
The claimant was again observed using the phone in front of the residence.



**Charles Ackley**
**Page 9 of 11**

1:55 p.m. (Video)
Video was obtained documenting the area and surveillance position. No claimant activity was observed.

3:15 p.m. (Video)
Video was obtained documenting the area and surveillance position. No claimant activity was observed.

3:37 p.m. (Video)
Video was obtained documenting the area and surveillance position. No further claimant activity was observed and the surveillance was terminated for the day.


**Surveillance**
**1182 SE 2nd Avenue**
**Deerfield Beach, FL**
**Sunday, July 21, 2013**

Weather: Mostly Clear, 80s - 90s (F)

7:56 a.m. (Video)
Surveillance was initiated at 1182 SE 2nd Avenue Deerfield Beach, FL where no vehicles were present.

**8:34 a.m. - 9:10 a.m. (Intermittent Video)**
The claimant departed the residence on a bicycle. He was accompanied by female who was on foot. He rode slowly to stay with her while she walked. While traveling they interacted with a male individual and appeared to engage in transaction, which involved the purchase of another bicycle. After completing the purchase, they continued to a bus stop on Dixie Highway where they waited for a bus to arrived which the female entered and left the area. The claimant took the additional bike and rode back to his residence.

 

 

**9:21 a.m. – 9:22 a.m. (Video)**
The claimant brought both bikes from the carport to the rear of the residence.

**9:25 a.m. - 9:28 a.m. (Intermittent Video)**
The claimant spoke on a phone in front of his residence.

**Charles Ackley**
**Page 10 of 11**



**9:47 a.m. (Video)**
The claimant again spoke on a phone in front of the residence.

**10:07 a.m. - 10:15 a.m. (Intermittent Video)**
After exiting the property on the newly purchased bike, the claimant rode it around the neighborhood in a manner consistent with testing the vehicle.  Afterward he returned onto the property.



11:12 a.m. (Video)
Video was obtained documenting the area and surveillance position.  No claimant activity was observed.

**12:20 p.m. - 12:32 p.m. (Intermittent Video)**
The claimant departed the area alone on the Bike with a backpack.  He rode the bike to a Circle K convenience store at 4791 Dixie Highway, Pompano Beach, FL.  After putting the bike upside down, he then entered the store where he was observed interacting with an employee.



**12:33 p.m. - 1:12 p.m. (Intermittent Video)**
After being observed twice in the doorway of the convenience store the claimant exited and brought his bike to the side where he drank an energy drink and appeared to wait for an unknown individual.  After some time he rode the bike across the street and met with another male. They engaged in what appeared to be a transaction before the claimant departed the parking lot and road in the general direction of his residence.

BRCOSA000085

**Charles Ackley**
**Page 11 of 11**

 



**1:14 p.m. - 1:20 p.m. (Intermittent Video)**
After riding the bike along neighborhood streets, the claimant returned home and pulled the bike out of view behind the residence.



**1:59 p.m. (Video)**
Video was obtained documenting the area and surveillance position.  No claimant activity was observed.

**3:02 p.m. (Video)**
Video was obtained documenting the area and surveillance position.  No claimant activity was observed.

**4:01 p.m. (Video)**
Video was obtained documenting the area and surveillance position.  No further claimant activity was observed and the surveillance was terminated for the day.

**END OF REPORT**

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO. CACE 12-031439

CHARLES ACKLEY,

        Plaintiff,

vs.

EQUITY ONE (Florida portfolio), INC. and
EILERSON DEVELOPMENT CORPORATION,

        Defendants.

_____

DEPOSITION OF CHARLES ACKLEY

Tuesday, November 19, 2013
10:42 a.m. - 2:10 p.m.

324 North Lakeside Court
West Palm Beach, Florida

Stenographically Reported By:
DARLENE L. GRANDINETTI, FPR, CSR
Florida Professional Reporter

---

2

1
2    APPEARANCES:
3    On behalf of the Plaintiff:
4
5        PINCUS & CURRIER, LLP
        324 North Lakeside Court
        West Palm Beach, Florida  33407
6        561-868-1340
        sphillips@wprclaw.com
7        BY:  STEVEN P. PHILLIPS, ESQ.
8
9    On behalf of the Defendant Eilerson Development:
10       PRATT & RADFORD, PL
        340 Columbia Drive
        Suite 111
11      West Palm Beach, Florida  33409
        561-640-0330
12      kspcourtdocs@prattradford.com
        BY:  KENT S. PRATT, ESQ.
13
14    On behalf of the Defendant Equity One:
15       LAW OFFICE OF LORRAINE LESTER
        8100 SW 10th Street
16      Suite 2500
        Plantation, Florida  33324
17      954-424-4667
        rosalind.milian@cna.com
18      BY:  ROSALIND R. MILIAN, ESQ.
19
20    ALSO PRESENT TELEPHONICALLY:  Margaret Carden.
21
22
23
24
25

---

3

1           INDEX OF PROCEEDINGS

2  Deposition of CHARLES ACKLEY        PAGE
3  Direct Examination by Mr. Pratt      4
4  Cross Examination by Ms. Milian     90
5  Redirect Examination by Mr. Pratt   120
6  Certificate of Oath             126
    Certificate of Reporter          127
7  Read and Sign Letter           128
    Errata Sheet                 129
8
9         DEFENDANT'S EXHIBITS
10  No. 1 (Photograph - attached)    18
11  No. 2 (Photograph - attached)    18
12  No. 3 (Photograph - attached)    18
13  No. 4 (Photograph - attached)    18
14  No. 5 (Photograph - attached)    18
15  No. 6 (Photograph - attached)    18
16  No. 7 (Photograph - attached)    18
17  No. 8 (Photograph - attached)    18
18  No. 9 (Photograph - attached)    18
19  No. 10 (Photograph - attached)   18
20  No. 11 (Photograph - attached)   18
21  No. 12 (Photograph - attached)   18
22  No. 13 (Photograph - attached)   18
23  No. 14 (Photograph - attached)   18
24
25

---

4

1       Deposition taken before Darlene L.
2  Grandinetti, Florida Professional Reporter and
3  Notary Public in and for the State of Florida at
4  Large in the above cause.
5            * * * * *
6      THE COURT REPORTER:  Do you swear the
7  testimony you are about to give will be the
8  truth, the whole truth, and nothing but the
9  truth?
10     THE WITNESS:  Yes, I do.
11  Thereupon,
12          CHARLES ACKLEY
13    having been first duly sworn, was examined
14  and testified as follows:
15         DIRECT EXAMINATION
16  BY MR. PRATT:
17    Q  Tell me your name, please?
18    A  Charles Ackley.
19    Q  Mr. Ackley, my name is Kent Pratt, I
20  represent EDC in this lawsuit, one of the
21  defendants.  I did not have the opportunity to
22  depose or be in attendance at your first deposition
23  that was taken in May by Ms. Milian, my client
24  wasn't a party at that time, so this is my
25  opportunity to take your deposition.

BRCOSA000087

5

1    I know that you have been through the
2  process, but let me just remind you of a couple of
3  things. Number one, I need a verbal response, out
4  loud response to my questions because our court
5  reporter has to record an answer and she may not see
6  you nod your head or shake your head.
7         Number two, you have to answer all of my
8  questions unless, of course, your attorney instructs
9  you not to answer, and he might do that if I invade
10  the attorney/client privilege or something like
11  that.
12        MR. PHILLIPS:  He won't do that, though.
13     Q   I will promise you I will try not to do
14  that.
15     A   Okay.
16     Q   So I don't see a problem there.
17        Number three, I want to make sure that
18  when you give me a response, that you have
19  completely understood my question.  So number one,
20  wait for the question to come out before you answer,
21  and number two, make sure that you have understood
22  what it is that I am asking, and if you don't, tell
23  me I don't understand your question, would you reask
24  it, rephrase it, whatever.
25        If I use a term that you don't understand,

6

1  tell me that.  My job here today is not to trick you
2  into saying something you didn't mean to say; it's
3  to find out as much information I can about your
4  claim and advise my client accordingly.
5         Certainly this is not an endurance
6  contest, so if you need a break, holler and we'll
7  take as many breaks as we need to get through this.
8  I don't think it will be too, too long, but I do
9  have several questions for you.
10        All right.  Do you understand those rather
11  wordy instructions?
12     A   Yes.
13     Q   Thank you.
14        Let's start by telling me where you are
15  currently living?
16     A   1182 Southeast Second Avenue, Deerfield
17  Beach, Florida, 33441.
18     Q   334?
19     A   41.
20     Q   41.
21        Unfortunately, I didn't realize that you
22  had not yet answered my Interrogatories, which are
23  written questions propounded to you.  But you have
24  answered Interrogatories to Ms. Milian, and, of
25  course, you gave your deposition and when you did

7

1  your current address was 8977 Wiles Road.  This is a
2  new address since that time.  How long have you been
3  at your new address?
4     A   Almost six months.
5     Q   Is it a single family home?
6     A   Yes.
7     Q   Single family?
8     A   Yes, it is.
9     Q   Are you a purchaser of that home?
10     A   No, sir; I rent.
11     Q   Who is your landlord?
12     A   Cassey Johnson.
13     Q   Excuse me?
14     A   Cassey Johnson.
15     Q   Is that a female?
16     A   Yes.
17     Q   Where does Ms. Johnson reside or how would
18  you get in touch with her?
19     A   She lives in Polk County outside of Tampa,
20  and when we need to, we just call each other.
21     Q   And what is your monthly rental expense?
22     A   It varies.  I have been doing some
23  litigation -- not litigation, but I was helping her
24  get a loan modification, so I was helping her do
25  that while she was getting her things together and

8

1  all that and it basically varies.  It could be 300
2  one month, 400.  It all depends on what gets done
3  that month.
4     Q   How big is the home, how many bedrooms?
5     A   Two bedroom, two bath.
6     Q   And who lives there with you?
7     A   My fiance and our two children.
8     Q   Your fiance's name?
9     A   Fabienn Elbaz.
10     Q   You called her fiance.  She's not -- Were
11  you not -- You are not married to her; correct?
12     A   No, not yet.
13     Q   Okay.  And is that E-l-b-a-z?
14     A   Uh-huh.
15     Q   That's yes?
16     A   Yes.  I'm sorry.
17     Q   That's the other thing I forgot to tell
18  you about.
19     A   Sorry.  Yes.  Yes, it is.
20     Q   All right.  You have been with Fabienn how
21  many years?
22     A   Quite awhile.  Six, seven something like
23  that, yeah.
24     Q   And you have two children, as well?
25     A   Hers from a previous marriage.  They

BRCOSA000088

9

```
 1   are not my children.
 2       Q    That's okay.
 3       A    I'm sorry.
 4       Q    That's okay.
 5            And what are their names and ages?
 6       A    Carla Chroukroun, she's 12.  Jordan
 7   Chroukroun, he's 13.
 8       Q    How are you spelling Chroukroun?
 9       A    C-h-r-o-u-k-r-o-u-n.  Very French.
10       Q    Jordan is how old?
11       A    13.
12       Q    Jordan is a male?
13       A    Yes.
14       Q    Are they in school?
15       A    Yes.
16       Q    Where do they attend school?
17       A    Deerfield Middle.
18       Q    Are you currently employed?
19       A    No, sir, I am not.
20       Q    How about Fabienn?
21       A    Yes, she's employed.
22       Q    Where does she work?
23       A    It's a pet -- It's a delicatessen at the
24   Fiesta Flea Market on Sample Road.
25       Q    Do you know the name of the deli?
```

10

```
 1       A    Fiesta Pet Deli.  It's actually a deli for
 2   both pets and humans.  Have actually the same --
 3       Q    They have what?
 4       A    They actually get the same food for their
 5   animals.  They eat the same food they give their
 6   animals.
 7       Q    Interesting.
 8            How long has she been employed there?
 9       A    About six months; since we moved.
10       Q    Your previous address at Wiles Road, was
11   that a rental unit, as well?
12       A    Yes, it was.
13       Q    Why did you move?
14       A    We couldn't afford the rent anymore.  We
15   just couldn't afford the rent.
16       Q    Other than the four of you, anyone else
17   currently live in your home?
18       A    No.
19       Q    Any pets?
20       A    Yes.
21       Q    How many pets?
22       A    Two.
23       Q    What are they?
24       A    One cat Nikko, one pit bull named Sky.
25   The pit bull came with the house.
```

11

```
 1       Q    That was Ms. Johnson's pit bull?
 2       A    Yes, yes.  She couldn't care for it.  Her
 3   life was in a bit of a mess and she --
 4       Q    Let me just show you your previous Answers
 5   to Interrogatories.  Look at Number 3.  You don't
 6   need to read your social security number, I just
 7   want you to verify your social security number and
 8   date of birth that's stated there, make sure that's
 9   accurate.  Do you see that?
10       A    Uh-huh.  Yes, it is.
11       Q    Great.  Thank you.
12            Currently do you earn any wages through
13   your own efforts?
14       A    Through my own efforts?  No.  I get a
15   social security check from my disability.
16       Q    Do you happen to remember when it was that
17   you were declared disabled?
18       A    August of 2010.
19       Q    And generally describe for me the nature
20   of the disability or the basis for that declaration?
21       A    To explain the wound, trauma, secondary --
22   I have half of a heart.  I have what's called left
23   myocardiopathy to my left ventricle.  I had a bypass
24   to remove all damage.  I basically had bypass.
25       Q    Let me ask you.  I read a lot of your
```

12

```
 1   medical records and I know you had a gunshot wound
 2   to the chest.  Did that result in the heart or was
 3   that a separate --
 4       A    No, it was second to trauma.  It was from
 5   that.
 6       Q    It was from that?
 7       A    Yes.
 8       Q    All right.  And you have not worked or
 9   earned any wages since August of -- at least August
10   of 2010?
11       A    Yes.  I was on my way back up.  My heart
12   was getting better.  It was getting better and there
13   was a time where I was actually going to get back on
14   my feet.  I was actually working at it.  It was
15   going to take some time.
16       Q    I think you misunderstood my question.  My
17   question was since August 2010 when you were
18   declared totally disabled by Social Security
19   Administration you have not earned any wages?
20       A    I have earned some.
21       Q    You have?
22       A    Yes, I have earned some.
23       Q    So tell me about what wages you have, in
24   fact, earned?
25       A    Well, I did some security work for some
```

BRCOSA000089

13

```
 1   friends of mine and was paid cash.
 2        Q    What was the nature of that work?  I mean,
 3   was it you were protecting somebody as a personal
 4   guard?
 5        A    Babysitting poker games, that sort of
 6   thing.
 7        Q    And you were paid cash?
 8        A    Uh-huh.
 9        Q    That's yes?
10        A    Yes.  Sorry.
11        Q    Can you estimate for me how much money you
12   earned?
13        A    A couple hundred dollars a night.
14        Q    What's the total amount?
15        A    I couldn't tell you.  Less than -- Not
16   much on that.
17        Q    That was always in cash?
18        A    Uh-huh.
19        Q    That's yes?
20        A    Yes.
21        Q    You keep saying uh-huh and I'll just keep
22   reminding you.  If you can, remember to say yes or
23   no.
24        A    Yes.
25        Q    What year was that security work done?
```

14

```
 1        A    Just last year, some of '12.  The latter
 2   part of '11, some of '12.  I didn't work
 3   consistently, no, but I was looking for work.  I was
 4   trying to get my health back in order so I could go
 5   back to work.
 6        Q    Was it reported as income?
 7        A    No.
 8        Q    Have you filed tax returns for the last
 9   two or three years?
10        A    No.  I haven't had to.
11        Q    And that's because you and or your
12   wife -- Strike that.
13             Do you file jointly with your fiance?
14        A    No, I do not.
15        Q    Because she's not your wife.
16        A    Uh-huh.
17        Q    So you would have filed as a single
18   person, I guess, or head of household?
19        A    Would have, yes.
20        Q    But because you didn't meet the earnings
21   criteria you have not filed tax returns?
22        A    Exactly.
23        Q    And if I understood your first deposition,
24   and your attorney can help on this if he cares to,
25   are you making a claim for lost wages or loss of
```

15

```
 1   capacity to earn money in this claim?
 2             MR. PHILLIPS:  No.
 3        A    No.
 4        Q    All right.  Then we'll move on.
 5             Despite that declaration that those claims
 6   are not being made, are you currently in rehab, and
 7   I am talking about physical rehab in order to get
 8   you back to a point where you can earn money?
 9        A    They are trying to fix the nerve.  Yes, I
10   am in the middle of -- I am scheduled for surgery.
11   I have to go back in.  Yes, I am.
12        Q    Okay, let's jump to that issue.  I know
13   the nature of your injury when -- You are alleging
14   that you tripped and fell in this case; correct?
15        A    Uh-huh.
16        Q    That's yes?
17        A    Yes.
18        Q    And that you sustained a hernia?
19        A    Yes.
20        Q    And was that a right inguinal hernia.
21        A    A right inguinal hernia, yes.
22        Q    You had surgery to repair it; correct?
23        A    Yes.
24        Q    You have suffered from nerve entrapment or
25   nerve damage as a result of that surgery?
```

16

```
 1        A    Yes.
 2        Q    And I was under the impression, perhaps
 3   wrongly, that you could not have surgery to repair
 4   that.  But you just said that you are now scheduled
 5   to have surgery?
 6        A    Because I had to wait a year.
 7        Q    Okay.  And so when is that surgery
 8   scheduled?
 9        A    Sometime in the following two weeks.  I
10   have to get my first initial visit -- I had to
11   switch doctors and switch plans because I couldn't
12   find anybody to do it.  It took awhile, but --
13        Q    Is it actually scheduled?
14        A    My first appointment is, yeah.
15        Q    I don't understand.  Your first
16   appointment.  What is that, preoperatively you have
17   to see --
18        A    I was just in the hospital last week for
19   cardiac issues and this and it's not getting any
20   better.  And I see my doctor on Thursday, it's a new
21   doctor, I see him on Thursday.
22        Q    This coming Thursday?
23        A    Yes.
24        Q    Which would be the 21st?
25        A    21st.
```

BRCOSA000090

17

1    Q    And who is the doctor that you are going
2    to see?
3    A    Dr. Arena.
4    Q    Arena?
5    A    Joe Arena, Joseph Arena.
6    Q    And where is Dr. Arena located?
7    A    1500 Hillsboro Boulevard.
8    Q    Is Dr. Arena part of a medical clinic or
9    is he on his own?
10   A    He's on his own.  He's part of a group,
11   associates.
12   Q    That's what I meant, a group.
13   A    Yeah.
14   Q    What type of doctor is Dr. Arena?
15   A    He's a general practitioner.
16   MS. MILIAN:  Excuse me, I am so sorry.
17   That court call where the plaintiff didn't show
18   up, apparently there was some story so they are
19   calling back for that court call.  Do you mind
20   if we take a break and I take that?
21   MR. PHILLIPS:  Yeah, whatever you need.
22   You got to do what you got to do.
23   MR. PRATT:  Okay.  We'll go off the
24   record.
25   (A recess was taken.)

18

1    (The Photographs were marked as
2    Defendant's Exhibit Numbers 1 through 14,
3    respectively.)
4    BY MR. PRATT:
5    Q    Mr. Ackley, I know we were talking about
6    your surgery and I will come back to that.
7    Let me just get some more data here.  How
8    tall are you, sir?
9    A    Six foot.
10   Q    What's your current weight?
11   A    Somewhere around 190.
12   Q    Does that represent a weight loss or a
13   weight gain since this accident?
14   A    Loss.
15   Q    Loss?
16   A    Loss.
17   Q    Of about how many pounds?
18   A    Maybe 15 pounds.
19   Q    Is that something that concerns you?
20   A    Yeah.  This whole thing -- yeah.
21   Q    Well, I know the whole thing concerns you,
22   but I meant do you see that as an unhealthy thing,
23   losing 15 pounds?
24   A    Yeah, due to my heart I can't exercise, I
25   have to watch what I eat because I can't exercise

19

1    and my heart, the way it is with the cholesterol,
2    it's -- yeah, it's a concern.
3    Q    My original question was how much had you
4    lost since this accident, which I understand
5    occurred September 24th, is it?
6    A    Of last year, yes.
7    Q    Of last year?
8    A    I have lost approximately 15 pounds.
9    Q    But I know you have other health problems
10   and we haven't really touched on that other than
11   your mentioning heart problems.  But do you
12   attribute the weight loss to the heart problems or
13   to the hernia issue from the slip and fall or both?
14   A    The latter.
15   Q    Why?
16   A    I couldn't do anything.  I was
17   basically -- I couldn't get out of bed, I
18   couldn't -- I would go into panic attacks when I
19   would see a stairwell.
20   Q    Well, we'll come back to that, the impact
21   that the accident has had, in a little bit.
22   We were talking when we went off the
23   record about your surgery and you told me about
24   having a preop visit with Dr. Arena on this Thursday
25   and you described Dr. Arena as a general

20

1    practitioner.  Is he the one who is going to do the
2    surgery or is he just screening you so that you can
3    get the surgery now?
4    A    No, he is not doing the surgery.  I had to
5    switch my plans.  I went from one plan to another
6    plan under these circumstances.  I was hospitalized
7    last week.  And the surgeons -- the doctors that I
8    am now seeing didn't take my plan.  So I got my plan
9    changed and it doesn't go into effect until
10   December 1st.  But under these circumstances,
11   Medicaid agreed to go ahead and okay me to do it,
12   but I have to see their doctor first.
13   Q    Dr. Arena is Medicaid's doctor?
14   A    Yes.
15   Q    When you talk about the plan, you are
16   referring to your Medicaid or Medicare?
17   A    Medicaid.
18   Q    Medicaid?
19   A    Yes, sir.
20   Q    Why is it Medicaid and not Medicare, do
21   you know?
22   A    I'm not retired.  It's just Medicaid.  I'm
23   on SSI.
24   Q    Because of your age?
25   A    I'm only 51.

BRCOSA000091

21

1    Q    I understand, you are not of retirement
2  age.
3    A    I don't get Medicare, I just get Medicaid.
4    Q    Just so it's clear for the record, the
5  plan that you are talking about is a Medicaid plan?
6    A    It's an HMO, yeah.
7    Q    And the one you had -- Okay, describe
8  that.  You changed plans because the doctors that
9  want to do the surgery were not on your old plan?
10   A    Right.  They only took a specific
11 Medicaid, and under the circumstances Medicaid
12 agreed.  And right now I'm still under Broward
13 Health until the 31st.  Seeing the doctor on
14 Thursday, he gives the okay and it's called a
15 one-time authorization for Broward Health to pick up
16 the tab until the 1st of December.
17   Q    And then as of December 1 you are going to
18 be on what plan?
19   A    Medicaid Sunshine State is what it's
20 called.
21   Q    Is this available through the State of
22 Florida?
23   A    Everything comes through the State of
24 Florida.
25   Q    It's state as opposed to federal?

22

1    A    Yeah, but it's disbursed through Florida,
2  yeah.
3    Q    So you will have your surgery sometime
4  after December 1st?
5    A    Yes.
6    Q    And it will be paid for by Medicaid
7  Sunshine State?
8    A    Yes.
9    Q    Who is going to do your surgery?
10   A    There's one of three, we haven't got that
11 far yet.  But they want to expedite this as fast as
12 possible because it's contributing to my cardiac
13 issues.
14   Q    Tell me who they are?
15   A    I can't pronounce them, actually.  One is
16 Goldman.  I have -- Excuse me.  I can't -- I don't
17 think I brought it.
18   Q    It's a group of doctors?
19   A    Yeah, they are associated.  Cleveland
20 Clinic.
21        MR. PHILLIPS:  It's part of Cleveland
22 Clinic.
23   A    Yeah, it's part of Cleveland Clinic.
24   Q    What kind of doctors are they?
25   A    Only thing they don't do is deliver

23

1  babies.
2    Q    No, no, no.
3    A    The doctors that I'm seeing?
4    Q    Yeah.
5    A    One is a -- what do you call those?
6  Urologist.  One is a urologist.
7    Q    Urologist?
8    A    One is a vascular surgeon and the other is
9  just general surgery.  They are all from the same
10 office.
11   Q    Do you know which one will be performing
12 the procedure?
13   A    No, not yet.
14   Q    But it will be at Cleveland Clinic in
15 Broward County?
16   A    Yes, it will.
17   Q    That's out in Weston, isn't it?
18   A    Yes, it is.
19   Q    And there's no date scheduled?
20   A    Not yet.
21   Q    So if you get clearance from Dr. Arena,
22 what is the next step?
23   A    I go to my first appointment, which will
24 be on Friday, sometime on Friday.
25   Q    The 22nd?

24

1    A    Yeah.  It hasn't been set.
2    Q    With the surgeons?
3    A    I am going to their office, yes, but I
4  have to get the referral first.
5    Q    And then at that appointment, presumably
6  they will say okay, let's do the surgery and we'll
7  do it on such and such a date or we won't do the
8  surgery?
9    A    Yeah, they are going to do it.  I was in
10 there for three days over the weekend due to this
11 and I had a complete check-over and they did
12 everything that they should, which was good.
13   Q    So you do reference that you had recently
14 been in the hospital.  Tell me about this recent
15 hospitalization?  What happened?
16   A    We were at a friend's and we were walking
17 back to the car to get something, I forget what it
18 was.  Some friends of mine had drove us to a party,
19 someone had a baby.  And I woke up in the grass and
20 they basically took me to the closest hospital.
21   Q    You woke up -- You passed out?
22   A    Yes.
23   Q    You were alone when that happened?
24   A    There was other people with me.  They
25 dialed 911.

BRCOSA000092

25

```
 1    Q    And this was cardiac related?
 2    A    Yeah.
 3    Q    And where were you taken?
 4    A    Weston.
 5    Q    To the Cleveland Clinic?
 6    A    Yes.
 7    Q    And can you give me the dates you were
 8  there?
 9    A    Saturday -- Friday.
10    Q    This past Saturday?
11    A    Last week.  I was discharged on the 13th.
12  I spent two days, so I went in on Friday.  Friday or
13  Saturday, yeah.
14    Q    What was the diagnosis?
15    A    I got a full work-over for my heart;
16  stress test.  My prognosis is a lot worse than it
17  was.  My EF has dropped from around 30 to under 20,
18  so somewhere between 20 and 21, they can't get an
19  exact.
20    Q    What is that, EF?
21    A    Ejection function.  The amount of blood
22  that your heart pumps through your body.
23    Q    Was any reason given for your worsening
24  condition?
25    A    Overall stress.  This most certainly
```

26

```
 1  didn't help matters.  My heart is declining due
 2  to -- it's just been getting worse over the last
 3  year, yeah.
 4    Q    Have any of your doctors said that your
 5  heart condition has declined because of the accident
 6  that you had, the trip and fall that you had that
 7  caused the inguinal hernia?
 8    A    Not the trip and fall itself, no.  The
 9  nerve damage is what's causing undue stress on
10  everything.  And he says it's not the main
11  contributor, but it's the better part of and that's
12  why they're so concerned about getting it done.
13    Q    Okay.
14    A    And I had to wait a year, so there was
15  nothing I could do.
16    Q    Now the hope for this upcoming surgery is
17  to correct the nerve damage done from the original
18  inguinal hernia surgery?
19    A    Yes.
20    Q    Has there been a definitive diagnosis made
21  relative to the "nerve damage"?  I say that in
22  quotations, "nerve damage."  Is it an entrapment
23  issue?
24    A    We don't know yet.  We simply don't know.
25    Q    Okay.
```

27

```
 1    A    There's no way to know until they go in.
 2  And then when they go in it -- it's difficult.  The
 3  surgery itself is difficult for two reasons.  My
 4  heart condition is one.  I am at a high risk because
 5  of my left ventricle.  But I'll take the chance.
 6        Now what happens if the surgery -- if you
 7  are not familiar with how this surgery works is, it
 8  could help, it might not do anything or it might
 9  make it worse.  That's what the doctors will tell
10  you if you ask them.  So anything is better than
11  now.
12    Q    I am just curious as to whether or not
13  there's been any further diagnostic work-up that has
14  sort of narrowed their focus on we think it's this,
15  but it might be this?
16    A    There's no way until they go in.  Simply
17  no way.
18    Q    Okay.
19    A    And the surgeon -- You have to wait a year
20  for this type of surgery 'cause this -- It's
21  actually common -- not as common as most, I guess,
22  side affects from surgery, but it does happen.  The
23  only thing they can really do is go in there and
24  either release the nerve or try to release the
25  nerve, which is the 50/50 part, or just clip the
```

28

```
 1  nerve.
 2    Q    And if they have to clip the nerve, so to
 3  speak, what affect does that have?
 4    A    Loss of feeling, of course.  The doctor
 5  told me --
 6    Q    Where?
 7    A    In my whole lower --
 8    Q    The groin?
 9    A    Including my genitals.
10    Q    Okay, I see.  So you would perhaps lose
11  feeling in that region?
12    A    Yeah.
13    Q    All right.  This is all part of the risk
14  that they have already told you about in
15  anticipation of surgery?
16    A    Yes.
17    Q    All right.  If successful, then the
18  release of the nerve would alleviate the pain that
19  you have been experiencing?
20    A    Yes.
21    Q    Would it be an immediate result?
22    A    We wouldn't know for about a month.  The
23  surgery itself is -- I wish I had the pictures.  The
24  surgery, it's doesn't -- doesn't seem like it's
25  much, but in that area of the body it's pretty bad.
```

BRCOSA000093

29

1   You usually have to wait about a month.
2       I didn't realize I had this.  It took
3   about a month and they told me I would be up and
4   running in two or three weeks and that just didn't
5   happen.
6       Q   Just so we have a focus on that, the
7   surgery that we are talking about that was
8   originally done, was that done October 4th of 2012
9   by Doctor --
10      A   Uh-huh just, a matter of days, yeah.
11      Q   -- by Dr. Parra?
12      A   Yeah.
13      Q   P-a-r-r-a?
14      A   Yeah.
15      Q   That's the one we are referring to?
16      A   Yes.
17      Q   And you have not had any other surgical
18  procedures, at least related to this accident, since
19  that date?
20      A   No.  I can't.
21      Q   Now there have been attempts, as I
22  understand your medical records, to do trigger point
23  injections and nerve blocks and things like that;
24  correct?
25      A   Uh-huh.

30

1       Q   That's yes?
2       A   Yes.  I'm sorry.
3       Q   And you have seen Dr. Pereira,
4   P-e-r-e-i-r-a?
5       A   Yes.
6       Q   And Dr. Beer, Lilia Beer?
7       A   That was my primary.  Actually, I never
8   saw her.
9       Q   That's right, you needed a referral.
10      A   Yeah.  She was absolutely worthless.
11      Q   All right.  There's another outfit called
12  Z Urology, I think you saw them for an ultrasound?
13      A   That was when we realized something was
14  wrong and that's when we went to the urologist.
15      Q   That was about a week post surgery?
16      A   A little longer than that.
17      Q   Well, I have October 11th, 2012, so that's
18  exactly seven days post surgery.
19      A   Yeah.  Something was wrong, yeah.
20      Q   Who are the doctors at Broad Pain Care
21  Consultants?  Do you recall seeing that group?
22      A   I have seen so many, I can't -- At this
23  time I couldn't tell you which one they were, I have
24  seen so many.
25      Q   Setting aside your upcoming conference

31

1   with Dr. Arena and then your surgeons, in the last,
2   say, six months who have been primarily treating you
3   for all of your conditions?
4       A   No one.  Just the pain center, that was
5   it.
6       Q   That's the pain center?
7       A   Well, the last place that I was at,
8   Dr. Pereira.
9       Q   Pereira?
10      A   Yes.
11      Q   And the Anesthesia Pain Care I think is
12  the name of his group?
13      A   I think so.  It's in Tamarac.
14      Q   Now how about for your cardiac condition,
15  who is your main doctor?
16      A   That would have been Lilia Beer.
17      Q   Well, she's a primary care.  But who is
18  your cardiologist?
19      A   I didn't have one at the time because of
20  Lilia Beer.
21      Q   When you say "at the time," I don't know
22  when that is.
23      A   The last year.
24      Q   In the last year you have not had a
25  cardiologist caring for you or seeing you on a

32

1   regular basis?
2       A   I couldn't get a referral from Lilia Beer.
3   I have a cardiologist now.
4       Q   Who is that?
5       A   Dr. Paris.
6       Q   What's his or her name?
7       A   He also is at 1500 Hillsboro Boulevard.
8       Q   What's his full name?
9       A   I don't know.  I think it's Mike.
10      Q   Paris as in the city?
11      A   Paris as in the city.
12      Q   Have you seen Dr. Paris?
13      A   Yes.
14      Q   How many times?
15      A   Once.
16      Q   Now let's go back to the -- Let's go back
17  and get some more information.  I apologize for sort
18  of jumping around a bit.  We got off track a little
19  bit on your medical and I didn't mean to go there in
20  such detail at that point, but whatever.
21          Do you wear glasses or contacts?
22      A   To read.
23      Q   Glasses?
24      A   No, just things you buy at the store.
25      Q   Just readers?

BRCOSA000094

33

```
 1    A    Yeah.  I don't wear prescription glasses.
 2    Q    Did you have glasses on at the time of
 3  your accident?
 4    A    No.
 5    Q    When I refer to "your accident" I am
 6  referring to this slip and fall --
 7    A    I don't wear them unless I read.
 8    Q    -- that is the subject of this case.  You
 9  understand when I say "your accident" I am talking
10  about that?
11    A    Yes, sir.
12    Q    Okay.  How about a hearing aid?
13    A    No.
14    Q    I saw a reference to prior convictions.  I
15  just need to ask you, in the past have you been
16  convicted of any felonies or crimes involving
17  dishonesty?
18    A    How would I answer that?
19    Q    Well, I guess -- I don't know if you --
20    A    You mean like fraud, things like that?
21    Q    Yes, fraud, false statement.
22    A    No.
23    Q    You know, forgery, things of that nature.
24    A    No.
25    Q    How about felonies?  I saw a reference in
```

34

```
 1  your Answers to Interrogatories about convictions in
 2  Kentucky in 1999.
 3    A    Yeah, they all stem from the same thing.
 4  It all was one going case.
 5    Q    What I need to know or what I need to ask
 6  you is do you know whether or not any of those
 7  convictions - and I don't know how many there were -
 8  were felony convictions?
 9    A    Two.
10    Q    And you believe they were in 1999 in
11  Kentucky?
12    A    Yeah, they started there and by the time
13  it was all over -- yeah.
14    Q    Anything in Florida?
15    A    No.
16    Q    By the way, how long have you lived here
17  in Florida?
18    A    I grew up here.
19    Q    But this most recent stay, how long have
20  you been here?
21    A    Three years.
22    Q    'Cause I know -- Having read your
23  deposition, I know you have been around the world
24  and you met your fiance in --
25    A    France.
```

35

```
 1    Q    -- France.
 2    A    She's French.
 3    Q    At the time of this accident -- Let's
 4  establish a date.  Do you remember the date?
 5    A    The 24th.  I think it was the 24th, yeah.
 6    Q    Of what month?
 7    A    September.
 8    Q    2012?
 9    A    Yes.
10    Q    Do you remember the day of the week?
11    A    No, I do not.
12    Q    If I told you it was a Monday, would you
13  have any way to dispute that?
14    A    No.
15    Q    You were not actively working at the time
16  anywhere?
17    A    No.
18    Q    Correct?
19    A    I was in search of work, yes.
20    Q    And was your wife employed in
21  September -- on September 24th, 2012?
22    A    I think she was, yes.  Yes.
23    Q    And do you recall it being a workday or a
24  non workday for her?
25    A    It was in the evening.  It would have been
```

36

```
 1  after work.
 2    Q    The accident occurred in the evening?
 3    A    Uh-huh.
 4    Q    That's a yes?
 5    A    Yes.
 6    Q    And can you proximate the time for me that
 7  it happened?
 8    A    Between 7:00 and 9:00 in the evening.
 9    Q    And why do you estimate 7:00 to 9:00
10  p.m.?
11    A    It was dark.  We were going to Fresh
12  Market.  Either we were going to go to Fresh Market
13  or Wal-Mart, whichever one, and we were going to get
14  ice cream for the kids.
15    Q    Who was with you when the accident
16  occurred?
17    A    Fabienn, Jordan and Carla.
18    Q    Do you remember it being a school night or
19  a non school night for the kids?  Meaning, they had
20  school the next day?
21    A    I don't -- More than likely it was a
22  school night.  I know it wasn't a weekend, so -- I
23  really couldn't answer that.  I mean, more than
24  likely, yeah.
25    Q    Why do you know it wasn't a weekend?
```

BRCOSA000095

37

```
 1        A    Fabienn would have been doing her side
 2   job.  She has side job cleaning houses on the
 3   weekends and at night she cleans houses.
 4        Q    In the evening?
 5        A    Yes.  But being a precise date on that, I
 6   couldn't tell you the day.
 7        Q    Just so I understand, Fabienn would, on
 8   the weekends, do house cleaning in the evening
 9   hours?
10        A    Occasionally, yeah.  She did it from time
11   to time.  More than not.
12        Q    And since she wasn't performing that task,
13   you believe it was not a weekend evening?
14        A    I couldn't -- I don't recall what day it
15   was.
16        Q    That's fair.
17             All right.  And so as I understood your
18   deposition before, the address at which you were
19   living was an apartment that was behind this plaza;
20   correct?
21        A    Yes.
22        Q    When I say "behind," I'm not familiar with
23   the plaza so orient me as to where the apartment
24   was; east, west north, south?
25        A    I live on the northeast side next to Pine
```

38

```
 1   Ridge Plaza and there was a gate put there for the
 2   community to have access to Pine Ridge Plaza.
 3        Q    What do you mean there was a gate put
 4   there?
 5        A    There was a gate.  They put a fence up.
 6   It's a walled community.  There's a gate there for
 7   the residents so they can get in and out without
 8   going all the way around.  Through the gate.
 9        Q    And on this evening had you walked from
10   your apartment to the plaza?
11        A    Yes.
12        Q    I think you told me that your intentions
13   were to go to either Fresh Market or Wal-Mart to get
14   ice cream for the kids?
15        A    All of us.
16        Q    Meaning a carton of ice cream or ice cream
17   cones?
18        A    Whatever they wanted to eat.  It wasn't a
19   specific type that we were going to get.  We were
20   going to get something sweet to eat, whether it was
21   a yogurt, whether it was ice cream, it was of that
22   nature.
23        Q    Why Fresh Market or Wal-Mart?
24        A    Fresh Market has good food and Fresh
25   Market, sometimes they close at 8:00, sometimes they
```

39

```
 1   close earlier, and if they weren't open we were
 2   going to go to Wal-Mart.
 3        Q    Did you know prior to going over there
 4   that Wal-Mart, in fact, had yogurt or ice cream
 5   available?
 6        A    It's not on the same level as Fresh
 7   Market.
 8        Q    That's not my question.  You are reading
 9   too much into my questions.  It's just very simple.
10        A    Fine.
11        Q    In other words, before you left to go over
12   to the plaza you said to Fabienn and the kids hey,
13   let's go get some ice cream.  Were you intending --
14   You know, you go to Carvel and you get a cone or
15   were you going to buy a carton of ice cream and
16   bring it home and eat it at home?
17        A    Their minds weren't made up yet what they
18   wanted.
19        Q    Fair enough.
20             And you didn't know Fresh Market was open,
21   I understand that, so you would go to Wal-Mart.  I
22   am just asking whether or not you knew at the time
23   going to Wal-Mart, if you ended up going to
24   Wal-Mart, whether you knew they had an ice cream
25   dispensing machine or were you going to have to buy
```

40

```
 1   a carton of ice cream and take it home?  Did you
 2   know?
 3        A    Of course I know, I shop there.
 4        Q    Okay.  So what did Wal-Mart have, an ice
 5   cream dispensing machine?
 6        A    To reiterate what I said before, Fresh
 7   Market has better ice cream.
 8        Q    I am not comparing the better -- I could
 9   care less if Fresh Market had better ice cream.
10        A    That's what you asked me.
11        Q    No, no.
12             MR. PHILLIPS:  Listen to the question.
13        This doesn't matter.  Just listen to the
14        question and answer whatever he asks you.
15        Q    Did Wal-Mart at the time have a machine
16   that you could dispense frozen yogurt or --
17        A    No.
18             MR. PHILLIPS:  Let him finish.
19        Q    -- or get an ice cream cone, you know, a
20   dairy place where somebody would scoop an ice cream
21   cone for you at Wal-Mart?
22        A    No.
23        Q    Fair enough.  That's all I was asking.
24        A    Either does Fresh Market.
25        Q    So I'm a little confused by then saying we
```

BRCOSA000096

41

1  were going to go get some ice cream, because my
2  question was whether or not you intended to eat it
3  there or bring it home.
4      A    I didn't hear that.
5      Q    Okay.  Well, what was your intention?
6      A    Getting ice cream or something what the
7  kids wanted.
8      Q    To eat there or to bring it home and eat
9  it?
10     A    We would have probably -- We don't know.
11 We would have probably ate it there.  Maybe we would
12 have walked.  There's a lake behind.  We don't know
13 what we would have done.  We were just spending time
14 together as a family.
15     Q    Okay.  And it was somewhere between 7:00
16 and 9:00 p.m.?
17     A    It was getting dark, yes.
18     Q    Now you came through the gate at your
19 apartment that separates the apartments from the
20 plaza; correct?
21     A    Yes.
22     Q    And you walked towards the plaza; correct?
23     A    Yes.
24     Q    And I am going to show you several
25 photographs.  I have been provided these by -- or

42

1  they were part of, I think, your production to the
2  co-defendant.  I have 14 photographs here that may
3  help orient us.  I am going to ask you to look at
4  these photographs.  Just look through them.
5      What my first question is, I want to find
6  out if any of these photographs show us the path
7  that you followed from the gate to the plaza where
8  you entered the plaza area.  Just take a minute to
9  look at them.
10     A    Coming from this direction --
11     Q    Hold on.  Before we start talking about
12 the photographs, you see each of them has a number
13 on it?
14     A    Without my glasses --
15     Q    Okay, get your readers.
16     When we start talking about a photograph,
17 if you will just say I am looking at photo number
18 whatever it is and then show me what you want to
19 show me.
20     A    I understand.
21     Q    Do any of these photographs show us the
22 path from the gate to the plaza?
23     A    Yes.
24     Q    Which photograph or photographs?
25     A    Number 8 and number 9, Number 11,

43

1  Number 10.
2      Q    So 8, 9, 10 and 11?
3      A    And 13 and 14.
4      Q    Let's start with Number 8 right here.
5  Number 8.
6      A    That's looking back in the direction that
7  we would have been coming.
8      Q    From?
9      A    Yeah.  This is the way that you come
10 through.  The gate is approximately here.  This is
11 the fence and the gate is here, the sidewalk.
12     MR. PHILLIPS:  When you say "the gate is
13 here" you mean to the right?
14     THE WITNESS:  Yes, to the right.
15     MR. PHILLIPS:  Behind the building?
16     THE WITNESS:  Behind the building.
17     MR. PHILLIPS:  Just for clarification,
18 this is a photo -- what's the number?
19     MR. PRATT:  8.
20     MR. PHILLIPS:  Number 8 is a photo
21 standing in the front -- toward the front of the
22 entrance looking toward the back of the
23 plaza?
24     THE WITNESS:  Uh-huh.
25     Q    In staying with Number 8, my question is:

44

1  We don't see the gate through which you came;
2  correct?
3      A    No.
4      Q    However, you see in the center of that
5  photograph there are hashmarks, if you will, in I
6  guess the parking lot.  Does this show the area on
7  which you walked into the plaza?
8      A    Okay, I'm not sure I understand what you
9  mean.
10     Q    Are you coming into the plaza from where
11 the fence is, this way?
12     A    Yes.
13     Q    Towards the bottom?
14     A    Yes.
15     Q    So you are walking -- Do you see this
16 little bit of sidewalk towards the end of the
17 building?
18     A    Uh-huh.
19     Q    Did you walk on that sidewalk?
20     A    More than likely, yeah.  Yes, yes.  Yes, I
21 did.
22     Q    And you are with your family?
23     A    Uh-huh.
24     Q    That's yes?
25     A    Yes.

BRCOSA000097

45

1    Q    And does this Photograph Number 8 also
2  show us the general area of where you fell?
3    A    Yes.
4    Q    And can you point to that for me, please?
5    A    Right in here.
6    Q    Could you use my pen?
7         MR. PHILLIPS:  We are not going to write
8  on anything.
9         MR. PRATT:  Why?.
10        MR. PHILLIPS:  I am instructing him not
11 to.
12        MR. PRATT:  Are you not going to have him
13 do anything at trial?
14        MR. PHILLIPS:  I don't know what we are
15 going to do at trial.
16        MR. PRATT:  Okay.  Well, I'm going to --
17 Okay, you're instructing him not to do that.
18        MR. PHILLIPS:  We are not obligated to
19 draw or write anything.
20        MR. PRATT:  I think you are.  If it
21 assists explaining his testimony and
22 particularly if later on you are going to have
23 him identify the exact location of his fall, I
24 think it's not --
25        MR. PHILLIPS:  He's not going to identify

46

1  anything in that photo.  He can point and you
2  can mark wherever he points to, the general
3  area where he fell.
4         But I can tell you right now 100 percent I
5  will not use that photo to identify where he
6  fell.
7         MR. PRATT:  Okay, that's fine.  All right.
8    Q    Point to it again.  Just leave your finger
9  there.
10   A    This area right about here.
11   Q    I am going to put a circle in that area.
12        Did I draw a circle in the area where you
13 had your finger?
14   A    Approximately, yeah.
15   Q    On Number 8?
16   A    Right in that general area, yeah.
17   Q    All right.  Now do you see in Number 8
18 what appears to be -- I guess are those mailboxes
19 there?
20   A    Uh-huh.
21   Q    That's yes?
22   A    Yes.
23   Q    Were those mailboxes there on the date
24 that you fell?
25   A    No.  The original ones weren't there.

47

1  This one was there.
2    Q    That was my question.
3    A    I was thinking on the big mailbox.
4         Yeah, this one was here.
5    Q    And that's just to the other side of that
6  bench we see.
7         That is a bench that I am pointing at?
8    A    Yes.
9    Q    Was that there on the date of the
10 accident?
11   A    Yes.
12   Q    Do you see this post in the middle of the
13 walkway?
14   A    Yeah, that was there.
15   Q    That was there?
16   A    That was there.
17   Q    That was there on the date of the
18 accident; is that correct?
19   A    I think -- I don't recall it, no.  I don't
20 think it was.  Yeah, of course it was.
21   Q    Do you know who took this photograph?
22   A    No, I do not.
23   Q    Have you seen that photograph before?
24   A    Yes.
25

48

1    Q    Yes or no?
2         MR. PHILLIPS:  Sure, no big deal.  I don't
3  know if we looked at that one or not.
4         Actually, we did in the depo.
5    A    We did all this once before.
6         MS. MILIAN:  Mr. Ackley needs to answer
7  the question.
8         MR. PHILLIPS:  If we are getting into
9  attorney/client privilege stuff I'm going to
10 speak up, so that's why.
11        MS. MILIAN:  Was that an attorney/client
12 privilege objection?
13        MR. PHILLIPS:  Whether or not it was an
14 attorney/client privilege or not, he would have
15 seen the photos at the prior depo.
16   Q    Number 9.  And I'm not trying to
17 complicate this, I'm just trying to find where this
18 accident happened.
19        So now we are looking at Photo 9.
20        MR. PHILLIPS:  Use the photos from the
21 night of the incident and you can cut to the
22 chase.
23        MR. PRATT:  We are going to get there.  I
24 don't know who took these photographs or when
25 they were taken.  They were provided to me.

BRCOSA000098

49

```
 1        Actually, they weren't provided to me.  These
 2   are what I have, so I have got to work with
 3   them to find out what they are and what they
 4   represent.
 5        Q    Photograph Number 9, again, do we see the
 6   area where you fell in that photograph?
 7        A    Not really, 'cause it's further over here.
 8        Q    You mentioned Number 10.  Where is
 9   Photograph Number 10?
10        A    10 is right --
11        Q    Here is 10.  Here is 10.
12        Does Photograph Number 10 show us the area
13   where you fell?
14        A    It's not in the picture.
15        Q    Does Photograph Number 10, however, show
16   us the direction in which you would have been
17   walking?
18        A    Yes.
19        Q    Or the area that you were walking towards?
20        A    Yes.
21        Q    At the time of the accident?
22        A    Yes.
23        Q    And relative to this picture I see a sign
24   that I think says "Hair Salon," but there's another
25   sign up there.  Do you know what that establishment
```

www.phippsreporting.com
888 811-3408

50

```
 1   is?
 2        A    It's for the restaurant.  It's a Mexican
 3   restaurant.
 4        Q    And where would Fresh Market and Wal-Mart
 5   be?
 6        A    This is the entrance to Bed Bath and
 7   Beyond, and the following store, the anchor store
 8   would be Fresh Market.
 9        Q    So it's beyond --
10        A    Yes.  And beyond that is Marshalls.
11        Q    Okay.  Looking at Photo 11, does that --
12        A    Yes.
13        Q    -- depict the area?
14        A    Yes.
15        MR. PHILLIPS:  Let him finish the
16   question.
17        Q    Again, could you point to the area where
18   you fell and I will put a circle?
19        A    This right here.
20        Q    I am going to try to duplicate your
21   circle.  Is that a close approximation?
22        A    Yeah, right in here, yeah.
23        MR. PHILLIPS:  He is just asking is that a
24   close approximation.
25        A    That's a close approximation, yes.
```

www.phippsreporting.com
888 811-3408

51

```
 1        Q    All right.  Were any of the photographs
 2   that I have shown you taken on the day of the
 3   accident?
 4        A    I believe this one.
 5        Q    You can't rely on your attorney's
 6   recollection.
 7        A    I am trying to find out which are which.
 8   These where taken --
 9        Q    Again, you have to refer to them by
10   number, if you would.
11        A    Okay.  Number 1 was taken the night of the
12   accident.  The rest of them I can't tell by the
13   shade 'cause it's just cement.  But this one was
14   taken the night of the accident.
15        Q    And who took that photograph?
16        A    My wife or my girlfriend.  My fiance.
17        Q    Did she have a camera or was it by her
18   cell phone?
19        A    Phone.
20        Q    Does she still have that cell phone?
21        A    Yes, actually.
22        Q    What is the number of that cell phone?
23        A    It's no longer in use, we got new phones.
24        Q    What was the number --
25        A    I don't remember it.
```

www.phippsreporting.com
888 811-3408

52

```
 1        Q    You are cutting me off.
 2        MR. PHILLIPS:  Just let him finish the
 3   questions.
 4        Q    We'll get through this a lot quicker.
 5        Do you know the number of the cell phone
 6   on the date of the accident?
 7        A    No.  I did at the time, but it's been over
 8   a year and we haven't used the phone.
 9        Q    Your answer is no?
10        MR. PHILLIPS:  Answer no.
11        Q    If you don't remember, just tell me you
12   don't remember, okay?  'Cause I can find that
13   information out.
14        Who was the provider for her cell phone?
15        A    I can't recall.
16        Q    Do you know if she downloaded the
17   photographs from her phone to a computer?
18        A    Yes.
19        Q    And do you still have possession of that
20   computer?
21        A    No.  It was sold.
22        Q    And before you sold the computer, did you
23   download the photos onto a disk?
24        A    No.  They were sent to my attorney.
25        Q    And so you do not believe that you have an
```

www.phippsreporting.com
888 811-3408

BRCOSA000099

53

1  electronic copy of these photos anymore?
2       MR. PHILLIPS:  We tried to find it, no one
3  has it.  The computer had crashed.
4       Q    All right.  Can you, using Photo Number 1,
5  which you have identified as being taken the night
6  of the accident, identify with specificity the area
7  where you fell?
8       A    Right about here.  It was in this area
9  because when I stood up -- Right in here.  Right
10 there.
11      Q    All right.  Now there's an identification
12 sticker.  So that's kind of in the area; right?
13      A    Yes.
14      Q    I see what appears to be -- at least it's
15 different color than the cement.  Do you know what
16 that is?
17      A    That's where the old mailbox was.
18      MR. PHILLIPS:  What is it?
19      Q    What is that?
20      A    What is that?
21      Q    Yes.
22      A    It's a bracket.
23      THE WITNESS:  I misunderstood what he
24 said.
25      Q    Does that bracket have anything to do with

54

1  your fall?
2       A    I don't know which one I fell on.
3       Q    Were there more than one brackets?
4       A    Yes.
5       Q    How many brackets were there?
6       A    Three or four, I think.
7       Q    Do you remember?
8       A    No, I don't.  Not exactly.  But I know
9  there were more than two.
10      Q    Is there any photograph amongst these that
11 I have given you that show us the location of each
12 bracket that you saw?
13      A    Okay.  When you say the bracket that I
14 saw --
15      Q    You said you saw three or four brackets.
16      A    Yes.  They were in this direction.  And if
17 I put these together, they were approximately -- I
18 never was very good at this.  There were more.
19      Q    My question is whether or not you see any
20 photographs amongst these that I have given you that
21 show the location of all three or four brackets that
22 you saw?
23      A    Not in one picture, no.
24      Q    How many photographs do you believe your
25 wife took that night?

55

1       A    I do not know.
2       Q    Have you ever sat down and looked at the
3  photographs that she took that evening to count
4  them?
5       A    No, I didn't.
6       Q    Did she ever tell you how many photographs
7  she took?
8       A    No, she did not.
9       Q    Did you instruct her to take photographs
10 that evening?
11      A    No, I did not.
12      Q    Did you see her taking the photographs?
13      A    No, I did not.
14      Q    Do you know if anyone else took
15 photographs that evening?
16      A    I don't know.  I do not know that.
17      Q    Were your kids carrying --
18      A    No.
19      MR. PHILLIPS:  Let him finish the
20 question.
21      THE WITNESS:  Sorry.
22      MR. PHILLIPS:  Were they carrying guns?
23 You don't know what he's going to say.  Were
24 they carrying knives and sticks and bats and
25 fishing poles?  You don't know what he's going

56

1  to say.  Let him finish.
2       Q    I know you are anticipating my question.
3       MR. PHILLIPS:  Even though you knew what
4  he was going to say, you may not.
5       Q    Were they carrying cell phones?
6       A    No.
7       Q    Did you have a cell phone on you?
8       A    No.
9       Q    Did anyone have a camera?
10      A    No.
11      Q    And you said that Photo Number 1 is the
12 only one that you can identify with certainty that
13 was taken on the night of the accident.
14      All of these other photographs that are in
15 front of you, I forgot how many there were, 14 of
16 them or whatever, you don't know who took them?
17      A    I don't know.  No, I don't know.  I don't
18 know which were taken by whom.  I don't.  I know
19 this one was taken by my wife.  The rest of them, I
20 do not know.
21      Q    That's fair enough.  That's fair enough.
22 I just want to know if you have any idea who took
23 them and when they were taken relative to the
24 accident.
25      A    These were taken after the accident.

BRCOSA000100

57

1    Q    Well, we'll presume that all of them were
2    taken after the accident.
3         Are you aware of any photographs taken
4    before the accident?
5    A    No.
6    Q    Okay.
7    A    I misunderstood the question.  I'm tired.
8    I have been up with a sick wife all night, you will
9    have to forgive me.
10   Q    I understand.  And like I told you at the
11   outset, if you need to stop and take a few minutes
12   break --
13   A    I'm fine, I'm fine.
14   Q    -- we'll be happy to do that.
15   A    I'm fine.
16   Q    Now as you are walking into the plaza
17   before you fell, can you tell me the configuration
18   of how you were walking?  That is, you relative to
19   your fiance and your children.  Four abreast?
20   A    Me and Fabby were walking in front and the
21   children were tailing behind us.
22   Q    And tell me what happened?
23   A    Walking, talking and the next thing you
24   know, I tripped.  I landed extremely hard.  And I
25   jumped up more out of embarrassment than anything

58

1    else, and I fell straight back down.  The pain in my
2    right side just -- I don't have the words for it.
3    Q    And do you believe that your children saw
4    you fall?
5    A    Maybe not -- The actual fall?
6    Q    Yes.
7    A    No, but they saw me on the ground.
8    Q    Did your wife see you fall?
9    A    Yes.
10   Q    Do you know why you fell?
11   A    Because of these brackets.
12   Q    These brackets, okay.
13        What did these brackets have to do with
14   your falling?
15   A    I tripped over them.
16   Q    All of them?
17   A    Caught my shoes.  One of them.
18   Q    Do you know which one?
19   A    No, I do not.
20   Q    Can you describe for me the configuration
21   of the brackets relative to each, one to the other?
22   In other words, if we take Photograph Number 1, we
23   see a bracket there.  Can you tell me how far away
24   from the bracket in Photograph Number 1 the other
25   brackets were?

59

1    A    It's been too long, I couldn't tell you.
2    Q    Inches or feet?
3    A    I only saw them for just a few minutes.
4    They were gone the next day.  This is all I have
5    ever seen of them since the accident.
6    Q    Did you go back to the scene the next day?
7    A    I didn't.  No, I did not.
8    Q    How do you know they were gone the next
9    day?
10   A    My wife was going to the grocery store.
11   Q    She walked over to the plaza?
12   A    Uh-huh.
13   Q    That's why?
14   A    Yes.
15   Q    And she said they were gone?
16   A    Yes.
17   Q    What time of day did your wife go to the
18   plaza the next day?
19   A    I don't -- I couldn't --
20   Q    Can you pinpoint it as to morning,
21   afternoon or evening?
22   A    I don't remember.
23   Q    And so as we sit here today you don't know
24   the configuration of the brackets on the ground or
25   how close they were to each other?

60

1    A    From the pictures I have seen, there were
2    mailboxes there.  And from the pictures I have seen,
3    evidently -- or I'm sure they were, they were in a
4    straight line.
5    Q    All three or four of them?
6    A    I don't know how many there were.
7    Q    Your best estimate is three or four you
8    told me earlier.
9    A    I don't know how many there were.  All I
10   can tell you is this, there's more than two.  I
11   don't know how many there were.
12   Q    Okay, I understand.
13        And you believe you tripped over how many
14   of them?
15   A    One of them.
16   A    One of them.
17        And do you have any idea which one?
18   A    No.
19   Q    Do you know if any of them are depicted
20   in -- or the one that you tripped over is depicted
21   in any of these photographs?
22   A    I tripped on one of these brackets;
23   whether it's this one, this one.
24   Q    My question is:  Do you see the bracket
25   you tripped on in any of these photographs?

BRCOSA000101

61

1    A   If I don't know which one I tripped

2  on -- I saw all of them, so one of them must be the

3  one I tripped on.

4    Q   But you don't know whether any of the

5  brackets shown in these photographs are the one that

6  you tripped on?

7    A   One of those brackets I tripped over.  I

8  cannot tell you which one.

9     Am I misunderstanding something here?  I

10  mean --

11    MR. PHILLIPS:  Just answer the question.

12    Q   What I am trying to find out -- Okay,

13  let's go at it a different way.

14     Is there any way to distinguish one

15  bracket from another?

16    A   No.  No.

17    Q   Okay.

18    A   I didn't see them.

19    Q   So for instance, I show you Photograph

20  Number 1.  There's a bracket there.  Did you trip on

21  that bracket?

22    A   I don't know.

23    Q   I am showing you Photograph Number 2.

24  That looks like there's a bracket in Photo 2.  Did

25  you trip on that bracket?

62

1    A   I don't know.

2    Q   That's fine.  That's all I'm asking.

3    MR. PHILLIPS:  There's also another one in

4  Number 1 you missed, it's hard to see.

5    Q   Take a look at Number 1.  Are there more

6  than one bracket in that photograph?  Your attorney

7  thinks so.

8    A   I can't really tell.

9    Q   I am interested in what you can tell, not

10  your attorney.

11    A   I know there was more than two.

12    Q   I am showing you Photograph Number 4 that

13  also depicts a bracket.  I think just one.  Is that

14  the bracket you fell on?

15    A   I do not know.

16    Q   Or tripped on.

17    All right, fair enough.

18    Now you fell.  You said you jumped up, but

19  then you fell back to the ground?

20    A   Straight down to the ground.

21    Q   And then what happened after that?

22    A   I couldn't get up.  We waited there for a

23  few minutes.  We sent the children home.  My wife

24  ran the children back to the gate, let them in to

25  send them home.

63

1    Q   Okay.

2    A   And told the children that we would be

3  back later.

4    So I don't know how long of a period we

5  sat there.  I managed to get over to the bench and

6  we sat there for -- I don't know how long it was

7  before I told her that the pain was not subsiding

8  and whatever it was in my abdomen wasn't going down.

9    Q   The hernia was discernable?

10    A   It was huge.

11    Q   You could feel it?

12    A   You could see it.

13    Q   Can you estimate for me how long you were

14  at the bench?

15    A   I couldn't tell you.  Approximately -- No,

16  I couldn't.

17    Q   Could it be as long as an hour?

18    A   It could have been, yes.

19    Q   It could have been an hour.

20    Then what happened?

21    A   911 was called.

22    Q   Do you know -- Was it Coral Springs Fire

23  Department that came?

24    A   Yes.

25    Q   And you were transported from the scene?

64

1    A   To Coral Springs Hospital.

2    Q   Do you know if the EMTs or emergency

3  people took any photographs?

4    A   No, I don't think they did.  I don't know.

5  They were mentioning -- I wasn't really paying that

6  much attention to what they were saying over there,

7  I was more concerned --

8    Q   Now back to the brackets for a moment.

9  Whatever bracket it was that caused you to trip, did

10  you see it before you tripped?

11    A   No.

12    Q   Why not?

13    A   Why didn't I see it?

14    Q   Yeah.

15    A   'Cause I was looking forward walking,

16  talking to my wife, looking about.

17    Q   Now this is somewhat of a hypothetical,

18  but if you had been looking down, could you have

19  seen it?

20    MR. PHILLIPS:  Objection, speculation.

21    You can answer.

22    A   How the hell am I supposed to answer that

23  I don't know if I would have saw them.  I mean,

24  really?

25    Q   Well, I am looking at --

BRCOSA000102

65

```
 1      A    If I was looking --
 2      Q    I am looking at Photograph Number 1.  I
 3  know it sounds like a ridiculous question, but it's
 4  not because I am looking at Photograph Number 1, a
 5  photograph that was taken by your wife on the night
 6  of the accident, showing a bracket, perhaps two
 7  according to your attorney, and I see the bracket.
 8  Okay.  I am looking at it and I see it.  And my
 9  question is:  If you had been looking down, could
10  you have seen that bracket?
11      A    I don't know.  I cannot answer that
12  question.
13      Q    Was there anything covering the bracket?
14      A    No.
15          MR. PHILLIPS:  Speculation.  Too, calls
16      for speculation as to whether the bracket was
17      even in that shape or it was bent because he
18      tripped on it.
19          MR. PRATT:  Whatever.  I mean, it's there.
20          MR. PHILLIPS:  There's two there.
21          MS. MILIAN:  Objection as to the speaking
22      objection.
23          MR. PHILLIPS:  The whole point.
24      Q    So tell me what the lighting conditions
25  were at or near the area where you fell?
```

66

```
 1      A    It wasn't too dark, but it was lit up.
 2  You could see.  I mean, you could see enough to get
 3  through the breezeway and into where it was more
 4  well lit.
 5      Q    Was there natural light providing lighting
 6  in the area?
 7      A    No.  I believe there were overhead lights.
 8  Actually, inset lights, I believe.
 9      Q    And they were on?
10      A    Yes.
11      Q    The EMT report indicates that you were on
12  medication.  It says Coreg?
13      A    Uh-huh.
14      Q    That's yes?
15      A    Yes.
16      Q    Diovan?
17      A    Yes.
18      Q    Baby aspirin?
19      A    Yes.
20      Q    Were you on any other medications at the
21  time?
22      A    No.  I wasn't on those because I didn't
23  have a cardiologist at the time.  I was on them --
24          MR. PHILLIPS:  He said were you on any
25      other medications since at the time.
```

67

```
 1      A    No, no, no.  I wasn't on any medications
 2  at the time.
 3      Q    So you weren't taking those medications?
 4      A    Those were prescribed to me.
 5      Q    But you weren't taking them?
 6      A    No.  I was unable to obtain them.
 7      Q    Is that because your plan wouldn't pay for
 8  them?
 9      A    No.  Lilia Beer was the problem.  I had
10  complained to Medicaid many, many times about her.
11  She's actually been taken off.  She's been fired
12  from Medicaid.
13      Q    But what was the problem with her relative
14  to you getting your medications?
15      A    I could never get to see her to get the
16  referral to find a cardiologist.  I was paying for a
17  cardiologist once or twice in the last three years
18  so I could get my meds when I first came here.
19      Q    But you were supposed to be taking Coreg
20  and Diovan and baby aspirin?
21      A    Uh-huh.  I took my aspirin.
22          MR. PHILLIPS:  Yes.  Just yes.  Not
23      uh-huh, just yes.
24      Q    But Lilia Beer -- I don't understand
25  how -- If you had a prescription for Coreg and
```

68

```
 1  Diovan or knew you were supposed to be taking those,
 2  somebody had written you a prescription for those or
 3  not?
 4      A    No, I didn't have them at the time.
 5      Q    You had run out and were trying to renew
 6  them?
 7      A    Yes.
 8      Q    And Lilia Beer would not do that or could
 9  not?
10      A    She couldn't do it.  She was just a
11  primary care doctor.
12      Q    Who had originally prescribed those
13  medications for you?
14      A    I can't remember the doctor's name.  We
15  were in -- I don't recall.  I haven't had a
16  cardiologist since I have been here up until now.
17      Q    Who was the last cardiologist you did
18  have?
19      A    I had him -- He retired.  I don't
20  remember, it's been awhile.  I don't remember.  He
21  was in Coral Springs.  But I only saw him once.
22      Q    What was his name?
23      A    Started with a B.  That was when we first
24  got here.
25      Q    His name started with a B?
```

BRCOSA000103

69

1    A    Yeah.  I can't recall.  I couldn't
2  afford -- I couldn't afford it.
3    Q    So Medicaid wouldn't pay for a
4  cardiologist?
5    A    They would pay for a cardiologist if I got
6  the referral from Lilia Beer.  Without that, I
7  cannot take one step further.
8    Q    When approximately did you see this
9  cardiologist who is in Coral Springs whose last name
10  starts with a B?
11    A    Last year.
12    Q    When you moved here three years ago, were
13  you under the care of a cardiologist?
14    A    Yes, I was.
15    Q    And who was that?
16    A    It was in another state.
17    Q    Okay.  But who was it?
18    A    I can't remember.
19    Q    What state?
20    A    Illinois.
21    Q    Do you have records in your possession
22  that would help you identify the names of these
23  cardiologists?
24    A    No, I do not.
25    Q    If you had to look them up, how would you

70

1  look them up?
2    A    I wouldn't.  I no longer use them.
3    Q    Would you have an old phone number or an
4  old billing record?
5    A    No.  Everything --
6    Q    Were these cardiologists paid for through
7  Medicaid?
8    A    At the time, yes.
9    Q    Okay.
10    A    Since 2010.
11    Q    So Medicaid would have a record of who
12  they were; correct?
13    A    Yes, I imagine they would.
14    Q    All right.  At the time of this accident
15  were you taking a medication called Gabapentin?
16    A    I have -- No.
17    Q    Have you ever taken that medication?
18    A    I don't even know what it is.
19    Q    Have you ever taken any medication that
20  has caused you to have blurred vision?
21    A    Only after the accident.
22    Q    Do you remember the name of that
23  medication?
24    A    Neurontin.  It's for the nerve damage.
25    Q    Prior to this accident, had you ever

71

1  tripped and fallen before?
2    A    No.  Well, I -- No.  Not to this degree,
3  no.  I'm sure I have tripped in my life sometime,
4  yeah, but no, not like this.
5    Q    Have you ever tripped over an item like a
6  bracket or something of similar size that was in a
7  sidewalk somewhere?
8    A    I can't recall.
9    Q    After you fell, did you look at the
10  bracket that caused you to fall?
11    A    I looked back to see what I fell over and
12  that's when --
13    Q    Did you --
14    A    I didn't examine them, no.
15          MR. PHILLIPS:  Let him finish.
16    Q    I just want to know the configuration it
17  had.  What shape was it in?  S shape?  L shape?
18    A    I saw the brackets.
19    Q    I am just asking.  If you don't know, you
20  can just tell me you don't know.
21    A    From where I was I couldn't tell what they
22  were, what configuration they were except that they
23  were sticking out of the ground.
24    Q    The next question is:  How high out of the
25  ground was it sticking?

72

1    A    Maybe -- I don't know.  From what I see of
2  the pictures -- 'cause I never saw them after that
3  night.  I don't know, maybe two inches,
4  three inches.
5    Q    Now you said that your wife had returned
6  to the scene the next day and the brackets were
7  gone; correct?
8    A    Correct.  She wasn't going to the scene,
9  she was going to the grocery store.
10    Q    I understand.
11    A    Correct, correct.
12    Q    But she passed by the scene?
13    A    Correct, correct.
14    Q    And did she determine --
15    A    Can you rephrase the question?  I'm sorry,
16  I'm very tired.
17          MR. PHILLIPS:  You answered it.
18    Q    I think you answered it.
19          MR. PHILLIPS:  You answered fine.
20  BY MR. PRATT:
21    Q    Yeah, there's no problem there.
22          What I want to know is whether or not you
23  or your wife have spoken to anyone who has any
24  knowledge about who removed the brackets and when
25  they were removed?

BRCOSA000104

73

```
 1    A    No.  Absolutely not.
 2    Q    What?
 3    A    I said no.
 4    Q    I understand.  I understood your answer.
 5         Have you spoken to anyone - you or your
 6   wife spoken to anyone who has knowledge of the
 7   brackets being there before your fall?
 8    A    Someone at the salon said that she saw
 9   them there prior.
10    Q    I think your deposition referred to
11   somebody named Patty?
12    A    I think that was her name.  I'm not a
13   friend of hers.  We see her from time to time when
14   we walk through to go to the store, 'cause we go to
15   Fresh Market quite a bit, and I don't know her name,
16   I just know that she's there.
17         And what did she tell you about the
18   brackets?
19    A    She said that they were there days before.
20   She doesn't remember exactly how long they were
21   there, but they were there before I fell, 'cause I
22   didn't see her again until probably two weeks later,
23   probably three weeks later 'cause I wasn't moving
24   around too well.
25    Q    When is the last time you saw her?
```

74

```
 1    A    Eight, nine months ago.  Before we moved.
 2    Q    Now that you have moved, and I don't know
 3   how far away from that plaza you are, but have you
 4   returned to that plaza?
 5    A    No, not once.
 6    Q    Have you spoken to anyone else other than
 7   this girl who work -- Did she work there?
 8    A    She was -- yeah.
 9    Q    Where did she work?
10    A    At the salon.
11    Q    The hair salon?
12    A    Uh-huh.
13    Q    Have you spoken to anyone else who has
14   professed to have any knowledge about the brackets,
15   the removal of the brackets or your fall?
16    A    No.
17    Q    Do you know if anyone else, other than
18   your family members, witnessed your fall?
19    A    I have no idea.
20    Q    You are not aware of some pedestrian
21   coming by and stopping and saying hey --
22    A    If they did, I'm unaware of it.
23    Q    Fair enough.
24         Have you personally spoken to anyone that
25   works for my client?  Do you know who my client is?
```

75

```
 1    A    Just by name.
 2    Q    Have you spoken to anyone from that
 3   company about this case?
 4    A    No, I have not.
 5    Q    Did you speak to anyone at the management
 6   company for the plaza about this case?
 7    A    Very briefly.  When we asked for the
 8   property management we got hung up on.
 9    Q    And when was that?
10    A    The day after the accident.  The day when
11   I got back.  I think it was a day or two after I got
12   back from the hospital.
13    Q    How many days were you in the hospital?
14    A    Just that night.
15    Q    And so you placed a call to the management
16   people?
17    A    Uh-huh.
18    Q    That's yes?
19    A    Uh-huh.
20    Q    Yes?
21    A    Yes.  I'm sorry, I'm tired.
22    Q    Do you know with whom you spoke?
23    A    No, I do not.  It was during a Jewish
24   holiday and the management -- she was off.  It was
25   during a Jewish holiday when we called, so that's
```

76

```
 1   why we didn't get to speak to the property manager,
 2   we spoke to someone else.
 3    Q    I think a moment ago you said they hung
 4   up?
 5    A    They did.
 6    Q    They just hung up on you?
 7    A    After we had asked to speak to the
 8   manager, she said in reference to what, and I said I
 9   had an accident and you need to tell somebody about
10   this, and she basically hung up.
11    Q    Any further contact with anybody at the
12   management company after that date?
13    A    No.
14    Q    How long after the accident did you
15   continue to live at the apartment behind the plaza?
16    A    Until June of this year.
17    Q    During that period of time, did you and
18   your family continue to visit the plaza?
19    A    Uh-huh.
20    Q    That's a yes?
21    A    Yes.
22    Q    The area where you fell and these brackets
23   were located, had that housed mailboxes previously?
24    A    Yes.
25    Q    And you knew that; correct?
```

BRCOSA000105

77

```
1     A    Yes.
2     Q    You had seen them?
3     A    Uh-huh.
4     Q    I think your prior deposition said that
5   you had been to that plaza once or twice a week at
6   least?
7     A    Uh-huh.
8         MR. PHILLIPS:  Yes?
9     A    Yes.
10    Q    When was the last time before this evening
11  of your accident that you had been at the plaza, if
12  you recall?
13    A    I don't recall.
14    Q    Was there any routine that you would
15  follow on a weekly basis going to the plaza?
16    A    Not really, no.
17    Q    We always went on Monday, we always went
18  on Thursday or anything like that?
19    A    No, no.
20    Q    If I tell you to assume that the evening
21  of your accident was a Monday - I am just going to
22  ask you to assume that - so the prior two days were
23  the weekend.  Do you have a recollection of having
24  been to the plaza on that weekend?
25    A    I can't recall.
```

78

```
1     Q    Relative to the day of your accident, the
2   evening of your accident, do you have a recollection
3   of whether or not the mailboxes that had been there
4   were there the last time you were there before your
5   accident?
6     A    The last time, I don't recall.  I know
7   they weren't there that night.
8     Q    I understand.  But the new ones were?
9     A    Uh-huh.
10    Q    That's yes?
11    A    Uh-huh.
12    Q    Yes?
13    A    Yes.  Sorry, I'm really tired.
14    Q    Why don't we take a two minute break, I'm
15  closing in.
16        (A recess was taken at 12:58 p.m.)
17        (Back on the record at 1:13 p.m.)
18        MR. PRATT:  Let's go back on the record
19    and see if we can get Mr. Ackley out of here.
20  BY MR. PRATT:
21    Q    Do you, Mr. Ackley, have a rough
22  approximation of how much in medical expense you
23  have incurred as a result of this accident?
24    A    Not as of yet, no.  It's still ongoing.
25    Q    Do you know whether or not all of the
```

79

```
1   medical expenses that are related to this accident
2   have been submitted to Medicaid, whatever plan that
3   was in effect at the time of this accident?
4     A    I have no -- That I -- I haven't gotten
5   anything back from Medicaid yet.
6     Q    Would your wife be more knowledgable about
7   that?
8     A    No.
9     Q    Who would be most knowledgable about what
10  has happened to all the medical bills that you have
11  incurred?
12        MR. PHILLIPS:  I could answer that one.
13        He's got them, I imagine.
14        At first I didn't quite -- I have no
15  reason to keep them.
16    Q    Well, I didn't know if, for instance, when
17  you went to Broward -- I think it was Broward
18  Health, Coral Springs -- is that the hospital you
19  were taken to?
20    A    Yes.
21    Q    And usually when they are processing the
22  patients they usually ask for financial
23  responsibility.  My question to you is:  Did you
24  hand them your Medicaid card or give them Medicaid
25  information?
```

80

```
1     A    Gave them my name and my social and it was
2   in the system for Broward Health.
3     Q    And have you been dunned for payment by
4   any of your medical providers?  Do you understand
5   what that means?
6     A    No.
7     Q    That means they would be sending you a
8   letter you owe us, your bill is outstanding?
9     A    I haven't gotten anything from this yet.
10  And it takes -- I had a heart attack a couple of
11  years ago and I didn't get that for like -- it took
12  awhile.  Sometimes you get them, sometimes you
13  don't.
14    Q    For instance, let's say your initial
15  hospital stay was $5,000 and they may have processed
16  it to Medicaid and Medicaid may have paid whatever
17  they pay and then there might be a balance.
18        But you haven't gotten a letter saying
19  Medicaid has paid, now you still owe us $1,000?
20    A    I haven't gotten any of that.  I am
21  unaware thus far.
22    Q    That's fine.
23        The plan that was in effect at the time of
24  your accident was the Medicaid -- I wrote down HBO
25  and I know that's not --
```

BRCOSA000106

81

```
 1      A    Broward Health.
 2      Q    It was Medicaid Broward Health?
 3      A    Uh-huh.
 4      Q    All right.  Do we have that information in
 5   Interrogatories?  Do you know the Medicaid?  Have we
 6   seen the Medicaid card or anything?  Do you have
 7   that card with you, Mr. Ackley?
 8      A    Actually, I think I do.
 9      Q    I just would like to get a copy of the
10   card.
11           MR. PHILLIPS:  We'll get you a copy of it.
12      A    Oh, no, I don't even have my wallet.  I
13   didn't bring my wallet.
14      Q    I don't want to belabor this.  We'll get
15   it.
16           MR. PHILLIPS:  It's ACS Recovery Services
17   has the lien on it.
18           MR. PRATT:  All right.
19           MS. MILIAN:  Do you have a copy of the
20   lien?
21           MR. PHILLIPS:  Yeah.  I have given you all
22   the lien stuff.  I haven't updated it in
23   awhile.
24           MS. MILIAN:  Can you fax or e-mail those
25   to me?
```

82

```
 1           MR. PHILLIPS:  You already got them.
 2           MS. MILIAN:  The updated?
 3           MR. PHILLIPS:  I just said I don't have
 4   anything in awhile.
 5           MS. MILIAN:  I see.
 6           MR. PHILLIPS:  It's not much, it's only a
 7   few grand.
 8           MS. MILIAN:  All right.
 9      Q    Mr. Ackley, can you think of any expense
10   that you have paid for out of pocket that you would
11   like to be reimbursed for for this accident?
12      A    There were a few.  Not many.  Not many out
13   of pocket.
14      Q    Well, what would the out of pocket expense
15   be that you are referring to?
16      A    Wow.  I'm trying to remember.
17      Q    Prescriptions?
18      A    Yeah, there was one time where I got my
19   prescriptions from this doctor, the last pain
20   management that I went to, and for some reason or
21   other I went to my local pharmacy, I actually drove
22   all the way out there -- I didn't drive, someone
23   drove me to get the pills, to get my medicine, and
24   they said I had to pay I think $150 for the
25   medicine.
```

83

```
 1      Q    What pharmacy was that?
 2      A    CVS on Riverside and Wiles Road.
 3           That was my last trip to that doctor.
 4      Q    Was the CVS pharmacy at Riverside and
 5   Wiles Road the pharmacy where you filled most, if
 6   not all, of your prescriptions?
 7      A    Uh-huh, yeah, that was my local pharmacy.
 8      Q    Have you now changed pharmacies because of
 9   the relocation?
10      A    Yeah.  CVS on Federal Highway, Deerfield
11   Beach.  It's two blocks from my house.
12      Q    What's the nearest intersecting street to
13   Federal Highway?
14      A    10th Street.  10th and Federal.
15      Q    Did you say that was Deerfield?
16      A    Yes, sir.
17      Q    Now I know that you mentioned, and it may
18   have been off the record, that you don't drive
19   anymore?
20      A    I don't.
21           MR. PHILLIPS:  Hold on.
22           THE WITNESS:  I'm sorry, I thought he was
23   done.
24           MR. PHILLIPS:  There was no question.
25      Q    Before the accident, the day before and
```

84

```
 1   days before were you driving?
 2      A    Not really because of my defibrillator, it
 3   had gone off once.
 4      Q    You have a Florida driver's license?
 5      A    It's expired.
 6      Q    Do you have it with you by any chance?
 7      A    No, I do not.
 8      Q    We can perhaps get that.
 9           Do you know when it expired?
10      A    When I went abroad in 1989.
11      Q    Well, you have been in Florida three
12   years.  Have you driven during those three years
13   here?
14      A    Very little.
15      Q    I mean, if you did, I guess you were doing
16   it without having a valid license?
17      A    Yeah.
18      Q    Okay.
19      A    Like half the people on the road.
20      Q    Have you attempted to renew your license?
21      A    No.  I do not want to drive.  I put other
22   people's lives in danger because of this device.
23      Q    And the device you refer to is a
24   defibrillator?
25      A    It's defib and a pacemaker.  My heart --
```

BRCOSA000107

85

```
 1    Q    When was that implanted?
 2    A    February of 2010.
 3    Q    Who was your doctor that did that?
 4    A    God, I can't remember.  There were so many
 5  doctors, I can't remember who did it.
 6    Q    Where was it done, what facility?
 7    A    Overseas.  I can't remember the doctor's
 8  name.
 9    Q    Overseas is a big area.
10    A    Europe.
11    Q    Well, that's still a big area.
12    A    I'm sorry.  Forgive me.  France.
13    Q    France is still big, too.  Can you just
14  give me --
15    A    Paris.  I don't know the name of the
16  facility.
17    Q    Was it a hospital in Paris?
18    A    It's a private hospital is what it is.
19    Q    Any idea what the name of the private
20  hospital is?
21    A    No, I do not.  In fact, I don't think it
22  has one.
23    Q    I didn't follow that.
24    A    It belonged to the corporation that I
25  worked for.
```

86

```
 1    Q    And that was what corporation?
 2    A    Blackwater Z, at the time.
 3    Q    They owned a private facility?
 4    A    They own several.
 5    Q    Blackwater is security?
 6    A    It's a security consulting firm.  They
 7  contract labor, truck drivers, chefs, that sort of
 8  thing.
 9    Q    And since it's been implanted, who here in
10  Florida, South Florida specifically, has been
11  responsible for monitoring, examining, maintaining
12  that device?
13    A    The people who made it or the doctor?
14    Q    The doctor.
15    A    I don't have -- I didn't have one, so it
16  wasn't monitored, but it was looked at last week and
17  it's never fired.
18    Q    It's never what?
19    A    It's never fired.  It never went off.
20    Q    Meaning that's a good thing; right?
21    A    Yes.
22    Q    So these doctors -- Well, wait a minute.
23  Who did you see last week?
24    A    What doctor?  I saw -- You mean the
25  doctor?  Are you referring to the hospital?
```

87

```
 1    Q    I don't know what I'm referring to, to be
 2  honest with you.
 3         MR. PHILLIPS:  Well, you asked the
 4    question.
 5    A    I'm done with this man.  I mean, come on,
 6  man.
 7         MR. PHILLIPS:  Just relax.
 8    Q    You said the doctors I saw last week; I
 9  don't know who you saw.
10    A    You just asked me who was maintaining any
11  care --
12         MR. PHILLIPS:  Take a breath.  He asked
13    you what doctor you saw.
14         He saw a bunch of them 'cause he was in
15    the hospital.
16         THE WITNESS:  That's why I stopped my
17    answer and asked him what he was referring to.
18         MR. PHILLIPS:  He will be more specific.
19    Q    Did you see a cardiologist last week?
20    A    Yes.
21    Q    Do you remember his name?
22    A    Jorge Bentor.
23    Q    Where is Dr. Bentor?
24    A    Cardiology at Cleveland clinic.
25    Q    And before Dr. Bentor looked at you --
```

88

```
 1    A    Dr. Paris.
 2    Q    And when was that?
 3    A    A couple months ago.  I had to get my
 4  medicine.
 5    Q    What medicines do you currently take?
 6    A    All the ones you mentioned, plus ones that
 7  I can't even pronounce.  So the ones that are making
 8  me sick.
 9    Q    You had mentioned at the outset that they
10  had changed medications and you were having a hard
11  time with it.
12    A    Yeah.  That's another thing that's making
13  me really irritable, you will have to forgive me.
14    Q    I have seen worse.
15    A    I can't even pronounce them.  They have me
16  on cholesterol, they have me on things I have never
17  taken before.
18    Q    You don't have a list or a script with
19  you?
20    A    I was going to bring them, believe it or
21  not, but last night was not a good night for me.
22    Q    Okay.
23    A    But I can get you a list.  I'm sure my
24  attorney can.
25         MR. PHILLIPS:  The doctors will have it.
```

BRCOSA000108

89

```
 1        Q   I think I understood what you told me at
 2   the outset when you said that you were "working" for
 3   your landlord, working in quotations, for your
 4   landlord.  Did you say loan modification or home
 5   modification?
 6        A   No.  What had happened was, she had worked
 7   with my wife, and we couldn't afford the rent
 8   anymore because my wife was barely working.  She had
 9   to quit her job to take care of me for the first
10   month or so.  And we had met someone there, she was
11   going to lose her house.  So a couple of friends of
12   mine that were lawyers were going to help me get
13   this together.  I signed a lease and that way we
14   didn't have to pay as much rent and that way we
15   could survive as a family.  It was our only option.
16   We had to move or we would have went in the street.
17        Q   Okay.
18        A   And this worked out good for everybody
19   thus far.
20        Q   But the word was loan --
21        A   Modification.
22        Q   -- modification as opposed to home
23   modification?
24        A   I'm not an attorney, they are.  I may have
25   said it wrong.
```

90

```
 1        Q   No, no, that wasn't even my point.  I
 2   wanted to make sure I didn't misunderstand.  I
 3   wasn't sure if you said home modification, which
 4   meant you were working rebuilding her home.
 5        A   No, I tried that, that doesn't work very
 6   well for me.
 7        MR. PRATT:  Okay.  I think those are all
 8        the questions I have for you today.
 9        MS. MILIAN:  I have some.  But I won't be
10        long because they are really just updates since
11        your last deposition.
12               CROSS EXAMINATION
13   BY MS. MILIAN:
14        Q   But Mr. Ackley, we met before, a few
15   times.
16        A   Unfortunately.
17        Q   So you know I am Rosalind Milian.  Sorry.
18   And I represent Equity One, Florida Portfolio, Inc.
19        Mr. Ackley, at your last deposition, at
20   the time of your deposition you were taking
21   Neurontin, Coreg and Klonopin.  Are you taking any
22   of those medications today?
23        A   No.
24        Q   No?
25        A   I'm not taking the Klonopin.  I am
```

91

```
 1   taking -- some of them I can't pronounce.  But
 2   Klonopin -- I'm not taking any mind-altering drugs.
 3   None.  Everything is basically -- the Neurontin is
 4   getting to the point where I can't stand it any
 5   longer.
 6        Q   Why not?
 7        A   It's horrible side effects, horrible drug.
 8        Q   What are the side effects?
 9        A   Nausea, diarrhea, blurriness, dizziness.
10   It's not pleasant.
11        Q   Who prescribes it?
12        A   Dr. Carerra (sic) did.
13        Q   Who is Dr. Carerra?
14        A   My last doctor at the pain -- whatever the
15   place was, Fort Lauderdale.
16        Q   Oh, Dr. Pereira?
17        A   Pereira, yeah, whatever his name is.
18        Q   When did you last see Dr. Pereira?
19        A   A couple of months ago.
20        Q   What was he doing for you when you last
21   saw him?
22        A   Really just prescribing medications for me
23   and nerve blocks.
24        Q   Why did you stop seeing him?
25        A   'Cause he -- How do I say this?  I choose
```

92

```
 1   to not see that doctor.  I don't like him, I don't
 2   like what he does.
 3        Q   Why don't you like him?
 4        A   I -- It's just not the doctor I want.
 5        Q   So you are changing to Dr. Arena?
 6        A   Yes.
 7        Q   And you haven't seen a doctor since, I
 8   mean between Pereira and Arena except at the
 9   hospital last week?
10        A   That is correct.
11        Q   How did you hear about Dr. Arena?
12        A   Through Medicaid.
13        Q   What medications - I don't think I got an
14   answer to that - are you taking today?
15        A   I am not taking anything today except for
16   the Neurontin and what the doctors gave me.  They
17   are all new.  I am not taking any of the drugs that
18   you just mentioned.  They took me off the Plavix,
19   they took me off the Coreg.  Anything of the things
20   you just mentioned I'm not taking.  Everything is
21   new except Neurontin.
22        Q   And you don't know what they are?
23        A   I can't pronounce them.
24        Q   Okay.  Why were you taken off the Coreg?
25        A   He told me there was a reason behind it.
```

BRCOSA000109

93

1  When you take Plavix for so long you have to be
2  taken off.  It has to be cycled.
3       The Coreg -- Me having such low blood
4  pressure -- My blood pressure is extremely low.
5  Coreg lowers your blood pressure even lower.  Even
6  though it's a beta-blocker, it's not a good thing to
7  take.
8       Q    Have you had any medical recommendations
9  for surgery?
10      A    Yes.
11      Q    Who recommended surgery?
12      A    The doctors that I just saw over the
13 weekend.
14      Q    Did Dr. Pereira recommend surgery?
15      A    He said that's the only option, but he
16 doesn't do surgery.
17      Q    Now what is the surgery that's being
18 recommended?
19      A    To relieve the nerve.  To decompress the
20 nerve.  Release it.
21      Q    And you gave the doctors at Cleveland
22 clinic a full medical history?
23      A    Yeah.  They did their own, actually.  They
24 wanted an up-to-date because my doctor was so lousy,
25 so they did it.  So I have a complete and

94

1  up -- Anything you need to know about my cardiac or
2  my groin injury, these doctors will let you know.
3       Q    Okay.
4       A    They will give you everything you need.
5       Q    How did you get here today?
6       A    Train.
7       Q    You came on your own?
8       A    Yes.
9       Q    And you are still not working?
10      A    No.
11      Q    You are at home?
12      A    I will never work again.
13      Q    You are at home then?
14      A    Yes.
15      Q    You stay at home?
16      A    Yeah.
17           I tried, doesn't work.
18      Q    What doesn't work?
19      A    I tried to work.  I have a family to
20 support.  I have tried everything from -- you name
21 it, I have tried it.  All it does is put me in the
22 bed for a month.
23      Q    Have you had any accidents or injuries
24 since your last deposition --
25      A    No.

95

1       Q    -- of April 25th, 2013?
2       A    No, I have not.
3       Q    Have you had any criminal convictions
4  since your last deposition?
5       A    No, I have not.
6       Q    Have you had any improvement in your nerve
7  condition from this accident since your last depo?
8       A    Only when I take the medicine.  As far as
9  improvement overall, no.
10      Q    Now when you say when you take the
11 medicine you have improvement --
12      A    The pain never goes away no matter how
13 much medicine I take.  It just makes the day a
14 little better.
15      Q    And is there a particular medicine that
16 does help make the things a little better?
17      A    The Neurontin, but it's a horrible drug.
18 You have to make a choice.  You know, you have to
19 make a choice.
20      Q    For the surgery that you are recommended
21 to have, this nerve decompression, do you have to be
22 anesthetized?
23      A    Pardon me?  You mean put under?
24      Q    Yes.
25      A    Yes.  And that in and of itself is a risk.

96

1  I'm 40 percent higher -- My left ventricle puts me
2  at risk just even going under.  So yeah, I'm risking
3  my life doing this.  That should give you a pretty
4  clear picture.
5       Q    At the last deposition, you testified that
6  you were not able to walk without a cane for
7  assistance?
8       A    Without -- Okay.  I said -- What I said
9  was I couldn't walk without a cane unless if I took
10 my medication.
11      Q    Okay.
12      A    Please don't do that to me.
13      Q    All right.  I'm sorry.
14      A    I know what I said.
15      Q    Let me clarify my understanding, that you
16 were unable -- I have it here, okay?
17      A    I'm sure you do.
18      Q    You were unable -- If you took your
19 medication, you were able to walk without a cane?
20      A    Some days.  Some days were better than
21 others.
22      Q    Right.  And that was -- At the time of
23 your deposition you were using a cane about two to
24 three times per week?
25      A    Yes.

BRCOSA000110

97

1    Q    Is that correct?

2    A    Yes.

3    Q    Is that still the case?

4    A    I don't -- Yeah. Well, not -- In the last
5    week or two, 'cause -- Yeah, yeah, it's still the
6    case. Nothing has changed.

7    Q    So you would still use a cane about two to
8    three days a week?

9    A    Uh-huh.

10    Q    Are you still, like, taking medication on
11    a couple of days and then off a couple of days?

12    A    You have to -- You have to -- it's hard to
13    explain. There are days when I know I am not going
14    to leave the house.

15         Rephrase the question. Say it again,
16    please.

17    Q    Are you still taking your medication on a
18    couple of days and off a couple of days?

19    A    Yes.

20    Q    Yes?

21    A    Uh-huh.

22    Q    And on the days that you don't take the
23    medication, are those the days that you use the
24    cane?

25    A    Yes.

98

1    Q    But you don't have to use the cane on the
2    days you do take the medications?

3    A    Sometimes I do. I just said that.

4    Q    Are you using a cane today?

5    A    No, I am not 'cause it broke. I am
6    waiting for a new one.

7    Q    So when did you last have it?

8    A    Two days ago, three days ago.

9    Q    Are you using any kind of assistive
10    devices?

11    A    I don't have one.

12    Q    When are you going to get a new one?

13    A    Probably today or tomorrow.

14    Q    Are you able to get around today without
15    the cane?

16    A    No -- Obviously. It doesn't mean --
17    Without the pain? No. Ma'am --

18         MR. PRATT: Without the cane she said.

19    A    Yes.

20    Q    Without the cane?

21    A    Yes. I had to be here. If I had to
22    crawl, I had to get here.

23    Q    Have you had difficulty getting around
24    today because you didn't have the cane?

25    A    Yes.

99

1    Q    At the time of your last deposition you
2    testified that basically you did nothing except lay
3    down. Is that still the case?

4    A    Most of the time. I tried -- Over the
5    last three or four months I tried to go out and
6    work. I would load up on medicine, I would go out
7    and try to do a job here, try to do a job there, a
8    friend might have a little work, 'cause I have to
9    feed my family, and it doesn't work. I mean, I have
10    tried to overlook this. I even tried to leave
11    twice.

12         I'll shut up.

13         I can't work, I have tried.

14    Q    What kind of work have you tried to do
15    over the last three or four months?

16    A    I tried to repair a leak on a man's house;
17    that didn't work out too well for me.

18    Q    Where was that?

19    A    Hollywood.

20    Q    And how did you get there?

21    A    He came and got me.

22    Q    When was that?

23    A    I don't know exactly the day. It was
24    between the day -- between today and last June.

25    Q    And what happened?

100

1    A    I couldn't do it.

2    Q    Why not?

3    A    Really?

4    Q    Yes, Mr. Ackley.

5    A    I really have to answer these questions?

6    Q    Yes, you do.

7    A    Man.

8         MR. PHILLIPS: We are going to take a
9    break for a second.

10         (A recess was taken.)

11         THE WITNESS: To reiterate the answer --

12         MS. MILIAN: Let the record reflect that
13    Mr. Ackley and his attorney stepped out and
14    they are back now.

15    BY MS. MILIAN:

16    Q    And do you have an answer?

17    A    Pain.

18    Q    You couldn't do it because of pain?

19    A    Uh-huh.

20    Q    Because of the pain in your right leg?

21    A    Groin, all the way down to the inside of
22    my knee.

23    Q    Had you taken your medication on the day
24    that you tried doing that?

25    A    Yes, I did.

BRCOSA000111

101

1   Q    And you still couldn't do it?
2   A    Yes.  Exactly.
3   Q    What else have you tried to do?
4   A    Not much after that.
5   Q    Well, you said in the last three to four
6  months you have tried to work a couple of different
7  jobs.
8   A    Little things.  I helped work where Fabby
9  was working helping with the dogs; I couldn't do
10 that either.  I can't stand for very long.  I can't
11 sit for very long.
12  Q    When you say you can't stand for very
13 long, can you quantify that?
14  A    Not a specific time limit, no.
15  Q    If you are standing without a cane, is
16 there a certain amount of time before you have to
17 change positions or sit down?
18  A    Just a few minutes.
19  Q    And that's without a cane?
20  A    Uh-huh.
21  Q    And it's been like that consistently since
22 I saw you at your last deposition?
23  A    Uh-huh.  Sometimes, like I said before,
24 some days are better than others.
25  Q    Can you stand any longer than a few

102

1  minutes at a time with your cane?
2   A    Yes.  It depends on -- Like I said, it
3  depends on the day.  Some days are better than
4  others.  I can't put it any more --
5   Q    So since your last deposition what have
6  you been able to do on your best day?
7   A    Go to the store.  But I can't walk.
8   Q    I'm sorry?
9   A    I mean, on my best day -- This is my best
10 day.  This is the longest day I have had in recent
11 memory.
12  Q    Today?
13  A    Uh-huh.
14  Q    You are not having any difficulty sitting
15 for --
16  A    Yes, I'm having difficulty sitting.  I'm
17 having difficulty standing.  Every aspect of my life
18 has been changed.
19  Q    I am just trying to get quantification of
20 what you are saying.
21  A    I'm telling you.
22  Q    You are saying --
23  A    Every aspect of my life is affected by
24 this.  There isn't a moment -- Even in my sleep.
25  Q    Have you had any change in your activities

103

1  at all since the last deposition?
2   A    Change in activities as opposed to when?
3  From before the accident or after the accident?
4   Q    From the last deposition until today.
5   A    I tried to regain some of my activities.
6  I tried to walk more.  I even tried to get my
7  dog -- Well, actually she does a pretty good job,
8  she pulls me on a skateboard and that way I don't
9  have to walk.  But that didn't work out too well,
10 either.
11  Q    So you walk your dog?
12  A    I can't.  I just said that.  On good days
13 when I could stand, it's okay.
14  Q    Your dog has pulled you on a skateboard?
15  A    It's better than walking.
16  Q    How often do you do that?
17  A    Not very often.  We did it twice, I think,
18 and it didn't work out too well.
19  Q    When was this?
20  A    I was trying to figure a way --
21       A couple months ago.
22       I was trying to figure a way I could get
23 to the store without walking.
24  Q    When you say it didn't work out --
25  A    It hurts.

104

1   Q    Why?
2   A    It hurts.  I have to -- It hurts.
3   Q    So your dog -- How did that work?  You are
4  riding a skateboard with one leg?
5   A    What I just said was that I tried to do
6  this and it didn't work.  It's pretty simple.
7   Q    So your dog did not pull you?
8   A    No, no, it just didn't work.
9   Q    Did the dog pull you on a skateboard for
10 any length, like for a foot?  Five feet?
11  A    10, 15, 20 feet maybe.
12  Q    Just 10 or 20 feet?
13  A    Uh-huh.
14  Q    For how long?
15  A    I can't recall.
16  Q    I mean, how long were you on a skateboard
17 with your dog pulling you?
18  A    I can't recall.
19  Q    You can't recall?
20  A    No.
21  Q    Do you know if it was more than 10
22 minutes?
23  A    I can't recall.
24  Q    And how big is your dog?
25  A    Medium size dog.

BRCOSA000112

105

```
 1    Q    And are you holding the dog on a leash?
 2    A    Uh-huh.
 3    Q    Yes?
 4    A    Yes.
 5    Q    You tried this once and it didn't work?
 6    A    A couple of times.
 7    Q    You tried it a couple of times?
 8    A    Uh-huh.
 9    Q    So where -- If your dog is pulling you
10  on a skateboard, where are your legs?
11    A    Underneath me on the skateboard.
12    Q    So you have got both legs on the
13  skateboard?
14         MR. PHILLIPS:  You weren't doing a
15    handstand?
16    A    Wow, man.
17         I know, I know, I know.
18         If I may elaborate.  If I may explain.
19  It's easier to stand in one place than it is to
20  walk.  So what I thought in my infinite genius was
21  that I could get the dog to pull me and it didn't
22  work.  Walking is excruciating on bad days.
23    Q    So you thought because it's easier to
24  stand in one place - just to reiterate so I'm not
25  misunderstanding - that you would try getting on a
```

106

```
 1  skateboard and having your dog pull you?
 2    A    Uh-huh.  Yes.
 3    Q    And that was to go to a store?
 4    A    To buy food for my family, yeah.
 5    Q    What store?
 6    A    Winn Dixie.
 7    Q    How far is Winn Dixie from your home?
 8    A    Quarter mile maybe.  Too far for me to
 9  walk.
10    Q    So have you been able to get to the
11  store - to Winn Dixie?
12    A    Very seldom.  Usually my wife has to -- or
13  my girlfriend.
14    Q    When you do --
15    A    When I do what?
16    Q    When you do go to the store, how do you
17  get there?
18    A    I walk.  I have to.
19    Q    And do you ever walk to the store without
20  your cane?
21    A    Yes.
22    Q    About how often do you go?
23    A    I cannot recall.  I don't know.  It varies
24  from week to week.
25    Q    Do you walk to the store every week, to
```

107

```
 1  Winn Dixie?
 2    A    Yes.
 3    Q    So give me an estimate of how many times a
 4  week --
 5         MR. PHILLIPS:  I am going to object.  This
 6    has already been asked and answered.  He said
 7    he didn't know.
 8    Q    Okay.  So every week, at least once a week
 9  you walk to Winn Dixie; right?
10    A    Uh-huh.  Yes.
11    Q    And that's with or without a cane,
12  depending on the day?
13    A    I just answered that.
14    Q    I'm sorry.
15    A    Yes, yes, yes.  Good days I don't need a
16  cane sometimes.  Sometimes I do, sometimes I don't,
17  it varies.
18    Q    Do you go anywhere else?
19    A    No.
20    Q    Now you say it's easier to stand.  So on
21  the days -- On the couple of occasions that you
22  tried having the dog pull you on the skateboard did
23  you stand with both legs on the skateboard?
24    A    I don't recall how long.
25         MR. PHILLIPS:  The question was, did you
```

108

```
 1    stand with both legs?  She meant both feet on
 2    the skateboard.
 3    A    Both of them flat on the deck, no.  One
 4  foot has more weight than the other.  It's a very
 5  long board, it's very easy to stand on.
 6    Q    Is this a skateboard that you own?
 7    A    It's not mine, it was at the house.  I
 8  don't own one.
 9         If your question was, was I equally on
10  both feet, no.
11    Q    So you had one leg on the skateboard --
12  one foot on the skateboard and one on the ground?
13    A    No.
14    Q    No?  Well, can you explain?
15         MR. PHILLIPS:  Explain in detail.
16         THE WITNESS:  I know.
17    A    Two feet.  You ever stand on one foot more
18  than the other because maybe you stepped on
19  something or your one foot is not in contact with
20  the ground as much as the other one?  Maybe you've
21  lifted it off the ground a little bit.
22    Q    I am asking you how you did it.
23    A    I am telling you how I did it.
24         MR. PHILLIPS:  He's explaining to you.
25    A    I am explaining to you because you seem to
```

BRCOSA000113

109

1    not understand.

2        Q    No, and I'm asking you to explain it.

3             MR. PHILLIPS:  He is.

4        A    One leg is not fully flush to the ground

5    or to the deck.

6        Q    Do you have your leg primarily on -- your

7    weight primarily on one leg?

8        A    The left leg.

9        Q    The one that's on the skateboard?

10       A    Uh-huh.

11       Q    And you keep the right leg off the

12   skateboard, but not flush to the ground?

13            MR. PRATT:  You misunderstood, Rosalind.

14            MR. PHILLIPS:  Here is the skateboard.

15       He's got two feet.  He's got more weight on one

16       leg versus the other leg.

17       Q    So let me clarify.  You have got -- you

18   don't have one foot off the skateboard, you have got

19   both feet on the skateboard, but your weight is

20   primarily on your left leg?

21       A    Uh-huh.

22            MR. PHILLIPS:  Yes?  Just say yes.

23       A    Yes.

24       Q    Thank you.

25            And you did it that way on both occasions

110

1    that you tried?

2        A    Yes.

3        Q    And on the one occasion you only went

4    about 10 to 20 feet and you couldn't do it; right?

5        A    Yes, yes.  I can't recall exactly how far

6    it was.

7        Q    How about the other occasion that you did

8    it?

9        A    I can't recall.

10       Q    Did you go further than 10 to 20 feet?

11       A    I can't recall.

12       Q    Was it only twice you attempted that?

13       A    I can't recall.

14       Q    You don't use one foot to push off?

15       A    No, I do not.

16       Q    Have you been able to do any -- Strike

17   that.

18            At the last deposition you testified you

19   could do arm curls at the gym if you were sitting

20   down, but nothing with lower torso movement.

21       A    No, no, no.  That was -- That was before

22   the accident.  I never ever once told you that I

23   picked up any weight after this accident.

24       Q    My understanding was this was after the

25   accident.

111

1        A    Okay.  No, it was not.

2             MR. PHILLIPS:  Just answer the question,

3        you don't have to argue.

4        Q    So you haven't been able to do arm curls

5    after the accident?

6        A    No.

7        Q    Have you been able to do anything at the

8    gym --

9        A    No.

10       Q    -- after the accident?

11       A    No.

12       Q    Maybe you can let me finish my question

13   and then you will know how to answer it.

14            Nothing at the gym since the accident?

15       A    No.

16       Q    You testified that you weren't able to

17   play ball with your kids anymore after the accident.

18   Is that still true?

19       A    That is correct.

20       Q    The only thing you were able to do with

21   them at the time of your last deposition is Play

22   Station; is that still true?

23       A    Pretty much, yeah.

24       Q    You haven't been able to swim at all since

25   your last deposition?

112

1        A    No.

2        Q    When you walk the dog, does it vary about

3    whether you use the cane?

4        A    I rarely walk the dog, and it doesn't help

5    either way.  I rarely walk the dog.

6        Q    So you haven't tried swimming since your

7    last deposition?

8        A    No, I have not.

9        Q    Why not?  The pain?  Is the answer still

10   the pain?

11       A    Obviously, yeah.

12       Q    Have you been able to have sexual

13   relations with your wife since your last deposition?

14       A    Once, and that is not due -- that's due to

15   pain.  And before that, since this accident -- Never

16   mind, I am not even going to go there.

17            Are we --

18       Q    I am asking you if there's been a change

19   in your activities?

20       A    Yes.

21       Q    Okay.  What is the change in your

22   activities?

23       A    Everything.

24            MR. PHILLIPS:  She is saying since the

25       last deposition has anything changed.

BRCOSA000114

113

1    A    No, nothing has changed.

2    Q    Okay.  It still hurts to sit and walk and

3 do anything like you testified the last time; right?

4    A    Correct.

5    Q    Have you tried riding a bike?

6    A    Yes, and it does not -- I can't.  I can't

7 do anything.

8    Q    Have you tried riding a bike?

9    A    I do not recall.  I do not recall if I did

10 or if I didn't.

11    Q    When you take your Neurontin and it's

12 let's say a good day and you indicated, I guess,

13 that just helps you get through the day better, it

14 doesn't make it completely pain free; right?

15    A    No, it never does.

16    Q    Are you able on those days that you take

17 the Neurontin, on a good day where you don't need

18 the cane to walk, what would you say is a maximum

19 distance that you walk?

20    A    Sometimes I have walked far, sometimes I

21 have walked short.  I don't know.  I have a family,

22 there are things that need to be gotten.  Whether I

23 have the pain or not, I still have to go on with my

24 life.  It doesn't matter how many questions you ask

25 me on what I can do and what I can't do, it doesn't

114

1 stop it.  I have to continue with my life, pain or

2 no pain.  So yes, I have walked far, I have walked

3 near.

4    Q    And on that type of good day --

5    A    Sometimes the cane sometimes --

6 BY MR. PHILLIPS:

7    Q    Without the cane what's the maximum

8 distance you have been able to walk?

9    A    I -- I couldn't tell you.  I don't know

10 exactly how far.

11    Q    Any further than the Winn Dixie?

12    A    I can't recall.

13    Q    You know, Mr. Ackley, I'm not trying to

14 upset you.  I understand you are getting angry,

15 but --

16    A    I'm not getting angry.

17    Q    -- I have to ask you these questions.  I

18 have a client to represent.

19    A    I understand that.

20    Q    And I need answers to these questions

21 about what has been happening since the last

22 deposition.  Okay?

23    A    Some of your questions are relevant, yes.

24    (A recess was taken.)

25

115

1 BY MS. MILIAN:

2    Q    Mr. Ackley, have you gone fishing at all

3 since your last deposition?

4    A    The last deposition was April.  So it was

5 before.  No, I haven't.

6    Q    You went in June?

7    A    I can't remember if I have or not.

8    Q    Well, that would have been after.

9    A    Yeah, I can't remember.  I don't recall.

10    Q    In the last week, what kind of things have

11 you been doing on a daily basis?  Or let's go with

12 the last week before your hospitalization at

13 Cleveland Clinic.

14    A    Okay.  That's a little broad there, I

15 don't understand.

16    Q    Well, in that last week before your

17 hospitalization at Cleveland Clinic what sorts of

18 things were you doing?  Were you able to walk more

19 than one day a week?  Were you going anywhere?  Were

20 you doing anything besides just staying home?

21    A    Taking care of my family and that's it.

22    Q    And that involves what?

23    A    That involves doing dishes, doing clothes,

24 taking care of the kids.

25    Q    Do you do cooking?

116

1    A    On occasions, yes.

2    Q    And you do laundry?

3    A    On occasions, yes.

4    Q    So what does "on occasions" mean?  How

5 often is that?

6    A    When I can.

7    Q    And how often is that that you can do

8 laundry?

9    A    When it doesn't hurt.

10    Q    And how often would you say that is?

11    A    It varies.  I have good days and I have

12 bad days.  You cannot -- I cannot give you a

13 definitive answer.  The word varies.

14    Q    So on a good day are you able to do

15 laundry and dishes and cooking and walk to the store

16 all in the same day?

17    A    No, no.

18    Q    Well, what are you able to do on a good

19 day?  What's the maximum you can do on a good day?

20    A    One or the other.  I can't do much, but

21 I'll do the dishes, I'll lay down.

22    Q    So my question is:  What's the maximum you

23 can do on what you are calling a good day?

24    A    Not very much.

25    You will have to forgive me for my

BRCOSA000115

117

1  temperament and my attitude, but I'm really tired
2  and if you'll forgive me.
3      Q   When you say "not very much," I'm sorry,
4  Mr. Ackley, but I need you to quantify what that
5  means.
6      A   I can't.  I am unable to.
7          Forgive me for my behavior.
8      Q   You don't do any kind of exercise?
9      A   I can't.
10     Q   Would you say your condition got worse
11 since the last deposition?
12     A   It's hard to say.  I can't -- I can't -- I
13 can't -- My heart condition has, yes, most
14 definitely.  But the pain in my groin, it's not
15 gotten worse, it's not gotten better.  It just
16 sucks.  It's ruining my life.
17     Q   Have you seen a psychologist or a
18 psychiatrist?
19     A   Actually, I have.  I also suffer from
20 depression, as well, but -- from all of this.
21     Q   When have you last seen a --
22     A   Cleveland Clinic.
23     Q   Who is that?
24     A   I only saw her once.  I have no plans on
25 seeing her again.

118

1      Q   What's her name?
2      A   I don't recall.  It will be in the medical
3  records.
4      Q   And when did you see her?
5      A   Over the weekend.
6      Q   On direct examination you testified that
7  "we called management and got hung up on."  Were you
8  on that phone call?
9      A   I can't -- I don't remember.  I don't
10 remember.  All I know is this:  When -- I forgot if
11 it was me or Fabienn that called, I don't remember,
12 but we got hung up on when we asked for the woman.
13     Q   When you say "we" --
14     A   We.  We are a couple.  We got hung up on.
15 We were sitting there together and we got hung up
16 on.  That was it.
17     Q   You don't know -- You didn't hear
18 somebody's voice on the other end?
19     A   I told you, a woman answered the phone, we
20 asked for the manager, she said she was off on
21 holiday, and that she said what is this in reference
22 to, I said you need to put me in touch with somebody
23 because you have -- you know, somebody could get
24 seriously hurt.
25     Q   Let me clarify.  What I am asking is, who

119

1  is the "we" that made that call?
2      A   Me and Fabienn.  We were sitting together
3  on the porch.
4      Q   Were you on speaker phone?
5      A   Actually, we were.
6      Q   You were on speaker phone?
7      A   Uh-huh.
8          The reason that the phone call was made
9  was to have those things removed because they could
10 have killed if some little kid comes through there.
11 Really?
12     Q   And when you and Fabienn made that call,
13 did the person on the other end identify themselves?
14     A   No, they did not.
15     Q   You don't know her name?
16     A   No, I do not.
17     Q   Did you report to that person that there
18 was a problem on that sidewalk?
19     A   She hung up on me.
20         The hernia didn't go down, so --
21     MS. MILIAN:  I don't have anything else.
22     MR. PRATT:  I have just a couple
23 follow-up.
24
25

120

1          REDIRECT EXAMINATION
2  BY MR. PRATT:
3      Q   Really has nothing to do with all of that,
4  but --
5      A   Again, I'm sorry.
6      Q   Forget it.
7          I don't know if you intend to make a
8  fashion statement, but I notice you are wearing a
9  shirt and the right cuff --
10     A   I can't get it to button.
11     Q   Was that because of some physical
12 inability or you don't have a button?
13     A   No.  It won't stay buttoned.  I know it
14 sucks.  It looks -- It won't stay buttoned.  I tried
15 it, it won't stay buttoned.
16     Q   That's fine.  Okay.
17     A   If it makes you feel better I'll take the
18 other one off.
19     Q   No, no, no.
20         You have a ring on your - what would
21 traditionally be your wedding ring finger.
22     A   It will be my wedding ring.
23     Q   You also have an interesting tattoo on
24 your left hand and it goes up the arm.  How far up
25 the arm does it go?

BRCOSA000116

121

```
 1    A    Just to here.
 2    Q    Just to the elbow.
 3         Any significance to the tattoo?  Any
 4  special meaning?
 5    A    It's private.
 6    Q    That's fine, I don't really care.
 7         You have tattoos on your chest, as well?
 8    A    Uh-huh.
 9    Q    Anywhere else on your body?
10    A    No.
11    Q    How old are the tattoos?
12    A    Over -- About 10 years old.  Maybe a
13  little longer than that.
14    Q    I was confused by something you said.  You
15  kind of got away from it, but --
16    A    I'm confused.
17    Q    I wish I could remember the context you
18  said it.  I wrote down, "I tried to leave twice."
19  And do you remember saying that?
20    A    Yeah, that was -- It was something
21  irrelevant.
22    Q    What did you mean by that?
23    A    It's just irrelevant.  It has nothing --
24    Q    Let me ask you.  You said you just saw --
25  over the weekend you saw a psychiatrist?
```

122

```
 1    A    Yeah.
 2    Q    This past weekend?
 3    A    Yeah, when I was in the hospital.  I was
 4  explaining to them what happened and what I was
 5  going through and they got my medical records and
 6  they told me that cases like this, not being able to
 7  work, this, that and the other, sometimes it causes
 8  depression and she wanted to come in -- they wanted
 9  her to talk to me to make sure that I wasn't
10  suffering from depression.  And however slight it
11  might be, obviously I am suffering from it, you
12  know, but not as bad as it could be.
13    Q    Did she make any treatment recommendations
14  to you?
15    A    No.
16    Q    No medications?
17    A    Not as of yet, no.  I haven't lost my mind
18  yet.
19    Q    No psychotherapy sessions or anything like
20  that?
21    A    No, no, no, no, no.  It's just when
22  something like this happens, I mean --
23    Q    I understand.
24         Were your surgeons or was the Cleveland
25  Clinic also requiring this as a prelude to surgery,
```

123

```
 1  that in other words, you had to get psychiatric
 2  clearance?
 3    A    Oh, no, no, no, nothing like that.
 4  Absolutely not.  No.
 5    Q    Have there been any occasions since this
 6  accident in which you have attempted suicide, for
 7  instance?
 8    A    No.
 9    Q    Any occasions in which you have had anger
10  issues to the extent where authorities had to be
11  called to your home?
12    A    No.
13    Q    Domestic kind of issues or anything like
14  that?
15    A    No.
16    Q    I am not talking sex now.  Would you
17  describe your relationship with your wife as still a
18  strong relationship?  Not with your wife, with your
19  fiance.  Is it still strong?
20    A    Yeah.  The reason we say wife and husband
21  is we feel too old to say girlfriend.  It's just
22  easier to say wife.
23    Q    I understand.
24    A    Our relations -- Our sexual relations have
25  stopped due to pain.
```

124

```
 1         MR. PHILLIPS:  He is not talking about
 2    that.
 3    Q    I am not asking you about that.  I
 4  understood what you said earlier and I'm not trying
 5  to elaborate on that.
 6         I am just talking about your connection --
 7    A    We are more in love now than when we
 8  first -- yeah.  And it grows every day.
 9    Q    Okay.  You said you took the train up to
10  West Palm; right?  And you got from the train to
11  here how?
12    A    Mr. Phillips picked me up.
13    Q    I assumed either that or a cab.  I didn't
14  think you would walk.
15    A    I don't have that kind of money for a cab.
16    Q    Okay.
17    A    And again, please, I need to say this,
18  forgive me for my attitude, I am just a little
19  strung out over this.  It's just been hard on me and
20  my family and it just doesn't seem like it's going
21  to stop.  And just forgive me, both of you.
22    Q    No problem.
23    A    Losing my temper is out of character.
24    Q    I have been doing this 37 years, I've seen
25  it all.
```

BRCOSA000117

125

```
1       A    I'm so far out of character.
2            MR. PHILLIPS:  We have seen a lot worse,
3       don't worry.
4       A    Forgive me.
5       Q    I have had to deal with Mr. Phillips.  No.
6            MR. PHILLIPS:  Exactly.
7            MR. PRATT:  Just teasing.
8            All right.  I have no other questions,
9       Mr. Ackley.  I think we are done.
10           MS. MILIAN:  I have nothing.
11           MR. PRATT:  We are done.
12           THE COURT REPORTER:  Would you like to
13      read or waive?
14           MR. PHILLIPS:  Read.
15           THE COURT REPORTER:  Would you like a
16      transcript?
17           MR. PRATT:  Yes, please.
18           MS. MILIAN:  I'll take a copy.
19           MR. PHILLIPS:  We are not ordering at this
20      time.
21           (The deposition was concluded at 2:10
22      o'clock p. m.)
23           (Reading and signing of the deposition was not
24      waived by the witness and all parties.)
25
```

126

```
1                    CERTIFICATE OF OATH
2
3       State of Florida
4       County of Palm Beach
5
6            I, Darlene L. Grandinetti, Florida
7       Professional Reporter, Notary Public,
8       State of Florida, certify that CHARLES
9       ACKLEY personally appeared before me on
10      the 19th day of November, 2013 and was
11      duly sworn.
12           Signed the 5th day of December, 2013.
13
14
15                        DARLENE L. GRANDINETTI, FPR, CSR
16                        Notary Public, State of Florida
17                        My Commission No. EE093792
                          Expires: August 16, 2015
18
19
20
21
22
23
24
25
```

127

```
1                    CERTIFICATE
2       State of Florida
3       County of Palm Beach
4            I, DARLENE L. GRANDINETTI, Florida
5       Professional Reporter, Certified Shorthand
6       Reporter and Notary Public, certify that I was
7       authorized to and did stenographically report the
8       deposition of CHARLES ACKLEY, pages 1 through
9       125; that a review of the transcript was
10      requested; and that the transcript is a true
11      record of my stenographic notes.
12           I further certify that I am not a relative,
13      employee, attorney or counsel of any of the
14      parties, nor am I a relative or employee of any of
15      the parties' attorneys or counsel connected with
16      the action, nor am I financially interested in the
17      action.
18           Dated this 5th day of December, 2013.
19
20
21                        DARLENE L. GRANDINETTI, FPR, CSR
                          Florida Professional Reporter
22
23
24
25
```

128

```
        December 5, 2013

        Charles Ackley
        C/O PINCUS & CURRIER, LLP
        324 North Lakeside Court
        West Palm Beach, Florida  33407
        ATTN:  STEVEN P. PHILLIPS, ESQ.

        RE:  Ackley v Equity One, et. al.
             Deposition taken on 11-19-13
             Phipps Reporting Job No. 8567


        The transcript of the above proceeding is now
        available for your review.

        Please call to schedule an appointment between the
        hours of 9:00 a.m. and 4:00 p.m., Monday through
        Friday, at a Phipps Reporting office located
        nearest you.

        Please complete your review within 30 days.


        Very truly yours,
        Darlene L. Grandinetti, FPR, CSR
        Florida Professional Reporter
        Phipps Reporting Inc.
        1615 Forum Place, Suite 500
        West Palm Beach, Florida  33401
        (888) 811-3408


        CC via transcript:
        Kent Pratt, Esq.
        Rosalind Milian, Esq.
```

BRCOSA000118

129

ERRATA SHEET

DO NOT WRITE ON THE TRANSCRIPT

ENTER CHANGES ON THIS PAGE

IN RE:  Ackley v. Equity One, et. al.

CHARLES ACKLEY

November 19 , 2013

| Page No. | Line No. | Change | Reason |
|----------|----------|--------|--------|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Under penalties of perjury, I declare that I have
read the foregoing document and that the facts
stated in it are true.

_____          _____
Date                     CHARLES ACKLEY

BRCOSA000119

# EXHIBIT 5

BRCOSA000120

# INVOICE

APEX REPORTING GROUP
12 SE 7th STREET, SUITE 702
FT. LAUDERDALE FL 33301
Phone:954-467-8204  Fax:954-467-8214

| Invoice No. | Invoice Date | Job No. |
|---|---|---|
| 68930 | 10/31/2014 | 99794 |

| Job Date | Case No. |
|---|---|
| 10/21/2014 | 14-1480 |

| Case Name |
|---|
| STATEMENT OF CHARLES ACKLEY |

| Payment Terms |
|---|
| DUE UPON RECEIPT |

WENDY UNGER
AGC DEPT OF INSURANCE FRAUD - FLL
DEPT OF FINANCIAL SERVICES
1400 WEST COMMERCIAL
SUITE 135
Fort Lauderdale FL 33309

ORIGINAL AND 1 CERTIFIED COPY OF TRANSCRIPT OF:

Statement of Charles Ackley   K03471**

| | | | | |
|---|---|---|---|---|
| | 31.00 PAGES | @ | 4.50 | 139.50 |
| LISTENING TIME - TRANSCRIPTION OF TAPE(S) / CD(S) / DVD(S) | 1.00 HOURS | @ | 60.00 | 60.00 |

**TOTAL DUE  >>>**                       **$199.50**

pick up

emailed 10/31/2014

(-) Payments/Credits:             0.00
(+) Finance Charges/Debits:       0.00
(=) New Balance:              **$199.50**

**Tax ID:** 20-5849842

*Please detach bottom portion and return with payment.*

WENDY UNGER
AGC DEPT OF INSURANCE FRAUD - FLL
DEPT OF FINANCIAL SERVICES
1400 WEST COMMERCIAL
SUITE 135
Fort Lauderdale FL 33309

Invoice No.   :  68930
Invoice Date  :  10/31/2014
**Total Due**     :  **$ 199.50**

Remit To: **APEX REPORTING GROUP**
          **12 SE 7th STREET, SUITE 702**
          **FT. LAUDERDALE FL 33301**

Job No.     :  99794
BU ID       :  APEX
Case No.    :  14-1480
Case Name   :  STATEMENT OF CHARLES ACKLEY

BRCOSA000121

Page 1

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT

IN AND FOR BROWARD COUNTY, FLORIDA


CASE NO.: 14-1480


STATE OF FLORIDA,

      Plaintiff,

vs.                                          ORIGINAL

CHARLES ACKLEY,

      Defendant,

_____/


COVERT CONVERSATION

OF

CHARLES ACKLEY


1182 Southeast 2nd Avenue

Deerfield Beach, Florida 33441


October 21st, 2014

2:07 p.m. - 2:30 p.m.


APEX REPORTING GROUP

BRCOSA000122

Page 2

1    APPEARANCES:

2

3          DETECTIVE WENDY UNGER

4          LIEUTENANT STACEY SPIRN

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

APEX REPORTING GROUP

BRCOSA000123

Page 3

1    THEREUPON:

2         MS. UNGER:  Today is October 21st, 2014.  The

3    time is 14:07 hours.  I'm with Lieutenant Spirn at

4    11 --

5         MS. SPIRN:  82.

6         MS. UNGER:  -- 82 Southeast 2nd Ave in

7    Deerfield Beach.  This will be an attempt to make

8    contact with what's his name again - Charles

9    Ackley, A-C-K-L-E-Y.  Case Number 14-1480.

10        MS. SPIRN:  Yeah.  Hey.  How are you doing,

11   Charles?

12        MS. UNGER:  Hey.  How are you?

13        MR. ACKLEY:  Oh my God.

14        MS. SPIRN:  Is he okay?  He's fine?

15        MR. ACKLEY:  Yeah.  Yeah.  Yeah.  They're not

16   going to hurt you.

17        MS. SPIRN:  Oh.  There's two.

18        MR. ACKLEY:  Yeah.  What's wrong?

19        MS. UNGER:  Oh no.

20        MS. SPIRN:  Nothing.

21        MS. UNGER:  No problem.

22        MS. SPIRN:  There's no problem at all.

23        MR. ACKLEY:  Why were you standing behind my

24   door?

25        MS. UNGER:  I was looking from over there and

APEX REPORTING GROUP

BRCOSA000124

1   listening to the window.

2        MS. SPIRN:  Hey baby.

3        MR. ACKLEY:  Come on, boy.  Inside.

4        MS. UNGER:  We're with the State Police.  I'm

5   Detective Wendy Unger.  This is Lieutenant Spirn,

6   and we have - do you got a couple of minutes to

7   talk to us?

8        MR. ACKLEY:  Sure.

9        MS. UNGER:  We're - thanks.  We're

10  investigating and incident you had, I guess it's

11  probably about a year and a half ago in Coral

12  Springs where you fell on a property, Pine Ridge

13  Shopping Center.

14       MR. ACKLEY:  Uh-huh.

15       MS. UNGER:  And, we've received our - as you

16  well know, I know you've been to a couple of

17  depositions --

18       MR. ACKLEY:  Uh-huh.

19       MS. UNGER:  -- regarding, and the insurance

20  company has handed the case over to the State

21  Police for an investigation.

22       MR. ACKLEY:  Sure.

23       MS. UNGER:  So, we wanted to give you the

24  opportunity to let us know what's going on with --

25       MR. ACKLEY:  I don't know.  I just spoke to my

BRCOSA000125

Page 5

1    - I'm sorry.

2         MS. SPIRN:  No.  That's okay.

3         MR. ACKLEY:  I have to sit like this.  I have

4    no idea what this is about.  I spoke with my

5    attorney yesterday, he didn't mention it.

6         MS. UNGER:  He didn't mention what?  Well,

7    we're not here representing an insurance company --

8         MS. SPIRN:  Yeah.

9         MS. UNGER:  And, we're not here --

10        MR. ACKLEY:  Well, why are you here?  Why does

11   it --

12        MS. SPIRN:  We don't work for the insurance

13   company.

14        MR. ACKLEY:  I know, but why are you here?

15        MS. SPIRN:  We regulate insurance companies,

16   and we --

17        MR. ACKLEY:  I don't understand.

18        MS. SPIRN:  What happened is it was brought to

19   our attention because you have a claim with an

20   insurance company, and the insurance company is

21   denying your claim.  So, we're not saying you're

22   right, they're wrong.

23        MR. ACKLEY:  Which insurance company is this?

24        MS. SPIRN:  What's the insurance company?

25        MS. UNGER:  Well, Equity One.

BRCOSA000126

Page 6

1        MR. ACKLEY:  Yeah.  They've been dissolved

2    from - they've been separated from the case.

3        MS. UNGER:  Okay.  But, it - the parent

4    company is C-N-A.

5        MR. ACKLEY:  Yeah.

6        MS. UNGER:  And, C-N-A has made the

7    allegation.

8        MR. ACKLEY:  Okay.  That's fine.

9        MS. UNGER:  So, we just want - are here as an

10   investigative unit to get your side of the story.

11   We see, you know, I've received a claim file from

12   C-N-A.  And, obviously they are not in agreement

13   with your claim other than that you made it.  So,

14   --

15       MR. ACKLEY:  Yeah.  They're lying.  So, I'm

16   really not really concerned with that.  There's

17   been no fraudulent - there's been no fraud of any

18   kind.  Yeah.  I've gone and I've done 2 major

19   surgeries for this.

20       MS. UNGER:  Uh-huh.

21       MR. ACKLEY:  It was left in the sidewalk; I

22   tripped over it, and that's about it.  There really

23   isn't anything to discuss.  I mean, this has been

24   horrible for me and my family; horrible.

25       And, with me if there are allegations that are

APEX REPORTING GROUP

BRCOSA000127

Page 7

1    leading to fraud, then they can blow away because

2    there's nothing to hide.  Right now my life is an

3    open book.  So, --

4         MS. SPIRN:  Are you working now?  No?

5         MR. ACKLEY:  I'm on S-S-I to begin with.  I

6    have - I'm a heart patient.

7         MS. UNGER:  To begin with --

8         MS. SPIRN:  Before this happened you mean?

9         MR. ACKLEY:  Yeah.

10        MS. SPIRN:  Oh.

11        MR. ACKLEY:  I was - I had open heart twice.

12        MS. SPIRN:  Wow.

13        MS. UNGER:  So, you're --

14        MS. SPIRN:  Oh sorry.  You're on Medicare?

15        MR. ACKLEY:  I'm a - yes.

16        MS. SPIRN:  Okay.

17        MS. UNGER:  So, can you tell - give me an idea

18   - because obviously I'm going to make a report that

19   --

20        MR. ACKLEY:  It's okay.

21        MS. UNGER:  -- you know, you took the

22   opportunity to --

23        MR. ACKLEY:  It's okay.

24        MS. UNGER:  -- speak with us.

25        MR. ACKLEY:  I'm not hiding anything.  The

BRCOSA000128

Page 8

1    reason I don't bring you inside is the dogs will

2    just --

3        MS. UNGER:  No.  No.  No.  That's fine.

4        MR. ACKLEY:  -- break --

5        MS. UNGER:  We're fine.  We're fine.

6        MR. ACKLEY:  Forgive me.

7        MS. UNGER:  We're fine.  And, if --

8        MR. ACKLEY:  Stop Charley.  My daughter named

9    him Charley, so --

10       MS. UNGER:  As a result of this claim what is

11   it that you couldn't do - can't do now as opposed

12   to prior to the accident?  I'm trying to get my

13   head around why we have this fraud claim.

14       MR. ACKLEY:  I don't know.  I don't know.

15       MS. SPIRN:  Do you have any idea why they are

16   saying that?

17       MR. ACKLEY:  I don't know.  I've never - I've

18   never --

19       MS. UNGER:  What is it that you can't do that

20   they are claiming you can do?

21       MR. ACKLEY:  I don't know.  They haven't said

22   anything to either of my - I have 2 counsels on

23   this - they haven't said anything to them.  I spoke

24   with Charlotte this morning about I needed

25   information on when I retained the lawyer for the

APEX REPORTING GROUP

BRCOSA000129

Page 9

1    foreclosure hearing.

2         MS. UNGER:  Okay.  So, --

3         MR. ACKLEY:  And, of course - so no one

4    mentioned this.  No one ever, I mean, there's never

5    been any claim of this.  There's never been

6    anything remotely close to this in the last 2

7    years.

8         I mean, the mediation was sort of a really

9    bizarre incident, but other than that it's gone

10   along exactly as the lawyer said it would.

11        MS. SPIRN:  So, since the accident what have

12   you not been able to do --

13        MR. ACKLEY:  Work.

14        MS. SPIRN:  -- or maybe is it easier to say

15   what are you able to do?

16        MR. ACKLEY:  I'm barely able to work.  I can

17   catch work here and there part-time, barely.

18        MS. SPIRN:  Doing what?

19        MS. UNGER:  What kind of work do you do?

20        MR. ACKLEY:  Just making deliveries, things

21   like that, but I don't do it anymore.  I can't.

22        MS. SPIRN:  Okay.

23        MR. ACKLEY:  Yeah.  I have to sit like this,

24   so please forgive me.

25        MS. SPIRN:  No.  And, prior to the accident --

BRCOSA000130

Page 10

1       MR. ACKLEY:  I was on my way --

2       MS. SPIRN:  You were about to get off?

3       MR. ACKLEY:  Yeah.  I'm on physical exercise.

4  I - you know.  I'm not one of those.  I had open

5  heart twice.  I was deemed basically disabled the

6  moment I left the hospital.  My EF has always been

7  low.  I haven't been able to do much, but --

8       MS. UNGER:  You said you did deliveries and

9  stuff.  Is that your vehicle?  Were you doing it --

10      MR. ACKLEY:  No.  That vehicle hasn't moved in

11  months.

12      MS. UNGER:  Oh.  Okay.  So, how do you guys

13  get around?

14      MR. ACKLEY:  We don't now.

15      MS. UNGER:  For like grocery shopping and

16  things like that?

17      MR. ACKLEY:  Take a cab.  Winn-Dixie's close

18  by.  We've been here for a year and a half and

19  we've managed.

20      MS. SPIRN:  So, what - so, like walk me

21  through a typical day for you.  Like --

22      MR. ACKLEY:  Waking up.  My wife goes to work,

23  the kids go to school.  I clean up.  I take care of

24  what needs to be taken care of around the house,

25  and that's about it.

BRCOSA000131

Page 11

1        MS. SPIRN:  So, you don't really leave the

2   house or --

3        MR. ACKLEY:  Not that often.  I mean, I do.

4   Sometimes I do, sometimes I don't.  It depends on

5   the day, but my day is not very long.

6        MS. SPIRN:  So, your wife has the car or she

7   takes the bus?

8        MR. ACKLEY:  She takes the bus.

9        MS. SPIRN:  She takes the bus.

10        MR. ACKLEY:  We've been doing it for over a

11   year.  You can ask any of the neighbors.

12        MS. UNGER:  So, you just walk around.  Is that

13   it?

14        MR. ACKLEY:  Basically.  I mean, I can't

15   really walk so like when I walk the dogs --

16        MS. UNGER:  Uh-huh.

17        MR. ACKLEY:  -- I jump on a skateboard and he

18   pulls me that way I don't have to walk and it

19   doesn't hurt.  If I walk for any length of time it

20   hurts.  I mean, the scars - it's pretty nasty.

21   They had to go in and remove mesh.  It was pretty

22   bad.

23        MS. UNGER:  So, you can't even bike around or

24   --

25        MR. ACKLEY:  Because of the movement I can't

APEX REPORTING GROUP

BRCOSA000132

Page 12

1    do it very long.  I just - I just can't do it.  It

2    hurts.  I stopped taking the pain medication.  We

3    all know where that goes, so - and everything else

4    on a holistic level doesn't work.  So, I went in

5    and had all the nerves clipped, and they're still

6    residual.

7         MS. UNGER:  Now, what were those two

8    surgeries?

9         MR. ACKLEY:  One was to fix the hernia itself.

10        MS. UNGER:  Okay.

11        MR. ACKLEY:  Which is - my ab-wall ripped

12   open.

13        MS. UNGER:  Okay.  As a result of the fall?

14        MR. ACKLEY:  Yeah.

15        MS. UNGER:  Okay.

16        MR. ACKLEY:  And, they put in a mesh, and in

17   that mesh all the nerves got entangled, and the

18   doctor had to remove the mesh.  But, I had to wait

19   a year --

20        MS. SPIRN:  Yeah.

21        MR. ACKLEY:  See, the reason I didn't just

22   jump right in and say take it out, I couldn't.

23   They wouldn't allow me to do it.  I had to wait an

24   entire year.  My life was completely upside-down.

25   I mean there's - my life just went completely

APEX REPORTING GROUP

BRCOSA000133

Page 13

1    upside down.

2           MS. UNGER:  So, is every day like that?  Do

3    you have good days and bad days?

4           MR. ACKLEY:  Yeah.

5           MS. UNGER:  Are you able to move around better

6    on --

7           MR. ACKLEY:  No.  I mean, as far as my

8    previous injuries, I mean, I was working my way up.

9    I mean, there's parts of my heart that are just

10   dead.  I mean, my longevity is about normal.  I'm

11   just not going to be able to do anything close to

12   what I did.  And, this doesn't help at all.  To say

13   how much of a degree it's harmed it or made it

14   worse I really couldn't say.  But, I know as you

15   get older I guess just things - I don't know.

16          But I know it surely didn't help.

17          MS. SPIRN:  Yeah.

18          MR. ACKLEY:  Other than that that's all I can

19   really say.  I mean I stopped taking the medication

20   because it just makes you insane.  And, I just

21   don't want to go there.

22          MS. UNGER:  So, was there any different - you

23   first gave a deposition in April of last year and

24   you gave a subsequent deposition in November.

25          MR. ACKLEY:  Nothing's really changed that

BRCOSA000134

1    much.  I mean --

2         MS. UNGER:  Nothing changed between April and

3    November?

4         MR. ACKLEY:  Not that significant.

5         MS. UNGER:  And, then now we're almost a year

6    ahead.  This is mid-October.  Has there been any

7    change from that last deposition until now?

8         MR. ACKLEY:  The aggravation.

9         MS. UNGER:  Are you any more mobile?  Are you

10    any --

11         MR. ACKLEY:  Yeah.  The aggravation from the

12    wound isn't - is at a constant.  When I was driving

13    I couldn't switch from - I mean, my - it would

14    really get sore from using my foot.  And, there

15    were times where I just simply couldn't drive.  I

16    couldn't move my foot.

17         MS. UNGER:  Now, when are you talking?

18    Between April and November or from November until

19    now?

20         MR. ACKLEY:  All along.

21         MS. UNGER:  Okay.

22         MR. ACKLEY:  All along.  That's always been

23    there.

24         MS. SPIRN:  So, a bike would have been

25    impossible to ride?

BRCOSA000135

Page 15

1      MR. ACKLEY:  It doesn't - it's not.  I can

2   ride, but not for very long.  And, when I do it's

3   for short periods.  It just - the muscle, I don't

4   know when he repaired if he used the muscle itself

5   so he tightened it up.

6      MS. SPIRN:  Uh-huh.

7      MR. ACKLEY:  It doesn't work very well, and it

8   causes this whole area all the way down to my knee

9   is dead.  I mean, you can't feel it, but on the

10   inside where the other nerves were left alone.

11      MS. UNGER:  Wow.  So, I guess swinging your

12   leg over a bike to mount the bike would hurt.

13      MR. ACKLEY:  Everything.  Everything hurts.

14   Sometimes it catches you.  Sometimes you don't see

15   it or feel it at all.  There are days - there are

16   days I have to be reminded I got hurt, and then

17   there are days that I don't want to get out of bed.

18      MS. SPIRN:  So, you take advantage of those

19   days when you feel good?

20      MR. ACKLEY:  I take advantage of everyday I

21   wake up.

22      MS. SPIRN:  Okay.  Like what would you do --

23      MR. ACKLEY:  I'm sorry.  I have a bad heart.

24      MS. SPIRN:  What would you --

25      MR. ACKLEY:  I'm sorry.

APEX REPORTING GROUP

BRCOSA000136

Page 16

1         MS. SPIRN:  What would you do on a day where

2    you felt great?

3         MR. ACKLEY:  Run the dogs.  Jump on the

4    skateboard and run the dogs.

5         MS. SPIRN:  But, you still use the skateboard

6    because you're not going to push yourself walking.

7         MR. ACKLEY:  Oh no.  There's no running.

8         MS. SPIRN:  Yeah.

9         MR. ACKLEY:  I can, barely. If I make it up

10   the block.  I walked my wife to work.  I used to do

11   that every morning, and 'cause we really didn't

12   know the neighborhood when we first moved in.  So,

13   I walked her every morning and picked her up

14   everyday.

15        MS. SPIRN:  Oh.  She works close?

16        MR. ACKLEY:  Not far away.  It's over on Wiles

17   Road.

18        MS. SPIRN:  Oh, okay.

19        MR. ACKLEY:  So, she would take the bus over.

20        MS. SPIRN:  So, a good day would just entail

21   just a little more activity like walking the dogs?

22        MR. ACKLEY:  That really never changed.  It's

23   just - I just can't - I can't do it as often and

24   for as long.

25        MS. SPIRN:  Right.

APEX REPORTING GROUP

BRCOSA000137

Page 17

1    MR. ACKLEY:  Nothing has changed in my

2    activity; I just can't do it for very long.  Like

3    I'm asleep by 9:30, 10:00 at night.

4    MS. SPIRN:  Me too.

5    MS. UNGER:  I'm just surprised that you're

6    even able to do the skateboard.  That takes a lot

7    of core strength.

8    MR. ACKLEY:  Actually, it does.  But, as long

9    as I'm not moving my leg, as long as I'm not using

10   that lower abdominal muscle, that lower --

11   MS. SPIRN:  So, you can't lift your leg up and

12   that's where your problem is?

13   MR. ACKLEY:  If I try pushing it.  I can push

14   like once or twice, but that's it.  I mean, I'm not

15   trying to hide.  I want to do thing.

16   MS. UNGER:  No.  No.  No.

17   MS. SPIRN:  No.  No.

18   MS. UNGER:  We're just trying to get an idea

19   --

20   MS. SPIRN:  Yeah.

21   MS. UNGER:  -- of your limitations.

22   MR. ACKLEY:  Regardless of how bad it hurts me

23   I'm going to continue to try to live --

24   MS. UNGER:  Right.

25   MS. SPIRN:  Right.

BRCOSA000138

Page 18

1          MR. ACKLEY:  I mean, if you guys want to - I

2     mean, you guys take it however you want.  I'm going

3     to try.

4          MS. SPIRN:  No.  We're --

5          MR. ACKLEY:  Whether I do it or not, you know?

6          MS. SPIRN:  We're just trying to figure out

7     how your injury impacts you and you're describing

8     it very well.  Like, you can't move your lower

9     extremities --

10          MR. ACKLEY:  Yeah.  It hurts.

11          MS. SPIRN:  -- to the point of driving a car,

12     like moving your foot is --

13          MR. ACKLEY:  Painful.

14          MS. SPIRN:  -- painful.  So, like riding a

15     bicycle, walking would be but riding on a

16     skateboard --

17          MR. ACKLEY:  Because I'm not doing anything.

18     If I put my foot down, I'm not moving my leg.

19          MS. SPIRN:  Right.

20          MR. ACKLEY:  I let the dogs do all of that.

21     I'm just standing there.

22          MS. SPIRN:  So, pretty much since the

23     accident, since surgery or whatever you can

24     consistently say that it's not really possible for

25     you to lift your leg up and --

APEX REPORTING GROUP

BRCOSA000139

1        MR. ACKLEY:  No.  I can.  It's just going to

2    hurt.  It's going to hurt to the point where I have

3    to stop.

4        MS. SPIRN:  You can't do it for --

5        MR. ACKLEY:  No.

6        MS. SPIRN:  -- like --

7        MR. ACKLEY:  I mean, I can.  I can physically

8    get my leg up, but the --

9        MS. SPIRN:  But, then that's it.

10       MR. ACKLEY:  -- consequences of doing that.

11       MS. SPIRN:  You're not going to continue

12   activity if you do that.

13       MR. ACKLEY:  I'm going to try not to --

14       MS. SPIRN:  Yeah.

15       MR. ACKLEY:  -- unless I really have to.

16       MS. SPIRN:  Okay.

17       MR. ACKLEY:  I mean, some days are better than

18   others, but you know.

19       MS. SPIRN:  Okay.

20       MR. ACKLEY:  You know.  My claim, I'm not

21   really sure how all that works.  I've never really

22   had a problem.  The only thing I ever had in the

23   past was a tooth, and they paid that quickly

24   because they were wrong.

25       I've never had anything in scope like this

APEX REPORTING GROUP

Page 20

1   happen to me before.

2       MS. SPIRN:  Was there anything with your upper

3   body?  Was that affected?  Like, can you --

4       MR. ACKLEY:  No.

5       MS. SPIRN:  -- lift things or --

6       MR. ACKLEY:  Just basically, no.  I never -

7   after the surgery, not really.

8       MS. SPIRN:  No.

9       MR. ACKLEY:  I mean, I have stretch marks.  I

10  don't look at anymore.  I haven't touched a weight

11  in almost 2 years.  Like I have - I've tried.  I

12  mean, all you got to do is look at me.  I have

13  stretch marks.  My skins falling off me.

14      MS. UNGER:  So, we're going - and, again,

15  we're just trying to get our head around your

16  limitations.  If you go to the grocery store, are

17  you able to carry groceries and things like that

18  and lift them up and --

19      MR. ACKLEY:  Sometimes I can, but it's

20  painful.  I mean, sometimes it is and sometimes

21  it's not, but no matter what I do it encompasses

22  just literally in a nut shell here everything I do

23  is almost the same except I can't do it for very

24  long, and it hurts; not all the time, not constant,

25  some days yeah, like I said, I have good days and

APEX REPORTING GROUP

BRCOSA000141

Page 21

1    bad days.

2         But, as far as limitations, the limitation is

3    the pain.  That's it.

4         MS. UNGER:  Are you - is it affected by the

5    weather?  Like, do you feel better when it's a

6    little cooler out rather than going out in the

7    summer time and getting --

8         MR. ACKLEY:  The heat, all that is all cardio.

9    That has nothing to do with - I can't stand the

10   heat because of my heart, it doesn't pump enough

11   blood.  But, other than that no.  It's just

12   movement of my leg.  Everyday use of my leg is

13   limited because of the pain.  The pain is not going

14   to go away.

15        MS. SPIRN:  And, you don't take any meds now?

16        MR. ACKLEY:  Yeah.  I take - it's a horrible

17   drug - it's for nerves, but that's it.  I don't

18   take any --

19        MS. UNGER:  Is that for your heart or for the

20   --

21        MR. ACKLEY:  For this.

22        MS. UNGER:  -- injury.

23        MR. ACKLEY:  Neurontin.

24        MS. SPIRN:  Oh okay.

25        MR. ACKLEY:  It's a horrible drug, but it

APEX REPORTING GROUP

BRCOSA000142

Page 22

1    works sometimes.  The pain isn't as bad.  It's not

2    as acute as it was.

3        MS. SPIRN:  Uh-huh.

4        MR. ACKLEY:  Before I couldn't even - oh my

5    God.  And, then he said it would take care of most

6    of it and hopefully all of it.  It just didn't.

7        MS. UNGER:  Are you seeing any doctors

8    regularly --

9        MR. ACKLEY:  Yes.

10       MS. UNGER:  -- now?

11       MR. ACKLEY:  Just my cardiologist.

12       MS. UNGER:  Okay.

13       MR. ACKLEY:  Yeah.  There's nothing more to

14   do.  There's nothing - not really.  I mean, I have

15   to live with it.  There's a spot in my lower

16   abdomen and sometimes it gets so tight, I mean it's

17   like a drum.

18       MS. SPIRN:  So, medically, there's nothing

19   else?

20       MR. ACKLEY:  There's nothing anybody else can

21   do unless you - a lobotomy.  I don't know.  I'm

22   sorry.  I don't know.  I mean this was the first

23   time this - I didn't see this coming.

24       MS. UNGER:  Well when you're putting --

25       MS. SPIRN:  Sorry.

APEX REPORTING GROUP

BRCOSA000143

1      MR. ACKLEY:  The privilege of you two sitting

2      in front of me was something I did not see coming.

3      MS. UNGER:  Is there anything that we haven't

4      asked you?  Any other statements that you want make

5      that would, you know, assist in our endeavor to

6      make heads or tails of this claim?

7      MR. ACKLEY:  I don't know.  I'm sure you guys

8      have been watching me.  I mean, I know you guys

9      watch what I do.  I'm not making anything up.  I'm

10      not lying to you.  I'm sure you're going to be

11      watching me now.  I have nothing to hide.

12      MS. SPIRN:  Well, you didn't see her phone.

13      We needed GPS to get here.

14      MS. UNGER:  Ha-ha-ha-ha.

15      MR. ACKLEY:  I'm sorry.

16      MS. SPIRN:  I mean we almost couldn't find

17      you.

18      MR. ACKLEY:  I was here.

19      MS. SPIRN:  We're not watching you.

20      MR. ACKLEY:  Okay.  Well, I didn't know that,

21      and I'm sorry.  That was bold move and I'm sorry.

22      But, I do - I have nothing to hide.  I really

23      don't.  I'm just trying to raise my family, and I

24      got hurt.  And, I wasn't in that bad of shape

25      before, and I got hurt, and it floored me.  I mean,

BRCOSA000144

Page 24

1    it floored me.  You should see the arrangement I

2    have with this house.  It's mind-boggling how I did

3    it.

4         It --

5         MS. UNGER:  So, is this going to be your

6    permanent residence?

7         MR. ACKLEY:  Oh no.  No.  No.  No.  No.

8         MS. UNGER:  No.

9         MR. ACKLEY:  As soon as my wife is able to get

10   everything squared away, what we want to do, the

11   kids are in school.  I have a 7th grader and I have

12   a 9th grader.  The 9th grader, I have an honor roll

13   student, I don't want to cause any grief for them.

14   I mean, they have a shot, and I want to try to stay

15   as stable as I can.  And, not being able to work,

16   that hurt - that hurt me.

17        I wasn't working all that much before, that's

18   almost impossible to keep a full-time job with no

19   leg.

20        MS. SPIRN:  So, you're trying to leave here?

21        MR. ACKLEY:  Yeah.  We're going to see how we

22   can get our finances together.  We're going to see,

23   because we don't know what's going to happen with -

24   we already know that Equity's been cut from the,

25   like the hearing last week.  So, --

APEX REPORTING GROUP

BRCOSA000145

Page 25

1          MS. UNGER:  You had a hearing last week --

2          MR. ACKLEY:  Yeah.

3          MS. UNGER:  -- regarding this?

4          MR. ACKLEY:  Yeah.  To separate your

5     benefactor as opposed to --

6          MS. UNGER:  Well, we don't represent --

7          MS. SPIRN:  No.  No.  No.  We're not the

8     insurance company.

9          MR. ACKLEY:  Oh.

10         MS. UNGER:  No.

11         MS. SPIRN:  We're the State Police.  Yeah.  We

12    regulate.

13         MR. ACKLEY:  Okay.

14         MS. UNGER:  Yes.

15         MS. SPIRN:  We're the Department of Financial

16    Services --

17         MR. ACKLEY:  Oh, okay.

18         MS. SPIRN:  -- that oversees --

19         MR. ACKLEY:  You're a division of what,

20    F-D-L-E?

21         MS. UNGER:  Well, we're --

22         MS. SPIRN:  Well, that's our division --

23         MS. UNGER:  Yeah.

24         MS. SPIRN:  Yeah.

25         MR. ACKLEY:  So, you're telling me - I mean I

APEX REPORTING GROUP

Page 26

1   haven't exactly been a - of society, but I've

2   stopped.

3        MS. SPIRN:  Yeah.

4        MS. UNGER:  That I did check.

5        MR. ACKLEY:  Okay.  That's fine.  I am not

6   ashamed of where I've been, what I've done.

7        MS. SPIRN:  Yeah.  No.  We're not the

8   insurance company.

9        MR. ACKLEY:  It's not quite a perfect - like,

10  I mean, I'm okay with myself. I have a loving wife.

11       MS. UNGER:  So, you guys are going to stay in

12  the area?

13       MR. ACKLEY:  In the area.  I don't know

14  exactly where.  It's kind of rough on the other

15  side.  I don't want my kids - but the schools are

16  okay.  My kids are involved in marching band,

17  baseball, and I just want to - I'd love to keep it

18  that way.

19       MS. UNGER:  Well, anything else from us?

20       MS. SPIRN:  No.

21       MR. ACKLEY:  I --

22       MS. UNGER:  Why don't you keep this --

23       MS. SPIRN:  You could --

24       MS. UNGER:  -- just in case you --

25       MS. SPIRN:  If that house was in foreclosure

BRCOSA000147

1       --

2           MR. ACKLEY:  That's not mine.

3           MS. SPIRN:  Not yours.  It's a friend of

4       yours.  Right?

5           MR. ACKLEY:  Hang on.  What he an I, what we

6       did before my wife stopped working to take care of

7       me, she was working and this woman, her name's

8       Casey Johnson - I'm actually in an eviction

9       proceeding right now for what she did.  Anyway, she

10      was leaving her house.  I was hurt.  I was still in

11      Coral Springs.  We were on the verge of being

12      thrown on the street.

13          She was leaving her house, she was

14      foreclosing, she was packed and ready to go home.

15      She was going to go home and rehab, and stay with

16      her dad and let the house go.

17          Well, I had a brain-child at the moment.  I

18      said, well, what if I can arrange to stop the

19      foreclosure through my attorney who is handling my

20      settlement.  I can stop that.  We can live in the

21      house while you rehab.  We'll come back.  We'll fix

22      it.  We'll do everything because it's a lot cheaper

23      for me and I can keep a roof over my families head.

24      And, my attorney thought so as well.

25          And, we signed a lease, and boom we did it.

BRCOSA000148

Page 28

1    Someone didn't hold up their end of the deal, and

2    they've been trying to throw us out.  We've broken

3    no lease, and anyway - that's how I managed to stay

4    here and keep a roof over my families head.

5        MS. SPIRN:  Oh.  So, you don't have to pay

6    rent because you're fixing up the house?

7        MR. ACKLEY:  Oh no.  I was paying - I had to

8    pay the attorneys, but how I situated it I'm also -

9    I was also trying to take care of the yard.  I

10   ended up hiring someone for that; that didn't work

11   out too well.  But, it all worked out.  It all

12   worked out.  She just tried to evict us without a

13   hearing.  She shut the electric off, the water off;

14   we had to go turn it back on.  And, now I have a

15   hearing on the 29th, and the judge wants to know

16   why she did it.

17       Oh.  I still have all my paperwork.  I have a

18   copy of the lease.

19       MS. SPIRN:  Yeah.  So, did you re - like, was

20   the house a mess when you moved in or like you were

21   saying that you were fixing it up and taking care

22   of it for her.

23       MR. ACKLEY:  Yeah.  We were trying to.  There

24   were some little things that, I mean, she took most

25   of everything with her and her friends came and got

APEX REPORTING GROUP

BRCOSA000149

Page 29

1    what was left.  And, the house was just – not

2    despair, but just unkept.

3         MS. SPIRN:  Yeah.

4         MR. ACKLEY:  She had an alcohol problem; a bad

5    one.  And --

6         MS. UNGER:  But, you didn't have to do any

7    construction or anything like that?

8         MR. ACKLEY:  Oh no.  No.  Nothing like that.

9    No.  No.  No.  No.  I couldn't.  At that time I

10   couldn't have anyway.  That was right before my

11   second operation.  I had nerve damage at that time,

12   and I was lucky.  I mean, on days I did get around

13   I was so doped up from – that was the only way I

14   got around was if I took a handful of those pills,

15   and no thanks.  I'd rather deal with what pain I

16   have to deal with then go through that.

17        MS. UNGER:  All righty, sir.  Well, I

18   appreciate your time.  I wish you the best of luck.

19        MR. ACKLEY:  I'm sorry.  I didn't mean to be a

20   smart-ass when I – because I didn't know who you

21   were or what you were.  I saw the sidearm.  I'm

22   like oh shit.  I didn't know, but it's spooky when

23   someone's standing behind your door with a weapon.

24        Anyways, sorry to – about the dogs.

25        MS. UNGER:  No.  They're fine.

APEX REPORTING GROUP

BRCOSA000150

Page 30

1      MS. SPIRN:  They're fine.

2      MS. UNGER:  All right.  Good luck.

3      MS. SPIRN:  All right.

4      MR. ACKLEY:  You guys be careful out there.

5      MS. UNGER:  Appreciate that.

6      The time is now 14:30 hours.  That ends this

7   interview.

8      (Thereupon, the covert conversation was concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

APEX REPORTING GROUP

BRCOSA000151

Page 31

```
 1                 CERTIFICATE OF COURT REPORTER

 2

 3     THE STATE OF FLORIDA:

 4                         :ss.

 5     COUNTY OF BROWARD    :

 6

 7          I, NICK BRUENS, certify that I was authorized

 8     to and did transcribe the foregoing recorded events.

 9          I do further certify that the foregoing is a

10     true and accurate transcript of the events as provided

11     to me on the CD taken at the time, place and the date

12     hereinabove set forth.

13          I do further certify that I am not an attorney

14     or counsel for any of the parties, nor related to any of

15     the parties, nor financially interested in the action.

16

17          Dated this 28th day of October, 2014

18

19

20          _____

            Nick Bruens

21          Typist

22

23

24

25                                              NBR/XXX
```

APEX REPORTING GROUP

BRCOSA000152

# EXHIBIT 6

BRCOSA000153

DEPARTMENT OF FINANCIAL SERVICES

Jeff Atwater
CHIEF FINANCIAL OFFICER
State of Florida

# AFFIDAVIT
# OF
# STATEMENT OF LOSS




I, (NAME) _____ANDREW BRYANT_____ (TITLE) ___LAW ENFORCEMENT LIAISON___ WITH

(COMPANY)___NATIONAL FIRE INSURANCE  COMPANY OF HARTFORD (A CNA COMPANY)___,

SWEAR OR AFFIRM THAT AS A RESULT OF A CLAIM FILED ON OR ABOUT __OCTOBER 17, 2012__,

CLAIM NUMBER___E2906093___, BY (INSURED PARTY OR INJURED PARTY) ___CHARLES ACKLEY___,

(COMPANY)___NATIONAL FIRE INSURANCE  COMPANY OF HARTFORD___ PAID A

TOTAL SUM OF (DOLLAR AMOUNT) OF OR SUFFERED LOSSES IN THE AMOUNT OF:

**$41,215.07 TOTAL as of October 15, 2014, which includes:     $1,730.00 for out-of-pocket payments to claim**

**investigation vendor;  $39,485.07 for legal fees and litigation costs related to the defense of this claim.**

**In addition, on or about April 29, 2013, Charles Ackley submitted a settlement demand of $300,000.00  in pursuit**

**of this claim.   The investigation of this claim revealed misrepresentations by Charles Ackley which were material**

**to National Fire Insurance Company's evaluation of this claim and decision in not paying this claim**

I swear/affirm that the above statement is true and correct.

_____ 10/27/14

**AFFIANT signature          Date**

___333 S. Wabash Ave_____
ADDRESS

___Chicago, IL 60604_____
CITY/STATE/ZIP

___312-822-6337_____
TELEPHONE

STATE OF _Illinois_
COUNTY OF _Cook_

The foregoing instrument was acknowledged
before me this 27th day of October, 20 14,
by _Andrew Bryant_____, who is
personally known to me and did take an oath.

_____

✓ Notary Public

____ Florida Law Enforcement Officer
Conducting Official Police Investigation
(Ref. Sec. 117.10 F.S.)

PETER G DREVER III
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
November 10, 2014

Page 1 of 1

BRCOSA000154

## BUSINESS RECORD CERTIFICATION

Name & Title:      Andrew Bryant, SIU Law Enforcement Liaison

Company Name:    CNA Insurance

Address:        333 S. Wabash Ave

           Chicago, IL 60604

Telephone:      312-822-6337

This document accompanies true and correct copies of the following records (list description):

**Claim documents, notes and reports from CNA Insurance claim file # E2906093; claimant Charles Ackley.**

These records were made at or near the time at which the information contained thereon was received by, or from information transmitted by a, person with knowledge of the information contained thereon, and further, that the information is kept in the course of a regularly conducted business activity of _____CNA Insurance_____.
                          (Name of Business or Institution)

I hereby certify that I am the custodian of this record, or a person otherwise qualified to make the above certification with regard to this record.

I further certify that it was in the regular practice of the business activity to make such memorandum, report, record, or data compilation.

I am aware that falsely making this certification subjects me to criminal penalty of laws of the foreign or domestic location in which the certification is signed.

**BEFORE ME**, the undersigned authority, personally appeared ___Andrew Bryant_____
                                 Affiant Name

who, being duly sworn, says this Business Record Certification is true and correct.

                          _____
                             Affiant Signature

The foregoing instrument was acknowledged before me this 3ʳᵈ day of, ___September___, 2014, by the individual whose name and signature appear above, and who is personally known to me, and who did take an oath.

                    _____
           Notary Public

PETER G DREVER III
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
November 10, 2014

Location Code: 4655
ClaimAttachAckFile@CNA.com
10/17/12

# GENERAL LIABILITY NOTICE OF OCCURRENCE / CLAIM

| AGENCY | INSURED LOCATION CODE | DATE OF LOSS AND TIME | | | |
|---|---|---|---|---|---|
| LOCKTON COMPANIES, LLC. | | 09/24/2012 | 12:01:00 | X | AM |
| 3280 PEACHTREE ROAD NE #800 | | | | | PM |
| ATLANTA GA 30305 | CARRIER | | | | |

| CONTACT NAME: | POLICY NUMBER 5082680450 | |
|---|---|---|
| PHONE (A/C, No, Ext): (404)460-3600 | 12/31/2011 | 12/31/2012 |
| FAX (A/C, No.): 4044603699 | | |
| E-MAIL ADDRESS: | | |

| CODE: 380034607 | SUBCODE: |
|---|---|
| AGENCY CUSTOMER ID: | |

## INSURED

| NAME OF INSURED(First, Middle,Last) | INSURED'S MAILING ADDRESS |
|---|---|
| EQUITY ONE INC | 1600 NE MIAMI GARDENS DR |
| | NORTH MIAMI FL 33179-4900 |

| DATE OF BIRTH | FEIN(if applicable) | |
|---|---|---|
| PRIMARY ☐HOME ☒BUS ☐CELL PHONE# ( ) - | SECONDARY☐HOME ☒BUS ☐CELL PHONE# ( ) - | PRIMARY E-MAIL ADDRESS: |
| | | SECONDARY E-MAIL ADDRESS: |

## CONTACT    ☐CONTACT INSURED

| NAME OF CONTACT (First, Middle,Last) | CONTACT'S MAILING ADDRESS |
|---|---|
| ALEXANDRA DE ANTONI | |

| PRIMARY ☒HOME ☐BUS ☐CELL PHONE# ( ) - | SECONDARY☐HOME ☒BUS ☐CELL PHONE# (786)528-1457 | |
|---|---|---|
| WHEN TO CONTACT | PRIMARY E-MAIL ADDRESS: |
| NOT IDENTIFIED | SECONDARY E-MAIL ADDRESS: |

## OCCURRENCE

| LOCATION OF OCCURRENCE STREET: | 4633 N. UNIVERSITY DRIVE | POLICE OR FIRE DEPARTMENT CONTACTED |
|---|---|---|
| CITY, STATE, ZIP: | CORAL SPRINGS FL 330674602 | REPORT NUMBER |
| COUNTRY: | | |

| DESCRIBE LOCATION OF OCCURRENCE IF NOT AT SPECIFIC STREET ADDRESS: |
|---|

| DESCRIPTION OF OCCURRENCE (ACORD 101, Additional Remarks Schedule, may be attached if more space is required) |
|---|
| CLMT HAS NOT IDENT INJURY TO NOT IDENT PART FROM NOT IDENT CAUSE |

## TYPE OF LIABILITY

| PREMISES: INSURED IS ☐OWNER ☐TENANT ☐ | TYPE OF PREMISES | | |
|---|---|---|---|
| OWNERS NAME & ADDRESS(if not insured) | | | |
| | PRIMARY☐HOME ☐BUS ☐CELL PHONE# | SECONDARY☐HOME ☐BUS ☐CELL PHONE# | |
| | PRIMARY E-MAIL ADDRESS: | | |
| | SECONDARY E-MAIL ADDRESS: | | |
| PRODUCTS:INSURED IS ☐MANUFACTURER ☐VENDOR ☐ | TYPE OF PRODUCT | | |
| MANUFACTURER'S NAME & ADDRESS (if not insured) | | | |
| | PRIMARY ☐HOME ☐BUS ☐CELL. PHONE# | SECONDARY☐HOME ☐BUS ☐CELL PHONE# | |
| | PRIMARY E-MAIL ADDRESS: | | |
| WHERE CAN PRODUCT BE SEEN? | SECONDARY E-MAIL ADDRESS: | | |

E2906093
**The ACORD name and logo are registered marks of ACORD**

BRCOSA000156

AGENCY CUSTOMER ID: _____

**INJURED/PROPERTY DAMAGED**

| NAME & ADDRESS (Injured/Owner)<br>CHARLES ACKLEY<br>NOT IDENTIFIED<br>NORTH MIAMI BEACH  FL  33179 | EMPLOYER'S NAME & ADDRESS |
|---|---|

| PRIMARY ☐HOME ☐ BUS ☐CELL<br>PHONE# ( ) - | SECONDARY☐HOME☐ BUS☐CELL<br>PHONE# | PRIMARY ☐HOME ☐ BUS ☐CELL<br>PHONE# ( ) - | SECONDARY ☐HOME☐ BUS☐CELL<br>PHONE# |
|---|---|---|---|

| PRIMARY E-MAIL ADDRESS: | PRIMARY E-MAIL ADDRESS: |
|---|---|
| SECONDARY E-MAIL ADDRESS: | SECONDARY E-MAIL ADDRESS: |

| AGE<br>0 | SEX | OCCUPATION<br>NOT IDENTIFIED | DESCRIBE INJURY NOT IDENTIFIED |
|---|---|---|---|

| WHERE TAKEN<br>NOT IDENTIFIED | WHAT WAS INJURED DOING?<br>NOT IDENTIFIED |
|---|---|

| DESCRIBE PROPERTY (Type, model, etc.) | ESTIMATE AMOUNT | WHERE CAN PROPERTY BE SEEN? |
|---|---|---|

**WITNESSES**

| NAME AND ADDRESS<br>NONE | PRIMARY ☐HOME☐ BUS☐CELL<br>PHONE# | SECONDARY ☐HOME☐ BUS☐CELL<br>PHONE# |
|---|---|---|
| | PRIMARY E-MAIL ADDRESS: | |
| | SECONDARY E-MAIL ADDRESS: | |
| NAME AND ADDRESS | PRIMARY ☐HOME☐ BUS☐CELL<br>PHONE# | SECONDARY ☐HOME☐ BUS☐CELL<br>PHONE# |
| | PRIMARY E-MAIL ADDRESS: | |
| | SECONDARY E-MAIL ADDRESS: | |
| NAME AND ADDRESS | PRIMARY ☐HOME☐ BUS☐CELL<br>PHONE# | SECONDARY ☐HOME☐ BUS☐CELL<br>PHONE# |
| | PRIMARY E-MAIL ADDRESS: | |
| | SECONDARY E-MAIL ADDRESS: | |

**REMARKS (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)**

LOSS TIME IS DEFAULTED. SUPPLEMENTS TO FOLLOW. ACORD NOT PROVIDED. PO

LICY NUMBER NOT PROVIDED. INAD ADDRESS AND ZIP PROVIDED IS: 1550 NE MI

AMI GARDENS DRIVE, SUITE 500, NORTH MIAMI BEACH, FL 331 (continued)...

| REPORTED BY STEVEN B PHILLIPS-EMAILED CLAIM | REPORTED TO CNC/FNS CALL#:436728-13:29 EST |
|---|---|

ACORD 3 (2011/07)    BY EMAIL          Page 2 of 4          E2906093

BRCOSA000157

## APPLICABLE IN ALASKA

A person who knowingly and with intent to injure, defraud, or deceive an insurance company files a claim containing false, incomplete, or misleading information may be prosecuted under state law.

## APPLICABLE IN ARIZONA

For your protection, Arizona law requires the following statement to appear on this form.  Any person who knowingly presents a false or fradulent claim for payment of a loss is subject to criminal and civil penalties.

## APPLICABLE IN ARKANSAS, DELAWARE, KENTUCKY, LOUISIANA, MAINE, MICHIGAN, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH DAKOTA, PENNSYLVANIA, RHODE ISLAND, SOUTH DAKOTA, TENNESSEE, TEXAS, VIRGINIA, AND WEST VIRGINIA

Any person who knowingly and with intent to defraud any insurance company or another person, files a statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact, material thereto, commits a fraudulent insurance act, which is a crime, subject to criminal prosecution and [NY: substantial] civil penalities.  In LA, ME, TN and VA, insurance benefits may also be denied.

## APPLICABLE IN CALIFORNIA

For your protection, California law requires the following to appear on this form:  Any person who knowingly presents a false or fraudulent claim for payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

## APPLICABLE IN COLORADO

It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company.  Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policy holder or claimant for the purpose of defrauding or attempting to defraud the policy holder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

## APPLICABLE IN THE DISTRICT OF COLUMBIA

Warning:  It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person.  Penalties include imprisonment and/or fines.  In addition, an insurer may deny insurance benefits, if false informaiton materially related to a claim was provided by the applicant.

## APPLICABLE IN FLORIDA

Persuant to S. 817.234, Florida Statutes, any person who, with the intent to injure, defraud, or deceive any insurer or insured, prepares, presents, or causes to be presented a proof of loss or estimate of cost or repair of damaged property in support of a claim under an insurance policy knowing that the proof of loss or estimate of claim or repairs contains any false, incomplete, or misleading information concerning any fact or thing material to the claim commits a felony of the third degree, punishable as provided in S. 775.082, S. 775.083, or S. 775.084, Florida Statutes.

## APPLICABLE IN HAWAII

For your protection, Hawaii law requires you to be informed that presenting a fraudulent claim for payment of a loss or benefit is a crime punishable by fines or imprisonment, or both.

## APPLICABLE IN IDAHO

Any person who knowingly and with the intent to injure, defraud, or deceive any insurance company files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

## APPLICABLE IN INDIANA

A person who knowingly and with intent to defraud an insurer files a statement of claim containing any false, incomplete, or misleading information commits a felony.

## APPLICABLE IN KANSAS

Any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker  or any agent thereof, any written statement as part of, or in support of, an application for the issuance of , or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act.

BRCOSA000158

### APPLICABLE IN MARYLAND

Any person who knowingly and willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly and willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

### APPLICABLE IN MINNESOTA

A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

### APPLICABLE IN NEVADA

Pursuant to NRS 6868A.291, any person who knowingly and willfully files a statement of claim that contains false, incomplete or misleading information concerning a material fact is guilty of a felony.

### APPLICABLE IN NEW HAMPSHIRE

Any person who, with purpose to injure, defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638:20.

### APPLICABLE IN OHIO

Any person who, with intent to defraud or knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

### APPLICABLE IN OKLAHOMA

WARNING:  Any person who knowingly and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

### APPLICABLE IN WASHINGTON

It is a crime to knowingly provide false, incomplete, or misleading information to an insurance company for the purpose of defrauding the company.  Penalties include imprisonment, fines and denial of insurance benefits.

BRCOSA000159

CALL NUMBER: 436728                    OVERFLOW PAGE                    PG:001

CLAIM TYPE:  NOTICE OF CLAIM


POLICY: 5082680450   EFF: 12/31/2011   EXP: 12/31/2012   LOSS DATE: 09/24/2012


POLICY TYPE:      -                 INSURED:EQUITY ONE INC


          PO BOX 8317

          FAX:(   )   -


AGENT FAX NUMBER: 4044603699

INSURED FAX NUMBER: (   )   -

LOSS CATEGORY: OPERATIONS
STEPPING ON/STRKG/CUT/PUNCT

INSURED VEHICLE COLOR:       OTHER VEHICLE COLOR:


CALLER INFORMATION:
CALLER NAME:              STEVEN B PHILLIPS
CALLER ADDRESS:


HOME PHONE:               (   )   -
WORK PHONE:               (561)868-1340
CALLER TYPE:              E        EMAILED CLAIM


CONTACT INFORMATION:
CONTACT NAME:             ALEXANDRA  DE ANTONI
CONTACT ADDRESS:


BUS. PHONE:               (   )   -
FAX NUMBER:               (   )   -
CONTACT TYPE:             O        OTHER

BRCOSA000160

THIS CLAIM IS IN THE ACT SYSTEM

---------------------------------------------------------------------------

ESCALATION: NO

----------------------------------------------------------------------------

REMARKS:

LOSS TIME IS DEFAULTED. SUPPLEMENTS TO FOLLOW. ACORD NOT PROVIDED. POLICY NUMBER NOT PROVIDED. INAD
ADDRESS AND ZIP PROVIDED IS: 1550 NE MIAMI GARDENS DRIVE, SUITE 500, NORTH MIAMI BEACH, FL 33179, P
CALL NUMBER: 436728                          OVERFLOW PAGE                                PG:002
CLAIM TYPE:  NOTICE OF CLAIM

POLICY: 5082680450   EFF: 12/31/2011   EXP: 12/31/2012   LOSS DATE: 09/24/2012

POLICY TYPE:        -                 INSURED:EQUITY ONE INC

HONE#: MAIN: 305.672.1234. LOSS CATEGORY IS DEFAULTED. LOCATION CODE: 4656. CLAIMANT'S ZIP CODE DEFA
ULTED TO INSD ZIP CODE. LOSS DESCRIPTION NOT PROVIDED. ATTORNEY INFORMATION: STEVEN B. PHILLIPS, 561
-868-1340.-------------------------------------------------------------------------------------
----------
        VENDOR REFERRALS:

        NONE...

        --------------------------------------------------------------------------------
----------
        ADDITIONAL CONTACT INFO
        CP-000 ALEXANDRA  DE ANTONI
        EMAIL: ADEANTONI@EQUITYONE.NET.
        ---------------------------------------------------------------------------

BRCOSA000161

AUTOMATIC DATA PROCESSING
INSURANCE AGENCY, INC.

PROPERTY & CASUALTY

GETTING STARTED    SERVICE & SUPPORT    RENEWAL TIME    AUDIT ACCURACY

Dear Davin

On behalf of everyone at Automatic Data Processing Insurance Agency, Inc. (ADPIA), welcome! ADPIA is now your agency of record for your Workers' Compensation insurance needs. Our licensed and professional Implementation team is actively working on the setup of your policy.

Carrier: Travelers                Policy #: UB-2F1493              Effective Date:  10/18/2014

Please allow up to 10 business days for all information to be entered into our system. Once your policy setup is complete, it is important that you confirm the details of your policy to ensure accuracy of your policy and the premium payments. If questions arise, an Implementation Specialist may be in touch to review critical policy details set up in our systems such as:

- Class codes and rates
- Employee classification
- Owner/Officer names and inclusion/exclusion
- Mailing and additional addresses
- ADP's Pay-by-Pay® Premium Payment Program

As a participant in ADP's Pay-by-Pay® Premium Payment Program, your premiums are automatically deducted from your payroll and forwarded directly to your carrier. Deductions will begin with your next payroll on or after your policy's effective date.

Since 1992, ADPIA has worked hard to become the agency of choice for ADP's small and mid-sized clients when it comes to your Health & Benefits and Property & Casualty insurance needs. We appreciate the opportunity to assist in protecting your business, and look forward to working with you.

Sincerely,

Automatic Data Processing Insurance Agency, Inc.
Rodrigues, Kaysa
Assoc Insurance Acct Exec, Licensed Agent in 9 states

Phone – (678) 966-2546
Fax – (855) 875-7663
Email – Kaysa.Rodrigues@adp.com

You can reach us Monday - Friday from 8:30AM – 8:00PM ET at (800) 524-7024

*Need proof that you carry workers' compensation insurance? Submit a Certificate of Insurance request 24/7 at adp.com/certofinsurance from your desktop or mobile device*



insurance.ADP.com

The information contained herein represents the products and services available through only one of the business groups of Automatic Data Processing Insurance Agency, Inc. (ADPIA). ADPIA services mid and large size clients with various insurance products and services through its other business groups.

All insurance products will be offered and sold only through Automatic Data Processing Insurance Agency, Inc., its licensed agents or its licensed insurance partners; 1 ADP Blvd., Roseland, NJ 07068. CA license #0D04044. Licensed in 50 states. Certain services may not be available in all states or with all carrier partners. Automatic Data Processing Insurance Agency, Inc. is an affiliate of ADP, LLC. ADP, LLC and the ADP Logo are registered trademarks of ADP, LLC. Copyright ©2014 ADP, LLC.

BRCOSA000162

## CONSTRUCTION / SERVICE CONTRACT

**THIS AGREEMENT** is made and entered into this _10th_ day of _April_, _2009_, by and between Owner, (Legal Name of Shopping Center - Complete list attached hereto and made a part hereof), whose address is _____ _See attached_ _____ And Contractor _East Coast's Finest Outdoor Service_ _____, whose address is _11915 161st Street North, Jupiter FL 33478_

### BACKGROUND STATEMENT

Equity One is the owner and operator of _See attached list of Centers_ ("Project") located at _____, _____, _____. In its capacity as owner and operator of the Project, the Owner desires to retain the services of Contractor to provide certain work, as hereinafter described, for the Project. Since the Contractor desires to provide the work as requested by the Owner, the parties have entered into this agreement to set forth their mutual agreements and obligations.

### AGREEMENT

**NOW, THEREFORE,** in consideration of the foregoing and the mutual agreements and obligations herein set forth, Owner and Contractor agree for themselves, their successors and assigns, as follows:

1.      Contractor shall provide and furnish all labor, materials, tools, supplies, equipment, services, facilities, permits, licenses, supervision, administration, insurance, layout, and other services and related items necessary for the proper and complete performance of the following work:

> **Exhibit A – Scope of Work and/or Service Specification and Frequencies** attached hereto and made a part hereof.
>
> **_Attachment 1_ - Property Site Plan** showing areas of service highlighted as well as areas **NOT** serviced i.e. ground leases cross hatched.
>
> **_Attachment 2_ – Current year Budget** with item circled.

2.      Contractor shall indemnify and hold harmless Owner and its agents, employees, officers and directors from any and all claims, damages, losses and expenses, direct, indirect, or consequential, arising out of or resulting from the performance of the Work.

3.      Contractor, at its expense, shall obtain and maintain insurance coverage on all of its Work until final acceptance of its Work by Owner, with liability limits of not less than $1 million combined single limit (covering bodily injury, death and property damage) as well as the statutory requirements for worker's compensation, all in a form reasonably satisfactory to "Equity One Legal Entity" as detailed in **Exhibit B -Insurance Requirements**. Contractor shall deliver to Owner before the commencement of its Work the customary certificate evidencing such Current Insurance coverage(s) indicated thereon and naming Owner as _additional insured_ attached hereto and made a part hereof. The certificate shall indicate that it is non-cancelable except after ten (10) days prior written notice to Owner.

BRCOSA000163

4.    Owner agrees to pay Contractor for the performance of the Work the sum of $_____ ( See attached Schedule_____ **dollars**), which amount includes all Work to be furnished under this Agreement, all permits that must be taken out for the performance of the Work, all taxes, licenses, fees and so on.  The contract price is to be paid in the manner and subject to the conditions precedent stated as follows:

### *Attachment 3* - Additional Service (Change Order) Cost Breakdown i.e. charge per additional items and/or hourly rate.

Owner shall pay Contractor upon (a) completion of the Work and final acceptance by Owner, and (b) Owner's receipt of a Final Release of Lien from each and every material supplier, subcontractor, renter of equipment, or other individual or entity providing labor or materials in connection with the performance of the Work.  (**Exhibit C - Contractor's Affidavit of Final Payment and Release of Lien** attached hereto and made a part hereof.)

5.    All labor, services, and materials to be furnished, supplied or performed by Contractor must comply with all federal, state, local, and municipal laws, rules, regulations, statutes, ordinances, and directives ("laws").  All labor, services or materials, in addition to that specifically required by this Agreement, that are necessary to fully comply with all applicable laws, shall be furnished by Contractor as part of this Agreement and without any additional compensation.

6.    All of the work shall be performed by Contractor in a first-class workmanlike manner and shall be in a good and usable condition at the date of completion.  Contractor guaranties to Owner that any such Work shall be free from any and all defects in workmanship and materials for one (1) year from the date of the completion or the date of final acceptance by Owner, whichever is later (**Exhibit D - Contractor's Warranty** attached hereto and made a part hereof.) Contractor shall also be responsible for the replacement or repair, without additional charge, of any and all Work done or furnished by it, or through any other person, which shall become defective within one (1) year after completion or final acceptance by Owner, whichever is later. The correction of such Work shall include, without additional charge, all expenses and damages in connection with the removal, replacement or repair of any part or any other Work that may be damaged or disturbed thereby.  All such guaranties and warranties shall be in addition to the cumulative of all other rights and remedies Owner otherwise has under applicable law.

### Exhibit E – Grease Guard (applies to installation of any grease containment units)

7.    During the term of this Contract, Contractor, its affiliates, agents and subcontractors shall not deny the benefits of this Contract to any person on the basis of religion, color, ethnic group identification, sex, age, or physical or mental disability, nor shall they discriminate unlawfully against any employee or applicant for employment because of race, religion, color, national origin, ancestry, physical handicap, mental disability, medical condition, marital status, age or sex. Contractor shall ensure that the evaluation and treatment of employees and applicants for employment are free of such discrimination.  Contractor, its affiliates, agents and subcontractors shall give written notice of their obligations under this clause to labor organizations with which they have a collective bargaining or other agreements.  Contractor shall include non-discrimination and compliance provisions in this clause in all subcontracts to perform work under this Contract. (**Exhibit F – Responsible Contractor Program** attached hereto and made a part hereof - *applies to GRI JV Properties*)

8.    Any controversy under this Agreement shall be settled by arbitration in the **State of** _____, in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association.

Construction-Service Contract-Policy 703 & 704

9.      Contractor agrees to begin the Work described herein by no later than_____. Contractor estimates that the Work will be completed by_____. Contractor agrees to use its best efforts to complete the Work by this date and understands that time is of the essence.

10.     In connection with any litigation or arbitration arising out of this Agreement, Owner shall be entitled to recover all costs incurred, including reasonable attorney's fees.

11.     This Agreement shall be construed in accordance with and governed by the laws of **(Florida).**

12.     All notices, demands, or other communications shall be deemed to have been legally given by mailing the same by overnight courier service or by registered or certified mail, return receipt requested, to the addresses first stated above.

13.     No claim for extra work shall be made by the Contractor, except upon a signed, written order from an authorized representative of Owner, which authorization must be signed prior to the performance of any extra work. Failure to do so will result in the Contractor assuming liability for the total cost thereof.  Notwithstanding the foregoing, the Contractor may perform extra work, without written authorization from the Owner, provided the cost of the work does not exceed $250.00 and provided further that the Contractor received verbal permission from an authorized representative of the Owner prior to the performance of such work.

14.     This contract may be terminated by either party with thirty (30) days prior written notice for any reason. This contract may also be terminated immediately by Owner in the event of any of the following occurrences:

i)      The failure of Contractor to perform its duties set forth herein on any day specified in this contract without prior written approval by Owner.

ii)     The failure of Contractor to perform its duties in a manner satisfactory to owner, in its sole discretion, after notification of any deficiencies in Contractor's Work.

iii)    The failure of Contractor to maintain public liability or worker's compensation insurance coverage's and to provide certificates of insurance therefore as required under Article V of this Contract.  Receipt by Owner of two (2) or more cancellation notices, for non-payment or otherwise shall also be grounds for immediately termination by Owner.

Contractor acknowledges its responsibility to keep owner informed at all times as to its current address and telephone number toward the end that Contractor can be reached.  Any notification of unsatisfactory work or termination shall be effective upon the date of attempted delivery to the last known address of Contractor.  Upon notice of termination to Contractor, Owner will not be liable for any costs incurred or services performed by Contractor.

Construction-Service Contract-Policy 703 & 704

**IN WITNESS WHEREOF,** Owner and Contractor have set their hands as of the date and year first herein above written.

(Owner)

By: _Kenneth E Miller_

Date: _5-1-09_

(Contractor)

By: _Chris Olsen_

Date: _5-1-09_

BRCOSA000166

# EAST COAST'S FINEST OUTDOOR SERVICES INC.

January 30, 2009

*COMPLETE PROPERTY MAINTENANCE SERVICES*

11915 161ST N.
JUPITER, FLORIDA 33478
OFFICE: (561) 743-0764
FAX: (561) 743-8308

Equity One
Attn: Joe Lopez
11594 US Highway One
Palm Beach Gardens, FL 33408

Dear Joe:

I have composed a list of items that would not be included in the parking lot sweeping or porter/maintenance person's regular services as out-lined by the contract:

1) Bulk trash removal in excess of $100 per trip. If the amount would exceed this limit, there would be authorization received before article(s) is removed.

2) Emergency service hours due to hurricanes or other emergency situations (theft, vandalism, etc.) that require additional time at the plaza from 6 p.m. to 6 a.m. These hours will be billed at a cost of $25.00 per hour per person.

3) Additional pressure washing due to heavily trafficked areas needing extra attention. In which case, the cost would be negotiated and approved before the work is performed.

4) In the event that a tenant leaves the premises in disarray and it is necessary to put extra attention into the cleaning of the space, a price will be discussed and approved before executing the work.

For any further questions or comments regarding these matters, please feel free to contact me at the above telephone number.

Sincerely,

*Chris Ochs*

Chris Ochs
Owner

BRCOSA000167

# EXHIBIT A-Parking Lot Sweeping

Property Name:_____

As used herein, the term "Common Areas" shall mean, without limitation, all parking areas, driveways, entrances, sidewalks, landscaped areas, dumpster areas, loading docks, fences on the Property (including those around the perimeter of the Property), ditch areas, retention ponds and all other areas that are not leased, occupied or for lease to tenants of the Property.

> Remove all trash and debris, including but not limited to bottles, paper, cans, glass, food particles, loose rocks and leaves, from all Common Areas.

> Blow and/or sweep all sidewalks, parking areas, driveways, entranceways and dumpster areas

> Blow and/or hand clean all landscape islands and mulched areas

> Remove any flyers from light poles or building areas

> Empty all trash receptacles (including ash trays) located in the Common Areas.  Contractor will, at its sole cost and expense, provide high quality leak-proof trashcan liners for all the trashcans in the Common Areas.  In the event of leaks or spills in or around said trash cans, Contractor will immediately clean and scrub the affected areas.  Contractor will clean and scrub the trashcans, inside and out, as often as necessary to prevent odors.

> Clean the areas surrounding all dumpsters.

> Clean all drink machines, newspaper racks and public telephones, and the areas surrounding the same, and report any missing phone books, broken equipment or other items requiring attention to the contact person for the Owner.

> Clean all loading docks and ramps.

> Remove all bulk trash items from around the property

> Return all carts to respective stores which have been left in the common area

> Service will be provided _____ days per week (the rear of the shopping center will also be serviced _____ days per week).

> Once per month all exterior lights will be checked (parking lot pole lights, under canopy lights, rear security lights) and any that are not working will be reported to Equity One.

> Contact property manager with any problems observed especially items that create a safety hazard, lighting outages, trip hazards, etc.

MAINTENANCE SERVICE SCHEDULE: _____

_____

OTHER SPECIAL CONDITIONS: _____

_____

Contractor shall provide all labor, materials, supplies, supervision, tools, equipment and services of any kind or description required to perform the Work.  Contractor shall be responsible for the proper care, maintenance and protection of Contractor's materials, tools and equipment used on the Property, all of which shall be new or of first quality.

BRCOSA000168

Specifications

**Day Porter Specifications:**

Contractor agrees to furnish and provide the necessary labor and materials, tools, implements and appliances, and to do and perform the herein described work in a conscientious, workmanlike manner.

Contractor agrees to clean the property (_____) times(s) per week at (_____) hours per day, per the following schedule:

**DAILY (Per Visit)**

1. Drive/walk entire center and look for any liability problems.
   a. Pot holes, Wheel stops in place, traffic signs in place
   b. Repairs should be made immediately.
   c. Check the bottom of the parking lot light poles to make sure electrical wiring covers are on.
   d. Straighten any leaning sign posts
2. Cleaning (Front of Center First)
   a. Check payphones for proper operation
   b. Wipe window sills along all store fronts
   c. Clean phones, trash cans, newspaper stand, mail boxes
   d. Pick up debris – sidewalk area, landscape area, back of center around dumpster.
   e. Spot clean any spills on sidewalk and dirty areas with mop and bucket, use Clorox or degreaser if needed.  Keep gum removed.
   f. Clean cobwebs – under canopy, under gutter, around windows, lights etc.
   g. Treat areas with ant powder as needed.
   h. Keep weeds sprayed in cracks in sidewalk and around building.
   i. Paint over any graffiti.
   j. Remove birds nests, cobwebs, bird droppings, bugs, dust graffiti, etc from tenant fascia signage.
   k. Paint over any fascia areas where previous tenant signs were removed.
   l. Remove any flyers/posters attached to the building or light poles.
3. Vacant Shops --
   a. Make sure leasing signs are up and straight in store windows
   b. Ensure vacant windows are clean
   c. Ensure vacancies are swept/vacuumed clean
   d. Remove any vendor stickers from vacant windows
   e. Check toilet and sink traps to ensure they are filled with water
   f. Check for and report any present roof leaks
4. Tenants – keep up good relations with tenants.

**WEEKLY**

1. Cleaning
   a. Clean light fixtures as needed, inside and out.
   b. Make repairs, i.e. columns, fences etc.
   c. Clean meter rooms, and keep debris free
   d. Clean EQY roadway leasing signs
2. Lights (complete report around 15th and 30th.
   a. Replace under canopy lights as needed.
   b. Report any tenant signage problems on report
   c. Note parking light poles that are out by number of the pole.
   d. Time clocks should be adjusted regularly.
3. Irrigation – Look for areas that irrigation may need repair, wash outs, sand etc.
4. Painting – touch up walls, columns as needed.
5. Structural Check – check walls/canopy/columns for cracks, broken pieces etc. and repair/replace as needed.
6. Vacant Spaces – keep swept out, leasing signs up, windows cleaned.  Check for dry drains, plumbing and roof leaks, and make sure sinks and toilets are turned off underneath.
7. Check on security guards

BRCOSA000169

**Pressure Cleaning**

1. Pressure clean and remove all gum, stains, dirt, oil, etc from sidewalk curbs on sidewalks, curbs on sidewalks, concrete /block columns, walls along sidewalks, trash enclosures, slabs, walls, doors, road ramps between walks, trash receptacles, ash urns, benches, bike racks, walls separate from property, and other areas as required.
   a. bird droppings on walls around sidewalks and canopy ledges
   b. Canopy ceilings
   c. Graffiti
   d. Awnings
   e. Tile on walls
   f. Other surfaces, as required
   g. Work shall be performed and completed prior to three hours before store openings
   h. Prior to each and every job start, EQY will be notified and told one day in advance of any work
   i. Contractor agrees to meet all government codes and requirements as may exist for the property.
   j. Contractor to provide protection from water going into shops through doors.
   k. All windows and doors must be wiped clean after work is completed, if overspray or excess water occurs in these locations
   l. Contractor will provide these services at least (____) times per year.

**MISCELLANEOUS**

1. All back doors to be kept cleaned and numbered
2. All bollards/fire risers to be kept painted
3. Bases of Public Telephone to be kept painted
4. Property Identification signs to be kept clean
5. All bricks/pavers to be kept grouted
6. All downspout drains to be kept clear.

**Reporting**

1. Report to Property Manager any problems observed, especially items creating any safety issues.
2. Report any common area lights that are on during the day
3. Report missing or bent signs that need to be replaced
4. Report light outages, both common area and tenant signs
5. Report large bulk trash problems.

**Additional Work**

1. Additional work may from time to time be requested by EQY and performed by Contractor. All such work will be billed separately. Additional work may include emergency labor promotional manpower, tenant in-store cleaning, special painting projects to include travel to purchase paint, or removal of heavy bulk trash to include transport and dump fees by Contractor or other.
   a. All such additional work to require prior EQY authorization and will be billed as negotiated between EQY and Contractor prior to the commencement of the work.

BRCOSA000170

CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM
STATEMENT OF INVESTMENT POLICY

FOR
RESPONSIBLE CONTRACTOR PROGRAM

August 15, 2005

*This Policy is effective immediately upon adoption and supersedes all previous Responsible Contractor policies.*

I.      PURPOSE

This document sets forth the investment policy ("the Policy") for the Responsible Contractor Program ("the Program"). The design of this Policy ensures that contractors, investors, managers, consultants, or other participants selected by the California Public Employees' Retirement System ("the System") take prudent and careful action while managing the Program. Additionally, use of this Policy provides assurance that there is sufficient flexibility in controlling investment risks and returns while using contractors.

II.     INTRODUCTION

The California Public Employees' Retirement System ("the System") has a deep interest in the condition of workers employed by the System and its advisors or partners. The System, through the Responsible Contractor Program Policy (Policy) described below, supports and encourages fair wages and benefits for workers employed by its contractors and subcontractors, subject to fiduciary principles concerning duties of loyalty and prudence, both of which further require competitive returns on the System's real estate investments.

The System endorses small business development, market competition, and control of operating costs. The System supports many of the ideals espoused by labor unions and encourages participation by labor unions and their signatory contractors in the development and management of the System's real estate investments. The System believes that an adequately compensated and trained worker delivers a higher quality product and service. This Policy shall complement and in no manner detract from the System's existing Policy regarding service-disabled California veteran owned business enterprises. The Policy is consistent with the recommendations of fiduciary counsel in a letter to the System's General Counsel dated December 7, 1992 and includes provisions for transition, monitoring, and enforcement.

*Copyright © 2005 by CalPERS. Reproduction of any part of this manual is permissible if reproduction contains notice of CalPERS' copyright as follows: "Copyright © 2005 by CalPERS".*

BRCOSA000171

## III. DEFINITION OF A RESPONSIBLE CONTRACTOR

A responsible contractor, as used in this Policy, is a contractor or subcontractor who pays workers a fair wage and a fair benefit as evidenced by payroll and employee records and who complies with service-disabled veteran business (SDV/BE) policy. The definition of fair benefits includes, but is not limited to, "employer-paid family health care coverage, pension benefits, and apprenticeship programs." What constitutes a "fair wage" and a "fair benefit" depends on the wages and benefits paid on comparable real estate projects. Fair wages and fair benefits are based upon local market factors, that include the nature of the project (e.g., residential or commercial and public or private), comparable job or trade classifications, and the scope and complexity of services provided.

## IV. INITIAL REQUIREMENTS OF THE RESPONSIBLE CONTRACTING POLICY

A. **Duty of Loyalty -** Notwithstanding any other considerations, assets shall be managed for the exclusive benefit of the participants and the beneficiaries of the System. The System's, as well as its advisors' or partners', duty to the participants and their beneficiaries shall take precedence over any other duty.

B. **Prudence -** The System's Board, staff, and advisors or partners are charged with the fiduciary duty of exercising the care, skill, prudence, and diligence appropriate to the task.

C. **Competitive Return -** To comply with duties of loyalty and prudence, all investments and services must be made and managed in a manner that produces a competitive risk-adjusted return.

D. **Competitive Bidding -** Contractors and their subcontractors for construction, maintenance, and services shall be selected through a competitive bidding and selection process. The purpose of this provision to encourage fair competition and to seek bids actively from all qualified sources within an area, particularly those identified as Responsible Contractors. Advisors or Partners and their subcontractors shall create a bidding process that includes notification and invitations to bid, distributed to a broad spectrum of potential bidders, particularly those identified as Responsible Contractors. The review of the bids shall include consideration of loyalty, prudence, and competitive risk-adjusted returns (factors to be considered include experience, reputation for honesty, integrity, timeliness, dependability, fees, SDV/BE policy, and the adherence to the Responsible Contracting Policy.)

*Copyright © 2005 by CalPERS. Reproduction of any part of this manual is permissible if reproduction contains notice of CalPERS' copyright as follows: "Copyright © 2005 by CalPERS".*

BRCOSA000172

E.    **Local, State, and National Laws -** All advisors or partners and their subcontractors shall observe all local, state, and national laws (including, by way of illustration, those pertaining to insurance, withholding taxes, minimum wage, and health and occupational safety).

F.    **CalPERS Service Disabled California Veteran Business Enterprise Policies --** Will adhere to CalPERS disabled veteran business enterprise policies.

V.    **SELECTION PREFERENCE OF A RESPONSIBLE CONTRACTOR**

If Initial Requirements A through F (see Section IV above) are satisfied, the System expresses a strong preference that Responsible Contractors be hired.

VI.    **TRANSITION, ENFORCEMENT, MONITORING, AND ADMINISTRATION**

A.    **Applicable Investments and Phasing -** This Policy shall apply to all domestic real estate advisors or partners single family real estate investments, and joint ventures and partnerships where CalPERS owns a greater than 50% ownership interest (and associated advisor or partner and subcontractor contracts and bids arising out of those investments).   This Policy specifically excludes all other types of investments, including commingles funds, opportunity funds, mezzanine debt, hybrid debt, international investments, and indirect, specialty, and mortgage investments lacking equity features and their respective advisors.  When the Policy is not applicable by its terms, partners or advisors shall be encouraged to make a good faith effort to comply with the spirit of the policy, consistent with their fiduciary duty.

Housing Development Partnership existing on the effective date of this Policy shall not be amended to incorporate this Policy, but voluntary compliance is strongly recommended.  The practicality, schedule, and method of extending this Policy in the future, beyond those investments and contracts described herein shall depend on factors that include the structure of the investment and the degree of control the System can exercise.

B.    **Notification -** The System shall provide all applicable current and prospective real estate advisors or partners with a copy of this Policy.

C.    **Solicitation Documents -** All requests for proposal and invitations to bid covered by this Policy shall include the terms of this Policy inclusive of the Responsible Contractor Self-Certification Form (Appendix 1). Responses by bidders shall include information to assist the Partner/Advisor in evaluating a bid.   CalPERS reserves the right to

*Copyright © 2005 by CalPERS.  Reproduction of any part of this manual is permissible if reproduction contains notice of CalPERS' copyright as follows: "Copyright © 2005 by CalPERS".*

BRCOSA000173

disclose the contents of the Self-Certification Form at its or its Advisors or Partners discretion.

D.    **Contracts and Renewals -** All contracts entered into after the effective date of this Policy and pertaining to applicable real estate investments, including renewals of such contracts, shall include the terms of this Policy.  Responsible Contractor compliance will be part of the advisors or partners contract renewal consideration.   Non-compliance will be reported to the System's Board on a timely basis or at a minimum annually.

E.    **Responsibilities -** The responsibilities of the System's staff ("the Staff"), advisors or partners, property managers, contractors, and unions are defined as follows:

1.    The System's staff shall have the following responsibilities:

   a.    Reviewing the advisors' or partners' annual reports regarding compliance with the Policy.

   b.    Developing and maintaining contact lists for all the System' properties and providing a copy to inquiring parties.

   c.    Reporting periodically to the Investments Committee on these findings and making recommendations for corrective action as necessary.  The first report shall be six months after adoption of the Policy.

2.    Advisors' or Partners' responsibilities shall include the following duties:

   a.    Communicating the Policy to all property managers.

   b.    Reviewing a contract listing for each property prepared by each property manager.

   c.    Maintaining a simplified bid summary for each applicable contract.  The summary shall include identifying contract, successful bidder, and bidder's status as Responsible Contractor.

   d.    Providing an annual report to the System' Staff, describing their own efforts as well as those by property managers and their subcontractors.

*Copyright © 2005 by CalPERS.  Reproduction of any part of this manual is permissible if reproduction contains notice of CalPERS' copyright as follows: "Copyright © 2005 by CalPERS".*

BRCOSA000174

    e.    Monitoring and enforcing the Policy, including the investigation of potential violations.

    f.    The Partner or Advisor shall sign and deliver, on their companies letterhead, a Partner or Advisor annual Certification stating the following:

        "I certify that for the fiscal year ending June 30, 20XX _____ (Partner Name) and any agents and/or subcontractors hired by us, have complied, to the best of my knowledge, with the Responsible Contractor Policy and more specifically with the roles and responsibilities stated within the policy."

    g.    The partner or advisor shall notify a national contact at trade/service unions as pursuant to Section VI E.5.a. if the partner or advisor is expanding into new areas so that trade/service unions can provide the partner or advisor contact information of local trade councils and union halls in the market where expansion is occurring.

3.    Property managers shall have responsibility for the following duties:

    a.    Communicating in bid documents the Responsible Contractor Program Policy to contractors seeking to secure construction or building service contracts.

    b.    Communicating about the Policy to any interested party.

    c.    Ensuring there is a competitive bidding process, inclusive of potentially eligible Responsible Contractors.

    d.    Requiring that bidders provide to the property manager a Responsible Contractor self-certification on a form approved by the System.

    e.    Preparing and sending to advisors or partners a contract listing for applicable service contracts for each property under management. The building trades and service trades and other potential bidders will have access to this list.

    f.    Providing advisors or partners with a simplified bid summary for each contract.

*Copyright © 2005 by CalPERS. Reproduction of any part of this manual is permissible if reproduction contains notice of CalPERS' copyright as follows: "Copyright © 2005 by CalPERS".*

BRCOSA000175

       g.      Providing property level annual report information to advisors or partners.

       h.      Maintaining documentation for successful bidders.

       i.      Seeking from trade unions/service unions input in the development of Responsible Contractor lists.

       j.      Maintaining a list of any interested Responsible Contractors and local trade councils and union halls in all markets in which the Responsible Contractor Policy is applicable. (Names, addresses and telephone numbers).

4.      Contractors shall have the responsibility for the following duties:

       a.      Submitting a Responsible Contractor self-certification on a form approved by the System to the property manager. Communicating to subcontractors the Responsible Contractor Program Policy.

       b.      Providing the property manager with Responsible Contractor documentation.

5.      Trade unions/service unions shall perform the following tasks:

       a.      Delivering to the property manager or advisor or partner, lists of names and telephone numbers of Responsible Contractors. Provide a national contact person/address where current information can be sent as well as notifications of expansions into new areas. In addition, provide contact information (address, phone number and contact person) of local trade councils and union halls in all markets in which the responsible contractor policy is applicable to the property manager or advisor or partner.

       b.      Referring interested and qualified Responsible Contractors to the property manager.

       c.      Monitoring the local labor markets continually to update the lists.

       d.      Providing technical input as appropriate.

F.    **Outreach -** The System' staff shall develop and maintain a list of all the System' properties. The list shall include the property name, address, advisor or partner and property manager, and telephone number of the

*Copyright © 2005 by CalPERS. Reproduction of any part of this manual is permissible if reproduction contains notice of CalPERS' copyright as follows: "Copyright © 2005 by CalPERS".*

BRCOSA000176

property manager and real estate advisors or partners. The System' staff shall provide this list to anyone who requests a copy. Actual contract expiration inquiries shall be referred to the property level. Property managers shall provide solicitation documents to any potential contractor who, has in writing, expressed an interest in bidding for the relevant contract.

G.     **Minimum Contract Size -** The Policy shall absolutely apply to all contracts of a minimum size of $50,000. Minimum contract size refers to the total project value of the work contracted for and not to any desegregation by trade or task. For example, a $50,000 contract to paint two buildings in a single office complex would not be treated as two $25,000 contracts, each less than the minimum contract size. Desegregation designed to evade the requirements of the Policy is not permitted.

H.     **Applicable Expenditures Categories -** The Policy shall apply to tenant improvements, capital expenditures, and operational service contracts (such as cleaning).

I.     **SDV/BE Policy -** Satisfaction of the System' SDV/BE Policy is a necessary condition before the System, acting through its contractors, hires a Responsible Contractor. Advisors or Partners and Contractors shall provide a certification statement of SDV/BE compliance or documentation of good faith efforts. Advisors or Partners shall collect and retain adequate data documenting their compliance with this Policy and shall be prepared to produce this data for review by the Staff when requested.

J.     **Fair Wage, Fair Benefits, and Training -** The Policy avoids a narrow definition of "fair wage", "fair benefits", and "training" that might not be practical in all markets. Furthermore, the Policy does not require a "prevailing wage", as defined by government surveys. Instead, the Policy looks to local practices concerning type of trade and type of project. The Policy recognizes that practices and labor market conditions vary across the country and that flexibility in its implementation is very important.

In determining "fair wages" and "fair benefits" concerning a specific contract in a specific market, items that may be considered include local wage practices, state laws, prevailing wages, labor market conditions, and other items.

In place of a prevailing wage standard, the Policy requires a broad outreach and competitive bidding program, as described in Section IV. D, and VI. F. and L. This program is premised upon the availability of a

*Copyright © 2005 by CalPERS. Reproduction of any part of this manual is permissible if reproduction contains notice of CalPERS' copyright as follows: "Copyright © 2005 by CalPERS".*

BRCOSA000177

list of Responsible Contractors in every market in which the System directly owns a property. While advisors or partners, their property managers and contractors are responsible for gathering and analyzing information relevant in identifying and hiring a Responsible Contractor, compilation of this list does not depend solely on the advisors or partners, property managers, or contractors. Instead, this Policy invites the various local trades to suggest contractors, which in their view, qualify as Responsible Contractors. Sources of information include local building and service trade councils, builders associations, and governments.

K.     **Annual Review and Data Forms -** A proposed Responsible Contracting annual report is required with this Policy. The annual review of Advisors' or Partners' compliance with the Policy shall coincide with the SDV/BE review. Advisors or Partners shall present summary data in a format described and approved by the System. The annual review of advisor or partners compliance shall provide the System' Staff with good faith evidence of monitoring and enforcement.

The annual review shall determine whether each advisor or partner, property manager, and contractor conducted a good faith outreach program and a competitive bidding process that includes responsible contractors. If a potential, responsible contractor does not respond to the invitation to bid, then the advisor or partner, property manager, or contractor has acted properly. For each bidder, the advisor or partner, property manger, or contractor is obliged to gather appropriate responsible contracting information and make a judgment concerning the five initial requirements described in Section IV. If there are instances in which an advisor or partner, property manager, or contractor failed to comply with this Policy, the System' review of the advisors or partners, property managers, or contractors shall focus on the overall pattern of conduct and not any one specific incident.

L.     **Competitive Bidding -** Property managers and contractors shall give notice for applicable bids in local trade publications, bulletin boards, and union building trades councils. Property managers shall seek input from building trades councils for developing lists of responsible contractors for inclusion in the bidding process.

Property managers may choose a reasonable number of contractors to invite to bid from the list of responsible contractors. Given the time and expense required to solicit and evaluate bids, it is not essential that advisors or partners, property managers, and contractors invite all potential bidders.

*Copyright © 2005 by CalPERS. Reproduction of any part of this manual is permissible if reproduction contains notice of CalPERS' copyright as follows: "Copyright © 2005 by CalPERS".*

BRCOSA000178

The property manager must ensure that there is a competitive bidding process, which is inclusive of potentially eligible responsible contractors. Large numbers of bidders does not necessarily assure inclusion. Property managers must take care in ensuring those bidders include potentially eligible responsible contractors.

Although the Policy does not require hiring union workers, the trade unions will be invited to participate in the following:

1. Deliver to the property manager or advisor or partner lists of names and telephone numbers of responsible contractors and local trade councils and union halls in all markets in which the responsible contractor policy is applicable, including those responsible contractors who expressed any interest in bidding.

2. Continually monitor the local markets, updating the lists. Property managers shall maintain these lists supplied by the trade unions.

M. **Neutrality -** The System supports a position of neutrality in the event there is a legitimate attempt by a labor organization to organize workers employed in the construction, maintenance, operation, and services at a System owned property.

Resolution of any interjurisdictional trade disputes shall be the responsibility of the trades and the various state and national building trades councils. This Policy does not call for any involvement by the advisors or partners, property managers, or contractors in interjurisdictional trade disputes.

N. **Enforcement -** The System shall place a non-complying advisor or partner or property manager on a probation watch list. If the advisor or partner or property manager does not modify this pattern of conduct, even after discussions with the System' staff, the System shall consider this pattern of conduct along with other information when it reviews the advisor or partner or property manager contract for possible renewal. The key indicator is a pattern of conduct that is inconsistent with the provisions of the Policy.

Advisors or Partners, property managers, and contractors that have not hired responsible contractors in the past may still bid for contracts. However, after the award of such contracts the System shall review its compliance with the Policy.

The System does not require that advisors or partners, property managers, or contractors use any particular system for compliance.

_Copyright © 2005 by CalPERS. Reproduction of any part of this manual is permissible if reproduction contains notice of CalPERS' copyright as follows: "Copyright © 2005 by CalPERS"._

BRCOSA000179

However, from time to time, the System's staff may disseminate information and suggestions regarding efficient ways for complying with this Policy.

O.   **Complaints -** Formal complaint(s) may be submitted to the System per the attached Complaint, Investigation and Resolution Process Regarding Potential Violations of the CalPERS' Responsible Contractor Policy (Appendix 2).

_Copyright © 2005 by CalPERS. Reproduction of any part of this manual is permissible if reproduction contains notice of CalPERS' copyright as follows: "Copyright © 2005 by CalPERS"._

BRCOSA000180

Appendix 1
Page 3 of 3

Responsible Contractor Worksheet

Company Name: *East Coast Finest Outdoor Serv. Inc.*

This Worksheet has been provided to assist you with answering questions on the Certification of Responsible Contractor Status form. The Responsible Contractor Program encourages fair wages and benefits, consistent with local market practices. Please take a few minutes to complete the following questions about your firm and the marketplace in which you operate.

**Wages**

1. Considering the wages paid by your competitors in this market, the nature of this project, and the size and scope of this contract, do you believe that your firm will pay local market wages for the employees on this job?

☒ YES  ☐ NO

**Benefits**

1. For the employees on this job, will your firm provide employer-paid health insurance for the employee or the employee and his or her family?

☐ YES  ☒ NO

2. For the employees on this job, will your firm provide pension, 401(k), or a similar retirement savings or deferred compensation program?

☐ YES  ☒ NO

3. For employees on this job, will your firm provide access to apprenticeship programs for skilled trades?

☐ YES  ☒ NO

4. Are there any other benefits that you will provide to the employees on this job that you would like to describe (e.g. paid vacation, sick leave, etc.)? If so, please describe:
   *We will provide paid vacations and sick leave and partial payment for health care.*

5. Considering your answers above, the benefits your competitors in this market provide to their employees, the size and scope of this contract, and the nature of this project, do you believe your firm will provide benefits consistent with local market practices to the employees on this job?

☒ YES  ☐ NO

Please attach additional page(s) if you would like to elaborate on any of the answers you provided above.

Copyright © 2005 by CalPERS. Reproduction of any part of this manual is permissible if reproduction contains notice of CalPERS' copyright as follows: "Copyright © 2005 by CalPERS".

BRCOSA000181

## CERTIFICATION OF RESPONSIBLE CONTRACTOR STATUS

**GENERAL INFORMATION**

Company Name _EAST COAST FinesT OUTDOOR SerVice INC._

Address _11915 161st STreet N._

City _Jupiter_          _FL   33478_

Telephone Number (_561_) _743-0764_          Fax Number (_561_) _743-8308_

Ownership Structure (Please check one)

___ Sole Proprietorship   ___ Partnership   _X_ Corporation   ___ Joint Venture   ___ Other _____

Description of Service(s) Provided _parking loT sweeping_
_PorTer  person  maiNT._

Contractor's License # _____

**RESPONSIBLE CONTRACTOR STATUS** *(Refer to definitions on reverse)*

Please check one of the following boxes:

1.   ___ Meets all Responsible Contractor requirements

2.   ___ Meets none of the Responsible Contractor requirements

3.   _X_ Meets certain of the Responsible Contractor requirements *(provide explanation below)*

If you have checked box 3 above, please provide an explanation below (*attach additional pages if necessary on questions 3, 4 and 6*):

Explanation: _We will provide: SICK PAY, VACATION PAY, Bonus's_
_parTial pay Health care, mAYBe in the FuTure A 401k plan_

4.  Has your firm ever been fined, received an adverse judgment, penalty, or received any mandated changes to its corporate policy in the past 18 months resulting from violations of State or Federal labor laws, including but not limited to the National Labor Relations Board, or Equal Opportunity Commission (i.e. sexual harassment and/or discrimination violations)? If yes, please explain.

Explanation: _____

5.  Relative to question #4, are there any complaints that you are aware of that have been filed with your firm or any entities listed under question #4? If yes, please explain. (Affirmative answer(s) to the question will not necessarily disqualify the vendor from being the successful bidder. The level of investigation of the complaints listed in response to the question will be left to the judgment of the investment partner.)

Explanation: _____

**TARGETED VENDOR STATUS** *(Refer to definitions on reverse.)*

Does your firm meet the definition of service-disabled veteran business enterprise?

___ Yes     _X_ No

**OWNER'S CERTIFICATION OF RESPONSIBLE CONTRACTOR STATUS**

On behalf of the above-named company, the undersigned certifies that the information and response provided herein are true, complete and accurate as of this date, and he/she is aware that any intentionally misrepresented or falsified information may result in disqualification from future contracting opportunities.

Signature _Chris Ochs_          Date _1-30-09_

Name (please print) _Chris Ochs_          Title _OWNer_

---

This form was prepared for use in compliance with the Responsible Contractor Program Policy of CALPERS. Any contractor or subcontractor with a minimum contract size of $50,000 should complete this form. CALPERS reserves the right to disclose the contents of this Self-Certification Form at its or its Advisors or Partners discretion.

Copyright © 2006 by CalPERS.  Reproduction of any part of this manual is permissible if reproduction contains notice of CalPERS' copyright as follows: "Copyright © 2006 by CalPERS".

BRCOSA000182

## INTRODUCTION:

The California Public Employees' Retirement System ("the System") has a deep interest in the condition of workers employed by the System and its advisors or partners. The System, through the Responsible Contracting Policy, supports and encourages fair wages and fair benefits for workers employed by its contractors and subcontractors, subject to fiduciary principles concerning duties of loyalty and prudence, both of which further require competitive returns on the System's real estate investments. The System endorses small business development, market competition and control of operating costs. This policy supports many of the ideals espoused by labor unions and encourages participation by labor unions and their signatory contractors in the development and management of the System's real estate investments. The System believes that an adequately compensated and trained worker delivers a higher quality product and service. This policy is intended to complement and in no manner detract from existing System policy regarding service-disabled California veteran owned business enterprises.

## DEFINITIONS:

**Responsible Contractor:** A contractor or subcontractor who pays workers a fair wage and a fair benefit as evidenced by payroll and employee records and who complies with CALPERS' service-disabled veteran business enterprise (SDV/BE) policy. "Fair Benefits" are defined as including, but not limited to, employer paid family health care coverage, pension benefits, and apprenticeship programs. What constitutes a "fair wage" and "fair benefit" depends on the wages and benefits paid on comparable real estate projects based upon local market factors, that include the nature of the project (e.g. residential or commercial, public or private) comparable job or trade classifications, and the scope and complexity of the services provided.

**SDV/BE Policy:** Contractors to the System shall make a good faith effort to comply with CALPERS annual contract participation goals by directing purchase of goods and services to 3% service-disabled veteran owned business enterprises. The definitions of these terms are as follows:

**Service-Disabled Veteran:** A veteran of the military, naval or air services of the United States with a service-connected disability.

**Service-Disabled Veteran Business Enterprise:** A business enterprise which is certified by the State of California Office of Small & Minority Business of the Department of General Services as meeting all of the following: (1) it is a business enterprise which is at least 51% owned by one or more disabled veterans, or, in the case of a publicly-owned business, at least 51% of the stock of which is owned by one or more disabled veterans, (2) the management and daily business operations are controlled by one or more disabled veterans (the disabled veterans who exercise management and control are not required to be the same disabled veterans as the owners of the business concern), and (3) it is a business concern with its home office in the United States and which is not a branch or subsidiary of a foreign corporation, firm or other business.

*Copyright © 2005 by CalPERS. Reproduction of any part of this manual is permissible if reproduction contains notice of CalPERS' copyright as follows: "Copyright © 2005 by CalPERS".*

BRCOSA000183

## ADDENDUM TO CONTRACT

In consideration of the contract dated April 10th, 2009 by and between (Owner), Equity One Realty & Management FL, Inc. and affiliated legal ownership entities (as listed on the attached) and (Contractor), East Coast's Finest Outdoor Services, the parties mutually agree for themselves, their successors, and assigns, as follows:

Effective immediately, the attached "Schedule A" dated March 24, 2010 will replace all previous versions of service/ pricing schedule for the above-referenced contract.  The schedule includes the following changes:

1.) Effective January 1, 2010, all sweeping and portering services provided by Contractor under this agreement for Sheridan Plaza were terminated in accordance with the cancellation letter dated December 1, 2009.

2.) Effective February 1st, 2010, all sweeping services provided by Contractor under this agreement for the 1900/2000 Office Buildings were terminated in accordance with a verbal agreement. Contractor will continue to provide 25 hours of portering services per week at this property.

3.) Effective immediately, Contractor will provide sweeping and portering services for Magnolia Shoppes, Hammocks Town Center, and Sunrise Town Center for the number of hours and contract prices listed on the attached schedule.

4.) Effective immediately, the total contract price for sweeping services at Banco Popular will be reduced to ▮▮▮▮▮▮▮ per annum.

5.) Effective immediately, the hours of service for Boynton Plaza will be increased from 24 hours to 30 hours per week.

In witness whereof, Owner and Contractor have set their hands as of the date and year first herein above written:

Equity One Realty & Management FL, Inc.*

BY: _____

Date: ___4-16-10_____

East Coast's Finest Outdoor Service

BY: ___Chris Ak._____

Date: ___4-6-10_____

*and affiliated ownership entities as listed on the attached

BRCOSA000184

Client#: 1000780                                                                         36EDC

**ACORD**™  **CERTIFICATE OF LIABILITY INSURANCE**

| | DATE (MM/DD/YYYY) |
|---|---|
| | 8/27/2012 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| BB&T G.C. Wright Insurance | PHONE (A/C, No, Ext): 804 733-3174 | | FAX (A/C, No): 8669257120 |
| 117 South Adams Street | E-MAIL ADDRESS: | | |
| PO Box 996 | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| Petersburg, VA 23804 | INSURER A : Amerisure Insurance Company | | 19488 |
| INSURED | INSURER B : Amerisure Mutual Insurance Co. | | 23396 |
| EDC | INSURER C : | | |
| Eilerson Development Corp. DBA | INSURER D : | | |
| 1660 Huguenot Road | INSURER E : | | |
| Midlothian, VA 23113 | INSURER F : | | |

**COVERAGES**          CERTIFICATE NUMBER:                    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | **GENERAL LIABILITY** | | | CPP2073737 | 12/31/2011 | 12/31/2012 | EACH OCCURRENCE | $1,000,000 |
| | [X] COMMERCIAL GENERAL LIABILITY | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $500,000 |
| | [ ] CLAIMS-MADE [X] OCCUR | | | | | | MED EXP (Any one person) | $10,000 |
| | [X] PD Ded:5,000 | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| | [ ] POLICY [X] PRO-JECT [ ] LOC | | | | | | | $ |
| | **AUTOMOBILE LIABILITY** | | | CA2073736 | 12/31/2011 | 12/31/2012 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | [X] ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | [X] ALL OWNED AUTOS [ ] SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | [X] HIRED AUTOS [X] NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| B | [X] **UMBRELLA LIAB** [X] OCCUR | | | CU2073738 | 12/31/2011 | 12/31/2012 | EACH OCCURRENCE | $10,000,000 |
| | [ ] EXCESS LIAB [ ] CLAIMS-MADE | | | | | | AGGREGATE | $10,000,000 |
| | [ ] DED [X] RETENTION $0 | | | | | | | $ |
| A | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y/N | | | WC2073739 | 12/31/2011 | 12/31/2012 | [X] WC STATU-TORY LIMITS [ ] OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? [N] (Mandatory in NH) | | N/A | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)
Equity One (Florida Portfolio) Inc., General Corporation is included as Additional Insured with respect to General Liability Coverage.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Equity One (Florida Portfolio) Inc., General Corporation 1600 NE Miami Gardens Drive Miami, FL 33179 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE *Vivian R. Hurd* |

© 1988-2010 ACORD CORPORATION. All rights reserved.

ACORD 25 (2010/05)    1 of 1      The ACORD name and logo are registered marks of ACORD
#S9141393/M8720542                                                                    2MS

BRCOSA000185

# GENERAL LIABILITY NOTICE OF OCCURRENCE / CLAIM

| AGENCY | INSURED LOCATION CODE | DATE OF LOSS AND TIME | | |
|---|---|---|---|---|
| LOCKTON COMPANIES, LLC. | | 09/24/2012 | 12:01:00 | X AM / PM |
| 3280 PEACHTREE ROAD NE #800 | CARRIER | | | |
| ATLANTA GA 30305 | | | | |
| | POLICY NUMBER 5082680450 | | | |
| CONTACT NAME: | 12/31/2011 | 12/31/2012 | | |
| PHONE (A/C, No, Ext): (404)460-3600 | | | | |
| FAX (A/C, No.): 4044603699 | | | | |
| E-MAIL ADDRESS: | | | | |
| CODE: 380034607 SUBCODE: | | | | |
| AGENCY CUSTOMER ID: | | | | |

## INSURED

| NAME OF INSURED(First, Middle,Last) | INSURED'S MAILING ADDRESS |
|---|---|
| EQUITY ONE INC | 1600 NE MIAMI GARDENS DR |
| | NORTH MIAMI FL 33179-4900 |
| DATE OF BIRTH / FEIN(if applicable) | |
| PRIMARY PHONE# ☐HOME ☐BUS ☐CELL   SECONDARY PHONE#( ) - ☐HOME ☒BUS ☐CELL | PRIMARY E-MAIL ADDRESS: |
| | SECONDARY E-MAIL ADDRESS: |

## CONTACT   ☐ CONTACT INSURED

| NAME OF CONTACT (First, Middle,Last) | CONTACT'S MAILING ADDRESS |
|---|---|
| ALEXANDRA DE ANTONI | |
| PRIMARY PHONE# ( ) - ☒HOME ☐BUS ☐CELL   SECONDARY PHONE# (786)528-1457 ☐HOME ☒BUS ☐CELL | |
| WHEN TO CONTACT | PRIMARY E-MAIL ADDRESS: |
| ☐IDENTIFIED | SECONDARY E-MAIL ADDRESS: |

## OCCURRENCE

| LOCATION OF OCCURRENCE 4633 N. UNIVERSITY DRIVE STREET: | POLICE OR FIRE DEPARTMENT CONTACTED |
|---|---|
| CITY, STATE, ZIP:   CORAL SPRINGS FL 330674602 | REPORT NUMBER |
| COUNTRY: | |

DESCRIBE LOCATION OF OCCURRENCE IF NOT AT SPECIFIC STREET ADDRESS:

DESCRIPTION OF OCCURRENCE (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
CLMT HAS NOT IDENT INJURY TO NOT IDENT PART FROM NOT IDENT CAUSE

## TYPE OF LIABILITY

| PREMISES: INSURED IS ☐OWNER ☐TENANT | TYPE OF PREMISES | |
|---|---|---|
| OWNERS NAME & ADDRESS(if not insured) | | |
| | PRIMARY PHONE# ☐HOME ☐BUS ☐CELL | SECONDARY PHONE# ☐HOME ☐BUS ☐CELL |
| | PRIMARY E-MAIL ADDRESS: | |
| | SECONDARY E-MAIL ADDRESS: | |
| PRODUCTS:INSURED IS ☐MANUFACTURER ☐VENDOR | TYPE OF PRODUCT | |
| MANUFACTURER'S NAME & ADDRESS (if not insured) | | |
| | PRIMARY PHONE# ☐HOME ☐BUS ☐CELL | SECONDARY PHONE# ☐HOME ☐BUS ☐CELL |
| | PRIMARY E-MAIL ADDRESS: | |
| | SECONDARY E-MAIL ADDRESS: | |
| WHERE CAN PRODUCT BE SEEN? | | |

| ACORD 3 (2011/07) | Page 1 of 4 | © 1986-2011 ACORD CORPORATION. All rights reserved. |
|---|---|---|

E2906093

**The ACORD name and logo are registered marks of ACORD**

AGENCY CUSTOMER ID:_____

## INJURED/PROPERTY DAMAGED

| NAME & ADDRESS (Injured/Owner) | EMPLOYER'S NAME & ADDRESS |
|---|---|
| CHARLES ACKLEY<br>NOT IDENTIFIED<br>NORTH MIAMI BEACH  FL  33179 | |

| PRIMARY ☐HOME ☐ BUS ☐CELL<br>PHONE# ( )  - | SECONDARY ☐HOME ☐ BUS ☐CELL<br>PHONE# | PRIMARY ☐HOME☐ BUS☐CELL<br>PHONE# ( )  - | SECONDARY  ☐HOME ☐ BUS ☐CELL<br>PHONE# |
|---|---|---|---|
| PRIMARY E-MAIL ADDRESS: | | PRIMARY E-MAIL ADDRESS: | |
| SECONDARY E-MAIL ADDRESS: | | SECONDARY E-MAIL ADDRESS: | |

| AGE<br>0 | SEX | OCCUPATION<br>NOT IDENTIFIED | DESCRIBE INJURY NOT IDENTIFIED |
|---|---|---|---|

| WHERE TAKEN<br>NOT IDENTIFIED | WHAT WAS INJURED DOING?<br>NOT IDENTIFIED |
|---|---|

| DESCRIBE PROPERTY (Type, model, etc.) | ESTIMATE AMOUNT | WHERE CAN PROPERTY BE SEEN? |
|---|---|---|

## WITNESSES

| NAME AND ADDRESS<br>NONE | PRIMARY ☐HOME ☐ BUS ☐ CELL<br>PHONE# | SECONDARY  ☐HOME ☐ BUS ☐ CELL<br>PHONE# |
|---|---|---|
| | PRIMARY E-MAIL ADDRESS: | |
| | SECONDARY E-MAIL ADDRESS: | |
| NAME AND ADDRESS | PRIMARY ☐HOME ☐ BUS ☐CELL<br>PHONE# | SECONDARY  ☐HOME ☐ BUS ☐ CELL<br>PHONE# |
| | PRIMARY E-MAIL ADDRESS: | |
| | SECONDARY E-MAIL ADDRESS: | |
| NAME AND ADDRESS | PRIMARY ☐HOME ☐ BUS ☐CELL<br>PHONE# | SECONDARY  ☐HOME ☐ BUS ☐CELL<br>PHONE# |
| | PRIMARY E-MAIL ADDRESS: | |
| | SECONDARY E-MAIL ADDRESS: | |

## REMARKS (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

LOSS TIME IS DEFAULTED. SUPPLEMENTS TO FOLLOW. ACORD NOT PROVIDED. PO

LICY NUMBER NOT PROVIDED. INAD ADDRESS AND ZIP PROVIDED IS: 1550 NE MI

AMI GARDENS DRIVE, SUITE 500, NORTH MIAMI BEACH, FL 331 (continued)...

| REPORTED BY STEVEN B PHILLIPS-EMAILED CLAIM | REPORTED TO CNC/FNS CALL#:436728-13:29 EST |
|---|---|

BRCOSA000187

AGENCY CUSTOMER ID:

### APPLICABLE IN ALASKA

A person who knowingly and with intent to injure, defraud, or deceive an insurance company files a claim containing false, incomplete, or misleading information may be prosecuted under state law.

### APPLICABLE IN ARIZONA

For your protection, Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fradulent claim for payment of a loss is subject to criminal and civil penalties.

### APPLICABLE IN ARKANSAS, DELAWARE, KENTUCKY, LOUISIANA, MAINE, MICHIGAN, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH DAKOTA, PENNSYLVANIA, RHODE ISLAND, SOUTH DAKOTA, TENNESSEE, TEXAS, VIRGINIA, AND WEST VIRGINIA

Any person who knowingly and with intent to defraud any insurance company or another person, files a statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact, material thereto, commits a fraudulent insurance act, which is a crime, subject to criminal prosecution and [NY: substantial] civil penalties. In LA, ME, TN and VA, insurance benefits may also be denied.

### APPLICABLE IN CALIFORNIA

For your protection, California law requires the following to appear on this form: Any person who knowingly presents a false or fraudulent claim for payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

### APPLICABLE IN COLORADO

It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policy holder or claimant for the purpose of defrauding or attempting to defraud the policy holder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

### APPLICABLE IN THE DISTRICT OF COLUMBIA

Warning: It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits, if false informaiton materially related to a claim was provided by the applicant.

### APPLICABLE IN FLORIDA

Persuant to S. 817.234, Florida Statutes, any person who, with the intent to injure, defraud, or deceive any insurer or insured, prepares, presents, or causes to be presented a proof of loss or estimate of cost or repair of damaged property in support of a claim under an insurance policy knowing that the proof of loss or estimate of claim or repairs contains any false, incomplete, or misleading information concerning any fact or thing material to the claim commits a felony of the third degree, punishable as provided in S. 775.082, S. 775.083, or S. 775.084, Florida Statutes.

### APPLICABLE IN HAWAII

For your protection, Hawaii law requires you to be informed that presenting a fraudulent claim for payment of a loss or benefit is a crime punishable by fines or imprisonment, or both.

### APPLICABLE IN IDAHO

Any person who knowingly and with the intent to injure, defraud, or deceive any insurance company files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

### APPLICABLE IN INDIANA

A person who knowingly and with intent to defraud an insurer files a statement of claim containing any false, incomplete, or misleading information commits a felony.

### APPLICABLE IN KANSAS

Any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written statement as part of, or in support of, an application for the issuance of , or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act.

---

ACORD 3 (2011/07)    E2906093                    **Page 3 of 4**

BRCOSA000188

### APPLICABLE IN MARYLAND

Any person who knowingly and willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly and willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

### APPLICABLE IN MINNESOTA

A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

### APPLICABLE IN NEVADA

Pursuant to NRS 6868A.291, any person who knowingly and willfully files a statement of claim that contains false, incomplete or misleading information concerning a material fact is guilty of a felony.

### APPLICABLE IN NEW HAMPSHIRE

Any person who, with purpose to injure, defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638:20.

### APPLICABLE IN OHIO

Any person who, with intent to defraud or knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

### APPLICABLE IN OKLAHOMA

WARNING:  Any person who knowingly and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

### APPLICABLE IN WASHINGTON

It is a crime to knowingly provide false, incomplete, or misleading information to an insurance company for the purpose of defrauding the company.  Penalties include imprisonment, fines and denial of insurance benefits.

BRCOSA000189

# ⁜AIA® Document A101™ – 2007

## Standard Form of Agreement Between Owner and Contractor where the basis of payment is a Stipulated Sum

AGREEMENT made as of the Ninth day of January in the year Two Thousand Twelve
*(In words, indicate day, month and year.)*

BETWEEN the Owner:
*(Name, legal status, address and other information)*

Equity One (Florida Portfolio) Inc., General Corporation
1600 NE Miami Gardens Drive
North Miami Beach, Florida 33179
Telephone Number: 305-672-1234
Fax Number: 786-523-1460

and the Contractor:
*(Name, legal status, address and other information)*

Etterson Development Corporation, Subchapter S Corporation
1601 Hogercot Road
Middlekun, VA. 22113
Telephone Number: 804-4974900
Fax Number: 804

for the following Project:
*(Name, location and detailed description)*

Pine Ridge Redevelopment
4601 – 4695 N. University Drive
Coral Springs, FL 33607

Construction Documents Set 01: Proposed Manhalls
Construction Documents Set 02: Proposed Retail
Construction Documents Set 03: Payde & Site Renovations
Construction Documents Set 04: Outparcel Modifications
Construction Documents Set 05: Civil Set; Site Improvements

The Architect:
*(Name, legal status, address and other information)*

Dezign Tech International Associates, Inc., General Corporation
14160 Valentia Frontage Road Suite 31A
Miami Lakes, FL 33016

Telephone Number: (786) 235-9997

The Owner and Contractor agree as follows.

---

ADDITIONS AND DELETIONS:
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An Additions and Deletions Report that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

AIA Document A201™–2007, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

---

## TABLE OF ARTICLES

1   THE CONTRACT DOCUMENTS

2   THE WORK OF THIS CONTRACT

3   DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

4   CONTRACT SUM

5   PAYMENTS

6   DISPUTE RESOLUTION

7   TERMINATION OR SUSPENSION

8   MISCELLANEOUS PROVISIONS

9   ENUMERATION OF CONTRACT DOCUMENTS

10   INSURANCE AND BONDS

## ARTICLE 1   THE CONTRACT DOCUMENTS

The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement, all of which form the Contract, and are as fully a part of the Contract as if attached to this Agreement or repeated herein. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. The Contractor and Owner may not claim a right to rely upon any representation not set forth in the Contract Documents, and they hereby waive such rights, if any. The Contract may be amended or modified only by a written Modification. The Contract Documents shall not be construed to create a contractual relationship of any kind (1) between the Architect, or the Owner's Representative, and Contractor, (2) between the Owner and a Subcontractor or sub-subcontractor, material or equipment supplier or vendor, etc., (3) between the Owner and Architect or (4) between any persons or entities other than the Owner and Contractor. An enumeration of the Contract Documents, other than a Modification, appears in Article 9.

## ARTICLE 2   THE WORK OF THIS CONTRACT

The Contractor shall fully execute the Work described in the Contract Documents, except as specifically indicated in the Contract Documents to be the responsibility of others.

§ 2.1 The Work shall be a complete job including but not limited to providing all permits, licenses, fees, taxes, dumping fees, insurance, clean-up, labor, materials, equipment, supervision, delivery, storage, hauling, insuring, and installation of the materials as well as related and incidental work necessary to complete the Work in accordance with all applicable Legal Requirements (as defined in Section 2.2) and the Contract Documents (as defined in Article 1). In addition, Contractor will secure and pay for all necessary approvals, easements, assessments and charges required for the use or occupancy of permanent structures or permanent changes in existing facilities including the building permit and trade permits. To the extent that Owner's cooperation in this effort is required, it will not be unreasonably withheld.

§ 2.2 At no additional cost to the Owner, the Contractor agrees to construct the Project in accordance with the requirements of the Contract Documents, and with the highest construction industry standards and practices for furnishing and installing the Work in accordance with the Contract Documents and shall perform the Work in compliance with all applicable federal, state and local laws, codes, ordinances, regulations and orders, as well as applicable regulations of any other body with jurisdiction over the Project ("Legal Requirements"). The Contractor shall inform itself fully of all Legal Requirements bearing on performance of the Work, and shall include in all of its subcontracts with Subcontractors

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 08:56:32 on 03/23/2012 under Order No.6808326712_1 which expires on 08/29/2012, and is not for resale.
User Notes:   (1357522735)

Init.   1

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 08:56:32 on 03/23/2012 under Order No.6808326712_1 which expires on 08/29/2012, and is not for resale.
User Notes:   (1357522735)

Init.   2





an obligation for its Subcontractors to similarly comply with all Legal Requirements bearing on performance of the Work. The Owner and Owner's Representative shall be under no duty to the Contractor or to Subcontractors to observe them of applicable Legal Requirements, except as such obligations are imposed on Owner and Owner's Representative by law.

§ 2.3 The Owner and the Contractor agree that the Owner has selected the Contractor for this Project because of the Contractor's special expertise in constructing similar projects. Before executing this Agreement, and before commencing the Work, the Contractor carefully reviewed all Contract Documents and Legal Requirements. The Contractor understands that the Work requires all construction necessary to reach a completed and functioning Project, notwithstanding, among other things, (i) any condition at the site differing from those conditions Contractor believes exist at the site or which may be indicated in the Drawings, Specifications and Contract Documents, or (ii) any errors or omissions in the Drawings, Specifications and Contract Documents. Therefore, the Contractor represents that if it encounters any differing site conditions, or if the Drawings, Specifications, or Contract Documents are incomplete, or if there are any errors or omissions in the Drawings, Specifications or Contract Documents, the Contractor shall report them promptly to the Owner.

§ 2.4 The drawings, specifications and other documents furnished to the Contractor are the property of the Owner.

### ARTICLE 3   DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

§ 3.1 The date of commencement of the Work shall be the date of this Agreement unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Owner. *(Insert the date of commencement if it differs from the date of this Agreement or, if applicable, state that the date will be fixed in a notice to proceed.)*

January 09, 2012

If, prior to the commencement of the Work, the Owner requires time to file mortgages and other security interests, the Owner's time requirement shall be as follows:

§ 3.2 The Contract Time shall be measured from the date of commencement.

§ 3.3 The Contractor shall achieve Substantial Completion of the entire Work not later than (   ) days from the date of commencement, or as follows: *(Insert number of calendar days. Alternatively, a calendar date may be used when coordinated with the date of commencement. If appropriate, insert requirements for earlier Substantial Completion of certain portions of the Work.)*

The Contractor shall achieve Substantial Completion of the entire Work not later than June 30, 2012.

| Portion of Work | Substantial Completion Date |
|---|---|

, subject to adjustments of this Contract Time as provided in the Contract Documents. *(Insert provisions, if any, for liquidated damages relating to failure to achieve Substantial Completion on time or for bonus payments for early completion of the Work.)*

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 00:00:00 on 00/00/0000 under Order No.0000000000_1 which expires on 00/00/0000, and is not for resale.
User Notes:

---

§ 3.4 Contractor represents and warrants to Owner that the Construction Schedule contains allowances for delays caused by Owner and Owner's Representative's performance of its obligations under the Contract Documents, and that no claim for delay shall be made as a result of rain, snow, cold or other weather conditions, unless expressly agreed to in writing by the Owner; provided, however, that should Contractor be delayed or hindered in or prevented from, the satisfaction of its obligations under the Contract Documents by reason of Force Majeure conditions (hurricane, tornado, flood, tsunami) ("Force Majeure"), then Contractor's performance of its obligations hereunder shall be excused for the period of the delay, and the period of the performance of its obligations hereunder shall be extended for a period equivalent to the period of such delay. Contractor shall not be entitled to claim a Force Majeure delay unless Contractor delivers written notice to Owner no later than two (2) business days after the occurrence of the delay which notice shall specify the exact nature of the delay and estimated period of delay and otherwise comply with the requirements of Section 8.1.5 of AIA Document A201-2007.

**Fifty Two**

### ARTICLE 4   CONTRACT SUM

§ 4.1 The Owner shall pay the Contractor the Contract Sum in current funds for the Contractor's performance of the Contract. The Contract Sum shall be Two Million Five Hundred Fifty Two Thousand Nine Hundred Seventy-nine Dollars and Zero Cents ($2,552,979.00), subject to additions and deductions as provided in the Contract Documents.

($ 2,552,979.00)

§ 4.2 The Contract Sum is based upon the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner: : The Contractor shall perform all Work involved in the performance of this Agreement within the Contract Sum.   Owner has the right to delete portions of this Work based on breakdown attached as Owner's "A Schedule of Values (Exhibit "A"), and to reduce the Contract Sum accordingly.

*(State the numbers or other identification of accepted alternates. If the bidding or proposal documents permit the Owner to accept other alternates subsequent to the execution of this Agreement, attach a schedule of such other alternates showing the amount for each and the date when that amount expires.)*

| Item | Units and Limitations | Price Per Unit ($0.00) |
|---|---|---|

§ 4.3 Unit prices, if any:
*(Identify and state the unit price; state quantity limitations, if any, to which the unit price will be applicable.)*

§ 4.4 Allowances included in the Contract Sum, if any:
*(Identify allowance and state exclusions, if any, from the allowance price.)*

| Item | Price |
|---|---|

### ARTICLE 5   PAYMENTS

§ 5.1 PROGRESS PAYMENTS

§ 5.1.1 Based upon Applications for Payment submitted to the Owner by the Contractor and Certificates for Payment issued by the Owner, the Owner shall make progress payments on account of the Contract Sum to the Contractor as provided below and elsewhere in the Contract Documents.

§ 5.1.2 The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:

§ 5.1.3 Provided that an Application for Payment is received by the Owner not later than the 10 day of a month, the Owner shall make payment of the certified amount to the Contractor not later than the 25 day of the same month. If an Application for Payment is received by the Owner after the application date fixed above, payment for any

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 00:00:00 on 00/00/0000 under Order No.0000000000_1 which expires on 00/00/0000, and is not for resale.
User Notes:

BRCOSA000191

unobligated amounts shall be made by the Owner no later than (10) days after the Owner receives the Application for Payment.

*(Federal, state or local laws may require payment within a certain period of time.)*

**§ 5.1.4** Each Application for Payment shall be based on the most recent schedule of values submitted by the Contractor in accordance with the Contract Documents. The schedule of values shall allocate the entire Contract Sum among the various portions of the Work. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy as the Owner may require. This schedule, unless objected to by the Owner, shall be used as a basis for reviewing the Contractor's Applications for Payment.

**§ 5.1.5** Applications for Payment shall show the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment.

**§ 5.1.6** Subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

.1 Take that portion of the Contract Sum properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Work by the share of the Contract Sum allocated to that portion of the Work in the schedule of values, less retainage of ten percent (10%). Pending final determination of cost to the Owner of changes in the Work, amounts not in dispute shall be included as provided in Section 7.3.9 of AIA Document A201™–2007, General Conditions of the Contract for Construction.

.2 Add that portion of the Contract Sum properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the completed construction (or, if approved in advance by the Owner, suitably stored off the site at a location agreed upon in writing), less retainage of ten percent (10 %);

.3 Subtract the aggregate of previous payments made by the Owner; and

.4 Subtract amounts, if any, for which the Owner has withheld or nullified a Certificate for Payment as provided in Section 9.5 of AIA Document A201–2007.

**§ 5.1.7** The progress payment amount determined in accordance with Section 5.1.6 shall be further reduced under the following circumstances:

.1 Add, upon Substantial Completion of the Work, a sum sufficient to increase the total payments to the full amount of the Contract Sum, less such amounts as the Owner shall determine for incomplete Work, retainage applicable to such work and unsettled claims; and (Section 9.8.5 of AIA Document A201–2007 requires release of applicable retainage upon Substantial Completion of Work if bonds are involved.)

.2 Add, if final completion of the Work is thereafter materially delayed through no fault of the Contractor, any additional amounts payable in accordance with Section 9.10.3 of AIA Document A201–2007.

**§ 5.1.8** Retainage shall be as follows: Retention of ten percent (10%) of the amount set forth in column G of the AIA G703. Total Completed and Stored to Date, shall be withheld from each progress payment. After Contractor has reached requirements for Substantial Completion, Retainage of ten percent (10%) shall continue to be withheld from each progress payment, in addition to any reserve withheld pursuant to Paragraph 3.4 hereunder.

**§ 5.2 FINAL PAYMENT**

**§ 5.1.9** Except with the Owner's prior approval, the Contractor shall not make advance payments to suppliers for materials or equipment which have not been delivered and stored at the site.

**§ 5.2.1** Final payment, constituting the entire unpaid balance of the Contract Sum, including any retainage, shall be made by the Owner to the Contractor no later than thirty (30) days after certification of all of the following:

.1 the Contractor has fully performed the Contract except for the Contractor's responsibility to correct Work as provided in Section 12.2.2 of AIA Document A201-2007 and to satisfy other requirements, if any, which extend beyond final payment; and
.2 a final Certificate for Payment has been issued by the Owner.

**§ 5.2.2** The Owner's final payment to the Contractor shall be made no later than 30 days after the issuance of the Owner's final Certificate for Payment, or as follows:

Upon completion of all LL's work and upon submission and acceptance by Owner of all required closeout documents including but not limited to:

1. General Contractors Notarized Original Affidavit of Partial Payment in a form satisfactory to Owner. All Subcontractors and Material Suppliers Notarized Affidavit of Partial Payment in a form satisfactory to Owner.
2. General Contractors Notarized Original Affidavit of Final Payment in a form satisfactory to Owner. All Subcontractors and Material Suppliers Notarized Affidavit of Final Payment in a form satisfactory to Owner.
3. Receipt and acceptance by Owner of all Closeout Documents as prescribed in the Contract Documents.
4. Evidence that all work has been inspected and accepted by governing building authorities.
5. Evidence that all work pertaining to the LL's work Letter / for all phases of work within the Pine Ridge Redevelopment Project has been inspected and accepted by Owner and Tenant

**ARTICLE 6 DISPUTE RESOLUTION**

**§ 6.1 INITIAL DECISION MAKER**

The Architect will serve as Initial Decision Maker pursuant to Section 15.2 of AIA Document A201–2007, unless the parties appoint below another individual, not a party to this Agreement, to serve as Initial Decision Maker.

*(If the parties mutually agree, insert the name, address and other contact information of the Initial Decision Maker, if other than the Architect.)*

**§ 6.2 BINDING DISPUTE RESOLUTION**

For any Claim subject to, but not resolved by, mediation pursuant to Section 15.3 of AIA Document A201–2007, the method of binding dispute resolution shall be as follows:

*(Check the appropriate box. If the Owner and Contractor do not select a method of binding dispute resolution below, or do not subsequently agree in writing to a binding dispute resolution method other than litigation, Claims will be resolved by litigation in a court of competent jurisdiction.)*

[X] Arbitration pursuant to Section 15.4 of AIA Document A201–2007

[ ] Litigation in a court of competent jurisdiction

[ ] Other *(Specify)*

**ARTICLE 7 TERMINATION OR SUSPENSION**

**§ 7.1** The Contract may be terminated by the Owner or the Contractor as provided in Article 14 of AIA Document A201–2007.

**§ 7.2** The Work may be suspended by the Owner as provided in Article 14 of AIA Document A201–2007.

**ARTICLE 8 MISCELLANEOUS PROVISIONS**

**§ 8.1** Where reference is made in this Agreement to a provision of AIA Document A201–2007 or another Contract Document, the reference refers to that provision as amended or supplemented by other provisions of the Contract Documents.

BRCOSA000192

§ 8.2 Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.
(Insert rate of interest agreed upon, if any.)

%

§ 8.3 The Owner's representative:
(Name, address and other information)

Ken Choquette
1609 Huguenot Road
Midlothian, VA 23113
Telephone Number: 305-672-1234
Fax Number: 786-538-1460

Email Address: kchoquette@epiqus.net

§ 8.4 The Contractor's representative:
(Name, address and other information)

Chris Johnson
1609 Huguenot Road
Midlothian, VA 23113
Telephone Number: 804-897-6900
Fax Number: 804

§ 8.5 Neither the Owner's nor the Contractor's representative shall be changed without ten days written notice to the other party.

§ 8.6 Other provisions:

ARTICLE 9   ENUMERATION OF CONTRACT DOCUMENTS
§ 9.1 The Contract Documents, except for Modifications issued after execution of this Agreement, are enumerated in the sections below.

§ 9.1.1 The Agreement is this executed AIA Document A101-2007, Standard Form of Agreement Between Owner and Contractor.

§ 9.1.2 The General Conditions are AIA Document A201-2007, General Conditions of the Contract for Construction.

§ 9.1.3 The Supplementary and other Conditions of the Contract:

| Document | Title | Date | Pages |
|---|---|---|---|

§ 9.1.4 The Specifications:
(Either list the Specifications here or refer to an exhibit attached to this Agreement.)
Title of Specifications exhibit for Pine Ridge Redevelopment are included within Drawings prepared by: DTI Architect  dated (exact vary, see Exhibit "C")

| Section | Title | Date | Pages |
|---|---|---|---|

§ 9.1.5 The Drawings:
(Either list the Drawings here or refer to an exhibit attached to this Agreement.)
Exhibit "C" attached

| Number | Title | Date | Pages |
|---|---|---|---|

§ 9.1.6 The Addenda, if any:

| Number | Date | Pages |
|---|---|---|

Portions of Addenda relating to bidding requirements are not part of the Contract Documents unless the bidding requirements are also enumerated in this Article 9.

§ 9.1.7 Additional documents, if any, forming part of the Contract Documents:
.1   AIA Document E201™-2007, Digital Data Protocol Exhibit, if completed by the parties, or the following:

.2   Other documents, if any, listed below:
(List here any additional documents that are intended to form part of the Contract Documents. AIA Document A201-2007 provides that bidding requirements such as advertisement or invitation to bid, Instructions to Bidders, sample forms and the Contractor's bid are not part of the Contract Documents unless enumerated in this Agreement. They should be listed here only if intended to be part of the Contract Documents.)

See Exhibits "A, B, C, D, E-1a, E-2a, F-1b, F-2b, and G attached

ARTICLE 10   INSURANCE AND BONDS
The Contractor shall purchase and maintain insurance and provide bonds as set forth in Article 11 of AIA Document A201-2007.
(State bonding requirements, if any, and limits of liability for insurance required in Article 11 of AIA Document A201-2007.)

| Type of insurance or bond | Limit of insurance or bond amount ($0.00) |
|---|---|
| 100%   Payment and Performance Bond | $2,530,979.00 |

This Agreement entered into as of the day and year first written above.

| OWNER (Signature) | CONTRACTOR (Signature) |
|---|---|
| —See attached digital signatures page— | —See attached digital signatures page— |
| Ken Choquette, Vice President of Construction | Chris Johnson, President |
| (Printed name and title) | (Printed name and title) |

X   Arthur C Gallagher VP
for Equity One (Florida Portfolio) Inc.

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 09:52:34 on 02/09/2013 under Order No.5192197412_1 which expires on 02/20/2013, and is not for resale.
User Notes:   (2087273)

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 09:52:34 on 02/09/2013 under Order No.5192197412_1 which expires on 02/20/2013, and is not for resale.
User Notes:   (2087273)

Digital Signatures Page

Ken
Choquette

Digitally signed by Ken Choquette
DN: cn=Ken Choquette, o=EEDP3,
ou,
email=kchoquette@edpmiami.inc,
c=US
Date: 2012.03.13 16:57:35 -04'00'



## BID SCHEDULE OF VALUES - BUILDINGS

PINE RIDGE SQUARE - Redevelopment
Coral Springs, FL

| Description | Materials | Retail | Outparcel | Facade |
|---|---|---|---|---|

AIA Document A101™ – 2007. Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 16:55:34 on 03/13/2012 under Order No.5180055232_1 which expires on 02/20/2013, and is not for resale.
User Notes: (1349787286)

Init. / 9

PAVING EQUIPMENT

**TOTAL ON-SITE COST** $102,954.94

Unit price per lineal foot for type 'D' curbing: $9.50 plf
Additional cost to provide a P&P Bond on this project: $22,000.00

**PART IV: BID SCHEDULE OF VALUES: GRAND TOTAL COST**

| | |
|---|---|
| TOTAL MARSHALLS COST | $1,558,848.33 |
| TOTAL RETAIL COST | $437,388.59 |
| TOTAL OUTPARCEL COST | $59,089.87 |
| TOTAL FACADE COST | $281,696.67 |
| TOTAL SITE COST | $102,954.94 |
| GRAND TOTAL COST | $2,539,978.00 |
| REVISED COST INCLUDING THE P&P BOND | $2,559,978.00 |

**BID SCHEDULE OF VALUES - BUILDINGS**

| | Marshalls | Retail | Outparcel | Facade |
|---|---|---|---|---|
| TOTAL FINISH WITH ACCESSORIES | $4,490.00 | $0.00 | $0.00 | $0.00 |
| OVERHEAD DOOR EQUIPMENT | $3,740.00 | $0.00 | $0.00 | $0.00 |
| PLUMBING (ROUGH) | $20,500.00 | $11,000.00 | $0.00 | $0.00 |
| HVAC | $32,750.00 | $16,750.00 | $0.00 | $0.00 |
| FIRE SPRINKLER SYSTEM | $19,500.00 | $7,500.00 | $0.00 | $0.00 |
| BUILDING AUTOMATION & AUTOMATED TEMPERATURE CONTROL | $14,450.00 | $0.00 | $0.00 | $0.00 |
| ELECTRICAL (BLDG) | $69,950.00 | $53,775.00 | $0.00 | $2,400.00 |
| LIGHTING | $118,650.00 | $4,600.00 | $0.00 | $0.00 |
| FIRE DETECTION/ALARM SYSTEM | $12,500.00 | $1,100.00 | $0.00 | $0.00 |
| **SUBTOTALS** | **$1,558,848.33** | **$437,388.59** | **$59,089.87** | **$281,696.67** |
| | $0.00 | $0.00 | $0.00 | $0.00 |

**BID SCHEDULE OF VALUES - SITE IMPROVEMENTS**

PINE RIDGE SQUARE - Redevelopment
Coral Springs, FL

| Section Description | Quantities | Unit Cost | Cost Extension |
|---|---|---|---|
| SURVEYING/STAKING/AS-BUILT + ONSITE | | | $4,000.00 |
| CLEARING | | | $47,000.00 |
| DEMO | | | $70,500.00 |
| GENERAL CONDITIONS | | | $70,000.00 |
| DEWATERING/SITE | | | $8,500.00 |
| PAVING | | | $0.00 |
| BOND FIELD | | | $0.00 |
| BUILDERS RISK INSURANCE | | | $0.00 |
| SITE EXCAVATION | | | $0.00 |
| UTILITY RELOCATION | | | $0.00 |
| BUILDING DEMOLITION | | | $47,000.00 |
| EARTHWORK/SITE EXCAVATING/FILL | | | $8,500.00 |
| EROSION CONTROL | | | $5,475.00 |
| FILL/GRADING/PAVING | | | $33,500.00 |
| PAVING | | | $9,790.00 |
| CURBING | | | $3,500.00 |
| PAVING/MARKING/FENCING | | | $18,000.00 |
| LANDSCAPE/IRRIGATION | | | $17,875.00 |
| SITE LIGHTING | | | $0.00 |
| SITE UTILITIES/SIGNAGE | | | $0.00 |
| STORM DRAINAGE/SITE/PIPING/CB/BOX | | | $14,000.00 |
| SITE IMPROVE | | | $0.00 |
| JOINT SEALANTS | | | $0.00 |
| PAINTING | | | $0.00 |
| PLUMBING | | | $0.00 |



EDC

16921 Hopwood Road
Richmond, Virginia 23113

(804) 897-6000
(804) 897-6001 FAX

**Pine Ridge Square**

BUILDING: Pine Ridge Plaza
LOCATION: Coral Springs, FL

BID DATE: 10-21-11
PLANS: DTI

**CLARIFICATIONS TO CONTRACTOR'S SCOPE OF WORK**

1  Pricing is good for 30 days due to volatile material pricing.
2  Contractor shall not be required to waive lien rights prior to payment.
3  We assume there is adequate water supply to accommodate the specified fire sprinkler requirements.
4  Owner we exclude the cost to increase any water lines or to provide any supplemental pumps or tanks.
4  At exterior signage and logo's to be supplied and installed by the Owner.
6  We assume that all on site non organic materials is suitable for structure fill, therefore no allowance has been made for the exportation of unsuitable or importation of replacement fill material.
6  All incoming telephone wiring to be by others.
7  This proposal is contingent upon EDC and the owner's ability to negotiate a mutually acceptable contract.
8  We acknowledge Addendums 1 thru 4.
0  We acknowledge RFI's 1 thru 8.
10  We are bidding this project under the assumption that all work will be constructed simultaneously.
11  We assume using roof tile from inside stock for facade portion of work. New tile to be used for retail and Marshall's portion of project.
12  Work to be performed during normal daytime business hours.
13  We have assumed 98° tall roof screen panels based on HVAC specs.
14  We accept the Marshall's spec book as submitted on 10-10-11.

**EXCLUSIONS TO CONTRACTOR'S SCOPE OF WORK**

1  All utility connection, tap, meter, and/or other multiple or governmental impact fees.
2  The costs for special inspections, soils testing, third party inspections or analysis and quality control testing.
3  Testing, removal, and replacement of rock from site.
4  Testing, removal, and replacement of unsuitable/contaminated materials or soils from site.
5  Dewatering and or soil amendment programs that may be required to meet design compaction requirements.
6  Cost of fire alarm and building permit.
7  Relocation of existing utilities unless noted on drawings.
8  Asbestos or other hazardous material testing or removal.
9  Landscape bonds.
10  Builders risk insurance.
11  Covers use of contractors dumpsters.
12  Fire sprinkler in exterior canopies and awnings.
13  Winter construction costs and techniques.

**EXHIBIT "J"**
**INSURANCE REQUIREMENTS**

During the performance of the work under this Agreement, the Contractor shall purchase from and maintain with a company or companies approved by the Owner and lawfully authorized to do business in the jurisdiction in which the project is located, insurance as described herein with limits as shown for the respective coverages. The insurance policies shall name the Owner, as additional insured.

Prior to commencement of any work, certificate of insurance acceptable to the Owner shall be filed with the Owner evidencing the specific coverages and containing a provision that coverages afforded under the policies will not be changed, cancelled or allowed to expire until at least 30 days prior to certified written notice has been given to the Owner.

The following coverages shall be provided:

A.  Workman's Compensation and Occupational Disease Insurance, including Employer's Liability Insurance, complying with the laws of the State in which the work is to be performed or elsewhere as may be required.

B.  Comprehensive General Liability Insurance, including Contractual Liability, Explosions, Collapse and Underground Damage Liability, Products-Completed Operations Liability, as well as coverage on all Contractor's equipment owned, hired or used on the job, with limits and less than:

    Bodily Injury        $2,000,000 each occurrence
    Property Damage   $1,000,000 each occurrence
    Personal Injury     $2,000,000 each occurrence

C.  Automobile Liability Insurance, including Contractual Liability covering all motor vehicles owned, hired or used on the job with limits not less than:

    Bodily Injury & Property Damaged Combined  $1,000,000 each occurrence

D.  "Completed Operations" coverage for a period of one (1) year following completion of all work at such limits as stipulated herein.

E.  "Contractual Liability" Insurance for the term of this Agreement to issue CONTRACTOR'S indemnity under the provisions in the Agreement.

F.  Excess Liability Insurance, Umbrella Form, with limits not less than:

    Bodily Injury & Property Damage Combined  $5,000,000 each occurrence

FORM OF AGREEMENT         00500-12

EXHIBIT "G" (continued)

G. Contractor's/Subcontractor's Excavation Insurance for any Contractor/Subcontractor performing any excavation must have Explosion, Collapse and Underground Damage Liability Insurance coverage.

The Contractor shall provide a sample form of policy for the Owner's approval. The policy shall specifically name the Owner as named insured.

The Contractor shall maintain such coverages as are described above for the length of the contract period, including any warranty or guarantee periods as applicable.

FORM OF AGREEMENT          00500-12

---

From: Josh Weiss
To: Bryan White
Subject: Re: PINE RIDGE PROJECT
Date: Wednesday, December 28, 2011 7:16:17 PM

Approved to proceed. Formal LOI will be issued next week. I'd like that AT&T meeting scheduled for the earliest possible day next week. Please get back to me tomorrow with meeting day/time and whom will be representing EDC. Also, please begin preparing a schedule for our review prior to the kickoff meeting.

This is an important project – lets make each other look good.

Josh

On Dec 28, 2011, at 4:31 PM, "Bryan White" <bgwhite@edcweb.com> wrote:

Per our conversation, please find the revised proposal including the additional cost for the P&P bond attached.

From: Bryan White
Sent: Wednesday, December 28, 2011 3:45 PM
To: Josh Weiss <jweiss@southerra.com> (jweiss@southerra.net)
Subject: PINE RIDGE PROJECT

Josh,

The bond is an add of $22K. I am not sure Jeff's reason for not including the cost. How can we handle that?

Regarding the curb pricing if appears that we can get down to $9.50 per ft. If the quantity is more than 500 additional ft. and able to be handled with one of two mobilizations. In the grand scheme of things we aren't talking about much money so I will work with you on that. We just don't want to do 20 ft. one day and leave and then do 100 ft. etc... piece meal.

Regarding our mobilization, we propose to be onsite by January 9th. I would like to schedule a kickoff meeting that week or early the following week. The proposed turnover date would remain the 1st of June with any proposed LD starting 1 week later if the permit is release prior to the 9th. If not, the schedule would push day for day.

Let me know your thoughts so we can put this thing to bed and get moving.

I will get back to you shortly on the proposed super.

BRCOSA000197

EQUITY ONE INC.

PROJECT MANUAL
For
PINE RIDGE PLAZA REDEVELOPMENT
4601-4695 N. UNIVERSITY DRIVE.
Coral Springs, FL 33067

**Owner:**
Equity One (Florida Portfolio) Inc.
Ken Choquette, V.P. of Construction
1600 N. E. Miami Gardens Drive
North Miami Beach, Florida 33179
(305) 672-1234 Phone
(786) 528-1460 Fax

**Architect:**
Design Tech International Assocites, Inc.
14125 NW 80th Avenue, Suite 303
Miami Lakes, FL 33016
(786) 235-9097 Phone
(305) 362-4420 Fax

Date: November 18, 2011

Thanks for the work. I look forward to another successful project.

PS Goodwill can start their fixtures as soon as they are ready. We will work the balance of the work including lights and punchlist items around them if needed.

Thanks,

<20111228163123226.pdf>



# DIVISION 0

## BIDDING AND CONTRACT REQUIREMENTS
### TABLE OF CONTENTS

PROJECT MANUAL
Pine Ridge Plaza Redevelopment

Coral Springs, FL.

| SECTION TITLE | Pages |
|---|---|

**CONDITIONS OF THE CONTRACT**

**DIVISION 0 - BIDDING AND CONTRACT REQUIREMENTS**

| | |
|---|---|
| 00005 - Table of Contents | 1 |
| 00010 - Introduction | 1 |
| 00101 - Instructions to Bidders | 4 |
| 00300 - Bid Form | 4 |
| 00700 - General Conditions | 1 |

**THE SPECIFICATIONS**

**DIVISION 1 - GENERAL REQUIREMENTS**

| | |
|---|---|
| 01210 - Procedures and Performances | 3 |
| 01340 - Submittals | 3 |
| 01500 - Temporary Facilities | 3 |
| 01600 - Products | 2 |
| 01630 - Product Options & Substitutions | 4 |
| 01700 - Project Closeout | 4 |
| 02060-Construction & Demolition Waste Management | 3 |

DIVISION 2 – 16 - See Construction Drawings

TABLE OF CONTENTS

Page 00005-1

INTRODUCTION

---

SECTION 00010

The project site is located at: *4601-4695 N. UNIVERSITY DRIVE*

The work to be performed under this Contract consists of:

Construction Documents Set #1: Proposed Marshalls

Construction Documents Set#2: Proposed Retail

Construction Documents Set #3: Façade & Site Renovations

Construction Documents Set #4: Outparcel Modifications

Construction Documents Set #5: Civil Set; Site Improvements

Work to be performed (by others) under separate contracts includes:

N/A

END OF SECTION 00010

INSTRUCTIONS TO BIDDERS
SECTION 00100

A. BID PROPOSAL – Bids will be received by the Owner, *Equity One Realty & Management, Inc., Attention: Josh Huber, Construction Project Coordinator, 1550 N.E. Miami Gardens Drive Suite 200, North Miami Beach, Florida 33179. Email: Jhuber@equityonemd.com. Tel: (305) 623-1314 Fax: (786) 528-1460.* ON or BEFORE December 12, 2011 by 3:00 p.m. EST

Bids may be transmitted electronically to jhuber@equityone.net or by facsimile, as long as a fully executed original Bid Form is received within 24 hours of the bid time. Bids will not be accepted beyond the Bid Time.

Bids must be submitted on the Bid Form provided. Bids submitted in any other form other than the Bid Form will not be accepted.

B. INVITED BIDDERS –

Moss Construction
Bob L. Moss
2101 N. Andrews Ave., Ste 300
Ft. Lauderdale, FL 33311
PH: (954) 524-5678
FX: (954) 524-5677

J. Raymond Construction
Jim Roemer
465 W. Warm Avenue
Longwood, FL 32750
PH: (407) 862-6096
FX: (407) 712-6873

RDC
Jeff Duffy
1600 Hogstreet Road
Midlothian, Virginia 23113
PH: (804) 897-0900 Office
FX: (804) 897-0901 Fax.

Turner Construction Company
Dave Robinson
1000 NW 57th Court
Miami, FL 33126
PH: (786) 621-9159
FX: (786) 621-9155

Stiles Construction
Russell J. Hills
301 E. Las Olas Blvd
Fort Lauderdale, FL 33301
PH: (954) 627-9366
FX: (954) 627-9192

INSTRUCTIONS TO BIDDERS                Page 00100-1

---

All items in the Project Manual, Landlord Work Letter and Plans in PDF format will be provided.

D. VISIT TO SITE – Each bidder shall visit the site of the proposed work before submitting proposal and shall be fully acquainted with all conditions relating to the work. It will be assumed that the bidder has investigated and is satisfied as to the conditions to be encountered, as to the character, quality and quantities of work to be performed.
***MANDATORY PRE-BID SITE MEETING ADJACENT TO FRESH MARKET ON 11/28/11 @ 10:00 AM – CONSULTANTS WILL BE ON SITE FOR A BRIEF BIT OPPORTUNITY ***

C. INTERPRETATION OF BID DOCUMENTS – Questions, requests for clarification, interpretations or other inquiries related to the bid documents shall be submitted in writing at least (5) days prior to the bid date and shall be directed to *Equity One Realty & Management, Inc., Josh Huber, Construction Project Coordinator, 1550 N.E. Miami Gardens Drive Suite 200, North Miami Beach, Florida, 33179. Fax (786) 528-1460, email Jhuber@equityone.net*

Any interpretation shall be issued to all bidders in the form of a written addendum. Only a written interpretation or correction by addendum shall be binding. Bidders shall not rely on information given by any other method.

D. FORM OF PROPOSAL – It is the Owner's intent and preference to award a single contract for the *Pine Ridge Plaza Redevelopment*

It is intended that each lump sum amount listed on the Bid Form include all costs related to that portion of the project, including a pro-rata share of the Contractor's General Conditions expenses, Overhead and Profit, Payment & Performance Bond Premium and Liability Insurance costs.

E. CORRELATION OF CONSTRUCTION PLANS AND SPECIFICATIONS - Division 0 (Bidding and Contract Requirements) and Division 1 (General Requirements) of the Project Manual are applicable to all portions of the project.

The Technical Specifications for *Pine Ridge Plaza Redevelopment* are incorporated into the construction plans.

I. The lump sum amount entered on the Bid Form in the line item labeled "Grand Total Cost" for *Pine Ridge Plaza Redevelopment* shall include all work shown on the Architectural & Civil plans labeled:
(1) Proposed Marshalls (2) Proposed Retail (3) Façade & Site Renovations (4) Out-parcel Modifications (5) Pine Ridge Square Site Improvements

H. ALTERNATES - The following alternates shall be included on the Bid Form of the proposal in the spaces provided:
-1-

INSTRUCTIONS TO BIDDERS                Page 00100-2



T. Requisitions to be submitted on A.I.A. G702 and include the entire substantiating backup as required by the Owner including but not limited to any and all appropriate release of liens.

U. Safety precautions and temporary protection measures are necessary for all patrons and tenants using the *Pine Ridge Plaza*. Patrons and tenants must be provided with a safe and clean access to areas surrounding the job site at all times.

J. SUBCONTRACTORS - If requested, within 24 hours of the bid opening, Bidder shall submit to the Owner, a list of subcontractors he intends to use to perform the work. Listing of subcontractors is strictly for the purpose of assuring the Owner that only qualified and competent subcontractors will be employed on the project. If the Owner has a reasonable and substantial objection to any listed subcontractor, the Bidder will have a reasonable time to replace such subcontractor with a subcontractor acceptable to the Owner. If such replacement of a subcontractor causes an increase in the Contract sum, the Owner may, at his discretion, accept the increased Contract sum or may disqualify the Bidder and award the contract to another Bidder

K. If requested, within 24 hours of the bid opening, Bidder will submit a SCHEDULE OF VALUES in form reasonably satisfactory to Owner, setting forth the cost breakdown for all components of the work.

L. If requested, within 48 hours of the bid opening, Bidder will submit a list of his PROPOSED PROJECT STAFF, including project manager and superintendent and resumes of individuals proposed to fill such positions.

M. If requested, within 48 hours of the bid opening, Bidder will submit a CONSTRUCTION SCHEDULE in form reasonably satisfactory to Owner, such schedule designating anticipated start and completion dates for each major item of work and compliance with schedule requirements stipulated on the bid documents.

N. The contract form will be the A.I.A. #101 – 2007.

O. The Contract Duration is as follows: **150** days from notice to proceed for the concurrent completion of (1) Proposed Marshalls (2) Proposed Retail (3) Facade & Site Renovations (4) Outparcel Modifications (5) Pine Ridge Square Site Improvements.

  *7-18-12*

P. The contract will contain Liquidated Damages in the amount of $1,000.00 per day from **GREEN** *7-23-12* **6/14/12** and $3,000 per day after **6/14/12** assuming notice to proceed is provided no later then 1/1/12
*7-23-12*

Q. Each Bidder must be licensed and or registered within this State and or locale (City, County or Municipality) as required in order to procure permits and be able to conduct business in the project location.

R. If requested, within 48 hours of bid opening, Bidder will submit proof of license and or registration in form reasonably satisfactory to Owner, confirming the ability to procure permits and the ability to conduct business in the project location.

S. The primary Building Permits will be paid for by Equity One, Inc. any and all secondary or subsequent or subcontractor permits is the responsibility of the General Contractor, and is to be included in the bid.
INSTRUCTIONS TO BIDDERS                                              Page 00100-3



BRCOSA000201

BID FORM
SECTION 00300

DATE:

CONTRACTOR:

PROJECT: _Pine Ridge Plaza Redevelopment_

_4601-4693 N. University Drive, Coral Springs, FL 33067_

OWNER: _Equity One (Florida Portfolio) Inc._
_1600 N.E. Miami Gardens Dr._
_North Miami Beach, FL 33179_

Having thoroughly examined all of the bid documents, including plans and specifications, general and special conditions, instructions to bidders, form of proposal, form of contract, and any addenda acknowledged below, and having carefully examined the site conditions and all local conditions affecting the cost of the work, the undersigned hereby proposes to perform all work as necessary and required to complete all IMPROVEMENTS in accordance with all referenced bid and contract documents for the following all inclusive lump sum amount. It is understood that the schedule of values is broken down into three sections as follows: (1) Proposed Marshalls (2) Proposed Retail (3) Façade & Site Renovations (4) Outparcel Modifications (5) Pine Ridge Square Site Improvements each of which is attached hereto. "Bid Schedule of Values – Grand Total Cost" below is to be filled out in its entirety at time of bid submission.

BID FORM                                                    Page 00300-1

---

BID SCHEDULE OF VALUES – GRAND TOTAL COST

| | |
|---|---|
| PROPOSED MARSHALLS | $ |
| PROPOSED RETAIL | $ |
| FAÇADE AND SITE RENOVATIONS | $ |
| OUTPARCEL MODIFICATIONS | $ |
| PINE RIDGE SQUARE SITE IMPROVEMENTS | $ |
| **GRAND TOTAL COST** ................................. | $ |
| **TOTAL BID ALTERNATE** ............................. | $ |

It is understood and agreed by the undersigned that this proposal shall not be withdrawn or altered, and shall remain in effect, for a period of thirty days from the date herein.

It is understood and agreed by the undersigned that the work shall commence within five days of receipt of Notice to Proceed from the Owner and shall be completed within time limits stipulated in the Contract Documents.

It is understood by the undersigned that the Owner reserves the right to reject any and all bids or waive any irregularity in connection therewith.

The undersigned acknowledges receipt of the following addenda and has included the cost of same in the amounts above.

1. Addendum No. _____ dated _____
2. Addendum No. _____ dated _____
3. Addendum No. _____ dated _____

Name of Bidder:

Address of Bidder:

Signature of Bidder's Authorized Representative:

_____ / _____
      (Name)                          (Title)

Date: _____

BID FORM                                                    Page 00300-2



GENERAL CONDITIONS
SECTION 00700

PART ONE - GENERAL

1.01     DESCRIPTION OF REQUIREMENTS

A.  The "General Conditions of the Contract for Construction", Document A-201, 2007
    edition as issued by the American Institute of Architects, is hereby made a part of
    these Specifications the same as if reproduced here in full.

B.  Copies of AIA Document A-201 may be examined at the offices of the Architect, and
    the Contractor is hereby specifically directed, as a condition of the Contract, to
    acquaint himself with the Articles contained therein and to notify and apprise all
    appropriate parties to the Contract as to its contents

C.  No contractual adjustments shall be due as a result of failure on the part of the
    Contractor to fully acquaint himself and all other parties to the Contract with the
    Conditions of Document A-201.

D.  The General Conditions shall be a part of all Sections of the Specifications, the same
    as if reproduced in full in each instance.

END OF SECTION 00700

BRCOSA000203

PROCEDURES AND PERFORMANCES
SECTION 01210
PART ONE - GENERAL

1.01   DESCRIPTION OF WORK

A. The types of minimum requirements for procedural and performance work of a general nature include but are not necessarily limited to the following categories:

1. Surveys and Records, Inspections, tests and reports.

2. General installation provisions.

3. Cutting and patching.

4. Cleaning and protection.

1.02   SURVEYS AND RECORDS

A. General: Establish and maintain bench marks and other dependable markers to set lines and levels for the work on the site as needed to properly locate each element of entire project. Calculate and measure required dimensions as shown (within recognized tolerances if not otherwise indicated), do not scale drawings to determine dimensions.

1.03   INSPECTIONS, TESTS AND REPORTS

A. General: Required inspection and testing services are intended to assist in determination of probable compliance of the work with requirements, but do not relieve Contractor of responsibility for those compliances, or for general fulfillment of requirements of contract documents. Specified inspections and tests are not intended to limit Contractor's quality control program. Afford reasonable access to agencies performing tests and inspections.

B. Qualifications of Testing Agencies: Except as otherwise indicated, engage independent testing laboratories specializing in required services and acceptable to the Owner and Architect.

C. Reports: Submit test/inspection reports, including agency's analysis of results and recommendation where applicable, to Architect/Engineer/Owner, except as otherwise indicated, and submit copies directly to governing authorities where required or requested.

PART 2 - PRODUCTS (not applicable)

PART 3 - EXECUTION

3.01   GENERAL INSTALLATION PROVISIONS

A. Installer's Inspection of Conditions: Require Installer of each major unit of work to inspect substrate to receive the work, and conditions under which the work will be performed, and to report (in writing to Contractor) unsatisfactory conditions. Do not proceed with the work until unsatisfactory conditions have been corrected in a manner acceptable to Installer.

B. Manufacturer's Instructions: Where installations include manufactured products, comply with manufacturer's applicable instructions and recommendations for installation, to whatever extent these are more explicit or more stringent than applicable requirements indicated in contract documents.

C. Inspect each item of materials or equipment immediately prior to installation, and reject damaged, defective items.

D. Provide attachment and connection devices and methods for securing work properly as it is installed; true to line and level, and within recognized industry tolerances if not otherwise indicated. Allow for expansions and building improvements. Provide uniform joint widths in exposed work, organized for best possible visual-effect. Refer questionable or alternative visual-effect choices to Architect/Owner for final decisions.

E. Mounting Heights: Except as otherwise indicated, mount individual units of work at industry-recognized standard mounting heights, for applications indicated. Refer questionable mounting height choices to Architect/Engineer/Owner for final decision.

BRCOSA000204

3.02  CUTTING AND PATCHING

A. General: Do not cut-and-patch structural work in a manner resulting in reduction of load-carrying capacity or load/deflection ratio; submit proposed cutting and patching to Architect/Engineer for structural approval before proceeding. Do not cut-and-patch operational elements and safety-related components in a manner resulting in reduction of capacities to perform in manner intended or resulting in decreased operational life, increased maintenance, or decreased safety. Do not cut-and-patch work in which is exposed on exterior or exposed in occupied spaces of building, in a manner resulting in reduction of visual qualities or resulting in substantial evidence of cut-and-patch work, both as judged solely by Architect/Owner. Remove and replace work, judged by Architect/Owner to be cut-and-patched in a visually unsatisfactory manner.

B. Materials: Except as otherwise indicated or approved by Architect/ Engineer/Owner, provide materials for cutting-and-patching which will result in equal-or-better work than work being cut-and-patched; in terms of performance characteristics and including visual effect where applicable. Use materials identical with original materials where feasible and where recognized that satisfactory results can be produced thereby.

C. Temporary Support and Protection: Provide adequate temporary support for work to be cut, to prevent failure. Do not endanger other work. Provide adequate protection of other work during cutting-and-patching, to prevent damage; and provide protection of the work from adverse weather exposure.

3.03  CLEANING AND PROTECTION

A. General: During handling and installation of work at project site, clean and protect work in progress and adjoining work on a basis of perpetual maintenance. Apply suitable protective covering, from damage or deterioration at time of substantial completion; otherwise, clean and perform maintenance on newly installed work as frequently as necessary through remainder of construction period. Adjust and lubricate operable components to ensure operability without damaging effects.

END OF SECTION 01210

PROCEDURES AND PERFORMANCES                Page 01210-3

---

**SUBMITTALS**
**SECTION 01340**

PART ONE - GENERAL

1.01  SUMMARY

A. Make submittals required by the Contract Documents, and review and resubmit as necessary to establish compliance with the specified requirements, all as described in this Section.

B. Related Work:
1. Documents affecting work of this Section include, but are not necessarily limited to, General Conditions, Supplementary Conditions, and Sections in Division 1 of these Specifications.
2. Individual requirements for submittals may also be described in pertinent Sections of these Specifications.
3. The process for securing approval of proposed substitutions is described in Section 01630, "Products and Substitutions."

C. Work not included:
1. Unnecessary submittals will not be reviewed by the Architect.
2. The Contractor may require his subcontractors to provide drawings, cutting diagrams, and similar information to help coordinate the Work, but such data shall remain between the Contractor and his subcontractors and will not be reviewed by the Architect unless specifically called for within the Contract Documents.

1.02  SUBMITTALS

A. Make submittals of Shop Drawings, Samples, substitution requests, and other items in accordance with the provisions of this Section.

1.03  QUALITY ASSURANCE

A. Coordination of submittals:
1. Prior to each submittal, carefully review and coordinate all aspects of each item being submitted.
2. Verify that each item and the submittal for it conform in all respects with the specified requirements.
3. By affixing the Contractor's signature to each submittal, certify that this coordination has been performed.



SUBMITTALS                Page 01340-1



PART TWO - PRODUCTS

2.01    SHOP DRAWINGS

A.  Scale and Measurements: Make Shop Drawings accurately to a scale sufficiently large to show all pertinent aspects of the item and its method of connection to the Work.

B.  Submit the number of copies, which are required to be returned, plus two copies, which will be retained by the Architect/Owner.

2.02    MANUFACTURERS LITERATURE

A.  Where contents of submitted literature from manufacturers include data not pertinent to the submittal, clearly show which portions of the contents are being submitted for review.

B.  Submit the number of copies, which are required to be returned, plus two copies, which will be retained by the Architect/Owner.

2.03    SAMPLES

A.  Provide Sample or Samples identical to the precise article proposed to be provided.

B.  Unless otherwise specified, submit three Samples, two of which will be retained by the Architect/Owner.

C.  Provide field samples and/or mockups as directed by the Architect/Owner for the following:
    1.  All finish paint colors
    2.  EIFS and/or stucco finishes, as applicable
    3.  Roof shingles and/or concrete roof tile, as applicable
    4.  Decorative columns and fascia molding
    5.  Sidewalk paver tile
    6.  Split face block and/or brick, as applicable
    7.  Pre-finished aluminum sheet metal

2.04    COLORS AND PATTERNS

A.  Unless the precise pattern is specifically called out in the Contract Documents, and whenever a choice of color or pattern is available in the specified products, submit accurate color and pattern charts to the Architect/Owner for selection.

SUBMITTALS                                                Page 01340-2

PART THREE - EXECUTION

3.01    IDENTIFICATION OF SUBMITTALS

A.  Consecutively number all submittals.
    1.  When material is resubmitted for any reason, transmit under a new letter of transmittal and with a new transmittal number.
    2.  On re-submittals, cite the original submittal number for reference.

B.  Accompany each submittal with a letter of transmittal showing all information required for identification and checking.

C.  On at least the first page of each submittal, and elsewhere as required for positive identification, show the submittal number in which the item was included.

D.  Submittal log:
    1.  Maintain an accurate submittal log for the duration of the Work, showing current status of all submittals at all times.
    2.  Make the submittal log available to the Architect/Owner for the Architect's/Owner's review upon request.

3.02    TIMING OF SUBMITTALS

A.  Make submittals far enough in advance of scheduled dates for installation to provide time required for reviews, for securing necessary approvals, for possible revisions and re-submittals, and for placing orders and securing deliveries.

B.  In scheduling, allow at least ten working days for review by the Architect/Owner following the Architect's/Owner's receipt of the submittal.

3.03    ACTION OF SUBMITTALS

A.  Architect's/Engineer's/Owner's Action: Where action and return is required or requested, Architect/Engineer/Owner will review each submittal, mark with "Action", and where possible return within two weeks of receipt. Where submittal must be held for coordination, Contractor will be so advised without delay.

    1.  Final Unrestricted Release: Work may proceed, provided it complies with contract documents, when submittal is returned marked "reviewed, no exceptions noted."
    2.  Final-But-Restricted Release: Work may proceed, provided it complies with notations and corrections on submittal and with contract documents, when submittal is returned marked "reviewed, exceptions noted."

SUBMITTALS                                                Page 01340-3



3. Returned for Re-submittal: Do not proceed with work when submittal is marked "not accepted, resubmit." Revise submittal in accordance with notations thereon, and resubmit to obtain a different action marking.

END OF SECTION 01340

TEMPORARY FACILITIES
SECTION 01500

PART ONE - GENERAL.

1.01 DESCRIPTION REQUIREMENTS

A. Contractor shall pay costs of installing and maintaining for the duration of the project all temporary facilities and shall pay costs associated with the use of those facilities. At completion of work or at time of permanent utility connections, contractor shall remove temporary facilities. Nothing in this section is intended to limit types and amounts of temporary work required, and no omission from this section will be recognized as an indication by Architect or Engineer that such temporary activity is not required for successful completion of the work and compliance with requirement of contract documents. Provisions of this section are applicable to, but not by way of limitation, utility services, construction facilities, support facilities, and security/protection provision.

1.02 TEMPORARY FACILITIES

A. Temporary Buildings: Provide temporary office as needed for the duration of the project; provide complete with lighting, heating, and air conditioning, telephone, plan table and chairs. Provide an area with desk and chair for use by the Owner. Provide temporary storage sheds as needed for the duration of the project. Location of temporary buildings shall be subject to the Owner's approval.

B. Water: Provide potable water service including required piping and equipment adequate for construction purposes.

C. Telephone: Provide telephone service which is listed with the information operator - the use of which is limited to business calls.

D. Heat and Ventilation: Provide heating equipment as necessary to protect all work and materials against injury from dampness and cold throughout the construction period. Provide ventilation to prevent accumulation of dust, fumes, or gases and to properly cure materials and disperse humidity.

TEMPORARY FACILITIES          Page 01500-1



E. Electrical Power: Provide weatherproof, grounded, power distribution system sufficient to accommodate construction operations requiring power, use of power tools, electrical heating, lighting, and start-up testing of permanent electric-powered equipment prior to its permanent connection to electrical system.

F. Lighting: Provide sufficient temporary lighting to ensure proper workmanship everywhere by combined use of daylight, general lighting, and portable plug-in task lighting.

G. Sanitary Facilities: Provide and maintain in a sanitary condition temporary toilet facilities for job personnel that are weather-tight, clean and sanitary; provide adequate light and ventilation, and comply with applicable legal and health requirements.

H. Building Enclosure and Lockup: At earliest possible date, secure building against unauthorized entrance at times when personnel are not working. Provide secure temporary enclosures at locations of possible entry, with locked entrances.

END OF SECTION 01500

TEMPORARY FACILITIES          Page 01500-2

BRCOSA000207



PRODUCTS
SECTION 01600
PART 1 - GENERAL

1.01    DESCRIPTION OF REQUIREMENTS

A.    Definition: "Products" is defined to include purchased items for incorporation into the work. "Materials," is defined as products which must be substantially cut, shaped, worked, mitred, finished, refined, or otherwise fabricated, processed, installed or applied to form units of work. "Equipment" is defined as products with operational parts, regardless of whether motorized or manually operated, and particularly including products with service connections (wiring, piping, etc.).

1.02    QUALITY ASSURANCE

A.    Source Limitations: To the greatest extent possible, provide products, materials and equipment of a singular generic kind and from a single source.

1.03    PRODUCT DELIVERY-STORAGE-HANDLING

A.    Deliver, handle and store products in accordance with manufacturer's recommendations and by methods and means, which will prevent damage, deterioration, and loss including theft.

1.04    WARRANTIES (GUARANTEES)

A.    Categories of Specific Warranties: Warranties on the work are in several categories, including those of General Conditions, and including (but not necessarily limited to) the following specific categories related to individual units of work specified in sections of Divisions 2 through 16 of these specifications:

1.    Special Project Warranty (Guarantee): A warranty specifically written and signed by Contractor for a defined portion of the work; and, where required, countersigned by subcontractor.

2.    Specified Product Warranty: A warranty which is required by contract documents, to be provided for a manufactured product incorporated into the work; regardless of whether manufacturer has published warranty without regard for specific incorporation of product without regard for specific applications except as otherwise limited by terms of warranty.

B.    General Limitations: It is recognized that specific warranties are intended primarily to protect Owner against failure of work to perform as required, and against deficient, defective and faulty materials and workmanship, regardless

of sources. Except as otherwise indicated, specific warranties do not cover failures in the work which result from: 1) Unusual and abnormal phenomena of the elements, 2) The Owner's misuse, maltreatment or improper maintenance of the work, 3) Vandalism after time of substantial completion.

C.    Related Damages and Losses: In connection with Contractor's correction of warranted work which has failed, remove and replace other work of project which has been damaged as a result of such failure, or must be removed and replaced to provide access for correction of warranted work.

D.    Reinstatement of Warranty Period: Except as otherwise indicated, when work covered by special project warranty or product warranty has failed and has been corrected by replacement or restoration, reinstate warranty by written endorsement for a period of time ending upon date original warranty would have expired if there had been no failure.

E.    Replacement Cost, Obligations: Except as otherwise indicated, costs of replacing or restoring failing warranted units or products is Contractor's obligation, without regard for whether Owner has already benefited from use through a portion of anticipated useful service life.

F.    Rejection of Warranties: Owner reserves the right, at time of substantial completion or thereafter, to reject coincidental product warranties submitted by Contractor, which in opinion of Owner tend to detract from or confuse interpretation of requirements of contract documents.

G.    Contractor's Procurement Obligations: Do not purchase, subcontract for, or allow others to purchase or sub-contract for materials or units of work for project where a special project warranty, specified product warranty, certification or similar commitment is required, until it has been determined that entities required to countersign such commitments are willing to do so.

PART 2 - PRODUCTS

2.01    GENERAL PRODUCT COMPLIANCES

A.    Procedures for selecting Products: Contractor's options for selecting products are limited by contract document requirements, and governing regulations, and are not controlled by industry traditions or procedures experienced by Contractor on previous construction projects. Required procedures include, but are not necessarily limited to, the following for various indicated methods of specifying:

1.    Single Product/Manufacturer Name: Provide product indicated.



# PRODUCTS OPTIONS AND SUBSTITUTIONS
## SECTION 01630

### PART 1 - GENERAL

1.01 SUMMARY

A. This Section describes product options available to Bidders and the Contractor, plus procedures for securing approval of proposed substitutions.

B. Related work:
1. Documents affecting work of this Section include, but are not necessarily limited to, General Conditions, Supplementary Conditions, and Sections in Division 1 of these Specifications.

2. Make submittals in accordance with pertinent provisions of Section 01340.

1.02 PRODUCT OPTIONS

A. The Contract is based on standards of quality established in the Contract Documents.

1. In agreeing to the terms and conditions of the Contract, the Contractor has accepted a responsibility to verify that the specified products will be available and to place orders for all required materials in such a timely manner as is needed to meet his agreed construction schedule.

2. Neither the Owner nor the Architect has agreed to the substitution of materials or methods called for in the Contract Documents, except as they may specifically otherwise state in writing.

B. Materials and/or methods specified by name:

1. Where materials and/or methods are specified by naming one single manufacturer and/or model number, without stating that equal products will be considered, only the material and/or method named is approved for incorporation into the work.

2. Should the Contractor demonstrate to the approval of the Architect/Owner that a specified material or method was ordered in a timely manner and will not be available in time for incorporation into this Work, the Contractor shall submit to the Architect/Owner such data on proposed substitute materials and/or methods as are needed to help the Architect/Owner determine suitability of the proposed substitution.

---

2. Two or More Product/Manufacturer Names: Provide one of the named products, at Contractor's option; but excluding products which do not comply with requirements.

### PRODUCTS
Page 01600-2

3. "Or Equal": Where named products in specifications text or drawings are accompanied by the term "or equal," or other language of similar effect, comply with those contract document provisions concerning "substitutions" for obtaining Architect's/Engineer's/Owner's approval (or change order) to provide an unnamed product.

4. Standards, Codes and Regulations: Where compliance with an imposed standard, code or regulation is required, selection from among products, codes and regulations, is Contractor's option.

5. Visual Matching: Where matching of an established sample is required, final judgment of whether a product proposed by Contractor matches sample satisfactorily is Architect's/Owner's judgment.

6. Visual Selection: Except as otherwise indicated, where specified product requirements include "...as selected from manufacturer's standard colors, patterns, textures..." or words of similar effect, the selection of manufacturer and basic product (complying with requirements) is Contractor's option, and subsequent selection of color, pattern and texture is Architect's/Owner's selection.

### PART 2 - EXECUTION: Not Used

## END OF SECTION 01600

BRCOSA000209



PROJECT CLOSEOUT
SECTION 01700

PART ONE - GENERAL

1.01    DESCRIPTION OF REQUIREMENTS

A.  Definitions: Closeout is hereby defined to include the transfer of prescribed documents and materials in preparation for final acceptance, final payment, normal termination of contract, occupancy by Owner and similar actions evidencing completion of work. Specific requirements for individual units of work are specified in sections of Divisions 2 through 16.

1.02    NOT USED

1.03    PREREQUISITES TO FINAL ACCEPTANCE

A.  General: Prior to requesting Architect/Engineer's/Owner's final inspection and acceptance certification for purposes of final payment, the Contractor shall provide the following, and list known exceptions (if any) in request:

1.  Final application for payment.

2.  Copy of Architect/Engineer/Owner's final punch-list with status of each item noted (i.e. completed or otherwise resolved for acceptance); punch-list shall be endorsed and dated by Architect/Engineer/Owner.

3.  Final temporary utility meter readings as of time of substantial completion or when Owner took possession.

4.  Consent of surety for final payment.

5.  Evidence of continuing insurance coverage in accordance with Contract requirements.

6.  Project Record Documents (As-Built Drawings).

7.  Maintenance manuals and Product Data Sheets.

8.  All warranties required by Contract Documents.

9.  Subcontractor and material supplier contact list (including company and contact name, address, telephone number), include emergency contact information (i.e. contact name and telephone number) for General Contractor, HVAC, Plumbing, Electrical, and Roofing Subcontractors.

PROJECT CLOSEOUT
Page 01700-1

---

C.  Where materials and/or methods are specified by name and/or model number, followed by the words "or equal".

1.  The material and/or the method specified by name establish the required standard of quality.

2.  Materials and/or methods proposed by the Contractor to be used in lieu of materials and/or methods so specified by name shall in all ways equal or exceed the qualities of the named materials and/or methods.

3.  Not Used.

4.  Proposed substitutions must be approved prior to the submittal of bids. No "or equal" substitutions will be accepted or reviewed after receipt of bids.

D.  Where the phrase "or equal" or "or equal as approved by the Architect/Owner," occurs in the Contract Documents, do not assume that the materials, equipment, or methods will be approved as equal unless the item has been specifically so approved for this Work by the Architect/Owner.

E.  The decision of the Architect/Owner shall be final.

1.03    REIMBURSEMENT OF ARCHITECT'S COSTS

A.  In the event substitutions are proposed to the Architect after the Contract has been awarded, the Architect will record all time used by the Architect and the Architect's consultants in evaluating each such proposed substitution.

B.  Whether or not the Architect approves a proposed substitution, the Contractor promptly upon receipt of the Architect's billing shall reimburse the Architect at the then current rate for architectural services and the Architect's consultants for all time spent by them in evaluating the proposed substitution.

1.04    DELAYS

A.  Delays in construction arising by virtue of the non-availability of a specified material and/or method will not be considered by the Architect/Owner as justifying an extension of the agreed Time of Completion.

END OF SECTION 01630

PRODUCT OPTIONS AND SUBSTITUTIONS
Page 01630-2

10. Complete final clean up requirements, including touch up of marred surfaces.

11. All keys, including master keys properly labeled.

12. Maintenance and/or Warranty Bonds, if applicable.

13. Store onsite at location directed by Owner, spare or touch-up materials as required in specific specification sections or as listed below:

   a. Interior paint colors - 2 gallons for basic wall color and 1 gallon for secondary and trim colors.
   b. Floor tile - 50 pieces of each color
   c. Molding - 3 pieces
   d. Ceiling tile - 20 pieces of each type

14. Any other documentation and/or materials required by the Contract Documents.

PART 2 - PRODUCTS (not applicable)
PART 3 - EXECUTION
3.01 CLOSEOUT PROCEDURES

A. General Operating/Maintenance Instructions: Arrange for each installer of work requiring continuing maintenance or operation, to meet with Owner's personnel, at project site, to provide basic instructions. Review maintenance manuals, record documentation, tools, spare parts and materials, lubricants, fuels, identification systems, control sequences, cleaning and similar procedures and facilities. For operational equipment, demonstrate start-up, shut-down, emergency operations, noise and vibration adjustments, safety, economy/efficiency adjustments, and similar operations. Review maintenance and operations in relation with applicable warranties, agreements to maintain, bonds, and similar continuing commitments.

3.02 PROJECT RECORD DOCUMENTS (AS-BUILTS)

A. The purpose of the final Project Record Documents is to provide factual and accurate information regarding all aspects of the Work, both concealed and visible, to enable future modification of the Work to proceed without lengthy and expensive site measurement, investigation, and examination.

B. The minimum Project Record Drawings required are as follows:

1. Water – Horizontal and vertical controls and all valve locations and any as-built information required by building or utility authorities.

2. Sewer – Horizontal and vertical controls and all clean-out locations and any as-built information required by building or utility authorities.

3. Electrical – All underground conduit and wire including horizontal and vertical control, specifically including conduit for parking lot pole lighting, and for any other side devices such as signs, irrigation pumps, sewer lift stations, etc...

4. Fire Sprinkler shop drawings and design calculations.

5. Building Plumbing – Horizontal and vertical controls for all underground piping.

C. Items 1-4 referenced in paragraph B shall be signed and sealed by a Registered Land Surveyor within the State where the project is located, approved by the Owner and the Owner's Engineer.

D. All project Record Drawings shall be accurately dimensioned to precisely locate all concealed or underground work.

E. Provide one reproducible of all Project Record Documents to the Owner and one reproducible to the project Architect/Engineer.

3.03 FINAL CLEANING

A. General: Provide final cleaning of the work, at time indicated, consisting of cleaning each surface or unit of work to normal "clean" condition expected for a first-class building cleaning and maintenance program. Comply with manufacturer's instructions for cleaning operations. The following are examples, but not by way of limitation, of cleaning levels required:

1. Remove labels which are not required as permanent labels.

2. Clean transparent materials, including mirrors and window/door glass. Replace broken glass and damaged transparent materials.

3. Clean exposed exterior and interior hard-surfaced finishes.

4. Wipe surfaces of mechanical and electrical equipment clean. Remove excess lubrication and other substances.

5. Remove debris and surface dust from limited-access spaces.

BRCOSA000211



## Construction and Demolition Waste Management
### Section 02060

**PART 1 - GENERAL**

1.1  Related Sections
   A.  Section 01340 - Submittals

1.2  Description of Work

   A.  This section describes the requirements for the Contractor and all subcontractors to minimize construction waste and debris and to reuse, salvage, and recycle to the greatest extent feasible.

   B.  This section includes a statement of Owner's Waste Management Goals, requirements for the development of a draft and final Waste Management Plan and steps for Management Plan Implementation.

   C.  This section specifies certain wastes that are required to be recycled.

   D.  This section specifies obligations for Reporting to the Owner the gross weights of materials recycled and materials not recycled or reused throughout the project.

1.3  Intent and Waste Management Goals

   A.  Equity One's waste management goals include increased recycling and construction of materials. Construction and Demolition Wastes have been identified as a particular target for reuse and recycling, for several reasons:

   - C&D debris typically represents a large volume of material;
   - Many of the waste streams generated during building demolition and construction projects are highly recyclable at reasonable prices;
   - Many States have banned landfill disposal of some C&D debris. It is expected away other States will ban C&D debris in coming years.

   C.  Equity One has determined that recycling, to the maximum extent practicable, the amount of waste disposed in this project is a high priority. The Contractor and Subcontractors shall take steps to generate the least amount of waste possible by minimizing waste due to error, poor planning, breakage, mishandling, contamination, or other factors.

   D.  Of the inevitable waste that is generated, many of the waste materials (as economically feasible) shall be segregated for reuse, salvage, or recycling, or recycled as stated debris. In no case shall material be disposed of in a landfill or incinerator where an approved and less costly recycling or reuse alternative exists. Waste disposal in landfill and incinerators shall be minimized and shall be considered the alternative of last resort.

   D.  With regard to these goals the Contractor shall develop, for the Owner's review and approval, a Waste Management Plan for the Project as described in Section 1.4.

1.4  Draft Waste Management Plan

   A.  Within 10 calendar days after receipt of Notice of Award of Bid, and prior to any waste removal, the Contractor shall submit a Draft Waste Management Plan - Pre-Demolition / Pre-Construction (Form 02060-5) to Owner.

---

6.  Clean concrete floors in non-occupied spaces broom clean.

7.  Vacuum clean carpeted surfaces and similar soft surfaces.

8.  Clean plumbing fixtures to a sanitary condition, free of stains including those resulting from water exposure.

9.  Clean light fixtures and lamps so as to function with full efficiency.

10. Clean project site (yard and grounds), including landscape development areas, of litter and foreign substances, sweep paved areas to a broom-clean condition; remove stains, petro-chemical spills and other foreign deposits. Rake grounds which are neither planted nor paved, to a smooth, even textured surface.

B.  Pest Control: Omitted.

C.  Removal of Protection: Except as otherwise indicated or requested by Architect/Engineer/Owner, remove temporary protection devices and facilities which were installed during course of the work to protect previously completed work during remainder of construction period.

**END OF SECTION 01700**

BRCOSA000212



Form 02060-5 shall contain, at minimum:

1. General Project Information and Project type.
2. An analysis of the project waste expected to be generated by to be listed by type.
3. Indicate the respective fees for each (including transportation costs), and the estimated net cost savings or cost increase resulting from recycling each material (versus landfills or other disposal), taking into account revenue from the sale of recycled or salvaged materials and fees saved due to diversion of materials.
4. If thefeld is to be disposed list the name of full landfill(s) and/or incinerator(s) proposed for trash disposal, the respective fee(s) including transportation cost. Total the proposed cost of disposing of all Project wastes in the landfill(s).

B. Following the submittal of Form 02060-5, Owner and/or Architect will review the John and consider the proposed recycling and waste disposal alternatives. The Owner and/or Architect may suggest alternatives to the proposed disposal options in order to increase recycling, reduce costs, or both.

**1.5   Materials for Which Recycling is Required**

A. Owner requires that, as a minimum, the following materials must be considered for recycling, salvage, or reuse during this project:
Concrete, concrete block, concrete masonry units (CMU)
Paper, including food, news print, cardboard, mixed paper, packing materials, and packaging
Paint
Rigid Foam
Glass and Plastics
Beverage Containers
Insulation
Ceiling Tiles
Gypsum Wallboard
Porcelain Plumbing Fixtures
Florescent Light Tubes, per local regulations
Metals including, but not limited to, steel trim, ductwork, piping, reinforcing steel (rebar), roofing, other trim, steel, iron, galvanized sheet steel, aluminum, copper, zinc, lead, brass, and bronze, (ferrous and non-ferrous)
Wood, including, clean dimensional wood, pallet wood, plywood, oriented strand board (OSB), particle board

**1.6   Final Waste Management Plan**

A. Once Owner has considered the Waste Management Plan (Form 02060-5) and made appropriate suggested modifications, the Contractor shall submit, within 10 Calendar days of receiving such suggested modifications, incorporating Owner's input. The Final Waste Management Plan (Form 02060-5) shall be resubmitted to Owner and contain the following:

1. General Project Information and Project type.
2. An analysis of the project waste expected to be generated by to be listed by type, approximating quantities, within respective column.
3. Indicate the respective fees for each (including transportation costs), and the estimated net cost savings or cost increase resulting from recycling each material (versus landfills or other disposal), taking into account revenue from the sale of recycled or salvaged materials and fees saved due to diversion of materials.
4. If thefeld is to be disposed list the name of full landfill(s) and/or incinerator(s) proposed for trash disposal, the respective fee(s) including transportation cost. Total the proposed cost of disposing of all Project wastes in the landfill(s).

Construction and Demolition Waste Management    Page 02060-2

5. Alternatives to Landfill: A list of the wastes materials from the Project that will be separated for reuse, salvage, or recycling.
6. Materials: A list of the method(s) or other on-site or off-site end use(s) that will be used for each material that will be separated for reuse, salvage, or recycling.
7. Materials Handling Procedures: A description of the means to be employed in separating and recycling the materials identified in item (2) above, consistent with requirements for acceptance by designated facilities, including the means by which each materials will be protected from contamination.
8. Transportation: A description of the means of transportation of the recyclable materials (whether materials will be site-separated and hauled to designated markets, or whether mixed materials will be collected by a hauler and removed from the site and later separated for recycling).
9. Cost of Reuse, Salvage, or Recycling. An estimate of the cost, including separation, transportation, and marketing, to reuse, salvage, or recycle the materials identified in item (3) above.

**1.7   Waste Management Plan Implementation**

A. Manager: The Contractor shall designate a specific party (or parties) responsible for instructing workers in recycling and overseeing and documenting results of the Waste Management Plan for the Project.

B. Distribution: The Contractor shall distribute copies of the Waste Management Plan to the Job-Site Foremen, each Subcontractor, the Owner, and the Architect.

C. Instruction: The Contractor or his designated waste manager shall provide on-site instruction regarding appropriate separation, handling, and recycling, salvage, reuse, and/or return methods to be used by all involved parties at the appropriate stages of the Project. Final Construction Waste Management Plan is to be posted on the project at all times.

D. Separation facilities: As appropriate during each stage of the Project, the Contractor shall lay out and label a specific area(s) to facilitate separation of materials for potential recycling, salvage, reuse, and return. Recycling and waste bin areas are to be kept neat and clean and clearly marked in order to avoid contamination of materials.

E. Hazardous wastes: Hazardous wastes shall be separated and disposed of accordingly.

**1.8   Reporting Required at Time of Invoicing**

A. Application for Progress Payments: The Contractor shall submit with each Application for Progress Payment a complete Construction Waste Management Statement (Form 02060-6) generated by the Project. Failure to submit this information shall render the Application for Payment incomplete and shall delay Process Payment. Form 02060-6 shall be submitted to the Owner and shall contain the minimum following information:

1. The amount (in tons) of material sent to landfill from the Project, the identity of the landfill, the total amount of fees paid, transportation costs (if required) and the total disposal cost. Include manifests, weight tickets, receipts, and invoices.
2. For each material recycled, reused, or salvaged from the Project, the amount (in tons or cubic yards), the date removed from the jobsite, the receiving party, the transportation cost, the amount of any money paid or received for the recycled or salvaged material, and the net total cost or savings of each salvage or recycling effort. All associated haulage, manifests, weight tickets, receipts and invoices must be attached.

Construction and Demolition Waste Management    Page 02060-3

BRCOSA000213

## EXHIBIT E-1a

### WAIVER OF LIEN TO DATE

State of _____    Qty $ _____

County of _____    Escrow # _____

TO WHOM IT MAY CONCERN:

WHEREAS the undersigned has been employed by _____

furnish _____ to _____ for the

premises known as _____ of which _____

is the owner.

THE undersigned, for and in consideration of _____

($ _____) Dollars, and other good and valuable consideration, the receipt whereof is hereby acknowledged, do(es) hereby waive and release any and all lien or claim of, or right to, lien under the statutes of the State of _____, relating to mechanics' liens, with respect to and on said above-described premises, and the improvements thereon, and on the material, fixtures, apparatus or machinery furnished, and on the moneys, funds or other considerations due or to become due from the owner, on account of all labor, services, material, fixtures, apparatus or machinery, furnished to this day by the undersigned for the above-described premises, INCLUDING EXTRAS.*

DATE _____    COMPANY NAME: _____

ADDRESS: _____

SIGNATURE AND TITLE: _____

*EXTRAS INCLUDE BUT ARE NOT LIMITED TO CHANGE ORDERS, BOTH ORAL AND WRITTEN, TO THIS CONTRACT

## CONTRACTORS AFFIDAVIT

State of _____

County of _____

TO WHOM IT MAY CONCERN:

THE undersigned, (name) _____

for or she is (position) _____

being duly sworn, deposes and says that

of (company name) _____

who is the contractor furnishing

work on the building located at _____

owned by _____

That the amount of the contract is $ _____ on which he has also has received payment of $ _____ prior to this payment. That all waivers are true, genuine, and unlimited and on behalf of all vendors, sub-contractors, laborers, etc.

That the following are the names and addresses of all parties who have furnished material and labor for said work and all parties having contracts or sub-contracts for specific portions of said work or for said material covering into the construction thereof and the contractors thereof for the specific portion of said work or for said material are correctly and fully stated and that the items mentioned include all labor and material required to complete said work according to the plans and specifications.

| Names and Addresses | What For | Contract Price Include Extras | Amount Paid | This Payment | Balance Due |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Total labor and material including extras to complete _____

That there are no other contracts for said work outstanding, and that due to nothing due or to become due to any person for material, labor or other work of any kind done or to be done upon or in connection with said work other than above stated.

DATE _____    SIGNATURE _____

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ DAY OF _____

NOTARY PUBLIC

## EXHIBIT E-2a

### WAIVER OF LIEN TO DATE

State of _____    Qty $ _____

County of _____    Escrow # _____

TO WHOM IT MAY CONCERN:

WHEREAS the undersigned has been employed by _____

furnish _____

premises known as _____ of which _____

is the owner.

THE undersigned, for and in consideration of _____

($ _____) Dollars, and other good and valuable consideration, the receipt whereof is hereby acknowledged, do(es) hereby waive and release any and all lien or claim of, or right to, lien under the statutes of the State of _____, relating to mechanics' liens, with respect to and on said above-described premises, and the improvements thereon, and on the material, fixtures, apparatus or machinery furnished, and on the moneys, funds or other considerations due or to become due from the owner, on account of all labor, services, material, fixtures, apparatus or machinery, furnished to this day by the undersigned for the above-described premises, INCLUDING EXTRAS.*

DATE _____    COMPANY NAME: _____

ADDRESS: _____

SIGNATURE AND TITLE: _____

*EXTRAS INCLUDE BUT ARE NOT LIMITED TO CHANGE ORDERS, BOTH ORAL AND WRITTEN, TO THIS CONTRACT

## SUBCONTRACTORS AFFIDAVIT

State of _____

County of _____

TO WHOM IT MAY CONCERN:

THE undersigned, (name) _____

for or she is (position) _____

being duly sworn, deposes and says that

of (company name) _____

who is the sub-contractor furnishing

work on the building located at _____

owned by _____

That the amount of the contract is $ _____ on which he or she has received payment of $ _____ prior to this payment. That all waivers are true, genuine, and unlimited and on behalf of all vendors, sub-contractors, laborers, etc.

That the following are the names and addresses of all parties who have furnished material and labor for said work and all parties having contracts or sub-contracts for specific portions of said work or for said material covering into the construction thereof and the contractors thereof for the specific portion of said work or for said material are correctly and fully stated and that the items mentioned include all labor and material required to complete said work according to the plans and specifications.

| Names and Addresses | What For | Contract Price Include Extras | Amount Paid | This Payment | Balance Due |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Total labor and material including extras to complete _____

That there are no other contracts for said work outstanding, and that due to nothing due or to become due to any person for material, labor or other work of any kind done or to be done upon or in connection with said work other than above stated.

DATE _____    SIGNATURE _____

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ DAY OF _____

NOTARY PUBLIC

## BID SCHEDULE OF VALUES - BUILDINGS

**PINE RIDGE SQUARE - Redevelopment**
**Coral Springs, FL**

| Description | Marshalls | Retail | Outparcel | Facade |
|---|---|---|---|---|
| TEMPORARY FACILITIES | | $0.00 | $0.00 | $0.00 |
| SECURITY | | $0.00 | $0.00 | $0.00 |
| TESTING/INSPECTIONS - BLDG | $3,568.00 | $2,972.00 | $0.00 | $0.00 |
| SURVEY - SITE | $34,078.00 | $850.00 | $0.00 | $2,450.00 |
| GENERAL CONDITIONS | $73,529.54 | $20,541.54 | $2,812.01 | $13,229.91 |
| CONTRACTOR'S FEE | $72,017.00 | $20,092.02 | $2,752.72 | $13,142.41 |
| TAXES | | $0.00 | $0.00 | $0.00 |
| BOND FEES | | $0.00 | $0.00 | $0.00 |
| LIABILITY INSURANCE | | $0.00 | $0.00 | $0.00 |
| BUILDER'S RISK INSURANCE | $32,690.00 | $0.00 | $0.00 | $0.00 |
| STRUCTURAL EXCAVATION & BACKFILLING | $112,371.00 | $46,763.00 | $5,235.00 | $8,410.00 |
| BUILDING CONCRETE - CAST IN PLACE | $837,083.00 | $27,800.00 | $17,125.00 | $8,000.00 |
| REINFORCED CONCRETE MASONRY | $138,426.00 | $56,312.00 | $0.00 | $0.00 |
| STRUCTURAL STEEL | | $0.00 | $0.00 | $0.00 |
| STEEL JOIST & JOIST GIRDERS | | $0.00 | $0.00 | $0.00 |
| METAL ROOF DECK | | $0.00 | $0.00 | $0.00 |
| METAL FABRICATION | $77,400.00 | $19,800.00 | $0.00 | $0.00 |
| STEEL RAILINGS AND HANDRAILS | $16,778.00 | $18,000.00 | $5,775.00 | $13,700.00 |
| ROUGH CARPENTRY | $35,657.00 | | $0.00 | $0.00 |
| FINISH CARPENTRY | | $0.00 | $0.00 | $0.00 |
| PREMIUM ARCHITECTURAL WOODWORK | | $0.00 | $0.00 | $0.00 |
| WATER REPELLENTS | | $0.00 | $0.00 | $0.00 |
| BUILDING INSULATION | $32,860.00 | $24,360.00 | $17,270.00 | $46,116.00 |
| EXTERIOR INSULATION/FINISH SYSTEM | $169,677.00 | | $0.00 | $2,500.00 |
| MEMBRANE ROOFING SYSTEM | $2,400.00 | $0.00 | $0.00 | $212,000.00 |
| SHEET METAL FLASHING AND TRIM | $13,900.00 | $11,000.00 | $0.00 | $5,500.00 |
| ROOF ACCESSORIES | | $0.00 | $0.00 | $0.00 |
| FIRE-RESISTIVE JOINT SYSTEMS | | $0.00 | $0.00 | $411,500.00 |
| DOOR & FRAMES | $5,775.00 | $1,000.00 | $0.00 | $0.00 |
| HOLLOW METAL DOORS AND FRAMES | | $0.00 | $0.00 | $0.00 |
| PRE-FINISHED FRAMES | $220.00 | $0.00 | $0.00 | $0.00 |
| ENTRANCE DOORS | $2,665.00 | $0.00 | $0.00 | $0.00 |
| OVERHEAD DOORS | $4,088.00 | $0.00 | $0.00 | $0.00 |
| IMPACT DOORS | | $0.00 | $0.00 | $0.00 |
| ACCESS DOORS AND FRAMES | | $0.00 | $0.00 | $0.00 |
| SECTIONAL OVERHEAD DOORS | | $0.00 | $0.00 | $0.00 |
| ALUMINUM FRAMED ENTRANCES AND STOREFRONTS | $15,320.00 | $29,005.00 | $0.00 | $62,900.00 |
| SLIDING AUTOMATIC ENTRANCE DOORS | $19,005.00 | | $0.00 | $0.00 |
| FINISH HARDWARE | $6,910.00 | $2,500.00 | $0.00 | $0.00 |
| GLAZING | | $0.00 | $0.00 | $0.00 |
| GYPSUM BOARD ASSEMBLIES | $103,795.00 | $40,150.00 | $20,700.00 | $97,100.00 |
| EXTERIOR PLASTER | $27,300.00 | $30,000.00 | $2,000.00 | $35,000.00 |
| ACOUSTICAL PANEL CEILINGS | $8,400.00 | $0.00 | $0.00 | $177,576.00 |
| RESILIENT FLOOR TILE AND BASE | $33,400.00 | $0.00 | $0.00 | $15,250.00 |
| RECYCLED RUBBER FLOORING | | $0.00 | $0.00 | $0.00 |
| CARPET TILE/ CARPETING | | $0.00 | $0.00 | $10,000.00 |
| PAINTING | $29,000.00 | $24,635.00 | $0.00 | $13,200.00 |
| TOILET COMPARTMENTS | $1,040.00 | $0.00 | $0.00 | $0.00 |
| LOUVERS AND VENTS | | $0.00 | $0.00 | $0.00 |
| IMPACT RESISTANT WALL PROTECTION | | $0.00 | $0.00 | $0.00 |

## BID SCHEDULE OF VALUES - BUILDINGS

| | Marshalls | Retail | Outparcel | Facade |
|---|---|---|---|---|
| TOILET AND BATH ACCESSORIES | $1,500.00 | | | $0.00 |
| LOADING DOCK EQUIPMENT | $3,740.00 | | | $0.00 |
| PLUMBING (BLDG) | $30,050.00 | $19,600.00 | | $0.00 |
| HVAC | $132,250.00 | $35,150.00 | | $0.00 |
| FIRE SPRINKLER SYSTEM | $33,900.00 | $7,000.00 | | $0.00 |
| BUILDING AUTOMATION & AUTOMATIC TEMPERATURE CONTROL | $41,450.00 | $0.00 | | $0.00 |
| ELECTRICAL (BLDG) | $99,800.00 | $33,275.00 | | $2,400.00 |
| LIGHTING | $118,665.00 | $4,500.00 | | $0.00 |
| FIRE SPRINKLER ALARM SYSTEM | $12,500.00 | $3,150.00 | | $0.00 |

| SUBTOTALS | $1,558,848.93 | $437,388.59 | $59,889.87 | $281,896.67 |
|---|---|---|---|---|
| | $1,558,848.93 | $437,388.59 | $59,889.87 | $281,896.67 |
| | $0.00 | $0.00 | $0.00 | $0.00 |

## BID SCHEDULE OF VALUES - SITE IMPROVEMENTS

**PINE RIDGE SQUARE - Redevelopment**
**Coral Springs, FL**

| Section Description | Quantities | Unit Cost | Cost Extension |
|---|---|---|---|
| TESTING/INSPECTION - ONSITE | | | $0.00 |
| STAKING | | | $2,500.00 |
| MISC. | | | $27,400.00 |
| GENERAL CONDITIONS | | | $9,051.74 |
| CONSTRUCTION FEE | | | $18,000.00 |
| PAVING | | | $0.00 |
| BOND FEES | | | $0.00 |
| BUILDER'S RISK INSURANCE | | | $0.00 |
| TAXES | | | $0.00 |
| SITE DEMOLITION | | | $0.00 |
| UTILITY RELOCATION | | | $0.00 |
| BUILDING DEMOLITION | | | $0.00 |
| EARTHWORK/SITE GRADING/PAD | | | $37,520.00 |
| SANITARY SEWER | | | $5,600.00 |
| FIRE LINE/HYDRANTS | | | $74,416.74 |
| PAVING | | | $53,760.00 |
| CURBING | | | $5,760.00 |
| STRIPING | | | $0.00 |
| EXTERIOR FENCING | | | $312,500.00 |
| BUILDER'S RISK FENCING | | | $35,000.00 |
| LANDSCAPE/IRRIGATION | | | $177,576.00 |
| SITE LIGHTING | | | $35,250.00 |
| SITE FLATWORK | | | $0.00 |
| SITE CONCRETE (HARDSCAPE) | | | $10,000.00 |
| SITE MASONRY | | | $0.00 |
| JOINT SEALANTS | | | $0.00 |
| PAINTING | | | $0.00 |
| PLUMBING | | | $0.00 |



**HVAC EQUIPMENT**

| | TOTAL ON SITE COST | $192,954.94 |

Unit price per lineal foot fo1 type "D" curbing:     $9.50 p/lf
Additional cost to provide a P&P Bond on the project:     $22,000.00

**PART IV: BID SCHEDULE OF VALUES; GRAND TOTAL COST**

| | |
|---|---|
| TOTAL MARSHALLS COST | $1,558,848.83 |
| TOTAL RETAIL COST | $437,388.59 |
| TOTAL OUTPARCEL COST | $59,889.87 |
| TOTAL FACADE COST | $281,896.67 |
| TOTAL SITE COST | $192,954.94 |
| | |
| GRAND TOTAL COST | $2,530,979.00 |
| | |
| REVISED COST INCLUDING THE P&P BOND | $2,552,979.00 |

---

**EDC**

1990 Hoquenot Road
Richmond, Virginia 23113

(804) 897-6900
(804) 897-6901 FAX

**Pine Ridge Square**

BUILDING: Pine Ridge Plaza
LOCATION: Coral Springs, FL

BID DATE: 12-21-11
PLANS: DTI

**CLARIFICATIONS TO CONTRACTORS SCOPE OF WORK**

1 Pricing is good for 30 days due to volatile material pricing.
2 Contractor shall not be required to waive lien rights prior to payment.
3 We assume there is adequate water supply to accommodate the specified fire sprinkler requirements, hence we exclude the cost to increase any water lines or to provide any supplemental pumps or tanks.
4 All exterior signage and logos to be supplied and installed by the Owner.
5 We assume that all on site non organic material is suitable for structural fills, therefore no allowance has been made for the exportation of unsuitable or importation of replacement fill material.
6 All incoming telephone wiring to be by others.
7 This proposal is contingent upon EDC and the owner's ability to negotiate a mutually acceptable contract.
8 We acknowledge addendums 1 thru 4.
9 We acknowledge RFI's 1 thru 6.
10 We are bidding this project under the assumption that all work will be constructed simultaneously.
11 We assume using roof tile from onsite stock for facade portion of work. New tile to be used for retail and Marshall's portion of project.
12 Work to be performed during normal daytime business hours.
13 We have assumed 60" tall roof screen panels based on HVAC specs.
14 We accept the Marshall's spec book as submitted on 12-16-11.

**EXCLUSIONS TO CONTRACTORS SCOPE OF WORK**

1 All utility connection, tap, meter, and/or other municipal or governmental impact fees.
2 The costs for special inspections, soils testing, third party inspections or analysis and quality control testing.
3 Testing, removal, and replacement of rock from site.
4 Testing, removal, and replacement of unsuitable/contaminated materials or soils from site.
5 Dewatering and or soil amendment programs that may be required to meet design compaction requirements.
6 Cost of the site and building permit.
7 Relocation of existing utilities unless noted on drawings.
8 Asbestos or other hazardous material testing or removal.
9 Municipal bonds
10 Builders risk insurance.
11 Owners use of contractors dumpsters.
12 Fire sprinkler in exterior canopies and awnings.
13 Winter construction costs and brakeages.

BRCOSA000216

## EXHIBIT "B"
## INSURANCE REQUIREMENTS

During the performance of the work under this Agreement, the Contractor shall purchase from and maintain with a company or companies approved by the Owner and lawfully authorized to do business in the jurisdiction in which the project is located, insurance as described herein with limits as shown for the respective coverages. The insurance policies shall name the Owner, as additional insured.

Prior to commencement of any work, certificates of insurance acceptable to the Owner shall be filed with the Owner evidencing the specific coverages and containing a provision that coverages afforded under the policies will not be changed, canceled or allowed to expire until at least 30 days prior to certified written notice has been given to the Owner.

The following coverages shall be provided:

A.  Workmen's Compensation and Occupational Disease Insurance, including Employer's Liability Insurance, complying with the laws of the State in which the work is to be performed or elsewhere as may be required.

B.  Comprehensive General Liability Insurance, including Contractual Liability, Explosions, Collapse and Underground Damage Liability, Products-Completed Operations Liability, as well as coverage on all Contractor's equipment owned, hired or used on the job, with limits not less than:

       Bodily Injury            $ 2,000,000 each occurrence
       Property Damage       $ 1,000,000 each occurrence
       Personal Injury         $ 2,000,000 each occurrence

C.  Automobile Liability Insurance, including Contractual Liability covering all motor vehicles owned, hired or used on the job with limits not less than:

       Bodily Injury & Property Damaged Combined  $ 1,000,000 each occurrence

D.  "Completed Operations" coverage for a period of one (1) year following completion of all work at such limits as stipulated herein.

E.  "Contractual Liability" insurance for the term of this Agreement to insure CONTRACTOR'S indemnity under the provisions in the Agreement.

F.  Excess Liability Insurance, Umbrella Form, with limits not less than:

       Bodily Injury & Property Damage Combined   $ 5,000,000 each occurrence

## EXHIBIT "B" (continued)

G.  Contractor's/Subcontractor's Excavation Insurance for any Contractor/Subcontractor performing any excavation must have Explosion, Collapse and Underground Damage Liability Insurance coverage.

The Contractor shall provide a sample form of policy for the Owner's approval. The policy shall specifically name the Owner as named insured.

The Contractor shall maintain such coverages as are described above for the length of the contract period, including any warranty or guarantee periods as applicable.

BRCOSA000217

From: Josh Haber
To: Bryan White
Subject: Re: PINE RIDGE PROJECT
Date: Wednesday, December 28, 2011 7:10:17 PM

Approved to proceed. Formal LOI will be issued next week. I'd like that AT&T meeting scheduled for the earliest possible day next week. Please get back to me tomorrow with meeting day/time and whom will be representing EDC. Also, please begin preparing a schedule for our review prior to the kickoff meeting.

This is an important project - lets make each other look good.

Josh

On Dec 28, 2011, at 4:31 PM, "Bryan White" <bwhite@edcweb.com> wrote:

Per our conversation, please find the revised proposal including the additional cost for the P&P bond attached.

From: Bryan White
Sent: Wednesday, December 28, 2011 3:45 PM
To: Josh Haber <jhaber@southronc.net> (jhaber@southronc.net)
Subject: PINE RIDGE PROJECT

Josh,

The bond is an add of $22K. I am not sure Jeff's reason for not including the cost. How can we handle that?

Regarding the curb pricing if appears that we can get down to $9.50 per ft. if the quantity is more than 500 additional ft. and able to be installed with one of two mobilizations. In the grand scheme of things we aren't taking about much money so I will work with you on that. We just don't want to do 20 ft. one day and leave and then do 100 ft. etc... piece meal.

Regarding our mobilization, we propose to be onsite by January 9th. I would like to schedule a kickoff meeting that week or early the following week. The proposed turnover date would remain the 1st of June with any proposed LD starting 1 week later if the permit is release prior to the 9th. If not, the schedule would push day for day.

Let me know your thoughts so we can put this thing to bed and get moving.

I will get back to you shortly on the proposed super.

Thanks for the work. I look forward to another successful project.

PS: Goodwill can start their fixtures as soon as they are ready. We will work the balance of the work including lights and punchlist items around them if needed.

Thanks,

<2011122816312326.pdf>

BRCOSA000218

## EXHIBIT E-1a

### WAIVER OF LIEN TO DATE

State of _____

County of _____                                   Gty # _____

                                                            Escrow # _____

TO WHOM IT MAY CONCERN:

WHEREAS the undersigned has been employed by _____

to furnish _____ for the

premises known as _____ of which

_____ is the owner.

THE undersigned, for and in consideration of

$ _____ Dollars, and other good and valuable considerations, the receipt whereof is hereby acknowledged, do(es) hereby waive and release any and all lien or claim of, or right to, lien under the statutes of the State of _____ relating to mechanic's liens, with respect to and on said above-described premises, and the improvements thereon, and on the material, fixtures, apparatus or machinery furnished, and on the moneys, funds or other considerations due or to become due from the owner, on account of all labor, services, material, fixtures, apparatus or machinery, furnished to this date by the undersigned for the above-described premises, INCLUDING EXTRAS.*

DATE _____

COMPANY NAME _____

ADDRESS _____

SIGNATURE AND TITLE _____
*EXTRAS INCLUDE BUT ARE NOT LIMITED TO CHANGE ORDERS, BOTH ORAL AND WRITTEN, TO THE CONTRACT

### CONTRACTOR'S AFFIDAVIT

State of _____

County of _____

TO WHOM IT MAY CONCERN:

THE undersigned, (name) _____ being duly sworn, depose(s) and say(s)
of (company name) _____
he or she is (position) _____ who is the contractor furnishing
work on the building located at _____
owned by _____

That the amount of the contract is $ _____ on which he or she has received payment of $ _____ prior to this payment. That all waivers are true, genuine, and delivered unconditionally and that there is nothing due or to become due to any person for material, labor or other work of any kind done or to be done upon or in connection with said work other than stated above. That the following are the names and addresses of all parties who have furnished material or labor, or both, for said work and that there is nothing due or so to become due to any person for material, labor or other work of any kind done or to be done upon or in connection with said work according to the plans and specifications.

| Names and Addresses | What For | Contract Price Include Extras | Amount Paid | This Payment | Balance Due |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

| Total labor and material including extras to complete |  |  |  |  |  |

That there are no other contracts for said work outstanding, and that there is nothing due or to become due to any person for material, labor or other work of any kind done or to be done upon or in connection with said work other than stated above.

DATE _____                 SIGNATURE _____

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ DAY OF _____

_____ NOTARY PUBLIC


## EXHIBIT E-2a

### WAIVER OF LIEN TO DATE

State of _____

County of _____                                   Gty # _____

                                                            Escrow # _____

TO WHOM IT MAY CONCERN:

WHEREAS the undersigned has been employed by _____

to furnish _____ for the

premises known as _____ of which

_____ is the owner.

THE undersigned, for and in consideration of

$ _____ Dollars, and other good and valuable considerations, the receipt whereof is hereby acknowledged, do(es) hereby waive and release any and all lien or claim of, or right to, lien under the statutes of the State of _____ relating to mechanic's liens, with respect to and on said above-described premises, and the improvements thereon, and on the material, fixtures, apparatus or machinery furnished, and on the moneys, funds or other considerations due or to become due from the owner, on account of all labor, services, material, fixtures, apparatus or machinery, furnished to this date by the undersigned for the above-described premises, INCLUDING EXTRAS.*

DATE _____

COMPANY NAME _____

ADDRESS _____

SIGNATURE AND TITLE _____
*EXTRAS INCLUDE BUT ARE NOT LIMITED TO CHANGE ORDERS, BOTH ORAL AND WRITTEN, TO THE CONTRACT

### SUBCONTRACTOR'S AFFIDAVIT

State of _____

County of _____

TO WHOM IT MAY CONCERN:

THE undersigned, (name) _____ being duly sworn, depose(s) and say(s)
of (company name) _____
that he or she is (position) _____ who is the contractor furnishing
work on the building located at _____
owned by _____

That the amount of the contract is $ _____ on which he or she has received payment of $ _____ prior to this payment. That all waivers are true, genuine, and delivered unconditionally and that there is nothing due or to become due to any person for material, labor or other work of any kind done or to be done upon or in connection with said work other than stated above. That the following are the names and addresses of all parties who have furnished material or labor, or both, for said work and that there is nothing due or so to become due to any person for material, labor or other work of any kind done or to be done upon or in connection with said work according to the plans and specifications.

| Names and Addresses | What For | Contract Price Include Extras | Amount Paid | This Payment | Balance Due |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

| Total labor and material including extras to complete |  |  |  |  |  |

That there are no other contracts for said work outstanding, and that there is nothing due or to become due to any person for material, labor or other work of any kind done or to be done upon or in connection with said work other than stated above.

DATE _____                 SIGNATURE _____

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ DAY OF _____

_____ NOTARY PUBLIC

BRCOSA000219

EXHIBIT "G"
CONTRACTOR'S ONE-YEAR GENERAL WARRANTY

OWNER:           EQUITY ONE (FLORIDA PORTFOLIO) INC. ("Owner")
CONTRACTOR:      EDC   ("Contractor")
PROJECT:         PINE RIDGE SQUARE REDEV.   ("Project")
CONTRACT DATED:  JANUARY 3, 2012, Between OWNER and CONTRACTOR ("Contract")
DATE OF WARRANTY:

Contractor warrants to Owner that all work in connection with the Project has been performed in strict accordance with the Contract Documents including the drawings and specifications and in accordance with all applicable laws, ordinances and regulations. Contractor agrees to immediately repair or replace or cause to be repaired or replaced any and all work which is defective in workmanship or materials, together with any adjacent or ancillary work which requires repair or replacement because of the defective work, for a period of one (1) year from the date of this warranty or the date of final acceptance by the Owner, whichever is later, ordinary wear and tear and damaged by insured casualty excepted.

If Contractor fails to begin any work required by the foregoing paragraph within ten (10) days following receipt of written notice from Owner, or to diligently proceed to complete such work, then Owner may, at its option and without further notice to Contractor, perform or cause to be performed such work and Contractor agrees to pay all costs and charges for such work. Contractor agrees to pay Owner all damages incurred by Owner, including, without limitation, reasonable attorneys' fees, resulting from Contractor's failure to fulfill any of Contractor's obligations under this warranty. Additionally, Contractor agrees to indemnify and hold harmless from and against any claims, actions, losses, liabilities, costs, fees (including attorneys' fees and court costs) or charges resulting from the acts or omissions of Contractor, its agents, employees, or subcontractors in the performance of the work under the Contract or arising out of a violation of any Contractor's representations or obligations under this warranty.

IN WITNESS WHEREOF, the Contractor has executed this Agreement under seal as of the day and year first above written.
SWORN to and subscribed before me,
this _____ day of _____, 2010

                                   BY: _____

                                   Title: _____

_____
Notary Public
(Seal)
My Commission Expires: _____

FORM OF AGREEMENT                                    00500-18

---

Equity One
1600 North East Miami Gardens Drive
North Miami Beach, FL 33179

**Non-Work Pay Type**
**Hours Detail Report**

As of Friday, May 24, 2013
Employee# 9030
09/03/2012  -  10/12/2012

| Name | Employee Number | Day | Date | Action | Hours |
|------|-----------------|-----|------|--------|-------|
| SCHOR, JANE | 9030 | Mon | 09/03/2012 | Holiday | 8.00 |
| SCHOR, JANE | 9030 | Wed | 09/26/2012 | Float | 8.00 |
| SCHOR, JANE | 9030 | Fri | 10/12/2012 | PTO | 8.00 |

1 of 1

BRCOSA000220

**Jane Schor**

From: Steve Brown [sbrown@edcweb.com]
Sent: Thursday, September 27, 2012 2:11 PM
To: Jane Schor
Subject: RE: Old Mailboxes

Yes, they are gone.

EDC
Steve Brown
Project Superintendent
1660 Huguenot Road
Midlothian, VA, 23113
Mobile 804-397-0377

This message contains confidential information and is intended only for the recipient. If you are not the recipient you should not disseminate, distribute or copy this e-mail. Please notify immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system.

From: Jane Schor [mailto:jschor@equityone.net]
Sent: Thursday, September 27, 2012 12:40 PM
To: Steve Brown
Cc: Jane Schor
Subject: Old Mailboxes

Hi Steve – Were you able to get rid of the old mailboxes?
Thanks.

---

**Jane Schor**

From: Jane Schor
Sent: Wednesday, August 08, 2012 12:31 PM
To: sbrown@edcweb.com
Cc: Alexandra De Antoni, Yaniey Davis, Jane Schor
Subject: FW: Mailboxes

From: Jane Schor
Sent: Wednesday, August 08, 2012 12:29 PM
To: Luvvegas
Cc: Jane Schor
Subject: Mailboxes

Good Afternoon Gary –

I hope you are enjoying your vacation.

I wanted to let you know that the mailboxes were delivered and installed where the old ones used to be. Steve Brown, with EDC has the keys. We will not do anything with them until your return next week.

Let me know if you have any questions.

Thank you!

JANE SCHOR
regional manager

Direct 305.697.1226
Cell 954.275.1744

Equity One Inc.
1550 NE Miami Gardens Drive, Suite 590
North Miami Beach, FL 33179
Main 305.672.1234
Fax 786.528.1440
www.equityone.net

Jane Schor

From:        Jane Schor
Sent:        Friday, August 03, 2012 9:05 AM
To:          Luvegas
Cc:          Steve Brown; Alexandra De Antoni; Jane Schor
Subject:     Mailboxes

Good Morning Gary –

I spoke to Steve this morning. As you and I discussed he is going to place the new boxes where the old ones are
currently, and move the old ones over to the left. He will hold onto the keys and any other paperwork that may comes
w/them.

We will continue to use the old boxes until you get back from your vacation and have the chance to label. You and I can
discuss the key distribution once you're back.

Thank you for your all of your help.
See you when you get back.

**JANE SCHOR**
regional manager

Direct 305.957.1228
Cell 954.275.1744

Equity One Inc.
1550 NE Miami Gardens Drive, Suite 500
North Miami Beach, FL 33179
Main 305.672.1234
Fax 786.528.1440
www.equityone.net

---

Jane Schor

From:        Jane Schor
Sent:        Thursday, August 02, 2012 5:34 PM
To:          Luvegas
Cc:          Jane Schor
Subject:     Mailboxes

Hi Gary – I hope you are enjoying your vacation!

Just to give you the heads up that the mailboxes are supposed to be delivered tomorrow (Friday 8/3) between 9am and
3pm. I sent an email to our GC so that he can accept delivery.

Let me know what you need me to do for you on our end.

Thanks Gary!

**JANE SCHOR**
regional manager

Direct 305.957.1228
Cell 954.275.1744

Equity One Inc.
1550 NE Miami Gardens Drive, Suite 500
North Miami Beach, FL 33179
Main 305.672.1234
Fax 786.528.1440
www.equityone.net

BRCOSA000222

CNA

> **A new federal law**, "*Section 111 of the Medicare, Medicaid and SCHIP Extension Act of 2007*" has been enacted that requires insurance companies to provide the government agency called "The Centers for Medicare & Medicaid Services" with specific information.  This means that National Fire Insurance Company Of Hartford needs to collect the information requested below in order to identify Medicare Recipients.

**Please review the picture of the Medicare card below to determine if you have, or have ever had, a similar Medicare card:**



**Section I**

Are you presently, or have you ever been, enrolled in Medicare Part A or Part B?

☐ YES          ☐ NO

*If yes, please complete the following. If no, proceed to Section II.*

| |
|---|
| **CLAIMANT NAME:** |
| *(Please print the name exactly as it appears on your SSN or Medicare card, if available)* |
| **Medicare Claim Number:** |
| **Date of Birth:** |
| **Sex:**   ☐ Male        ☐ Female |
| **Social Security Number:** <br> *(If Medicare Claim Number is Unavailable)* |

CNA Claim Number:  E2906093    LS

Claim Adjuster:    Shawna Bryson

BRCOSA000223

**Section II**

I understand that the federal government requires  National Fire Insurance Company Of Hartford
to collect the information requested above to be submitted to The Centers for Medicare &
Medicaid Services.

_____

**Claimant Name (Please Print)**
_____

**Name of Person Providing This Information (Please Print)**
_____

**Signature of Person Completing this Form**
_____

**Date**

*If you have completed Sections I - II above, stop here.*
*If you are **refusing** to provide the information requested in Sections I - II, proceed to Section III.*

**Section III**

_____

**Claimant Name (Please Print)**

For the reason(s) listed below, I have not provided the information requested. I understand that
if I am a Medicare beneficiary and I do not provide the requested information, I may be violating
my obligation as a Medicare beneficiary to assist Medicare in coordinating benefits to pay my
claims correctly and promptly

| *Reason(s) for Refusal to Provide Requested Information:* |
|---|
|  |
|  |
|  |
|  |

_____

**Name of Individual Providing This Information (Please Print)**
_____

**Signature of Individual Providing This Information**
_____

**Date**

**CNA Claim Number:**  E2906093     LS

BRCOSA000224



PO Box 8317
Chicago, IL  60680-8317

**Shawna Bryson**
*Claims Representative*
*CHICAGO, IL*
Telephone 610-208-6517
           877-378-0541 x6517
Facsimile 312-260-4343
Email      Shawna.Bryson@cna.com

October 22, 2012

PINCUS & CURRIER
324 N LAKESIDE CT
WEST PALM BEACH, FL 33407-6512

| | |
|---|---|
| Case Name: | EQUITY ONE INC |
| CNA Claim Number: | E2906093     LS |
| Claimant: | CHARLES ACKLEY |
| Date of Loss: | 09/24/2012 |

**Medicare Verification Form**

Dear Steven Phillips Esq.,

As you know, pursuant to the Medicare, Medicaid and SCHIP Extension Act of 2007 (MMSEA), 42 U.S.C. 1395y(b)(8), insurance companies, including National Fire Insurance Company Of Hartf, are required to report data necessary to assist in the identification of Medicare beneficiaries who have or will obtain payment through settlement, judgment or award from a workers' compensation, liability, or no-fault insurance plan (Section 111 Reporting).

In this regard, the parties to such an action are required to consider Medicare's interests. Medicare has provided "model questions" contained in the attached Medicare Verification Form designed to assist in gathering the necessary data for Medicare reporting purposes. Please instruct your client to complete the enclosed form and return it to the undersigned as soon as possible, so that we may include this data in Medicare's mandatory electronic reporting cycle.

In the event your client refuses to provide this information, please have him or her complete the entirety of Section III of this form explaining his refusal to provide the requested information. Please also advise your client that failure to provide this important information may impede the settlement process. Please do not hesitate to call if you have any questions or concerns. Your anticipated timely response is highly anticipated.

Sincerely,                              CC:

*Shawna Q Bryson*

Shawna Bryson

Attachment: Medicare Verification Form

CNAL0831

Claim: E2906093

|| Pol: 5082680450 | SCHI: Yes | || Ins: EQUITY ONE INC | Clmt: CHARLES ACKLEY | DoL.: 09/24/2012 | St: Open | || | Adj: Virginia Fisher (31 - MCU GL Melville(Searles)) |

## Latest Notes

| | |
|---|---|
| **By:** | **Andrew Bryant** |
| **Topic:** | SIU |
| **Related to:** | E2906093 |
| **Subject:** | SIU update |
| **Confidential:** | Yes |
| **Date:** | 08/25/2014 |
| **Time Stamp:** | 12:29 PM |

SIU received claim file request from FL DFS. I submitted OPS request for claim file materials to be sent to me for review/distribution.

| | |
|---|---|
| **By:** | **Andrew Bryant** |
| **Topic:** | SIU |
| **Related to:** | E2906093 |
| **Subject:** | SIU Update |
| **Confidential:** | Yes |
| **Date:** | 08/25/2014 |
| **Time Stamp:** | 12:23 PM |

I received call from Lt. Spirn at FL DFS. She indicated that she will be sending me a claim file request for documents from the CNA claim file. She also will need a business records affidavit and an affidavit of loss from CNA. Lt. Spirn will send email requesting these items. Lt. Spirn spoke to prosecutor office. Prosecutor expressed interest in bringing charges, but needs to review first. SIU will continue to monitor this referral

BRCOSA000226

Claim: E2906093

|| Pol: 5082680450 | SCHI: Yes | | | Ins: EQUITY ONE INC | Clmt: CHARLES ACKLEY | DoL: 09/24/2012 | St: Open | | | | Adj: Virginia Fisher (31 - MCU GL Melville(Searles)) |

and post updates to the claim file.

| By: | Andrew Bryant |
| Topic: | SIU |
| Related to: | E2906093 |
| Subject: | SIU Update |
| Confidential: | Yes |
| Date: | 08/25/2014 |
| Time Stamp: | 09:25 AM |

I received email from Lt Spirn at FL DFS Fraud Unit in Broward County. The CNA fraud referral investigation is active at her office & she is waiting to hear back from prosecutor's office regarding potential prosecution of claimant for criminal charges of insurance fraud. SIU will continue to follow up with DFS and post updates to claim file.

| By: | Andrew Bryant |
| Topic: | SIU |
| Related to: | E2906093 |
| Subject: | SIU Update |
| Confidential: | No |
| Date: | 08/21/2014 |
| Time Stamp: | 03:38 PM |

BRCOSA000227

Claim: E2906093

| | Poi: 5082680450 | SCHI: Yes | | | Ins: EQUITY ONE INC | Clmt: CHARLES ACKLEY | DoL: 09/24/2012 | St: Open | | | | Adj: Virginia Fisher (31 - MCU GL Melville(Searles)) |

I spoke on phone with Lt. Padich at WPB office of FL DFS Fraud Unit. He indicated that this fraud referral should have stayed at Broward office, so it was sent back & that we should contact Lt. Spirn at Broward for status. I sent email to Lt. Spirn inquiring on status of referral.

**By:** **Raymond Searles**

**Topic:** **Management Review**

**Related to:** E2906093

**Subject:** case update

**Confidential:** No

**Date:** 08/08/2014

**Time Stamp:** 03:17 PM

current reserve: 50k*, ** SIU HOLD *** . coverage: AGgregate policy limit concern. COntinue to monitor and u[d]ate uw on issue as needed . note recent updates. f/u with cunsel on outstanding discovery in light of recent rulings and push for risk transfer. what addtl time frames/schedules are pending? . lets review adn update POA

**By:** **Andrew Bryant**

**Topic:** SIU

**Related to:** E2906093

**Subject:** SIU Update

**Confidential:** Yes

**Date:** 08/06/2014

BRCOSA000228

Claim: E2906093

|| Pol: 5082680450 | SCHI: Yes | || Ins: EQUITY ONE INC | Clmt: CHARLES ACKLEY | DoL: 09/24/2012 | St: Open ||||| Adj: Virginia Fisher (31 - MCU GL Melville(Searles)) |

**Time Stamp:** 02:46 PM

SIU received email from Lt Ted Padich at FL DFS in WPB. Lt. Paddich indicates that at this time he was unable to assign this fraud referral for investigation, and indicated he will be glad to discuss. I placed a call to Lt. Padich and rec'd vm. I left message with my call back #. Contact Info: Lt. Ted Padich Florida Department of Financial Services Fraud Division, General Fraud Squad 3111 South Dixie Hwy. Suite 310 West Palm Beach, FL 33405 561-837-5635 Ted.Padich@myfloridacfo.com

**By:** Virginia Fisher
**Topic:** Coverage Analysis
**Related to:** CHARLES ACKLEY
**Subject:**
**Confidential:** Yes
**Date:** 07/31/2014
**Time Stamp:** 10:24 AM

█████████████

**By:** Virginia Fisher
**Topic:** Litigation Management
**Related to:** CHARLES ACKLEY
**Subject:**
**Confidential:** Yes

User: Carol Sue Cox                    Page 4                    08/25/2014 03:29 PM

BRCOSA000229

Claim: E2906093

| | Poi: 5082680450 | SCHI: Yes | | | Ins: EQUITY ONE INC | Clmt: CHARLES ACKLEY | DoL: | | | | Adj: Virginia Fisher (31 - MCU GL Melville(Searles)) | 09/24/2012 | St: Open | | | | Adj: Virginia Fisher (31 - MCU GL Melville(Searles)) |

**Date:** 07/28/2014

**Time Stamp:**

**By:** Andrew Bryant

**Topic:** SIU

**Related to:** E2906093

**Subject:** SIU Update

**Confidential:** Yes

**Date:** 07/28/2014

**Time Stamp:** 09:49 AM

Per Lt. Spirn at FL DFS / Broward, the alleged misreps occurred in West Palm Beach, so the fraud referral will be assigned to the WPB office. She forwarded my inquiry on status to Lt. Padich at WPB. I sent email to Lt. Padich asking him to contact me with status. Email: ted.padich@myfloridacfo.com

**By:** Virginia Fisher

BRCOSA000230

Claim: E2906093

|| Pol: 5082680450 | SCHI: Yes | | | Ins: EQUITY ONE INC | Clmt: CHARLES ACKLEY | DoL: 09/24/2012 | St: Open | | | | Adj: Virginia Fisher (31 - MCU GL Melville(Searles)) |

**Topic:** Litigation Management

**Related to:** CHARLES ACKLEY

**Subject:**

**Confidential:** No

**Date:** 07/25/2014

**Time Stamp:** 01:13 PM

**By:** Virginia Fisher

**Topic:** Litigation Management

**Related to:** CHARLES ACKLEY

**Subject:**

**Confidential:** Yes

**Date:** 07/24/2014

**Time Stamp:** 11:19 AM

User: Carol Sue Cox

Page 6

08/25/2014 03:29 PM

BRCOSA000231

Claim: E2906093

| | Pol: 5082680450 | SCHI: Yes | | | Ins: EQUITY ONE INC | Clmt: CHARLES ACKLEY | DoL: 09/24/2012 | St: Open | | | | | Adj: Virginia Fisher (31 - MCU GL Melville(Searles)) |

-----Original Message----- From: Milian,Rosalind Sent: Wednesday, July 23, 2014 10:56 AM To:



| By: | Virginia Fisher |
| Topic: | Litigation Management |
| Related to: | CHARLES ACKLEY |
| Subject: | |
| Confidential: | Yes |
| Date: | 07/22/2014 |
| Time Stamp: | 01:16 PM |

User: Carol Sue Cox

Page 7

08/25/2014 03:29 PM

Claim: E2906093

| | Poi: 5082680450 | SCHI: Yes | | | Ins: EQUITY ONE INC | Clmt: CHARLES ACKLEY | DoL: 09/24/2012 | St: Open | | | | Adj: Virginia Fisher (31 - MCU GL Melville(Searles)) |

**By:** Virginia Fisher

**Topic:** Investigation

**Related to:** CHARLES ACKLEY

**Subject:**

**Confidential:** No

**Date:** 07/22/2014

**Time Stamp:** 12:45 PM

From: Fisher,Virginia R. Sent: Tuesday, July 22, 2014 1:45 PM To: 'khackett@amerisure.com' Subject: Ackely v Equity One Your File: 1298732 My File: E2906093 Hi Kim. Just following up on my phone call and prior requests for a copy of the EDC policy. Equity One is supposed to have been made an additional insured as per the contract. Would you please provide this in the next week? Thanks.

Virginia Fisher Claims Consultant CNA P.O. Box 8317 Chicago, IL 60680-8317 5565 Glenridge Connector, Suite 505 Atlanta, GA 30342-4756 (404) 531-3411 Fax: 312-260-6431

**By:** Virginia Fisher

**Topic:** Investigation

**Related to:** CHARLES ACKLEY

**Subject:**

**Confidential:** No

**Date:** 07/22/2014

**Time Stamp:** 09:30 AM

Got Ex B of the insd's conract w/ GC (EDC) this covers insurance requirements. The insurance that the

BRCOSA000233

Claim: E2906093

| | Pol: 5082680450 | SCHI: Yes | | | Ins: EQUITY ONE INC | Clmt: CHARLES ACKLEY | DoL.: 09/24/2012 | St: Open | | | | | Adj: Virginia Fisher (31 - MCU GL Melville(Searles)) |

contractor secures is supposed to name the owner as AI. The limit of GL coverage should be no less than $2 mill. There's no requirement to name our insd on primary and noncontrib basis. Our other ins reads that our ins is excess over (b) any other primary insd available to you covering liab for dmgs...for which you've been added as an AI. I don't have EDC's policy, but need this.

**By:** Virginia Fisher

**Topic:** Automatic

**Related to:** E2906093

**Subject:** Status Report

**Confidential:** No

**Date:** 07/22/2014

**Time Stamp:** 12:00 AM
ACTIVITY FROM OFFICE: 02A Status Report was approved.

**By:** Lee Janicek

**Topic:** SIU

**Related to:** E2906093

**Subject:** Roundtable with Andy/Virginia

**Confidential:** Yes

**Date:** 05/02/2014

**Time Stamp:** 12:33 PM

User: Carol Sue Cox

Page 9

08/25/2014 03:29 PM

BRCOSA000234

Claim: E2906093

| | Pol: 5082680450 | SCHI: Yes | | | Ins: EQUITY ONE INC | Clmt: CHARLES ACKLEY | DoL: 09/24/2012 | St: Open | | | | Adj: Virginia Fisher (31 - MCU GL Melville(Searles)) |

Sent Virginia the Fraud committee presentation form for completion. She'll return to me when completed for processing and meeting arrangments

**By:** Andrew Bryant

**Topic:** SIU

**Related to:** E2906093

**Subject:** SIU Update

**Confidential:** Yes

**Date:** 04/29/2014

**Time Stamp:** 02:52 PM

I received call from Virginia Fisher who advised that co-dendant (contractor) was advised of the CNA SIU surveillance. Carrier for co-defendant is considering pursuit of settlement by advising the claimant of the surveillance to induce a settlement. In order to pursue this settlement, CNA will need to agree to this course of action. Virginia inquired on SIU's position on settlement and release of video surveillance to claimant. I advised Virginia that per CNA policy on claims with an SIU HOLD, the matter must go to Claims/SIU leadership for authority to settle via the Fraud Committe process and that I cannot authorize removal of the SIU HOLD. I suggested that FCM Lee Janicek could assist in this process if needed. As per releasing the video surveillance to the claimant to encourage settlement, I advised that it may be best to get an answer on wether settlement is an option before releasing the video to claimant. If so, then I would defer to CNA's counsel on this matter to address the litigation strategy and pro's and con's of releasing the video.

**By:** Virginia Fisher

**Topic:** Litigation Management

**Related to:** CHARLES ACKLEY

**Subject:**

BRCOSA000235

Claim: E2906093

| | Pol: 5082680450 | SCHI: Yes | | | Ins: EQUITY ONE INC | Clmt: CHARLES ACKLEY | DoL: 09/24/2012 | St: Open | | | | Adj: Virginia Fisher (31 - MCU GL Melville(Searles)) |

**Confidential:** Yes

**Date:** 04/29/2014

**Time Stamp:** 01:05 PM



**By:** **Andrew Bryant**

User: Carol Sue Cox

Page 11

08/25/2014 03:29 PM

BRCOSA000236

Claim: E2906093

| | Poi: 5082680450 | SCHI: Yes | | | Ins: EQUITY ONE INC | Clmt: CHARLES ACKLEY | DoL:
09/24/2012 | St: Open | | | | | Adj: Virginia Fisher (31 - MCU GL Melville(Searles)) |

| | |
|---|---|
| **Topic:** | SIU |
| **Related to:** | E2906093 |
| **Subject:** | SIU Update |
| **Confidential:** | Yes |
| **Date:** | 04/21/2014 |
| **Time Stamp:** | 02:54 PM |

SIU received correspondence from FL DFS that the fraud referral is "open" and was assigned to Lt. Spirn in Ft. Lauderdale office for further action (see below). I sent email to Lt. Spirn inquiring on status. ------------- This one is still open. It was assigned to Lt. Stacy Spirn, located in DIFs Ft. Lauderdale/Broward county office. Her phone number is _____ nd her email address is Stacy.spirn@myfloridacfo.com if you want to follow up. Thanks. Denise E. Prather Sr. Management Analyst Division of Insurance Fraud Florida Department of Financial Services 200 E. Gaines Street Tallahassee, Florida 32399-0324 Phone: 850 413 4036 VOIP 1 4036 Facsimile: 850 413 3996 email: denise.prather@myfloridacfo.com

| | |
|---|---|
| **By:** | Virginia Fisher |
| **Topic:** | Litigation Management |
| **Related to:** | CHARLES ACKLEY |
| **Subject:** | |
| **Confidential:** | Yes |
| **Date:** | 04/18/2014 |
| **Time Stamp:** | 10:22 AM |

Letters sent to Swiss Re and Amerisure asking for copies of their policies.
                    From: Fisher,Virginia R. Sent: Friday, April 18, 2014 11:22 AM To: 'Jason Gibson' Subject: Ackley v Equity One E2906093 Hi Jason. I hope all is well there. I just wanted to follow up with you on an email I sent to in February about Equity's contract with East

BRCOSA000237

Claim: E2906093

|| Poi: 5082680450 | SCHI: Yes | | | Ins: EQUITY ONE INC | Clmt: CHARLES ACKLEY | DoL: 09/24/2012 | St: Open | | | | Adj: Virginia Fisher (31 - MCU GL Melville(Searles)) |

Coast's Finest. It looks like the copy of the contract I got from you is missing Exhibit B. Do you have it and if so, can you please send it? Thanks so much!
Virginia
Fisher Claims Consultant CNA P.O. Box 8317 Chicago, IL 60680-8317 5565 Glenridge Connector, Suite 505 Atlanta, GA 30342-4756 (404) 531-3411 Fax: 312-260-6431

From: Fisher, Virginia R. Sent: Friday, April 18, 2014 11:18 AM To: Milian,Rosalind Subject: Ackley v Equity E2906093 << File: CsGateway.pdf >> Here's the EDC AIA / A101 contract with EDC. As per Ex B, it does not require AI coverage on primary & non contrib basis, but will still ask Amerisure for a copy of their policy. Since the coverage is not required on a primary basis, they may not have a defense obligation. The East Coast's Finest Contract also references an Ex B about insurance requirements, but Jason never gave that to me. Not sure if East Coast was required to provide primary AI coverage to Equity. As we discussed, I'm following up with Jason Gibson for this. I will follow up with both carriers for East Coast's and EDC and ask for copies of their policies.
Virginia Fisher Claims Consultant CNA P.O. Box 8317 Chicago, IL 60680-8317 5565 Glenridge Connector, Suite 505 Atlanta, GA 30342-4756 (404) 531-3411 Fax: 312-260-6431

08/25/2014 03:29 PM

Page 13

User: Carol Sue Cox

BRCOSA000238

Claim: E2906093



| By: | Virginia Fisher |
| --- | --- |
| Topic: | Coverage Analysis |
| Related to: | CHARLES ACKLEY |
| Subject: | |
| Confidential: | Yes |
| Date: | 04/18/2014 |
| Time Stamp: | 09:49 AM |

| By: | Virginia Fisher |
| --- | --- |
| Topic: | Litigation Management |
| Related to: | CHARLES ACKLEY |
| Subject: | |
| Confidential: | Yes |
| Date: | 04/18/2014 |
| Time Stamp: | 09:17 AM |

08/25/2014 03:29 PM

Page 14

User: Carol Sue Cox

BRCOSA000239



BRCOSA000240

Claim: E2906093

| | |
|---|---|
| **By:** | Virginia Fisher |
| **Topic:** | SIU |
| **Related to:** | E2906093 |
| **Subject:** | |
| **Confidential:** | Yes |
| **Date:** | 04/18/2014 |
| **Time Stamp:** | 08:38 AM |

9:34 AM To: Fisher,Virginia R. Cc: Janicek,Lee Subject: RE: E2906093 Ackely v Equity One Hi Virginia, It usually takes about 2-3 months before we hear if the DFS is going to open an investigation -- then if they do, the investigation can last 6-12 months or so, and sometimes longer due to manpower constraints. I sent an email to the DFS to check status and I will let you know what I hear back. Have a great weekend! Andy Andrew B. Bryant, JD Law Enforcement Liaison at CNA Special Investigations Unit 312-822-6337

From: Bryant,Andrew Sent: Friday, April 18, 2014

| | |
|---|---|
| **By:** | Andrew Bryant |
| **Topic:** | SIU |
| **Related to:** | E2906093 |
| **Subject:** | SIU Update |
| **Confidential:** | Yes |
| **Date:** | 04/18/2014 |
| **Time Stamp:** | 08:34 AM |

I sent an email today to Denise Prather at FL DFS checking on status of foundational referral. I will follow up and post updates to claim file.

BRCOSA000241

Claim: E2906093



**By:** Virginia Fisher

**Topic:** Litigation Management

**Related to:** CHARLES ACKLEY

**Subject:**

**Confidential:** Yes

**Date:** 03/25/2014

**Time Stamp:** 09:38 AM

By: Virginia Fisher

Topic: Litigation Management

Related to: CHARLES ACKLEY

08/25/2014 03:29 PM

Page 17

User: Carol Sue Cox

BRCOSA000242

Claim: E2906093

**Subject:**

**Confidential:** Yes

**Date:** 03/20/2014

**Time Stamp:** 12:08 PM

**By:** Virginia Fisher

**Topic:** General

**Related to:** CHARLES ACKLEY

**Subject:**

**Confidential:** No

**Date:** 03/20/2014

**Time Stamp:** 11:32 AM

From: Greene,April Sent: Thursday, March 20, 2014 10:01 AM To: Fisher,Virginia R. Subject: RE: Ackley v. Equity One, et al; Claim No. E2906093; Mediation Good morning. Mediation has been set for April 24, 2014 at 10:00 AM with Kevin L. O'Brien, Esq. as mediator. The mediation will take place at Matrix Mediation, LLC, 2300 Glades Road, Suite 135 East, Boca Raton, FL 33431, (561) 340-3500. As discussed previously, you will be appearing by phone for this mediation. Please let us know if you need anything further at this time. Thank you. April Greene Legal Secretary to Lorraine Lester, Myrnabelle Roche and Rosalind Milian Law Office of Lorraine Lester A Staff Counsel Office of the CNA Insurance Companies 8100 SW 10th Street, Suite 2500 Plantation, FL 33324 954-424-4675 866-696-7828 (fax) April.Greene@CNA.com

BRCOSA000243

Claim: E2906093

**By:** Andrew Bryant

**Topic:** SIU

**Related to:** E2906093

**Subject:** SIU update

**Confidential:** Yes

**Date:** 03/15/2014

**Time Stamp:** 12:39 PM

I received CD from ICS Merrill of video surveillance conducted on this investigation. I will forward to FL DFS if they make claim file request.

**By:** Virginia Fisher

**Topic:** Litigation Management

**Related to:** CHARLES ACKLEY

**Subject:**

**Confidential:** Yes

**Date:** 03/14/2014

**Time Stamp:** 04:46 PM

From: Fisher, Virginia R. Sent: Friday, March 14,

08/25/2014 03:29 PM

Page 19

User: Carol Sue Cox

Claim: E2906093

**By:** Virginia Fisher

**Topic:** General

**Related to:** CHARLES ACKLEY

**Subject:**

**Confidential:** No

**Date:** 03/12/2014

**Time Stamp:** 10:24 AM

From: Fisher, Virginia R. Sent: Wednesday, March 12, 2014 11:20 AM To: jgibson@equityone.net; judith.anderson@wellsfargo.net Subject: Ackely v Equity One E2906093 Hi Jason and Judi. I hope all's well with both of you. Just wanted to touch base and let you know that we'll have to file the contractual indemnity and breach of contract claims vs East Coast's Finest in the next couple days on this one since Michael Mullen with Swiss Re is not inclined to change his position. Virginia Fisher Claims Consultant CNA P.O. Box 8317 Chicago, IL 60680-8317 5565 Glenridge Connector, Suite 505 Atlanta, GA 30342-4756 (404) 531-3411 Fax: 312-260-6431

**By:** Virginia Fisher

**Topic:** Settlement

**Related to:** CHARLES ACKLEY

User: Carol Sue Cox

Page 20

08/25/2014 03:29 PM

BRCOSA000245

Claim: E2906093

| | |
|---|---|
| **Subject:** | |
| **Confidential:** | Yes |
| **Date:** | 03/12/2014 |
| **Time Stamp:** | **10:23 AM** |

-----Original Message----- From: Fisher,Virginia R. Sent: Wednesday, March 12, 2014 11:23 AM To: Searles,Raymond C. Subject: FW: Ackley v. Equity One, Inc. - E2906093- mediation Ray, can you please give me authority for this FL mediation (in order to comply with rules)? A confirming email is usually what Steve sends to us for purposes of mediation. We must attend with policy limits authority or sufficient authority to meet the plaintiff's last demand, which is $337,000. You may recall we have the SIU hold on this one. We told plaintiff's authority that we are not offering anything on this, but he set this for mediation anyway._____ Virginia Fisher Claims Consultant CNA P.O. Box 8317 Chicago, IL 60680-8317 5565 Glenridge Connector, Suite 505 Atlanta, GA 30342-4756 (404) 531-3411 Fax: 312-260-6431 -----Original Message----- From: Milian,Rosalind Sent: Wednesday, March 12, 2014 11:12 AM To: Fisher,Virginia R. Subject: Ackley v. Equity One, Inc. - E2906093- mediation Virginia, The mediation is not set yet. It is currently on hold for 4/24. When we get a definite date and time, I will let you know. Also, when you are extended the $337,000.00 settlement authority in compliance with the mediation rules, please let me know and I will file a certificate of authority. Thank you. Rosalind Milian, Esq. Law Office of Lorraine Lester A Staff Counsel Office of the CNA Insurance Companies 8100 S.W. 10th Street, Suite 2500 Plantation, FL 33324 954-424-4660 direct 954-424-4667 Fax: 866-696-7828 Cell: 954-770-6632

| | |
|---|---|
| **By:** | **Virginia Fisher** |
| **Topic:** | Litigation Management |
| **Related to:** | **CHARLES ACKLEY** |
| **Subject:** | |
| **Confidential:** | Yes |
| **Date:** | 03/12/2014 |
| **Time Stamp:** | 10:00 AM |

BRCOSA000246



Claim: E2906093

**By:** Virginia Fisher
**Topic:** General
**Related to:** CHARLES ACKLEY
**Subject:**
**Confidential:** No
**Date:** 03/03/2014
**Time Stamp:** 05:38 PM

**By:** Andrew Bryant
**Topic:** SIU

User: Carol Sue Cox

Page 22

08/25/2014 03:29 PM

BRCOSA000247

Claim: E2906093

**Related to:** E2906093

**Subject:** SIU foundational referral

**Confidential:** Yes

**Date:** 02/28/2014

**Time Stamp:** 01:51 PM

SIU submitted a foundational fraud referral to FL DFS today via DFS online portal. Tip # T14-2547. See attached. Copy sent to NICB. SIU will monitor this referral and checks status with FL DFS on approximate 6 week intervals.

**By:** Virginia Fisher

**Topic:** Litigation Management

**Related to:** CHARLES ACKLEY

**Subject:**

**Confidential:** Yes

**Date:** 02/27/2014

**Time Stamp:**

08/25/2014 03:29 PM

Page 23

User: Carol Sue Cox

BRCOSA000248

Claim: E2906093

**By:** Virginia Fisher

**Topic:** General

**Related to:** CHARLES ACKLEY

**Subject:**

**Confidential:** No

**Date:** 02/27/2014

**Time Stamp:** 03:54 PM

Judi Anderson said that there were discussions between Jason, Joe and EC folks. EC folks tt Mike Mullin w/ Swiss Re and he stands by his letter--said again that their two ees said the mailboxes were removed at

User: Carol Sue Cox                    Page 24                    08/25/2014 03:29 PM

BRCOSA000249

Claim: E2906093

the end of the day after they left (and then they presume that the accident happened that night ) and then someone removed the brackets the next day so that is they they never saw the brackets at all. Of course stmt from the salon person to Ros (not in depo testimony) is that the brackets were there for a period of time and she knew someone was going to trip over them. We didn't want to take that dep as it seals liability against us (and East Coast).

**By:** Virginia Fisher

**Topic:** Litigation Management

**Related to:** CHARLES ACKLEY

**Subject:**

**Confidential:** Yes

**Date:** 02/27/2014

**Time Stamp:** 10:54 AM

BRCOSA000250

Claim: E2906093



By: **Virginia Fisher**

Topic: **Litigation Management**

Related to: **CHARLES ACKLEY**

Subject:

Confidential: **Yes**

Date: **02/27/2014**

Time Stamp: **09:45 AM**

-----Original Message----- From: Milian,Rosalind Sent: Thursday, February 27, 2014 11:18 AM To:

08/25/2014 03:29 PM

Page 26

User: Carol Sue Cox

BRCOSA000251

Claim: E2906093

**By:** Virginia Fisher

**Topic:** General

**Related to:** CHARLES ACKLEY

**Subject:**

**Confidential:** No

**Date:** 02/27/2014

**Time Stamp:** 07:34 AM

Jason recommended changes to my letter. I've revised and sent back to him. Advised that we need to take some action (on the indmenity claim to East Coast's) in the next couple of weeks.

From: Fisher,Virginia R. Sent: Thursday, February 27, 2014 8:34 AM To: 'jgibson@equityone.net' Cc: 'judith.anderson@wellsfargo.net' Subject: Ackely v Equity One E2906093 << File: E2906093 J Gibson 013114.pdf >> Jason, here's the letter with changes you recommended. Please go ahead and share it with East Coast–or feel free to send your own letter to them with an appeal for them to change their position. We will have to take some action in the next couple of weeks. Thanks ---------------------- From: Jason Gibson [mailto:jgibson@equityone.net] Sent: Wednesday, February 26, 2014 4:37 PM To: Fisher,Virginia R. Cc: judith.anderson@wellsfargo.net; Joseph Lopez Subject: Pine Ridge: Ackley v Equity One, etal Our File: E2906093 Virginia I just realized that I never sent you these comments to the letter you provided earlier. Please revise the letter and we will forward to East Coast. We do not believe it is likely that they will agree to pick up tender given their carriers position. Thanks! Jason S. Gibson associate general counsel Direct 305.957.1208 Cell 305.409.4415 Equity One, Inc. Improving retail real estate in urban communities

**By:** Virginia Fisher

**Topic:** Litigation Management

**Related to:** CHARLES ACKLEY

**Subject:**

BRCOSA000252

Claim: E2906093

**Confidential:** Yes

**Date:** 02/26/2014

**Time Stamp:** 02:35 PM



-----Original Message----- From: Milian,Rosalind Sent: Wednesday, February 26, 2014 2:34 PM To:

08/25/2014 03:29 PM

Page 28

User: Carol Sue Cox

BRCOSA000253

Claim: E2906093

| | |
|---|---|
| **By:** | Virginia Fisher |
| **Topic:** | Litigation Management |
| **Related to:** | CHARLES ACKLEY |
| **Subject:** | |
| **Confidential:** | Yes |
| **Date:** | 02/26/2014 |
| **Time Stamp:** | 02:32 PM |

From: Fisher,Virginia R. Sent: Wednesday, February 26, 2014 3:32 PM To: 'jgibson@equityone.net' Cc: 'judith.anderson@wellsfargo.net' Subject: Ackley v Equity One, etal Our File: E2906093 Hi Jason. I hope all is well with you. I wanted to follow up with you on the issue with East Coast's Finest. Have they been successful in getting their carrier to pick up our tender of defense on the Ackley matter? We will have to proceed with the third party claim for indemnification against East Coast if they will not agree to defend and indemnify Equity One. I'll look forward to hearing back from you. Thanks.                                                        Virginia Fisher Claims Consultant CNA P.O. Box 8317 Chicago, IL 60680-8317 5565 Glenridge Connector, Suite 505 Atlanta, GA 30342-4756 (404) 531-3411 Fax: 312-260-6431

| | |
|---|---|
| **By:** | Virginia Fisher |
| **Topic:** | General |
| **Related to:** | CHARLES ACKLEY |
| **Subject:** | |
| **Confidential:** | Yes |
| **Date:** | 02/26/2014 |
| **Time Stamp:** | 02:25 PM |

BRCOSA000254

Claim: E2906093



**By:** Lee Janicek

**Topic:** SIU

**Related to:** E2906093

**Subject:** SIU F/R status

**Confidential:** Yes

**Date:** 02/26/2014

**Time Stamp:** 10:45 AM

Follow up with AB as to status by email. await response

**By:** Michelina Emore

User: Carol Sue Cox

Page 30

08/25/2014 03:29 PM

BRCOSA000255

Claim: E2906093

| | |
|---|---|
| Topic: | General |
| Related to: | E2906093 |
| Subject: | |
| Confidential: | No |
| Date: | 02/13/2014 |
| Time Stamp: | 01:38 PM |
| | Mailed letter per request |

| | |
|---|---|
| By: | Virginia Fisher |
| Topic: | Reserve Analysis |
| Related to: | CHARLES ACKLEY |
| Subject: | |
| Confidential: | Yes |
| Date: | 02/13/2014 |
| Time Stamp: | 12:07 PM |
| | ███████ |

| | |
|---|---|
| By: | Virginia Fisher |
| Topic: | General |
| Related to: | CHARLES ACKLEY |

BRCOSA000256

Claim: E2906093

**Subject:**

**Confidential:** No

**Date:** 02/13/2014

**Time Stamp:** 11:50 AM

Prepared letter to Amerisure asking for their policy. Request to ops to send the letter out.

**By:** Virginia Fisher

**Topic:** Plan of Action

**Related to:** CHARLES ACKLEY

**Subject:**

**Confidential:** No

**Date:** 02/13/2014

**Time Stamp:** 11:08 AM

Case roundtabled w/ Steve, Brian, Ros, Ray, Kirk. POA: -Agreed to keep ce at $50k -pltf had recent surgery (in Jan '14) to remove mesh and release an entrapped nerve in R groin. Amt of addl meds unknown. -SIU hold remains on the file -Ros to ck to make sure east coast isn't a mgmt company here (she seems confident they're not.) -Ros will send disclosue letter to e coast to get insurance policy. -I mistakenly said in our conf call that EDC wasn't required to name us as AI. There was that requirement in the contract, however, the contract didn't require EDC to provide primary coverage. Their coverage applies on an xs basis. I will ask for their policy to confirm. -I need to r/u w/ Jason Gibson w/ Equity One at the end of the month to see if he's been able to persuade East Coast to p/u the tender. If not, I will need to tell Ros to move ahead with the 3-p against them—contractual idem and breach of contract claims to be asserted, per Steve.

BRCOSA000257

Claim: E2906093

**By:** Raymond Searles

**Topic:** Management Review

**Related to:** E2906093

**Subject:** Box recap

**Confidential:** No

**Date:** 02/13/2014

**Time Stamp:** 11:07 AM

Attended roundtable discussion with counsel/consultant and counsel. discussed case status and POA. Consultant to update case file with recap. - reserve appropriate at this time.

**By:** Lee Janicek

**Topic:** SIU

**Related to:** E2906093

**Subject:** Slu status F/R

**Confidential:** Yes

**Date:** 02/13/2014

**Time Stamp:** 09:04 AM

Inquired of Andy Bryant, JD in the SIU as to status

**By:** Virginia Fisher

User: Carol Sue Cox

Page 33

08/25/2014 03:29 PM

BRCOSA000258

Claim: E2906093

**Topic:** Litigation Management

**Related to:** CHARLES ACKLEY

**Subject:**

**Confidential:** Yes

**Date:** 02/09/2014

**Time Stamp:** 11:45 AM

-------- From: Fisher,Virginia R. Sent: Sunday, February 09, 2014 12:44 PM To: Milian,Rosalind Subject: RE: E2906093 FW: CHARLES ACKLEY v. EQUITY ONE (Florida Portfolio), INC Hi Ros. I'd rather not because of the SIU hold. Thanks. -------- From: Milian,Rosalind Sent: Friday, February 07, 2014 4:23 PM To: Fisher,Virginia R. Subject: E2906093 FW: CHARLES ACKLEY v. EQUITY ONE (Florida Portfolio), INC I was wondering when someone was going to suggest mediation. Here it is: from Plaintiff's counsel. What do you want to do? Would you like me to tell them that we are not interested in mediation? We can probably attend a voluntary mediation without settlement authority just to hear what the parties propose, but we can't be productive in moving toward resolution. Let me know. Rosalind Milian, Esq. Law Office of Lorraine Lester A Staff Counsel Office of the CNA Insurance Companies 8100 S.W. 10th Street, Suite 2500 Plantation, FL 33324 954-424-4660 direct 954-424-4667 Fax: 866-696-7828 Cell: 954-770-6632

**By:** Virginia Fisher

**Topic:** General

**Related to:** CHARLES ACKLEY

**Subject:**

**Confidential:** No

**Date:** 01/31/2014

**Time Stamp:** 10:30 AM

BRCOSA000259

Claim: E2906093

From: Fisher, Virginia R. Sent: Friday, January 31, 2014 11:26 AM To: jgibson@equityone.net; jlopez@equityone.net Cc: judith.anderson@wellsfargo.net Subject: Ackley v Equity One E2906093 << File: E2906093 J Gibson 013114.doc >> << File: E2906093 Swiss Re.pdf >> Hi Jason and Joe. Here's my proposed letter to you, Jason, that you can take to East Coast's Finest to make our appeal to them. Please let me know if you're ok with it or if you have any suggestions. I'll look forward to hearing back. Thanks.
Virginia Fisher Claims Consultant CNA P.O. Box 8317 Chicago, IL 60680-8317 5565 Glenridge Connector, Suite 505 Atlanta, GA 30342-4756 (404) 531-3411 Fax: 312-260-6431

| | |
|---|---|
| **By:** | **Virginia Fisher** |
| **Topic:** | Litigation Management |
| **Related to:** | CHARLES ACKLEY |
| **Subject:** | |
| **Confidential:** | Yes |
| **Date:** | 01/31/2014 |
| **Time Stamp:** | 07:47 AM |

08/25/2014 03:29 PM

Page 35

BRCOSA000260



Claim: E2906093

By: Virginia Fisher

Topic: Litigation Management

Related to: CHARLES ACKLEY

Subject:

Confidential: Yes

Date: 01/27/2014

Time Stamp: 02:07 PM

08/25/2014 03:29 PM

Page 36

User: Carol Sue Cox

Claim: E2906093

| | |
|---|---|
| **By:** | Virginia Fisher |
| **Topic:** | General |
| **Related to:** | CHARLES ACKLEY |
| **Subject:** | |
| **Confidential:** | No |
| **Date:** | 01/27/2014 |
| **Time Stamp:** | 01:36 PM |

Called Jason Gibson again 305.957.1208 -- lm for call back.

| | |
|---|---|
| **By:** | Lee Janicek |
| **Topic:** | SIU |
| **Related to:** | E2906093 |
| **Subject:** | SIU |
| **Confidential:** | Yes |
| **Date:** | 01/27/2014 |
| **Time Stamp:** | 09:34 AM |

Thanks Virginia - I looked at these and best I can tell is they are from 2012 - what we need to be able to determine if he is making misrepresentations to any doctor about any activity/activities he claims he is unable to do and then compare that to the video - these statements need to be within a reasonable proximity to the dates of surveillance (which will explain the request for records from March 2013 up and through December 2013). Unless I overlooked them, there were none in the 11/27/2013 attachment to claims center Rosalind - Are you aware of any records during that time frame that we have or can we get them from the claimant attorney?

 08/25/2014 03:29 PM

BRCOSA000262

Claim: E2906093

| | |
|---|---|
| By: | Raymond Searles |
| Topic: | Management Review |
| Related to: | E2906093 |
| Subject: | roundtable recap. |
| Confidential: | No |
| Date: | 01/27/2014 |
| Time Stamp: | 07:31 AM |

Attended roundtable discussion with consultant and parties. Nle recap and agree. .

| | |
|---|---|
| By: | Virginia Fisher |
| Topic: | Plan of Action |
| Related to: | CHARLES ACKLEY |
| Subject: | |
| Confidential: | Yes |
| Date: | 01/27/2014 |
| Time Stamp: | 07:21 AM |

POA following discussion with Ray, Steve, Ros, Lorraine, Lee and Andy. -SIU hold will remain. -We will file indemnity claim vs East Coast's Finest. -Spoke w/ Valerie Buchanan and advised. Will let Ray and Steve know if any push back. -I need to get Ex B of the East Coast contract from Jason. Called Jason Gibson last Friday and lm for him to call me back to discuss his email to Ros.

BRCOSA000263

Claim: E2906093

| | |
|---|---|
| **By:** | Andrew Bryant |
| **Topic:** | SIU |
| **Related to:** | E2906093 |
| **Subject:** | SIU Update |
| **Confidential:** | Yes |
| **Date:** | 01/24/2014 |
| **Time Stamp:** | 03:23 PM |

I discussed claim with SIU FCM Lee Janicek and participated in call with claims management. I initiated my review of evidence in claim and will continue review towards potential foundational fraud referral to Florida DFS. I will update claim file with status anticapate completion of SIU review wil next two weeks.

| | |
|---|---|
| **By:** | Lee Janicek |
| **Topic:** | SIU |
| **Related to:** | E2906093 |
| **Subject:** | Roundtable |
| **Confidential:** | Yes |
| **Date:** | 01/24/2014 |
| **Time Stamp:** | 03:12 PM |

Andy Bryant, Stephen Perry, Ray Searles, Lee Janicek, Rosalind and Lorraine Lester - As per Stephen they will get with CSD to discuss how to handle this with the insured - as for now the SIU HOLD remains in tact

BRCOSA000264

Claim: E2906093



| By: | Virginia Fisher |
| Topic: | Litigation Management |
| Related to: | E2906093 |
| Subject: | |
| Confidential: | Yes |
| Date: | 01/24/2014 |
| Time Stamp: | 11:01 AM |

08/25/2014 03:29 PM

Page 40

User: Carol Sue Cox

BRCOSA000265

Claim: E2906093



**By:** Virginia Fisher

**Topic:** General

**Related to:** E2906093

**Subject:**

**Confidential:** Yes

**Date:** 01/23/2014

**Time Stamp:** 07:47 PM

Rosalind Milian, Esq. Law Office of Lorraine Lester A Staff Counsel Office of the CNA Insurance Companies 8100 S.W. 10th Street, Suite 2500 Plantation, FL 33324 954-424-4660 direct 954-424-4667 Fax: 866-696-7828 Cell: 954-770-6632

**By:** Lee Janicek

User: Carol Sue Cox

Page 41

08/25/2014 03:29 PM

BRCOSA000266

Claim: E2906093

**Topic:** SIU

**Related to:** E2906093

**Subject:** SIU review of deposition

**Confidential:** Yes

**Date:** 01/22/2014

**Time Stamp:** 10:29 AM

Reviewed updated deposition - Subject says 'due to his heart, he can't exercise' - video contradicts this as he takes a bicycle ride long in duration as well as is active on a skateboard. Page 18 line24.-25 and Page 19 line 1-2. Subject says on Page 19 lines 10-19 that he attributes his weight loss to his hernia issue from the slip and fall because he 'couldn't do anything, I was basically --I couldn't bet out of bed, I couldn't -- I would go into panic attacks when I woudl see a stairwell." Claimant portrays and attributes his declining health condition to his inability to exercise and stress as a result of being disabled or restricted as a result of the slip and fall Page 25 Line 23, page 26 1-3 Page 62 line 22 - 25 subject says he couldn't get up when he fell - EMT reports indicate he was sitting on a bench He indicates he can walk without a cane when he takes his medications which he takes on occasion - Subject indicates when with a cane, he can only stand for a few minutes - Page 102 line 5 Q. Since our last deposition what have you been able to do on your best day? A. Go to the Store. But I can' walk. This stands in contradiction to what the video shows Subject admits his dog pulls him on a skateoard so he didn't have to walk but this didn't work well. He denies placing a foot on the ground and pushing off (page 109 17-25 and Page 110 lines 1-15) --> This stands in contradiction to the video as he is seen pushing off and riding the skateboard in a normal manner. Page 111 lines 4 - Q. - So you haven't een able to do arm curls after the accident'? A. No Page 113 Lines 4-10 Q. Have you tried riding a bike? A. yes, and it does not -- Ic can't. Ican't do anything. Q. Have you tried riding a bike? A. I do not recall. I do not recall if I did nor if I didn't? I will team with Andy Bryant to determine if this is sufficient to warrant a foundational referral

**By:** Virginia Fisher

**Topic:** Litigation Management

**Related to:** CHARLES ACKLEY

**Subject:**

BRCOSA000267

Claim: E2906093

**Confidential:** Yes

**Date:** 01/09/2014

**Time Stamp:** 11:17 AM

**By:** Virginia Fisher

**Topic:** General

**Related to:** CHARLES ACKLEY

**Subject:**

**Confidential:** No

**Date:** 01/09/2014

**Time Stamp:** 10:46 AM

---------- From: Arthur L Gallagher [mailto:agallagher@equityone.net] Sent: Thursday, December 05, 2013 12:55 PM To: Fisher, Virginia R. Cc: Jason Gibson Subject: RE: EDC AIA Contract My file: E2906903 Re: Ackley v Equity One, etal Virginia, I have attached the form that you requested. I asked our construction group, and it appears that our property management asked the GC to move the mailboxes as a favor. It was not part of the contract and they didnt get paid for it. Just facts for our lawyer:

BRCOSA000268

Claim: E2906093

| | |
|---|---|
| **By:** | Virginia Fisher |
| **Topic:** | General |
| **Related to:** | CHARLES ACKLEY |
| **Subject:** | |
| **Confidential:** | No |
| **Date:** | 01/09/2014 |
| **Time Stamp:** | 10:44 AM |

Updated depo of pltf sent to Lee Janicek today.

| | |
|---|---|
| **By:** | Raymond Searles |
| **Topic:** | Management Review |
| **Related to:** | E2906093 |
| **Subject:** | case update |
| **Confidential:** | No |
| **Date:** | 01/08/2014 |
| **Time Stamp:** | 01:12 PM |

Current reserve: 50K*.. SIU HOLD noted.. any f/u on transcipts to SIU as requested? if not, reason for delay and time frame to complete? . have we received a completed contract you have requested on the case.

**By:** Lee Janicek

BRCOSA000269

Claim: E2906093

| | |
|---|---|
| **Topic:** | SIU |
| **Related to:** | E2906093 |
| **Subject:** | SIU |
| **Confidential:** | Yes |
| **Date:** | 12/20/2013 |
| **Time Stamp:** | 07:50 AM |

Hi Virginia! Any status on the transcription of the updated depo? All the best Lee R. Janicek, Jr., FCLA Consultant - Special Investigations Unit (SIU) K - P.O. Box 8317, Chicago, IL 60680-8317 Tel - 800-262-0039 Ext 6448

| | |
|---|---|
| **By:** | Virginia Fisher |
| **Topic:** | Litigation Management |
| **Related to:** | CHARLES ACKLEY |
| **Subject:** | |
| **Confidential:** | Yes |
| **Date:** | 12/05/2013 |
| **Time Stamp:** | 10:52 AM |

User: Carol Sue Cox

BRCOSA000270

Claim: E2906093

| | |
|---|---|
| **By:** | **Virginia Fisher** |
| **Topic:** | **Investigation** |
| **Related to:** | **CHARLES ACKLEY** |
| **Subject:** | |
| **Confidential:** | **No** |
| **Date:** | **12/05/2013** |
| **Time Stamp:** | **10:47 AM** |

From: Fisher,Virginia R. Sent: Thursday, December 05, 2013 11:47 AM To: 'Arthur L Gallagher' Subject: E2906903 Re: Ackley v Equity One, etal Hey Arthur. Just checking in to see if you've had a chance to locate the rest of this contract. Hope all is well with you. ——— From: Fisher,Virginia R. Sent: Wednesday, November 20, 2013 6:01 PM To: 'Arthur L Gallagher' Subject: RE: EDC AIA Contract Hi Arthur. Thanks so much for sending this. This is the same as what our defense attorney has. I have looked at this more closely and noticed what is missing. Many sections of this AIA contract reference AIA Document A201-2007 (it's referenced in Articles 9 and 10, as well as other sections.) I'm thinking that is where I would find any indemnity language in the contract. We are missing this document. Do you have it? I did note however, that the insurance language in what you sent does provide that the contractor will purchase and maintain GL insurance, however, there is no requirement that it be provided on a primary and noncontributory basis (that was one reason for their denial of the tender.) additionally, they didn't see any indemnity requirement. Let's see if they're wrong! If you can find the rest of this contract that would be great. Thanks so much for your assistance. I really appreciate it! ——— Virginia Fisher Claims Consultant CNA P.O. Box 8317

BRCOSA000271

Claim: E2906093

Chicago, IL 60680-8317 5565 Glenridge Connector, Suite 505 Atlanta, GA 30342-4756 (404) 531-3411
Fax: 312-260-6431

| | |
|---|---|
| **By:** | Lee Janicek |
| **Topic:** | SIU |
| **Related to:** | E2906093 |
| **Subject:** | SIU medical records review |
| **Confidential:** | Yes |
| **Date:** | 12/04/2013 |
| **Time Stamp:** | 07:56 AM |

This entry should be considered privileged as it is made with the expectation of future litigation and does contain some opinion - Reviewed file for possible misrepresentations - Subject records date back to 2010 which predate our alleged incident - he has a history of a gunshot wound as described to the physicians as a result of working in Afghanistan as a defense base Security contractor - (Dyncorp and Blackwater) where he had internal damage to his heart, had surgery and has a perm implanted pacemaker as a result. Records reviewed suggest he has cardiac necrosis. In 2010 Ackley had what appears to be a syncope issue (fainting) and was treated for injuries. He denied illicit drug use, but later reports (2012) suggest he smoke marijuana. In Sept 2012 medical records [Ambulance] in response to an emergency call reflect the was found sitting close to where he allegedly fell and was found with a bulge in his lower abdomen. He claims to have tripped over some unmarked 'L' Brackets from a removed postal stand. Subject later had surgery to repair a hernia which he alleges is a result of this incident. A review of the deposition of Mr. Ackley taken on April 25, 2013 reflects - Page 5 line 11 - Q. And you've taken all of thse medications today A. I take them every day ma'am. Found inside the medical documents dated April 12, 2013 is a tox screen which appears to be negative for any medications which include Oxy, Hyrdocodone etc. On April 17, 2013 is another report which reflects a positive finding for these items. It's unclear as to the length of time these stay in your system for testing; however, the results reflect that he does not take these items (or had not taken) them prior to the testing. Mr. Ackley on page 19 indicates his wife or significant other quit her job to take care of him-she was working as a salesperson at a mall in Pompano Beach as a manager of an antique shop (SIU suggests subpoena of these records to validate the accuracy of the statement) The subject deposition has some inconsistencies in it. Ackley advises in his depo that he was just walking talking as he wold every other day and thenext thing he landed o the groudn hard, stood up, and a stabbing

Page 47

08/25/2014 03:29 PM

User: Carol Sue Cox

BRCOSA000272

Claim: E2906093

pain dropped him to the ground where the stayed until the EMS showed up [not vebatim Pg 64 line 1-7]. On the other hand, the EMS report reflects "station 43 responding for a 50 y/o male that fell and has chest pain. On arrival PT was found sitting on a bench in the company of his wife". Earlier in his deposition he stated he was 'with his kids' then changed it to include his wife, then said it was his family. There is no mention of children - Ackley also stated that EMS took photos and it's noted on the report. The document I reviewed does not reflect this; however, later in the depo he indicates he sent his children home. On pages 93-96 the subject describes his abilities as limited and makes reference to weight curls' before 10-15 pounds and that he can't do them very long at all and can not do them standing up. The video on Jul 18 reflects this subject at 10:44 AM without any heistation or visible discomfort rides a bicycle at many times steering with his left hand for a period of 4 minutes in what appears to be rainy conditionis. He dismounts, walks around, then gets back on the bike at or about 10:53AM riding in the rain and at one time turns his torso around to the right in looking behind him [twisting motion]. The next day the subject is seen walking his dog at 9:22 in the morning - he is seen balancing on a skateboard - he is bending, stoopionng balancing on his left foot and pushing off on his right foot. He dismounts the skateboard at 9:27, bends down to pet the dog, and then picks up his skateboard with his left hand. He is seen at 11:03AM - talking on the phone seen riding a bicycle, smoking something and discarding it. He rides this bicycle while following a female - it's unclear who this individual is but suspected it's his significant other. he dismounts the bicycle from the left, standing on his left leg, while lifting his right leg over the seat [8:42:14]. He then gets back on the bicycle in opposite fashion. he abruptly stops the bike when he passes an unknown African American male, the female then exchanges an unknown item for what appears to be the bicycle he was riding. Ackley lens over to his right on two occasions to stabilze the bike with his right hand and then rides the bike he was on while with his left hand steers the other bicycle with his right. After this he lifts both bicycles under each arm and walks. he then in backward motion steps up onto what is a bench in a public area. The medical documentation is 3 months prior to this video and given that things can change SIU sugests if possible another deposition to determine what his claimed abilities/inabilities are since his last deposition - Additionally it may be beneficial to depose the subject wife to determine if she is complicit in this attempt and what she knows is abilities or inabilities to be since April 2013. While the video we have is telling and portrays a completely different individual than the deposition reflects, we don't know if he is on medication at this time. FOR defense counsel - if possible does Florida track dispensing of medications? I note in the medical records, there is found what appears to be a record of medication dispensing history from various providers and facilities. If this is available SIU suggests securing same. If we can in Florida get an updated deposition SIU suggests surveillance a few days before the date of depo.

By: **Lee Janicek**

Topic: **SIU**

08/25/2014 03:29 PM

User: Carol Sue Cox

BRCOSA000273

Claim: E2906093

**Related to:** E2906093

**Subject:** Email to Virginia F

**Confidential:** Yes

**Date:** 11/26/2013

**Time Stamp:** 01:06 PM

Asking to resend medical for SIU review as unable to locate.

**By:** Virginia Fisher

**Topic:** General

**Related to:** CHARLES ACKLEY

**Subject:**

**Confidential:** No

**Date:** 11/20/2013

**Time Stamp:** 05:19 PM

-----------------------------------From: Fisher,Virginia R. Sent: Wednesday, November 20, 2013 6:01 PM To: 'Arthur L Gallagher' Subject: RE: EDC AIA Contract Hi Arthur. Thanks so much for sending this. This is the same was what our defense attorney has. I have looked at this more closely and noticed what is missing. Many sections of this AIA contract reference AIA Document A201-2007 (it's referenced in Articles 9 and 10, as well as other sections.) I'm thinking that is where I would find any indemnity language in the contract. We are missing this document. Do you have it? I did note however, that the insurance language in what you sent does provide that the contractor will purchase and maintain GL insurance, however, there is no requirement that it be provided on a primary and noncontributory basis (that was one reason for their denial of the tender.) additionally, they didn't see any indemnity requirement. Let's see if they're wrong! If you can find the rest of this contract that would be great. Thanks so much for your assistance. I really appreciate it!                                                  Virginia Fisher Claims Consultant CNA P.O. Box 8317 Chicago, IL 60680-8317 5565 Glenridge Connector, Suite 505 Atlanta, GA

BRCOSA000274

Claim: E2906093

-----Original Message-----  From: Arthur L Gallagher [mailto:agallagher@equityone.net] Sent: Wednesday, November 20, 2013 10:31 AM To: Fisher,Virginia R. Subject: FW: EDC AIA Contract Here it is. From: Lissette Bajra Sent: Wednesday, November 20, 2013 10:27 AM To: Arthur L Gallagher Subject: EDC AIA Contract EDC Executed contract attached. LISSETTE G. BAJRA project administrator Direct: 786.528.1462 Cell: 305.970.3429 Equity One, Inc. 1550 NE Miami Gardens Drive, Suite 200 North Miami Beach, FL 33179 Main: 305.672-1234 Fax: 786.528.1460 www.equityone.net Improving retail real estate in urban communities

30342-4756 (404) 531-3411 Fax: 312-260-6431

| | |
|---|---|
| **By:** | Virginia Fisher |
| **Topic:** | Investigation |
| **Related to:** | CHARLES ACKLEY |
| **Subject:** | |
| **Confidential:** | No |
| **Date:** | 11/20/2013 |
| **Time Stamp:** | 05:01 PM |

Had the Equity claim review today. They noted that this location is Coral Springs. They indicated that I may not have a complete contract w/ EDC and Arthur Gallagher w/ Equity said that he would send it to me. I asked them twice if they would agree to a contractual indemnity claim vs East coast's Finest the state didn't say yes--they just didn't answer. So for now, we will not file this. After the review I talked to Lee Janicek. Advised that I am having the medicals scanned into the file (pulled and printed this from TC) Lee will review and decide in next 60 days if they have enough to send this to the state. I subsequently got the EDC contract from Equity and found out that we're missing the genl conditions, A201-2007. Emailed Arthur for this. Ros and I also spoke today. EDC noticed the dep of Ackley so we got another chance to question him. He is very evasive. Asked what if anything improved in the way of his abilities/activies? He said nothing, in fact his heart condition is now getting worse due to the stress of this lawsuit. He's going to go to a new PCP and to Cleveland Clinic thinks he'll need the nerve decompression surgery still. He said he has good days and bad days. Ros asked him what he was able to do on his best day? Vague answer: I really don't know, I do household chores...he said at one point he tried to walk the dog while on a skate board but he couldn't do it very long (it's as if he knew he was under surveillance)--Ros said we got more than a little footage of him doing that. He said he couldn't do it for longer than 20' and he was not able to push off w/ his R leg, but

08/25/2014 03:29 PM

BRCOSA000275

Claim: E2906093

| | |
|---|---|
| **By:** | Virginia Fisher |
| **Topic:** | Plan of Action |
| **Related to:** | CHARLES ACKLEY |
| **Subject:** | |
| **Confidential:** | No |
| **Date:** | 11/19/2013 |
| **Time Stamp:** | 07:54 AM |

video shows him pushing off the R leg most of the time. he didn't recall if he could ride a bike. (Based on answers I assume he did figure out we were watching him.) The dep of Steve Brown the EDC supt was reset.

Called Ros to discuss the claim, Im for call back 954-424-4667. Status/POA: -SIU hold remains on the file. -FU for a formal response from East Coast's carrier, Swiss Re--their response to our tender is overdue. I've asked for a copy of their policy as well. -As for risk transfer, we have none. No one tendering to us and EDC (the GC) doesn't owe us any risk transfer/ indemnity--no indem language in the contract w/ them. East Coast's Finest (day porter) DOES owe us indemnity and was supposed to have named insd as AI. We can file contractual indemnity claim vs them. We'll need to decide on whether or not we're going to do that. Equity will have a say on that as well. -FU w/ Ros for addl discovery needed. When is trial likely to be set? -Per Ros, verdict potential is around $65k. Insd has 85-90% of the liability; pltf has 10-15% comparative for failure to watch out. We may be able to put 20-40% fault onto EDC, the gc.

From: Fisher,Virginia R. Sent: Tuesday, November 19, 2013 9:06 AM To: Michael_Mullen@swissre.com Subject: Ackley v Equity One Our File: E2906093 Our Insured: Equity One Your Insured: East Coast's Finest Hi Michael, I am still waiting for your response to our tender in connection with this claim. Equity's contract with East Coast required East Coast to name them as an additional insured. Your company should be defending this on behalf of Equity. Would you please provide a copy of the East Coast policy? Thanks.

Virginia Fisher Claims Consultant CNA P.O. Box 8317 Chicago, IL 60680-8317 5565 Glenridge Connector, Suite 505 Atlanta, GA 30342-4756 (404) 531-3411 Fax: 312-260-6431

BRCOSA000276

Claim: E2906093

| | |
|---|---|
| **By:** | Virginia Fisher |
| **Topic:** | General |
| **Related to:** | CHARLES ACKLEY |
| **Subject:** | |
| **Confidential:** | No |
| **Date:** | 11/19/2013 |
| **Time Stamp:** | 07:37 AM |

From: Fisher,Virginia R. Sent: Tuesday, November 19, 2013 8:37 AM To: Janicek,Lee Subject: RE: Charles Ackley E2906093 Ok. I thought this was already done. The medicals may be voluminous. SIU should really have access to TeamConnect. Let me see if I can get someone in ops to pull and put in my file. This is going to be a little project. Virginia Fisher Claims Consultant CNA P.O. Box 8317 Chicago, IL 60680-8317 5565 Glenridge Connector, Suite 505 Atlanta, GA 30342-4756 (404) 531-3411 Fax: 312-260-6431 From: Janicek,Lee Sent: Tuesday, November 19, 2013 8:24 AM To: Fisher,Virginia R. Subject: RE: Charles Ackley E2906093 Hey there and thanks Unfortunately I don't have access to Team Connect - please pull and scan them in PDF and place them in Claim Center documents so we can complete our review for possible foundational referral review?

| | |
|---|---|
| **By:** | Lee Janicek |
| **Topic:** | SIU |
| **Related to:** | E2906093 |
| **Subject:** | SIU |
| **Confidential:** | Yes |
| **Date:** | 11/19/2013 |

BRCOSA000277

Claim: E2906093

| | |
|---|---|
| Time Stamp: | 07:24 AM |
| | Requested CS scan all meds from Team Connect to CC documents so SIU can complete it's review for foundational review. |

| | |
|---|---|
| By: | Virginia Fisher |
| Topic: | Automatic |
| Related to: | E2906093 |
| Subject: | Status Report |
| Confidential: | No |
| Date: | 11/19/2013 |
| Time Stamp: | 12:00 AM |
| | ACTIVITY FROM OFFICE: 02A Status Report was approved. |

| | |
|---|---|
| By: | Virginia Fisher |
| Topic: | General |
| Related to: | (1) Injury - CHARLES ACKLEY |
| Subject: | |
| Confidential: | Yes |
| Date: | 11/18/2013 |
| Time Stamp: | 08:46 PM |

BRCOSA000278

Claim: E2906093

From: Fisher,Virginia R. Sent: Monday, November 18, 2013 9:46 PM To: Janicek,Lee Subject: Charles Ackley E2906093 Hi Lee. Saw your note in the file. The medicals on this can be found in Team Connect.

**By:** Andrew Bryant

**Topic:** SIU

**Related to:** E2906093

**Subject:** SIU update

**Confidential:** Yes

**Date:** 11/08/2013

**Time Stamp:** 02:30 PM

Received request for review from FCM for foundational referral. Added claim to FCM foundational referral request case log & will schedule call with FCM Janicek to discuss.

**By:** Lee Janicek

**Topic:** SIU

**Related to:** E2906093

**Subject:** Forward to Andy Bryant, JD SIU

**Confidential:** Yes

**Date:** 10/29/2013

**Time Stamp:** 03:00 PM

BRCOSA000279

Claim: E2906093

for consideration of foundational referral. The subject alleges bodily injury as a result of insured claimed negligence - under oath the subject states he can not walk without a cane but leaves the door open by saying on certain days. The subject attempts to clarify that when he is on meds he doesn't need the cane. Video depicts this subject as being very active and able to do much more than what is explained in the notes and deposition. I am going to forward to discuss with Andy Bryant - I am going to ask Virginia Fisher if she can PDF any medical notes from doctors that may have been provided so we can rule out misreps to the doctors. the HOLD will stay in place until such time Andy reviews and medical is received

08/25/2014 03:29 PM

User: Carol Sue Cox

BRCOSA000280

Claim: E2906093

| | |
|---|---|
| **By:** | Virginia Fisher |
| **Topic:** | General |
| **Related to:** | CHARLES ACKLEY |
| **Subject:** | |
| **Confidential:** | Yes |
| **Date:** | 10/29/2013 |
| **Time Stamp:** | 02:18 PM |

Called Lee Janicek for his decision on the hold. He reviewed the dep summary of pltf and was going to get back to me.

| | |
|---|---|
| **By:** | Virginia Fisher |
| **Topic:** | Litigation Management |
| **Related to:** | CHARLES ACKLEY |
| **Subject:** | |
| **Confidential:** | Yes |
| **Date:** | 09/26/2013 |
| **Time Stamp:** | 02:01 PM |

User: Carol Sue Cox                                       08/25/2014 03:29 PM

BRCOSA000281

Claim: E2906093

**By:** Virginia Fisher

**Topic:** General

**Related to:** CHARLES ACKLEY

**Subject:**

**Confidential:** No

**Date:** 09/24/2013

**Time Stamp:** 07:55 AM

Awaiting Swiss Re's response to my tender to East Coast Finest:

From: Fisher,Virginia R. Sent: Friday, September 06, 2013 4:26 PM To: Michael_Mullen@swissre.com Subject: RE: Charles Ackley v Equity One, etal. Our Claim # E2906093 Your File: 02013000576 0 Mr. Mullen, Please allow me to bring up some additional points as well: -The contract between Equity One and East Coast's Finest requires the latter to walk the property daily and check for safety issues. There is also a reporting requirement for any such safety issues. -There is no requirement in the contract that East Coast's Finest be notified in advance about something such as removal of the mailboxes. However, as I stated below, your insured did know that the mailboxes were being removed as the new mailboxes were put in place and Alexis testified as to his actual notice of removal of the mailboxes. -East Coast's Finest is on the job to be the owner's "eyes." It is their job to notify the property owner of a dangerous condition and there is NOTHING in the contract excluding a dangerous

08/25/2014 03:29 PM

BRCOSA000282

Claim: E2906093

condition caused by a contractor hired by the owner. If East Coast's Finest had been doing its job, the maintenance person would have detected the exposed brackets. He was not doing his job properly (as per the requirements of the contract). Please let me know if you have any questions or need any additional information. Thanks.
Virginia Fisher Claims Consultant CNA P.O. Box 8317 Chicago, IL 60680-8317 5565 Glenridge Connector, Suite 505 Atlanta, GA 30342-4756 (404) 531-3411 Fax: 312-260-6431
From: Fisher,Virginia R. Sent: Friday, September 06, 2013 3:26 PM To: 'Michael_Mullen@swissre.com' Subject: RE: Charles Ackley v Equity One, etal. Our Claim # E2906093 Your File: 020130005760 Mr. Mullen, Thanks for your letter, acknowledging our tender of defense and request for indemnity. The information you're looking for would have absolutely no impact our insured's status as an additional insured on the Swiss Re policy, in my opinion. Having said that, I will try to address your questions: -There is no separate proposal for the removal of the mail boxes. This contractor was in the process of doing a major remodeling project on the property, as a courtesy to our client, Equity One, they agreed to remove the old mail boxes since new ones were being installed. -I am attaching the contract between Equity One and EDC, but feel this is completely irrelevant to your evaluation of coverage for Equity One as an additional insured under your policy -There is no billing from the contractor that shows on what day the mailbox was removed. -I have no information indicating that Equity One notified East Coast's Finest that the mailbox was going to be removed. In the deposition of East Coast's employee, Alexis Jean, he testified that he pressure cleaned the sidewalk on the same day the old mailboxes were removed and he denied seeing any exposed brackets in the concrete. He said that if he would have seen them he would have removed them. He also testified that he walked the property every day (Mon through Sat from 7a-2p) and would clean ad inspect the property for any safety hazards. I will look forward to hearing your response.
Virginia Fisher Claims Consultant CNA P.O. Box 8317 Chicago, IL 60680-8317 5565 Glenridge Connector, Suite 505 Atlanta, GA 30342-4756 (404) 531-3411 Fax: 312-260-6431

| | |
|---|---|
| **By:** | Virginia Fisher |
| **Topic:** | General |
| **Related to:** | CHARLES ACKLEY |
| **Subject:** | |
| **Confidential:** | No |
| **Date:** | 09/24/2013 |

BRCOSA000283

Claim: E2906093

| | |
|---|---|
| Time Stamp: | 07:51 AM |
| | Sent Lee the depo trans of Charles Ackley. He will let me know about the hold. |
| By: | Lee Janicek |
| Topic: | SIU |
| Related to: | E2906093 |
| Subject: | SIU |
| Confidential: | Yes |
| Date: | 09/24/2013 |
| Time Stamp: | 07:31 AM |
| | teamed with Virginia Fischer - |
| By: | Virginia Fisher |
| Topic: | General |
| Related to: | CHARLES ACKLEY |
| Subject: | |
| Confidential: | No |
| Date: | 09/23/2013 |
| Time Stamp: | 08:54 PM |
| | Rec'd letter from Amerisure that our tender to EDC is denied. The adjuster feels thats the indemnification |

08/25/2014 03:29 PM

Page 59

BRCOSA000284

Claim: E2906093

|provision in the contract is not enforceable—it doesn't contain any monetary limits. Equity One is entitled to AI status- but on an excess basis. I have nothing to argue here as there is no indemnity provision in the contract. No requirement for us to be AI on primary basis. Will f/u on tender to East Coast Finest's carrier.

| | |
|---|---|
| **By:** | **Virginia Fisher** |
| **Topic:** | **Litigation Management** |
| **Related to:** | **CHARLES ACKLEY** |
| **Subject:** | |
| **Confidential:** | **No** |
| **Date:** | **09/23/2013** |
| **Time Stamp:** | **08:52 PM** |

From: Fisher,Virginia R. Sent: Monday, September 23, 2013 9:52 PM To: Janicek,Lee Subject: Ackley v. Equity One E2906093 Lee, I called you over a week ago to discuss the SIU hold, but have heard back from you. While I believe Mr. Ackley greatly exaggerated his disability he still had an injury, resulting in a surgery. Im in all week. Will look forward to hearing from you.

| | |
|---|---|
| **By:** | **Virginia Fisher** |
| **Topic:** | **General** |
| **Related to:** | **CHARLES ACKLEY** |
| **Subject:** | |
| **Confidential:** | **No** |
| **Date:** | **09/06/2013** |

User: Carol Sue Cox

08/25/2014 03:29 PM

BRCOSA000285

Claim: E2906093

**Time Stamp:**

**03:27 PM**

TT Ros. She pointed out that in light of SIU hold she's not steering this to mediation. She and I agreed that case still has a value. We aren't disputing an accident happened, he was damaged & he did have surgery. We just feel that he's grossly exaggerated his current condition. We agreed that I will need to speak w/ SIU and find out what their plan is regarding the hold. We will have no choice but to defend if SIU hold remains on the file. Called Lee Janicek and left message for him to call me back.

**By:** Virginia Fisher

**Topic:** Liability Evaluation

**Related to:** CHARLES ACKLEY

**Subject:**

**Confidential:** No

**Date:** 09/06/2013

**Time Stamp:** 02:42 PM

08/25/2014 03:29 PM

Page 61

BRCOSA000286

Claim: E2906093

By: Virginia Fisher

Topic: General

Related to: CHARLES ACKLEY

Subject:

Confidential: No

Date: 09/06/2013

Time Stamp: 02:38 PM

----- From: Fisher, Virginia R. Sent: Friday, September 06, 2013 3:38 PM To: 'Hackett, Kimberly' Subject: RE: Ackley v. Equity One and EDC: My CL #: 1298732; Your CL #: E2906093 Hi Ms. Hackett. Thanks for your response to our tender. I must point out that the tender was based upon the contractual requirement that EDC to maintain GL insurance and include Equity One as an additional insured under your policy. Your letter is silent as to that issue. Would you please confirm whether or not Equity One is indeed an insured under this policy? I didn't see an indemnity provision in the contract, can you please tell me what page or section that is? I must be missing that from my copy of the contract. Thanks. I'll look forward to hearing your response.

Virginia Fisher Claims Consultant CNA P.O. Box 8317 Chicago, IL 60680-8317 5565 Glenridge Connector, Suite 505 Atlanta, GA 30342-4756 (404) 531-3411 Fax: 312-260-6431

By: Virginia Fisher

Topic: General

BRCOSA000287

Claim: E2906093

**Related to:** CHARLES ACKLEY

**Subject:**

**Confidential:** No

**Date:** 09/06/2013

**Time Stamp:** 02:26 PM

---------- From: Fisher,Virginia R. Sent: Friday, September 06, 2013 3:26 PM To: 'Michael_Mullen@swissre.com' Subject: RE: Charles Ackley v Equity One, etal. Our Claim # E2906093 Your File: E2013000576O Mr. Mullen, Thanks for your letter, acknowledging our tender of defense and request for indemnity. The information you're looking for would have absolutely no impact our insured's status as an additional insured on the Swiss Re policy, in my opinion. Having said that, I will try to address your questions: -There is no separate proposal for the removal of the mail boxes. This contractor was in the process of doing a major remodeling project on the property, as a courtesy to our client, Equity One, they agreed to remove the old mail boxes since new ones were being installed. -I am attaching the contract between Equity One and EDC, but feel this is completely irrelevant to your evaluation of coverage for Equity One as an additional insured under your policy -There is no billing from the contractor that shows on what day the mailbox was removed. -I have no information indicating that Equity One notified East Coast's Finest that the mailbox was going to be removed. In the deposition of East Coast's employee, Alexis Jean, he testified that he pressure cleaned the sidewalk on the same day the old mailboxes were removed and he denied seeing any exposed brackets in the concrete. He said that if he would have seen them he would have removed them. He also testified that he walked the property every day (Mon through Sat from 7a-2p) and would clean ad inspect the property for any safety hazards. I will look forward to hearing your response. Virginia Fisher Claims Consultant CNA P.O. Box 8317 Chicago, IL 60680-8317 5565 Glenridge Connector, Suite 505 Atlanta, GA 30342-4756 (404) 531-3411 Fax: 312-260-6431
---------- From: Michael_Mullen@swissre.com [mailto:Michael_Mullen@swissre.com] Sent: Monday, August 12, 2013 2:27 PM To: Fisher,Virginia R. Subject: Charles Ackley v Equity claim # E2906093 Ms. Fisher, this letter will advise that First Specialty, a Swiss Re company insured East Coast's Finest at the time of this accident. I will need more information to evaluate the tender.

**By:** Virginia Fisher

**Topic:** Litigation Management

User: Carol Sue Cox      Page 63      08/25/2014 03:29 PM

Claim: E2906093

| | |
|---|---|
| **Related to:** | **CHARLES ACKLEY** |
| **Subject:** | |
| **Confidential:** | **No** |
| **Date:** | **09/06/2013** |
| **Time Stamp:** | **01:54 PM** |

From: Fisher,Virginia R. Sent: Friday, September 06, 2013 2:49 PM To: Milian,Rosalind Subject: FW: Charles Ackley v Equity claim # E2906093 Here's what I heard from East Coast/Countryside Power Sweeping's carrier (above.) Equity is supposed to be named as an AI on their policy and we have the indemnity agreement in our favor. I will tell them that what they're asking for is completely irrelevant to the AI issue. However, in their last question in the letter, they ask whether or not East Coast's Finest was given notice that the mailbox was to be removed. Do you know if that was the case? As to EDC, their carrier denied our tender, but they completely ignored the requirement that they provide AI coverage to our insured. I'll write to them again and bring that up. I had an opportunity to speak with Jason Gibson, the Associate General Counsel for Equity One. He is now our new point of contact for this client for consulting on reserves and settlement. Could you please now direct copies of your reports to him as well? Here's from updated Special Handling Instructions: "Please instruct attorney assigned defense attorney to copy Jason Gibson or Oscar Zamora (depending upon the state) on legal correspondence (in this case it would be Jason). Request that defense attorney use the following information in the letter RE: block: Please always include the name of the Equity One property when communicating with the insured and/or agent. Also; please include the following in the subject line: name of the property in the address line of the loss location, claimant name, date of loss, and file number (in that order) . For example; Madison Center, Madison, AL, Joe Smith, 1/1/01, E2999999. His contact information is: Florida account contact for Inv and contracts Jason Gibson Assoc General Counsel Equity One US Office:305-957-1208 jgibson@equityone.net What additional discovery is there to be done on this one? And, do you think mediation would be helpful? EDC is our real target here and now that they're in the case maybe we can push this in this direction? What do you think?

Virginia Fisher Claims Consultant CNA P.O. Box 8317 Chicago, IL 60680-8317 5565 Glenridge Connector, Suite 505 Atlanta, GA 30342-4756 (404) 531-3411 Fax: 312-260-6431

From: Michael_Mullen@swissre.com [mailto:Michael_Mullen@swissre.com] Sent: Monday, August 12, 2013 2:27 PM To: Fisher,Virginia R. Subject: Charles Ackley v Equity claim # E2906093 Ms. Fisher, this letter will advise that First Specialty, a Swiss Re company insured East Coast's Finest at the time of this accident. I will need more information to evaluate the tender. Michael Mullen | Claims Specialist | Assistant Vice President | Corporate Solutions Departments Westport Insurance Corporation | Teleworker, 32766 Oviedo, USA Direct +1407977 0858 E-mail: Michael_Mullen@swissre.com http://www.swissre.com | www.swissre.com/corporatesolutions Reach for the sky

User: Carol Sue Cox

Page 64

08/25/2014 03:29 PM

BRCOSA000289

Claim: E2906093

| | |
|---|---|
| **By:** | Virginia Fisher |
| **Topic:** | General |
| **Related to:** | CHARLES ACKLEY |
| **Subject:** | |
| **Confidential:** | No |
| **Date:** | 09/06/2013 |
| **Time Stamp:** | 01:35 PM |

EDC is now a defendant. East Coast is not a defendant. We will not bring them in as Ros felt that pointing the finger at them is like pointing the finger at ourselves, since they are contractually doing what our insd, as the landowner, had a nondelegable duty to do. Insd has a non-delegable duty to maintain the premises in a safe condition. We hired East Coast to do routine inspections of the property, make sure there were no unsafe conditions, and if they saw any unsafe conditions they were to fix or report them to the insd immediately. Here's where things stand with the tenders of East Coast and EDC: East Coast Finest --still considering and has asked for addtl information, which is irrelevant to our status as an AI under their policy. EDC's carrier has denied on the basis that they don't owe indemnity, the indemnity language isn't enforeable since it doesn't have a monetary limitation. Ros thinks they're wrong about that, but they completely ignored that we have AI status. I am writing to each of them to reinforce the AI status.

| | |
|---|---|
| **By:** | Virginia Fisher |
| **Topic:** | Litigation Management |
| **Related to:** | CHARLES ACKLEY |
| **Subject:** | |
| **Confidential:** | Yes |
| **Date:** | 09/06/2013 |

BRCOSA000290

Claim: E2906093

| **Time Stamp:** | **12:48 PM** |
| | -----Original Message----- From: Milian,Rosalind Sent: Tuesday, August 27, 2013 4:55 PM To: Fisher,Virginia R. Subject: Ackley v. Equity One, Inc. E2906093, Status of tender Virginia, I note that EDC's carrier is reviewing the complaint in order to respond to your tender. Did you ever hear back from East Coast's Finest regarding your tender to them as well? Rosalind Milian, Esq. Law Office of Lorraine Lester A Staff Counsel Office of the CNA Insurance Companies 8100 S.W. 10th Street, Suite 2500 Plantation, FL 33324 954-424-4660 direct 954-424-4667 Fax: 866-696-7828 Cell: 954-770-6632 |
| **By:** | **Virginia Fisher** |
| **Topic:** | **General** |
| **Related to:** | **CHARLES ACKLEY** |
| **Subject:** | |
| **Confidential:** | **No** |
| **Date:** | **09/06/2013** |
| **Time Stamp:** | **11:55 AM** |
| | |
| **By:** | **Virginia Fisher** |
| **Topic:** | **Litigation Management** |



BRCOSA000291

Claim: E2906093

Related to:           CHARLES ACKLEY
Subject:
Confidential:         Yes
Date:                 09/05/2013
Time Stamp:           04:21 PM

By:                   Virginia Fisher
Topic:                General
Related to:           CHARLES ACKLEY
Subject:
Confidential:         No
Date:                 09/04/2013
Time Stamp:           01:08 PM

User: Carol Sue Cox

Page 67

08/25/2014 03:29 PM

BRCOSA000292

Claim: E2906093

**By:** Virginia Fisher

**Topic:** General

**Related to:** CHARLES ACKLEY

**Subject:**

**Confidential:** No

**Date:** 08/22/2013

**Time Stamp:** 12:34 PM

Wasn't sure if I'd sent a copy of the complaint yet to Kim Hackett w/ Amerisure yet--did so today. Amerisure is the carrier for EDC, their claim is 1298732. Called Kim today at 727-561-7158 to advise that complaint is coming. She called me back and said that she did get a copy of the suit--corporate is looking at our tender and they will respond. Pltf did bring in EDC as direct defendant now. Her email is: khackett@amerisure.com.

**By:** Virginia Fisher

------------------- From: Fisher,Virginia R. Sent: Wednesday, September 04, 2013 2:08 PM To: Milian,Rosalind Subject: FW: Ackley v. Equity One and EDC; My CL #: 1298732; Your CL #: E2906093 Hi Ros, Hope all's well with you. I received this response from EDC's carrier. Are they correct about the lack of a monetary limitation in the agreement making it invalid? Virginia Fisher Claims Consultant CNA P.O. Box 8317 Chicago, IL 60680-8317 5565 Glenridge Connector, Suite 505 Atlanta, GA 30342-4756 (404) 531-3411 Fax: 312-260-6431 Tender from EDC's carrier denied. They say that the indemnity provision lack a monetary limitation, therefore the indemnification language is not enforceable. Sent to Ros to see if she agrees w/ this. ------------------- From: Hackett, Kimberly [mailto:KHackett@amerisure.com] Sent: Wednesday, September 04, 2013 11:20 AM To: Fisher,Virginia R. Subject: RE: Ackley v. Equity One and EDC; My CL #: 1298732; Your CL #: E2906093 Please see attached letter. Kim Hackett Senior Claims Adjuster Amerisure Ins. Companies 727-561-7158 khackett@amerisure.com

BRCOSA000293

Claim: E2906093

**Topic:** General

**Related to:** CHARLES ACKLEY

**Subject:**

**Confidential:** No

**Date:** 08/22/2013

**Time Stamp:** 12:30 PM

--------- From: Fisher,Virginia R. Sent: Thursday, August 22, 2013 1:29 PM To: 'csfrontieradj@bellsouth.net' Subject: RE: Equity OneClaimant: Charles Ackley Hi Jim. Here's the complaint. I look forward to hearing back from you.

Virginia Fisher Claims Consultant CNA P.O. Box 8317 Chicago, IL 60680-8317 5565 Glenridge Connector, Suite 505 Atlanta, GA 30342-4756 (404) 531-3411 Fax: 312-260-6431 --------- From: csfrontieradj@bellsouth.net [mailto:csfrontieradj@bellsouth.net] Sent: Monday, August 19, 2013 8:01 AM To: Fisher,Virginia R. Subject: Equity OneClaimant: Charles Ackley Importance: High Good Morning, Virginia. As per our telephone conversation of Friday, August 16, 2013, please forward to me a copy of the complaint and/or any amended complaint filed in the above matter, I have attached a copy of your letter placing my insured, East Coast on notice, Thanking you in advance, Jim Rogers Frontier Adjusters of South Florida Owner/Operator 5712 NW 41 Ave. Coconut Creek, Fl. 33073 (954)421-1162 Office (954)862-6886 Fax csfrontieradj@bellsouth.net

**By:** Virginia Fisher

**Topic:** General

**Related to:** CHARLES ACKLEY

**Subject:**

**Confidential:** No

**Date:** 08/22/2013

User: Carol Sue Cox

08/25/2014 03:29 PM

BRCOSA000294

Claim: E2906093

**Time Stamp:**

**11:58 AM**

Discussed claim w/ Suzette. She suggested I call Jason Gibson to discuss the choice of counsel and reserve. Called Mr. Gibson at 305-957-1208–lm for call back.

08/25/2014 03:29 PM

Page 70

User: Carol Sue Cox

BRCOSA000295

Claim: E2906093

**By:** Cynthia Strong

**Topic:** Management Review

**Related to:** E2906093

**Subject:** Management

**Confidential:** Yes

**Date:** 08/22/2013

**Time Stamp:** 11:27 AM

**By:** Virginia Fisher

**Topic:** General

**Related to:** CHARLES ACKLEY

**Subject:**

**Confidential:** No

**Date:** 08/20/2013

**Time Stamp:** 08:34 PM

-------------------- From: csfrontieradj@bellsouth.net
[mailto:csfrontieradj@bellsouth.net] Sent: Monday, August 19, 2013 8:01 AM To: Fisher, Virginia R. Subject: Equity OneClaimant: Charles Ackley Importance: High Good Morning, Virginia, As per our telephone conversation of Friday, August 16, 2013, please forward to me a copy of the complaint and/or any amended

BRCOSA000296

Claim: E2906093



complaint filed in the above matter, I have attached a copy of your letter placing my insured, East Coast on notice, Thanking you in advance, Jim Rogers Jim Rogers Frontier Adjusters of South Florida Owner/Operator 5712 NW 41 Ave. Coconut Creek, Fl. 33073 (954)421-1162 Office (954)862-6886 Fax csfrontieradj@bellsouth.net Consider the environment before printing this message. This transmission is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is confidential, proprietary, privileged or otherwise exempt from disclosure. If you are not the named addressee, you are NOT authorized to read, print, retain, copy or disseminate this communication, its attachments or any part of them. If you have received this communication in error, please notify the sender immediately and delete this communication from all computers. This communication does not form any contractual obligation on behalf of the sender, the sender's employer, or the employer's parent company, affiliates or subsidiaries.

**By:**              Virginia Fisher

**Topic:**           Coverage Analysis

**Related to:**      CHARLES ACKLEY

**Subject:**

**Confidential:**    Yes

**Date:**            08/19/2013

**Time Stamp:**      03:47 PM

BRCOSA000297



Claim: E2906093

By:            Virginia Fisher
Topic:         Litigation Management
Related to:    CHARLES ACKLEY
Subject:
Confidential:  Yes
Date:          08/02/2013
Time Stamp:    09:18 AM

08/25/2014 03:29 PM

Page 73

User: Carol Sue Cox

BRCOSA000298



Claim: E2906093

**By:** Virginia Fisher

**Topic:** Litigation Management

**Related to:** CHARLES ACKLEY

**Subject:**

**Confidential:** Yes

**Date:** 08/01/2013

**Time Stamp:** 02:05 PM

User: Carol Sue Cox

Page 74

08/25/2014 03:29 PM

Claim: E2906093

**By:** Virginia Fisher

**Topic:** General

**Related to:** CHARLES ACKLEY

**Subject:**

**Confidential:** No

**Date:** 08/01/2013

**Time Stamp:** 09:12 AM

Called East Coast's Finest to f/u on tender at 561-743-0764--got a vm (unidentified person/ company) and left a message for a call back on my letter of July 15.

**By:** Virginia Fisher

**Topic:** Litigation Management

**Related to:** CHARLES ACKLEY

**Subject:**

**Confidential:** Yes

**Date:** 08/01/2013

**Time Stamp:** 08:55 AM

08/25/2014 03:29 PM

Page 75

BRCOSA000300



Claim: E2906093

| | |
|---|---|
| By: | Donna Niejako |
| Topic: | General |
| Related to: | E2906093 |
| Subject: | Wrong file |
| Confidential: | Yes |
| Date: | 07/30/2013 |
| Time Stamp: | 07:24 AM |
| | Entered wrong file. |

User: Carol Sue Cox       Page 76       08/25/2014 03:29 PM

BRCOSA000301

Claim: E2906093

| By: | Donna Niejako |
| --- | --- |
| Topic: | Contact |
| Related to: | E2906093 |
| Subject: | FILE REVIEW |
| Confidential: | No |
| Date: | 07/30/2013 |
| Time Stamp: | 07:21 AM |

Account review held 7/25. I presented the case in the consultant's absence. The account indicated that there was construction being performed at this location and the area of this fall had been completed. The GC was working near the anchor store (TJ Maxx). I advised that we could check into whether there was substantial completion as many times the GC is still responsible for the entire site. They will check the contract and their records to determine whether there is a sign-off for substantial completion in this area as well as getting the contract w/ the GC to the consultant for review. We will explore if the GC can be put on notice of this claim.

| By: | Lee Janicek |
| --- | --- |
| Topic: | SIU |
| Related to: | E2906093 |
| Subject: | Final report and surveillance effort |
| Confidential: | Yes |
| Date: | 07/29/2013 |
| Time Stamp: | 10:01 AM |

I have received this final report and invoice authorizing payment of it to ICS - OK to pay ICS merrill invoice

BRCOSA000302

Claim: E2906093

309201307260762 for $1,710.00 code EX Subject is quite active for the type of injury he is claiming and is acting contrary to what is claimed in the form of an inability. I have notified Virginia Fisher. The information referral has been made - before a foundational referral is made I suggest the following - recommend if possible to depose this subject to compare his testimony under oath or ask they provide documentation in any medical ultimately submitted that may support the subject made misrepresentations in support of an inability to move about that is contradicted on the video in CNA possession. If the results are such that contradict the video and medical presented to doctors as to ability, we will consider referring to the Stea of Florida Dept of Financial Services Inquiry Review. The request was carefully reviewed. An investigative action plan was formulated. Data: An NCR was pulled on the claimant which did not show the reported address. His last address was in Coral Springs. No vehicles were found to be associated to the claimant. Multiple arrests were located and the claimant is reported as a convicted felon for a violent crime. An arrest search is suggested. Satellite and Mapping: Google Earth was utilized to scout the subject neighborhood for surveillance positions and points of egress. Basic Internet Search: No social networking hits were located for the claimant. Reverse searches failed to yield viable information regarding the claimant. The Broward Clerk of Courts yielded one hit. Mugshots.com provided a recent image of the claimant as follows: [PHOTO COULD NOT BE DOWNLOADED] On Thursday, July 18, 2013, surveillance was conducted at 1182 SE 2nd Avenue Deerfield Beach, FL. At 7:01 a.m., the claimant was briefly observed in the doorway. At 9:18 a.m., the claimant was briefly observed in the driveway. At 9:55 a.m., the claimant answered the door to a mail carrier and signed for an item. At 10:08 a.m., the claimant was observed briefly in the driveway. At 10:44 a.m., the claimant departed on a bicycle. He rode to a Winn Dixie grocery store 1019 South Federal Highway Deerfield Beach, FL., which he entered briefly before riding the bicycle back home at 10:55 a.m. At 11:58 a.m., the claimant stood in the doorway and stared at a female walking by the front of his residence. On Friday, July 19, 2013, surveillance was conducted at 1182 SE 2nd Avenue Deerfield Beach, FL. At 8:04 a.m., the claimant was observed briefly in front of his residence. At 8:58 a.m., the claimant moved his bicycle from the carport to the rear of the residence. At 9:22 a.m., the claimant took a leashed dog around the block in his neighborhood using a skateboard. He returned back inside the residence at 9:27 a.m. At 11:04 a.m., the claimant spoke on a phone in front of the residence. At 11:13 a.m., the claimant was briefly observed in front of the residence. At 12:04 p.m., the claimant was briefly observed in front of the residence. At 12:27 p.m., the claimant spoke on a phone in front of the residence. On Sunday, July 21, 2013, surveillance was conducted at 1182 SE 2nd Avenue Deerfield Beach, FL, where no vehicles were present. At 8:34 a.m., the claimant departed on a bicycle accompanied by a female on foot. They traveled toward a bus stop where they interacted with another male. The claimant appeared to purchase a second bicycle from the other male. After the female entered the bus the claimant rode one bike while guiding the second back to his residence at 9:09 a.m. At 9:21 a.m., the claimant brought both bikes to the rear of the residence. At 9:25 a.m., the claimant spoke on a phone in front of the residence. At 9:47 a.m., the claimant again spoke on a phone in front of his residence. At 10:08 a.m., the claimant drove the newly purchased bike around his neighborhood. He appeared to be testing it. At 12:20 p.m., the claimant departed on a bike and traveled to a Circle K convenience store at 4791 Dixie Highway, Pompano Beach, FL., where he loitered for a considerable time interacting with other individuals. He engaged in a (unknown type) transaction with another individual before returning back to his residence at 1:19 p.m. VIDEO DOCUMENTATION 90 minutes and 59 seconds of video documentation was obtained during this

BRCOSA000303

Claim: E2906093

investigation, of which 81 minutes and 35 seconds depicts claimant activity. https://www.tmgecase.com/mgis2/VideoStream.asp?sid=12759642 The hyperlink is active for one (1) year from the date of the report. If you need this link to reactivated, please contact ICS|MERRILL at (888) 932-8364. As is customary, the original video data will be securely maintained at our corporate office in Jacksonville, Florida.

**By:** Lee Janicek

**Topic:** SIU

**Related to:** E2906093

**Subject:** Surveillance udpate

**Confidential:** Yes

**Date:** 07/22/2013

**Time Stamp:** 12:10 PM

The additional 3rd day of surveillance was conducted this past Sunday, 7/21/13. On Sunday, July 21, 2013 from 7:56 a.m. to 4:01 p.m. surveillance was conducted at 1182 SE 2nd Avenue Deerfield Beach, FL where no vehicles were present. At 8:34 a.m. the claimant departed on a bicycle accompanied by a female on foot. They traveled toward a bus stop where they interacted with another male. The claimant appeared to purchase a second bicycle from the other male. After the female entered the bus the claimant rode one bike while guiding the second back to his residence at 9:09 a.m. At 9:21 a.m. the claimant brought both bikes to the rear of the residence. At 9:25 a.m. the claimant spoke on a phone in front of the residence. At 9:47 a.m. the claimant again spoke on a phone in front of his residence. At 10:08 a.m. the claimant drove the newly purchased bike around his neighborhood. He appeared to be testing it. At 12:20 p.m. the claimant departed on a bike and traveled to a Circle K convenience store at 4791 Dixie Highway, Pompano Beach, FL where he loitered for a considerable time interacting with other individuals. He engaged in a (unknown type) transaction with another individual before returning back to his residence at 1:19 p.m. By 4:01 p.m. no further activity had been observed and the surveillance was terminated for the day.

**By:** Virginia Fisher

BRCOSA000304

Claim: E2906093

| | |
|---|---|
| **Topic:** | SIU |
| **Related to:** | E2906093 |
| **Subject:** | |
| **Confidential:** | Yes |
| **Date:** | 07/19/2013 |
| **Time Stamp:** | 03:27 PM |

————— From: Fisher,Virginia R. Sent: Friday, July 19, 2013 4:24 PM To: Janicek,Lee Cc: Greg Foutz; Milian,Rosalind Subject: RE: E2906093_Charles Ackley_Update If this guy is riding a bike then yes, let's do more. Based on how he portrayed his injuries I would not expect him to be riding a bike. I might add that he looks rather fit for a completely disabled person. He must have a gym membership somewhere...
Virginia Fisher Claims Consultant CNA P.O. Box 8317 Chicago, IL 60680-8317 5565 Glenridge Connector, Suite 505 Atlanta, GA 30342-4756 (404) 531-3411 Fax: 312-260-6431

————— From: Janicek,Lee Sent: Friday, July 19, 2013 4:22 PM To: Fisher,Virginia R. Cc: Greg Foutz Subject: RE: E2906093_Charles Ackley_Update Virginia It'll show up in their Accurint reporting but I will remind them. Yes they are on him today, you want us to go one more day...say tomorrow if possible (20th?) Greg - if Virginia ok's can you do tomorrow as well?

————— From: Fisher,Virginia R. Sent: Friday, July 19, 2013 3:20 PM To: Janicek,Lee; Milian,Rosalind Subject: RE: E2906093_Charles Ackley_Update It's him. Are you going more? A mugshot? Ros, should we do a criminal background check on him?
Virginia Fisher Claims Consultant CNA P.O. Box 8317 Chicago, IL 60680-8317 5565 Glenridge Connector, Suite 505 Atlanta, GA 30342-4756 (404) 531-3411 Fax: 312-260-6431

————— From: Janicek,Lee Sent: Friday, July 19, 2013 4:13 PM To: Fisher,Virginia R. Subject: FW: E2906093_Charles Ackley_Update Do you know of anyone who can positively identify these photos as our subject? If so, please forward this to them and get their thoughts - the third from the left is a mug shot from somewhere

| | |
|---|---|
| **By:** | Lee Janicek |
| **Topic:** | SIU |
| **Related to:** | E2906093 |

BRCOSA000305

Claim: E2906093

**Subject:** Surveillance Day 1

**Confidential:** Yes

**Date:** 07/19/2013

**Time Stamp:** 03:11 PM

On Thursday, July 18, 2013 from 6:01 a.m. to 2:01 p.m. surveillance was conducted at 1182 SE 2nd Avenue Deerfield Beach, FL where no vehicles were present. At 7:01 a.m. the claimant was present. At 9:18 a.m. the claimant was briefly observed in the driveway. At 9:55 a.m. the claimant answered the door to a mail carrier and signed for an item. At 10:08 a.m. the claimant was observed briefly in the driveway. At 10:44 a.m. the claimant departed on a bicycle. He rode to a Winn Dixie grocery store 1019 South Federal Highway Deerfield Beach, FL which he entered briefly before riding the bicycle back home at 10:55 a.m. At 11:58 a.m. the claimant stood in the doorway and stared at a female walking by the front of his residence. By 2:01 p.m. no further activity had been observed and the surveillance was terminated for the day.

**By:** Virginia Fisher

**Topic:** Plan of Action

**Related to:** CHARLES ACKLEY

**Subject:**

**Confidential:** No

**Date:** 07/19/2013

**Time Stamp:** 12:58 PM

POA in status report: -I have assigned surveillance to confirm the plaintiff's current level of activities; this should help us evaluate the case. -I have asked EDC and East Coast's to put their carriers on notice and respond to us regarding additional insured coverage for Equity One. -I will reevaluate the reserve and discuss with you following our responses to our tenders to EDC and East Coast's.

BRCOSA000306

Claim: E2906093

| | |
|---|---|
| **By:** | Virginia Fisher |
| **Topic:** | General |
| **Related to:** | CHARLES ACKLEY |
| **Subject:** | |
| **Confidential:** | No |
| **Date:** | 07/19/2013 |
| **Time Stamp:** | 10:54 AM |

Rec'd letter from Amerisure, who insures EDC; their cllam is 1298732. They rec'd my tender and are requesting a copy of the suit. Their adjuster is Kim Hackett at 727-561-7158. ---------- From: Fisher, Virginia R. Sent: Friday, July 19, 2013 12:28 PM To: 'Hackett, Kimberly' Cc: 'Margaret H. Carden, CLA' Subject: RE: Your Claim #:; E2906093 (Equity One); My Claim # 1298732 (EDC) Kimberly, Here's the complaint. I understand the plaintiff's attorney is now amending to name EDC directly. Please let me know if you need anything else at this time. Virginia Fisher Claims Consultant CNA P.O. Box 8317 Chicago, IL 60680-8317 5565 Glenridge Connector, Suite 505 Atlanta, GA 30342-4756 (404) 531-3411 Fax: 312-260-6431 ---------- From: Hackett, Kimberly [mailto:KHackett@amerisure.com] Sent: Friday, July 19, 2013 11:30 AM To: Fisher, Virginia R. Cc: 'Margaret H. Carden, CLA' Subject: RE: Your Claim #:; E2906093 (Equity One); My Claim # 1298732 (EDC) Ms. Fisher, Please see attached letter. Thank you, Kim Hackett Senior Claims Adjuster Amerisure Ins. Companies 727-561-7158 khackett@amerisure.com

| | |
|---|---|
| **By:** | Lee Janicek |
| **Topic:** | SIU |
| **Related to:** | E2906093 |
| **Subject:** | Surveillance scheduled |
| **Confidential:** | Yes |

08/25/2014 03:29 PM

BRCOSA000307

Claim: E2906093

| | |
|---|---|
| **Date:** | 07/17/2013 |
| **Time Stamp:** | 03:59 PM |
| | Thursday, 7/17 and Friday, 7/18/13 |
| **By:** | Lee Janicek |
| **Topic:** | SIU |
| **Related to:** | E2906093 |
| **Subject:** | Surveillance Assignment ICS |
| **Confidential:** | Yes |
| **Date:** | 07/17/2013 |
| **Time Stamp:** | 10:48 AM |

THIS FILE IS NOT TO BE SETTLED AND NO SETTLEMENT DISCUSSIONS ARE TO BE ENTERED INTO WITH THE SUBJECT OR HIS COUNSEL (IF APPLICABLE) WHILE THERE IS AN SIU HOLD IN PLACE E2906093 Due date- 8/13/2013 Insured Equity One Inc DOI 9/24/2012 Adjuster is: Virginia Fischer - Nashville Description of Loss: The claimant alleges while on the property of the insured he tripped over some brackets and tore some muscles in the abdomen area *** RED FLAG INDICATORS *** 1. Possible malingering more active than portraying to be 2. Details are sketchy Underwriting Company Name: National Fire Insurance Company of Hartford Restrictions Ackley said he can only walk with a cane, otherwise he is completely disabled --- SIU REVIEW --- Ive reviewed this and agree that surveillance is warranted Ive assigned to ICS -Ive advised Virginia Fisher through CS. He claims that although he was disabled before this accident, he was able about 25% functional. After this accident he is now completely disabled. He claims he does not ambulate with out a cane. His is 51 years old and has two kids, ages 12-13 and used to be fairly active with them (gym, catching football at a park.) Would like to see what we can observe as to his current level of activities. --- SIU PLAN OF ACTION --- 1. Authority is for 2 weekdays a) He is suspected to be active with his kids as theyre out of school b) Stay on him as long as he is active 2. Accurint and Social Media Searches Biographical and contact data Claimant Charles Ackley 1182 SE 2nd Avenue, Deerfield Beach, Florida 33441-6804 DOB 4/24/1962 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 Driver's License -unknown 60 190 lbs White male, balding Home phone unknown Marital status married

BRCOSA000308

Claim: E2906093

**By:** Virginia Fisher

**Topic:** SIU

**Related to:** E2906093

**Subject:**

**Confidential:** Yes

**Date:** 07/16/2013

**Time Stamp:** 04:22 PM

From: Fisher,Virginia R. Sent: Tuesday, July 16, 2013 5:22 PM To: Janicek,Lee Subject: E2906093 Charles Ackley is Caucasian. I put his height and weight in the activity—6'0" around 190 lbs. Virginia Fisher Claims Consultant CNA P.O. Box 8317 Chicago, IL 60680-8317 5565 Glenridge Connector, Suite 505 Atlanta, GA 30342-4756 (404) 531-3411 Fax: 312-260-6431

**By:** Virginia Fisher

**Topic:** Litigation Management

**Related to:** E2906093

**Subject:**

**Confidential:** Yes

**Date:** 07/16/2013

**Time Stamp:** 04:20 PM

Page 84

User: Carol Sue Cox

08/25/2014 03:29 PM

BRCOSA000309

Claim: E2906093

| | |
|---|---|
| **By:** | Lee Janicek |
| **Topic:** | SIU |
| **Related to:** | E2906093 |
| **Subject:** | Descriptors |
| **Confidential:** | Yes |
| **Date:** | 07/16/2013 |
| **Time Stamp:** | 02:00 PM |

I've asked Virginia for more information about height weight and race before we can consider surveillance

08/25/2014 03:29 PM

Page 85

BRCOSA000310

Claim: E2906093

| | |
|---|---|
| By: | Virginia Fisher |
| Topic: | Investigation |
| Related to: | CHARLES ACKLEY |
| Subject: | |
| Confidential: | No |
| Date: | 07/16/2013 |
| Time Stamp: | 07:56 AM |

TT Tosha Ferron, the Travelers' investigator today. She said best # to reach her on is 317-294-4224 (cell). Her claim invovled a claim that clmt bit onto a peice of glass and broke a tooth. The dentist said the findings were consistent /w what he claimed. They only questioned it since he was only customer making the claim. Their claim was settled for $1500.

| | |
|---|---|
| By: | Virginia Fisher |
| Topic: | Coverage Analysis |
| Related to: | E2906093 |
| Subject: | Coverage Analysis for MEDP-Medical Payments, BODI-Bodily Injury |
| Confidential: | Yes |
| Date: | 07/15/2013 |
| Time Stamp: | 05:23 PM |

User: Carol Sue Cox

08/25/2014 03:29 PM

BRCOSA000311



**By:**

**Topic:** Virginia Fisher

**Related to:** Plan of Action

**Subject:** E2906093

**Confidential:** No

**Date:** 07/15/2013

**Time Stamp:** 05:14 PM

BRCOSA000312

Claim: E2906093



**By:** Virginia Fisher
**Topic:** Investigation
**Related to:** CHARLES ACKLEY
**Subject:**
**Confidential:** No

User: Carol Sue Cox          Page 88          08/25/2014 03:29 PM

BRCOSA000313

Claim: E2906093

| | |
|---|---|
| **Date:** | 07/15/2013 |
| **Time Stamp:** | 03:36 PM |

Review ISO hits. There is one hit for claim made w/ Travelers for a 5-29-10 loss. Their insured was 21C Muserna Hotel in Louisville, KY. The clmt had a KY address at that time. The clmt's SSN matched theirs. Their notes on ISO hit said "Suspicious claim". I confirmed this was a products claim for them. They paid $1500 and it was closed. I was told to contact Tosha Ferron, their investigator, for addl info at 317-818-5386/office, or her cell at 317-294-4224. I called her office # and lm for call back. Their claim is EK24941001.

| | |
|---|---|
| **By:** | Virginia Fisher |
| **Topic:** | Litigation Management |
| **Related to:** | CHARLES ACKLEY |
| **Subject:** | |
| **Confidential:** | Yes |
| **Date:** | 07/15/2013 |
| **Time Stamp:** | 09:58 AM |

08/25/2014 03:29 PM

Page 89

User: Carol Sue Cox

BRCOSA000314

Claim: E2906093



**By:** Virginia Fisher

**Topic:** Automatic

**Related to:** E2906093

**Subject:** Status Report

**Confidential:** No

**Date:** 07/15/2013

**Time Stamp:** 12:00 AM

ACTIVITY FROM OFFICE: 02A Status Report was approved.

**By:** Virginia Fisher

User: Carol Sue Cox

Page 90

08/25/2014 03:29 PM

BRCOSA000315

Claim: E2906093

| | |
|---|---|
| **Topic:** | Contact |
| **Related to:** | CHARLES ACKLEY |
| **Subject:** | |
| **Confidential:** | No |
| **Date:** | 05/06/2013 |
| **Time Stamp:** | 01:14 PM |

Rec'd trans file. Called insd tt Alexandra and advised of my handling 786-528-1457. Called Judith at Lockton 404-460-3600--got her vm--lm that I'm handling the claim. Called Ros Milian, dc, asked her to call me to discuss POA and lit budget. She's out of the office today. Called plff atty Steve Phillips at 561-868-1340--he wasn't in, tt Laurel. She said that their client is still treating. He has surgery scheduled for his 2nd hernia surgery. His first hernia repair was on 10-4-12 done by Dr. Parra--mesh placement. We deposed plff on 4-25.

| | |
|---|---|
| **By:** | Cynthia Strong |
| **Topic:** | Management Review |
| **Related to:** | E2906093 |
| **Subject:** | Management |
| **Confidential:** | Yes |
| **Date:** | 05/06/2013 |
| **Time Stamp:** | 09:29 AM |

Case assigned to Virginia Fisher. Please review and follow SCHI. Insured is the property owner. Reserves need to ba adjusted. Clarify the demolition of the mailbox area and who requested it and who performed the work. Does the lease agreement of the Salon tenant have any requirements for them to give notice of any hazards on the premises? Review agreement. Bring in GC aor any other responsible parties.

BRCOSA000316

Claim: E2906093

**By:** Jacqueline Adorno

**Topic:** Form / Letter

**Related to:** E2906093

**Subject:**

**Confidential:** No

**Date:** 05/02/2013

**Time Stamp:** 01:35 PM

Activity rec'd. for Ack. / Transfer letters but Alan Carr has been adjuster on this claim since 10/2012. No letters due out.

**By:** Alan Carr

**Topic:** General

**Related to:** E2906093

**Subject:** MCU Review

**Confidential:** No

**Date:** 05/02/2013

**Time Stamp:** 07:03 AM

Alerted MCU to the new facts on the injuries, and the PFS and if they want to handle the matter.

**By:** Alan Carr

BRCOSA000317

Claim: E2906093



**Topic:** Litigation Management

**Related to:** E2906093

**Subject:** Plaintiff PFS

**Confidential:** Yes

**Date:** 05/01/2013

**Time Stamp:** 06:39 PM

**By:** Alan Carr

**Topic:** Contact

**Related to:** E2906093

**Subject:** Suzette Bergbower - CSM

**Confidential:** No

**Date:** 04/30/2013

User: Carol Sue Cox

Page 93

08/25/2014 03:29 PM

Claim: E2906093

**Time Stamp:** 02:55 PM

Discussed claim with her and she has meeting with agent. Asked her to see if she can get a response from the insured on this matter. As she indicated this is an account where there is a consult but not authority needed. If we provide them with information on the claim and they do not respond can place the reserve, and take necessary action to see if we can resolve the claim.

**By:** Alan Carr

**Topic:** Settlement

**Related to:** E2906093

**Subject:** Authority Request

**Confidential:** Yes

**Date:** 04/24/2013

**Time Stamp:** 11:47 AM

BRCOSA000319

Claim: E2906093

**By:** Alan Carr

**Topic:** Medical

**Related to:** E2906093

**Subject:** The Pain Center - Medical Record

**Confidential:** Yes

**Date:** 03/25/2013

**Time Stamp:** 08:11 AM

Only medical record we have to date. Treatment date - 12/3/2012 Dr. John Gomez Involved in fall injury on 9/29/2012 Developed a right inguinal hernia Had a inguinal hernia repair on 10/4/2012. Has continued to complain of sever pain in his right groin, right scrotum and right inner upper thigh. Pain is aggravated when moving, bending, lifting or when having sex. Treated with anti-inflammatory - No benefit. Treated with Hydrocodone - No benefit. Oxycodone provides some relief - ??? PAST MEDICAL HISTORY - Chest injury while on duty in Afghanistan - VETERAN Treatment recommendations; Diagnostic right ilioinguinal and right genitofemoral nerve block Presently being treated with Percocet.

08/25/2014 03:29 PM

User: Carol Sue Cox

BRCOSA000320

Claim: E2906093



**By:** Alan Carr

**Topic:** Litigation Management

**Related to:** E2906093

**Subject:** Damages

**Confidential:** Yes

**Date:** 03/22/2013

**Time Stamp:**

**By:** Alan Carr

**Topic:** Liability Evaluation

**Related to:** E2906093

**Subject:** LIABILITY

**Confidential:** No

**Date:** 03/08/2013

**Time Stamp:** 01:58 PM

08/25/2014 03:29 PM

Page 96

User: Carol Sue Cox

BRCOSA000321



Claim: E2906093

**By:** Alan Carr
**Topic:** Litigation Management
**Related to:** E2906093
**Subject:** Inspection
**Confidential:** Yes
**Date:** 02/22/2013
**Time Stamp:** 02:34 PM

**By:** Alan Carr

User: Carol Sue Cox

Page 97

08/25/2014 03:29 PM

BRCOSA000322

Claim: E2906093

| | |
|---|---|
| **Topic:** | **Contact** |
| **Related to:** | E2906093 |
| **Subject:** | Linda - Broad Anesthesia |
| **Confidential:** | No |
| **Date:** | 01/25/2013 |
| **Time Stamp:** | 09:06 AM |

Contacted me regarding outstnading invoice for $456 for date of service 11/19/2012. Advised her that I need to have Ok from plaintiff counsel to issue payment directly or through attorney's office. Linda - 908-653-1283 Ext. 114 Cl# BCP3433

| | |
|---|---|
| **By:** | Alan Carr |
| **Topic:** | Litigation Management |
| **Related to:** | E2906093 |
| **Subject:** | Rosalind Milian |
| **Confidential:** | Yes |
| **Date:** | 12/26/2012 |
| **Time Stamp:** | 07:50 AM |

BRCOSA000323



Claim: E2906093

By:
Topic:
Related to:
Subject:
Confidential:
Date:
Time Stamp:

Alan Carr
Litigation Management
E2906093
Defense counsel
No
12/26/2012
07:49 AM

08/25/2014 03:29 PM

Page 99

User: Carol Sue Cox

BRCOSA000324

Claim: E2906093

**By:** UNKNOWN - SYSTEM unknown

**Topic:** Reserve Analysis

**Related to:** E2906093

**Subject:** System Generated Note

**Confidential:** Yes

**Date:** 12/26/2012

**Time Stamp:** 07:46 AM

---

**By:** Alan Carr

**Topic:** Plan of Action

**Related to:** E2906093

**Subject:** Plan of Action

**Confidential:** No

**Date:** 12/03/2012

**Time Stamp:** 07:13 AM

Claimant alleging that he fell over brackets that were on the pavement. Insured has advised that the brackets were not their. They had belonged to mail boxes and they had requested that GC on project taking place at location move the mail boxes. The GC was doing as a courtesy and not as part of their scope of

---

User: Carol Sue Cox

Page 100

08/25/2014 03:29 PM

BRCOSA000325

Claim: E2906093

work. Suit has been filed without any chance to investigate and look to resolve. COMPLETED Assigned suit to Lorraine Lester TO BE DONE COmpleted discovery Complete investigation' Determine damages Determine liability.

**By:** Alan Carr

**Topic:** Litigation Management

**Related to:** E2906093

**Subject:** Lorraine Lester

**Confidential:** Yes

**Date:** 12/03/2012

**Time Stamp:** 07:10 AM

Sent S&C to L. Lester for further handling.

**By:** Christopher Jenkins

**Topic:** Management Review

**Related to:** E2906093

**Subject:** Suit committee

**Confidential:** No

**Date:** 11/30/2012

**Time Stamp:** 01:43 PM

Reviewed Suit: -Compaint has not been filed in Broward County, FL -The insureds (Both Equity One & IRT

BRCOSA000326

Claim: E2906093

Coral Springs) are the only parties named -No coverage issue with the complaint -There is a duty to defend created for the occurrence resulting in the BI to the clmt on the insured's opened/operated & maintained location. -Will need to investigate the potential tender to the GC or if naming as a fabre defendant is a viable option in this case. -Interesting that the complaint is filed so quickly when the clmt clearly is not done treating -At this point, need to have the discovery to evaluate further -Agree that should proceed with referral to staff counsel Reserves: -With all of the information being so new, agree with a nominal reserve until the discovery is on hand to evaluate more fully

| By: | Alan Carr |
| Topic: | Coverage Analysis |
| Related to: | E2906093 |
| Subject: | IRT Coral Springs |
| Confidential: | Yes |
| Date: | 11/27/2012 |
| Time Stamp: | 09:34 AM |

| By: | Alan Carr |
| Topic: | Litigation Management |
| Related to: | E2906093 |
| Subject: | Suit Review |

BRCOSA000327

Claim: E2906093

**Confidential:** Yes

**Date:** 11/26/2012

**Time Stamp:** 06:34 PM

███████████████████████

**By:** Alan Carr

**Topic:** Contact

**Related to:** E2906093

**Subject:** Jane Schor - Insured

**Confidential:** No

**Date:** 11/18/2012

**Time Stamp:** 02:48 PM

Good Morning Alan As discussed, Im not sure how this may have happened. To the best of my knowledge there wasnt a time when there were brackets w/o the boxes so not sure how he could have tripped over them. The boxes were moved and installed as a courtesy to me by the GC; not really part of the redevelopment, but they did need to be moved due to the new configuration of the center. As far as I know we havent yet received any photos. When we do I will let you know. Thanks Alan. JANE SCHOR

**By:** Alan Carr

BRCOSA000328

Claim: E2906093

| | |
|---|---|
| **Topic:** | Contact |
| **Related to:** | E2906093 |
| **Subject:** | Jane Schor - Insured |
| **Confidential:** | No |
| **Date:** | 11/14/2012 |
| **Time Stamp:** | 07:30 AM |

Contacted me and advised that she has not got any S&C at this time and has not seen any photos of the alleged brackets. She advised me that the mail boxes in question were moved by the GC as a courtesy to her. The area where the mail boxes were was ging to be demolished so the had the mail boxes moved intoa breezeway that goes from front to back of the property. The long mail boxes were not bracketed down initially and the mail man complained that they needed to be. As a result the mail boxes were then anchored to the ground. She does not believe that at any time the brackets were exposed. She will wait for the photos that allegedly were with the S&C and then we will be able to ascertain that we are talking about the same location. However, based on her information this will not be a tender claim as this was not part of the construction project that was ongoing at the time.

| | |
|---|---|
| **By:** | Alan Carr |
| **Topic:** | Contact |
| **Related to:** | E2906093 |
| **Subject:** | Insured |
| **Confidential:** | No |
| **Date:** | 11/13/2012 |
| **Time Stamp:** | 01:59 PM |

Jane Schor Ken Miller & Joseph Lopez "I have finally been able to talk to the claimant counsel. He has advised me that his client tripped over brackets that had been left in the sidewalk after, what he believes

BRCOSA000329

Claim: E2906093

were mail boxes, were removed. He told me that he has filed a S&C on the matter and that you will likely be served over the next couple of days if you have not already. He has apparently sent you photos of the condition. It would appear that this would be the responsibility of the ongoing construction. Once you get the Complaint and the photos can you please forward to me along with the contract with the GC so that I can immediately tender to them. Although he was not certain of the the extent of the injuries it seems that the client tore stomach muscles and required emergency surgery and may require a second surgery. If you have any questions please let me know. Thanks

| | |
|---|---|
| By: | Alan Carr |
| Topic: | Contact |
| Related to: | E2906093 |
| Subject: | Stephen Philips - Claimant counsel |
| Confidential: | No |
| Date: | 11/13/2012 |
| Time Stamp: | 01:48 PM |

He never responded to letter that I sent to him asking for additional information on the claim, so contacted him yet again. He advised me that his client had injury to abdomen when he tore his stomach muscles. He has had one surgery and will be undergoing another. Apparently the claimant tripped over some brackets that had been left on the sidewalk after mail boxes (he believes) had been removed. Claimant tripped over them He told me that he has served the insured as of November 5 and that he presented them with photos of the condition. he believes that the insured would have been served over the last few days.

| | |
|---|---|
| By: | Alan Carr |
| Topic: | SIU |
| Related to: | E2906093 |

User: Carol Sue Cox

Page 105

08/25/2014 03:29 PM

BRCOSA000330

Claim: E2906093

**Subject:**        SIU

**Confidential:**   Yes

**Date:**           10/31/2012

**Time Stamp:**     01:05 PM
No red flags at this time. Need more information on the accident itself.

**By:**             Alan Carr

**Topic:**          General

**Related to:**     E2906093

**Subject:**        MCU Review

**Confidential:**   No

**Date:**           10/31/2012

**Time Stamp:**     01:04 PM
We are aware of emergency surgery being alleged but do not know what is was for and why it was needed. Presently no need for MCU review at this time.

**By:**             Alan Carr

**Topic:**          Coverage Analysis

**Related to:**     E2906093

**Subject:**        Coverage Analysis for MEDP-Medical Payments, BODI-Bodily Injury

BRCOSA000331

Claim: E2906093

**Confidential:** Yes

**Date:** 10/31/2012

**Time Stamp:** 01:04 PM

**By:** Jacqueline Adorno

**Topic:** Claim Assignment

**Related to:** E2906093

**Subject:** No

**Confidential:** No

**Date:** 10/25/2012

**Time Stamp:** 06:17 AM

Claim transferred and assigned to: Alan Carr. Claim Specialist Phone : 407-919-3012 Email : Alan.Carr@cna.com Manager : Christopher Jenkins Phone : 407-919-5594 Fax # : 407-670-0174 Christopher.jenkins@cna.com ***Transfer letter e-mailed to Judith Anderson @ Wells Fargo per SCHI. ***Commercial account.

08/25/2014 03:29 PM

Page 107

User: Carol Sue Cox

BRCOSA000332

Claim: E2906093

| | |
|---|---|
| **By:** | Alan Carr |
| **Topic:** | Contact |
| **Related to:** | E2906093 |
| **Subject:** | Stephen Phillips - Claimant counsel |
| **Confidential:** | No |
| **Date:** | 10/24/2012 |
| **Time Stamp:** | 12:08 PM |

Followed up with claimant counsel and his paralegal Charlotte to get some information on the matter. However, once again other than knowing that the claimant had emergency surgery they were not willing to provide any information as to the facts of the loss. Claimant counsel will be back on Monday and he will call me then.

| | |
|---|---|
| **By:** | Alan Carr |
| **Topic:** | Contact |
| **Related to:** | E2906093 |
| **Subject:** | Steven Philips - Claimant counsel |
| **Confidential:** | No |
| **Date:** | 10/23/2012 |
| **Time Stamp:** | 06:49 PM |

Contacted claimant counsel but had to leave message. Advised him that I had the claim and that I would respond to his disclosure request, but upon receipt I would be expecting some cooperation with providing further information as we would not be able to begin any information with the limited information to date. 561-868-1340

BRCOSA000333

Claim: E2906093

| | |
|---|---|
| **By:** | Alan Carr |
| **Topic:** | Contact |
| **Related to:** | E2906093 |
| **Subject:** | Jane Schor - Insured |
| **Confidential:** | No |
| **Date:** | 10/23/2012 |
| **Time Stamp:** | 06:46 PM |

Advised insured that I now had this claim based on the allegation of emergency surgery. Once I had more information I would let her know. Will compplete a fulll investigation once I had been able to talk to the claimant counsel

| | |
|---|---|
| **By:** | Alan Carr |
| **Topic:** | Claim Assignment |
| **Related to:** | E2906093 |
| **Subject:** | Assignment |
| **Confidential:** | No |
| **Date:** | 10/23/2012 |
| **Time Stamp:** | 06:45 PM |

Claim now at this desk based on comment by claimant counsel that emergency surgery was required by the claimant after the incident. LOR was insured's first notice and they have no information on loss.

BRCOSA000334

Claim: E2906093

**By:** Shawna Bryson

**Topic:** General

**Related to:** E2906093

**Subject:**

**Confidential:** No

**Date:** 10/23/2012

**Time Stamp:** 09:10 AM
Roundtabled w/ mgr, although we don't know the extent of injury/diagnosis or type of surgery needed-agree exposure exceeds express

**By:** Shawna Bryson

**Topic:** General

**Related to:** E2906093

**Subject:**

**Confidential:** No

**Date:** 10/23/2012

**Time Stamp:** 09:09 AM
REASON FOR TRANSFER: with the information received to date the exposure appears to exceed the Express threshold due to extent of treatment needed. Clmnt needed emergency surgery after the incident. SPECIAL CONSIDERATIONS OR ALERTS FOR RECEIVING ADJUSTER: -Clmnt is represented by an atty, atty has been out of the office since the claim was recvd, have not been able to confirm the actual FOL or exact injurys- the office assistance would only tell me clmnt needed surgery in the abdominal area, would not provide any further information -certified policy request was done for atty via ops DATA INTEGRITY: -

BRCOSA000335

Claim: E2906093

LENS CODING - y - PI SCREEN for all parties:y - MEDICARE Info - Requested and/or updated:needed - LI SCREEN, if applicable-y

BRCOSA000336

Claim: E2906093

**By:** Shawna Bryson

**Topic:** Contact

**Related to:** E2906093

**Subject:**

**Confidential:** No

**Date:** 10/23/2012

**Time Stamp:** 08:40 AM

Your fax has been successfully sent to Pincus & Currier at 561-366-1310.
------------------------- From: Shawna Bryson Issuing Company: 0
------------------------- Time: 10/23/2012 8:38:06 AM Sent to 561-366-1310 with
remote ID "" Result: (0/339;0/0) Successful Send Page record: 1 - 3 Elapsed time: 01:08 on channel 11

**By:** Shawna Bryson

**Topic:** Contact

**Related to:** E2906093

**Subject:**

**Confidential:** No

**Date:** 10/23/2012

**Time Stamp:** 08:30 AM

recvd call from Caroline w/ attys office she stated they need just a copy of the dec page sent over asap
because the clmnt needs addtl treatment and has no insurance, they need confirmation we have coverage,
ok to send reg copy of policy via fax, when I asked again about the injuries she stated the atty is the best
person to speak with, I explained I really need to know so I can confirm we are handling the claim in the

BRCOSA000337

Claim: E2906093

By:                  **Shawna Bryson**

Topic:               **Contact**

Related to:          **E2906093**

Subject:

Confidential:        **No**

Date:                **10/19/2012**

Time Stamp:          **02:07 PM**

proper area, she then stated she knows the clmnt had to get Emergency Surgery after the incident, when ask what type or what body part all she would say is the "abdomen area"

called atty office, 561-868-1340-spoke w/ receptionist-she stated the atty is going to be out of the office for a week, she will request another atty give me a call on Monday

By:                  **Shawna Bryson**

Topic:               **Contact**

Related to:          **E2906093**

Subject:

Confidential:        **No**

Date:                **10/19/2012**

Time Stamp:          **02:07 PM**

From: Alexandra De Antoni [mailto:adeantoni@equityone.net] Sent: Thursday, October 18, 2012 10:13 AM

User: Carol Sue Cox                     Page 113                     08/25/2014 03:29 PM

BRCOSA000338

Claim: E2906093

To: Bryson,Shawna Subject: RE: Pine Ridge Square, Coral Springs,FL- Charles Ackley, dol 9/24/2012, E2906093 Thank you ALEXANDRA DE ANTONI administrative assistant Direct: 786.528.1457 Equity One Inc. 1550 NE Miami Gardens Drive, Suite 500 North Miami Beach, FL 33179 Main: 305.672.1234 Fax: 786.528.1440 www.equityone.net

**By:** Shawna Bryson

**Topic:** Coverage Analysis

**Related to:** E2906093

**Subject:** Coverage Analysis for BODI-Bodily Injury, MEDP-Medical Payments

**Confidential:** Yes

**Date:** 10/18/2012

**Time Stamp:** 08:59 AM

**By:** Shawna Bryson

**Topic:** Contact

**Related to:** E2906093

**Subject:**

BRCOSA000339

Claim: E2906093

| | |
|---|---|
| **Confidential:** | No |
| **Date:** | 10/18/2012 |
| **Time Stamp:** | 08:55 AM |

called atty office, 561-868-1340-spoke w/ receptionist, provided claim info, my contact info, req a return call from atty, need fol.inj.tx status

| | |
|---|---|
| **By:** | Shawna Bryson |
| **Topic:** | Contact |
| **Related to:** | E2906093 |
| **Subject:** | |
| **Confidential:** | No |
| **Date:** | 10/18/2012 |
| **Time Stamp:** | 08:32 AM |

LVM for mc, Alexandra DeAntoni @ 786-528-1457-gave fol, provided claim# and contact info-also sent email rom: Bryson,Shawna Sent: Thursday, October 18, 2012 9:32 AM To: 'adeantoni@equityone.net' Subject: Pine Ridge Square, Coral Springs,FL- Charles Ackley, dol 9/24/2012, E2906093 As a follow up to my voicemail, I have been assigned the above mentioned claim. Once I gather more information from the attorney will let you know if any contract or agreement is needed. Thanks Shawna Bryson, CRIS Claims Representative

| | |
|---|---|
| **By:** | Tina Morrison |
| **Topic:** | Claim Assignment |
| **Related to:** | E2906093 |

User: Carol Sue Cox

Page 115

08/25/2014 03:29 PM

BRCOSA000340

Claim: E2906093

**Subject:**

**Confidential:** No

**Date:** 10/17/2012

**Time Stamp:** 04:40 PM

IN FORCE POLICY FOUND GL 5082680450 System where policy confirmed: Covers

**By:** UNKNOWN - SYSTEM unknown

**Topic:** General

**Related to:** E2906093

**Subject:** System Generated Note

**Confidential:** No

**Date:** 10/17/2012

**Time Stamp:** 12:46 PM

The following field(s) marked with an asterisk were added Loss Details - New Property Non-Auto Incident - Details - Damage - *Property Description: 4633 N. UNIVERSITY DRIVE Loss Details - New Property Non-Auto Incident - Details - Damage - Damage - *Damage Description: CLMT HAS NOT IDENT INJURY TO NOT IDENT PART FROM NOT IDENT CAUS

**By:** UNKNOWN - SYSTEM unknown

**Topic:** General

**Related to:** E2906093

BRCOSA000341

Claim: E2906093

**Subject:** System Generated Note

**Confidential:** No

**Date:** 10/17/2012

**Time Stamp:** 12:46 PM

The following field(s) marked with an asterisk were added Injury Incident - Injury Details - *Describe
Injuries: NOT IDENTIFIED

08/25/2014 03:29 PM

Page 117

User: Carol Sue Cox

BRCOSA000342



PO Box 8317  Chicago  IL  60680-8317

**Virginia Fisher**
Claim Consultant
Telephone    404-531-3411
                   800-283-2318  x3411
Facsimile     312-260-6431
Internet       virginia.fisher2@cna.com

April 18, 2014

Mr. Michael Mullen
Swiss Re
First Specialty Insurance Corp
1945 W C.R. 419, Ste 1141-205
Oviedo, FL  32766

Our Insured:  Equity One
Your Insured:  East Coast's Finest
Our File:  E2906093
Your File:  020130005760
RE:  Ackely v Equity One

Dear Mr. Mullen:

Would you please provide a copy of the general liability policy that provides coverage to East Coast's Finest in connection with the above lawsuit?   According to the contract between Equity One and your insured, East Coast's Finest, East Coast's Finest is obligated to name our insured as an additional insured under that policy.

I will look forward to receiving a copy of the policy.  Thanks.

Sincerely,


Virginia Fisher

BRCOSA000343



PO Box 8317   Chicago  IL  60680-8317

**Virginia Fisher**
Claims Consultant
Major Case Unit
Telephone   678-473-3442
               800-283-2318  x3442
Facsimile    312-260-6431
Internet      virginia.fisher2@cna.com

February 13, 2014

Ms. Kim Hackett
Amerisure Insurance Company
140 Fountain Pkwy, Ste 300
St. Petersburg, FL  33716-1285

Your Insured:  EDC Construction
Our Insured:  Equity One
Your File:  1298732
Our File: E2906093
Re:   Ackley v Equity One

Dear Ms. Hackett:

Following up on your denial of our tender sent on September 4, 2014 would you please forward a
copy of the Amerisure policy that provides additional insured coverage to Equity One?  I understand
that it is your position that the policy provides additional insured coverage on an excess basis,
however, I would like a copy of the policy for our file.

Thank you in advance for your cooperation.

Sincerely,

Virginia Fisher

BRCOSA000344



PO Box 8317   Chicago  IL 60680-8317

**Virginia Fisher**
*Claims Consultant*
*Major Case Unit*
Telephone   678-473-3442
            800-283-2318  x3442
Facsimile   312-260-6431
Internet     virginia.fisher2@cna.com

January 31, 2014

Mr. Jason Gibson
Associate General Counsel
Equity One, Inc.
1600 NE Miami Gardens Dr
Miami, FL  33179-4900

Re:  Charles Ackley v IRT Coral Springs,
      LLC and Equity One, Inc.
Insured:  Equity One, Inc.
Loss Location:  Pine Ridge Square, 4663 N University Dr,
     Coral Springs, FL
Our File:  E2906093

Dear Mr. Gibson:

As we discussed, enclosed please find a copy of a letter we received from Swiss Re, the carrier for East Coast's Finest, dated November 20, 2013.  This letter responded to our tender of defense and request for indemnity pursuant to Equity's contract with East Coast's Finest in connection with the above lawsuit.

Mr. Ackley, the plaintiff, has sued Equity One for a trip and fall accident that occurred at Pine Ridge Shopping Center on 9/24/2012.  Mr. Ackley tripped over anchor brackets that were left in the concrete after mail boxes were relocated.  While we do believe that EDC, the contractor that moved the mailboxes, has considerable liability exposure for not removing the anchor brackets, it is our position that East Coast's Finest was providing the day to day inspection and cleaning of this property and, therefore, also has exposure in this suit in that they undertook to do the following as indicated in the specifications sections of the contract with Equity One:

"Day Porter Specifications:

*    *    *

DAILY (Per Visit)

   1.  Drive/walk entire center and look for any liability problems.

*    *    *

BRCOSA000345

<u>Reporting</u>

1.  Report to Property Manager any problems observed, especially items creating any safety issues."

Additionally, the contract with East Coast's Finest provides that:

2.  Contractor shall indemnify and hold harmless Owner and its agents...from any and all claims, damages...arising out of or resulting from the performance of the work.

3.  Contractor, at its expense, shall obtain and maintain insurance coverage...Contractor shall deliver to Owner before the commencement of its work the customary certificate evidencing such current insurance coverage(s) indicated thereon and naming Owner as additional insured...

The complaint alleges that Equity Once negligently maintained the premises/sidewalk in that they failed to remove the hazardous condition or failed to warn of the hazardous condition or guard/barricade the area.  This is precisely what Equity One hired East Coast to do.

I find it hard to believe that The Swiss Re adjuster could take the position that there is any negligence on Equity One when Equity One had no personnel on this property on a daily basis.  East Coast's Finest was hired to be the daily presence on this property for the owner.  I believe the position taken by Swiss Re contradicts the obligations East Coast's assumed in the contract.  Is there anyone at East Coast's Finest that you would be able to speak with about the position their carrier has taken?  Can they persuade Swiss Re to take another look at their position?

If Swiss Re does not change its position we will have no other choice than to file a claim for contractual indemnification against East Coast's Finest in the next thirty days.

I will look forward to hearing back from you soon.

Sincerely,


Virginia Fisher


cc:  Ms. Judith Anderson
     Claims Consultant AVP
     Wells Fargo
     3475 Piedmont Rd., Ste 800
     Atlanta, GA  30305



PO Box 8317  Chicago  IL  60680-8317

**Virginia Fisher**
Claims Consultant
Major Case Unit
Telephone   678-473-3442
                    800-283-2318  x3442
Facsimile    312-260-6431
Internet      virginia.fisher2@cna.com

February 27, 2014

Mr. Jason Gibson
Associate General Counsel
Equity One, Inc.
1600 NE Miami Gardens Dr
Miami, FL  33179-4900

Re:  Charles Ackley v IRT Coral Springs,
       LLC and Equity One, Inc.
Insured:  Equity One, Inc.
Loss Location:  Pine Ridge Square, 4663 N University Dr,
       Coral Springs, FL
Our File:  E2906093

Dear Mr. Gibson:

As we discussed, enclosed please find a copy of a letter we received from Swiss Re, the carrier for East Coast's Finest, dated November 20, 2013.  This letter responded to our tender of defense and request for indemnity pursuant to Equity's contract with East Coast's Finest in connection with the above lawsuit.

Mr. Ackley, the plaintiff, has sued Equity One for a trip and fall accident that occurred at Pine Ridge Shopping Center on 9/24/2012.  Mr. Ackley tripped over anchor brackets that were left in the concrete after mail boxes were relocated.  While we do believe that EDC, the contractor that moved the mailboxes, has considerable liability exposure for not removing the anchor brackets, it is our position that East Coast's Finest was providing the day to day inspection and cleaning of this property and, therefore, also has exposure in this suit in that they undertook to do the following as indicated in the specifications sections of the contract with Equity One:

"**Day Porter Specifications**:

*     *     *

**DAILY (Per Visit)**

   1.  Drive/walk entire center and look for any liability problems.

*     *     *

BRCOSA000347

**Reporting**

1. Report to Property Manager any problems observed, especially items creating any safety issues."

Additionally, the contract with East Coast's Finest provides that:

2. Contractor shall indemnify and hold harmless Owner and its agents...from any and all claims, damages...arising out of or resulting from the performance of the work.

3. Contractor, at its expense, shall obtain and maintain insurance coverage...Contractor shall deliver to Owner before the commencement of its work the customary certificate evidencing such current insurance coverage(s) indicated thereon and naming Owner as additional insured...

The complaint alleges that Equity Once negligently maintained the premises/sidewalk in that they failed to remove the hazardous condition or failed to warn of the hazardous condition or guard/barricade the area.

I believe the position taken by Swiss Re contradicts the obligations East Coast's assumed in the contract. East Coast's Finest was hired to be the daily presence on this property for the owner.   Is there anyone at East Coast's Finest that you would be able to speak with about the position their carrier has taken?  Can they persuade Swiss Re to take another look at their position?

If Swiss Re does not change its position we will have no other choice than to file a claim for contractual indemnification against East Coast's Finest in the next thirty days.

I will look forward to hearing back from you soon.

Sincerely,


Virginia Fisher


cc: Ms. Judith Anderson
    Claims Consultant AVP
    Wells Fargo
    3475 Piedmont Rd., Ste 800
    Atlanta, GA  30305

BRCOSA000348

Corporate Solutions                                    Swiss Re

Virginia Fisher                          First Specialty Insurance Corporation
CNA Insurance Company                    1945 West County Road 419
P O Box 8317                             Suite 1141-205
Chicago, IL 60680-8317                   Oviedo, FL 32766
                                         Phone 407 977 0858
**SENT BY EMAIL**                        Fax 913 676 5221
                                         Michael_mullen@swissre.com

                                                    November 20, 2013

RE:    Claim Number:        020130005760
       Insured:             Countryside Power Sweeping/East Coast Finest
       Your Claim Number:   E2906093
       Your Insured:        Equity One
       Plaintiff:           Charles Ackley
       Date of Loss:        September 24, 2012

Dear Ms. Fisher,

Please accept this letter as a formal response to the tender for defense and indemnity/additional insured status with regards to this claim.

With regard to the contract between Equity One and East Coast Finest Outdoor(East Coast) that was effective beginning April 10, 2009 and still valid on the date of accident, there was the following language:

2.    "Contractor shall indemnify and hold harmless Owner and its agents, employees, officers and directors from any and all claims, damages, losses and expenses, direct, indirect, or consequential, arising out of or resulting from the performance of the Work."

3.    "Contractor shall deliver to owner coverage(s) indicated thereon and naming Owner as additional insured attached hereto and made a part thereof.

SWISS RE
**150**
YEARS

BRCOSA000349

Corporate Solutions

**Swiss Re**

Paragraph 2 as noted above was written to provide the Owner with defense and indemnity for those actions of the Contractor that contributed to or caused the accident from which the plaintiff seeks damages. It would be against public policy in Florida for this clause to have also considered the negligence of the Owner. It has been reported that the porter from East Coast who was working the Pine Ridge Shopping Center at the time of accident has testified under oath that the mailbox was removed after he had left for the day. Basing our position on the testimony of the porter, we find that the porter was performing his duties according to the contract and cannot be held responsible for what happened on the property after he had left for the day. Since the porter did not contribute to or cause the accident we deny any tender for defense and indemnification.

The same negligence evaluation will apply to the request for Additional Insured status. The First Specialty Insurance policy includes Additional Insured Endorsement CG 20 37 07 04, which is included in the policy copy included as an attachment. That endorsement includes the following language:

"Who is an insured is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or part, by "your work" at the location designated in the schedule.

Your request for additional insured status is contingent on the potential negligence of the porter from East Coast. Consistent with his testimony at deposition, he was not on the property when the mailbox was removed and therefore, did not contribute or cause this accident. The request for additional insured status is denied.

By citing certain policy provisions or part of certain policy provisions herein, First Specialty expressly reserves and does not waive the right to assert any and all additional provisions or parts thereof that might also apply.

If you have any information you would like First Specialty to consider with respect to this determination, please forward that information to our attention.

Respectfully,

Michael P. Mullen
Claims Specialist
Commercial Insurance
First Specialty Insurance Corporation

CC:   Countryside Power Sweeping (by email)

SWISS RE
**150**
YEARS

2

BRCOSA000350



Amerisure Mutual Holdings, Inc.
Amerisure Mutual Insurance Company
Amerisure Insurance Company
Amerisure Partners Insurance Company

September 4, 2013

SENT VIA E-MAIL TO:          virginia.fisher@cna.com
AND REGULAR MAIL

Virginia Fisher
CNA
P. O. Box 8317
Chicago, IL 60180-8317

RE:   Cases:        Charles Ackley v. Equity One, Inc. and Eilerson
                    Development Corporation
      Insured:       EDC
      Claim #:       1298732
      D/L:           09/24/12
      Your Insured:  Equity One, Inc.
      Your file #:   E2906093

Dear Ms. Fisher:

We have reviewed your defense and indemnification demand on behalf of Equity One, Inc. against
EDC. Our review indicates there is no entitlement to indemnification as the indemnity provision in
the contract is not enforceable. The indemnity provision does not contain a monetary limitation as to
the extent of EDC's indemnity obligation which is mandated by Florida Statute FSA 726.06.
Therefore, the indemnity agreement is invalid. Equity One, Inc. is entitled to Additional Insured
status; however, it is on an excess basis.

Therefore, we respectfully deny your defense and indemnification request. If you have any questions,
or would like to discuss this matter further, please contact me at (727)561-7158.

Sincerely,

Kim Hackett
Senior Claims Adjuster
Amerisure Insurance Company

CC: EDC

140 Fountain Parkway, Suite 300, St. Petersburg, FL 33716-1285
**Claim Mailing Address:** P.O. Box 33478, Detroit, MI 48232-5478
800.282.2743   www.amerisure.com

Corporate Solutions                                                    **Swiss Re**

Virginia Fischer, Claim Consultant                    First Specialty Insurance Corporation
CNA Insurance Company                                 1945 West County Road 419
P O Box 8317                                          Suite 1141-205
Chicago, IL 60680-8317                                Oviedo, FL 32766
                                                     Phone 407 977 0858
**SENT BY EMAIL**                                     Fax 913 676 5221
                                                     Michael_mullen@swissre.com

                                                              August 12, 2013

RE:      Claim Number:        020130005760
         Insured:             Countryside Power Sweeping
         Plaintiff:           Charles Ackley
         Your Claim Number:   E2906093
         Your Insured:        Equity One, Inc.
         Accident Location:   Pine Ridge Shopping Center, Coral Springs, FL
         Date of Loss:        September 24, 2012

Dear Ms. Fischer,

First Specialty Insurance was the liability insurance carrier for Countryside Power Sweeping at the time of this accident. Countryside owns East Coast's Finest Outdoor Service. Your correspondence of July 15th sent to East Coast's Finest Outdoor Service is acknowledged.

Countryside Power Sweeping had a Commercial General Liability policy with First Specialty under policy number IRG 15253 that was effective from July 21, 2012 to July 21, 2013. This policy provided liability coverage of $1,000,000 on a per occurrence basis with a $2,000,000 aggregate. The policy included a $5000 deductible applicable to loss and expense. I have attached a copy of the Additional Insured – Owners, Lessees or Contractors – Automatic Status When Required in Construction Agreement with You Endorsement.

I will acknowledge your tender for defense and indemnity for this accident. Before I can respond to your tender I will secure a copy of the contract from between East Coast and Equity One from the insured and would ask for the following information from your office:
- Copy of the proposal estimating the cost from the contractor who moved the mailbox
- Copy of contract between contractor and whomever paid for services rendered
- Billing from contractor that shows on what day the mailbox was moved

SWISS RE
**150**
YEARS

Corporate Solutions

**Swiss Re**
⫫

- Notice sent to East Coast's Finest advising them that the mailbox was to be moved

I am struggling with the position that East Coast's Finest had a duty to notify the property owner of a dangerous condition that was either caused by a contractor who moved the mailbox at the direction of the property owner, was created by a contractor paid by the property owner or took place on a date that the property owner knew about. Granted, I may not have enough information to make an informed decision, but there seems to be a viable argument that the property owner, with a non-delegable duty to maintain the property, had or should have had superior knowledge that the mailbox was moved.

Once I have the requested information and copy of the contract I will advise you of our position. If you have any questions concerning this letter or the handling of this claim, please call me. Thank you.

Respectfully,

Michael P. Mullen
Claims Specialist
Commercial insurance
First Specialty Insurance Corporation

SWISS RE
**150**
YEARS

2

BRCOSA000353



**Amerisure**
**Insurance**
The Advantage of Partnership

Amerisure Mutual Holdings, Inc.
Amerisure Mutual Insurance Company
Amerisure Insurance Company
Amerisure Partners Insurance Company

July 19, 2013

SENT VIA E-MAIL TO:        virginia.fisher2@cna.com
AND REGULAR MAIL

Virginia Fisher
CNA
P. O Box 8317
Chicago, IL 60680-8317

RE:    Insured:          EDC
       Claim #:          1298732
       D/L:              09/24/12
       Claimant:         Charles Ackley
       Your Claim #:     E2906093

Dear Ms. Fisher:

Please allow this letter to serve as acknowledgement of receipt of your letter dated 07/15/13 directed to EDC in which you request EDC's general liability insurance carrier defend and indemnify your insured, Equity One, Inc. regarding a lawsuit filed by Charles Ackley. Your letter to EDC did not include a copy of the lawsuit.

At your earliest convenience provide me with a copy of the lawsuit to which your reference. Upon receipt of the lawsuit, we will conduct a coverage analysis and provide a formal response to your request once completed.

Please contact me at (727)561-7158 if you have any questions or concerns regarding this matter.

Sincerely,

*Kim Hackett*

Kim Hackett
Senior Claims Adjuster
Amerisure Insurance Company

cc:  Margaret Cardin - EDC

140 Fountain Parkway, Suite 300, St. Petersburg, FL 33716-1285
**Claim Mailing Address:** P.O. Box 33478, Detroit, MI 48232-5478
800.282.2743   www.amerisure.com

BRCOSA000354



PO Box 8317
Chicago, IL  60680-8317

October 31, 2012

**Alan Carr**
Claim Specialist
CHICAGO, IL
Telephone 407-919-3012
          877-371-5121 x3012
Facsimile  407-670-0255
Email      alan.carr@cna.com

PINCUS & CURRIER
324 N LAKESIDE CT
WEST PALM BEACH, FL 33407-6512

| | | | |
|---|---|---|---|
| Claim Number: | E2906093    M9 | Location Code: | 4656 |
| Policyholder: | EQUITY ONE INC | | |
| Underwriting Co: | National Fire Insurance Company Of Hartford | | |
| Date of Loss: | 09/24/2012 | | |
| Policy Number: | 5082680450 | | |
| Claimant: | CHARLES ACKLEY | | |

### Pursuant to your request under Florida Statute Section 627.4137

This will acknowledge receipt of your letter and to advise you on the accident date above the insurance coverage existed as follows:

1. The name of each insured is:
   EQUITY ONE INC

2. The name of the insurer:
   National Fire Insurance Company Of Hartford

3. The limits of liability for the above policy are:

| | | | |
|---|---|---|---|
| a. Property Damage ................$ | | ☐ None ☐ CSL | ☐ Single Limit |
| b. Bodily Injury...........................$ 1,000,000.00 | | ☐ None ☐ CSL | ☐ Single Limit |
| c. Medical Payments ................$ 15,000.00 | | ☐ None ☐ CSL | ☐ Single Limit |
| d. Uninsured Motorist ...............$ | | ☐ None ☐ CSL | ☐ Single Limit |
| e. Personal Injury Protection......$ | | ☐ None ☐ CSL | ☐ Single Limit |
| f. Other.......................................$ | | ☐ None ☐ CSL | ☐ Single Limit |

CNAL0613B

BRCOSA000355

Claim Number:   E2906093      M9        - 2 -                          October 31, 2012

4. Enclosed please find a copy of the declaration page for this policy.

5. The following is a statement of any and all policy or coverage defenses which the named
   company reasonably believes is available to said insurer at this time:
No known policy defense at this time, but reserve our right to assert any policy or coverage
defenses that may arise in the future.

6. Excess or Umbrella Policy...........$         ☐ None ☐CSL  ☐Single Limit

National Fire Insurance Company Of Hartford

If you have any questions please feel free to contact our office.

Please use our claim number when corresponding with our office.

Sincerely,                                CC:

Alan Carr

CNAL0613B

BRCOSA000356



PO Box 8317
Chicago, IL  60680-8317

October 22, 2012

**Shawna Bryson**
Claims Representative
CHICAGO, IL
Telephone 610-208-6517
         877-378-0541 x6517
Facsimile 312-260-4343
Email   Shawna.Bryson@cna.com

PINCUS & CURRIER
324 N LAKESIDE CT
WEST PALM BEACH, FL 33407-6512

| | | | | |
|---|---|---|---|---|
| Claim Number: | E2906093 | LS | Location Code: | 4656 |
| Policyholder: | EQUITY ONE INC | | | |
| Underwriting Co: | National Fire Insurance Company Of Hartford | | | |
| Date of Loss: | 09/24/2012 | | | |
| Policy Number: | 5082680450 | | | |
| Claimant: | CHARLES ACKLEY | | | |

Dear Steven Phillips Esq.,

In order to expedite the processing of your claim, I am enclosing a Medical Authorization Form. Please note that this is not a release and will merely serve to allow me to gather the information related to your injury necessary to evaluate this claim.

Please sign the forms where indicated and return them to me in the enclosed self-addressed, stamped envelope. Please also provide the name and address of all medical providers.

Please use our claim number when corresponding with our office.

Sincerely,

Shawna A Bryson                    CC:

Shawna Bryson

CNAL0263

BRCOSA000357



PO Box 8317
Chicago, IL  60680-8317

October 18, 2012

**Shawna Bryson**
*Claims Representative*
*CHICAGO, IL*
Telephone 610-208-6517
           877-378-0541 x6517
Facsimile  312-260-4343
Email      Shawna.Bryson@cna.com

EQUITY ONE INC
1600 NE MIAMI GARDENS DR
NORTH MIAMI, FL 33179-4900

| | | |
|---|---|---|
| Claim Number: | E2906093      LS      Location Code:      4656 | |
| Policyholder: | EQUITY ONE INC | |
| Underwriting Co: | National Fire Insurance Company Of Hartford | |
| Date of Loss: | 09/24/2012 | |
| Policy Number: | 5082680450 | |
| Claimant: | CHARLES ACKLEY | |

## Acknowledgement of New Claim

**We have received your new claim report.**

Type of Claim:   General Liability
Loss Description:CLMT HAS NOT IDENT INJURY TO NOT IDENT PART FROM NOT IDENT CAU

**This claim has been set up in our office.**
All correspondence should be faxed to: 312-260-4343
Your claim number is:  E2906093      LS

Please use our claim number when corresponding with our office.

Sincerely,

*Shawna a Bryson*          CC:      LOCKTON COMPANIES, LLC.

Shawna Bryson

CNAL0018

BRCOSA000358



PO Box 8317
Chicago, IL 60680-8317

November 4, 2012

**Alan Carr**
Claim Specialist
CHICAGO, IL
Telephone 407-919-3012
877-371-5121 x3012
Facsimile 407-670-0255
Email alan.carr@cna.com

PINCUS & CURRIER
324 N LAKESIDE CT
WEST PALM BEACH, FL 33407-6512

| | | | | |
|---|---|---|---|---|
| Claim Number: | E2906093 | M9 | Location Code: | 4656 |
| Policyholder: | EQUITY ONE INC | | | |
| Underwriting Co: | National Fire Insurance Company Of Hartford | | | |
| Date of Loss: | 09/24/2012 | | | |
| Policy Number: | 5082680450 | | | |
| Claimant: | CHARLES ACKLEY | | | |

Dear Steven Philips, Esq:
As you are aware I am the adjuster handling this matter. I am attempting to evaluate and investigate the claim but have very little information on the accident or the injuries, although your office has advised that your client needed emergency surgery.
Please provide our office with any information that will enable us to begin an investigation into the matter.

Please use our claim number when corresponding with our office.

Sincerely,

Alan Carr

CC:

CNAL0500



PO Box 8317
Chicago, IL  60680-8317

October 22, 2012

**Shawna Bryson**
Claims Representative
CHICAGO, IL
Telephone 610-208-6517
          877-378-0541 x6517
Facsimile  312-260-4343
Email      Shawna.Bryson@cna.com

PINCUS & CURRIER
324 N LAKESIDE CT
WEST PALM BEACH, FL 33407-6512

| | | |
|---|---|---|
| Claim Number: | E2906093      LS      Location Code:      4656 | |
| Policyholder: | EQUITY ONE INC | |
| Underwriting Co: | National Fire Insurance Company Of Hartford | |
| Date of Loss: | 09/24/2012 | |
| Policy Number: | 5082680450 | |
| Claimant: | CHARLES ACKLEY | |

Dear Steven Phillips Esq.,

As you are aware, National Fire Insurance Company Of Hartford is the General Liability carrier for EQUITY ONE INC. We acknowledge receipt of your letter of representation for CHARLES ACKLEY in the above captioned matter. Currently, we are investigating the facts affecting coverage and liability, as well as the injuries involved.

As part of our investigation, we respectfully request  the complete name, address, social security number and date of birth of your client. Additionally, please forward the following:

☒  1. All medical bills.
☐  2. Wage loss verification.

Also, enclosed please find:

☒  1. Authorization for release of medical information and medical provider list.
☐  2. Authorization for verification of lost wages.

Once we have had an opportunity to review the above information, we will be in touch with you to discuss the matter further.

CNAL0531

BRCOSA000360

Claim Number:   E2906093   LS        - 2 -                    October 22, 2012

Please use our claim number when corresponding with our office.

Sincerely,

*Shawna A Bryson*    CC:

Shawna Bryson

CNAL0531

BRCOSA000361



PO Box 8317
Chicago, IL  60680-8317

**Alan Carr**
Claim Specialist
CHICAGO, IL
Telephone 407-919-3012
877-371-5121 x3012
Facsimile  407-670-0255
Email      alan.carr@cna.com

October 25, 2012

Judith Anderson

| | | | |
|---|---|---|---|
| Claim Number: | E2906093    M9 | Location Code: | 4656 |
| Policyholder: | EQUITY ONE INC | | |
| Underwriting Co: | National Fire Insurance Company Of Hartford | | |
| Date of Loss: | 09/24/2012 | | |
| Policy Number: | 5082680450 | | |
| Claimant: | CHARLES ACKLEY | | |

Dear Judith Anderson:

Please be advised that the above captioned claim has been transferred to me for further handling.

Please call me so we may discuss your loss. I look forward to working with you.

Please use our claim number when corresponding with our office.

Sincerely,

CC:

Alan Carr

CNAL0022

BRCOSA000362



BRCOSA000363

BRCOSA000364



**333 S. Wabash Ave.  Chicago  IL  60604**

**Andrew B. Bryant, JD**
*Law Enforcement Liaison*
*Special Investigations Unit*
*Telephone 312-822-6337*
*Email andrew.bryant@cna.com*

*Submitted via FL DFS on-line portal*

February 28, 2014

Florida Department of Financial Services
Division of Insurance Fraud
200 East Gaines Street
Tallahassee, FL 32399-0324

Re:   **Report of Suspected Insurance Fraud by CHARLES ACKLEY**

| | |
|---|---|
| CNA Claim #: | E2906093 |
| Claimant: | CHARLES ACKLEY |
| Underwriting Co.: | National Fire Insurance Company of Hartford |
| Date of Loss: | 9/24/2012 |
| Location of Loss: | Pine Ridge Shopping Center |
| | 4633 N. University Drive, Coral Springs, FL (Broward County) |
| Insured: | Equity One, Inc. |
| Policy #: | 5082680450 |

Dear Sir or Madam,

<u>**Summary**</u>

On September 24, 2012, claimant Charles Ackley allegedly tripped and fell over mailbox anchoring brackets in the concrete at the Pine Ridge Shopping Center at 4633 N. University Drive, Coral Springs, Florida.   Equity One Inc. ("insured") managed the Pine Ridge Shopping Center and was insured at the time under a general liability policy with National Fire Insurance Company of Hartford ("National Fire"), which is a CNA company.  Ackley has subsequently pursued a claim with National Fire in relation to his claimed injuries from the alleged trip and fall.

In pursuing his claim, Ackley gave sworn testimony on two occasions describing the extent of his injuries and his physical limitations.   National Insurance investigated Ackley's claims.   This investigation resulted significant video surveillance evidence of Ackley engaged in various physical activities in direct contradiction to his sworn testimony.

The sworn statements by Ackley contain apparent false, incomplete and misleading information concerning facts material to this claim.   Therefore, pursuant to Florida statute § 626.989, or other applicable authority, National Fire is referring this matter to your agency for investigation, and referral for prosecution if warranted, of Charles Ackley for violations of Florida law.

*www.cna.com*

BRCOSA000365

## Claim

On October 15, 2012, attorney Steven Phillips sent notice to Equity One, Inc. that he represented Charles Ackley regarding a claim for injuries resulting from an alleged trip and fall that occurred at the Pine Ridge Shopping Center at 4633 N. University Drive, Coral Springs, Florida on September 24, 2014.   In this correspondence, the claimant requested a copy of Equity One's insurance policy.

On November 7, 2012, Ackley filed suit against Equity One in the 17th Judicial Circuit of Florida (Broward County) under case number 12-31439.    Ackley alleges that on September 24, 2014 he tripped and fell over mailbox anchors that were in the walkway at the shopping center. Ackley further alleges that he suffered permanent bodily injury as a result of this fall.   Ackley's complaint demands payment for damages in excess of $15,000.

In his subsequent depositions, Ackley testified to his inability to work or perform normal daily activities due extensive pain involving his chest, legs, upper body, and a hernia, stating "every aspect of my being is affected." (Trans 4/25/13, p. 84)

## Ackley First Deposition – April 25, 2013

On April 25, 2013, Ackley gave sworn testimony during his deposition at 700 West Hillsboro Boulevard, Deerfield Beach, Florida (Broward County).     During this deposition, Ackley testified to his past and current medical conditions.   Ackley described how he had suffered a gunshot wound to the chest several years before this claim, and the subsequent medical problems resulting from the gunshot wound.

Ackley testified that before the September 24, 2013 incident, he was able to do some activities, despite ongoing medical conditions.   However, since the alleged trip and fall, his ability to perform daily activities was significantly reduced.   Ackley testified (p. 98):

> Q.  And what about now?
> A.  I can't do anything.
> Q.  What do you do every day?
> A.  Nothing, just nothing - sitting, nothing, laying down.
> Q.  You don't watch TV, you don't do anything with  your kids, play games, you don't go out to dinner?
> A.  I can't walk. We had to sell our car to pay the bills.

April

## Surveillance

July 18, 2013

On July 18, 2013, video taped surveillance was obtained of Ackley at and near his residence at 1182 SE 2nd Ave, Deerfield Beach, Florida.   At approximately 10:44 am, Ackley was observed

leaving his residence on a bicycle, riding the bicycle without assistance.   Several minutes later, Ackley arrived on his bicycle at the Winn Dixie grocery store at 1019 South Federal Highway, in Deerfield Beach.   After exiting the grocery store, Ackley rode his bicycle out of the area and back to his residence.

<u>July 19, 2013</u>

On July 19, 2013 at approximately 8:58 am, Ackley exited his residence and brought a bicycle from the carport to the rear of his residence.   Ackley was also captured on video tape as he utilized a skateboard to ride with a dog on a leash around the neighborhood block before returning home.

<u>July 21, 2013 (AM)</u>

On July 21, 2013 at approximately 8:43 am, Ackley was video taped as he rode his bicycle. Ackley left his residence on the bicycle, and he was accompanied by a woman who was on foot. Ackley rode slowly while the woman walked beside him.   Ackley met with another male and engaged in what appeared to be the purchase of another bicycle.  After completing the apparent purchase, Ackley and female continued to a bus stop where the female entered a bus.   Ackley now had both bicycles.   Ackley rode back to his residence on his bicycle, holding the handle bars of the second bicycle at his side and steering both bicycles as he peddled.

During this surveillance on July 21, 2013, Ackley lifted both bicycles off the ground and carried them at the same time, carrying each bicycle in a separate hand.

<u>July 21, 2013 (PM)</u>

On July 21, 2013 at approximately 12:20 pm, video taped surveillance captured Ackley as he rode his bicycle away from his residence traveling to the Circle K store at 4791 Dixie Highway, Pompano Beach (approximately 1.3 miles distance).   Ackley was wearing a backpack during this trip.   At the store, Ackley lifted the bike to turn it upside down.

After exiting the store, Ackley brought the bike down and moved it to the side of the store. After meeting briefly with an unknown individual, Ackley returned to residence, riding his bike.


**Ackley Second Deposition – November 19, 2013**

On November 18, 2013, Ackley gave sworn testimony during his second deposition at 324 North Lakeside Court, West Palm Beach, Florida (Palm Beach County).   During this second deposition, Ackley was asked about his limitations and daily activities since the first deposition of April 25, 2013.

Ackley testified that he was still not working, stating "I will never work again." (p. 94).   Ackley described how his condition has not improved and he was still suffering pain as a result of the accident.

In discussing his daily activities, Ackley was asked about his dog pulling him on a skateboard. Ackley testified that he tried this because it is easier to stand in one spot than to walk due to his pain that is excruciating on bad days (p. 105).   Despite video taped evidence of Ackley going around the block with the dog while on the skateboard, Ackley testified that he performed this activity for just "10 or 20 feet" (p. 104).

Ackley testified that he has not been able to do arm curls since the accident (p. 111).  However, Ackley clearly curls his arms to carry two bicycles at the same time on July 21, 2013.

When asked if he has done any kind of exercise, Ackley testified, "I can't" (p. 117), despite the above evidence of bicycle riding.

Finally, Ackley was asked directly about riding a bicycle (p. 113):

> Q:    Have you tried riding a bike?
> A:     Yes, and it does not – I can't.  I can't do anything.
> Q.    Have you tried riding a bike.
> A.    I do not recall.  I do not recall if I did or if I didn't.

This evolving and changing response to the question about riding a bike shows a continuing intent to provide false, incomplete and misleading information.

**Florida Statutes**

**§ 817.234  False and fraudulent insurance claims**

> (1)(a) A person commits insurance fraud punishable as provided in subsection (11) if that person, with the intent to injure, defraud, or deceive any insurer:
>
> 1. Presents or causes to be presented any written or oral statement as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy or a health maintenance organization subscriber or provider contract, knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim.

**Loss to National Fire**

To date, National Fire has incurred $28,712.34 in losses due to out-of-pocket expenses in investigating and defending this claim.

**Attachments**

To assist in your review, the following documents are attached to this submission:

      1.     Surveillance report of July 23, 2013
      2.     Deposition transcript of November 19, 2013

**Summary**

The evidence in this matter shows the Charles Ackley provided apparent false, incomplete and misleading material information in support of his claim. When given the opportunity to provide truthful and complete testimony, Ackley failed to do so, in suspected violation of Florida Insurance Fraud law.

Therefore, National Fire is submitting this matter to your agency for investigation and referral for prosecution as warranted. Please feel free to contact me directly to discuss this matter or to request materials from our claim files.

Sincerely,

Andrew B. Bryant, JD
Law Enforcement Liaison
Special Investigations Unit at CNA

cc: NICB

encl: as described



*EMSI Investigative Services*

**THIS CONFIDENTIAL REPORT IS SUBMITTED IN ANTICIPATION OF FUTURE LITIGATION.
IT IS AND SHOULD ALWAYS BE CONSIDERED ATTORNEY/CLIENT WORK PRODUCT.**

**CONFIDENTIAL INVESTIGATIVE REPORT**
**July 23, 2013**

| Attn: Lee Janicek CNA Insurance Co.-FCM P. O. Box 8317 Chicago, IL 60680 | YOUR FILE NO. | E2906093 |
|---|---|---|
| | OTHER FILE NO. | Not Provided |
| | OUR FILE NO. | 201307-1406.1 |
| | INSURED | Equity One Inc |
| | SUBJECT/CLAIMANT | Charles Ackley |
| | SSN | |
| | DATE OF LOSS | 9/24/2012 |
| ASSIGNMENT RECEIVED | 7/17/2013 | |
| TYPE OF CLAIM | Accident Claim | |
| REPORTED INJURY | Abdomen | |

| INVESTIGATOR | David Battle |
|---|---|
| ASSIGNMENT | Surveillance |
| OBJECTIVE | To determine the activities and abilities of the claimant |
| STATUS | Final |

| PRELIMINARY INVESTIGATION |
|---|

**Inquiry Review:** The request was carefully reviewed. An investigative action plan was formulated.

**Data:** An NCR was pulled on the claimant which did not show the reported address. His last address was in Coral Springs. No vehicles were found to be associated to the claimant. Multiple arrests were located and the claimant is reported as a convicted felon for a violent crime. An arrest search is suggested.

**Satellite and Mapping:** Google Earth was utilized to scout the subject neighborhood for surveillance positions and points of egress.

**Basic Internet Search:** No social networking hits were located for the claimant. Reverse searches failed to yield viable information regarding the claimant. The Broward Clerk of Courts yielded one hit. Mugshots.com provided a recent image of the claimant as follows:



BRCOSA000370

**Charles Ackley**
**Page 2 of 11**

| Broward County Case Number: 91010032CF10A | State Reporting Number: 061991CF010032A88810 |
|---|---|
| Court Type: **Felony** | Case Type: **Felony** |
| Filing Date: **05/28/1991** | Case Status: **Disposed** |
| Court Location: **Central Courthouse** | Judge ID / Name: **Judge, Unassigned** |
| Magistrate ID / Name: **N/A** | BCCN: **006239S** |

Style: **State of Florida Vs. Ackley, Charles**

### Party Detail

| Party Type | Party Name | Sex | Race | D.O.B. | Attorneys / BarID ★ Denotes Lead Attorney |
|---|---|---|---|---|---|
| Defendant | Ackley, Charles<br>Ackley, Charles Albert<br>Asher, Charles Neil | Male | White | 04/24/1962 | |
| State | State of Florida | | | | |

### Future Scheduled Hearings

There is no key date information available for this case.

### Charge Detail

| Select Charge | Charge | Citation/NTA Number | Status | Offense Date | Statute | Description | Filed On | Filed By |
|---|---|---|---|---|---|---|---|---|
| ○ | 1 | | Disposition Entered | 05/27/1991 | 810.02(1)3 | Burglary Of A Dwelling | 06/14/1991 | Plantation PD |

### INVESTIGATIVE SUMMARY

On **Thursday, July 18, 2013,** surveillance was conducted at **1182 SE 2nd Avenue Deerfield Beach, FL.** At 7:01 a.m., the claimant was briefly observed in the doorway. At 9:18 a.m., the claimant was briefly observed in the driveway. At 9:55 a.m., the claimant answered the door to a mail carrier and signed for an item. At 10:08 a.m., the claimant was observed briefly in the driveway. At 10:44 a.m., the claimant departed on a bicycle. He rode to a Winn Dixie grocery store 1019 South Federal Highway Deerfield Beach, FL., which he entered briefly before riding the bicycle back home at 10:55 a.m. At 11:58 a.m., the claimant stood in the doorway and stared at a female walking by the front of his residence.

On **Friday, July 19, 2013,** surveillance was conducted at **1182 SE 2nd Avenue Deerfield Beach, FL.** At 8:04 a.m., the claimant was observed briefly in front of his residence. At 8:58 a.m., the claimant moved his bicycle from the carport to the rear of the residence. At 9:22 a.m., the claimant took a leashed dog around the block in his neighborhood using a skateboard. He returned back inside the residence at 9:27 a.m. At 11:04 a.m., the claimant spoke on a phone in front of the residence. At 11:13 a.m., the claimant was briefly observed in front of the residence. At 12:04 p.m., the claimant was briefly observed in front of the residence. At 12:27 p.m., the claimant spoke on a phone in front of the residence.

On **Sunday, July 21, 2013,** surveillance was conducted at **1182 SE 2nd Avenue Deerfield Beach, FL,** where no vehicles were present. At 8:34 a.m., the claimant departed on a bicycle accompanied by a female on foot. They traveled toward a bus stop where they interacted with another male. The claimant appeared to purchase a second bicycle from the other male. After the female entered the bus the claimant rode one bike while guiding the second back to his residence at 9:09 a.m. At 9:21 a.m., the claimant brought both bikes to the rear of the residence. At 9:25 a.m., the claimant spoke on a phone in front of the residence. At 9:47 a.m., the claimant again spoke on a phone in front of his residence. At 10:08 a.m., the claimant drove the newly purchased bike around his neighborhood. He appeared to be testing it. At 12:20 p.m., the claimant departed on a bike and traveled to a Circle K convenience store at 4791 Dixie Highway, Pompano Beach, FL., where he loitered for a considerable time interacting with other individuals. He engaged in a (unknown type) transaction with another individual before returning back to his residence at 1:19 p.m.

### VIDEO DOCUMENTATION

**90 minutes and 59 seconds** of video documentation was obtained during this investigation, of which **81 minutes and 35 seconds** depicts claimant activity.

### https://www.tmgecase.com/mgis2/VideoStream.asp?sid=12759642

*The hyperlink is active for one (1) year from the date of the report. If you need this link to reactivated, please contact ICS|MERRILL at (888) 932-8364.*

BRCOSA000371

**Charles Ackley**
**Page 3 of 11**

As is customary, the original video data will be securely maintained at our corporate office in Jacksonville, Florida.

| PHYSICAL DESCRIPTION |
|---|

The claimant can be described as a 51 year old, Caucasian male with the following features: bald hair, 6'0", and approximately 180 lbs.

Addtl Info: Tattoos on front of body. The claimant's provided Date of Birth is 4/24/1962.







**Charles Ackley**
**Page 4 of 11**

| RESIDENTIAL ASSESSMENT |
|---|

The Claimant currently resides at the address of **1182 SE 2nd Avenue Deerfield Beach, FL 33441** which is a single story, single family residence of concrete block construction with a car port and no garage. The mail box is attached to the structure near the front door.



| VEHICLES |
|---|

No vehicles were found to be registered to or associated with the claimant. The claimant was noted to ride a bicycle.

| CUSTOMER CONTACT |
|---|

Lee Janicek was updated throughout the surveillance period.

| CONCLUSIONS |
|---|

The claimant rode a bicycle; skate boarded with a dog and was observed walking in front of his residence. When observed, he wore no visible braces or orthopedic support devices. There was no indication to support that the claimant is currently employed.

Should you need any additional assistance to this file, please feel free to contact our Jacksonville, Florida office and it will be addressed immediately.

| ENCLOSURES | None |
|---|---|


### DETAILS OF INVESTIGATION

**Surveillance**
**1182 SE 2nd Avenue**
**Deerfield Beach, FL**
**Thursday, July 18, 2013**

Weather: Cloudy, Rain 80s (F)

6:01 a.m. (Video)
Surveillance was initiated at 1182 SE 2nd Avenue Deerfield Beach, FL where no vehicles were present. A surveillance position was taken where the front of the residence was observable as follows:

**Charles Ackley**
**Page 5 of 11**



6:55 a.m. (Video)
Video was obtained documenting the area and surveillance position.  No claimant activity was observed.

**7:01 a.m. (Video)**
The claimant was briefly observed in the doorway of his residence.



7:56 a.m. (Video)
Video was obtained documenting the area and surveillance position.  No claimant activity was observed.

8:48 a.m. (Video)
Video was obtained documenting the area and surveillance position.  No claimant activity was observed.

**9:18 a.m. (Video)**
The claimant walked toward the street and looked South before returning back to the residence.



**9:55 a.m. – 9:56 a.m. (Video)**
A USPS delivery person knocked on the door which the claimant answered.  They conversed while the claimant appeared to sign for an item.

**Charles Ackley**
**Page 6 of 11**



**10:08 a.m. (Video)**
The claimant was briefly observed in the car port area of the residence.

**10:44 a.m. – 10:47 a.m. (Intermittent Video)**
After departing the residence on a bicycle, the claimant road out of the area. Mobile surveillance was engaged.



**10:48 a.m. – 10:49 a.m. (Intermittent Video)**
The claimant left his bicycle in front of the Winn Dixie grocery store at 1019 South Federal Highway Deerfield Beach, FL.

**10:51 a.m. – 10:55 a.m. (Intermittent Video)**
After exiting the grocery store the claimant road the bicycle out of the area.



10:55 a.m.
The claimant returned to his residence.

**11:58 a.m. (Video)**
As a female walked by the front of the claimant's residence, he was observed in the doorway staring at her until she was out of view and he returned inside the house.

**Charles Ackley**
**Page 7 of 11**



1:02 p.m. (Video)
Video was obtained documenting the area and surveillance position.  No claimant activity was observed.

2:01 p.m. (Video)
Video was obtained documenting the area and surveillance position.  No further claimant activity was observed and the surveillance was terminated for the day.


**Surveillance**
**1182 SE 2nd Avenue**
**Deerfield Beach, FL**
**Friday, July 19, 2013**

Weather: Partly Cloudy,  80s (F)

7:37 a.m. (Video)
Surveillance was initiated at 1182 SE 2nd Avenue Deerfield Beach, FL where no vehicles were present.

**8:04 a.m. – 8:05 a.m. (Video)**
The claimant was observed briefly in front of the residence.



8:58 a.m. (Video)
Video was obtained after the claimant briefly came into view and brought the bicycle from the car port to the rear of the residence.

**9:22 a.m. - 9:27 a.m. (Intermittent Video)**
After exiting the house with a leashed dog, the claimant utilized a skate board to ride with the dog around his neighborhood block before returning home.

**Charles Ackley**
**Page 8 of 11**



10:45 a.m. (Video)
Video was obtained documenting the area and surveillance position.  No claimant activity was observed.

**11:03 a.m. – 11:05 a.m. (Video)**
The claimant was observed speaking on a phone in front of the residence.



**11:13 a.m. (Video)**
The claimant was briefly observed in front of his residence.

**12:04 p.m. (Video)**
Video was obtained of the claimant as he was briefly observed in front of his residence.



**12:27 p.m. – 12:28 p.m. (Intermittent Video)**
The claimant was again observed using the phone in front of the residence.



**Charles Ackley**
**Page 9 of 11**

1:55 p.m. (Video)
Video was obtained documenting the area and surveillance position.  No claimant activity was observed.

3:15 p.m. (Video)
Video was obtained documenting the area and surveillance position.  No claimant activity was observed.

3:37 p.m. (Video)
Video was obtained documenting the area and surveillance position.  No further claimant activity was observed and the surveillance was terminated for the day.


**Surveillance**
**1182 SE 2nd Avenue**
**Deerfield Beach, FL**
**Sunday, July 21, 2013**

Weather: Mostly Clear,  80s - 90s (F)

7:56 a.m. (Video)
Surveillance was initiated at 1182 SE 2nd Avenue Deerfield Beach, FL where no vehicles were present.

**8:34 a.m. - 9:10 a.m. (Intermittent Video)**
The claimant departed the residence on a bicycle.  He was accompanied by  female who was on foot.  He rode slowly to stay with her while she walked.   While traveling they interacted with a male individual and appeared to engage in transaction, which involved the purchase of another bicycle.  After completing the purchase, they continued to a bus stop on Dixie Highway where they waited for a bus to arrived which the female entered and left the area. The claimant took the additional bike and rode back to his residence.

 

 

**9:21 a.m. – 9:22 a.m. (Video)**
The claimant brought both bikes from the carport to the rear of the residence.

**9:25 a.m. - 9:28 a.m. (Intermittent Video)**
The claimant spoke on a phone in front of his residence.

**Charles Ackley**
**Page 10 of 11**



**9:47 a.m. (Video)**
The claimant again spoke on a phone in front of the residence.

**10:07 a.m. - 10:15 a.m. (Intermittent Video)**
After exiting the property on the newly purchased bike, the claimant rode it around the neighborhood in a manner consistent with testing the vehicle. Afterward he returned onto the property.




11:12 a.m. (Video)
Video was obtained documenting the area and surveillance position. No claimant activity was observed.

**12:20 p.m. - 12:32 p.m. (Intermittent Video)**
The claimant departed the area alone on the Bike with a backpack. He rode the bike to a Circle K convenience store at 4791 Dixie Highway, Pompano Beach, FL. After putting the bike upside down, he then entered the store where he was observed interacting with an employee.




**12:33 p.m. - 1:12 p.m. (Intermittent Video)**
After being observed twice in the doorway of the convenience store the claimant exited and brought his bike to the side where he drank an energy drink and appeared to wait for an unknown individual. After some time he rode the bike across the street and met with another male. They engaged in what appeared to be a transaction before the claimant departed the parking lot and road in the general direction of his residence.

**Charles Ackley**
**Page 11 of 11**

 



**1:14 p.m. - 1:20 p.m. (Intermittent Video)**
After riding the bike along neighborhood streets, the claimant returned home and pulled the bike out of view behind the residence.



1:59 p.m. (Video)
Video was obtained documenting the area and surveillance position.  No claimant activity was observed.

3:02 p.m. (Video)
Video was obtained documenting the area and surveillance position.  No claimant activity was observed.

4:01 p.m. (Video)
Video was obtained documenting the area and surveillance position.  No further claimant activity was observed and the surveillance was terminated for the day.

**END OF REPORT**

BRCOSA000380



## ISO CLAIMSEARCH MATCH REPORT SUMMARY

A claim report identified by ClaimSearch identification number 0H003272435 was received by ISO ClaimSearch on 10/18/2,012 as a Replacement of a previously submitted claim. Submission of this replacement claim initiated a search of the ClaimSearch database. The claim(s) listed below appear(s) to be similar to the claim submitted. Reasonable procedures have been adopted to maximize the accuracy of this report. Independent investigations should be performed to evaluate the relevant data provided.

If you have any questions concerning your report, please contact Customer Support at (800) 888-4476.

### INITIATING CLAIM INFORMATION

| | | | |
|---|---|---|---|
| Claim Number: | E29060931 | Date of Loss: | 09/24/2,012 |
| Policy Number: | GL5082680450 | ISO File Number: | 0H003272435 |

## SUMMARY FOR EACH SEARCHABLE PARTY

**CHARLES ACKLEY,**
**Coverage:**                                                                 **Loss Type:**

| | SAME LOSS TYPE | SIU INVOLVEMENT | NAME | ADDRESS | SSN | PHONE | DRIVER'S LICENSE | VIN | LICENSE PLATE | KEY INDICATORS FOR THIS PARTY |
|---|---|---|---|---|---|---|---|---|---|---|
| **# of Matches** | 1 | | 1 | 1 | 3 | | | | | • Prior Claims History |
| **ISO File Number** | | | | | | | | | | |
| 4O002753814 | | | | | X | | | | | |
| 6C003276311 | | | X | X | X | | | | | |
| 9P003447346 | X | | | | X | | | | | |

**EQUITY ONE INC,**
No matches for this party

---

## ISO CLAIMSEARCH REPLACEMENT CLAIM DETAILS

### Initiating Claim                                    **File Number: 0H003272435**

| | |
|---|---|
| **Company:** | C03510030 |
| | E29060931 |

mhtml:file://\\dfspftl2fp1\frdusers\GIF\ftl2\UngerW\Cases\14-1480 Ackley, Charles\ISO ...    10/22/2014

BRCOSA000381

Page 2 of 6

Claim Number:
Date/Time of Loss:          09/24/2,012  12:01
Policy Number:              GL5082680450
Policy Type:                CCGL
Inception Date:             12/31/2,011     **Expiration Date:** 12/31/2,012
Company Received Date:      10/17/2,012
ISO Received Date:          10/18/2,012
Loss Description:           MCU. CLMT TRIPPED OVER BRACKETS LEFT FROM REMOVAL
Location of Loss:           PINE RIDGE SQUARE
                            4633 N UNIVERSITY DRIVE
                            CORAL SPRINGS, FL 33067--460

## Involved Party                **CL**
Name:                       CHARLES  ACKLEY
Address:                     1182 SE 2ND AVE
                            DEERFIELD BEACH, FL 33441--680
DOB:                        04/24/1,962
Gender:                     MALE
SSN:                                          etween 1977 and 1977  in FL

## Casualty Coverage Information:
Coverage Type:              LIAB
Loss Type:                  BODI
Claim Status:
Adjuster Company:           CONTINENTAL CASUALTY CO (CNA INS GRP)
Adjuster:                   FISHER , VIRGINIA
Adjuster Phone:             (404) 531-3,411
Alleged Injury / Property Damage:  NOT IDENTIFIED

## Involved Party                **IN**
Business Name:              EQUITY ONE INC
Address:                    1600 NE MIAMI GARDENS DR
                           NORTH MIAMI, FL 33179--490

back

back
## Matching Claim                        **File Number:** 4Q002753814
Reason(s) for match:            **S**
Insuring Company:               TRAVELERS INDEMNITY COMPANY

BRCOSA000382

| | |
|---|---|
| Claim Number: | EKZ4941001 |
| Date/Time of Loss: | 05/29/2,010 |
| Policy Number: | PJ6309291A136 |
| Policy Type: | CCGL |
| Insuring Co. Address: | NAPERVILLE CL CLM - A028 |
| | PO BOX 3204 * |
| | NAPERVILLE, IL 60567-0000 |
| Insuring Co. Phone: | (800) 842-6,172 |
| Loss Description: | (SUSPICIOUS CLAIM) - PLEASE INVESTIGATE TO THE FUL |
| Location of Loss: | 700-710 WEST MAIN STREET |
| | LOUISVILLE, KY |

## Involved Party                    IN

| | |
|---|---|
| Business Name: | 21C MUSEUM HOTEL |
| Address: | 700 W MAIN ST |
| | LOUISVILLE, KY 40202-2634 |

## Involved Party                    CL

| | |
|---|---|
| Name: | CHARLES  ACKLEY |
| Address: | 432 EAST JEFFERSON STREET |
| | LOUISVILLE, KY 40202 |
| Home Phone: | (502) 544-9,357 |
| | *** More matches on this Home Phone outside this report *** |
| SSN: | between 1977 and 1977  in FL |

## Service Provider                    LC

| | |
|---|---|
| Business Name: | WINTERS YONKER & ROUSSELLE, PSC |
| TIN: | in Portsmouth in NH |
| Address: | P.O. BOX 70999 |
| | LOUISVILLE, KY 40270 |
| Business Phone: | (502) 779-9,998 |

## Casualty Coverage Information:

| | |
|---|---|
| Coverage Type: | LIAB |
| Loss Type: | OTCA |
| Date Claim Closed: | 10/13/2,010 |
| Adjuster Company: | TRAVELERS INDEMNITY COMPANY |
| Adjuster: | KRISTINA VO |
| Adjuster Phone: | (630) 961-4,336 |
| Alleged Injury / Property Damage: | (SUSPICIOUS CLAIM) - PLEASE INVESTIGATE TO THE FUL |

BRCOSA000383

back
## Matching Claim

**File Number:** 6C003276311

| | |
|---|---|
| Reason(s) for match: | S |
| | N |
| | A |
| Insuring Company: | CONTINENTAL CASUALTY CO (CNA INS GRP) |
| Claim Number: | E29060932 |
| Date/Time of Loss: | 09/24/2,012  12:01 |
| Policy Number: | GL5082680450 |
| Policy Type: | CCGL |
| Inception Date: | 12/31/2,011     **Expiration Date:** 12/31/2,012 |
| Insuring Co. Address: | 333 S WABASH AVE |
| | CHICAGO, IL 60604 |
| Company Received Date: | 10/17/2,012 |
| Loss Description: | MCU. CLMT TRIPPED OVER BRACKETS LEFT FROM REMOVAL |
| Location of Loss: | PINE RIDGE SQUARE |
| | 4633 N UNIVERSITY DRIVE |
| | CORAL SPRINGS, FL 33067--460 |

## Involved Party     **CL**

| | |
|---|---|
| Name: | CHARLES  ACKLEY |
| Address: | 1182 SE 2ND AVE |
| | DEERFIELD BEACH, FL 33441--680 |
| DOB: | 04/24/1,962 |
| Gender: | MALE |
| SSN: | between 1977 and 1977  in FL |

## Casualty Coverage Information:

| | |
|---|---|
| Coverage Type: | LIAB |
| Loss Type: | MPAY |
| Claim Status: | |
| Adjuster Company: | CONTINENTAL CASUALTY CO (CNA INS GRP) |
| Adjuster: | FISHER , VIRGINIA |
| Adjuster Phone: | (404) 531-3,411 |
| Alleged Injury / Property Damage: | NOT IDENTIFIED |

## Involved Party     **IN**

| | |
|---|---|
| Business Name: | EQUITY ONE INC |
| Address: | 1600 NE MIAMI GARDENS DR |
| | NORTH MIAMI, FL 33179--490 |

BRCOSA000384

back

## Matching Claim

**File Number:** 9P003447346

| | |
|---|---|
| **Reason(s) for match:** | S |
| **Insuring Company:** | AMERISURE INSURANCE COMPANY |
| **Claim Number:** | 1298732 |
| **Date/Time of Loss:** | 09/24/2,012 |
| **Policy Number:** | CPP207373702 |
| **Policy Type:** | CPMP |
| **Inception Date:** | 12/31/2,011   **Expiration Date:** 12/31/2,012 |
| **Insuring Co. Address:** | PO BOX 10790 |
| | ST PETERSBURG, FL 33733-0000 |
| **Insuring Co. Phone:** | (813) 381-6,789 |
| **Loss Description:** | NOTICE FROM ATTY - CLMT TRIPPED OVER ANCHORS FOR M |
| **Location of Loss:** | CORAL SPRINGS, FL 33065 |

## Involved Party          CL

| | |
|---|---|
| **Name:** | CHARLES  A  ACKLEY |
| **Address:** | 8977 WILES ROAD |
| | APT. 2-305 |
| | CORAL SPRINGS, FL 33067 |
| | US |
| **DOB:** | 04/24/1,962 |
| **Gender:** | MALE |
| **SSN:** | between 1977 and 1977  in FL |

## Casualty Coverage Information:

| | |
|---|---|
| **Coverage Type:** | LIAB |
| **Loss Type:** | BODI |
| **Claim Status:** | |
| **Adjuster Company:** | AMERISURE INSURANCE COMPANY |
| **Adjuster:** | HACKETT , KIM |
| **Alleged Injury / Property Damage:** | NOTICE FROM ATTY - CLMT TRIPPED OVER ANCHORS FOR M |

## Involved Party          IN

| | |
|---|---|
| **Business Name:** | EDC |
| **Address:** | 1660 HUGUENOT ROAD |
| | MIDLOTHIAN, VA 23113 |
| **TIN:** | in Richmond in VA |

BRCOSA000385

ISO Stylesheet Version: 5.2 Release Date: 05-13-2010

BRCOSA000386



**ISO CLAIMSEARCH MATCH REPORT SUMMARY**

A claim report identified by ClaimSearch identification number 6C003276311 was received by ISO ClaimSearch on 10/31/2,012 as a Replacement of a previously submitted claim. Submission of this replacement claim initiated a search of the ClaimSearch database. The claim(s) listed below appear(s) to be similar to the claim submitted. Reasonable procedures have been adopted to maximize the accuracy of this report. Independent investigations should be performed to evaluate the relevant data provided.

If you have any questions concerning your report, please contact Customer Support at (800) 888-4476.

**INITIATING CLAIM INFORMATION**

| | | | |
|---|---|---|---|
| Claim Number: | E29060932 | Date of Loss: | 09/24/2,012 |
| Policy Number: | GL5082680450 | ISO File Number: | 6C003276311 |

**SUMMARY FOR EACH SEARCHABLE PARTY**

CHARLES ACKLEY,
Coverage:                                                                 Loss Type:

| | SAME LOSS TYPE | SIU INVOLVEMENT | NAME | ADDRESS | SSN | PHONE | DRIVER'S LICENSE | VIN | LICENSE PLATE | KEY INDICATORS FOR THIS PARTY |
|---|---|---|---|---|---|---|---|---|---|---|
| **# of Matches** | | | 1 | 1 | 3 | | | | | • Prior Claims History |
| **ISO File Number** | | | | | | | | | | |
| 0H003272435 | | | X | X | X | | | | | |
| 4Q002753814 | | | | | X | | | | | |
| 9P003447346 | | | | | X | | | | | |

**EQUITY ONE INC,**
No matches for this party

---

**ISO CLAIMSEARCH REPLACEMENT CLAIM DETAILS**

**Initiating Claim**                                          **File Number:** 6C003276311

Company:                              C03510030
                                      E29060932

BRCOSA000387

| Claim Number: | |
|---|---|
| Date/Time of Loss: | 09/24/2,012  12:01 |
| Policy Number: | GL5082680450 |
| Policy Type: | CCGL |
| Inception Date: | 12/31/2,011    Expiration Date: 12/31/2,012 |
| Company Received Date: | 10/17/2,012 |
| ISO Received Date: | 10/31/2,012 |
| Loss Description: | MCU. CLMT TRIPPED OVER BRACKETS LEFT FROM REMOVAL |
| Location of Loss: | PINE RIDGE SQUARE |
| | 4633 N UNIVERSITY DRIVE |
| | CORAL SPRINGS, FL 33067--460 |

**Involved Party**      **CL**

| Name: | CHARLES  ACKLEY |
|---|---|
| Address: | 1182 SE 2ND AVE |
| | DEERFIELD BEACH, FL 33441--680 |
| DOB: | 04/24/1,962 |
| Gender: | MALE |
| SSN: | ...between 1977 and 1977  in FL |

**Casualty Coverage Information:**

| Coverage Type: | LIAB |
|---|---|
| Loss Type: | MPAY |
| Claim Status: | |
| Adjuster Company: | CONTINENTAL CASUALTY CO (CNA INS GRP) |
| Adjuster: | FISHER , VIRGINIA |
| Adjuster Phone: | (404) 531-3,411 |
| Alleged Injury / Property Damage: | NOT IDENTIFIED |

**Involved Party**      **IN**

| Business Name: | EQUITY ONE INC |
|---|---|
| Address: | 1600 NE MIAMI GARDENS DR |
| | NORTH MIAMI, FL 33179--490 |

back

---

back

**Matching Claim**                          **File Number:** 0H003272435

Reason(s) for match:
                              A
                              S

BRCOSA000388

**N**

| | |
|---|---|
| Insuring Company: | CONTINENTAL CASUALTY CO (CNA INS GRP) |
| Claim Number: | E29060931 |
| Date/Time of Loss: | 09/24/2,012 12:01 |
| Policy Number: | GL5082680450 |
| Policy Type: | CCGL |
| Inception Date: | 12/31/2,011   Expiration Date: 12/31/2,012 |
| Insuring Co. Address: | 333 S WABASH AVE |
| | CHICAGO, IL 60604 |
| Company Received Date: | 10/17/2,012 |
| Loss Description: | MCU. CLMT TRIPPED OVER BRACKETS LEFT FROM REMOVAL |
| Location of Loss: | PINE RIDGE SQUARE |
| | 4633 N UNIVERSITY DRIVE |
| | CORAL SPRINGS, FL 33067--460 |

**Involved Party**   **CL**

| | |
|---|---|
| Name: | CHARLES  ACKLEY |
| Address: | 1182 SE 2ND AVE |
| | DEERFIELD BEACH, FL 33441--680 |
| DOB: | 04/24/1,962 |
| Gender: | MALE |
| SSN: | between 1977 and 1977  in FL |

**Casualty Coverage Information:**

| | |
|---|---|
| Coverage Type: | LIAB |
| Loss Type: | BODI |
| Claim Status: | |
| Adjuster Company: | CONTINENTAL CASUALTY CO (CNA INS GRP) |
| Adjuster: | FISHER , VIRGINIA |
| Adjuster Phone: | (404) 531-3,411 |
| Alleged Injury / Property Damage: | NOT IDENTIFIED |

**Involved Party**   **IN**

| | |
|---|---|
| Business Name: | EQUITY ONE INC |
| Address: | 1600 NE MIAMI GARDENS DR |
| | NORTH MIAMI, FL 33179--490 |

back

**Matching Claim**                    **File Number:** 4Q002753814

S

BRCOSA000389

**Reason(s) for match:**

| | |
|---|---|
| **Insuring Company:** | TRAVELERS INDEMNITY COMPANY |
| **Claim Number:** | EKZ4941001 |
| **Date/Time of Loss:** | 05/29/2,010 |
| **Policy Number:** | PJ6309291A136 |
| **Policy Type:** | CCGL |
| **Insuring Co. Address:** | NAPERVILLE CL CLM - A028 |
| | PO BOX 3204 * |
| | NAPERVILLE, IL 60567-0000 |
| **Insuring Co. Phone:** | (800) 842-6,172 |
| **Loss Description:** | (SUSPICIOUS CLAIM) - PLEASE INVESTIGATE TO THE FUL |
| **Location of Loss:** | 700-710 WEST MAIN STREET |
| | LOUISVILLE, KY |

**Involved Party**        **IN**

| | |
|---|---|
| **Business Name:** | 21C MUSEUM HOTEL |
| **Address:** | 700 W MAIN ST |
| | LOUISVILLE, KY 40202-2634 |

**Involved Party**        **CL**

| | |
|---|---|
| **Name:** | CHARLES  ACKLEY |
| **Address:** | 432 EAST JEFFERSON STREET |
| | LOUISVILLE, KY 40202 |
| **Home Phone:** | (502) 544-9,357 |
| | *** More matches on this Home Phone outside this report *** |
| **SSN:** | ) between 1977 and 1977  in FL |

**Service Provider**        **LC**

| | |
|---|---|
| **Business Name:** | WINTERS YONKER & ROUSSELLE, PSC |
| **TIN:** | in Portsmouth in NH |
| **Address:** | P.O. BOX 70999 |
| | LOUISVILLE, KY 40270 |
| **Business Phone:** | (502) 779-9,998 |

**Casualty Coverage Information:**

| | |
|---|---|
| **Coverage Type:** | LIAB |
| **Loss Type:** | OTCA |
| **Date Claim Closed:** | 10/13/2,010 |
| **Adjuster Company:** | TRAVELERS INDEMNITY COMPANY |
| **Adjuster:** | KRISTINA VO |
| **Adjuster Phone:** | (630) 961-4,336 |

BRCOSA000390

Alleged Injury / Property Damage:      (SUSPICIOUS CLAIM) - PLEASE INVESTIGATE TO THE FUL

back

## Matching Claim

**File Number: 9P003447346**

| | |
|---|---|
| Reason(s) for match: | S |
| Insuring Company: | AMERISURE INSURANCE COMPANY |
| Claim Number: | 1298732 |
| Date/Time of Loss: | 09/24/2,012 |
| Policy Number: | CPP207373702 |
| Policy Type: | CPMP |
| Inception Date: | 12/31/2,011      Expiration Date: 12/31/2,012 |
| Insuring Co. Address: | PO BOX 10790 |
| | ST PETERSBURG, FL 33733-0000 |
| Insuring Co. Phone: | (813) 381-6,789 |
| Loss Description: | NOTICE FROM ATTY - CLMT TRIPPED OVER ANCHORS FOR M |
| Location of Loss: | CORAL SPRINGS, FL 33065 |

## Involved Party          CL

| | |
|---|---|
| Name: | CHARLES  A  ACKLEY |
| Address: | 8977 WILES ROAD |
| | APT. 2-305 |
| | CORAL SPRINGS, FL 33067 |
| | US |
| DOB: | 04/24/1,962 |
| Gender: | MALE |
| SSN: | between 1977 and 1977  in FL |

## Casualty Coverage Information:

| | |
|---|---|
| Coverage Type: | LIAB |
| Loss Type: | BODI |
| Claim Status: | |
| Adjuster Company: | AMERISURE INSURANCE COMPANY |
| Adjuster: | HACKETT , KIM |
| Alleged Injury / Property Damage: | NOTICE FROM ATTY - CLMT TRIPPED OVER ANCHORS FOR M |

## Involved Party          IN

| | |
|---|---|
| Business Name: | EDC |
| Address: | 1660 HUGUENOT ROAD |
| | MIDLOTHIAN, VA 23113 |
| | in Richmond in VA |

mhtml:file://\\dfspftl2fp1\frdusers\GIF\ftl2\UngerW\Cases\14-1480 Ackley, Charles\ISO ...   10/22/2014

BRCOSA000391

**TIN:**

ISO Stylesheet Version: 5.2 Release Date: 05-13-2010

BRCOSA000392

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

CHARLES ACKLEY,                          CASE NO. CACE12031439(21)

     Plaintiff(s),

vs.

EQUITY ONE (Florida Portfolio), INC.,

     Defendant(s).

_____/

**PLAINTIFF'S, CHARLES ACKLEY, NOTICE OF SERVING PROPOSAL FOR
SETTLEMENT PURSUANT TO FLA. R. CIV. PRO. 1.442 AND DEMAND FOR
JUDGMENT PURSUANT TO FLA. STAT. § 768.79 TO DEFENDANT, EQUITY ONE
(Florida Portfolio), INC.**

**COME NOW**, the Plaintiff, CHARLES ACKLEY, individually, by and through his
undersigned counsel, pursuant to Rule 1.442, Florida Rules of Civil Procedure and Florida
Statute § 768.79 hereby gives notice that a Proposal for Settlement and Demand for
Judgment has been served upon Defendant, EQUITY ONE (Florida Portfolio), INC., on April
29, 2013.

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served this
29th day of April, 2013, via ☒ E-Mail, ☐ U.S. Mail, ☐ facsimile, ☐ hand delivery, and/or ☐
overnight courier, upon: **Rosalind R. Milian, Esq.**, Law Office of Lorraine Lester, 8100
SW 10th Street, Suite 2500, Plantation, FL  33324, rosalind.milian@cna.com,
thelawofficeoflorrainelester@cna.com.

PINCUS & CURRIER LLP
324 North Lakeside Court
West Palm Beach, FL 33407
E-Mail:   sphillips@wprclaw.com
            lshand@wprclaw.com
Telephone:   (561) 868-1340
Facsimile:   (561) 366-1310

By:_____
     Steven Phillips
     Florida Bar No. 893374

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

CHARLES ACKLEY,                              CASE NO. CACE12031439(21)

     Plaintiff(s),

vs.

EQUITY ONE (Florida Portfolio), INC.,

     Defendant(s).

_____/

**PLAINTIFF'S PROPOSAL FOR SETTLEMENT PURSUANT TO
RULE 1.442, FLA. R. CIV. PRO. AND DEMAND FOR JUDGMENT PURSUANT
TO FLA. STAT. § 768.79 TO DEFENDANT, EQUITY ONE (Florida Portfolio), INC.**

Plaintiff, CHARLES ACKLEY (hereafter, "PLAINTIFF"), states that at least 90 days
have passed since service of process on the Defendant, and there are at least 45 days
remaining before the date set for trial or the first day of the docket on which this case is set
for trial, whichever is earlier.

THEREFORE, PLAINTIFF hereby serves this proposal for settlement pursuant to
Florida Rule of Civil Procedure 1.442 and Florida Statute §768.79. This proposal for
settlement must be accepted in writing, within thirty (30) days or it shall be deemed
rejected. The Proposal for Settlement is as follows:

1.  **PARTY MAKING PROPOSAL:**

    CHARLES ACKLEY

2.  **PARTY TO WHOM THE PROPOSAL IS BEING MADE:**

    EQUITY ONE (Florida Portfolio), INC. (herein "DEFENDANT")

3.  **CLAIMS THE PROPOSAL ATTEMPTS TO RESOLVE:**

    All issues and claims for damages asserted by this PLAINTIFF against the
    DEFENDANT.   If accepted, PLAINTIFF shall dismiss his claims asserted against
    DEFENDANT.

4.  **TOTAL AMOUNT OF PROPOSAL:**

    PLAINTIFF proposes to resolve all of his claims for damages against
    DEFENDANT in exchange for payment by or on behalf of DEFENDANT the sum of

Three Hundred Thousand Dollars ($300,000.00).   As noted in Paragraph 3, above, if this Proposal is accepted, PLAINTIFF shall dismiss his claims asserted against DEFENDANT.

A. **NONMONETARY TERMS OF PROPOSAL, IF ANY:**
   None.

B. **AMOUNT PROPOSED TO SETTLE CLAIM FOR PUNITIVE DAMAGES, IF ANY:**
   None.

C. **ARE ATTORNEY FEES PART OF THE PLAINTIFF'S LEGAL CLAIM?**
   (check one) Yes_____ No____X_____

D. **AMOUNT PROPOSED TO SETTLE CLAIM FOR ATTORNEY FEES, IF ANY:**
   **None.**   Amount is inclusive of fees and costs.

5. **SERVICE AND FILING:**
   This proposal shall be served on the party to whom it is made through counsel, but shall not be filed unless necessary to enforce the provisions of Rule 1.442.

6. **WITHDRAWAL:**
   This proposal may be withdrawn in writing provided the written withdrawal is delivered before a written acceptance is delivered.   Once withdrawn, this Proposal is void.

7. **ACCEPTANCE AND REJECTION:**
   This Proposal shall be deemed by this PLAINTIFF to be rejected by DEFENDANT unless accepted by delivery of a written notice of acceptance within thirty (30) days after service of the Proposal.   The provisions of Florida Rule of Civil Procedure 1.090(e) do not apply to this Proposal.   No oral communications shall constitute an acceptance, rejection or counteroffer of this Proposal.   This Proposal for Settlement shall not be combined with any other Proposals or offers made in this case by this PLAINTIFF.

8. **CONSEQUENCES OF REJECTION:**
   In the event this proposal is rejected, DEFENDANT is subject to sanctions, including, but not limited to, those as outlined in Rules 1.442(g) and (h) of the Florida Rules of Civil Procedure, Fla. Stat. 768.79 and any other relief PLAINTIFF is entitled to as a matter of law and which the Court deems just and proper.

9.   **GOOD-FAITH:**

This Proposal is being submitted with the knowledge, understanding, and consent of the PLAINTIFF making this Proposal.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served this 29th day of April, 2013, via ☒ E-Mail, ☐ U.S. Mail, ☐ facsimile, ☐ hand delivery, and/or ☐ overnight courier, upon:   **Rosalind R. Milian, Esq.**, Law Office of Lorraine Lester, 8100 SW 10th Street, Suite 2500, Plantation, FL   33324, rosalind.milian@cna.com, thelawofficeoflorrainelester@cna.com.

PINCUS & CURRIER LLP
324 North Lakeside Court
West Palm Beach, FL 33407
E-Mail:   sphillips@wprclaw.com
          lshand@wprclaw.com
Telephone:   (561) 868-1340
Facsimile:   (561) 366-1310

By:_____
    Steven Phillips
    Florida Bar No. 893374

BRCOSA000396

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

CHARLES ACKLEY,                          CASE NO. CACE12031439(21)
        Plaintiff(s),

vs.

EQUITY ONE (Florida Portfolio), INC. and
EILERSON DEVELOPMENT
CORPORATION,
        Defendant(s).

_____/

**PLAINTIFF'S, CHARLES ACKLEY, NOTICE OF SERVING PROPOSAL FOR
SETTLEMENT PURSUANT TO FLA. R. CIV. PRO. 1.442 AND DEMAND FOR
JUDGMENT PURSUANT TO FLA. STAT. § 768.79
TO DEFENDANT, EQUITY ONE (Florida Portfolio) INC.**

**COME NOW**, the Plaintiff, CHARLES ACKLEY, individually, by and through his

undersigned counsel, pursuant to Rule 1.442, Florida Rules of Civil Procedure and Florida

Statute § 768.79 hereby gives notice that a Proposal for Settlement and Demand for

Judgment has been served upon Defendant, EQUITY ONE (Florida Portfolio), INC., on

February 27, 2014.

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served this 27th

day of February, 2014, via ☒ E-Mail upon **Rosalind R. Milian, Esq.**, Law Office of Lorraine

Lester, 8100 SW 10th Street, Suite 2500, Plantation, FL 33324, rosalind.milian@cna.com,

thelawofficeoflorrainelester@cna.com; **Kent S. Pratt, Esq.**, Pratt & Radford, P.L., 340 Columbia

Drive, Suite 111, West Palm Beach, FL  33409, KSPCourtDocs@prattradford.com.

PINCUS & CURRIER LLP
324 North Lakeside Court
West Palm Beach, FL 33407
E-Mail:   sphillips@wprclaw.com
          lshand@wprclaw.com
Telephone:   (561) 868-1340
Facsimile:   (561) 366-1310


By: /s/ Steven B. Phillips
    Steven Phillips
    Florida Bar No. 893374

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

CHARLES ACKLEY,                       CASE NO. CACE12031439(21)

      Plaintiff(s),

vs.

EQUITY ONE (Florida Portfolio), INC. and
EILERSON DEVELOPMENT
CORPORATION,

      Defendant(s).

_____/

**PLAINTIFF'S PROPOSAL FOR SETTLEMENT PURSUANT TO
RULE 1.442, FLA. R. CIV. PRO. AND DEMAND FOR JUDGMENT PURSUANT
TO FLA. STAT. § 768.79 TO DEFENDANT, EQUITY ONE (Florida Portfolio) INC.**

Plaintiff, CHARLES ACKLEY (hereafter, "PLAINTIFF"), states that at least 90 days have passed since service of process on the Defendant, and there are at least 45 days remaining before the date set for trial or the first day of the docket on which this case is set for trial, whichever is earlier.

THEREFORE, PLAINTIFF hereby serves this proposal for settlement pursuant to Florida Rule of Civil Procedure 1.442 and Florida Statute §768.79. This proposal for settlement must be accepted in writing, within thirty (30) days or it shall be deemed rejected. The Proposal for Settlement is as follows:

1. **PARTY MAKING PROPOSAL:** .
   CHARLES ACKLEY

2. **PARTY TO WHOM THE PROPOSAL IS BEING MADE:\**
   EQUITY ONE (Florida Portfolio), INC. (herein EQUITY ONE")

3. **CLAIMS THE PROPOSAL ATTEMPTS TO RESOLVE:**
   All issues and claims for damages asserted by this PLAINTIFF that could be awarded in a final judgment against EQUITY ONE.  If accepted, PLAINTIFF shall dismiss his claims asserted against EQUITY ONE and Defendant EILERSON DEVELOPMENT CORPORATION ("EDC").

BRCOSA000398

4. TOTAL AMOUNT OF PROPOSAL:

> PLAINTIFF proposes to resolve all of his claims for damages against EQUITY ONE in exchange for payment by or on behalf of DEFENDANT the sum of Three Hundred Thirty-Seven Thousand Five Hundred Dollars ($337,500.00). As noted in Paragraph 3, above, if this Proposal is accepted, PLAINTIFF shall dismiss his claims asserted against EQUITY ONE and EDC.

A. NONMONETARY TERMS OF PROPOSAL, IF ANY:

> None.

B. AMOUNT PROPOSED TO SETTLE CLAIM FOR PUNITIVE DAMAGES, IF ANY:

> None.

C. ARE ATTORNEY FEES PART OF THE PLAINTIFF'S LEGAL CLAIM?

> (check one) Yes_____ No____X_____

D. AMOUNT PROPOSED TO SETTLE CLAIM FOR ATTORNEY FEES, IF ANY:

> None. Amount is inclusive of fees and costs.

5. SERVICE AND FILING:

> This proposal shall be served on the party to whom it is made through counsel, but shall not be filed unless necessary to enforce the provisions of Rule 1.442.

6. WITHDRAWAL:

> This proposal may be withdrawn in writing provided the written withdrawal is delivered before a written acceptance is delivered. Once withdrawn, this Proposal is void.

7. ACCEPTANCE AND REJECTION:

> This Proposal shall be deemed by this PLAINTIFF to be rejected by EQUITY ONE unless accepted by delivery of a written notice of acceptance within thirty (30) days after service of the Proposal. The provisions of Florida Rule of Civil Procedure 1.090(e) do not apply to this Proposal. No oral communications shall constitute an acceptance, rejection or counteroffer of this Proposal. This Proposal for Settlement shall not be combined with any other Proposals or offers made in this case by this PLAINTIFF.

8. CONSEQUENCES OF REJECTION:

> In the event this proposal is rejected, EQUITY ONE is subject to sanctions,

including, but not limited to, those as outlined in Rules 1.442(g) and (h) of the Florida Rules of Civil Procedure, Fla. Stat. 768.79 and any other relief PLAINTIFF is entitled to as a matter of law and which the Court deems just and proper.

9.  **GOOD-FAITH:**

This Proposal is being submitted with the knowledge, understanding, and consent of the PLAINTIFF making this Proposal.

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served this 27th day of February, 2014, via ☒ E-Mail upon **Rosalind R. Milian, Esq.,** Law Office of Lorraine Lester, 8100 SW 10th Street, Suite 2500, Plantation, FL 33324, rosalind.milian@cna.com, thelawofficeoflorrainelester@cna.com; **Kent S. Pratt, Esq.,** Pratt & Radford, P.L., 340 Columbia Drive, Suite 111, West Palm Beach, FL 33409, KSPCourtDocs@prattradford.com.

PINCUS & CURRIER LLP
324 North Lakeside Court
West Palm Beach, FL 33407
E-Mail:  sphillips@wprclaw.com
lshand@wprclaw.com
Telephone:  (561) 868-1340
Facsimile:  (561) 366-1310


By: /s/ *Steven B. Phillips*
Steven Phillips
Florida Bar No. 893374

Filing # 11712051 Electronically Filed 03/25/2014 11:24:25 AM

| | |
|---|---|
| CHARLES ACKLEY | ) IN THE CIRCUIT COURT OF THE 17th |
| | ) JUDICIAL CIRCUIT IN AND FOR |
| vs. | ) BROWARD COUNTY, FLORIDA |
| | ) |
| EQUITY ONE, INC. and | ) |
| EILERSON DEVELOPMENT | ) CASE NUMBER:  12031439(21) |
| CORPORATION | ) |
| ————————————————— | ) |

## NOTICE OF MEDIATION

Rosalind R. Milian, Esq.
Law Office of Lorraine Lester
8100 SW 10th Street, Suite 2500
Plantation, FL 33324
Phone: 954-424-4667
rosalind.milian@cna.com
thelawofficeoflorrainelester@cna.com

Kent S. Pratt, Esq.
Pratt & Radford, P.L.
340 Columbia Drive, Suite 111
West Palm Beach, FL 33409
Phone: 561-640-0330
KSPCourtDocs@prattradford.com

YOU ARE HEREBY NOTIFIED, pursuant to the agreement of the parties, that a Mediation Conference shall be held in this case as follows:

Mediator:   Brian Reeves
            NEXUS MEDIATION, LLC
Location:   1551 Forum Place, Suite 400-A
            West Palm Beach, Florida  33401
            Phone: 561-615-3124
            Fax:    866-936-7079
            Scheduling@NexusMediation.com
Date:       Tuesday, April 29, 2014
Time:       1:30 p.m. to 4:30 p.m.

Three hours have been reserved for this case.  The mediation charges are $350/hour plus a $54/per party administrative charge. There is a two-hour minimum for Palm Beach, Martin and Broward Counties. Unless alternative arrangements are made in writing, each party is responsible for a *pro rata* share of the total charges rendered in this case.

I HEREBY CERTIFY that a true and correct copy of the foregoing was provided by fax and/or email to the above named addressees this March 25, 2014.

By: _____

Steven Phillips
Pincus & Currier, LLP
324 North Lakeside Court
West Palm Beach, FL 33407
Phone: 561-868-1340
SPhillips@wprclaw.com
ccastillo@wprclaw.com

ACKLEY v. IRT and EQUITY ONE
SUMMONS
Page 2 of 2

Witness my hand and seal of said Court this _____ day of November, 2012.

NOV 07 2012

YVELINE GASPARD

(Court Seal)

By: _____

HOWARD C. FORMAN
DAVID C. COPY
Circuit Civil

**IMPORTANTE**

Usted ha sido demandado legalmente. Tiene 20 dias, contados a partir del recibo de esta notificacion para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Sino conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica. Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

**IMPORTANT**

Des poursuites judiciaires ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes oblige de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

---

IN THE CIRCUIT COURT OF THE 17th JUDICIAL CIRCUIT OF FLORIDA, IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO.: 12-3/439 21

CHARLES ACKLEY,
            Plaintiff,

vs.

IRT CORAL SPRINGS, LLC and EQUITY ONE, INC.,
            Defendants.

Served date 11-6-12 Time 9:3..
IMCN, No. 111
is a certified process server in the
Circuit and County Courts

**CIVIL ACTION SUMMONS for the Second Judicial Circuit**

THE STATE OF FLORIDA
To Each Sheriff of the State:

YOU ARE HEREBY COMMANDED to serve this Summons, a copy of the Complaint, Two (2) Sets of Interrogatories, Request for Admissions and a Request to Produce in the above-styled cause upon the Defendant:

EQUITY ONE, INC.
By serving its Registered Agent:
Corporation Service Company
1201 Hays Street
Tallahassee, FL 3179

Each Defendant is hereby required to serve written defenses to said Complaint upon:

STEVEN B. PHILLIPS, ESQ.
PINCUS & CURRIER, LLP

324 NORTH LAKESIDE COURT
WEST PALM BEACH, FL 33407
(561) 868-1340 - Fax (561) 366-1310

Plaintiff's attorney whose address is:

within twenty days after service of this summons upon you, exclusive of the date of service, and to file the original of said written defenses with the Clerk of the said Court either before service upon Plaintiff's attorney or immediately thereafter. If you fail to do so, a default will be entered against you for the relief demanded in the Complaint.

BRCOSA000402

IN THE CIRCUIT COURT OF THE 17th
JUDICIAL CIRCUIT OF FLORIDA, IN
AND FOR BROWARD COUNTY,
FLORIDA

CASE NO.:   12 - 3 1 4 3 9

CHARLES ACKLEY,

    Plaintiff,

vs.

IRT CORAL SPRINGS, LLC
and EQUITY ONE, INC.,

    Defendants.

_____/

## COMPLAINT

The Plaintiff, CHARLES ACKLEY, sues the Defendants, IRT CORAL SPRINGS,

LLC and EQUITY ONE, INC., and says:

1.   This is an action for damages which exceed the sum of FIFTEEN THOUSAND

($15,000.00) DOLLARS.

2.   At all times material hereto the Plaintiff, CHARLES ACKLEY, was and is a

resident of Broward County, Florida.

3.   At all times material hereto, the Defendant, IRT CORAL SPRINGS, LLC (herein

IRT), was and is a foreign limited liability company organized to do and doing business

in Broward County, Florida with a principal place of business located at 1600 N.E.

Miami Gardens Drive, Miami, FL 33179.

4.   At all times material hereto, the Defendant, EQUITY ONE, INC. (herein EQUITY

ONE), was and is a foreign profit corporation organized to do and doing business in

Broward County, Florida with a principal place of business located at 1600 N.E. Miami

Gardens Drive, Miami, FL 33179.

ACKLEY v. IRT CORAL SPRINGS, LLC and EQUITY ONE, INC.
Complaint
Page 2 of 4

5.   On or about September 24, 2012, Defendant, IRT, owned and maintained real

property located at 4601-4695 N. University Drive, Coral Springs, Broward County,

Florida commonly known as Pine Ridge Square.

6.   On September 24, 2012, Defendant, EQUITY ONE, was an owner of and/or the

agent or property manager for Defendant IRT responsible for managing and maintaining

the real property located at 4601-4695 N. University Drive, Coral Springs, Broward

County, Florida and commonly known as Pine Ridge Square.

7.   On September 24, 2012, Defendants, IRT and EQUITY ONE, were responsible

for maintaining the sidewalk on the above described property as depicted on the

photograph attached as Exhibit A.

8.   On or about September 24, 2012, the Plaintiff, CHARLES ACKLEY, was a

customer and business invitee on Defendant's property.

9.   At all times material hereto Defendants, IRT and EQUITY ONE, owed a duty to

the Plaintiff, CHARLES ACKLEY, and other customers and business invitees similarly

situated to keep the property and premises in a reasonably safe condition and to protect

the Plaintiff from dangers which the business or its employees were or should have

been aware of.

10.   Defendants, IRT and EQUITY ONE had a duty to warn invitees, including

Plaintiff, of any unsafe and unreasonably dangerous conditions of which it created,

knew or should have known about in the exercise of reasonable care.

A TRUE COPY

NOV 07 2012

21

BRCOSA000403

ACKLEY v. IRT CORAL SPRINGS, LLC and EQUITY ONE, INC.
Complaint
Page 3 of 4

11. At all times material hereto the Defendants, IRT and EQUITY ONE , failed to conform to the above mentioned duties in one or more, but not limited to, the following:

a. The Defendants negligently maintained the premises in that they carelessly and negligently maintained the sidewalk located adjacent to the building on the subject property. The negligent maintenance of their premises created a hazardous condition which caused Plaintiff to fall.

b. The Defendants, through their employees, agents or servants negligently maintained the premises in that they carelessly and negligently maintained the sidewalk located adjacent to the building on its property by leaving multiple anchors mounted to the concrete and sticking up above the surface of the sidewalk after removing mailboxes and/or other items from the sidewalk on or before September 24, 2012. This negligent maintenance of their premises created a hazardous condition which caused Plaintiff to fall.

c. The Defendants were negligent in that they failed to place any warning, guard, barricade or notice of any kind on or around the subject sidewalk to warn of the multiple anchors mounted to the concrete and sticking up above the surface of the sidewalk which Defendants were aware of or should have been aware of so that, as a result, a dangerous condition existed and as a result the Plaintiff fell.

d. The Defendants failed to exercise reasonable care under all of the relevant surrounding circumstances.

12. The negligent condition was created by the Defendants their agents, employees or servants, known to Defendants or had existed for a sufficient length of time so that

ACKLEY v. IRT CORAL SPRINGS, LLC and EQUITY ONE, INC.
Complaint
Page 4 of 4

Defendants should have known of it by virtue of the location of the hazardous condition.

13. As a result, Plaintiff suffered bodily injury that is permanent within a reasonable degree of medical probability, resulting pain and suffering, disability, mental anguish, lost wages, loss of capacity for the enjoyment of life, inconvenience, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a preexisting condition. These are either permanent or continuing in nature and Plaintiff will suffer these losses in the future.

WHEREFORE, the Plaintiff, CHARLES ACKLEY, demands Judgment for damages against the Defendants, IRT CORAL SPRINGS, LLC and EQUITY ONE, INC., jointly and severally, and further demands trial by jury.

DATED on this ___13th___ day of November, 2012.

PINCUS & CURRIER LLP
324 North Lakeside Court
West Palm Beach, FL 33407
E-Mail:      SPhillips@pwpclaw.com
Telephone: (561) 868-1340
Facsimile:   (561) 366-1310

By: _____
     Steven B. Phillips
     Florida Bar No. 893374

IN THE CIRCUIT COURT OF THE 17th
JUDICIAL CIRCUIT OF FLORIDA, IN
AND FOR BROWARD COUNTY,
FLORIDA

CASE NO.:

**12 - 31439**

CHARLES ACKLEY,

    Plaintiff,

vs.

IRT CORAL SPRINGS, LLC
and EQUITY ONE, INC.,

    Defendants.
_____/

**PLAINTIFF'S REQUEST FOR ADMISSIONS TO DEFENDANT EQUITY ONE**

Plaintiff, CHARLES ACKLEY, by and through undersigned counsel, pursuant to

Rule 1.370, Florida Rules of Civil Procedure, and hereby request the above-named

Defendant, **EQUITY ONE, INC.**, to make the following admissions:

1. That the date and place of the accident set forth below are correct:

    Date of accident:   9/24/12

    Place of Accident:  4601-4695 N. University Drive, Coral Springs,

    Broward County, Florida.

2. That on 9/24/12, Defendant EQUITY ONE, INC. was the owner of the

walkway depicted on the attached exhibit A.

3. That on 9/24/12, Defendant EQUITY ONE, INC. was the owner of the

subject property as described above and in the complaint.

4. That the photograph attached as Exhibit A fairly and accurately depicts the

condition of the walkway at the subject property as it existed on 9/24/12 at the time MR.

ACKLEY tripped and fell on the anchors depicted in the attached photograph.

---

ACKLEY V. IRT CORAL SPRINGS, LLC and EQUITY ONE, INC.
RFA to DEFENDANT EQUITY ONE
Page 2 of 4

5. That the condition of the walkway depicted on the photograph attached as

Exhibit A is dangerous.

6. That the walkway depicted on the photograph attached as Exhibit A is not

in a safe condition.

7. That no warning signs of any kind were placed anywhere near the subject

anchors at the time Mr. Ackley tripped and fell on them.

8. That on 9/24/12, Defendant EQUITY ONE, INC. was responsible for

maintaining the walkway shown on the attached exhibit A.

9. That Plaintiff was lawfully on the subject premises located at the above

address on 9/24/12 when he tripped and fell on the subject anchors.

10. That on 9/24/12 MR. ACKLEY tripped and fell on anchors protruding up

from the walkway on the Defendant's premises as depicted on the attached Exhibit A.

11. That you (through your agents, employees, or servants) were aware that

the anchors were protruding up from the subject walkway prior to MR. ACKLEY's fall on

9/24/12.

12. That no cones, signs or other warning devices were placed at the location

of the subject anchors prior to or at the time of MR. ACKLEY's fall.

13. That a video camera or other recording device made a video record of the

fall.

14. That Plaintiff, CHARLES ACKLEY, fell on 9/24/12 as a result of anchors

attached to the walkway and sticking up above the walkway as described in the

complaint herein and depicted on the attached Exhibit A.

BRCOSA000405

ACKLEY v. IRT CORAL SPRINGS, LLC and EQUITY ONE, INC.
RFA to DEFENDANT EQUITY ONE
Page 3 of 4

15.     That you were negligent in failing to properly maintain the subject walkway on 9/24/12 as described in the complaint in this matter and depicted on the attached Exhibit A.

16.     That Plaintiff, CHARLES ACKLEY, was not, in any way, negligent so as to cause the subject accident.

17.     That Plaintiff, CHARLES ACKLEY, sustained injuries as a result of the subject accident.

18.     That Plaintiff, CHARLES ACKLEY, received at least some medical treatment as a result of the subject accident.

19.     That Plaintiff, CHARLES ACKLEY, has not failed to mitigate her damages.

20.     That Plaintiff, CHARLES ACKLEY, sustained injuries as the proximate result of the subject accident.

21.     That you were 100% at fault for causing the subject incident on 9/24/12.

22.     That no one else other than you is responsible for the subject incident on 9/24/12.

23.     That CHARLES ACKLEY has a permanent injury within a reasonable degree of medical probability as a result of injuries sustained in the subject incident of 9/24/12.

24.     That CHARLES ACKLEY did nothing wrong which contributed to cause the subject incident on 9/24/12.

25.     That you hired a person or entity to remove mailboxes from the subject premises in the location depicted on the attached Exhibit A.

---

ACKLEY v. IRT CORAL SPRINGS, LLC and EQUITY ONE, INC.
RFA to DEFENDANT EQUITY ONE
Page 4 of 4

26.     That your employees removed mailboxes from the subject premises in the location depicted on the attached Exhibit A.

27.     That it is a violation of Broward Building Codes to leave the walkway in the condition as depicted on the attached Exhibit A.

I HEREBY CERTIFY that a true copy of the foregoing Request for Admissions has been served upon the defendant with the complaint by service of process in this action.

PINCUS & CURRIER LLP
324 North Lakeside Court
West Palm Beach, FL 33407
E-Mail:      SPhillips@pvrclaw.com
Telephone:  (561) 868-1340
Facsimile:   (561) 366-1310

By: _____
     Steven B. Phillips
     Florida Bar No. 893374

BRCOSA000406

IN THE CIRCUIT COURT OF THE 17th
JUDICIAL CIRCUIT OF FLORIDA, IN
AND FOR BROWARD COUNTY,
FLORIDA

CASE NO.: **12 - 31439**

CHARLES ACKLEY,

    Plaintiff,

vs.

IRT CORAL SPRINGS, LLC
and EQUITY ONE, INC.,

    Defendants.

_____/

**TRUE COPY**

NOV 07 2012

HOWARD C. FORMAN
CLERK OF CIRCUIT COURT
BROWARD COUNTY, FL

## REQUEST FOR PRODUCTION TO BOTH DEFENDANTS

Pursuant to Rule 1.350 of the Florida Rules of Civil Procedure, Plaintiff, by and through their undersigned counsel hereby requests that Defendants, **IRT CORAL SPRINGS, LLC and EQUITY ONE, INC.**, produce and make available for inspection and copying all documents in its possession, custody or control as more fully described in the specifications below. The documents produced pursuant to this request are to be made available for inspection and copying at the offices of PINCUS & CURRIER, LLP, within forty-five (45) days of service of this request.

## DEFINITIONS AND INSTRUCTIONS

In interpreting each part of this document request, the following definitions and instructions shall apply:

A.   As used herein "document" means all written and graphic matter, however produced or reproduced, and each and every thing from which information can be processed, transcribed, transmitted, restored, recorded, or memorialized in any way, by any means, regardless of technology or form. It includes, without limitation, correspondence, memoranda, notes, notations, diaries, papers, books, accounts, newspaper and magazine articles, photographs, notebooks, ledgers, letters, telegrams,



EXHIBIT "A"

BRCOSA000407

cables, telex messages, facsimiles, contracts, offers, agreements, reports, objects, tangible things, work papers, transcripts, minutes, reports and recordings of telephone or other conversations or communications, or of interviews or conferences, or of other meetings, occurrences or transactions, affidavits, statements, summaries, opinions, tests, experiments, analysis, evaluations, journals, balance sheets, income statements, statistical records, desk calendars, appointment books, lists, tabulations, sound recordings, data processing input or output, microfilms, checks, statements, receipts, summaries, computer printouts, computer programs, information kept in computer hard drive, computer tape back-up, CD-ROM, computer floppy diskettes, teletypes, telecopies, invoices, worksheets, printed matter of every kind and description, graphic and oral records and representations of any kind, and electronic and mechanical records and representations of any kind and all things included in the definitions of "writings" and "recordings" as set forth in the Florida Rules of Evidence, in the actual or constructive possession, custody, care or control of Plaintiff including, but not limited to, originals or copies where originals are not available. Any document with any marks such as initials, comments or notations of any kind is not deemed to be identical with one without such marks and is to be produced as a separate document. Where there is any question about whether a tangible item otherwise described in these requests falls within the definition of "document" such tangible item shall be produced.

B. The term "all documents'" means every document or group of documents or communication as defined herein that are known to you or that can be located or discovered by reasonably diligent efforts.

C. As used herein, "relating to" or "related to" means in any way, directly or indirectly concern, reflect, refer to, constitute, contain, evidence, analyze, memorialize, discuss, show, amend, confirm, endorse, represent, support, qualify, describe, terminate, revoke, pertain to, comment on, negate or relate to or connect in any way, logically or factually, with the matter described in this request.

D. As used herein "and" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope hereof any information (as defined herein) which might otherwise be construed to be outside the scope of this

discovery request.

E. As used herein "any" shall be understood to include and encompass "all" and vice versa.

F. Whenever appropriate herein, the masculine form of a word shall be interpreted as feminine, and vice versa.

G. As used herein "information" shall be expansively construed and shall include, but not be limited to, facts, data, opinions, images, impressions, concepts and formulae.

H. As used herein "communications" shall mean any oral or written statement, dialogue, colloquy, discussion, conversation, or direct or indirect representation and, also, means any transfer of thoughts or ideas between persons by means of documents and includes any transfer of data from one location to another by electronic or similar means.

I. As used herein, the term "all communications" means each and every communication as above-defined that is known to you or about which you have any information.

J. As used herein "agreements" shall mean agreements, contracts, arrangements, mutual promises, accords, engagements or undertakings.

K. If this request, read literally, requires the production of a part or portion of a document, production of the entire document is requested.

L. The singular includes the plural and the plural includes the singular.

M. All words in the present tense include the past tense and all words in the past tense include the present tense.

N. This request shall be deemed continuing so as to require prompt, further and supplemental production if Defendant locates or obtains possession, custody or control of additional responsive documents at any time prior to trial herein to the extent and in the manner prescribed by the Florida Rules of Civil Procedure and any and all other rules of the court having jurisdiction over this matter.

O. If any request for documents is deemed to call for the production of privileged or work product material and such privilege or work product is asserted, identify

BRCOSA000408

in writing each document so withheld and provide the following information:

1. The reason for withholding the documents;
2. A statement of the basis for the claim of privilege, work product or other ground of non-disclosure;
3. The date of the document, the number of pages, the name(s) of its author or preparer(s) and identification by employment and title of each such person(s);
4. The name of each person to whom the document was sent or received a copy;
5. The present custodian of the document; and
6. A brief statement as to the subject matter of the document.

P. If you object to part of any request to produce and refuse to answer that request, state your objection, identify the part to which you are objecting, and answer the remaining portion of the request. If you object to the scope or the time period of any request, state your objection, identify the scope or time period to which you are objecting and answer the request for the scope or time period you believe appropriate.

Q. If any document requested herein was at one time in existence, but has been lost, discarded, destroyed or purged, identify each document as completely as possible, and state the type of document, the date or approximate date it was lost, discarded, destroyed or purged; the circumstances and manner in which it was lost, discarded, destroyed or purged; the reason or reasons for disposing of the documents; the identity of persons having knowledge of the contents of the documents; the identify of all persons believed at any time to have had a copy of the document or to have ever seen the document; and the identity of the persons authorizing or aware of the loss, discard, destruction or purging of the document.

R. All documents produced pursuant hereto are to be produced as they are kept in the usual course of business and shall be organized and labeled (without permanently marking the original item produced) to correspond with the categories of each numbered request hereof.

S. Any response to these requests shall set forth the request in full

before each response.

T. As used herein, the term "person", "individual", or "entity" means any natural person, individual, proprietorship, partnership, corporation, association, organization, joint venture, firm, other business enterprise, governmental body, group of natural persons or other entity.

U. As used herein, the term "you" or "your" means the party or parties to whom this request for production is directed, or anyone acting for, or on their behalf.

V. As used herein, "medical records" means any and all records pertaining to your care and treatment by a psychotherapist, physician or medical practitioner, including, but not limited to, correspondence; reports and office notes maintained by you or the psychotherapist, physician or medical practitioner; all records of appointments, your initial contact, scheduled but cancelled appointments, telephone conferences, office visits and consultations; records pertaining to medications prescribed; billing and payment records; records regarding diagnosis, prognosis and treatment.

W. Each request herein for a document or documents to be produced contemplates production of a document in its entirety, without abbreviation or expurgation.

X. If one or more responses to this document request would require duplication of a document previously produced by Defendant in response to a prior enumerated request herein, Defendant may refer to that document in a manner identifying it with particularity as to the specific portion, page, paragraph, and line thereof, or make and submit a copy of a document designating the particular portion thereof to which Defendant makes later reference.

## SPECIFICATIONS

1. Copies of any and all policies of insurance, including any and all primary, umbrella and excess policies, which cover or may cover the Defendant(s) or Plaintiff(s) for any or all of the allegations set forth in the Complaint filed in this case.

2. Copies of any and all writings, recordings, tapes, videos, records, memoranda, notes, or other material in the care, custody, possession or control of the Defendant(s) or the Defendant('s)(s') attorneys, investigators, agents, representatives, servants or employees reflecting statements, as described in Section 1.280, Florida

Rules of Civil procedure, made by the Plaintiff(s) or Plaintiff('s)[s*] employees or agents regarding any of the issues in this case.

3. Copies of any and all writings, records, memoranda, notes, or other material in the care, custody, possession or control of the Defendant(s) or the Defendant('s)[s*] attorneys, investigators, agents, representatives, servants or employees reflecting statements, as described in Section 1.280, Florida Rules of Civil Procedure, made by any and all witnesses regarding any of the issues in this case.

4. Any and all photographs and videos (including store security videos) taken by or on behalf of the Defendant(s) or the Defendant('s)[s*] attorneys, investigators, agents, representatives, servants or employees which are in any manner related to the subject matter of this lawsuit. This request includes, but is not limited to, any and all photographs depicting the damage to either vehicle, photographs taken of the scene of the accident, incident or event that is the subject matter of this lawsuit, and photographs taken of the Plaintiff(s).

5. Any and all movies, motion pictures, videotapes or reproductions of the accident, incident or event that is the subject matter of this lawsuit taken by or on behalf of the Defendant(s) or the Defendant('s)[s*] attorneys, investigators, agents, representatives, servants or employees which are in any manner related to the subject matter of this lawsuit.

6. Copies of any charts, drawings, graphs, diagrams or other documentary evidence involving the subject matter of this lawsuit which are expected to be offered as evidence at the time of the trial.

7. Copies of any and all medical records, reports, opinions, or other writings in the care, custody, possession or control of the Defendant(s) or the Defendant('s)[s*] attorneys, investigators, agents, representatives, servants or employees, received from doctors, physicians, nurses, other health care providers or anyone else who saw, examined, or rendered care or treatment to the Plaintiff(s) or from any hospitals where the Plaintiff(s) was/were seen, examined or treated for injuries or conditions that were or may have been sustained as a result of the accident, incident or event that is the subject of this lawsuit.

8. Copies of any and all other medical reports, opinions, or other writings in the care, custody, possession or control of the Defendant(s) or the Defendant('s)[s*] attorneys, investigators, agents, representatives, servants or employees, from doctors, physicians, nurses, other health care providers or anyone else who saw, examined, or rendered care or treatment to the Plaintiff(s) or from any hospitals where the Plaintiff(s) was/were seen, examined or treated for injuries or conditions not related to the accident, incident or event that is the subject of this lawsuit.

9. Copies of any and all reports prepared by experts who are expected to testify at the trial of this cause.

10. For each expert whom you expect to call as an expert witness at the trial of this cause, copies of any and all factual information or data supplied to or relied upon by the expert, copies of any and all textual material, including, but not limited to, treatises, periodicals, books, dissertations, pamphlets, journals and other writings on which the expert will or is anticipated to rely or which the expert alleges supports any of his or her opinions, copies of any and all statutes, ordinances, codes, safety manuals, regulations, or other standards on which the expert will or is anticipated to rely, and copies of any and all records, evaluations, charts, graphs, photographs, movies, motion pictures, slides, films, videotapes, audiotapes, reconstructions and other writings or recorded representations prepared or generated by or on behalf of the expert that relate in any way to the preparation or formulation of any of his or her opinions in this case, including but not limited to all books, manuals, texts or other written or recorded materials referenced by you for the formulation of this opinion

11. Copies of any and all contracts, agreements or other writings relating in any way to any ownership interest in or right to control the property at the time of the accident, incident or event that is the subject matter of this lawsuit by anyone other than the Defendant(s).

12. Copies of all maintenance, inspection and repair records for the walkway mat that is the subject of this action, including but not limited to inspection schedules, maintenance schedules, cleaning schedules, repair schedules, other similar schedules, reports, invoices, repair bills, receipts, work orders, estimates, management contracts,

BRCOSA000410

service contracts and any other agreements with outside vendors/entities, memos, e-mails and correspondence from January 1, 2012 to present whether in hard copy form or stored in electronic format.

13. Copies of any and all photographs, movies, motion pictures, slides, films, videotapes, audiotapes, records, reports and other writings or recorded representations relating in any way to any surveillance conducted on the Plaintiff(s) by the Defendant(s) or the Defendant('s)(s') attorneys, investigators, agents, representatives, servants or employees.

14. Copies of any and all agreements the Defendant has made with anyone that would limit the Defendant's or the other person or entity's liability to anyone for any of the damages in this case.

15. Copies of any and all claims indexes or similar documents relating to Plaintiff's accident and claims history

16. For each expert expected to be identified or whom you have consulted about any matter or issue in this case, copies of any and all factual information or data supplied to, or relied upon, by the expert. Copies of any and all texts or written material, including, but not limited to, treatises, periodicals, books, dissertations, pamphlets, journals and other writings on which the expert will or is anticipated to rely or which the expert alleges it supports any of his or her opinions. Copies of any and all statutes, ordinances, codes, safety manuals, regulations, or other standards on which the expert will, or is anticipated to rely. Copies of any and all records, evaluations, charts, graphs, photographs, movies, motion pictures, slides, films, videotapes, audiotapes, reconstructions, and other writings or recorded representations prepared or generated by or on behalf of the expert that relate in any way to the preparation or formulation of any of his or her opinions in this case, including, but not limited to, all books, manuals, texts, or other written or recorded materials referenced by you for the formulation of the opinion.

17. All letters, correspondence, e-mail, notes, inter-company communications and memos by or to Defendant, intercompany or to outside persons or entities, related to the walkway where Plaintiff fell as described in the Complaint from January 1, 2012 through the present including all documents related to what was removed from the subject

walkway where the anchors were left protruding from the walkway.

18. All documents including but not limited to invoices, repair bills, work orders, estimates, letters, memos, incident reports, photographs, computerized notes and hand written notes related to the item(s) that was removed from the walkway where the anchors were left protruding from the walkway as described in the Complaint on 9/24/12.

19. All documents, invoices, contracts, work orders, service agreements, repair orders and reports related to the maintenance of the walkway where Plaintiff fell as described in the Complaint and depicted in Exhibit A attached thereto from 1/1/12 to present.

20. All photographs depicting what was installed on the walkway prior to 9/24/12 as described in the Complaint.

21. All documents provided by any expert witness retained or consulted by Defendant in connection with this matter, whether or not you intend to call the expert as a witness at trial.

22. All documents consulted, relied upon, or used which support your contentions in preparing or drafting the Answer and affirmative defenses in this action.

23. All documents not already included in your answers to this Request For Production which were consulted, relied upon, referred to or used in any way in preparing or drafting Defendant's Initial Interrogatories to Defendant and Defendant's Response to Plaintiff's Request for Admissions served with the complaint in this matter.

24. All documents provided by any investigator retained or employed by you in connection with this matter including surveillance video of the plaintiff.

25. A copy of all documents which identify the party, person or entity responsible for maintaining, repairing and/or removing the item from the walkway at issue in this matter from 1/1/12 to the present including any and all service or maintenance contracts or agreements in effect during this time frame.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Request for Production has been furnished to the Defendants via Service of Process with the

TRUE COPY
NOV 07 2012

IN THE CIRCUIT COURT OF THE 17th JUDICIAL CIRCUIT OF FLORIDA, IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO.: 12 - 3 1 4 3 9

CHARLES ACKLEY,
    Plaintiff,

vs.

IRT CORAL SPRINGS, LLC and EQUITY ONE, INC.,
    Defendants.

## NOTICE OF SERVICE OF INTERROGATORIES TO DEFENDANT EQUITY ONE

Plaintiff, CHARLES ACKLEY, by and through undersigned counsel files Notice of Service that Interrogatories numbered 1-18 have been propounded to the Defendant, **EQUITY ONE, INC.** with Service of Process of the Summons and Complaint in this action and that pursuant to Florida Rules of Civil Procedure, answers shall be provided to the undersigned attorney within forty-five (45) days from the date of service thereof.

PINCUS & CURRIER LLP
324 North Lakeside Court
West Palm Beach, FL 33407
E-Mail:    SPhillips@pgriclaw.com
Telephone: (561) 868-1340
Facsimile:  (561) 366-1310

By: Steven B. Phillips
Florida Bar No. 893374

---

ACKLEY v. IRT CORAL SPRINGS, LLC and EQUITY ONE, INC.
PLAINTIFF'S REQUEST FOR PRODUCTION TO BOTH DEFENDANTS WITH COMPLAINT
Page 10 of 10

Summons and Complaint.

PINCUS & CURRIER LLP
324 North Lakeside Court
West Palm Beach, FL 33407
E-Mail:    SPhillips@pgriclaw.com
Telephone: (561) 868-1340
Facsimile:  (561) 366-1310

By: Steven B. Phillips
Florida Bar No. 893374

BRCOSA000412

## INITIAL INTERROGATORIES TO DEFENDANT EQUITY ONE

1. What is the name, address and date of birth of the person answering these interrogatories, and if applicable, the official position or relationship with the party to whom the interrogatories are directed?

2. (a) What policies of insurance do you contend cover or may cover you for the allegations set forth in plaintiff's complaint?

(b) What is the name of each insurer?

(c) What is the number of each policy?

(d) What is the effective date of each policy?

(e) What are the limits of liability of each policy?

(f) What is the name and address of the custodian of each policy?

3. How did the incident described in the complaint happen, including all actions taken by you to prevent the incident?

4. In detail what is each act or omission on the part of any party to this lawsuit that you contend constituted negligence that was a contributing legal cause of the incident in question?

5. What are the facts upon which you rely for each affirmative defense in your answer?

BRCOSA000413

ACKLEY v. IRT CORAL SPRINGS, LLC & EQUITY ONE, INC.
PLAINTIFF'S INITIAL INTERROGATORIES TO DEFENDANT EQUITY ONE WITH SUMMONS
Page 4 of 10

6. (a) Do you contend any person or entity other than you is, or may be, liable in whole or part for the claims asserted against you in this lawsuit?

(b) If so, what is the name and address of each person or entity?

(c) What is the factual and legal basis for your contention including a detailed statement of the facts or evidence upon which your contention is based?

(d) Have you notified each person or entity of your contention?

7. Please state the names, addresses and phone numbers of all individuals and business entities responsible for inspecting, maintaining, servicing and/or repairing the subject property including the walkways/sidewalks on the property from September 1, 2012 through the time of answering these interrogatories including in your answer whether each individual is an employee of defendant or not?

ACKLEY v. IRT CORAL SPRINGS, LLC & EQUITY ONE, INC.
PLAINTIFF'S INITIAL INTERROGATORIES TO DEFENDANT EQUITY ONE WITH SUMMONS
Page 5 of 10

8. Please state the names, addresses and phone numbers of all individuals, contractors, subcontractors and any other business entity responsible for removing the mailboxes or other item(s) from the walkway on the subject property and leaving the anchor brackets attached to the concrete and sticking up on the sidewalk where Mr. Ackley fell on September 24, 2012 as depicted in the attached Exhibit A?

9. What are the names and addresses of all persons who are believed or known by you, your agents or attorneys to have any knowledge concerning any of the issues in this lawsuit including in your answer a detailed description of the knowledge of each such witness including all individuals who authorized the removal of the mailboxes or other item(s) from the walkway on the subject premises and the person(s) who left the anchor brackets attached to the concrete as depicted in the attached Exhibit A where Mr. Ackley fell on September 24, 2012.

BRCOSA000414

10.   (a) Have you heard or do you know about any statement or remark made by the Plaintiff or on behalf of the Plaintiff or any party to this lawsuit, other than yourself, concerning any issue in this lawsuit?  If so,

(b)  What did you hear the Plaintiff say or what have you heard that the Plaintiff said?

(c) If not the Plaintiff, what is the name and address of each person who made the statement or statements?

(c)  What is the name and address of each person who heard the statement or statements made by the Plaintiff or other party?

(d)  What is the date, time and place of each statement made by the Plaintiff or other party?

(f) What is the substance of any other statement or remark you know of that the Plaintiff or other party has made?

11.   (a) What is the name and address of every person known to you, your agents or attorneys who have knowledge about, or possession, custody or control of any model, plat, map, drawing, motion picture, DVD, CD, video tape or photograph pertaining to any fact or issue involved in this controversy?

(b) What item does each person have?

(c) What is the name and address of the person who took or prepared the item?

(d) What is the date the item was taken or prepared?

12.   Please identify in detail the name, address and phone number of the person(s) who removed the anchor brackets from the walkway on the subject property after Mr. Ackley fell on September 24, 2012 including the name, address and phone number of who hired or supervised this person(s) and instructed or authorized the anchors be removed.

13.   Please state the name, address and phone number of each defendant's employees, agents, representatives, property managers and maintenance personnel working on the subject property from September 15, 2012 through September 30, 2012 including each person's job title and description of job duties.  If no longer employed by defendant, please state the last known address and phone number for each former employee.

BRCOSA000415

ACKLEY v. IRT CORAL SPRINGS, LLC & EQUITY ONE, INC.
PLAINTIFF'S INITIAL INTERROGATORIES TO DEFENDANT EQUITY ONE WITH SUMMONS
Page 8 of 10

14.   If any of the Requests for Admissions propounded by Plaintiff with the complaint in this matter is denied, either in whole or in part, identify the request and:

(a)  Give a complete description of all facts relied upon in making the denial, along with the names, current addresses, and telephone numbers of all persons having sufficient knowledge of each fact to be able to testify as a witness;

(b)  Give a detailed description of the substance and content of all expert opinions relied upon in making the denial, along with the names, professional qualifications, addresses and telephone numbers of the person rendering each opinion;

(c)  Identify all documents and tangible items relied upon in making the denial, and for each such document and/or tangible item identify by name, current address and telephone number its custodian.

15.   If any part or subpart of the preceding interrogatory is answered on information or belief, set forth the specific information believed, the source of the information, when and in what manner the information was obtained, and why it is reasonable to believe the information is true.

ACKLEY v. IRT CORAL SPRINGS, LLC & EQUITY ONE, INC.
PLAINTIFF'S INITIAL INTERROGATORIES TO DEFENDANT EQUITY ONE WITH SUMMONS
Page 9 of 10

16.   Please state the names, addresses and phone numbers of all of our employees, agents, servants, contractors and/or vendors who were responsible for inspecting, cleaning and/or maintaining the walkways/sidewalks at the subject property for the time period from September 1, 2012 through September 30, 2012.

17.   If in your answer to Plaintiff's complaint in this matter you denied any of the allegations contained in Paragraph 6 of the Complaint, please state the name, phone number and address of the person or entity who you believed owned the subject property on 9/24/12 and the name, phone number and address of the person or entity you believe was responsible for maintaining the property if not you.

18.   Please state with specificity what was removed from the subject walkway that was anchored by the anchors that were left on the walkway when Mr. Ackley fell on 9/24/2012 including the names, addresses and phone numbers of all persons responsible for removing this item from the walkway.

ACKLEY v. IRT CORAL SPRINGS, LLC & EQUITY ONE, INC.
PLAINTIFF'S INITIAL INTERROGATORIES TO DEFENDANT EQUITY ONE WITH SUMMONS
Page 2 of 10

## INITIAL INTERROGATORIES TO DEFENDANT EQUITY ONE

1. What is the name, address and date of birth of the person answering these interrogatories, and if applicable, the official position or relationship with the party to whom the interrogatories are directed?

2. (a) What policies of insurance do you contend cover or may cover you for the allegations set forth in plaintiff's complaint?

(b) What is the name of each insurer?

(c) What is the number of each policy?

(d) What is the effective date of each policy?

(e) What are the limits of liability of each policy?

(f) What is the name and address of the custodian of each policy?

---

ACKLEY v. IRT CORAL SPRINGS, LLC & EQUITY ONE, INC.
PLAINTIFF'S INITIAL INTERROGATORIES TO DEFENDANT EQUITY ONE WITH SUMMONS
Page 10 of 10

NAME: _____

STATE OF _____

COUNTY OF _____

BEFORE ME, the undersigned authority, authorized to administer oaths, personally appeared _____ who DID/DID NOT take an oath, and who showed the following form of valid identification: _____ and first being duly sworn, acknowledged that he/she is the person authorized to execute the foregoing answers to interrogatories, and that he/she has read the answers and that they are true and correct to the best of his/her knowledge and belief, and he/she executed the same in my presence, on this _____ day of _____ 2012.

_____
Notary Public, State of _____

_____
Name typed or printed
My Commission Expires:
My Commission Number is:

ACKLEY v. IRT CORAL SPRINGS, LLC & EQUITY ONE INC.
PLAINTIFF'S INITIAL INTERROGATORIES TO DEFENDANT EQUITY ONE WITH SUMMONS
Page 3 of 10

3. How did the incident described in the complaint happen, including all actions taken by you to prevent the incident?

4. In detail what is each act or omission on the part of any party to this lawsuit that you contend constituted negligence that was a contributing legal cause of the incident in question?

5. What are the facts upon which you rely for each affirmative defense in your answer?

ACKLEY v. IRT CORAL SPRINGS, LLC & EQUITY ONE, INC.
PLAINTIFF'S INITIAL INTERROGATORIES TO DEFENDANT EQUITY ONE WITH SUMMONS
Page 4 of 10

6.    (a) Do you contend any person or entity other than you is, or may be, liable in whole or part for the claims asserted against you in this lawsuit?

(b) If so, what is the name and address of each person or entity?

(c) What is the factual and legal basis for your contention including a detailed statement of the facts or evidence upon which your contention is based?

(d) Have you notified each person or entity of your contention?

7.    Please state the names, addresses and phone numbers of all individuals and business entities responsible for inspecting, maintaining, servicing and/or repairing the subject property including the walkways/sidewalks on the property from September 1, 2012 through the time of answering these interrogatories including in your answer whether each individual is an employee of defendant or not?

ACKLEY v. IRT CORAL SPRINGS, LLC & EQUITY ONE, INC.
PLAINTIFF'S INITIAL INTERROGATORIES TO DEFENDANT EQUITY ONE WITH SUMMONS
Page 5 of 10

8.    Please state the names, addresses and phone numbers of all individuals, contractors, subcontractors and any other business entity responsible for removing the mailboxes or other item(s) from the walkway on the subject property and leaving the anchor brackets attached to the concrete and sticking up on the sidewalk where Mr. Ackley fell on September 24, 2012 as depicted in the attached Exhibit A?

9.    What are the names and addresses of all persons who are believed or known by you, your agents or attorneys to have any knowledge concerning any of the issues in this lawsuit including in your answer a detailed description of the knowledge of each such witness including all individuals who authorized the removal of the mailboxes or other item(s) from the walkway on the subject premises and the person(s) who left the anchor brackets attached to the concrete as depicted in the attached Exhibit A where Mr. Ackley fell on September 24, 2012.

ACKLEY v. IRT CORAL SPRINGS, LLC & EQUITY ONE, INC.
PLAINTIFF'S INITIAL INTERROGATORIES TO DEFENDANT EQUITY ONE WITH SUMMONS
Page 6 of 10

10.    (a) Have you heard or do you know about any statement or remark made by the Plaintiff or on behalf of the Plaintiff or any party to this lawsuit, other than yourself, concerning any issue in this lawsuit? If so,

(b) What did you hear the Plaintiff say or what have you heard that the Plaintiff said?

(c) If not the Plaintiff, what is the name and address of each person who made the statement or statements?

(c) What is the name and address of each person who heard the statement or statements made by the Plaintiff or other party?

(d) What is the date, time and place of each statement made by the Plaintiff or other party?

(f) What is the substance of any other statement or remark you know of that the Plaintiff or other party has made?

11.    (a) What is the name and address of every person known to you, your agents or attorneys who have knowledge about, or possession, custody or control of any model, plat, map, drawing, motion picture, DVD, CD, video tape or photograph pertaining to any fact or issue involved in this controversy?

(b) What item does each person have?

(c) What is the name and address of the person who took or prepared the item?

(d) What is the date the item was taken or prepared?

BRCOSA000419

ACKLEY v. IRT CORAL SPRINGS, LLC & EQUITY ONE, INC.
PLAINTIFF'S INITIAL INTERROGATORIES TO DEFENDANT EQUITY ONE WITH SUMMONS
Page 8 of 10

14. If any of the Requests for Admissions propounded by Plaintiff with the complaint in this matter is denied, either in whole or in part, identify the request and:

(a) Give a complete description of all facts relied upon in making the denial, along with the names, current addresses, and telephone numbers of all persons having sufficient knowledge of each fact to be able to testify as a witness;

(b) Give a detailed description of the substance and content of all expert opinions relied upon in making the denial, along with the names, professional qualifications, addresses and telephone numbers of the person rendering each opinion;

(c) Identify all documents and tangible items relied upon in making the denial, and for each such document and/or tangible item identify by name, current address and telephone number its custodian.

15. If any part or subpart of the preceding interrogatory is answered on information or belief, set forth the specific information believed, the source of the information, when and in what manner the information was obtained, and why it is reasonable to believe the information is true.

ACKLEY v. IRT CORAL SPRINGS, LLC & EQUITY ONE, INC.
PLAINTIFF'S INITIAL INTERROGATORIES TO DEFENDANT EQUITY ONE WITH SUMMONS
Page 7 of 10

12. Please identify in detail the name, address and phone number of the person(s) who removed the anchor brackets from the walkway on the subject property after Mr. Ackley fell on September 24, 2012 including the name, address and phone number of who hired or supervised this person(s) and instructed or authorized the anchors be removed.

13. Please state the name, address and phone number of each defendant's employees, agents, representatives, property managers and maintenance personnel working on the subject property form September 15, 2012 through September 30, 2012 including each person's job title and description of job duties. If no longer employed by defendant, please state the last known address and phone number for each former employee.

16. Please state the names, addresses and phone numbers of all of our employees, agents, servants, contractors and/or vendors who were responsible for inspecting, cleaning and/or maintaining the walkways/sidewalks at the subject property for the time period from September 1, 2012 through September 30, 2012.

17. If in your answer to Plaintiff's complaint in this matter you denied any of the allegations contained in Paragraph 6 of the Complaint, please state the name, phone number and address of the person or entity who you believed owned the subject property on 9/24/12 and the name, phone number and address of the person or entity you believe was responsible for maintaining the property if not you.

18. Please state with specificity what was removed from the subject walkway that was anchored by the anchors that were left on the walkway when Mr. Ackley fell on 9/24/2012 including the names, addresses and phone numbers of all persons responsible for removing this item from the walkway.

NAME: _____

STATE OF _____ )
                     )
COUNTY OF _____ )

BEFORE ME, the undersigned authority, authorized to administer oaths, personally appeared _____ who DID/DID NOT take an oath, and who showed the following form of valid identification: _____, and first being duly sworn, acknowledged that he/she is the person authorized to execute the foregoing answers to interrogatories, and that he/she has read the answers and that they are true and correct to the best of his/her knowledge and belief, and he/she executed the same in my presence, on this _____ day of _____, 2012.

_____
Notary Public, State of _____

_____
Name typed or printed
My Commission Expires:
My Commission Number is:

BRCOSA000421

Three Hundred Thousand Dollars ($300,000.00). As noted in Paragraph 3, above, if this Proposal is accepted, PLAINTIFF shall dismiss his claims asserted against DEFENDANT.

A. NONMONETARY TERMS OF PROPOSAL, IF ANY:

None.

B. AMOUNT PROPOSED TO SETTLE CLAIM FOR PUNITIVE DAMAGES, IF ANY:

None.

C. ARE ATTORNEY FEES PART OF THE PLAINTIFF'S LEGAL CLAIM?

(check one) Yes ___ No ___X___

D. AMOUNT PROPOSED TO SETTLE CLAIM FOR ATTORNEY FEES, IF ANY:

None. Amount is inclusive of fees and costs.

5. SERVICE AND FILING:

This proposal shall be served on the party to whom it is made through counsel, but shall not be filed unless necessary to enforce the provisions of Rule 1,442.

6. WITHDRAWAL:

This proposal may be withdrawn in writing provided the written withdrawal is delivered before a written acceptance is delivered. Once withdrawn, this Proposal is void.

7. ACCEPTANCE AND REJECTION:

This Proposal shall be deemed by this PLAINTIFF to be rejected by DEFENDANT unless accepted by delivery of a written notice of acceptance within thirty (30) days after service of the Proposal. The provisions of Florida Rule of Civil Procedure 1.090(e) do not apply to this Proposal. No oral communications shall constitute an acceptance, rejection or counteroffer of this Proposal. This Proposal for Settlement shall not be combined with any other Proposals or offers made in this case by this PLAINTIFF.

8. CONSEQUENCES OF REJECTION:

In the event this proposal is rejected, DEFENDANT is subject to sanctions, including, but not limited to, those as outlined in Rules 1.442(g) and (h) of the Florida Rules of Civil Procedure, Fla. Stat. 768.79 and any other relief PLAINTIFF is entitled to as a matter of law and which the Court deems just and proper.

9. GOOD-FAITH:

This Proposal is being submitted with the knowledge, understanding, and consent of the PLAINTIFF making this Proposal.

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served this 29th day of April, 2013, via ☒ E-Mail, ☐ U.S. Mail, ☐ facsimile, ☐ hand delivery, and/or ☐ overnight courier, upon: Rosalind R. Millan, Esq., Law Office of Lorraine Lester, 8100 SW 10th Street, Suite 2500, Plantation, FL 33324, rosalind.millan@cna.com, thelawofficeoflorrainelester@cna.com.

PINCUS & CURRIER LLP
324 North Lakeside Court
West Palm Beach, FL 33407
E-Mail: sphillips@wpcrlaw.com
              lshand@wpcrlaw.com
Telephone: (561) 868-1340
Facsimile: (561) 366-1310

By: _____
Steven Phillips
Florida Bar No. 893374

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

CHARLES ACKLEY,                           CASE NO. CACE12031439(21)

Plaintiff(s),

vs.

EQUITY ONE (Florida Portfolio), INC.,

Defendant(s).

_____/

**PLAINTIFF'S PROPOSAL FOR SETTLEMENT PURSUANT TO
RULE 1.442, FLA. R. CIV. PRO. AND DEMAND FOR JUDGMENT PURSUANT
TO FLA. STAT. § 768.79 TO DEFENDANT, EQUITY ONE (Florida Portfolio), INC.**

Plaintiff, CHARLES ACKLEY (hereafter, "PLAINTIFF"), states that at least 90 days have passed since service of process on the Defendant, and there are at least 45 days remaining before the date set for trial or the first day of the docket on which this case is set for trial, whichever is earlier.

THEREFORE, PLAINTIFF hereby serves this proposal for settlement pursuant to Florida Rule of Civil Procedure 1.442 and Florida Statute §768.79. This proposal for settlement must be accepted in writing, within thirty (30) days or it shall be deemed rejected. The Proposal for Settlement is as follows:

1. **PARTY MAKING PROPOSAL:**

   CHARLES ACKLEY

2. **PARTY TO WHOM THE PROPOSAL IS BEING MADE:**

   EQUITY ONE (Florida Portfolio), INC. (herein "DEFENDANT")

3. **CLAIMS THE PROPOSAL ATTEMPTS TO RESOLVE:**

   All issues and claims for damages asserted by this PLAINTIFF against the DEFENDANT. If accepted, PLAINTIFF shall dismiss his claims asserted against DEFENDANT.

4. **TOTAL AMOUNT OF PROPOSAL:**

   PLAINTIFF proposes to resolve all of his claims for damages against DEFENDANT in exchange for payment by or on behalf of DEFENDANT the sum of

---

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

CHARLES ACKLEY,                           CASE NO. CACE12031439(21)

Plaintiff(s),

vs.

EQUITY ONE (Florida Portfolio), INC.,

Defendant(s).

_____/

**PLAINTIFF'S, CHARLES ACKLEY, NOTICE OF SERVING PROPOSAL FOR
SETTLEMENT PURSUANT TO FLA. R. CIV. PRO. 1.442 AND DEMAND FOR
JUDGMENT PURSUANT TO FLA. STAT. § 768.79 TO DEFENDANT, EQUITY ONE
(Florida Portfolio), INC.**

**COME NOW**, the Plaintiff, CHARLES ACKLEY individually, by and through his undersigned counsel, pursuant to Rule 1.442, Florida Rules of Civil Procedure and Florida Statute § 768.79 hereby gives notice that a Proposal for Settlement and Demand for Judgment has been served upon Defendant, EQUITY ONE (Florida Portfolio), INC., on April 29, 2013.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served this 29th day of April, 2013, via ☒ E-Mail, ☐ U.S. Mail, ☐ Facsimile, ☐ hand delivery, and/or ☐ overnight courier, upon:  Rosalind R. Milian, Esq., Law Office of Lorraine Lester, 8100 SW 10th Street, Suite 2500, Plantation, FL 33324, rosalind.milian@cna.com; thelawofficeoflorrainelester@cna.com.

PINCUS & CURRIER LLP
324 North Lakeside Court
West Palm Beach, FL 33407
E-Mail:  sphillips@wprclaw.com
         lshand@wprclaw.com
Telephone:  (561) 868-1340
Facsimile:  (561) 366-1310

By: _____
    Steven Phillips
    Florida Bar No. 893374

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA

CHARLES ACKLEY,                   CASE NO. CACE12031439(21)

Plaintiff(s),

vs.

EQUITY ONE (Florida Portfolio), INC.,

Defendant(s).

_____/

PLAINTIFF'S PROPOSAL FOR SETTLEMENT PURSUANT TO RULE 1.442, FLA. R. CIV. PRO. AND DEMAND FOR JUDGMENT PURSUANT TO FLA. STAT. § 768.79 TO DEFENDANT, EQUITY ONE (Florida Portfolio), INC.

Plaintiff, CHARLES ACKLEY (hereafter, "PLAINTIFF"), states that at least 90 days have passed since service of process on the Defendant, and there are at least 45 days remaining before the date set for trial or the first day of the docket on which this case is set for trial, whichever is earlier.

THEREFORE, PLAINTIFF hereby serves this proposal for settlement pursuant to Florida Rule of Civil Procedure 1.442 and Florida Statute §768.79. This proposal for settlement must be accepted in writing, within thirty (30) days or it shall be deemed rejected. The Proposal for Settlement is as follows:

1. PARTY MAKING PROPOSAL:

   CHARLES ACKLEY

2. PARTY TO WHOM THE PROPOSAL IS BEING MADE:

   EQUITY ONE (Florida Portfolio), INC. (herein "DEFENDANT")

3. CLAIMS THE PROPOSAL ATTEMPTS TO RESOLVE:

   All issues and claims for damages asserted by this PLAINTIFF against the DEFENDANT. If accepted, PLAINTIFF shall dismiss his claims asserted against DEFENDANT.

4. TOTAL AMOUNT OF PROPOSAL:

   PLAINTIFF proposes to resolve all of his claims for damages against DEFENDANT in exchange for payment by or on behalf of DEFENDANT the sum of

---

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA

CHARLES ACKLEY,                   CASE NO. CACE12031439(21)

Plaintiff(s),

vs.

EQUITY ONE (Florida Portfolio), INC.,

Defendant(s).

_____/

PLAINTIFF'S, CHARLES ACKLEY, NOTICE OF SERVING PROPOSAL FOR SETTLEMENT PURSUANT TO FLA. R. CIV. PRO. 1.442 AND DEMAND FOR JUDGMENT PURSUANT TO FLA. STAT. § 768.79 TO DEFENDANT, EQUITY ONE (Florida Portfolio), INC.

COME NOW, the Plaintiff, CHARLES ACKLEY, individually, by and through his undersigned counsel, pursuant to Rule 1.442, Florida Rules of Civil Procedure and Florida Statute § 768.79 hereby gives notice that a Proposal for Settlement and Demand for Judgment has been served upon Defendant, EQUITY ONE (Florida Portfolio), INC., on April 29, 2013.

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served this 29th day of April, 2013, via ☒ E-Mail, ☐ U.S. Mail, ☐ facsimile, ☐ hand delivery, and/or ☐ overnight courier, upon: Rosalind R. Millan, Esq., Law Office of Lorraine Lester, 8100 SW 10th Street, Suite 2500, Plantation, FL 33324, rosalind.milan@cna.com, thelawofficeoflorrainelester@cna.com.

PINCUS & CURRIER LLP
324 North Lakeside Court
West Palm Beach, FL 33407
E-Mail:  sphillips@wprclaw.com
         lshand@wprclaw.com
Telephone: (561) 868-1340
Facsimile:  (561) 366-1310

By: _____
Steven Phillips
Florida Bar No. 893374

BRCOSA000424

Three Hundred Thousand Dollars ($300,000.00). As noted in Paragraph 3, above, if this Proposal is accepted, PLAINTIFF shall dismiss his claims asserted against DEFENDANT.

A. NONMONETARY TERMS OF PROPOSAL, IF ANY:

None.

B. AMOUNT PROPOSED TO SETTLE CLAIM FOR PUNITIVE DAMAGES, IF ANY:

None.

C. ARE ATTORNEY FEES PART OF THE PLAINTIFF'S LEGAL CLAIM?

(check one) Yes._____ No.___X___

D. AMOUNT PROPOSED TO SETTLE CLAIM FOR ATTORNEY FEES, IF ANY:

None. Amount is inclusive of fees and costs.

5. SERVICE AND FILING:

This proposal shall be served on the party to whom it is made through counsel, but shall not be filed unless necessary to enforce the provisions of Rule 1.442.

6. WITHDRAWAL:

This proposal may be withdrawn in writing provided the written withdrawal is delivered before a written acceptance is delivered.   Once withdrawn, this Proposal is void.

7. ACCEPTANCE AND REJECTION:

This Proposal shall be deemed to be rejected by this PLAINTIFF to be rejected by DEFENDANT unless accepted by delivery of a written notice of acceptance within thirty (30) days after service of the Proposal.  The provisions of Florida Rule of Civil Procedure 1.090(e) do not apply to this Proposal.   No oral communications shall constitute an acceptance, rejection or counteroffer of this Proposal.  This Proposal for Settlement shall not be combined with any other Proposals or offers made in this case by this PLAINTIFF.

8. CONSEQUENCES OF REJECTION:

In the event this proposal is rejected, DEFENDANT is subject to sanctions, including, but not limited to, those as outlined in Rules 1.442(g) and (h) of the Florida Rules of Civil Procedure, Fla. Stat. 768.79 and any other relief PLAINTIFF is entitled to as a matter of law and which the Court deems just and proper.

9. GOOD-FAITH:

This Proposal is being submitted with the knowledge, understanding, and consent of the PLAINTIFF making this Proposal.

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served this 29th day of April, 2013, via ☒ E-Mail, ☐ U.S. Mail, ☐ facsimile, ☐ hand delivery, and/or ☐ overnight courier, upon:  Rosalind R. Milian, Esq., Law Office of Lorraine Lester, 8100 SW 10th Street, Suite 2500, Plantation, FL 33324, rosalind.milian@cna.com, thelawofficeoflorrainelester@cna.com.

PINCUS & CURRIER LLP
324 North Lakeside Court
West Palm Beach, FL 33407
E-Mail:   sphillips@wpclaw.com
             lshanif@wpclaw.com
Telephone:   (561) 868-1340
Facsimile:   (561) 366-1310

By: _____
     Steven Phillips
     Florida Bar No. 893374

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

CHARLES ACKLEY,                                    CASE NO. CACE12031439(21)

Plaintiff(s),

vs.

EQUITY ONE (Florida Portfolio), INC.,

Defendant(s).
_____/

### PLAINTIFF'S AMENDED NOTICE OF SERVICE OF INTERROGATORIES

### TO DEFENDANT EQUITY ONE

Plaintiff, CHARLES ACKLEY, by and through undersigned counsel files this Notice of Service that Interrogatories numbered 1-18 have been propounded to the Defendant, **EQUITY ONE (Florida Portfolio), INC.** on January 3, 2013 and that pursuant to Florida Rules of Civil Procedure, answers shall be provided to the undersigned attorney.

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served this 3rd of January, 2013, via ☒ U.S. Mail, ☐ facsimile, ☐ hand delivery, and/or ☐ overnight courier, upon: **Equity One (Florida Portfolio), Inc.,** by and through its Registered Agent: Corporation Service Company, 1201 Hays Street, Tallahassee, FL 3179 and via ☒ E-Mail to **Rosalind R. Milian, Esq.,** Law Office of Lorraine Lester, 8100 SW 10th Street, Suite 2500, Plantation, FL 33324, rosalind.milian@cna.com, thelawofficeoflorrainelester@cna.com.

BRCOSA000426

ACKLEY v. EQUITY ONE (Florida Portfolio), INC.
PLAINTIFF'S AMENDED INTERROGATORIES TO DEFENDANT EQUITY ONE
Page 2 of 11

PINCUS & CURRIER LLP
324 North Lakeside Court
West Palm Beach, FL 33407
E-Mail:       SPhillips@wprclaw.com
Telephone:   (561) 868-1340
Facsimile:   (561) 366-1310

By: _____
Steven B. Phillips
Florida Bar No. 893374

BRCOSA000427

ACKLEY v. EQUITY ONE (Florida Portfolio), INC.
PLAINTIFF'S AMENDED INTERROGATORIES TO DEFENDANT EQUITY ONE
Page 3 of 11

## <u>INITIAL INTERROGATORIES TO DEFENDANT EQUITY ONE</u>

1. What is the name, address and date of birth of the person answering these interrogatories, and if applicable, the official position or relationship with the party to whom the interrogatories are directed?

2.      (a) What policies of insurance do you contend cover or may cover you for the allegations set forth in plaintiff's complaint?

(b) What is the name of each insurer?

(c) What is the number of each policy?

(d) What is the effective date of each policy?

(e) What are the limits of liability of each policy?

(f) What is the name and address of the custodian of each policy?

BRCOSA000428

ACKLEY v. EQUITY ONE (Florida Portfolio), INC.
PLAINTIFF'S AMENDED INTERROGATORIES TO DEFENDANT EQUITY ONE
Page 4 of 11

3. How did the incident described in the complaint happen, including all actions taken by you to prevent the incident?

4. In detail what is each act or omission on the part of any party to this lawsuit that you contend constituted negligence that was a contributing legal cause of the incident in question?

5. What are the facts upon which you rely for each affirmative defense in your answer?

ACKLEY v. EQUITY ONE (Florida Portfolio), INC.
PLAINTIFF'S AMENDED INTERROGATORIES TO DEFENDANT EQUITY ONE
Page 5 of 11

6.      (a) Do you contend any person or entity other than you is, or may be, liable in whole or part for the claims asserted against you in this lawsuit?

(b) If so, what is the name and address of each person or entity?

(c) What is the factual and legal basis for your contention including a detailed statement of the facts or evidence upon which your contention is based?

(d) Have you notified each person or entity of your contention?

7.      Please state the names, addresses and phone numbers of all individuals and business entities responsible for inspecting, maintaining, servicing and/or repairing the subject property including the walkways/sidewalks on the property from September 1, 2012 through the time of answering these interrogatories including in your answer whether each individual is an employee of defendant or not?

ACKLEY v. EQUITY ONE (Florida Portfolio), INC.
PLAINTIFF'S AMENDED INTERROGATORIES TO DEFENDANT EQUITY ONE
Page 6 of 11

8.     Please state the names, addresses and phone numbers of all individuals, contractors, subcontractors and any other business entity responsible for removing the mailboxes or other item(s) from the walkway on the subject property and leaving the anchor brackets attached to the concrete and sticking up on the sidewalk where Mr. Ackley fell on September 24, 2012 as depicted in the attached Exhibit A?

9.     What are the names and addresses of all persons who are believed or known by you, your agents or attorneys to have any knowledge concerning any of the issues in this lawsuit including in your answer a detailed description of the knowledge of each such witness including all individuals who authorized the removal of the mailboxes or other item(s) from the walkway on the subject premises and the person(s) who left the anchor brackets attached to the concrete as depicted in the attached Exhibit A where Mr. Ackley fell on September 24, 2012.

ACKLEY v. EQUITY ONE (Florida Portfolio), INC.
PLAINTIFF'S AMENDED INTERROGATORIES TO DEFENDANT EQUITY ONE
Page 7 of 11

10.    (a) Have you heard or do you know about any statement or remark made by the Plaintiff or on behalf of the Plaintiff or any party to this lawsuit, other than yourself, concerning any issue in this lawsuit?  If so,

(b)  What did you hear the Plaintiff say or what have you heard that the Plaintiff said?

(c)  If not the Plaintiff, what is the name and address of each person who made the statement or statements?

(c)  What is the name and address of each person who heard the statement or statements made by the Plaintiff or other party?

(d)  What is the date, time and place of each statement made by the Plaintiff or other party?

(f)  What is the substance of any other statement or remark you know of that the Plaintiff or other party has made?

11.    (a) What is the name and address of every person known to you, your agents or attorneys who have knowledge about, or possession, custody or control of any model, plat, map, drawing, motion picture, DVD, CD, video tape or photograph pertaining to any fact or issue involved in this controversy?

(b) What item does each person have?

(c) What is the name and address of the person who took or prepared the item?

(d) What is the date the item was taken or prepared?

BRCOSA000432

ACKLEY v. EQUITY ONE (Florida Portfolio), INC.
PLAINTIFF'S AMENDED INTERROGATORIES TO DEFENDANT EQUITY ONE
Page 8 of 11

    12.    Please identify in detail the name, address and phone number of the person(s) who removed the anchor brackets from the walkway on the subject property after Mr. Ackley fell on September 24, 2012 including the name, address and phone number of who hired or supervised this person(s) and instructed or authorized the anchors be removed.

    13.    Please state the name, address and phone number of each defendant's employees, agents, representatives, property managers and maintenance personnel working on the subject property from September 15, 2012 through September 30, 2012 including each person's job title and description of job duties.  If no longer employed by defendant, please state the last known address and phone number for each former employee.

BRCOSA000433

ACKLEY v. EQUITY ONE (Florida Portfolio), INC.
PLAINTIFF'S AMENDED INTERROGATORIES TO DEFENDANT EQUITY ONE
Page 9 of 11

14.    If any of the Requests for Admissions propounded by Plaintiff in this matter is denied, either in whole or in part, identify the request and:

(a)  Give a complete description of all facts relied upon in making the denial, along with the names, current addresses, and telephone numbers of all persons having sufficient knowledge of each fact to be able to testify as a witness;

(b)  Give a detailed description of the substance and content of all expert opinions relied upon in making the denial, along with the names, professional qualifications, addresses and telephone numbers of the person rendering each opinion;

(c)  Identify all documents and tangible items relied upon in making the denial, and for each such document and/or tangible item identify by name, current address and telephone number its custodian.

15.    If any part or subpart of the preceding interrogatory is answered on information or belief, set forth the specific information believed, the source of the information, when and in what manner the information was obtained, and why it is reasonable to believe the information is true.

BRCOSA000434

ACKLEY v. EQUITY ONE (Florida Portfolio), INC.
PLAINTIFF'S AMENDED INTERROGATORIES TO DEFENDANT EQUITY ONE
Page 10 of 11

16.    Please state the names, addresses and phone numbers of all of our employees, agents, servants, contractors and/or vendors who were responsible for inspecting, cleaning and/or maintaining the walkways/sidewalks at the subject property for the time period from September 1, 2012 through September 30, 2012.

17.    If in your answer to Plaintiff's complaint in this matter you denied any of the allegations contained in Paragraph 6 of the Complaint, please state the name, phone number and address of the person or entity who you believed owned the subject property on 9/24/12 and the name, phone number and address of the person or entity you believe was responsible for maintaining the property if not you.

18.    Please state with specificity what was removed from the subject walkway that was anchored by the anchors that were left on the walkway when Mr. Ackley fell on 9/24/2012 including the names, addresses and phone numbers of all persons responsible for removing this item from the walkway.

BRCOSA000435

ACKLEY v. EQUITY ONE (Florida Portfolio), INC.
PLAINTIFF'S AMENDED INTERROGATORIES TO DEFENDANT EQUITY ONE
Page 11 of 11

NAME: _____

STATE OF _____ )
                                                 )
COUNTY OF _____ )

     BEFORE ME, the undersigned authority, authorized to administer oaths, personally appeared _____, who DID/DID NOT take an oath, and who showed the following form of valid identification:_____, and first being duly sworn, acknowledged that he/she is the person authorized to execute the foregoing answers to interrogatories, and that he/she has read the answers and that they are true and correct to the best of his/her knowledge and belief, and he/she executed the same in my presence, on this _____ day of _____, 2013.

_____
Notary Public, State of _____

_____
Name typed or printed
My Commission Expires:
My Commission Number is:

BRCOSA000436

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

CHARLES ACKLEY,                                        CASE NO. CACE12031439(21)

                                    Plaintiff(s),

vs.

EQUITY ONE (Florida Portfolio), INC.,

                                    Defendant(s).

_____/

## PLAINTIFF'S AMENDED REQUEST FOR ADMISSIONS
## TO DEFENDANT EQUITY ONE

Plaintiff, CHARLES ACKLEY, by and through undersigned counsel, pursuant to Rule 1.370, Florida Rules of Civil Procedure, and hereby request the above-named Defendant, **EQUITY ONE (Florida Portfolio), INC. (herein "EQUITY ONE")**, to make the following admissions:

1. That the date and place of the accident set forth below are correct:

    Date of accident:    9/24/12

    Place of Accident:  4601-4695  N.  University  Drive,  Coral  Springs, Broward County, Florida.

2.      That on 9/24/12, Defendant EQUITY ONE as named in the Amended Complaint in this action was the owner of the walkway depicted on the attached exhibit A.

3.      That on 9/24/12, Defendant EQUITY ONE was the owner of the subject property as described above and in the Amended Complaint.

BRCOSA000437

ACKLEY V. EQUITY ONE (Florida Portfolio), INC.
AMENDED RFA to DEFENDANT EQUITY ONE
Page 2 of 4

4.      That the photograph attached as Exhibit A fairly and accurately depicts the condition of the walkway at the subject property as it existed on 9/24/12 at the time MR. ACKLEY tripped and fell on the anchors depicted in the attached photograph.

5.      That the condition of the walkway depicted on the photograph attached as Exhibit A is dangerous.

6.      That the walkway depicted on the photograph attached as Exhibit A is not in a safe condition.

7.      That no warning signs of any kind were placed anywhere near the subject anchors at the time Mr. Ackley tripped and fell on them.

8.      That on 9/24/12, Defendant EQUITY ONE was responsible for maintaining the walkway shown on the attached exhibit A.

9.      That Plaintiff was lawfully on the subject premises located at the above address on 9/24/12 when he tripped and fell on the subject anchors.

10.     That on 9/24/12 CHARLES ACKLEY tripped and fell on anchors protruding up from the walkway on the Defendant's premises as depicted on the attached Exhibit A.

11.     That you (through your agents, employees, or servants) were aware that the anchors were protruding up from the subject walkway prior to CHARLES ACKLEY's fall on 9/24/12.

12.     That no cones, signs or other warning devices were placed at the location of the subject anchors prior to or at the time of CHARLES ACKLEY's fall.

13.     That a video camera or other recording device made a video record of the fall.

ACKLEY V. EQUITY ONE (Florida Portfolio), INC.
AMENDED RFA to DEFENDANT EQUITY ONE
Page 3 of 4

14.    That Plaintiff, CHARLES ACKLEY, fell on 9/24/12 as a result of anchors attached to the walkway and sticking up above the walkway as described in the complaint herein and depicted on the attached Exhibit A.

15.    That you were negligent in failing to properly maintain the subject walkway on 9/24/12 as described in the complaint in this matter and depicted on the attached Exhibit A.

16.    That Plaintiff, CHARLES ACKLEY, was not, in any way, negligent so as to cause the subject accident.

17.    That Plaintiff, CHARLES ACKLEY, sustained injuries as a result of the subject accident.

18.    That Plaintiff, CHARLES ACKLEY, received at least some medical treatment as a result of the subject accident.

19.    That Plaintiff, CHARLES ACKLEY, has not failed to mitigate her damages.

20.    That Plaintiff, CHARLES ACKLEY, sustained injuries as the proximate result of the subject accident.

21.    That you were 100% at fault for causing the subject incident on 9/24/12.

22.    That no one else other than you is responsible for the subject incident on 9/24/12.

23.    That CHARLES ACKLEY has a permanent injury within a reasonable degree of medical probability as a result of injuries sustained in the subject incident of 9/24/12.

24.    That CHARLES ACKLEY did nothing wrong which contributed to cause the subject incident on 9/24/12.

BRCOSA000439

ACKLEY V. EQUITY ONE (Florida Portfolio), INC.
AMENDED RFA to DEFENDANT EQUITY ONE
Page 4 of 4

25.      That you hired a person or entity to remove mailboxes from the subject premises in the location depicted on the attached Exhibit A.

26.      That your employees removed mailboxes from the subject premises in the location depicted on the attached Exhibit A.

27.      That it is a violation of Broward Building Codes to leave the walkway in the condition as depicted on the attached Exhibit A.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served this 3rd day of January, 2013, via ☒ U.S. Mail, ☐ facsimile, ☐ hand delivery, and/or ☐ overnight courier, upon: **Equity One, Inc.**, By and through its Registered Agent: Corporation Service Company, 1201 Hays Street, Tallahassee, FL 3179 and via ☒ E-Mail to **Rosalind R. Milian, Esq.**, Law Office of Lorraine Lester, 8100 SW 10th Street, Suite 2500, Plantation, FL 33324, rosalind.milian@cna.com, thelawofficeoflorrainelester@cna.com.

PINCUS & CURRIER LLP
324 North Lakeside Court
West Palm Beach, FL 33407
E-Mail:      SPhillips@wprclaw.com
Telephone:  (561) 868-1340
Facsimile:   (561) 366-1310

By: _____
Steven B. Phillips
Florida Bar No. 893374



BRCOSA000441

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

CHARLES ACKLEY,                               CASE NO. CACE12031439(21)

Plaintiff(s),

vs.

EQUITY ONE (Florida Portfolio), INC.,

Defendant(s).

_____/

## PLAINTIFF'S REQUEST FOR PRODUCTION

## TO DEFENDANT EQUITY ONE

Pursuant to Rule 1.350 of the Florida Rules of Civil Procedure, Plaintiff by and through their undersigned counsel hereby requests that Defendant, **EQUITY ONE (Florida Portfolio), INC.**, produce and make available for inspection and copying all documents in its possession, custody or control as more fully described in the specifications below.  The documents produced pursuant to this request are to be made available for inspection and copying at the offices of PINCUS & CURRIER, LLP, as provided for in the Florida Rules of Civil Procedure.

## DEFINITIONS AND INSTRUCTIONS

In interpreting each part of this document request, the following definitions and instructions shall apply:

A.    As used herein "document" means all written and graphic matter, however produced or reproduced, and each and every thing from which information can be processed, transcribed, transmitted, restored, recorded, or memorialized in any way, by any means, regardless of technology or form.   It includes, without limitation, correspondence, memoranda, notes, notations, diaries, papers, books, accounts, newspaper and magazine articles, photographs, notebooks, ledgers, letters, telegrams, cables, telex messages, facsimiles, contracts, offers, agreements, reports, objects,

BRCOSA000442

tangible things, work papers, transcripts, minutes, reports and recordings of telephone or other conversations or communications, or of interviews or conferences, or of other meetings, occurrences or transactions, affidavits, statements, summaries, opinions, tests, experiments, analysis, evaluations, journals, balance sheets, income statements, statistical records, desk calendars, appointment books, lists, tabulations, sound recordings, data processing input or output, microfilms, checks, statements, receipts, summaries, computer printouts, computer programs, information kept in computer hard drive, computer tape back-up, CD-ROM, computer floppy diskettes, teletypes, telecopies, invoices, worksheets, printed matter of every kind and description, graphic and oral records and representations of any kind, and electronic and mechanical records and representations of any kind and all things included in the definitions of "writings" and "recordings" as set forth in the Florida Rules of Evidence, in the actual or constructive possession, custody, care or control of Plaintiff including, but not limited to, originals or copies where originals are not available. Any document with any marks such as initials, comments or notations of any kind is not deemed to be identical with one without such marks and is to be produced as a separate document. Where there is any question about whether a tangible item otherwise described in these requests falls within the definition of "document" such tangible item shall be produced.

B. The term "all documents" means every document or group of documents or communication as defined herein that are known to you or that can be located or discovered by reasonably diligent efforts.

C. As used herein, "relating to" or "related to" means in any way, directly or indirectly concern, reflect, refer to, constitute, contain, evidence, analyze, memorialize, discuss, show, amend, confirm, endorse, represent, support, qualify, describe, terminate, revoke, pertain to, comment on, negate or relate to or connect in any way, logically or factually, with the matter described in this request.

D. As used herein "and" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope hereof any information (as defined herein) which might otherwise be construed to be outside the scope of this discovery request.

ACKLEY v. EQUITY ONE (Florida Portfolio), INC.
PLAINTIFF'S AMENDED REQUEST FOR PRODUCTION TO DEFENDANT EQUITY ONE
Page 3 of 10

E.   As used herein "any" shall be understood to include and encompass "all" and vice versa.

F.   Whenever appropriate herein, the masculine form of a word shall be interpreted as feminine, and vice versa.

G.   As used herein "information" shall be expansively construed and shall include, but not be limited to, facts, data, opinions, images, impressions, concepts and formulae.

H.   As used herein "communications" shall mean any oral or written statement, dialogue, colloquy, discussion, conversation, or direct or indirect representation and, also, means any transfer of thoughts or ideas between persons by means of documents and includes any transfer of data from one location to another by electronic or similar means.

I.   As used herein, the term "all communications" means each and every communication as above-defined that is known to you or about which you have any information.

J.   As used herein "agreements" shall mean agreements, contracts, arrangements, mutual promises, accords, engagements or undertakings.

K.   If this request, read literally, requires the production of a part or portion of a document, production of the entire document is requested.

L.   The singular includes the plural and the plural includes the singular.

M.   All words in the present tense include the past tense and all words in the past tense include the present tense.

N.   This request shall be deemed continuing so as to require prompt, further and supplemental production if Defendant locates or obtains possession, custody or control of additional responsive documents at any time prior to trial herein to the extent and in the manner prescribed by the Florida Rules of Civil Procedure and any and all other rules of the court having jurisdiction over this matter.

O.   If any request for documents is deemed to call for the production of privileged or work product material and such privilege or work product is asserted, identify in writing each document so withheld and provide the following information:

1. The reason for withholding the documents;

2. A statement of the basis for the claim of privilege, work product or other ground of non-disclosure;

3. The date of the document, the number of pages, the name(s) of its author or preparer(s) and identification by employment and title of each such person(s);

4. The name of each person to whom the document was sent or received a copy;

5. The present custodian of the document; and

6. A brief statement as to the subject matter of the document.

P.  If you object to part of any request to produce and refuse to answer that request, state your objection, identify the part to which you are objecting, and answer the remaining portion of the request.  If you object to the scope or the time period of any request, state your objection, identify the scope or time period to which you are objecting and answer the request for the scope or time period you believe appropriate.

Q.  If any document requested herein was at one time in existence, but has been lost, discarded, destroyed or purged, identify each document as completely as possible, and state the type of document, the date or approximate date it was lost, discarded, destroyed or purged; the circumstances and manner in which it was lost, discarded, destroyed or purged; the reason or reasons for disposing of the documents; the identity of persons having knowledge of the contents of the documents; the identity of all persons believed at any time to have had a copy of the document or to have ever seen the document; and the identity of the persons authorizing or aware of the loss, discard, destruction or purging of the document.

R.  All documents produced pursuant hereto are to be produced as they are kept in the usual course of business and shall be organized and labeled (without permanently marking the original item produced) to correspond with the categories of each numbered request hereof.

S.  Any response to these requests shall set forth the request in full before each response.

T.     As used herein, the term "person", "individual", or "entity" means any natural person, individual, proprietorship, partnership, corporation, association, organization, joint venture, firm, other business enterprise, governmental body, group of natural persons or other entity.

U.     As used herein, the term "you" or "your" means the party or parties to whom this request for production is directed, or anyone acting for, or on their behalf.

V.     As used herein, "medical records" means any and all records pertaining to your care and treatment by a psychotherapist, physician or medical practitioner, including, but not limited to, correspondence; reports and office notes maintained by you or the psychotherapist, physician or medical practitioner; all records of appointments, your initial contact, scheduled but cancelled appointments, telephone conferences, office visits and consultations; records pertaining to medications prescribed; billing and payment records; records regarding diagnosis, prognosis and treatment.

W.     Each request herein for a document or documents to be produced contemplates production of a document in its entirety, without abbreviation or expurgation.

X.     If one or more responses to this document request would require duplication of a document previously produced by Defendant in response to a prior enumerated request herein, Defendant may refer to that document in a manner identifying it with particularity as to the specific portion, page, paragraph, and line thereof, or make and submit a copy of a document designating the particular portion thereof to which Defendant makes later reference.

## SPECIFICATIONS

1.     Copies of any and all policies of insurance, including any and all primary, umbrella and excess policies, which cover or may cover the Defendant(s) or Plaintiff(s) for any or all of the allegations set forth in the Complaint filed in this case.

2.     Copies of any and all writings, recordings, tapes, videos, records, memoranda, notes, or other material in the care, custody, possession or control of the Defendant(s) or the Defendant('s)(s') attorneys, investigators, agents, representatives, servants or employees reflecting statements, as described in Section 1.280, Florida Rules of Civil procedure, made by the Plaintiff(s) or Plaintiff('s)(s') employees or agents

regarding any of the issues in this case.

3.     Copies of any and all writings, records, memoranda, notes, or other material in the care, custody, possession or control of the Defendant(s) or the Defendant('s)(s') attorneys, investigators, agents, representatives, servants or employees reflecting statements, as described in Section 1.280, Florida Rules of Civil Procedure, made by any and all witnesses regarding any of the issues in this case.

4.     Any and all photographs and videos (including store security videos) taken by or on behalf of the Defendant(s) or the Defendant('s)(s') attorneys, investigators, agents, representatives, servants or employees which are in any manner related to the subject matter of this lawsuit.  This request includes, but is not limited to, any and all photographs depicting the damage to either vehicle, photographs taken of the scene of the accident, incident or event that is the subject matter of this lawsuit, and photographs taken of the Plaintiff(s).

5.     Any and all movies, motion pictures, videotapes or reproductions of the accident, incident or event that is the subject matter of this lawsuit taken by or on behalf of the Defendant(s) or the Defendant('s)(s') attorneys, investigators, agents, representatives, servants or employees which are in any manner related to the subject matter of this lawsuit.

6.     Copies of any charts, drawings, graphs, diagrams or other documentary evidence involving the subject matter of this lawsuit which are expected to be offered as evidence at the time of trial.

7.     Copies of any and all medical records, reports, opinions, or other writings in the care, custody, possession or control of the Defendant(s) or the Defendant('s)(s') attorneys, investigators, agents, representatives, servants or employees, received from doctors, physicians, nurses, other health care providers or anyone else who saw, examined, or rendered care or treatment to the Plaintiff(s) or from any hospitals where the Plaintiff(s) was/were seen, examined or treated for injuries or conditions that were or may have been sustained as a result of the accident, incident or event that is the subject of this lawsuit.

8.     Copies of any and all other medical reports, opinions, or other writings in

BRCOSA000447

the care, custody, possession or control of the Defendant(s) or the Defendant('s)(s')
attorneys, investigators, agents, representatives, servants or employees, from doctors,
physicians, nurses, other health care providers or anyone else who saw, examined, or
rendered care or treatment to the Plaintiff(s) or from any hospitals where the Plaintiff(s)
was/were seen, examined or treated for injuries or conditions not related to the
accident, incident or event that is the subject of this lawsuit.

9.     Copies of any and all reports prepared by experts who are expected to
testify at the trial of this cause.

10.     For each expert whom you expect to call as an expert witness at the trial
of this cause, copies of any and all factual information or data supplied to or relied upon
by the expert, copies of any and all textual material, including, but not limited to,
treatises, periodicals, books, dissertations, pamphlets, journals and other writings on
which the expert will or is anticipated to rely or which the expert alleges supports any of
his or her opinions, copies of any and all statutes, ordinances, codes, safety manuals,
regulations, or other standards on which the expert will or is anticipated to rely, and
copies of any and all records, evaluations, charts, graphs, photographs, movies, motion
pictures, slides, films, videotapes, audiotapes, reconstructions and other writings or
recorded representations prepared or generated by or on behalf of the expert that relate
in any way to the preparation or formulation of any of his or her opinions in this case.,
including but not limited to all books, manuals, texts or other written or recorded
materials referenced by you for the formulation of this opinion

11.     Copies of any and all contracts, agreements or other writings relating in
any way to any ownership interest in or right to control the property at the time of the
accident, incident or event that is the subject matter of this lawsuit by anyone other than
the Defendant(s).

12.     Copies of all maintenance, inspection and repair records for the walkway
mat that is the subject of this action, including but not limited to inspection schedules,
maintenance schedules, cleaning schedules, repair schedules, other similar schedules,
reports, invoices, repair bills, receipts, work orders, estimates, management contracts,
service contracts and any other agreements with outside vendors/entities, memos, e-

mails and correspondence from January 1, 2012 to present whether in hard copy form or stored in electronic format.

13. Copies of any and all photographs, movies, motion pictures, slides, films, videotapes, audiotapes, records, reports and other writings or recorded representations relating in any way to any surveillance conducted on the Plaintiff(s) by the Defendant(s) or the Defendant('s)(s') attorneys, investigators, agents, representatives, servants or employees.

14. Copies of any and all agreements the Defendant has made with anyone that would limit the Defendant's or the other person or entity's liability to anyone for any of the damages in this case.

15. Copies of any and all claims indexes or similar documents relating to Plaintiff's accident and claims history

16. For each expert expected to be identified or whom you have consulted about any matter or issue in this case, copies of any and all factual information or data supplied to, or relied upon, by the expert. Copies of any and all texts or written material, including, but not limited to, treatises, periodicals, books, dissertations, pamphlets, journals and other writings on which the expert will or is anticipated to rely or which the expert alleges it supports any of his or her opinions. Copies of any and all statutes, ordinances, codes, safety manuals, regulations, or other standards on which the expert will, or is anticipated to rely. Copies of any and all records, evaluations, charts, graphs, photographs, movies, motion pictures, slides, films, videotapes, audiotapes, reconstructions, and other writings or recorded representations prepared or generated by or on behalf of the expert that relate in any way to the preparation or formulation of any of his or her opinions in this case, including, but not limited to, all books, manuals, texts, or other written or recorded materials referenced by you for the formulation of the opinion.

17. All letters, correspondence, e-mail, notes, inter-company communications and memos by or to Defendant, intercompany or to outside persons or entities, related to the walkway where Plaintiff fell as described in the Complaint from January 1, 2012 through the present including all documents related to what was removed from the subject walkway where the anchors were left protruding from the walkway.

ACKLEY v. EQUITY ONE (Florida Portfolio), INC.
PLAINTIFF'S AMENDED REQUEST FOR PRODUCTION TO DEFENDANT EQUITY ONE
Page 9 of 10

18.     All documents including but not limited to invoices, repair bills, work orders, estimates, letters, memos, incident reports, photographs, computerized notes and hand written notes related to the item(s) that was removed from the walkway where the anchors were left protruding from the walkway as described in the Complaint on 9/24/12.

19.     All documents, invoices, contracts, work orders, service agreements, repair orders and reports related to the <u>maintenance</u> of the walkway where Plaintiff fell as described in the Complaint and depicted in Exhibit A attached thereto from 1/1/12 to present.

20.     All photographs depicting what was installed on the walkway prior to 9/24/12 as described in the Complaint.

21.     All documents provided by any expert witness retained or consulted by Defendant in connection with this matter, whether or not you intend to call the expert as a witness at trial.

22.     All documents consulted, relied upon, or used which support your contentions in preparing or drafting the Answer and affirmative defenses in this action.

23.     All documents not already included in your answers to this Request For Production which were consulted, relied upon, referred to or used in any way in preparing or drafting Defendant's Answers to Plaintiff's Initial Interrogatories to Defendant and Defendant's Response to Plaintiff's Request for Admissions served with the complaint in this matter.

24.     All documents provided by any investigator retained or employed by you in connection with this matter including surveillance video of the plaintiff.

25.     A copy of all documents which identify the party, person or entity responsible for maintaining, repairing and/or removing the item from the walkway at issue in this matter from 1/1/12 to the present including any and all service or maintenance contracts or agreements in effect during this time frame.

<u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served this 3<sup>rd</sup> of January, 2013, via ☒ U.S. Mail, ☐ facsimile, ☐ hand delivery, and/or

BRCOSA000450

ACKLEY v. EQUITY ONE (Florida Portfolio), INC.
PLAINTIFF'S AMENDED REQUEST FOR PRODUCTION TO DEFENDANT EQUITY ONE
Page 10 of 10

☐ overnight courier, upon:  **Equity One (Florida Portfolio), Inc.**, by and through its

Registered Agent: Corporation Service Company, 1201 Hays Street, Tallahassee, FL

3179 and via ☒ E-Mail to **Rosalind R. Milian, Esq.**, Law Office of Lorraine Lester,

8100 SW 10th Street, Suite 2500, Plantation, FL  33324, rosalind.milian@cna.com,

thelawofficeoflorrainelester@cna.com.

<div style="margin-left:40%">

PINCUS & CURRIER LLP
324 North Lakeside Court
West Palm Beach, FL 33407
E-Mail:      SPhillips@wprclaw.com
Telephone:   (561) 868-1340
Facsimile:   (561) 366-1310

By: _____
     Steven B. Phillips
     Florida Bar No. 893374

</div>

BRCOSA000451

$ 007.200

02 1P
0003097892   JAN 03 2013
MAILED FROM ZIP CODE 33407

7011 0470 0003 1107 2660

Steven B. Phillips, Esq.
Pincus & Currier, LLP
324 North Lakeside Court
West Palm Beach, Florida 33407

Equity One (Florida Portfolio), Inc.
c/o Registered Agent: Corporation Service Co.
1201 Hays Street
Tallahassee, Florida    32301

BRCOSA000452

*First Specialty Insurance Corporation*

NAMED INSURED

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
PRODUCTS COMPLETED OPERATIONS COVERAGE FORM
OWNERS CONTRACTORS PROTECTIVE LIABILITY FORM
RAILROAD PROTECTIVES LIABILITY FORM
BUSINESSOWNERS POLICY
COMMERCIAL PACKAGE POLICY
LIQUOR LIABILITY COVERAGE FORM

In consideration of the premium charged, it is agreed the **named insured** in Item #1 of the policy Declarations is amended to read as follows, but, for the purpose of giving and receiving notices and the payment or the return of premium, the first **named insured** shall be deemed the only **named insured** and shall act as the agent for any and all other **named insureds**:

1. Countryside Power Sweeping, Inc., etal
2. Countryside Power Sweeping, Inc.
3. Countryside Power Sweeping, Inc. dba Day and Night
4. J&K Property Maintenance Services dba East Coast's Finest Outdoor Services

All other terms and conditions of this policy shall remain unchanged.

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

Policy Number:

Named Insured

Endorsement Effective Date:

FSIC 3367 0611                                                      Page 1 of 1

---

*First Specialty Insurance Corporation*

PRIMARY AND NON-CONTRIBUTING INSURANCE
(Third-Party)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
PRODUCTS COMPLETED OPERATIONS LIABILITY COVERAGE FORM
RAILROAD PROTECTIVE LIABILITY COVERAGE FORM

Section IV: **Conditions**, **Other Insurance**, and all subparts thereof, as contained in the policy is deleted in its entirety and replaced with the following condition as respects the Third Party shown below:

Section IV: Conditions

Other Insurance:

With respect to the Third Party shown below, the insurance provided by this policy shall be primary and non-contributing insurance. Any and all other valid and collectible insurance available to such Third Party in respect of work performed by you under written contractual agreements with said Third Party for a loss covered by this policy, shall in no instance be considered as primary, co-insurance, or contributing insurance. Rather, any such other insurance shall be considered excess over and above the insurance provided by this policy.

The Third Party to whom this endorsement applies is:

Blanket Basis where required under a written contract or agreement with the Named Insured.

Absence of a specifically named Third Party above means that the provisions of this endorsement apply "as required by written contractual agreement with any Third Party for whom you are performing work."

All other terms and conditions of this policy shall remain unchanged.

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

Policy Number:

Named Insured:

Endorsement Effective Date

FSIC 33513 0611      Includes copyrighted material of Insurance Office, Inc. with its permission      Page 1 of 1

---

POLICY NUMBER: 1RG15263-1                    COMMERCIAL GENERAL LIABILITY
                                             CG 24 04 05 09

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

SCHEDULE

| Name Of Person Or Organization: ANY PERSON OR ORGANIZATION WHEN YOU AND SUCH PERSON OR ORGANIZATION HAVE AGREED IN WRITING IN A CONTRACT OR AGREEMENT THAT YOU WILL WAIVE ANY RIGHT OF RECOVERY AGAINST SUCH PERSON OR ORGANIZATION. |
|---|

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

The following is added to Paragraph 8. Transfer Of Rights Of Recovery Against Others To Us of Section IV – Conditions:

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization shown in the Schedule above.

CG 24 04 05 09          © Insurance Services Office, Inc., 2008          Page 1 of 1

COMMERCIAL GENERAL LIABILITY
CG 22 79 07 98

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – CONTRACTORS – PROFESSIONAL LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph 2., Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability and Paragraph 2., Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:

**1.** This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional services by you or on your behalf, but only with respect to either or both of the following operations:

**a.** Providing engineering, architectural or surveying services to others in your capacity as an engineer, architect or surveyor; and

**b.** Providing, or hiring independent professionals to provide, engineering, architectural or surveying services in connection with construction work you perform.

**2.** Subject to Paragraph 3. below, professional services include:

**a.** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and

**b.** Supervisory or inspection activities performed as part of any related architectural or engineering activities.

**3.** Professional services do not include services within in construction means, methods, techniques, sequences and procedures employed by you in connection with your operations in your capacity as a construction contractor.

CG 22 79 07 98          Copyright, Insurance Services Office, Inc., 1997          Page 1 of 1   □

---

POLICY NUMBER: IRG15263-1

COMMERCIAL GENERAL LIABILITY
CG 21 54 01 96

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – DESIGNATED OPERATIONS COVERED BY A CONSOLIDATED (WRAP-UP) INSURANCE PROGRAM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

SCHEDULE

**Description and Location of Operation(s):** All locations and all operations that a consolidated (wrap up) insurance program has been provided by the prime contractor, project manager or owner of the construction project for which you provided services or materials but only when you participate in the consolidated (wrap-up) insurance program.

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

The following exclusion is added to paragraph 2., Exclusions of COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages):

This insurance does not apply to "bodily injury" or "property damage" arising out of either your ongoing operations or operations included within the "products-completed operations hazard" at the location described in the Schedule of this endorsement, as a consolidated (wrap-up) insurance program has been provided by the prime contractor/project manager or owner of the construction project in which you are involved.

This exclusion applies whether or not the consolidated (wrap-up) insurance program:

**(1)** Provides coverage identical to that provided by this Coverage Part;

**(2)** Has limits adequate to cover all claims; or

**(3)** Remains in effect.

CG 21 54 01 96          Copyright, Insurance Services Office, Inc., 1994          Page 1 of 1   □

---

COMMERCIAL GENERAL LIABILITY
CG 22 43 07 98

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – ENGINEERS, ARCHITECTS OR SURVEYORS PROFESSIONAL LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph 2., Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability and Paragraph 2., Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.

Professional services include:

**1.** The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and

**2.** Supervisory, inspection, architectural or engineering activities.

CG 22 43 07 98          Copyright, Insurance Services Office, Inc., 1997          Page 1 of 1   □

---

*First Specialty Insurance Corporation*

INDEPENDENT CONTRACTORS RESTRICTION – BROAD FORM

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
PRODUCTS-COMPLETED OPERATIONS LIABILITY COVERAGE FORM

All Coverage Forms listed above are amended to include the following exclusion:

This insurance does not apply to "bodily injury," "property damage," or "personal and advertising injury" arising out of operations performed by independent contractors unless

1.    Such independent contractors have, in force at the time of such injury or damage, insurance of the types provided by this policy and the limits of liability for such insurance are equal to or greater than the limits of insurance provided by this policy; and

2.    The subcontractor's insurance is written on a primary and non-contributory basis; and

3.    Such independent contractors have agreed, in writing, to provide you with Additional Insured Status and hold you harmless from all liability, including attorney fees, arising from their acts, errors, or omissions

Also such insurance as is afforded by this policy shall be excess over the independent contractor's insurance as described above.

All other terms and conditions of this policy shall remain unchanged.

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

Policy Number:

Named Insured

Endorsement Effective Date

SP 3-498 0611          Page 1 of 1

BRCOSA000454

COMMERCIAL GENERAL LIABILITY
CG 20 33 07 04

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – AUTOMATIC STATUS WHEN REQUIRED IN CONSTRUCTION AGREEMENT WITH YOU

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Section II – Who Is An Insured is amended to include as an additional insured any person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. Such person or organization is an additional insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

1. Your acts or omissions; or
2. The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured.

A person's or organization's status as an additional insured under this endorsement ends when your operations for that additional insured are completed.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to:

1. "Bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of, or the failure to render, any professional architectural, engineering or surveying services, including:

   a. The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

   b. Supervisory, inspection, architectural or engineering activities.

2. "Bodily injury" or "property damage" occurring after:

   a. All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

   b. That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

CG 20 33 07 04               © ISO Properties, Inc., 2004               Page 1 of 1   □

---

POLICY NUMBER: IRG15263-1

COMMERCIAL GENERAL LIABILITY
CG 20 37 07 04

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s): | Location And Description Of Completed Operations |
|---|---|
| Any person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. | As Per Written Contract |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

Section II – Who Is An Insured is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work" at the location designated and described in the schedule of this endorsement performed for that additional insured and included in the "products-completed operations hazard".

CG 20 37 07 04               © ISO Properties, Inc., 2004               Page 1 of 1   □

---

*First Specialty Insurance Corporation*

AMENDMENT – AGGREGATE LIMITS OF INSURANCE
(PER PROJECT – WITH POLICY CAP)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The General Aggregate Limit under LIMITS OF INSURANCE (Section III) applies separately to each of your projects away from premises owned by or rented to you.

Notwithstanding the application of the General Aggregate Limit to each of your projects, under no circumstances, will we pay more than $ 5,000,000 for all claims under this policy that are subject to the General Aggregate Limit.

All other terms and conditions of this policy shall remain unchanged.

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

Policy Number:

Named Insured:

Endorsement Effective Date:

SP 2 389 0611        Includes copyrighted material of Insurance Services Office, Inc with its permission.        Page 1 of 1

---

*First Specialty Insurance Corporation*

CROSS SUITS LIABILITY EXCLUSION

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
PRODUCTS-COMPLETED OPERATIONS LIABILITY COVERAGE FORM

All Coverage Forms attached to this policy are amended to include the following exclusions:

Cross Suits Liability Exclusion

This policy does not apply to "bodily injury," "property damage," or "personal and advertising injury" arising from claims or "suits" brought by:

a.   One named insured against another named insured,

b.   Any insured as identified in the declarations or policy as a named insured against a defendant who is an insured as defined in Section II – Who is an Insured, paragraph 1; or

c.   Any insured as defined in Section II – Who is an Insured, paragraph 1 against a named insured or any other insured as defined in Section II – Who is an Insured, paragraph 1.

All other terms and conditions of this policy shall remain unchanged.

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

Policy Number

Named Insured

Endorsement Effective Date

FSIC 3392 0611        Page 1 of 1

BRCOSA000455

3  Deductible payments shall be paid by the Insured and received by us within thirty (30) days from the date we request, by mail, such payment from the Insured. If the Insured does not make such payment and we do not receive such amount in that period of time, we have the right to cancel the policy.

"Claim(s)" whenever used in this policy means, a demand, received by the Insured, for money or services, including the service of suit or institution or arbitration proceedings against the Insured

D   The terms of this insurance, including those with respect to

1   Our right and duty to defend the Insured against any "suits" seeking shown damages; and

2   Your duties in the event of an "occurrence", offense, "claim," or "suit"

apply irrespective of the application of the Deductible amount

E   We may pay any part or all of the Deductible amount to effect settlement of any "claim" or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the Deductible amount as has been paid by us.

All other terms and conditions of this policy shall remain unchanged.

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

Policy Number:

Named Insured:

Endorsement Effective Date:

FSIC 33544 0611      Includes copyrighted material of Insurance Services Office, Inc  with its permission      Page 3 of 3

---

COMMERCIAL GENERAL LIABILITY
CG 21 73 01 08

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCLUSION OF CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

A.  The following exclusion is added:
This insurance does not apply to:
**TERRORISM**
"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism".

B.  The following definitions are added:
1.  For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

2.  "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:
a.  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and
b.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

CG 21 73 01 08      © ISO Properties, Inc., 2007      Page 1 of 1   □

---

### First Specialty Insurance Corporation

TOTAL EXCLUSION OF OTHER THAN CERTIFIED ACTS OF TERRORISM

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
LIQUOR LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
POLLUTION LIABILITY COVERAGE FORM
RAILROAD PROTECTIVE LIABILITY COVERAGE FORM
UNDERGROUND STORAGE TANK POLICY
COMMERCIAL LIABILITY UMBRELLA COVERAGE FORM
EXCESS LIABILITY POLICY

A.  The following exclusion is added
This insurance does not apply to:
**TERRORISM**
"Any injury or damage" arising, directly or indirectly, out of an "other act of terrorism".

B.  The following definitions are added:
1.  For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to "underlying insurance" to which this endorsement is applicable, and includes but is not limited to "bodily injury," "property damage," "personal and advertising injury," "injury" or "environmental damage" as may be defined in any applicable Coverage Part or "underlying insurance."

2.  "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act.

3.  "Other act of terrorism" means an actual or threatened violent act, or an actual or threatened act that is dangerous to human life, property or infrastructure; that is committed by an individual or individuals and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion, and the act is not a "certified act of terrorism". However, "other act of terrorism" does not include an act which would meet all the criteria necessary to be a "certified act of terrorism" pursuant to the federal Terrorism Risk Insurance Act.

C.  In the event that the "underlying insurance" does not provide coverage for "other act of terrorism," to which this exclusion does not apply, the insurance provided by this policy shall not replace the "underlying insurance," but shall apply in the same manner as though such "underlying insurance" was available and collectible

All other terms and conditions of this policy shall remain unchanged
This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

Policy Number:

Named Insured:

Endorsement Effective Date:

SP 4 145 0611      Includes copyrighted material of Insurance Services Office, Inc  with its permission      Page 1 of 1

---

COMMERCIAL GENERAL LIABILITY
CG 20 34 07 04

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ADDITIONAL INSURED – LESSOR OF LEASED EQUIPMENT – AUTOMATIC STATUS WHEN REQUIRED IN LEASE AGREEMENT WITH YOU

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A.  Who Is An Insured (Section II) is amended to include as an additional insured any person or organization from whom you lease equipment when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. Such person or organization is an insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your maintenance, operation or use of equipment leased to you by such person or organization.

A person's or organization's status as an additional insured under this endorsement ends when their contract or agreement with you for such leased equipment ends.

B.  With respect to the insurance afforded to these additional insureds, this insurance does not apply to any "occurrence" which takes place after the equipment lease expires.

CG 20 34 07 04      © ISO Properties, Inc., 2004      Page 1 of 1   □

COMMERCIAL GENERAL LIABILITY
CG 21 49 09 99

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## TOTAL POLLUTION EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion f. under Paragraph 2., Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability is replaced by the following:

This insurance does not apply to:

**f. Pollution**

**(1)** "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

CG 21 49 09 99          Copyright, Insurance Services Office, Inc., 1998          Page 1 of 1    □

---

COMMERCIAL GENERAL LIABILITY
CG 21 47 12 07

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph 2., Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability:

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

**(a)** Refusal to employ that person;

**(b)** Termination of that person's employment; or

**(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs (a), (b), or (c) above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs (a), (b) or (c) above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph 2., Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:

This insurance does not apply to:

"Personal and advertising injury" to:

**(1)** A person arising out of any:

**(a)** Refusal to employ that person;

**(b)** Termination of that person's employment; or

**(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs (a), (b), or (c) above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs (a), (b) or (c) above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

CG 21 47 12 07          © ISO Properties, Inc., 2006          Page 1 of 1    □

---

## First Specialty Insurance Corporation

### DEDUCTIBLE ENDORSEMENT

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
PRODUCTS-COMPLETED OPERATIONS LIABILITY COVERAGE PART

### DEDUCTIBLE SCHEDULE

| | | | |
|---|---|---|---|
| $5,000 | Per Claim | $N/A | Aggregate |
| $N/A | Per Occurrence | $N/A | Aggregate |
| $N/A | Maintenance | | |

(Fill in amounts, as applicable.)

**A.** Our obligation under this policy for damages and "defense costs" apply only to amounts excess of the Deductible shown in the Deductible Schedule.

**B.** We shall select a Deductible amount on either a per "claim" or a per "occurrence" basis. Your Deductible applies to the coverage option and to the basis of the Deductible indicated by the placement of the Deductible amount in the Schedule above. The Deductible amount stated in the Schedule above applies as follows:

**1.** PER CLAIM BASIS. If the Deductible amount indicated in the Schedule above is on a per "claim" basis, that Deductible applies as follows:

**a.** Under Bodily Injury Liability Coverage, to all damages sustained by any one person because of "bodily injury";

**b.** Under Property Damage Liability Coverage, to all damages sustained by any one person because of "property damage", or

**c.** Under Bodily Injury Liability and/or Property Damage Liability Coverage Combined, to all damages sustained by any one person because of

(1)   "Bodily injury";

(2)   "Property damage"; or

(3)   "Bodily injury" and "property damage" combined

as the result of any one "occurrence."

If damages are claimed for care, loss of services or death resulting at any time from "bodily injury," a separate Deductible amount will be applied to each person making a "claim" for such damages.

With respect to "property damage," person includes an organization.

**2.** PER OCCURRENCE BASIS. If the Deductible amount indicated in the Schedule above is on a per "occurrence" basis, that Deductible amount applies as follows:

**a.** Under Bodily Injury Liability Coverage, to all damages because of "bodily injury";

**b.** Under Property Damage Liability Coverage, to all damages because of "property damage"; or

**c.** Under Bodily Injury Liability and/or Property Damage Liability Coverage Combined, to all damages because of

(1)   "Bodily injury";

(2)   "Property damage"; or

(3)   "Bodily injury" and "property damage" combined

as a result of any one "occurrence," regardless of the number of persons or organizations who sustain damages because of that "occurrence."

**3.** If the Deductible applies on the aggregate, the Insured shall be responsible for and pay all damages, either on a per "claim" or a per "occurrence" basis as applicable, up to the aggregate Deductible.

**4.** If the maintenance Deductible applies after the aggregate Deductible has been satisfied by the Insured, the Insured shall be responsible for and pay all damages, either on a per "claim" or a per "occurrence" basis as applicable, up to the maintenance Deductible per "claim," or per "occurrence."

**C.** "Defense costs" are included within the Deductible.

**1.** The Insured will pay such "defense costs" in accordance with and subject to the terms and conditions of the policy.

**2.** "Defense Costs," as used herein, means:

**A.** "Claim" expense, including attorneys fees, incurred by or on behalf of the Insured in the handling and defense of "claims" or "suits" against the Insured arising out of an "occurrence" or offense to which this policy applies, but excluding salaries or wages of the Insured's officers or employees or the Insured's office expenses.

**B.** Up to $250 for the cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the bodily injury liability coverage applies. We do not have to furnish these bonds.

**C.** The cost of bonds to release attachment, but only for the bond amount within the applicable Limit of Insurance. We do not have to furnish these bonds.

**D.** All reasonable expenses incurred by the Insured at our request to assist us in the investigation or defense of the "claim" or "suit," including actual loss of earnings up to $100 a day because of time off from work.

**E.** All costs taxed against the Insured in the "claim" or "suit."

FSIC 33544 0611          Includes copyrighted material of Insurance Services Office, Inc. with its permission          Page 1 of 3

FSIC 33544 0611          Includes copyrighted material of Insurance Services Office, Inc. with its permission          Page 2 of 3

BRCOSA000457

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph a. above; or

c. All other parts of the world if the injury or damage arises out of:

   (1) Goods or products made or sold by you in the territory described in Paragraph a. above;

   (2) The activities of a person whose home is in the territory described in Paragraph a. above, but is away for a short time on your business; or

   (3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

   provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph f. does not include that part of any contract or agreement:

   (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

   (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

      (a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

      (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

   (3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

   (1) Power cranes, shovels, loaders, diggers or drills; or

   (2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in Paragraph a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

   (1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

   (2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in Paragraph a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

   (1) Equipment designed primarily for:

      (a) Snow removal;

      (b) Road maintenance, but not construction or resurfacing; or

      (c) Street cleaning;

   (2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

   (3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

f. The use of another's advertising idea in your "advertisement"; or

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

   (1) Products that are still in your physical possession; or

   (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

      (a) When all of the work called for in your contract has been completed.

      (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

      (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

   Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

b. Does not include "bodily injury" or "property damage" arising out of:

   (1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

   (2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

   (3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

a. Means:

   (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

      (a) You;

      (b) Others trading under your name; or

      (c) A person or organization whose business or assets you have acquired; and

   (2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

b. Includes:

   (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

   (2) The providing of or failure to provide warnings or instructions.

c. Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work":

a. Means:

   (1) Work or operations performed by you or on your behalf; and

   (2) Materials, parts or equipment furnished in connection with such work or operations.

b. Includes:

   (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

   (2) The providing of or failure to provide warnings or instructions.

BRCOSA000458

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 2.b.(2) of Section I – Coverage A – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph f. above, are no longer met.

**SECTION II – WHO IS AN INSURED**

1. If you are designated in the Declarations as:
   **a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.
   **b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.
   **c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.
   **d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.
   **e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:
   **a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:
      **(1)** "Bodily injury" or "personal and advertising injury":
         **(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;
         **(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph (1)(a) above;
         **(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs (1)(a) or (b) above; or
         **(d)** Arising out of his or her providing or failing to provide professional health care services.
      **(2)** "Property damage" to property:
         **(a)** Owned, occupied or used by,
         **(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by
         you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.
**c.** Any person or organization having proper temporary custody of your property if you die, but only:
   **(1)** With respect to liability arising out of the maintenance or use of that property; and
   **(2)** Until your legal representative has been appointed.
**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:
   **a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;
   **b.** Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and
   **c.** Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III – LIMITS OF INSURANCE**

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:
   **a.** Insureds;
   **b.** Claims made or "suits" brought; or
   **c.** Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:
   **a.** Medical expenses under Coverage C;
   **b.** Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and
   **c.** Damages under Coverage B.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to Paragraph 2. above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to Paragraph 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:
   **a.** Damages under Coverage A; and
   **b.** Medical expenses under Coverage C
   because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to Paragraph 5. above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage A for damages because of "property damage" to any one premises, while rented to you or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to Paragraph 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

1. **Bankruptcy**
   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**
   **a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:
      **(1)** How, when and where the "occurrence" or offense took place;
      **(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b.** If a claim is made or "suit" is brought against any insured, you must:
   **(1)** Immediately record the specifics of the claim or "suit" and the date received; and
   **(2)** Notify us as soon as practicable.
   You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:
   **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";
   **(2)** Authorize us to obtain records and other information;
   **(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and
   **(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Legal Action Against Us**
   No person or organization has a right under this Coverage Part:
   **a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or
   **b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.
   A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

4. **Other Insurance**
   If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:
   **a.** Primary Insurance
      This insurance is primary except when Paragraph b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph c. below.
   **b.** Excess Insurance
      **(1)** This insurance is excess over:
         **(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:
            **(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for your work";
            **(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;
            **(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or
            **(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Section I – Coverage A – Bodily Injury And Property Damage Liability.
         **(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement.
      **(2)** When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:
   **(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and
   **(b)** The total of all deductible and self-insured amounts under all that other insurance.
**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c.** Method Of Sharing
   If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.
   If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

5. **Premium Audit**
   **a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.
   **b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.
   **c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

6. **Representations**
   By accepting this policy, you agree:
   **a.** The statements in the Declarations are accurate and complete;
   **b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

7. **Separation Of Insureds**
   Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:
   **a.** As if each Named Insured were the only Named Insured; and
   **b.** Separately to each insured against whom claim is made or "suit" is brought.

8. **Transfer Of Rights Of Recovery Against Others To Us**
   If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

9. **When We Do Not Renew**
   If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.
   If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:
   **a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and
   **b.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means:
   **a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or
   **b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.
   However, "auto" does not include "mobile equipment".

BRCOSA000459

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III – Limits Of Insurance.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Distribution Of Material In Violation Of Statutes**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

(3) Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

Exclusions c. through n. do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III – Limits Of Insurance.

**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

(1) Advertising, broadcasting, publishing or telecasting;

(2) Designing or determining content of web-sites for others; or

(3) An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs 14.a., b. and c. of "personal and advertising injury" under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-Related**

Any loss, cost or expense arising out of any:

(1) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Distribution Of Material In Violation Of Statutes**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

(3) Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**COVERAGE C MEDICAL PAYMENTS**

**1. Insuring Agreement**

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(a) The accident takes place in the "coverage territory" and during the policy period;

(b) The expenses are incurred and reported to us within one year of the date of the accident; and

(c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage A.

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

a. All expenses we incur.

b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

e. All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

b. This insurance applies to such liability assumed by the insured;

c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

f. The indemnitee:

(1) Agrees in writing to:

(a) Cooperate with us in the investigation, settlement or defense of the "suit";

(b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c) Notify any other insurer whose coverage is available to the indemnitee; and

(d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2) Provides us with written authorization to:

(a) Obtain records and other information related to the "suit"; and

COMMERCIAL GENERAL LIABILITY
CG 00 01 12 07

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V – Definitions.

## SECTION I – COVERAGES

### COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

(2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period; and

(3) Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

2. Exclusions

This insurance does not apply to:

a. Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

b. Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

c. Liquor Liability

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

d. Workers' Compensation And Similar Laws

Any obligation of the insured under a workers' compensation, disability, benefits or unemployment compensation law or any similar law.

e. Employer's Liability

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

---

f. Pollution

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations being performed by those operations. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

g. Aircraft, Auto Or Watercraft

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

(a) Less than 26 feet long; and

(b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of:

(a) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

(b) the operation of any of the machinery or equipment listed in Paragraph f.(2) or f.(3) of the definition of "mobile equipment".

h. Mobile Equipment

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

i. War

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

j. Damage To Property

"Property damage" to:

(1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

BRCOSA000461

COMMERCIAL GENERAL LIABILITY
CG 21 96 03 05

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SILICA OR SILICA-RELATED DUST EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph 2., Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability:

**2. Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

**a.** "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

**b.** "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**c.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**B.** The following exclusion is added to Paragraph 2., Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:

**2. Exclusions**

This insurance does not apply to:

**a.** "Personal and advertising injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**b.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**C.** The following definitions are added to the Definitions Section:

**1.** "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

**2.** "Silica-related dust" means a mixture or combination of silica and other dust or particles.

---

*First Specialty Insurance Corporation*

ACTS OF DISCRIMINATION EXCLUSION

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

This insurance does not apply to "Bodily Injury" or "Personal and Advertising Injury" arising out of, based upon or attributable to an "Act of Discrimination".

"Act of Discrimination" means any act or omission of an "Insured" undertaken or committed for reasons including but not limited to race, religion, creed, age, gender, national origin, disability, handicap, status as an individual with a disability (as defined in the Americans with Disabilities Act of 1990 including any amendments thereto), sexual orientation or preference, pregnancy and any act or failure to act with respect to public accommodation or accessibility as required under the Americans with Disabilities Act of 1990 including any amendments thereto.

All other terms and conditions of this policy shall remain unchanged.

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

Policy Number:

Named Insured:

Endorsement Effective Date:

---

*First Specialty Insurance Corporation*

INTERNATIONAL TRADE CONTROLS

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM
LIQUOR LIABILITY COVERAGE FORM
EXCESS LIABILITY POLICY – ENHANCED DEFENSE
EXCESS LIABILITY POLICY – INDEMNITY ONLY
COMMERCIAL LIABILITY UMBRELLA COVERAGE FORM

The insuring agreement section of your policy is modified by adding the following:

We will not be deemed to have provided coverage and will not be liable to pay any claim or provide any benefit including defending a claim hereunder to the extent that payment of such claim or provision of such benefit would expose us to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of any jurisdiction applicable to us.

All other terms and conditions of this policy shall remain unchanged.

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

Policy Number:

Named Insured:

Endorsement Effective Date:

---

*First Specialty Insurance Corporation*

POLICY NUMBER: IRG15263-I

THE ATTACHED DECLARATIONS, COVERAGE FORM(S) AND OTHER FORMS AND ENDORSEMENTS, IF ANY, FORM THE ATTACHED POLICY.

IN WITNESS WHEREOF, First Specialty Insurance Corporation has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our duly authorized representative.

FIRST SPECIALTY INSURANCE CORPORATION

President                              Secretary

BRCOSA000462

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

**(a)** Any "nuclear reactor";

**(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

---

### First Specialty Insurance Corporation

**TOTAL LEAD EXCLUSION**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
PRODUCTS COMPLETED OPERATIONS LIABILITY COVERAGE FORM
RAILROAD PROTECTIVE LIABILITY COVERAGE FORM
COMMERCIAL LIABILITY UMBRELLA COVERAGE FORM

This insurance does not apply to:

**A.** "Bodily injury," "property damage," or "personal and advertising injury" in whole or in part, either directly or indirectly arising out of, based upon or attributable to any of the following:

**(1)** The use, installation, storage, withdrawal, removal, encapsulation, destruction, containment, testing, distribution, ownership, sale or disposal of lead, lead dust, lead fibers or material containing lead.

**(2)** Exposure to lead, lead dust, lead fibers or material containing lead, or

**(3)** Any error or omission in supervision, instructions, recommendations, notices, warnings or advice given, or which should have been given, in connection with lead, lead dust, lead fibers or material containing lead.

**B.** The investigation, settlement or defense of any claim, "suit" or proceeding against the insured alleging any actual or threatened injury, or damage which arises out of or would not have occurred but for lead "bodily injury," "property damage," or "personal and advertising injury," as described above.

Notwithstanding any other provision of this endorsement, the above exclusion will not bar coverage for "bodily injury," "property damage," or "personal and advertising injury" and attendant defense costs arising out of "your product" that is manufactured with or composed of lead whether in whole or in part, if the "bodily injury," "property damage," or "personal and advertising injury" does not arise out of lead poisoning or another toxic, hazardous, or damaging effect caused in whole or in part by the presence of lead in "your product."

All other terms and conditions of this policy shall remain unchanged.

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

Policy Number:

Named Insured:

Endorsement Effective Date:

---

### First Specialty Insurance Corporation

**ASBESTOS EXCLUSION**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
PRODUCTS-COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
BUSINESSOWNERS LIABILITY COVERAGE FORM

This insurance does not apply to:

**A)** "Bodily Injury" or "property damage" or "personal and advertising injury" in whole or in part, either directly or indirectly arising out of, based upon or attributable to any of the following:

1. Asbestos or any asbestos related injury or damage; or

2. any alleged act, error, omission or duty involving asbestos, its use, exposure, presence, existence, detention, removal, elimination or avoidance, or

3. the use, exposure, presence, existence, detention, removal, elimination or avoidance of asbestos in any environment, building or structure; and

**B)** The investigation, settlement or defense of any claim, "suit" or proceeding against the insured alleging any actual or threatened injury, or damage or clean-up which arises out of or would not have occurred but for asbestos "Bodily Injury" or "Property Damage," and "personal and advertising injury" as described above.

All other terms and conditions of this policy shall remain unchanged.

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

Policy Number:

Named Insured:

Endorsement Effective Date:

---

COMMERCIAL GENERAL LIABILITY
CG 21 67 12 04

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph 2. Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability:

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following exclusion is added to Paragraph 2. Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**C.** The following definition is added to the Definitions Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

BRCOSA000463

(10) The value of meals received by employees as part of their pay to the extent shown in the insured's records;

(11) The value of store certificates, merchandise, credits or any other substitute for money received by employees as part of their pay;

(12) The payroll of mobile equipment operators and their helpers, whether or not the operators are designated as interested in operating automobiles. If the operators and their helpers are provided to the insured along with equipment hired under contract and their actual payroll is not known, use 1/3 of the total amount paid out by the insured for the hire of the equipment;

(13) The payroll of executive officers of a corporation and individual insureds and co-partners. Use the payroll shown on the state exceptions under ISO Rule 24. For the purposes of payroll determination, managers of limited liability companies shall be considered executive officers and members of limited liability companies shall be considered co-partners.

The executive officers of a corporation are those persons holding any of the officer positions created by the named insured's charter, constitution or by-laws or any other similar governing document.

The payroll of all executive officers of a corporation and individual insureds or co-partners engaged principally as clerical operators or as salespersons, and officers and co-partners who are inactive for the entire policy period, shall not be included for premium purposes.

For part-time or seasonal businesses the payroll amounts may be reduced by 2 percent for each full calendar week in excess of twelve during which the risk performs no operations.

(14) The payroll of leased workers furnished to the named insured by a labor leasing firm. Premium on such payroll shall be based on the classifications and rates which would have applied if the leased workers had been the direct employers of the named insured. If payroll is unavailable, use 100% of the total cost of the contract for leased workers as the payroll of leased workers. The premium shall be charged on that amount as payroll.

If investigation of a specific employee leasing contract discloses that a definite amount of the contract price represents payroll, such amount shall be considered payroll for premium computation purposes.

(15) Fees paid to employment agencies for temporary personnel provided to the insured.

c.   Exclusions:

(1) Tips and other gratuities received by employees;

(2) Payments by an employer to group insurance or group pension plans for employees, other than payments covered in paragraph 2.c.;

(3) The value of special rewards for individual invention or discovery;

(4) Dismissal or severance payments except for time worked or accrued vacation.

---

(5) The payroll of clerical office employees.

Clerical office employees are those employees who work in an area which is physically separated by walls, floors or partitions from all other work areas of the insured and whose duties are strictly limited to keeping the insured's books or records or conducting correspondence, including any other employees engaged in clerical work in the same area.

(6) The payroll of salespersons, collectors or messengers who work principally away from the insured's premises. Salespersons, collectors or messengers are those employees engaged principally in any such duties away from the premises of the employer.

This term does not apply to any employee whose duties include the delivery of any merchandise handled, treated or sold.

(7) The payroll of drivers and their helpers if their principal duties are to work on or in connection with automobiles.

(8) The payroll of aircraft pilots or co-pilots if their principal duties are to work on or in connection with aircraft in either capacity; and

(9) The payroll of draftsmen if their duties are limited to office work only and who are engaged strictly as draftsmen in a manner that they are not exposed to the operative hazards of the business. The payroll of those draftsmen in such a manner that they are not exposed to the operative hazards of the business. The payroll of these draftsmen shall be assigned to the classification "Draftsmen" – Code 91805.

d.   Overtime

(1) Definition:

Overtime means those hours worked for which there is an increase in the rate of pay:

(a) For work in any day or in any week in excess of the number of hours normally worked; or

(b) For hours worked in excess of 8 hours in any day or 40 hours in any week; or

(c) For work on Saturday, Sundays or Holidays.

In the case of guaranteed wage agreements, overtime means only those hours worked in excess of the number specified in such agreement.

(2) Exclusion of Overtime payroll:

The extra pay for overtime shall be excluded from the "payroll" on which premium is computed as indicated in (a) or (b), provided the insured's books and records are maintained to show overtime pay separately by employee and in summary by classification.

(a) If the records show separately the extra pay earned for overtime, the entire extra pay shall be excluded.

(b) If the records show the total pay earned for overtime (regular pay plus overtime pay) in one combined amount, 1/3 of this total pay shall be excluded. If double time is paid for overtime and the total pay for such overtime is recorded separately, 1/2 of the total pay for double time shall be excluded.

---

Exclusion of overtime pay does not apply to payroll assigned to the "Stevedoring" classifications.

3.   When premium is calculated on the basis of "Total Cost", it is understood and agreed "Total Cost" is defined as:

The total cost of all work let or sublet, which is paid during the audit period, including:

(a) The cost of all labor, materials and equipment furnished, used or delivered for use in the execution of the work; however, do not include the cost of finished equipment installed but not furnished by the subcontractor if the subcontractor does no other work on or in connection with such equipment; and

(b) All fees, bonuses or commissions.

4.   When premium is calculated on the basis of "Units," it is understood and agreed "Units" is defined as:

A single room or group of rooms intended for occupancy during the audit period as separate living quarters by a family, by a group of unrelated persons living together, or by a person living alone.

5.   When premium is calculated on the basis of "Admissions," it is understood and agreed "Admissions" is defined as:

The total number of persons, other than employees of the Named Insured, admitted to the event insured or to events conducted on the premises during the audit period, whether on paid admissions, tickets, complimentary tickets or passes.

All other terms and conditions of this policy shall remain unchanged.

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

Policy Number:

Named Insured:

Endorsement Effective Date

---

IL 00 21 09 08

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
## (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

1.   The insurance does not apply:

A.   Under any Liability Coverage, to "bodily injury" or "property damage";

(1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B.   Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

C.   Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

(1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

(2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

(3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2.   As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "special nuclear material" or "by-product material".

## First Specialty Insurance Corporation

### AMENDMENT OF CONDITIONS

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
PRODUCTS COMPLETED OPERATIONS COVERAGE FORM
LIQUOR LIABILITY COVERAGE FORM

All Coverage Forms attached to this policy are amended to include the following:

I. **AMENDMENT OF CONDITIONS**

A. Section IV, **Commercial General Liability Conditions**, paragraph 5. **Premium Audit**, and Section IV, **Products/Completed Operations Liability Conditions**, paragraph 5. **Premium Audit** and Section IV, **Liquor Liability Conditions**, paragraph 5. **Premium Audit** (as applicable) are deleted and replaced by the following:

5. **Premium Audit, Minimum Earned Premium**

   a. We will compute all premiums for this Coverage Part in accordance with the terms and conditions of this policy.

   b. Premium shown in this policy is a Deposit Premium only. At the close of each audit period, we will compute the earned premium for that period and send notice to the first Named Insured. Audit premiums are due and payable upon notice to the first Named Insured. Any return premium shall be subject to the Minimum and Minimum Earned Premiums described in this condition.

   c. The Minimum Premium is shown on the Common Policy Declarations of this policy. The premium retained by us will be the greater of the Minimum Premium or earned premium. The Minimum Premium is subject to short rate or pro rata adjustment.

   d. This policy is also subject to a Minimum Earned Premium, calculated as a percentage of the Deposit Premium. The Minimum Earned Premium percentage is shown on the Common Policy declarations. Such Minimum Earned Premium is not subject to pro rata or short rate adjustment. In the event of cancellation by you we shall retain no less than the Minimum Earned Premium regardless of the policy term. Cancellation of this policy for non-payment of premium shall be deemed a request by you for cancellation of this policy.

   e. The first Named Insured must keep records of the information we need for premium computation and send us copies at such times as we may request. You must cooperate with us in our audit of the premium due that we conduct at the end of each audit period. As part of your cooperation you will provide information and documentation requested by our auditors. If your failure to cooperate with our audit in a timely manner results in our inability to determine the actual exposures during the audit period, we may assess an estimated audited earned premium that will be no less than 125% of your deposit premium.

B. Section IV, Conditions, paragraph 9. When We Do Not Renew, is deleted in its entirety.

II. **ADDITIONAL CONDITIONS**

The following condition is added to Section IV, Commercial General Liability Conditions, Section IV, **Products/Completed Operations Liability Conditions** and Section IV, Liquor Liability Conditions (as applicable) of the Coverage Form attached to this policy:

**Premium Financing/Cancellation of Financed Policy**

a. When we become aware that you financed all or part of this policy's premium, regardless of whether or not we receive a notice of premium financing, we will not be bound, as respects coverage we provide, by the terms of your finance agreement. This policy alone governs coverage.

b. When you sign a premium finance agreement, by the terms of the agreement, you may be giving the premium finance company the right, under certain conditions, to cancel this policy on your behalf. When we receive notice of cancellation from the finance company, we will recognize their request for termination of this insurance as though it was your request and we will pay any return premium due. In the absence of statutes to the contrary, nonpayment to a premium finance company shall be considered the same as if the first Named Insured cancelled the policy. The return premium will be calculated on a pro rata basis. Any requested termination date set by the premium finance company that conflicts with other policy provisions or the operation of law, is subject to both the policy provisions and applicable law. You must resolve any resulting premium difference directly with the finance company.

All other terms and conditions of this policy shall remain unchanged.

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

Policy Number:

Named Insured:

Endorsement Effective Date:

## First Specialty Insurance Corporation

### BASES OF PREMIUM CLARIFICATION ENDORSEMENT

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
PRODUCTS COMPLETED OPERATIONS LIABILITY COVERAGE FORM
LIQUOR LIABILITY COVERAGE FORM

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS, Paragraph 5, SECTION IV – PRODUCTS/COMPLETED OPERATIONS LIABILITY CONDITIONS, Paragraph 5 and SECTION IV – LIQUOR LIABILITY CONDITIONS, Paragraph 5** are modified by the addition of the following:

The earned premium for your policy is calculated on the basis of one or more factors that are identified as the Premium Basis in the Coverage Part Declarations.

1. When the Premium Basis is identified as "gross sales," the following applies to that portion of your premium that is calculated upon "gross sales."

   a. It is understood and agreed "gross sales" is defined and calculated as follows:

      (1) Definition

         "Gross sales" is the gross amount charged by the named insured, concessionaires of the named insured or by others trading under the insured's name for:

         (a) All goods or products, sold or distributed;

         (b) Operations performed; and

         (c) Rentals; and

         (d) Dues or fees.

      (2) The following items shall not be deducted from "gross sales."

         (a) Foreign exchange discounts;

         (b) Freight allowance to customers;

         (c) Total sales of consigned goods and warehouse receipts;

         (d) Trade or cash discounts;

         (e) Bad debts; and

         (f) Repossession of items sold on installments (amount actually collected)

      (3) The following items shall be deducted from "gross sales:"

         (a) Sales or excise taxes which are collected and submitted to a governmental division;

         (b) Credits for repossessed merchandise and products returned. Allowances for damaged and spoiled goods;

         (c) Finance charges for items sold on installments;

         (d) Freight charges commensurate with the cost of shipping if charged as a separate item on the customers invoice;

         (e) Royalty income from patent rights or copyrights which are not product sales; and

         (f) Rental receipts for products liability coverage only.

      b. Recognition of "gross sales"

         For purposes of determining when a sale took place in order to be part of the "gross sales," the sale will be considered to have occurred at the time when the insured recognizes the revenue in its accounting records, whether it is recognized when payment is received or when the revenue is earned.

2. When the Premium Basis is identified as "payroll," the following applies to that portion of your premium that is calculated upon "payroll."

   a. Definitions:

      (1) "Payroll" means remuneration paid during the audit period.

      (2) Remuneration means money or substitutes for money.

   b. Inclusions:

      "Payroll" includes the following items:

      (1) Commissions;

      (2) Bonuses;

      (3) Extra pay for overtime work, except as provided in paragraph 4;

      (4) Pay for holidays, vacations or periods of sickness;

      (5) Payment by an employer of amounts otherwise required by law to be paid by employees to statutory insurance or pension plans, such as the Federal Social Security Act;

      (6) Payment to employees on any basis other than time worked, such as piecework, profit sharing or incentive plans;

      (7) Payment or allowance for hand tools or power tools used by hand provided by employees and used in their work or operations for the insured;

      (8) The rental value of an apartment or a house provided for an employee based on comparable accommodations;

      (9) The value of lodging, other than an apartment or house, received by employees as part of their pay, to the extent shown in the insured records;

*First Specialty Insurance Corporation*

This insurance is issued pursuant to the Florida Surplus Lines laws. Persons insured by surplus lines carriers do not have the protection of the Florida Insurance Guaranty Act to the extent of any right of recovery for the obligation of an insolvent unlicensed insurer.

FSMSG FL 0611 Page 1 of 1

---

*First Specialty Insurance Corporation*

SERVICE OF SUIT CLAUSE ENDORSEMENT

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

Service of process in any lawsuit, or mandated alternative dispute resolution (ADR) proceeding instituted against the Company may be made upon:

General Counsel
First Specialty Insurance Corporation
5200 Metcalf
Overland Park, Kansas 66201

The above party is authorized and directed to accept service of process on behalf of the Company in any suit or ADR proceeding, and or, upon the request of the insured, agrees to give a written undertaking to the insured that he will enter a general appearance upon the Company's behalf should a lawsuit, or ADR proceeding be instituted.

Further, pursuant to any law of any state, the District of Columbia, territory, or protectorette of the United States which makes provision therefore, the Company hereby designates the Superintendent, Commissioner, Director of Insurance, deputy, or department employee specified as attorney or agent for receipt of lawful service of process or ADR proceeding, in the law, instituted by or on behalf of the insured or any beneficiary within this contract, the above is hereby authorized as the company's designee upon whom the service of process may be served.

Nothing contained herein shall limit or enlarge the right to serve any process, notice or demand upon the company in any other manner permitted or required by law.

All other terms and conditions of this policy shall remain unchanged.

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

Policy Number:

Named Insured:

Endorsement Effective Date:

FSIC 3371 0611 Page 1 of 1

---

IL 00 17 11 98

## COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. Inspections And Surveys**

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**E. Premiums**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

**F. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without your written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

IL 00 17 11 98    Copyright, Insurance Services Office, Inc., 1998    Page 1 of 1    □

---

*First Specialty Insurance Corporation*

COMMERCIAL GENERAL LIABILITY COVERAGE PART
DECLARATIONS

POLICY NO: IRG15203-1

NAMED INSURED: Countrywide Power Sweeping, Inc., et al

LIMITS OF INSURANCE:

| | |
|---|---|
| GENERAL AGGREGATE LIMIT (Other Than Products/Completed Operations) | $2,000,000 |
| PRODUCTS - COMPLETED OPERATIONS AGGREGATE LIMIT | $2,000,000 |
| PERSONAL & ADVERTISING INJURY LIMIT | $1,000,000 |
| EACH OCCURRENCE LIMIT | $1,000,000 |
| DAMAGE TO PREMISES RENTED TO YOU LIMIT | $50,000 |
| MEDICAL EXPENSE LIMIT - Any One Person | $5,000 |
| OTHER - | $N/A |
| OTHER - | $N/A |

☒ DEDUCTIBLE    ☐ SELF-INSURED RETENTION    applicable to:

☒ Defense and Loss    ☐ Loss Only

$5,000    ☒ per claim    ☐ per occurrence    $N/A    annual aggregate

RETROACTIVE DATE (CG 00 02 only)

COVERAGE A and B of this insurance do not apply to "bodily injury" or "property damage," "personal and advertising injury" which occurred before the Retroactive Date, if any, shown below.

Retroactive Date:    None    (Enter Date or "None" if no Retroactive Date applies.)

Extended Reporting Period Charge:  N/A    For N/A -year period.

| Classification | Code No. | Exposure Basis | Estimated Exposure | Rate | Deposit Premium |
|---|---|---|---|---|---|
| Cleaning Services | 90816 | Per $1,000 of Gross Sales | $7,000,000 | $12.00 | $84,000 |

Premium Subject to Audit    ☒ Yes    ☐ No

Frequency of Audit    ☒ Annual    ☐ Quarterly    ☐ Monthly

THESE DECLARATIONS ARE PART OF THE COMMON POLICY DECLARATIONS
CONTAINING THE NAMED INSURED AND THE POLICY PERIOD

SP 3 550 0711    Page 1 of 1

Corporate Solutions

Swiss Re

July 27, 2012

First Specialty Insurance Corporation
5200 Metcalf Avenue
Overland Park, KS 66202
USA
Phone 913 676 5200
www.swissre.com/corporate_solutions

Mary Henke
International Placement Services, A Division of
Breckenridge Ins. Services
3870 S Lindberg, Suite 100
St. Louis, MO   63127

RE:    Countryside Power Sweeping, Inc., etal
Policy Number:    IRG15263-1
Commission:    15 %

Dear Mary,

Attached is the policy for the above referenced insured.  Please forward it to the insured and keep a copy for your file.

**Please remember to stamp the Declarations Page of the policy with the appropriate Surplus Lines warning language or complete the applicable surplus lines requirements for insured's state of domicile.**

If you have questions regarding the policy please contact the Underwriting Administrator, Sally Gustafson at (816) 926-0610. We appreciate the opportunity to be of service.

Sincerely,

Underwriting Services

attachment

03/12

---

**First Specialty Insurance Corporation**

Policy Number   IRG5263-1
Renewal of Number   IRG5263

COMMON POLICY DECLARATIONS

Administrative Address: 5200 Metcalf, Overland Park, KS 66202
Domiciliary Address: 233 East High Street, Jefferson City, MO 65102

| Item 1. Named Insured and Mailing Address | Agent Name and Address |
|---|---|
| Countryside Power Sweeping, Inc., etal 3317 W. Villanova Court Beverly Hills, FL   34465 | International Placement Services, A Division of Breckenridge Ins Services 3870 S Lindberg, Suite 100 St. Louis, MO   63127 |

Item 2.  Policy Period:  From:  July 21, 2012                      To: July 21, 2013
at 12:01 A.M. Standard Time at your mailing address shown above

Item 3.  Business Description:  Cleaning Services

Form of Business    Corporation

Item 4.  In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

This policy consists of the following coverage parts for which a premium is indicated.  Where no premium is shown, there is no coverage.  This premium may be subject to adjustment.

| Coverage Part(s) | Premium |
|---|---|
| Commercial Property Coverage Part | N/A |
| Commercial General Liability Coverage Part | $84,660 |
| Commercial Crime Coverage Part | N/A |
| Commercial Inland Marine Coverage Part | N/A |
| Commercial Auto (Business or Truckers) Coverage Part | N/A |
| Liquor Liability Coverage Form | N/A |
| Garage Coverage Form | N/A |

|  |  |
|---|---|
| | Total Deposit Premium    $84,660 |
| Minimum Earned Premium *= 25 % | Minimum Premium    $75,000 |

Item 5.  Forms and Endorsements

Form(s) and Endorsement(s) made a part of this policy at time of issue:  See Schedule of Forms and Endorsements

THIS COMMON POLICY DECLARATION AND THE SUPPLEMENTAL DECLARATION(S), TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART(S), COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, COMPLETE THE ABOVE NUMBERED POLICY

SP 2 207 0711                                                                                    Page 1 of 1

---

**First Specialty Insurance Corporation**

Policy Number   IRG15263-1

SCHEDULE OF FORMS AND ENDORSEMENTS

| Named Insured | Countryside Power Sweeping, Inc., etal | Effective Date: | July 21, 2012 12:01 A.M., Standard Time |
|---|---|---|---|
| Agent Name | International Placement Services, A Division of Breckenridge Ins. Services | Agent No. | 73828 |

| Policy Form Description | Form Number | Edition Date |
|---|---|---|
| Common Policy Declarations | SP 2 2 07 | 07-11 |
| Schedule Of Forms And Endorsements – FSIC | SP 2 174 | 06-11 |
| Claim Reporting Procedures | SP 3 291 | 06-11 |
| Warning Language | FSMSG–FL | 06-11 |
| Service Of Suit Clause Endorsement | FSIC 3371 | 06-11 |
| Common Policy Conditions | IL 00 17 | 11-98 |
| Comm General Liability Coverage Part Declarations | SP 3 550 | 07-11 |
| Amendment Of Policy Conditions | SP 4 546 | 06-11 |
| Bases Of Premium Clarification Endorsement | SP 4 547 | 06-11 |
| Nuclear Energy Liability Exclusion Endorsement | IL 00 21 | 09-08 |
| Total Lead Exclusion | SP 4 040 | 06-11 |
| Asbestos Exclusion | SP 3 549 | 06-11 |
| Fungi Or Bacteria Exclusion (CGL) | CG 21 67 | 12-04 |
| Silica Or Silica-Related Dust Exclusion (CGL) | CG 21 96 | 03-05 |
| Acts Of Discrimination Exclusion | SP 3 559 | 06-11 |
| International Trade Controls | SP 5 400 | 11-11 |
| Signature Endorsement – FSIC | SP 3 695 | 06-11 |
| Commercial General Liability Coverage Form - Occurrence | CG 00 01 | 12-07 |
| Total Pollution Exclusion Endorsement | CG 21 49 | 09-09 |
| Employment-Related Practices Exclusion – CGL | CG 21 47 | 12-07 |
| Deductible Endorsement | FSIC 33544 | 06-11 |
| Exclusion Of Certified Acts Of Terrorism | CG 21 73 | 01-08 |
| Total Exclusion Of Other Than Certified Acts Of Terrorism | SP 4 145 | 06-11 |
| Additional Insured – Lessors Of Leased Equipment – Automatic Status | CG 20 34 | 07-04 |
| When Required In Lease Agreement With You | | |
| Additional Insured–Owners, Lessees Or Contractors – Automatic Status | CG 20 33 | 07-04 |
| When Required In Construction Agreement With You | | |
| Additional Insured – Owners, Lessees Or Contractors – Completed Operations | CG 20 37 | 07-04 |
| Amendment-Aggregate Limits Of Insurance (Per Project-With Policy Cap) | SP 2 389 | 06-11 |
| Cross Suits Liability Exclusion | FSIC 3392 | 06-11 |
| Exclusion - Contractors Professional Liability | CG 22 79 | 07-98 |
| Exclusion-Designated Operations Covered By A Consolidated (Wrap Up) Insurance Program | CG 21 54 | 01-96 |
| Exclusion - Engineers, Architects Or Surveyors Professional Liability | CG 22 43 | 07-98 |
| Independent Contractor Restriction-Broad Form | SP 3 408 | 06-11 |
| Named Insured Endorsement | FSIC 3367 | 06-11 |
| Primary And Non-Contributing Insurance (Third Party) | FSIC 33513 | 06-11 |
| Waiver Of Transfer Of Rights Of Recovery Against Others To Us | CG 24 04 | 05-09 |

SP 2 174 0611                                                                Page 1 of 1

---

**First Specialty Insurance Corporation**

CLAIMS REPORTING PROCEDURES

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

In the event of a claim or potential claim, please immediately complete and forward a First Notice of Loss on an ACORD Loss Form, along with a copy of the Policy Declarations Page and any policy-specific, unnumbered endorsements to one of the following addresses:

| By Mail: | E&S Casualty Claims, P.O. Box 2976, Overland Park, Kansas 66201 |
|---|---|
| By Fax: | Send to the attention of E&S Casualty Claims at (866) 487-8755 |
| By e-mail: | ES_CasualtyClaims@SwissRe.com |
| By Special Delivery (Fed Ex, UPS): | E&S Casualty Claims 5200 Metcalf Overland Park, Kansas 66202 |

All other terms and conditions of this policy shall remain unchanged.

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

Policy Number:

Named Insured:

Endorsement Effective Date:

SP 3 291 0611                                                                Page 1 of 1

BRCOSA000467

Email Date: 24.Apr.2013 09:36 CET                          Page 1 of 1

| FROM: | Satender Singh/External |
|---|---|
| TO: | Claims Backfile/SwissRe@RCOMINT |
| CC: | Michael Mullen/SwissRe@RCOMINT |
| Subject: | Auto indexing- Policy |

---

Claim No: 020130005760
Claim Subject: Policy
Document Type: 53
Legacy System Id: 10
Line of Business: 3
Transaction Type: 1

PolicyRIRG000097201.pdf

Email Date: 24.Apr.2013 15:18 CET                          Page 1 of 1

| FROM: | Pushpender Goyat/External |
|---|---|
| TO: | Claims Backfile/SwissRe@RCOMINT |
| CC: | Tricia Miles/SwissRe@RCOMINT |
| Subject: | Auto Indexing Policy |

---

Claim No: 020130005498
Claim Subject: Policy
Document Type: 53
Legacy System Id: 10
Line of Business: 3
Transaction Type: 1



Policy.pdf

Pushpender Goyat | Process Developer | Direct Claims
For & on behalf of Swiss Re America Holding Corporation & Affiliates | Unicraud, Building No. 4n1. OLF Ltd. SEZ, BluAhore, Gurgaon
Haryana 122002, India
Direct: +91 124 492 1098 Mobile: +91 7016791623 E-mail: pushpender_goyat@rcomext.com

http://www.swissre.com

Please consider the environment - do you really need to print this email?

---

From:       Julie_Mohling@swissre.com
Sent:       08.08.2012 15.33.39
To:         CI_SpecialtyPIF@swissre.com
CC:
Subject:    Fw: Countryside Power Sweeping, Inc., etal    IRG15263-1

E45
Policy Number:  IRG15263-1
Please PIF as Policy.
Effective Date:  7/31/12
Subject: 12/13 Policy
Underwriter:  Resman

Julie Mohling, AINS | Underwriting Assistant | Corporate Solutions
Swiss Re America Holding Corporation | 5200 Metcalf Ave, Overland
Park, KS 66202, USA
Direct: +1 913 676 5607 Fax: +1 913 676 6916 or 800 303 8415 E-mail:
Julie_Mohling@swissre.com

http://www.swissre.com

Please consider the environment - do you really need to print this
email?

----- Forwarded by Julie Mohling/SwissRe on 08/08/2012 03:32 PM -----
From:       Julie Mohling/SwissRe
To:         mhenke@ipsico.com
Date:       08/08/2012 03:32 PM
Subject:    Countryside Power Sweeping, Inc., etal    IRG15263-1

Dear Mary,

Attached is the new business/renewal policy for the above referenced
insured. If you have questions or concerns, please contact the
underwriting administrator referenced in the policy cover letter. We
appreciate your business.

Regards,

Julie Mohling

Julie Mohling, AINS | Underwriting Assistant | Corporate Solutions
Swiss Re America Holding Corporation| 5200 Metcalf Ave, Overland
Park, KS 66202, USA
Direct: +1 913 676 5607 Fax: +1 913 676 6916 or 800 303 8415 E-mail:
Julie_Mohling@swissre.com

http://www.swissre.com

Please consider the environment - do you really need to print this
email?

- IRG15263-1.pdf

BRCOSA000468