



**COURT REPORTING**

**LEGAL VIDEOGRAPHY**

**VIDEOCONFERENCING**

**TRIAL PRESENTATION**

**MOCK JURY SERVICES**

**LEGAL TRANSCRIPTION**

**COPYING AND SCANNING**

**LANGUAGE INTERPRETERS**



**(800) 528-3335**

**NAEGELIUSA.COM**

                IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
                    FT. LAUDERDALE DIVISION

CHARLES ACKLEY,

          Plaintiff,                    

vs.                                     No. 22-cv-60377

CONTINENTAL CASUALTY
COMPANY,

          Defendant.
_____




                          VIDEOTAPED DEPOSITION OF

                   CONTINENTAL CASUALTY COMPANY
                   30(B)(6) - KATIE LYNN GALL
                                     VOLUME 1


                                    TAKEN ON
                       TUESDAY, MARCH 7, 2023
                                 10:10 A.M.


                  8745 WEST HIGGINS ROAD, SUITE 110
                         CHICAGO, ILLINOIS 60631

EXHIBIT "A"

```
 1                        APPEARANCES:

 2

 3   On behalf of the Plaintiff:

 4   RICHARD M. BENRUBI, ESQUIRE

 5   BENRUBI, LAW, P.A., by

 6   6501 Congress Avenue, Suite 118

 7   Boca Raton, FL  33487

 8   (561) 910-8650

 9   rbenrubi@benrubilaw.com

10

11   On behalf of the Defendant:

12   LAURA BESVINICK, ESQUIRE

13   STROOCK & STROOCK & LAVAN, LLP, by

14   200 So. Biscayne Boulevard, Suite 3100

15   Miami, FL  33131

16   (212) 806-5400

17   lbesvinick@stroock.com

18

19   ALSO PRESENT:

20   Mr. Christopher Khaler

21

22

23

24

25
```

1                              INDEX

2                                                          Page

3

4  EXAMINATION BY MR. BENRUBI                              6

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT "A"

```
 1                        EXHIBITS

 2    Exhibit                                    Page

 3

 4      1        REPORT                          21

 5

 6      2        NOTICE                          34

 7

 8      3        DOCUMENTS LIST                  37

 9

10      4        TIMELINE                        38

11

12      5        COMPLAINT                       39

13

14      6        CLAIM                           53

15

16      7        INDICATORS                      69

17

18      8        TRANSCRIPT                      105

19

20      9        GUIDE                           119

21

22     10        CLAIM E2906093                  135

23

24

25
```



1              VIDEOTAPED DEPOSITION OF

2          CONTINENTAL CASUALTY COMPANY

3            30(B)(6) - KATIE LYNN GALL

4                    VOLUME 1

5                    TAKEN ON

6              TUESDAY, MARCH 7, 2023

7                   10:10 A.M.

8

9              **THE VIDEOGRAPHER:**  Okay.  We are on the

10   record.  The time is 10:10 a.m.  The date is March

11   7th, 2023.

12            This is the beginning of the deposition of

13   Katie Gall.  The case caption is "Charles Ackley

14   verse Continental Casualty

15   Company."

16            Will counsel introduce yourselves and

17   state whom you represent.

18            **MR. BENRUBI:**  Yes.  Thank you, and good

19   morning.

20            Rick Benrubi for Charles Ackley.

21            **MS. BESVINICK:**  Laura Besvinick on behalf

22   of Continental Casualty Company.

23            **THE VIDEOGRAPHER:**  The court reporter will

24   now swear in the witness.

25            **(Witness sworn.)**



NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM
EXHIBIT "A"

1    **KATIE LYNN GALL,** called as a witness herein, having

2    been first duly sworn, was examined and testified as

3    follows:

4    **EXAMINATION**

5    **BY MR. BENRUBI:**

6        Q.    Good morning.  Your full name, please.

7        A.    Katie Lynn Gall.

8        Q.    And your date of birth?

9        A.    7-15-1972.

10       Q.    Where were you born?

11       A.    Illinois.

12       Q.    Have you always lived in Illinois?

13       A.    No.

14       Q.    Okay.  Where else have you lived?

15       A.    Wisconsin.

16       Q.    Okay.  Where do you currently reside?

17       A.    Wisconsin.

18       Q.    What city?

19       A.    Twin Lakes.

20       Q.    And are you married?

21       A.    Yes.

22       Q.    Your husband's name, please.

23       A.    Matthew.

24       Q.    Who are you currently employed by?

25       A.    Continental Casualty Company.

NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM
EXHIBIT "A"

1    Q.    And where do you work -- where do you

2  report to work on a daily basis?

3    A.    Chicago, Illinois.

4    Q.    So you commute?

5    A.    I do.

6    Q.    How long is your commute, just curious?

7    A.    An hour and 30 minutes.

8    Q.    Okay.  And you've been employed by

9  Continental Casualty Company since when?

10    A.    November 2016.

11    Q.    Your educational background, please.

12    A.    I have an associate's degree in criminal

13  justice; graduated high school.

14    Q.    And what year did you obtain the

15  associate's degree?

16    A.    1994, if I'm recalling correctly.

17    Q.    Any other education beyond that?

18    A.    Yes.

19    Q.    What kind?

20    A.    Professional development throughout my

21  entire career since I started in this industry, so

22  --

23    Q.    Okay.

24    A.    -- all sorts of resources within the

25  industry.

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
EXHIBIT "A"
(800)528-3335
NAEGELIUSA.COM

```
 1        Q.    When you say "this industry," what are you
 2   referring to?
 3        A.    The insurance industry.
 4        Q.    Have you been in the insurance industry
 5   your entire adult working life?
 6        A.    No, I have not.
 7        Q.    Okay.  What did you do before that?
 8        A.    I was a police officer.
 9        Q.    Okay.  From when to when?
10        A.    1996 to 1999.
11        Q.    With what department?
12        A.    City of Warrenville in the state of
13   Illinois.
14        Q.    And tell us your duties as a police
15   officer for those three years.
16        A.    I was uniformed patrol.
17        Q.    Okay.  Were you ever a detective?
18        A.    No, I was not.
19        Q.    And you left there in 1999?
20        A.    I did.
21        Q.    Why did you leave?
22        A.    I obtained a -- employment with -- in the
23   insurance industry.
24        Q.    With who?
25        A.    The Hartford.
```

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT "A"

1    Q.   Located where?

2    A.   At the time, Naperville, Illinois.

3    Q.   And you were with Hartford for how long?

4    A.   Approximately a year and a half.

5    Q.   Okay.  What position did you have?

6    A.   Special investigations.

7    Q.   Did you seek a job in special

8  investigations in the insurance industry as a result

9  of your experience as a police officer?

10   A.   Partly, yes.

11   Q.   What is the other part?

12   A.   I became a mother.

13   Q.   Okay.  And when did you -- you left

14 Hartford after about a year and a half.  Why?

15   A.   I was able to excel in my profession and

16 got promoted into a management role at Founders

17 Insurance in Chicago, Illinois.

18   Q.   All right.  So you left Hartford for a

19 management position with Founders?

20   A.   Correct.

21   Q.   What was the management title?

22   A.   Special investigations unit manager.

23   Q.   From what year to what year?

24   A.   It would have been...

25   Q.   2000 or 2001?

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
EXHIBIT "A"
(800)528-3335
NAEGELIUSA.COM

1    A.   2000 to approximately 2003, early 2004.

2    **Q.   Okay.  And tell us what you did during**

3 **your tenure with Founders.**

4    A.   I had management oversight of the

5 investigators that were reporting to the special

6 investigations unit.

7    **Q.   What type of claims were being reported?**

8    A.   Auto, auto property damage, auto bodily

9 injury, auto theft.  It was a high-risk auto

10 carrier.

11    **Q.   Okay.  Okay.  Where did you go next?**

12    A.   Zurich North America.

13    **Q.   Your title?**

14    A.   When I was hired, my title was special

15 investigations major case investigator.

16    **Q.   And when you left?**

17    A.   My title was special investigations

18 interim assistant vice president.

19    **Q.   When did you start, and when did you**

20 **leave?**

21    A.   Well, I went directly from Founders, so

22 2000...

23    **Q.   Three?**

24    A.   2003/2004 all the way until November of

25 2016 when I went to Continental Casualty.

NAEGELI

DEPOSITION & TRIAL

(800)528-3335

NAEGELIUSA.COM

EXHIBIT "A"

1    Q.    Okay.  And what was your title when you

2    started with Continental Casualty?

3    A.    SIU major case investigator.

4    Q.    And your duties as an SIU major case

5    investigator?

6    A.    Conduct investigations into suspect claim

7    matters on a systemic -- as a whole -- company as a

8    whole, multiple suspect issues over multiple claims,

9    service provider investigations.

10    Q.    And you did that until what year?

11    A.    It was less than a year.

12    Q.    Okay.

13    A.    Was promoted to special investigations

14    unit director, which is the current position that I

15    hold.

16    Q.    And what are your job duties as the SIU

17    director?

18    A.    Oversight of a team of investigators that

19    handle day-to-day suspect claim investigations.

20         I also have oversight of our compliance

21    within the special investigations unit, oversight of

22    training, content development and delivery.

23    Q.    Anything else?

24    A.    Oversight of our analytical tools.

25    Q.    Okay.

```
 1        A.    And ad hoc as my assistant vice president

 2   needs.

 3        Q.    Who is the AVP?

 4        A.    Steven Piper.

 5        Q.    Did you have an AVP back in 2016?

 6        A.    Yes.

 7        Q.    Who was that?

 8        A.    Tim -- which I believe his full name is

 9   Timothy -- Wolfe with an E.

10        Q.    Do you have a license to adjust claims?

11        A.    I do not.

12        Q.    Do you have any licenses that are

13   pertinent to your job as an SIU investigator or

14   director?

15        A.    There are no requirements to have any

16   licenses.

17        Q.    Okay.  Do you have any certifications or,

18   you know, some of those fancy letters after your

19   name?

20        A.    I do.

21        Q.    What do you have?

22        A.    CIFI.

23        Q.    CIFI.

24        A.    Certified Insurance Fraud Investigator.

25        Q.    Okay.  When did you obtain that?
```

1    A.    I -- I don't recall.  It's a biannual

2    recertification.  I don't recall when I initially

3    obtained it.

4    **Q.    Okay.  And what is the purpose of that**

5    **credential?**

6    A.    Continuing professional education.

7    **Q.    Okay.  What else?**

8    A.    FCLS, Fraud Claim Law Specialist.

9    **Q.    And when did you obtain that?**

10   A.    I don't recall.

11   **Q.    Okay.  Prior to joining CNA?**

12   A.    Yes.

13   **Q.    Same with the CIFI?**

14   A.    CIFI was obtained during my employment

15   with CNA.

16   **Q.    Okay.  And what's the purpose of the fraud**

17   **claim law specialist certification designation?**

18   A.    Professional education.

19   **Q.    Okay.  And what type of things do they**

20   **teach you?**

21   A.    There are multiple modules of topics

22   within the course that took seven months to

23   complete, so there's seven different modules.

24   **Q.    Okay.**

25   A.    Anything ranging from fraud law, claim

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT "A"

1   law, claim handling principles, compliance -- I

2   don't recall them all specifically, but those would

3   be the main --

4        Q.   Okay.

5        A.   -- ones.

6        Q.   **And when you say "fraud law," are you**

7   **talking about the different state statutes that have**

8   **fraud laws?**

9        A.   It would include that.

10       Q.   Okay.

11       A.   It would also include appropriate

12   processes and procedures for properly investigating

13   suspect claim.

14       Q.   **Were you educated on case law -- do you**

15   **know what "case law" is?**

16       A.   I do.

17       Q.   **Okay.  Were you educated on case law**

18   **through your training?**

19       A.   There would be some notations about case

20   law.  I don't remember specifically.

21       Q.   **Okay.  Are you familiar with a phrase**

22   **called "fraud on the Court"?**

23       A.   No, I'm not.

24       Q.   **You've never heard that before?**

25       A.   No, I have not.


NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
EXHIBIT "A"
(800)528-3335
NAEGELIUSA.COM

1    Q.   And I'm talking about as it pertains to a

2    civil lawsuit like Mr. Ackley's?

3    A.   Can you repeat the request?

4    Q.   Yes.  Are you familiar with the case law

5    pertaining to fraud on the Court in civil actions?

6    A.   Not that verbiage, no.

7    Q.   What --

8    A.   Not the -- not the way that you -- and you

9    presented it a different way in the second question.

10   I am not familiar with fraud on the Court.  I'm --

11   I'm not familiar with that.

12   Q.   Okay.  You're familiar with the criminal

13   statutes?

14   A.   I am.

15   Q.   Okay.  What other designations or

16   certifications?

17   A.   PCLS, Property Claim Law Specialist.

18   Q.   And do you recall when you obtained that?

19   A.   That would have been during my employment

20   at Zurich.  Exact year I don't recall.

21   Q.   Okay.  And what's the function of that

22   designation?

23   A.   Professional education.

24   Q.   In what respect?

25   A.   It's specific to property, property --

1    commercial property, personal lines property, and

2    processes for managing, evaluating, investigating

3    property claims.

4        Q.   Okay.  So although you don't adjust

5    claims, as a licensed adjuster, you -- you have had

6    education and training about how to adjust bodily

7    injury claims?

8        A.   Correct.

9        Q.   Any others?

10       A.   No.

11       Q.   Okay.  And in all this education you've

12   had, was any of it specific to the state of Florida?

13       A.   Those designations and that education

14   isn't specific to one state.

15       Q.   Okay.

16       A.   It is focused on the entirety of all of

17   the states.

18       Q.   Okay.  Have you ever received Florida-

19   specific training?

20       A.   I'm not sure I understand what you mean.

21       Q.   As far as the criminal statutes in

22   Florida, the case law in Florida pertaining to

23   fraud, the -- the bad-faith statutes, claims-

24   handling statutes?

25       A.   I'm familiar with the statutes that is

1  presented to me during my normal, ongoing

2  professional development.  I haven't taken a

3  specific course designated for Florida.

4       **Q.   Okay.**

5       A.   And only Florida.

6       **Q.   Okay.  Do you know if Florida has a**

7  **statute that gives a cause of action for civil**

8  **remedies against an insurer?**

9       A.   I don't know specifically.  I can't recite

10 the statute.

11      **Q.   Do you know if Florida has a statute**

12 **pertaining to suspected insurance fraud?**

13      A.   Yes.

14      **Q.   Okay.  How did you come to know about that**

15 **statute?**

16      A.   During my training and my education.

17      **Q.   Okay.  And so it was Florida-specific as**

18 **far as that statute's concerned?**

19      A.   Part of the training and education through

20 -- whether it was the CIFI, PCLS, FCLS, or ongoing

21 annual antifraud training, which covers any and all

22 of the states, I can't point to specifically which

23 one it would have been, but we are trained during --

24 for all -- all potential suspect criminal statutes

25 that are related to insurance fraud.

1    Q.    You mentioned compliance.  What does that

2    involve?

3    A.    I have oversight of ensuring annually our

4    antifraud plans and compliance reporting for each

5    appropriate jurisdiction is filed completely and

6    timely.

7    Q.    Okay.  And in Florida what do you require

8    to report to the authorities?

9    A.    An antifraud plan in addition to annual

10   fraud reporting, which would include our metrics

11   with regards to how many claims we -- we investigate

12   and how many claims we would refer to the Department

13   of Insurance based on our regulatory obligations.

14   Q.    All right.  The metrics you mentioned,

15   number of claims investigated, number of referrals

16   to the authorities, correct?

17   A.    Correct.

18   Q.    Do you have metrics on the outcome of

19   those referrals?

20   A.    We do not keep that information.

21   Q.    You don't keep information regarding the

22   disposition of a referral to the authorities?

23   A.    Only when it's reported to us.

24   Q.    Okay.  Do you keep metrics on anything

25   else that you report to the state?



NAEGELI  (800)528-3335
DEPOSITION & TRIAL  NAEGELIUSA.COM

```
 1              MS. BESVINICK:  Can you provide a time

 2     frame for your question?

 3              MR. BENRUBI:  Well, since her -- you know,

 4     she only knows since 2016 forward, so it would be

 5     that time frame.

 6              MS. BESVINICK:  Okay.  Well, then I --

 7              I think it's outside the scope because the

 8     Court has limited the question to the 2012 to 2014

 9     time frame for these purposes, so we would object.

10     I don't -- I don't want to -- if it's just

11     background questions --

12              MR. BENRUBI:  It's just background

13     information.

14              MS. BESVINICK:  That's fine.

15              You can answer.

16         A.   There's more, but without being able to

17     look at the report, I -- I don't memorize all of the

18     -- the data fields that have to be completed.

19     BY MR. BENRUBI:

20         Q.   Okay.

21         A.   I would need to look at a -- an annual

22     report to --

23         Q.   Okay.

24         A.   -- recollect my memory.

25         Q.   Is there a name to the report other than
```



1  annual report?

2      A.   The antifraud annual report.

3      Q.   Okay.  Do you happen to know if those

4  statutory requirements about reporting go back to

5  the 2012/2014 time frame?

6      A.   I do.

7      Q.   Okay.  What do you know?

8      A.   That an insurance carrier is obligated to

9  report to the Department of Insurance in the state

10 of Florida when there is a -- the potential for a

11 suspect insurance claim that has been submitted.

12     Q.   Okay.

13     A.   Or presented to that carrier.

14     Q.   Did you review any of Continental

15 Casualty's antifraud annual reports for 2012 to

16 2014?

17     A.   Yes.

18     Q.   When did you review that?

19     A.   During my preposition -- my preparation

20 for this dis- -- the deposition, excuse me.

21     Q.   Okay.  And --

22          MR. BENRUBI:  There's so many documents.

23 That wasn't produced to us, right?

24          MS. BESVINICK:  Sure it was.

25          MR. BENRUBI:  Was it?

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT "A"

1          **MS. BESVINICK:**  Absolutely.

2           **MR. BENRUBI:**  The -- the antifraud plan...

3          **MS. BESVINICK:**  The reports are on the

4   list of documents, and we produced them to you

5   pursuant to the Court's order.

6          **MR. BENRUBI:**  Are you referring to these?

7          **MS. BESVINICK:**  Yes.

8          **MR. BENRUBI:**  Okay.  We'll go ahead and

9   mark those then.

10          All right.  I'm gonna mark these as

11   composite Exhibit 1.

12          **(Exhibit 1 was marked for identification.)**

13          **MS. BESVINICK:**  I'm just -- I'm just

14   noting, for the record, that, unfortunately, the way

15   these were copied, the Bates numbers are cut off.

16          **MR. BENRUBI:**  I know.  I -- I do have

17   them, though.

18          **MS. BESVINICK:**  Okay.  Good.

19          **MR. BENRUBI:**  I have them written down.

20          **MS. BESVINICK:**  Okay.  Do you have a copy

21   so -- for me to look on while the witness is

22   testifying?

23          **MR. BENRUBI:**  I don't.  I didn't have

24   enough baggage, but I could give you the

25   Bates number, and you could look it right up.

```
 1              MS. BESVINICK:  Well, actually, I don't

 2   have that ability with me.  So if we get to other

 3   documents that -- maybe to break and make copies, so

 4   -- but I don't need to see these.

 5              And -- but if you could put the

 6   Bates numbers and --

 7              MR. BENRUBI:  Yes.

 8              MS. BESVINICK:  -- and identify them --

 9              MR. BENRUBI:  Yes.

10              MS. BESVINICK:  -- for the record so it's

11   on the...

12              MR. BENRUBI:  I absolutely will.

13              MS. BESVINICK:  (Continuing) ...record.

14              MR. BENRUBI:  Okay.  The documents go from

15   18041 to 18046.

16   BY MR. BENRUBI:

17       Q.   Do you recognize those documents Miss

18   Gall?

19       A.   I do.

20       Q.   Okay.  What are they?

21       A.   They appear to be a printout from the

22   website of the Department of Insurance for the state

23   of Florida identifying multiple underwriting

24   companies associated to CNA.

25       Q.   Okay.
```



NAEGELI
DEPOSITION & TRIAL
CELEBRATING
40
YEARS
THIS IS BUSINESS

EXHIBIT "A"

(800)528-3335
NAEGELIUSA.COM

```
 1        A.     And then it appears to be our files for

 2   our antifraud report annual reporting.  I do not

 3   know what years these are from 'cause it does not

 4   show.  So I don't -- that's -- the only thing that I

 5   -- I can't state is what years these were reported

 6   'cause they don't say what they -- what years they

 7   were reported.

 8        Q.     When you were referring to antifraud

 9   annual reports, are these the documents you were

10   referring to?

11        A.     Yes.

12        Q.     Okay.  And so they would be on this list

13   of documents you reviewed?

14             MS. BESVINICK:  And, for the record, that

15   list was prepared not by Miss Gall.  It was prepared

16   by us, but, yes, they should be on that list.

17             MR. BENRUBI:  Okay.  Yeah, the -- okay.

18   BY MR. BENRUBI:

19        Q.     This is the 2013 report, the one that has

20   a 40 here, where it says "Claimant Referrals"

21   instead of 19.

22        A.     Okay.  I see that.

23        Q.     Okay.  All right.  So at the top it says:

24   Company List.  And, like you said, it has six

25   different underwriters that are part of the CNA
```

 1  umbrella of insurance companies?

 2          MS. BESVINICK:  Object to form.

 3          You can answer.

 4      A.   It appears to be that way, yes.

 5  BY MR. BENRUBI:

 6      Q.   Okay.  And what company is doing the

 7  reporting to the state?

 8      A.   Yeah.  I'm sorry.  Can you repeat that?

 9      Q.   What company is doing the reporting to the

10  state of Florida?

11      A.   CNA.

12      Q.   Okay.  You're employed by Continental

13  Casualty Company?

14      A.   Correct.

15      Q.   That's who you get your paycheck from?

16      A.   Correct.

17      Q.   Okay.  And does Continental Casualty

18  Company handle claims for National Fire Insurance

19  Company of Hartford?

20      A.   Yes.

21      Q.   Does Continental Casualty Company handle

22  and adjust claims for the other underwriters listed

23  on this company list?

24      A.   Yes.

25      Q.   The folks in the SIU department, who are

```
 1  they employed by?

 2       A.   Continental Casualty Company.

 3       Q.   And is the SIU function across this entire

 4  list of underwriters?

 5       A.   Yes.

 6       Q.   And is the SIU department nationally

 7  based?

 8            MS. BESVINICK:  Object to form.

 9            MR. BENRUBI:  I'll rephrase it.

10  BY MR. BENRUBI:

11       Q.   Does the SIU department handle claims

12  nationwide for -- for this group of companies?

13       A.   Yes.

14       Q.   Okay.  Do you have any regional SIU

15  offices?

16       A.   SIU doesn't have offices.

17       Q.   Okay.

18       A.   Our staff are placed throughout the entire

19  continental United States.

20       Q.   Okay.  The department, though, is

21  headquartered in Chicago?

22       A.   SIU doesn't consider a headquarters.

23  Again, our staff is placed throughout the entire

24  continental United States.  My office is in Chicago.

25  I'm housed in Chicago.  I have staff that are
```

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

EXHIBIT "A"

1  throughout the entire country.

2      Q.    Okay.  How large is your staff, by the

3  way?

4      A.    Currently?

5      Q.    Sure.

6      A.    18.

7      Q.    Okay.  Do you know if that's an increase

8  or a decrease from the 2012 to 2014 time period?

9      A.    I do not know what the number of employees

10  were within the special investigations unit from

11  2012 to 2014 were.

12      Q.    All right.  Under "Filing ID," which says

13  302661, it says, "Claimant Losses" and then

14  "Claimant Recoveries," and there's numbers next to

15  those.

16      A.    Yes, I see that.

17      Q.    What do those numbers represent?

18      A.    I don't know specifically without being

19  able to refer to the state's website.  They

20  typically have definitions for what those categories

21  mean.  With the document showing just plain numbers,

22  I -- I can't speculate.  I don't know what that

23  definition would be.

24      Q.    Okay.  Did you do any research to find

25  out?

1      A.    No, I did not.

2      Q.    **The column to the right, is that supposed**

3   **to be a dollar figure, or do you have any idea what**

4   **it represents?**

5      A.    I don't know.

6      Q.    **Okay.  Same with claimant recoveries?**

7      A.    I do not know.

8      Q.    **All right.  How about claimant referrals,**

9   **40?  What does that represent?**

10     A.    That would be the total number of

11  regulatory referrals that the SIU would have made to

12  the Department of Insurance in the state of Florida.

13     Q.    **And there's various adjectives here:**

14  **Employer referrals, claimant referrals.**

15           **What is a "claimant referral"?**

16     A.    It would be a regulatory referral to the

17  state of Florida, the department of insurance,

18  identifying a suspect insurance claim related to an

19  individual related to that claim, involved in that

20  claim.

21     Q.    **Okay.  The document indicates that**

22  **sometimes CNA uses a third-party administrator for**

23  **this purpose.**

24           **MS. BESVINICK:**  Object to form.

25  BY MR. BENRUBI:

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT "A"

1    Q.   (As read:)   CNA also utilizes a number of

2    TPAs for claims adjusting.   The number of losses,

3    recoveries, and referrals for CNA's TPAs are

4    reported separately by the investigative companies

5    that are utilized; do you see that, where I read

6    from that?

7    A.   I do see that, yes.

8    Q.   Are you aware of any referrals made by the

9    TPAs on behalf of CNA in 2013?

10   A.   I am not aware.

11   Q.   All right.   Then there's a section:

12   Evaluation and Training.   CNA requires that all

13   employees successfully complete CNA's antifraud

14   basics online training course.

15           My question is:   Did that course exist

16   prior to 2016?

17   A.   Yes, it did.

18   Q.   Did it exist in 2012 to 2014?

19   A.   Yes, it did.

20   Q.   Is that something proprietary to CNA?

21   A.   We utilized an outside training company to

22   provide that training during that time frame 2012 to

23   2014.

24   Q.   What company was that?

25   A.   NATG.

NAEGELI
DEPOSITION & TRIAL
EXHIBIT A
(800)528-3335
NAEGELIUSA.COM

1      Q.   NATG?

2      A.   Correct.

3      Q.   **What does that stand for?**

4      A.   I believe it is the National Association

5   Training Group.  If I'm recalling correctly, that's

6   what the acronym stands for.

7      Q.   **Okay.**

8           **MS. BESVINICK:**  And just one correction,

9   my understanding is it's National

10  American --

11          **THE WITNESS:**  American --

12          **MS. BESVINICK:**  -- Training Group.

13          **THE WITNESS:**  -- Training Group.

14          Okay.  Thank you.

15          **MS. BESVINICK:**  It's hard with acronyms.

16  **BY MR. BENRUBI:**

17     Q.   **Do you still have access to that online**

18  **training course?**

19     A.   No.

20     Q.   **Where would one obtain access to that?**

21     A.   Through NATG.

22     Q.   **And that -- that training course was for**

23  **all employees.  And then it also says:  All integral**

24  **antifraud personnel are also required to complete**

25  **CNA's online training course, "Discovering**

1    Deception," correct?

2         A.    That is what the document states, correct.

3         Q.    Okay.  Was that also provided by NATG?

4         A.    I don't recall.

5         Q.    Do you have access to that training?

6         A.    I don't know.

7         Q.    All right.  Who are integral anti- --

8    integral antifraud personnel?

9         A.    Any employee that has a work process that

10   would involve claim handling, handling tasks or work

11   processes within a claim.  It can range across

12   multiple business units and if they have a work

13   process where they are exposed to potentially

14   identifying any suspect indicators within a claim

15   file, within claim documents, within underwriting

16   files, within policy applications or any other

17   information, documentation related to claims and

18   policies presented to the company.

19        Q.    And does CNA maintain a log -- an

20   electronic log of all training completed by its

21   employees?

22        A.    Yes.

23        Q.    Did that date back to 2012?

24        A.    Yes.

25        Q.    Okay.  Are you part of any trade

1    organizations?

2         A.    Yes.

3         Q.    **Which ones?**

4         A.    The International Association of Special

5    Investigations Unit.  The acronym is IA --

6         Q.    **SIU.**

7         A.    -- SIU, both the international chapter and

8    our local Illinois chapter.

9         Q.    **Is SIU a member of the Coalition Against**

10   **Insurance Fraud?**

11        A.    No.

12        Q.    **Were they ever?**

13        A.    No, it doesn't work that way.

14        Q.    **Okay.**

15        A.    Continental Casualty Company is a member

16   of the coalition.

17        Q.    **Okay.  Is there an -- is there individual**

18   **membership in that organization?**

19        A.    To the coalition?

20        Q.    **Yes.**

21        A.    No.

22        Q.    **All right.  Any others?**

23        A.    Are you asking for me personally --

24        Q.    **Individually, yes.**

25        A.    -- individually?

1      Q.   Yeah.

2      A.   No.

3      Q.   Okay.  All right.  Does Continental

4  Casualty have any board member with the Coalition

5  Against Insurance Fraud?

6      A.   Currently or from 2012 to 2014?

7      Q.   2012 to 2014?

8      A.   I do not know.

9      Q.   Okay.  Have you ever been on the board?

10     A.   Of the coalition?  No, I have not.

11     Q.   All right.  On the bottom of the second

12  page is a description of the number and types of

13  employees with CNA -- with Continental's fraud unit;

14  is that correct?

15          MS. BESVINICK:  Object to form.  It's a

16  composite document, so can you indicate which one

17  you're looking at?

18          MR. BENRUBI:  Just the one we've been

19  looking at the entire time.

20  BY MR. BENRUBI:

21     Q.   Underneath "Customer Education

22  Description," the box that has a blank.

23     A.   Okay.  I see that, what you pointed to.

24     Q.   Okay.  In 2012 -- in 2013 there was an

25  assistant vice president, correct?

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT "A"

1      A.   That's what the document states.

2      **Q.   Okay.  And who was that?**

3      A.   I believe it was Tim Wolfe.

4      **Q.   Okay.  Three managers?**

5      A.   That's what the document states, yes.

6      **Q.   Okay.  Who were they?**

7      A.   I do not know their names.

8      **Q.   Okay.  Eight fraud case managers.**

9           **Do you know any of their names?**

10     A.   Not all of them.

11     **Q.   I believe they might be -- well, we'll get**

12 **to that.**

13          **Five major case investigators?**

14     A.   That's what the document states.

15     **Q.   One of the fraud case managers has an**

16 **office in Orlando.  Do you know who that was?**

17     A.   I do not know who that was.

18     **Q.   All right.  And then under "Organization**

19 **Description"...**

20     A.   On the next page?

21     **Q.   Yeah.**

22     A.   Okay.

23     **Q.   And if you go one, two, three, four, five,**

24 **six lines from the bottom...**

25     A.   Can you recite the -- like the line so --

1    Q.    Yeah.

2    A.    -- I can relate it to this document?

3    Q.    (As read:)  Special investigations involve

4    the application of techniques and resources to

5    resolve fraud issues, and then the results are used

6    to decide which course of action is warranted. These

7    actions may include claim payment, claim mitigation,

8    claim denial, law enforcement referral, coverage

9    termination or the pursuit of restitution; did I

10    read that correctly?

11    A.    Yes.

12    Q.    Okay.  And that was part of CNA's

13    antifraud plan back in 2013?  Continental?

14    A.    Correct.

15    Q.    Okay.

16        MR. BENRUBI:  I'm going to mark as

17    Plaintiff's No. 2 the notice of taking deposition

18    today.

19        (Exhibit 2 was marked for identification.)

20    BY MR. BENRUBI:

21    Q.    I just -- when I hand you a document, I

22    don't want to presume that you've read it or are

23    going to read it, so if you'd just let me know when

24    you're ready for my questions.

25    A.    I'm ready.

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT "A"

1      Q.   Okay.  Do you recognize that document?

2      A.   I do.

3      Q.   It's the notice for your deposition today?

4      A.   Correct.

5      Q.   And you've seen that before, correct?

6      A.   Yes.

7      Q.   And there's 26 topics that we asked the

8   corporate representative to testify about today?

9      A.   Correct.

10      Q.   And other than No. 26, for which

11   Continental has objected, are you prepared to

12   testify as the person with the most knowledge

13   regarding these 25 topics?

14      A.   Yes.

15           MS. BESVINICK:  And the only caveat is

16   that Ms. Gall is being submitted as the corporate

17   representative on these topics.

18           There is no dispute about that.  There may

19   be other people who are no longer with the company

20   that may have more knowledge with respect to certain

21   topics; but, for purposes of today, for purpose of

22   the representation of Continental Casualty, Ms. Gall

23   is your witness.

24   BY MR. BENRUBI:

25      Q.   Okay.  So if there's any topics where you

 1  feel like somebody else other than you might have

 2  more knowledge, I ask that you please tell me that.

 3  Okay?

 4      A.   Sure.

 5      Q.   And have you ever testified as a corporate

 6  representative before?

 7      A.   I don't recall if it was a corporate

 8  representative, but I have been deposed previous in

 9  the state of California.

10      Q.   Okay.  Was that the only time you've given

11  a deposition?

12      A.   Correct.

13      Q.   When was that?

14      A.   Hmm.  That would have been during my

15  employment at Zurich North America.

16      Q.   Okay.

17      A.   I don't recall a specific date or a year.

18      Q.   Have you ever testified in a court of law?

19      A.   Yes.

20      Q.   How many times?

21      A.   Less than five.

22      Q.   Any with your employment with Continental?

23      A.   No, with my employment with the City of

24  Warrenville as a police officer.

25      Q.   Okay.  And you understand that the answers



NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

 1  that you give today are on behalf of Continental

 2  Casualty and will bind them to your answers?

 3       A.   Yes.

 4       Q.   You reviewed certain documents to prepare

 5  for today's deposition?

 6       A.   I did.

 7            MR. BENRUBI:  I'm going to mark as

 8  Exhibit 3...

 9            (Exhibit 3 was marked for identification.)

10            THE WITNESS:  Okay.  I've reviewed the

11  document.

12  BY MR. BENRUBI:

13       Q.   Okay.  And is that an accurate list of the

14  documents you reviewed in preparation for the

15  deposition?

16       A.   It appears to be.

17       Q.   Okay.  And that wasn't prepared by you, it

18  was prepared by counsel, correct?

19       A.   Correct.

20       Q.   Okay.  When did your review occur?

21       A.   Over the past couple weeks, numerous days,

22  many hours.

23       Q.   How many hours do you think you spent

24  preparing approximately?

25       A.   Approximately 20.



1    Q.   And did you meet with counsel?

2    A.   I did.

3    Q.   How many hours did you meet with counsel?

4    A.   Approximately 15.

5    Q.   And when did that occur?

6    A.   Over the past few weeks.

7    Q.   What was the most recent time?

8    A.   Yesterday.

9    Q.   And how long did you meet yesterday?

10   A.   Just over an hour.

11   Q.   Did you meet the day before yesterday?

12   A.   Today is Tuesday.

13   Q.   It would have been a Sunday.

14   A.   No, I did not.

15   Q.   All right.

16        MR. BENRUBI:   And I'm going to mark as

17   Exhibit 4, and it's titled:   Ackley Timeline.

18        (Exhibit 4 was marked for identification.)

19   BY MR. BENRUBI:

20   Q.   Is that a document you prepared?

21   A.   No.

22   Q.   Counsel?

23   A.   Counsel prepared it.

24   Q.   And did your document review help to

25   refresh your recollection about this case?

```
 1        A.   Yes.

 2        Q.   Okay.

 3             MR. BENRUBI:  Where's 1 and 2?

 4             MS. BESVINICK:  You took them.

 5             MR. BENRUBI:  Right in front of me.

 6   BY MR. BENRUBI:

 7        Q.   Okay.  You understand that we are here

 8   today about the case of Charles Ackley versus

 9   Continental Insurance Company?

10             MS. BESVINICK:  Objection to form.

11        A.   Yes, I do understand that.

12             MS. BESVINICK:  Can I help you?

13             MR. BENRUBI:  I'm looking for my...

14             (Brief pause.)

15             MS. BESVINICK:  Counsel.

16             MR. BENRUBI:  Thanks.

17             (Exhibit 5 was marked for identification.)

18   BY MR. BENRUBI:

19        Q.   I'm handing you Exhibit 5, Plaintiff's

20   Exhibit 5.  Let me know when you're ready.

21             MS. BESVINICK:  I'm just gonna object.

22             Exhibit 5 is incomplete.

23             But you can go ahead and review it.

24             THE WITNESS:  Okay.

25             MR. BENRUBI:  Because the exhibits aren't
```



```
 1  attached?

 2          MS. BESVINICK:  Correct.

 3          (Reporter clarification.)

 4          MR. BENRUBI:  Because the exhibits are not

 5  attached?

 6          MS. BESVINICK:  That is correct.

 7  BY MR. BENRUBI:

 8      Q.   Okay.  Have you seen that before?

 9      A.   Yes.

10      Q.   When did you see it?

11      A.   While preparing for today.

12      Q.   Okay.  How long ago?

13      A.   Within the last couple weeks.

14      Q.   Okay.  And you understand that Mr. Ackley

15  is suing Continental under four causes of action:

16  Malicious prosecution, intentional affliction of

17  emotional distress, abuse of process, and violation

18  of Florida Statute 817.234?

19      A.   I am aware.

20      Q.   Okay.  Having reviewed the documents that

21  you reviewed regarding the case, looking back in

22  retrospect, was it a mistake for Continental to

23  report Mr. Ackley to the department of insurance

24  Fraud?

25      A.   No.
```

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

EXHIBIT "A"

1      Q.    Okay.    Why not?

2      A.    Continental Casualty Company has a

3   requirement based on the state of Florida -- the

4   state of Florida's jurisdiction.    We have an

5   obligation to report suspect insurance fraud.    We

6   met that obligation when submitting the referral to

7   the DOI in the state of Florida.

8      **Q.    When you say you have an "obligation," do**

9   **you have an obligation to report every case of**

10  **suspected insurance fraud?**

11     A.    We have an obligation to determine, on a

12  case-by-case basis, on its own merits for each

13  claim, the evidence that's obtained, the information

14  within the claim, the allegations, and we make a

15  determination, based on their own merits, as to

16  whether or not it fits our obligation in -- based on

17  the state of Florida's statute.

18     **Q.    Did you have any involvement in adjusting**

19  **Mr. Ackley's claim?**

20     A.    I do not adjust claims, no.

21     **Q.    Did you have any involvement in the**

22  **decision to report Mr. Ackley to the authorities for**

23  **suspected insurance fraud?**

24     A.    No, I did not.

25     **Q.    Did you have any involvement in Mr.**



1  Ackley's claim whatsoever from beginning to end?

2      A.   I did in an oversight manner.  As the SIU

3  director at the time, one of my employees was the

4  point of contact.

5      Q.   Was that Mr. Bryant?

6      A.   No, it was not.

7      Q.   Who was it?

8      A.   Marty Callahan.

9      Q.   Okay.  He took over for Mr. Bryant?

10     A.   No, he did not.

11     Q.   Okay.  Were you involved in any decisions

12  whether or not to continue to prosecute -- strike

13  that.

14          Were you involved in any of the decisions

15  whether or not to cooperate with the state of

16  Florida in continuing the prosecution of Mr. Ackley?

17          MS. BESVINICK:  Object to form.

18     A.   Continental Casualty does not have any

19  authority to make decisions regarding prosecutions

20  in the state of Florida, so, no.

21  BY MR. BENRUBI:

22     Q.   Well, at some point Continental decided

23  that it didn't -- wouldn't any longer cooperate with

24  the authorities in the criminal prosecution, isn't

25  that true?

NAEGELI
DEPOSITION & TRIAL
CELEBRATING
40
YEARS IN BUSINESS
EXHIBIT "A"
(800)528-3335
NAEGELIUSA.COM

1        A.    That is not true.

2        **Q.    Okay.    Why is that not true?**

3        A.    We cooperated with meeting our obligation

4    to report the suspec- -- the suspected insurance

5    claim based on the regulations.

6              We had oversight of any information that

7    was relayed back to us from -- whether it was the

8    DOI or Broward County or the detectives, and we

9    cooperated with their requests.  And we did not

10   voluntary -- voluntarily provide any attorney-client

11   privileged documentation or communication, so if...

12       **Q.    Were the charges against Mr. Ackley**

13   **dropped by the State of Florida?**

14       A.    I believe they were nolle prossed.

15       **Q.    Okay.  Which means what?**

16       A.    They didn't continue on with the criminal

17   case.

18       **Q.    And did they tell as -- did they tell**

19   **Continental why?**

20       A.    From my recollection, reading through the

21   documents, they nolle prossed due to their

22   explanation of not being able to have certain

23   documentation that they were requesting, that we

24   wouldn't release based on the attorney-client

25   privilege.

```
 1        Q.   Okay.  And the case was nolle prossed

 2   because the State said that they couldn't prove the

 3   case without the cooperating victim, didn't they?

 4             MS. BESVINICK:  Object to form.

 5        A.   Again, as I just stated, it's my

 6   understanding that they nolle prossed because they

 7   were requesting documentation that we deemed

 8   attorney-client privilege, and we wouldn't release

 9   it.

10   BY MR. BENRUBI:

11        Q.   And the State told you that we can't prove

12   the charges without your cooperation, didn't they?

13             MS. BESVINICK:  Object to form.

14   BY MR. BENRUBI:

15        Q.   You can answer.

16        A.   Specifically that, I imagine that is what

17   they stated.  I mean, again, I -- you know, I don't

18   know how else you want me to answer it.  We didn't

19   provide them with attorney-client privilege

20   information, and they did not go forward with the

21   criminal case.

22        Q.   Were you involved with any discussions

23   with the assistant state attorney about the charges

24   being dropped?

25        A.   I was not.
```



**NAEGELI**
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT "A"

1      Q.    Was anybody from Continental?

2      A.    Not that I recall, no.

3      Q.    Okay.  How about a lawyer named DeeDee

4  Scheller from Kubicki & Draper?  Do you know who she

5  is?

6      A.    I think -- through some of the

7  documentation, I'd have to look through some of that

8  to recall specifically.

9      Q.    Is it true that Continental is a wholly-

10  owned subsidiary of CNA Financial Corporation?

11      A.    Yes.

12      Q.    Is it true that National Fire Insurance

13  Company of Hartford is a wholly-owned subsidiary of

14  Continental?

15      A.    Yes.

16      Q.    Now, let's talk about the underlying

17  bodily injury claim.

18           Do you recall the date of loss was

19  September 24, 2012?

20           MS. BESVINICK:  May the witness refer to

21  the timeline --

22           MR. BENRUBI:  Of course.

23           MS. BESVINICK:  -- for dates?

24      A.    Can you repeat the date, please.

25  BY MR. BENRUBI:

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

EXHIBIT "A"

(800)528-3335
NAEGELIUSA.COM

1      Q.   September 24th, 2012.

2      A.   Yes, that's correct.

3      Q.   And CNA insured Equity One or IRT

4  Holdings?

5      A.   I believe it was -- National Fire was the

6  underwriting company.

7      Q.   Okay.  All right.  But Continental

8  adjusted the claim on National Fire's behalf?

9      A.   Continental Casualty Company, yes,

10 adjusted the claim.

11     Q.   Okay.  Okay.  And the ins- -- National

12 Fire's insured here was the owner of the property

13 where Mr. Ackley tripped and fell on September 24,

14 2012?

15     A.   To my recollection, yes.

16     Q.   Okay.  Is there any dispute that he

17 tripped and fell over the mailboxes on that

18 property?

19     A.   There is no dispute.

20     Q.   Okay.  Was there ever a dispute?

21     A.   No.

22     Q.   And CNA, I believe, insured Equity One for

23 a million dollars in liability coverage?

24     A.   National Fire --

25     Q.   Yes, thank you.

1    A.    -- insured Equity One.

2    Q.    **And Mr. Ackley, through counsel, asserted**

3  **a bodily injury claim against National Fire's**

4  **insured Equity One?**

5    A.    Correct.

6    Q.    **What were the procedures, back in 2012 to**

7  **2014, for an adjuster to evaluate a bodily injury**

8  **claim such as Mr. Ackley's?**

9    A.    They would make contact with our insured

10  to obtain the facts of the incident...

11    Q.    **Mm-hmm.**

12    A.    (Continuing) ...understand anybody that

13  was involved, obtain information, and start to

14  evaluate the exposure, make contact with the third-

15  party, obtain basic information, request information

16  about what happened, request that individual provide

17  a statement, a statement of incident, statement of

18  injuries, provide information relative to medical

19  providers, treatment; and then, during the normal

20  course of the claim file, would evaluate injuries;

21  continued -- you know, continued conversation with

22  the insured and obtain as much information to make a

23  decision for a claim resolution.

24    Q.    **So, basically, investigate, evaluate, and**

25  **settle, if possible?**

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

EXHIBIT "A"

(800)528-3335
NAEGELIUSA.COM

```
 1        A.    Yes.

 2        Q.    Okay.  Do you have an understanding of

 3   what an insurer's good-faith duties are when

 4   processing an insurance claim in the state of

 5   Florida?

 6            MS. BESVINICK:  Objection to form, and

 7   this is outside the scope of the deposition notice.

 8            MR. BENRUBI:  You think it is?

 9            MS. BESVINICK:  Yes, I do.  This is not a

10   bad-faith case.  There's nothing on there about --

11            MR. BENRUBI:  Well, part of the defense is

12   that Continental didn't act in bad faith, so...

13            MS. BESVINICK:  Two different kinds of

14   things --

15            MR. BENRUBI:  Well --

16            MS. BESVINICK:  -- claims handling and bad

17   faith --

18            MR. BENRUBI:  That's according --

19            MS. BESVINICK:  -- the statute and issue

20   --

21            MR. BENRUBI:  That's according to you, not

22   according to me, so...

23            MS. BESVINICK:  It's a different statute.

24   And you're not asking about bad faith.  You're

25   asking about insurer's duties regarding claims
```

```
 1  handling.

 2          MR. BENRUBI:  That is bad faith.  If you

 3  let me continue, please.

 4  BY MR. BENRUBI:

 5      Q.   Can you answer the question?

 6          MS. BESVINICK:  Can we hear the question

 7  back.

 8          (Record read as requested.)

 9          MS. BESVINICK:  And we'll object it's

10  outside the scope, but you can go ahead and answer.

11          MR. BENRUBI:  Okay.

12      A.   Yes, I do have an understanding.

13  BY MR. BENRUBI:

14      Q.   Okay.  Just tell us your understanding,

15  not from a legal perspective but from your

16  perspective.

17      A.   Obtain information --

18      Q.   Mm-hmm.

19      A.   -- necessary to evaluate and make the

20  appropriate claim decision.

21          (Reporter clarification.)

22          THE WITNESS:  Yes.

23  BY MR. BENRUBI:

24      Q.   All right.  So an investigation of a

25  claim, does that involve investigating coverage,
```

1    liability, and damages?

2        A.    It can.

3        Q.    Okay.  Did it in Mr. Ackley's claim?

4        A.    Yes.

5        Q.    Okay.  And when we speak of coverage, the

6    issue is whether or not the insurance policy issued

7    by National Fire to Equity One covered the incident

8    that was being alleged by Mr. Ackley, correct?

9        A.    That would be a part of it.

10       Q.    Okay.  And was there coverage?

11       A.    Yes, there was.

12       Q.    And it was determined from the outset that

13   coverage was in place, correct?

14       A.    Yes, that's correct.

15       Q.    Okay.  And did -- well, strike that.

16             Was liability investigated?

17       A.    Yes, it was.

18       Q.    Okay.  What's your understanding about how

19   the accident occurred?

20       A.    Mr. Ackley was walking on our insured's

21   property and tripped and fell.

22       Q.    Okay.  Tripped and fell over what?

23       A.    There allegedly was a piece of metal that

24   was left behind from a prior mailbox that was in --

25   in the cement, like cemented in, that was removed.

```
 1        Q.    And was it the insured that removed that

 2  mailbox, or was it somebody else?

 3        A.    It was somebody else, not the insured.

 4        Q.    Who was that?

 5        A.    I would have to recall some documents to

 6  -- for the name, the specific name of the general

 7  contractor that was doing work on our insured's

 8  property.

 9        Q.    Okay.  And did you -- strike that.

10              Did the investigation determine whether

11  there were any eyewitnesses to the fall?

12        A.    Yes.

13        Q.    Okay.  Please elaborate on that.

14              MS. BESVINICK:   Object to form.

15  BY MR. BENRUBI:

16        Q.    Who was the eyewitness?

17        A.    There was an individual that was working

18  at a hair salon that was in the vicinity of where

19  Mr. Ackley fell.

20        Q.    Okay.  And was any information obtained

21  from that person?

22        A.    Yes.

23        Q.    What information?

24        A.    That this individual spoke with Mr.

25  Ackley, that she found out that he had tripped and
```

NAEGELI
DEPOSITION & TRIAL

EXHIBIT "A"

(800)528-3335
NAEGELIUSA.COM

```
 1  fell.  And she had stated that she saw -- I don't
 2  know specifically if it was called metal brackets,
 3  but there was some type of metal left behind from
 4  the old mailboxes.
 5       Q.   Did she provide any information about the
 6  notice issue, how long --
 7            MS. BESVINICK:  Object to form.
 8  BY MR. BENRUBI:
 9       Q.   How long the condition had been like that?
10       A.   Can you -- can you rephrase that?
11       Q.   The salon employee, did she --
12       A.   Correct.
13       Q.   -- did she provide any information
14  regarding how long this condition was on the
15  property?
16       A.   I don't recall.
17       Q.   Okay.  In a trip-and-fall you want to
18  investigate whether the insured had notice of the
19  dangerous condition, correct?
20       A.   Correct.
21       Q.   Okay.  Did Equity One have notice of the
22  dangerous condition in this case?
23            MS. BESVINICK:  Object to form.
24       A.   No.
25  BY MR. BENRUBI:
```

1      Q.    They didn't?

2      A.    Not at the time that Mr. Ackley allegedly

3  fell.

4      Q.    Okay.

5           MS. BESVINICK:  Can you just tell me which

6  version this is?

7           MR. BENRUBI:  I think the Bates numbers

8  are on there.

9           MS. BESVINICK:  No, but is it the first --

10          MR. BENRUBI:  It's the supplemental --

11          MS. BESVINICK:  -- version or the second?

12          MR. BENRUBI:  It's a supplemental

13  production.

14          MS. BESVINICK:  Okay.  I just wanted to be

15  sure because I don't have the Bates numbers

16  memorized --

17          MR. BENRUBI:  Yeah.

18          MS. BESVINICK:  -- that's all.  Oh, and

19  they've been put into -- I see.  I see how this

20  goes.  One second.

21          (Brief pause.)

22          MS. BESVINICK:  Okay.  So this goes up

23  through August of 2014?  Okay.

24          MR. BENRUBI:  Thank you.

25          (Exhibit 6 was marked for identification.)

NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM
EXHIBIT "A"

BY MR. BENRUBI:

    Q.   I'm gonna show you what's been marked as composite Exhibit 6.

    A.   Okay.

    Q.   Do you recognize what that is?

    A.   Yes.

    Q.   What is it?

    A.   Printout of our claim file notes -- or a portion of the claim file notes --

    Q.   Okay.

    A.   -- if I'm seeing the times -- the dates correctly.

    Q.   And do all the adjusters, supervisors, employees involved in a claim have access to those notes?

    A.   Yes.

    Q.   So they can input their own notes and also see what other activity there was in the file --

        (Reporter clarification.)

BY MR. BENRUBI:

    Q.   So they can input their own notes and also see what activity has been occurring on the file?

    A.   Yes.

    Q.   Okay.  If you would go -- and these are in reverse chronological order, so they start closer to

 1  the date of the accident in the back.

 2        A.   Okay.

 3        Q.   And we have Bates numbers on the bottom

 4  right.  It says 15301.

 5             MS. BESVINICK:  Can you provide the date,

 6  Counsel?

 7             MR. BENRUBI:  Yes.  3 -- I'm sorry, 2-22-

 8  13.

 9  BY MR. BENRUBI:

10        Q.   Go ahead and take as long as you need to

11  read that note.

12        A.   There's two notes on this page, so I'm

13  looking at 15301 Bates number.  So there --

14        Q.   Yeah, the one at 2:34 p.m.

15        A.   Okay.  So 2-22-2013...

16        Q.   Yes.

17        A.   (Continuing) ...2:34 p.m. okay.

18             (Witness peruses document.)

19        A.   I read the note.

20  BY MR. BENRUBI:

21        Q.   Does that refresh your recollection as to

22  whether or not the salon employee gave Continental

23  information about how long the condition had been

24  present on the property?

25        A.   She does state to this individual that did



1  the inspection she does not remember how long the

2  bracket was exposed.  So, technically, yes, she told

3  them that she didn't know how long the bracket was

4  exposed.

5       Q.   Well, Mr. Carr wrote:  She would not give

6  her name, but she recalled the exposed bracket and

7  thought -- and though she that can't say how long

8  the bracket was exposed, she remembered thinking

9  that someone was going to get hurt, correct?

10      A.   That's what it states, yes.

11      Q.   All right.  And then, if you go to the

12  next page, 15300?

13      A.   Okay.

14      Q.   There's a note by Alan Carr that says:

15  Liability evaluation?

16      A.   Yes, March 8, 2013, 1:58 p.m., correct.

17      Q.   Okay.  And this note was not redacted for

18  any privilege, correct?

19      A.   No, it wasn't.

20      Q.   Okay.  And it contains Mr. Carr's thoughts

21  about liability of the insured?

22      A.   I'm sorry.  Can you repeat that.

23      Q.   This note contains Mr. Carr's thoughts

24  regarding liability of the insured?

25      A.   Are you asking me if --

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS
THIS IS BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT "A"

1    **Q.    Yes.**

2    A.    -- that's what the note contains?

3    **Q.    Yes.  I could add "correct," I'm sorry.**

4    **Correct?**

5    A.    Okay.

6         **MS. BESVINICK:**  And just to -- to -- one

7    caveat, just for the record, 'cause you noted that

8    it had not been redacted...

9         **MR. BENRUBI:**  Yeah.

10        **MS. BESVINICK:**  (Continuing) ...is that,

11   obviously, there was a Court order issued regarding

12   the production of information, not attorney-client

13   but with respect to opinion and work product...

14        **MR. BENRUBI:**  Yes.

15        **MS. BESVINICK:**  (Continuing) ...so we're

16   -- obviously documents were produced to you pursuant

17   to Court order.  So I don't know if this is -- why

18   that was provided, but --

19        **MR. BENRUBI:**  Okay.

20        **MS. BESVINICK:**  -- just for the record.

21   So I'm not objecting to her answering the question

22   if the witness knows the answer.

23        **MR. BENRUBI:**  Okay.

24   **BY MR. BENRUBI:**

25        **Q.    By March 8, 2013 did Mr. Carr determine**

 1  that liability would be adverse to the insured,

 2  Equity One?

 3       A.   Based on this file note?

 4       Q.   Yes.

 5       A.   Yes, but we were never disputing

 6  liability.

 7       Q.   Okay.  And when you say "never disputing

 8  liability," was that from beginning to end?

 9       A.   Once our evaluation and once our

10  investigation was underway, we didn't dispute

11  liability.

12       Q.   Okay.  Mr. Carr also says:  Claimant's

13  counsel is getting medical records to us at which

14  time it would behoove us -- it says "the look" to

15  resolve the case; do you see that?

16       A.   I do see that.

17       Q.   Okay.  So was it Mr. Carr's

18  recommendation, at that point, that it would be in

19  the insured's best interest to try and resolve the

20  case?

21            MS. BESVINICK:  Object to form.

22       A.   It's the normal course of making a

23  determination of liability, evaluation, to resolve a

24  case to make a statement such as that.

25  BY MR. BENRUBI:

1    Q.   Okay.

2    A.   The claim professional is doing their due

3  diligence, obtaining the information to make a sound

4  decision.

5    Q.   Okay.  'Cause part of the job of adjusting

6  **a claim is to have a plan for resolving the case,**

7  **the claim, correct?**

8    A.   Correct.

9    Q.   **And if you now go to -- give me one**

10 **second, please.**

11        (Brief pause.)

12 BY MR. BENRUBI:

13   Q.   **All right.  So with coverage being**

14 **determined in the affirmative, with liability being**

15 **determined to be adverse to your insured, what left**

16 **was to evaluate before you could settle the claim?**

17   A.   The extent of the injuries.

18   Q.   **What injuries were being claimed?**

19   A.   From my recollection, he sustained a

20 hernia, if that's the correct term.

21        And then, based on his -- Mr. Ackley's

22 depositions and statements to us, there were

23 multiple other injuries and physical limitations

24 that he was experiencing due to the fall.

25   Q.   **Did Mr. Ackley have surgery to repair the**



NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM
EXHIBIT "A"

1  hernia shortly after the accident?

2     A.   From my understanding, he did.

3     Q.   **Okay.  Do you recall it was October of**

4  **2012?**

5     A.   I -- I believe so.  From my understanding

6  there was an emergency surgery that took place.

7     Q.   **Okay.**

8     A.   So I would assume emergency meaning very

9  timely since the -- the date.

10    Q.   **Now, there was a Shawna Bryson, S-h-a-w-n-**

11 **a, B-r-y-s-o-n, that was initially handling the**

12 **claim, correct?**

13    A.   Can you tell me what page you're looking

14 on --

15    Q.   **Yes, I'm sorry.**

16    A.   -- in the notes?  Yeah.  That's okay.

17    Q.   **15313.**

18    A.   So 15313, October 23rd, 2012, multiple

19 file notes entered by Shawna Bryson.

20    Q.   **A 9:09 a.m.?**

21    A.   9:09 a.m., 9:10 a.m.

22    Q.   **I'm focused on the 9:09.**

23    A.   Okay.

24    Q.   **What did Miss Bryson say at that point?**

25         MS. BESVINICK:  I'm sorry, Counsel -- oh,

1  never mind.

2      A.   Her file note reads:  Reason for transfer:

3  With information received to date, the exposure

4  appears to exceed the express threshold due to

5  extent of treatment needed.  Claimant needed

6  emergency surgery after the incident.

7          Would you care for me to continue reading?

8      **Q.   No, that's fine.**

9          **So at that point was the claim transferred**

10  **to a higher-level adjuster?**

11     A.   Well, I'm not sure what you mean by

12  "higher-level adjuster."

13     **Q.   Okay.**

14     A.   Based on this file note that it says: It

15  appears to exceed the express threshold, that would

16  have -- that gives me indication that it was going

17  to be a -- a bodily injury claim...

18     **Q.   Okay.**

19     A.   (Continued) ...that needed to be

20  transferred to another claim professional.

21     **Q.   Okay.**

22     A.   Which it appears to, based on the file

23  notes, get transferred to Alan Carr, which noted the

24  file on October 23rd of 2012.

25     **Q.   Okay.  And back at this point in time, did**


NAEGELI
DEPOSITION & TRIAL        (800) 528-3335
                          NAEGELIUSA.COM
EXHIBIT "A"

1   Continental have a claims adjusting unit that

2   handled general liability claims?

3        A.   Yes.

4        Q.   And did they divide the units by the

5   severity of the injuries or the alleged injuries?

6        A.   I don't know specifically what you mean by

7   the "severity of injuries" and what that -- what the

8   definition of that would be.

9        Q.   I'm just referring to document 1894 that

10   was produced, and it says:  Alan Carr, GL, medium

11   severity, parentheses, Murphy?

12           MS. BESVINICK:  I'm sorry.  What document

13   is GL -- was 1894?

14           (Brief pause.)

15           MS. BESVINICK:  Okay.

16   BY MR. BENRUBI:

17        Q.   So would that background -- I'll read it

18   again, if you need it.

19           MS. BESVINICK:  It's not one of those

20   documents.

21           THE WITNESS:  Yeah, I don't think I've

22   seen the document, so I'm not --

23   BY MR. BENRUBI:

24        Q.   Here.  I have an extra copy, I believe.

25   Yes.

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS
EXHIBIT "A"
(800)528-3335
NAEGELIUSA.COM

```
 1              MR. BENRUBI:  Just for the record it's

 2   Bates stamped 01894.

 3              THE WITNESS:  Okay.

 4              MS. BESVINICK:  To what?

 5              MR. BENRUBI:  I don't know.  I'm looking

 6   at my back page.  It doesn't have a number.  It goes

 7   to 97 -- oh, to 98.

 8              MS. BESVINICK:  Thank you, Counsel.

 9              MR. BENRUBI:  Yep.

10   BY MR. BENRUBI:

11       Q.   All right.  So, now having that document,

12   can you answer my question about the severity issue?

13       A.   Can you repeat it, or can you --

14       Q.   Yeah.  Did Continental, within its general

15   liability claims adjusting unit, did it separate

16   claim files by severity?

17       A.   Yes, it did.

18       Q.   Tell me about that, please.

19       A.   I can't.

20       Q.   Okay.  That's easy enough.

21       A.   Apologize, but...

22       Q.   All right.  So -- but, anyway, Mr. Carr is

23   medium severity, right?

24       A.   That is correct.

25       Q.   But you don't know exactly what that
```



NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

EXHIBIT "A"

 1   means?

 2       A.    I don't know what the criteria at the

 3   time, from 2012 to 2014, would have been --

 4       Q.    Okay.

 5       A.    -- to differentiate between medium

 6   severity and any other --

 7       Q.    Okay.

 8       A.    -- titled severity group.

 9       Q.    Okay.  And "Murphy" in parentheses, is

10   that a supervisor?

11       A.    That would have been his supervisor's last

12   name.

13       Q.    Who was that?  Do you know?

14       A.    I don't know the first name.

15       Q.    No problem.

16             All right.  And, you know what, while

17   we're here, let's just go through a few of these.

18   Andrew Bryant it says:  SIU Foundational O-R-A

19   Group.  Do you know what that is?

20       A.    Yes.  These group names are user names

21   within our claim management system.

22       Q.    Mm-hmm.

23       A.    And not necessarily fully indicative of

24   the names -- the named individual's job title.

25       Q.    Okay.

EXHIBIT "A"

1    A.    There's a difference.

2    **Q.    Okay.**

3    A.    And the -- the reasoning for the

4    "foundational" would have been because Mr. Bryant

5    was the one responsible for submitting the

6    foundational referral to the DOI.

7    **Q.    What does MCU stand for?  Is that "medical**

8    **claims unit"?**

9    A.    In what context?  Like if you're looking

10   on this page...

11   **Q.    Yeah.  Virginia Fisher, actually, on the**

12   **second page.**

13   A.    That would be "major claim unit."

14   **Q.    Okay.  Major claim unit.  Okay.**

15   **Do you know enough to know if that's a**

16   **higher level than medium or high severity?**

17   A.    I don't know specifically.

18   **Q.    Okay.**

19   A.    It would only -- yeah, I don't know.

20   **MR. BENRUBI:  I'll take that back from**

21   you.

22   **MS. BESVINICK:  Counsel, can you let me**

23   know when you have time for a short break?

24   **MR. BENRUBI:  Yeah, in about 15 minutes.**

25   **MS. BESVINICK:  Okay.**

```
 1              MR. BENRUBI:  Are you okay with that?
 2              MS. BESVINICK:  Yeah, I'll try.
 3   BY MR. BENRUBI:
 4        Q.    So was the claim transferred to Mr. Carr
 5   because of the surgery that Mr. Ackley had had?
 6        A.    Well, I don't know specifically just
 7   because there was a surgery that it was transferred
 8   to Mr. Carr.  There would have been an evaluation
 9   based on the medical information they were getting
10   --
11        Q.    Okay.
12        A.    -- that they would have made the
13   determination due, to the fact that there were
14   injuries...
15        Q.    Mm-hmm.
16        A.    (Continuing) ...that it would have been
17   transferred to him into medium severity.
18        Q.    Okay.  And Mr. Carr, shortly after he
19   takes over the file, is looking for "red flags"?
20              MS. BESVINICK:  Objection to form.
21   BY MR. BENRUBI:
22        Q.    You could go to Page 15310.
23              MS. BESVINICK:  Could you give me a date,
24   Counsel?
25              MR. BENRUBI:  Yes.
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

 1          MS. BESVINICK:  I don't have a copy, so

 2   I'm looking at an --

 3          MR. BENRUBI:  10-31-12 --

 4          MS. BESVINICK:  -- unstamped copy.

 5          I'm sorry?

 6          MR. BENRUBI:  10-31 -- I'm sorry.

 7          You said a date?

 8          MS. BESVINICK:  Yes, please.

 9          MR. BENRUBI:  Yeah, 10-31-12.

10          MS. BESVINICK:  Thank you.

11          MR. BENRUBI:  At 1:05 p.m.

12      A.   What was your question?

13   BY MR. BENRUBI:

14      Q.   Yes.  Do you see where Mr. Carr says on

15   10-31-2012:  Topic SIU.  And then he says:  No red

16   flags at this time, need more information on the

17   accident itself.

18      A.   I do see that.

19      Q.   Okay.  Are the claims adjusters trained to

20   look for red flags from the outset of a case, a

21   claim?

22      A.   The claim professionals are trained to

23   identify indicators at any point in time within the

24   life of a claim.

25      Q.   Okay.  So a red flag is an indicator of

NAEGELI
DEPOSITION & TRIAL
CELEBRATING
40 YEARS IN BUSINESS
EXHIBIT "A"
(800)528-3335
NAEGELIUSA.COM

1   **what?**

2       A.   Red flag indicator of any potential

3   inconsistencies, inconsistencies with reported

4   injuries, the -- the facts of the incident, or any

5   material information presented.

6       **Q.   For the period of 2012 to 2014, was there**

7   **a written list of red flags that adjusters were**

8   **trained to determine or not?**

9       A.   Claim professionals were provided with

10  resource documents that outline indicators of

11  potential suspect insurance fraud.

12          **MR. BENRUBI:**  I need to get some paper

13  clips.  We'll do that after.

14          These are copied on both sides.

15          **MS. BESVINICK:**  Some yes; some no.

16          **MR. BENRUBI:**  Well, the first one didn't

17  have a second page.

18          **MS. BESVINICK:**  If you could read the

19  Bates numbers into the record.

20          **MR. BENRUBI:**  Yeah.

21          **MS. BESVINICK:**  If some of -- especially

22  if they're gonna be a group of documents.

23          **MR. BENRUBI:**  Yeah.

24          Is that 7?  Yeah.

25          **MS. BESVINICK:**  Do you have a set there

```
 1   you're gonna read the notes in?

 2           MR. BENRUBI:  Yeah.

 3           MS. BESVINICK:  Also, since they're

 4   separate, we need to make sure that what the witness

 5   is looking at is gonna match what you're gonna read

 6   into the record.

 7           MR. BENRUBI:  Yes.  So the first one is:

 8   Recognize suspicious claims, general indicators

 9   numbered 18155; the second is one is recognizing

10   suspicious claims bodily injury, 18156 through 157;

11   and recognizing suspicious claims catastrophes is

12   18174 through 18177.

13           MS. BESVINICK:  Thank you.  I just want to

14   confirm with the witness.

15           Are those the ones --

16           THE WITNESS:  Yes.

17           MS. BESVINICK:  -- that you have?

18           Thank you.

19           (Exhibit 7 was marked for identification.)

20   BY MR. BENRUBI:

21       Q.   All right.  So Exhibit 7, composite

22   Exhibit 7, what are those, ma'am?

23       A.   These appear to be resource documents for

24   the claims organization that provide a list of

25   indicators to recognize suspicious claims.  One
```

```
 1  states general indicators; a second is bodily
 2  injury; and a third is noted as catastrophes.
 3      Q.   Okay.  And those were dated as of, I
 4  believe, April 2013?
 5      A.   The date on the general indicators is
 6  April 22, 2003.
 7      Q.   '13 or '3?
 8      A.   2003.
 9      Q.   Okay.  Sorry.  Okay.  And the other two
10  sets?
11      A.   The bodily injury on the second page says:
12  April 22nd, 2003; the catastrophes on the fourth
13  page, April 22nd, 2003.
14      Q.   Okay.  And those are the ones that would
15  be in effect from 2012 to 2014 as a resource for the
16  claims adjusters?
17      A.   Yes, they would have been.
18      Q.   Okay.  And could a claims adjuster utilize
19  a red flag indicator that is not part of that list?
20      A.   Yes, they can.
21      Q.   Okay.  Now, Mr. Ackley obtained counsel,
22  Steven Phillips?
23      A.   Yes.
24      Q.   Okay.  And how long after the accident did
25  Mr. Ackley file suit against Equity One?
```

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

EXHIBIT "A"

(800)528-3335
NAEGELIUSA.COM

1      A.   It appears November 7th, 2012.

2      Q.   **Okay.**

3      A.   I'm just referring to my timeline.

4      Q.   **Mm-hmm.  Okay.  And that's about six weeks**

5 **after the accident, if it was 9-20- --**

6      A.   Yeah, give or take.  Yeah.  Yes, that

7 would be pretty close.

8      Q.   **Okay.  The fact that suit was filed six**

9 **weeks after the incident, was that a red flag**

10 **indicator in Mr. Ackley's case?**

11      A.   It would depend on the other circumstances

12 in the file.  Not necessarily.

13           It -- when you consider a red flag

14 indicator, general indicators, as noted in Exhibit

15 7, claim professionals and SIU investigators are

16 trained to consider indicators based on the merits

17 of the claim and not just based on the fact that

18 they're written as a general indicator.

19           We take all of the information within a

20 claim on a case-by-case basis.  So in one instance

21 filing a lawsuit within six or seven weeks may not

22 necessarily be a suspect issue, but in another

23 claim, it could be.

24      Q.   **Was it a suspect issue in this claim?**

25      A.   We did not -- no.

1    Q.   Okay.  Now, you're aware that April 29,

2  2013 that Mr. Ackley filed a proposal for

3  settlement?

4    A.   You said April 29th, 2013?

5    Q.   Yes.

6    A.   Yes, that is correct.

7    Q.   Okay.  And the amount was?

8    A.   300,000.

9    Q.   And that was filed the exact day where Mr.

10  Ackley's deposition was taken, his first one?

11    A.   From my timeline Mr. Ackley's first

12  deposition was April 25th, 2013.

13    Q.   Okay.  Okay.  So it was four days after?

14    A.   It appears.  That is correct.

15    Q.   I meant to ask you, what are special claim

16  handling instructions?

17    A.   Special claim handling instructions are

18  our customers' way of providing us with specific

19  instructions and requirements that they ask of us

20  based on our policy and contract with them.

21    Q.   Did this file have any special claim

22  handling instructions?

23    A.   It did.

24    Q.   What were those?

25    A.   I'd have to reference a document.  I don't

```
 1  recall off...

 2      Q.    Okay.

 3      A.    (Continuing) ...off of memory.

 4      Q.    What is -- what is consult but not

 5  authority to settle?

 6      A.    I'm not sure.  I'd have to look -- are you

 7  looking at something specific I can reference, so I

 8  understand the context?

 9      Q.    Let me see here.

10            (Brief pause.)

11  BY MR. BENRUBI:

12      Q.    Are there client accounts where the

13  insured's authority to settle is required?

14            MS. BESVINICK:  Object to form.

15  BY MR. BENRUBI:

16      Q.    You can answer.

17      A.    Yes.

18      Q.    Are there accounts where authority is not

19  required but the insured requires consult before

20  settling?

21            MS. BESVINICK:  Object to form.

22      A.    Yes.

23  BY MR. BENRUBI:

24      Q.    Do you know which one this was?

25            MS. BESVINICK:  Object to form.
```

```
 1        A.    I do not.

 2   BY MR. BENRUBI:

 3        Q.    Okay.

 4        A.    Without -- without looking at documents to

 5   --

 6        Q.    Okay.

 7        A.    -- give you specifically...

 8        Q.    Okay.  Who was retained by -- strike that.

 9              Was a lawyer rep- -- was a lawyer retained

10   to represent Equity One after suit was filed?

11        A.    Yes.

12        Q.    Who was that?

13        A.    If I can refer to my timeline.

14              I don't recall without being able to look

15   at some of the supporting documentation.  I -- I

16   don't want to misspeak.  I didn't memorize the

17   names.

18        Q.    Rosalind Milian?

19        A.    It sounds familiar.

20        Q.    Okay.  Do you know who she is?

21        A.    I know -- I don't know who she is.  I

22   mean, I know the name.  I know she was an attorney

23   for our insured...

24        Q.    Okay.

25        A.    (Continuing) ...in some capacity; but,
```



```
 1  again, I'd have to recall some of the documents to
 2  be able to give you that specific --
 3      Q.   Okay.
 4      A.   -- of an answer, that...
 5      Q.   Do you recall if Miss Milian was part of
 6  in-house counsel?
 7          MS. BESVINICK:   Object to form.
 8  BY MR. BENRUBI:
 9      Q.   Staff counsel?
10      A.   I don't.  I wasn't there during that time,
11  so I'm -- I guess, maybe if you can rephrase the
12  question, I'm not quite sure I'm --
13      Q.   Okay.
14      A.   -- understanding what you're asking.
15      Q.   Did -- did there exist special claims
16  handling instructions where the insured required
17  that if suit is filed that the matter be referred to
18  a private law firm, outside counsel, rather than in-
19  house counsel?
20      A.   I'm sorry.  Can you repeat that.
21          MR. BENRUBI:   Can you read that back,
22  please.
23          (Record read as requested.)
24      A.   Yes, I do recall that.
25  BY MR. BENRUBI:
```

1    Q.   Okay.  Did these instructions exist on

2    this file?

3    A.   From my understanding that they did.

4    Q.   They did?

5    A.   Yes.

6    Q.   Okay.  And was there a specific

7    instruction that only be -- only that outside

8    counsel be utilized to defend the insured?

9    A.   From my understanding, yes, that is

10   correct.

11   Q.   And if Miss Milian was, in fact, in-house

12   counsel employed directly by Continental, then that

13   requirement was not met?

14   A.   So Miss Milian was staff counsel.

15   Q.   Yes.

16   A.   And that is correct, she would not have

17   been outside counsel -- deemed outside counsel.

18   Q.   Okay.  And if she was the lawyer that was

19   retained to represent Equity One here, what -- what

20   happened?  Was that a mistake?  Did they agree to

21   how it happened?  Do you have any knowledge?

22        MS. BESVINICK:  Object to form.

23   A.   I do not have knowledge as to why that

24   decision was made.  Miss Milian represented counsel,

25   it was staff counsel, and didn't -- they did not

```
 1  hire outside counsel.  I can't give you the

 2  reasoning why.

 3  BY MR. BENRUBI:

 4      Q.    Did the insured know that outside counsel

 5  was not hired at this point in time?

 6      A.    I do not know what the insured knew.

 7      Q.    Okay.

 8            (Brief pause.)

 9            THE WITNESS:  Can we take a break?

10            MR. BENRUBI:  I'm just -- yep.  I'm

11  getting there right now.

12            THE WITNESS:  Okay.

13            MS. BESVINICK:  'Cause I had actually...

14            MR. BENRUBI:  I'm getting there and just

15  --

16            MS. BESVINICK:  Okay.

17            MR. BENRUBI:  Momentarily.

18            (Brief pause.)

19            MR. BENRUBI:  Okay.  Let's go off the

20  record, take a lunch break.

21            MS. BESVINICK:  Oh, lunch?  Oh, I thought

22  we were just taking a break.  You want to take a

23  lunch break?  Okay.  We're off the record.

24            THE VIDEOGRAPHER:  The time is 12:00 p.m.

25  We are off the record.
```

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
EXHIBIT "A"
(800)528-3335
NAEGELIUSA.COM

 1              (Whereupon, the deposition in the above-

 2    entitled cause was recessed to 1:00 p.m. this date.)

 3              **THE VIDEOGRAPHER:**  The time is 1:09 p.m.,

 4    and we are on the record.

 5    **BY MR. BENRUBI:**

 6        **Q.   Okay.  We're back on the record after we**

 7    **took our break.**

 8              **Are you ready to proceed?**

 9        A.   I am.

10        **Q.   Okay.  I'm gonna ask you to refer to**

11    **Exhibit 6, particularly Page 15296.**

12              **MS. BESVINICK:**  And if you could give me a

13    date, that would be helpful.

14              **MR. BENRUBI:**  5-1-13.

15        A.   15296?

16    **BY MR. BENRUBI:**

17        **Q.   Yes.**

18        A.   And you said the date 5-1-2013?

19        **Q.   Yes.**

20        A.   Okay.

21        **Q.   6:39 p.m.**

22        A.   Excuse me, yes.

23        **Q.   Do you need a little time to read that**

24    **note?**

25        A.   Yes, please.


NAEGELI
DEPOSITION & TRIAL    (800) 528-3335
NAEGELIUSA.COM
EXHIBIT "A"

```
 1              (Witness peruses document.)

 2       A.   I read the file note.

 3  BY MR. BENRUBI:

 4       Q.   And that was a file note drafted by Mr.

 5  Carr titled:  Plaintiff PFS, correct?

 6       A.   Yes.

 7       Q.   And "PFS" is proposal for settlement?

 8       A.   That's what I would defer from -- from

 9  that statement, yeah, from that acronym.

10       Q.   And he notes that plaintiff had filed the

11  $300,000 PFS that we had previously spoken about?

12       A.   Yes, that's correct.

13       Q.   Okay.  And Mr. Carr feels that that

14  300,000 figure is representative of the fact that

15  Mr. Ackley, after surgery, had nerve damage and

16  needed a second surgery, a nerve decompression?

17            MS. BESVINICK:  Object to form.

18  BY MR. BENRUBI:

19       Q.   Is that correct?

20            MS. BESVINICK:  Object to form.

21       A.   Well, I don't know what Mr. Carr felt.  I

22  can...

23  BY MR. BENRUBI:

24       Q.   Well, he says:  It is clear that the basis

25  for the PFS comes from the allegation that he has
```

NAEGELI
DEPOSITION & TRIAL
EXHIBIT A
(800)528-3335
NAEGELIUSA.COM

1  nerve damage and is anticipating having nerve

2  decompression?

3      A.   That is correct.  That's what this states.

4  I'm just saying like I don't -- I don't know what

5  Mr. Carr felt.  I'm just -- do -- does Mr. Carr

6  state that there's the allegation of nerve damage

7  and he is anticipating potentially having a nerve

8  decompression?  Yes, he does state that.

9      Q.   Okay.  And as you go further down, it

10  says:  DC is recommending surveillance in few (sic)

11  -- in view of the testimony that plaintiff cannot do

12  anything.

13      A.   That is a partial statement, yes.

14      Q.   And then, if you turn to the next page,

15  Mr. Carr says:  It is clear that the 25 to 30,000 is

16  not going to resolve this claim anymore, correct?

17      A.   That is correct.

18      Q.   Okay.  Was that the amount of the

19  settlement authority on the case at that time --

20      A.   I don't know.

21      Q.   -- 25 to 30,000?

22      A.   I don't know specifically what the

23  authority was at that time without having more

24  information.

25      Q.   Okay.  So you don't know where those

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
EXHIBIT "A"
(800)528-3335
NAEGELIUSA.COM

1  figures came from?

2      A.   Not just from this file note, no.

3      Q.   Okay.  What are "reserves"?

4      A.   A guideline for a claim professional to

5  understand the potential financial exposure of a

6  loss.

7      Q.   And when reserves were set on this file,

8  did they include the cost of defense or just the

9  value of the claim?

10          MS. BESVINICK:  Object to form.

11      A.   I don't recall specifically.  My

12  understanding of the process is it does not include

13  expenses.

14  BY MR. BENRUBI:

15      Q.   Who's responsible -- who was responsible

16  for setting the reserves on Mr. Ackley's claim?

17      A.   Are you asking about this time frame

18  related to this note or just in general?

19      Q.   Well, let's -- let's talk about from the

20  inception of the claim through this note.

21      A.   Well, through the -- through this time

22  frame, it would have been the claim professional,

23  who appears to be Alan Carr.

24      Q.   And as of May 1, 2013, what were the

25  reserves on this file?

1    A.    I don't know that I have that specific

2  number available to me, and I did not memorize it.

3  I'm sorry.  I would have to -- I would need a

4  reserve history to be able to accurately state what

5  that number was at that time.

6    **Q.    Okay.  One of the things I asked you to**

7  **talk about were No. 13, the reserves placed on**

8  **plaintiff's claims at all times.**

9    A.    Okay.

10    **Q.    Are you able to testify to that or no?**

11  **It's okay if you can't.**

12    A.    So -- so what date are you asking for?

13    **Q.    Well, right now just through May 1, 2013.**

14    A.    Well, what I have, based on my timeline,

15  but it's July of 2013 --

16    **Q.    Yes.**

17    A.    -- reserves were 2,000 bodily injury and

18  5,000 at med pay.

19    **Q.    Okay.  What date was that?**

20    A.    That would have been July 15th of 2013,

21  and that's noted in the timeline.

22    **Q.    All right.  So 2,000 was said as the**

23  **potential financial exposure to Mr. Ackley's bodily**

24  **injury claim and --**

25    A.    Reserve -- reserve would have been set at

NAEGELI

DEPOSITION & TRIAL

EXHIBIT "A"

(800)528-3335

NAEGELIUSA.COM

```
 1   -- at that time, 2,000 and --

 2       Q.   And that was for Mr. Ackley's claim?

 3       A.   Yes.

 4       Q.   Okay.  Go ahead.  I'm sorry to interrupt.

 5       A.   That's okay.  And then 5,000 for med pay.

 6       Q.   Okay.  Do you have the reserves at any

 7   other time on the file?

 8       A.   I do.

 9       Q.   Please.

10       A.   January 8, 2014, reserve 50,000.

11       Q.   Okay.

12       A.   And then it would have changed on October

13   20 of 2021 when the case was settled.

14       Q.   And was that changed to make the reserve

15   amount commensurate with the amount of the

16   settlement?

17       A.   Correct.

18       Q.   So it was 100,000?

19       A.   That is correct.

20       Q.   Okay.  Is that the entirety of the reserve

21   information that you could provide to me?

22       A.   Yes.

23       Q.   Okay.  Do you know if there's other times

24   the reserves were changed?

25       A.   No, I don't believe there were any other
```

NAEGELI
DEPOSITION & TRIAL
EXHIBIT "A"
(800)528-3335
NAEGELIUSA.COM

```
 1  times.

 2      Q.   Okay.

 3           MS. BESVINICK:  Just for the record, I

 4  would note on the timeline there's another reserve

 5  entry at August 8, 2014.

 6      A.   Oh.

 7           MR. BENRUBI:  8-8-14?

 8      A.   Oh, at the top.  Yeah, that stayed the

 9  50,000.

10  BY MR. BENRUBI:

11      Q.   Okay.

12      A.   That's why I didn't mention it 'cause it

13  wouldn't have -- it was still the same reserve,

14  so...

15           THE WITNESS:  Thank you.

16  BY MR. BENRUBI:

17      Q.   During this time frame, let's say when the

18  reserve was increased to $50,000, January 2014,

19  aside from an SIU hold, what claims personnel would

20  have the authority to settle up to that amount?

21           MS. BESVINICK:  Object to form.

22      A.   So I'm not sure I quite understand with

23  regards to the except for the SIU hold.

24  BY MR. BENRUBI:

25      Q.   Yeah, I --
```



```
 1       A.   Like what do you mean -- what do you mean
 2   by that?
 3       Q.   We know that that was placed earlier on
 4   the file, but now I'm talking about January 8, 2014.
 5       A.   Okay.
 6       Q.   And my question was, with the $50,000
 7   reserve, did the adjuster have discretionary
 8   authority to try and settle the matter within that
 9   reserve?
10       A.   At that time, with the SIU hold in place,
11   no.
12       Q.   Okay.  How about if the SIU hold was not
13   in place?
14       A.   If there was no SIU hold in place, then
15   the claim professional would be able to make
16   decisions based on their authority level.
17       Q.   Okay.
18       A.   Which I don't know what Mr. Carr's
19   authority level was at that point, so I can't speak
20   to if he would have had that authority to --
21       Q.   Okay.
22       A.   -- to do that.
23       Q.   All right.  So -- so you -- and I know I
24   didn't list it, but you're not able to tell me what
25   the settlement authority was for the different
```

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT "A"

1   levels of adjusters?

2       A.   No, I don't know that specifically.

3       Q.   All right.  If you go to the top of that

4   page we were referring to, 15296...

5       A.   Okay.

6       Q.   (Continuing) ... do you see where it says

7   -- I think Mr. Carr made an entry on May 2nd, 2013.

8   He says:  Alerted MCU to the new facts on the

9   injuries and the PFS and if they want to handle the

10  matter; is that correct?

11      A.   That is correct.

12      Q.   Okay.  And did the major claims unit, in

13  fact, take over the handling of the matter?

14      A.   Yes.

15      Q.   And that was a Virginia Fisher?

16      A.   Yes, that is correct.

17      Q.   Do you know what her discretionary

18  authority would have been as of May 6, 2013?

19           MS. BESVINICK:  Object to form.

20      A.   No, I do not.

21  BY MR. BENRUBI:

22      Q.   Her supervisor was a Cynthia Strong?

23      A.   Yes, it appears that way based on the file

24  notes.

25      Q.   Is Miss Strong still employed by any of



NAEGELI
DEPOSITION & TRIAL                    (800)528-3335
                                      NAEGELIUSA.COM

1    the CNA companies?

2        A.    I do not know.

3        Q.    And Mr. -- Miss Strong makes the comment

4    that:  Reserves need to be adjusted on May 8th,

5    2013?

6            MS. BESVINICK:  Object to form.

7        A.    Not on May 8th, but May 6th, 2013 --

8    BY MR. BENRUBI:

9        Q.    Oh, yeah --

10        A.    -- the 9:29 a.m.?  Is that the one you're

11    looking at?

12        Q.    Yeah --

13        A.    Yeah.

14        Q.    -- that's my blurry eye vision.

15        A.    That's okay.

16            Yes.  Cynthia Strong notes:  Reserves need

17    to be adjusted is what I'm assuming that -- the BA

18    -- the typo.

19        Q.    And Miss Strong makes a comment -- or,

20    actually, directs Miss Fisher to bring in the

21    general contractor or any other parties that may be

22    responsible?

23        A.    That is correct that she notes that.

24        Q.    Okay.  Who were the other parties that may

25    be responsible?

1    A.    Well, that would have been part of

2    Virginia's responsibility to determine any other

3    potential responsible party to the incident.

4        **Q.    Okay.  And did -- did Continental here**

5    **place anybody on notice --**

6    A.    Yes.

7        **Q.    -- of a third-party claim?**

8    A.    I believe it was the -- well, actually,

9    no, I don't -- I believe what occurred was the

10   discussion as to whether or not there was any third-

11   party that was responsible, so I take back what I

12   said -- when my answer was yes.

13        I don't believe that there was,

14   ultimately, a decision that anybody else would have

15   been responsible -- I don't recall specifically.  I

16   apologize for that.

17       **Q.    Is one of the purposes of bringing in**

18   **potentially responsible third-parties is to transfer**

19   **Continental's potential exposure to these**

20   **third-parties?**

21       **MS. BESVINICK:  Object to form.**

22   A.    The claim professional's responsibility is

23   to determine if there is any other third-party that

24   would bear any responsibilities, so, in -- in

25   general, yes, that's the purpose.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT "A"

 1  BY MR. BENRUBI:

 2      Q.   Is it true that Miss Milian requested Mr.

 3  Phillips to bring in these potentially responsible

 4  third-parties, and he refused to do so?

 5      A.   Is there -- I don't recall that

 6  specifically.  Is there somewhere that you're

 7  getting that information from?

 8      Q.   I think there is.  It's back to that May

 9  1st, 2013 note at 6:39 --

10      A.   Oh, the Alan Carr?

11      Q.   -- it's at the end of that.

12      A.   Okay.

13      Q.   Yeah, it's at the end of the note on Page

14  297.

15      A.   Okay.  One second.

16           (Witness peruses document.)

17      A.   Okay.  And can you repeat your question.

18  BY MR. BENRUBI:

19      Q.   Equity One's counsel, Miss Milian,

20  requested Mr. Phillips to bring in these potentially

21  responsible third-parties into the lawsuit, and he

22  declined to do so?

23      A.   It appears so based on the file note, yes.

24      Q.   Do you know what a nondelegable duty is?

25      A.   Not by definition, no.



1    Q.   Do you know in -- in Florida whether a

2    landowner is ultimately responsible for the

3    condition on his property even though he might have

4    contracted with another to perform work on the

5    property?

6    A.   I don't know.

7    Q.   Okay.  All right.  If we go back to the 5-

8    6-13 note that I thought was on 5-8, 9:29 a.m.

9    A.   By Cynthia Strong?

10   Q.   Yeah.  Miss Strong directs her to please

11   review and follow the special claim handling

12   instructions?

13   A.   Correct.

14   Q.   Did you have any involvement in deciding

15   which documents to produce in redacted versus

16   unredacted form in this case?

17   A.   No, I did not.

18   Q.   Did you have any involvement in the

19   decision of what to send the Department of Financial

20   Services as far as documents?

21   A.   No, I did not.

22   Q.   That was before your time?

23   A.   It was.

24   Q.   Okay.  So was it at this point in time

25   that Continental felt that Mr. Ackley might have

 1   been committing insurance fraud?

 2        A.   At what point in time?

 3        Q.   **Right here, in May of 2013?**

 4        A.   So SIU did not get involved until July of

 5   2013.

 6        Q.   **Okay.  So prior to that point in time, was**

 7   **Mr. Ackley suspected of committing insurance fraud**

 8   **by Continental?**

 9        A.   Based on my review of the file notes, what

10   was recommended for surveillance, in view of his

11   testimony that he was not able to do anything, there

12   wasn't a speculation of insurance fraud but that he

13   was potentially malingering in his injuries.  And

14   then SIU was -- collaborated -- the claim

15   professional reached out to SIU to review the file

16   with them after that point.

17        Q.   **So prior to July of 2013 were there any**

18   **red flag indicators regarding Mr. Ackley's claim?**

19        A.   Well, the issues -- or suspect issues, red

20   flag indicators, would be the fact that the

21   allegation of unable to do anything, in addition to

22   testimony that he was unable to walk without a cane.

23   Those would be some issues that we would rise as

24   indicators for potential investigation or

25   surveillance.



1    Q.    Was Mr. Ackley's testimony in his first

2  deposition that he was completely unable to walk

3  without a cane?

4    A.    From his initial -- in his initial

5  deposition?

6    Q.    Deposition, yeah.

7    A.    His -- from my recollection of reading his

8  -- his testimony in the first deposition was that he

9  had days when he was not on his medication that he

10 would have issues and needed a cane.  It wasn't

11 necessarily every single day but that he had

12 difficulty doing anything.

13   Q.    Would you agree with me that when his

14 entire first deposition is read in context, Mr.

15 Ackley testified that sometimes he was able to walk

16 without a cane and sometimes he was unable to walk

17 without a claim -- a cane?

18   A.    That would be an accurate statement, based

19 on my recollection of the testimony.

20   Q.    So when he said he was unable to walk

21 without a claim -- a cane in his deposition, that,

22 standing alone, is that a false statement?

23        MS. BESVINICK:   Objection to form.

24   A.    So some of the things that -- when claim

25 professionals, SIU staff, investigators take into

1  consideration whether or not to assign surveillance

2  is information that's presented.  So when an

3  individual that is alleging an injury states:  I

4  cannot do anything...

5  **BY MR. BENRUBI:**

6      **Q.    Mm-hmm.**

7      A.    (Continuing) ...and in the same

8  conversation, or in the same testimony says:  But

9  sometimes I can walk and sometimes I can't walk,

10 that is an inconsistent statement.

11     **Q.    Okay.**

12     A.    And that would lead us, "us" meaning SIU

13 or a claim professional, to consider conducting an

14 investigation, which would include the surveillance.

15     **Q.    Okay.  All right.  So, again, back to my**

16 **question.**

17         **The unable to do anything, the unable to**

18 **walk without a cane, did Continental consider those**

19 **to be inconsistencies or false statements?**

20     A.    Inconsistencies.

21     **Q.    Did Continental consider them to be**

22 **misleading?**

23     A.    Yes.

24     **Q.    How are they misleading?**

25     A.    In -- Mr. Ackley made a statement that he

 1  could not do anything.  Not being able to do

 2  anything meaning physically incapable of any type of

 3  physical task and in the same testimony stated that

 4  he could walk without a cane, which contradicts the

 5  statement:  I can't do anything.

 6       Q.   All right.  So it was based upon -- well,

 7  we'll get to that in a minute.

 8            Between May of 2013 and the time that the

 9  case was referred to SIU for their involvement, did

10  Continental perform any other type investigation on

11  Mr. Ackley?

12       A.   Not that I'm aware of.

13       Q.   Okay.  What's an ISO search?

14       A.   That is Insurance Service Offices.  That's

15  what the ISO stands for is Insurance Service Office.

16  That would -- it's a database that we utilize to

17  retrieve information from.

18       Q.   Okay.  And what's the purpose of doing

19  that?

20       A.   To obtain information.

21       Q.   About any prior claims, prior injuries,

22  prior accidents?

23       A.   Yeah.  Yes.

24       Q.   Okay.  And that's important so that, if

25  you need to, you and your lawyers can prove that Mr.

 1  **Ackley's injuries were not caused by this incident,**

 2  **they were caused by something else?**

 3          MS. BESVINICK:  Object to form.

 4      A.   So the use of information coming from the

 5  ISO claim search database is to understand an

 6  individual's history --

 7  **BY MR. BENRUBI:**

 8      **Q.   Mm-hmm.**

 9      A.   -- related to any other prior claims.

10      **Q.   Okay.**

11      A.   In this instance, we did not dispute Mr.

12  Ackley's injuries.  Information that would have been

13  gleaned from this database would have been used as

14  that, as information.  And the -- the information

15  that is contained in ISO -- in the ISO database,

16  like I said, just -- it provides us with

17  information.

18      **Q.   And an investigation was performed called**

19  **the Travelers because they were listed on the ISO**

20  **report as handling a suspicious claim, Page 15292?**

21          MS. BESVINICK:  Could you give us the

22  date, Counsel?

23          MR. BENRUBI:  7 -- boy, I really need

24  glasses -- 15, 2013.

25      A.   So you said 2 --

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

EXHIBIT "A"

(800)528-3335
NAEGELIUSA.COM

 1  BY MR. BENRUBI:

 2      Q.   At 3:36 p.m.

 3           (Reporter clarification.)

 4           MR. BENRUBI:  7-15-2013, 3:36 p.m.

 5      A.   So did you -- I'm sorry, did you have a

 6  question for me?

 7           MR. BENRUBI:  Can you read that back,

 8  please, Lucy.

 9           (Record read as requested.)

10      A.   Are you asking me to --

11  BY MR. BENRUBI:

12      Q.   Yes --

13      A.   -- confirm --

14      Q.   -- was that done in this case?

15      A.   Yes.

16      Q.   Okay.  And what information did you

17  receive from Travelers?

18      A.   Well, based on the file note that

19  Travelers had a loss from May 29th of 2010 in

20  Louisville, Kentucky.  Notes indicate the ISO was a

21  suspicious claim.  It appears that Virginia

22  confirmed it was a products claim.

23      Q.   Mm-hmm.

24      A.   They paid $1500, and it was closed.  And

25  then there's note for contact for investigator,

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT "A"

 1  additional information, phone number, and a claim

 2  number.

 3      Q.   Okay.   What was the date this was referred

 4  to SIU?

 5           MS. BESVINICK:   Objection to form.

 6      A.   Well, it appears from the timeline that

 7  there was a request from the claim professional on

 8  July 15th of 2013.

 9  BY MR. BENRUBI:

10      Q.   Do you know what document you got that

11  from?

12      A.   It was a document within our production.

13      Q.   Yeah, I mean, do you have a Bates number

14  or anything like that off of the --

15      A.   I don't know.  What the -- my timeline I'm

16  -- I'm referencing this file note, like the -- the

17  July 15th -- let me look at the -- I believe, if I'm

18  able to look at another file note...

19           (Witness peruses document.)

20      A.   So Bates No. 15287 is when SIU is first

21  noted in the file, which is July 16th.

22  BY MR. BENRUBI:

23      Q.   Okay.

24      A.   So either -- either technically when our

25  -- within our claim management system it occurred

1  either July 15th or July 16th.

2      Q.   Okay.  And that referral would have been

3  made by Virginia Fisher?

4      A.   Without being able to look at the exact

5  screen -- like there's just -- I -- technical stuff

6  that I can tell if it was actually coming from the

7  claim professional or if the SIU opened up their

8  assignment...

9      Q.   Mm-hmm.

10     A.   (Continuing) ...but it's either coming

11  from Virginia Fisher or Lee Janicek.

12     Q.   Okay.  Who is Lee Janicek?

13     A.   He was the SIU investigator assigned to

14  this claim.

15     Q.   Was there a fraud case manager assigned to

16  the claim?

17     A.   That would have been his job title.

18     Q.   Is Mr. Janicek still with the company?

19     A.   No, he is not.

20     Q.   Do you know when he left?

21     A.   I don't know specifically.  I can give you

22  a year, but...

23     Q.   That's fine.

24     A.   It would have been 2017, 20- -- 2018.

25     Q.   Are you aware of why he left?



1    A.   No, I -- I do not know.

2    **Q.   Okay.  So what was the basis of the**

3    **referral to SIU in July of 2013?**

4    A.   There were -- there were two specific

5    things:  The inconsistencies with regards to Mr.

6    Ackley's testimony of unable to -- or cannot do

7    anything and able to walk with a cane, not able to

8    walk with a cane; in addition to the -- the

9    suspicion of malingering in his injuries.

10          And then we also take into consideration

11   the suspicious claim that was previously in his

12   history.

13   **Q.   So is malingering a red flag indicator for**

14   **Continental?**

15   A.   Yes, it can be.

16   **Q.   And if we have to go over the document, we**

17   **will, but do you know if malingering is listed as**

18   **one of the red flag fraud indicators?**

19   A.   I don't know without being able to look at

20   the document --

21   **Q.   Okay.**

22   A.   -- specifically.

23   **Q.   And inconsistent testimony is also**

24   **considered a red flag indicator?**

25   A.   It can be.

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS THIS IS BUSINESS
EXHIBIT "A"
(800)528-3335
NAEGELIUSA.COM

1    Q.   Okay.  Or it can't be?

2    A.   As I said earlier, we make a determination

3  on a case-by-case basis.

4    Q.   Okay.  If you look at Miss Fisher's note

5  on July 15, 2013 at 5:14 p.m., Page 15289.

6    A.   Okay.

7         MS. BESVINICK:  I'm sorry.  What was the

8  date again?  I apologize.

9         MR. BENRUBI:  July 15, 2013.

10        MS. BESVINICK:  Okay.  Thank you.

11  BY MR. BENRUBI:

12    Q.   If you go to Page 291.

13    A.   Okay.

14    Q.   There's a notation there that says "SIU"

15  about three-quarters of the way to the bottom.

16    A.   Okay.  I see it.

17    Q.   What does it say?

18    A.   It says:  SIU, no flag seen to warrant

19  referral but looking into an ISO hit.

20         Do you want me to keep going?

21    Q.   No, that's good.

22         If Miss Fisher is saying no red flags at

23  this point in time, is it fair to say that she did

24  not consider malingering to be a red flag?

25    A.   So it's very possible that she didn't

1   identify malingering as a concern.  She states that

2   she's looking into the ISO hit.  Her plan of action

3   is to assign surveillance to confirm the plaintiff's

4   current level of activities to help evaluate the

5   case.

6           Also as a part of the claim professional's

7   guidelines is to confer with SIU, which at that

8   point she confers with Lee Janicek, who then reviews

9   the file and identifies malingering as a potential

10  red flag indicator.

11      **Q.   Okay.  Just above that there's some other**

12  **-- well, I'm sorry.**

13          **Yeah, just above that there's some other**

14  **things:  ICD9 codes completed.  What does that mean?**

15      A.   Is that also on Page 291, or is that --

16      **Q.   Yes, right above SIU.**

17      A.   Oh, I see.  Okay.

18          So this would indicate that there's data

19  fields within the claim management system that is

20  asking for the ICD9 codes, which are related to the

21  types of injuries --

22      **Q.   Mm-hmm.**

23      A.   -- that the -- the plaintiff is alleging.

24  And by her stating it's completed, she would have

25  entered data -- done a data entry --

1    Q.    Mm-hmm.

2    A.    -- of what those codes were to indicate

3  the type of injuries the plaintiff was alleging.

4    Q.    Okay.  And what is "Lens Coding"?  Coding,

5  c-o-d-i-n-g.

6    A.    Sure.  That would go towards the -- the --

7  whether it's incident type or an overall type of

8  incident, injury.

9          There's certain codes that the system --

10  our claim management system utilizes to identify --

11  let's say it's like, for -- for instance, if he's

12  alleging the hernia or back injury, there's a

13  specific lens coding that the claim professional

14  will identify, which is different than the ICD.  The

15  ICD9 codes are coming from medical reports that

16  specifically state out a diagnosis.

17    Q.    Mm-hmm.  Okay.  What is MLU?

18    A.    Where are you referencing?  In the same

19  file note?

20    Q.    Yeah, but Page 290.  MLU:  This would not

21  meet the reporting guidelines.

22    A.    So I would imagine she's referencing major

23  loss unit.

24    Q.    Okay.  Is that different from MCU, major

25  claims unit?

NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM
EXHIBIT "A"

1    A.    So from -- from my recollection it changes

2  from major claim unit to major loss unit.

3    **Q.    Okay.**

4    A.    So, yes, it's the same.

5    **Q.    Is there any escalation in the claim from**

6  **one to the other?**

7    A.    What do you mean from one to the other?

8    **Q.    Does a claim get escalated from MCU to**

9  **MLU?**

10   A.    It would have been one and the same.

11   **Q.    Okay.  And then it says:  CLUE:  I see no**

12 **basis for CLUE?**

13   A.    That's correct.

14   **Q.    What is CLUE?**

15   A.    It's a -- a report for our underwriting

16 purposes.  If there's any issues or concerns with

17 policy, then the claim professionals, based on their

18 guidelines, are to report to underwriting.  And

19 she's stating that she's not seeing any issues with

20 our insured or the policy that would warrant a

21 report to underwriting.

22   **Q.    Okay.  Does Miss Fisher place a monetary**

23 **value on the claim in this note?**

24   A.    So at this time, in this file note, I

25 believe she mentions the reserves.  If you look on

```
 1  15291, in the middle of her file note, RESERVE 2,000

 2  body...

 3       Q.   Yeah.

 4       A.   (Continuing) ...which I'm imagining that's

 5  supposed to be bodily injury, and then the 5,000 med

 6  pay, which I noted earlier.

 7       Q.   Okay.  She says:  The estimated full value

 8  of this claim to the defendant is up to $200,000?

 9       A.   So, yeah, that file -- like the sentence

10  before that, that is correct.  She states estimated

11  full value up to 200,000.

12       Q.   And she says:  For defendants, plural.

13       A.   I don't know why that was plural.

14       Q.   She said she did a verdict search for

15  peripheral neuropathy that yielded a $100,000 award

16  for past and future pain and suffering.

17       A.   It appears that's what she states.

18       Q.   Okay.  And the reserves were 2,000?

19       A.   Correct.

20       Q.   And she says:  If we don't get risk

21  transfer, then we're looking at exposure of up to

22  190,000?

23       A.   That is correct.

24            MR. BENRUBI:  Okay.  I just want to mark

25  at this time Mr. Ackley's first deposition as
```

```
 1  Plaintiff's 8.

 2           MS. BESVINICK:  Is there a Bates range?

 3           THE WITNESS:  Thank you.

 4           Here, you want to...

 5           MR. BENRUBI:  There is.

 6           MS. BESVINICK:  May I see it, please.

 7           MR. BENRUBI:  1091.

 8           MS. BESVINICK:  Thank you.

 9           (Exhibit 8 was marked for identification.)

10      A.   Thank you.

11  BY MR. BENRUBI:

12      Q.   You're welcome.

13           You have reviewed that deposition in

14  preparation for today?

15      A.   I have.

16      Q.   Other than what you've told me already

17  about the cane and unable to do anything, did

18  Continental determine that there were any other

19  inconsistencies in Mr. Ackley's first deposition?

20      A.   I'd -- I would have to go through line by

21  line and then watch all the surveillance to give you

22  very specifics.

23           In general terms, the contradictions, from

24  his initial testimony, based on the surveillance

25  video that we had, was misleading and
```

 1  misrepresenting his physical abilities.  That's what

 2  -- that's the contradictions that I reviewed --

 3      Q.    But --

 4      A.    -- in this material.

 5      Q.    **Earlier in the deposition you gave me two**

 6  **contradictions.  What I want to know --**

 7      A.    Right.

 8      Q.    **-- is were there any other contradictions**

 9  **in that deposition that Continental felt worthy of**

10  **an SIU referral?**

11          MS. BESVINICK:  So your -- your question

12  is prior to their surveillance being conducted

13  'cause this is the --

14          MR. BENRUBI:  Sure.

15          MS. BESVINICK:  -- deposition in

16  April.

17          MR. BENRUBI:  Sure.  I'm -- I'm exploring

18  the basis for the SIU referral.

19          MS. BESVINICK:  Okay.

20          MR. BENRUBI:  Yeah.

21          MS. BESVINICK:  Thank you.

22      A.    The --

23  BY MR. BENRUBI:

24      Q.    **So my -- was -- was it based on those two**

25  **subject matters, the unable to do anything and the**

1  unable to walk without a cane to the exclusion of

2  everything else in his deposition?

3      A.   I don't see any other contradictions.

4      Q.   Okay.  So except in those two topics,

5  you'll agree that Mr. Ackley was truthful in his

6  first deposition?

7          MS. BESVINICK:  Object to form.

8      A.   So I don't believe he was truthful.

9  BY MR. BENRUBI:

10     Q.   Those two instances -- I'm saying aside

11  from those two instances, would you agree with me

12  that Mr. Ackley gave truthful testimony in his

13  deposition?

14     A.   I can't say specifically.

15     Q.   Well, if it was untruthful, you would have

16  picked it out for referral to SIU, no?

17     A.   And we did.

18          MS. BESVINICK:  Object to form.

19  BY MR. BENRUBI:

20     Q.   Hmm?

21     A.   We did.  We did.

22     Q.   Was Mr. Ackley truthful in his first

23  deposition about the medications he was taking?

24     A.   I -- I don't know.  I didn't -- I don't

25  have information for his medical that I would be

1  able to dispute that with, so I don't -- I don't

2  know.

3      Q.   Did you review any of his medical?

4      A.   I -- did I review his medical?  No, I did

5  not.

6      Q.   Okay.  Did Mr. Ackley testify that he had

7  a preexisting condition?

8      A.   Yes.

9      Q.   Okay.  And he was candid and truthful

10  about that in his first deposition?

11         MS. BESVINICK:  Objection to form.

12      A.   He was candid.  I -- I can't speak to that

13  -- the truthfulness of all of his medical because I

14  haven't seen his medical records.

15  BY MR. BENRUBI:

16      Q.   Was his medical investigated by -- by

17  Continental?

18      A.   When you say "investigated," what do you

19  mean?

20      Q.   Did CNA look at Mr. Ackley -- did

21  Continental look at Mr. Ackley's medical records to

22  determine whether he made any false statements,

23  misleading statements, exaggerations,

24  inconsistencies as far as his past medical history?

25      A.   Yes.

1    Q.   They did review it?

2    A.   The claim professional reviewed his

3 medical records.

4    Q.   Okay.

5    A.   From my understanding, based on the

6 documents I've reviewed, the claim file notes, that,

7 yes, they reviewed his medicals.

8    Q.   And did a review of his medicals provide

9 any indications that he was inconsistent,

10 untruthful, misleading?

11    A.   Yes, I do recall reading in his deposi- --

12 in this transcript that he was on medications.  And

13 there's a file note, which I would -- I read that I

14 would have to go through to find, but there was a

15 file note that indicated there was a drug screen

16 done during this time and that the drug screen came

17 back with no medications in his system.  So that's

18 another inconsistency that I identified.

19         So our claim professional reviewed

20 medicals.  There's file notes indicating, based on

21 his testimony, for his -- the meds that he was

22 allegedly on was inconsistent.

23    Q.   That's conclusive proof, that -- that tox

24 screen?

25         MS. BESVINICK:  Object to form.

```
 1      A.   I was reading file notes based on the
 2 medical review.  I don't know who did the tox
 3 screen, so I can't speak to that.
 4 BY MR. BENRUBI:
 5      Q.   Well, I guess the question is, just
 6 because a tox screen is negative, does that
 7 necessarily mean that Mr. Ackley was not taking any
 8 medications at that point in time?
 9      A.   I don't know.
10      Q.   Mr. Ackley truthfully testified in his
11 first deposition that he was 75 percent disabled
12 before his trip-and-fall accident occurred?
13           MS. BESVINICK:  Object to form.
14      A.   I don't know if it's truthful or not.
15 BY MR. BENRUBI:
16      Q.   He did say that, correct?
17      A.   He said that.
18      Q.   Okay.  And that's a claim mitigation fact,
19 is it not, the fact that --
20      A.   What do you mean by that?
21      Q.   Well, if somebody is three-quarters
22 disabled before they even have an accident, it's
23 valuable evidence to demonstrate that he was not
24 significantly damaged as a result of this accident,
25 correct?
```

 1              **MS. BESVINICK:**  Object to form.

 2        A.    Yeah, I'm sorry.  I'm not -- I don't

 3   understand the question.  Like I'm not understanding

 4   what you're really asking me.

 5   **BY MR. BENRUBI:**

 6        **Q.    What I'm saying is Mr. Ackley was not**

 7   **claiming that he was in perfectly good condition**

 8   **before he ever tripped and fell on the insured's**

 9   **property?**

10        A.    That is correct.

11        **Q.    Okay.  And that was truthful?**

12              **MS. BESVINICK:**  Objection to form.

13        A.    I did not -- let me rephrase that.

14              Continental Casualty Company and the claim

15   professional and the SIU investigator did not

16   investigate any previous disability.  There was no

17   determination of his previous disability...

18   **BY MR. BENRUBI:**

19        **Q.    Okay.**

20        A.    (Continuing) ...based off of Continental

21   Casualty's claim investigation.

22        **Q.    Was Mr. Ackley truthful in his first**

23   **deposition about how the accident occurred?**

24              **MS. BESVINICK:**  Objection to form.

25        A.    As far as the information shows, we take



NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT "A"

1  it as what he stated.  There weren't any witnesses

2  outside of his wife.  We didn't dispute liability.

3  We didn't dispute that the incident occurred, so we

4  would take it as his information to us would have

5  been an accurate depiction of the incident.

6  **BY MR. BENRUBI:**

7       **Q.   Okay.  But it's a fraud indicator if**

8  **somebody portrays how an accident occurred when it**

9  **really didn't occur that way, is it not?**

10      A.   So it can be.

11      **Q.   Okay.  Such as a staged car accident?**

12      A.   What do you mean as a staged car accident?

13  I'm not sure --

14      **Q.   You don't --**

15      A.   -- I understand the question.

16      **Q.   You don't know what a staged car accident**

17  **--**

18      A.   I do understand what a staged car accident

19  --

20      **Q.   What's a staged car accident?**

21      A.   Willing participants intentionally causing

22  an accident to occur.

23      **Q.   Did -- did you suspect Mr. Ackley of doing**

24  **that?**

25      A.   Being involved in a staged auto accident,

 1  no.

 2      Q.   No, being involved in a staged accident?

 3      A.   No, we never disputed the incident.

 4      Q.   Okay.  So the only thing that was disputed

 5  was the extent of his disability; is that correct?

 6      A.   The extent of his injuries.

 7      Q.   Isn't that very common in bodily injury

 8  claims?

 9      A.   Is what very common in bodily injury

10  claims?

11      Q.   That the plaintiff and the defense have a

12  different view about the extent of somebody's

13  injuries and disabilities?

14      A.   It very well can be.

15      Q.   Okay.  All right.  And don't we rely on

16  cross-examination and juries to figure that out for

17  us?

18          MS. BESVINICK:  Objection to form.

19      A.   So in this case...

20  BY MR. BENRUBI:

21      Q.   Mm-hmm.

22      A.   (Continuing) ...what the determination,

23  for the claim professional and the SIU investigator,

24  was -- after they collaborated, with regards to the

25  information that was obtained, not only based on Mr.

 1 | Ackley's testimony but prior information, in
 2 | addition to his medical, his injuries, the alleged
 3 | injuries, that was the determination, based on the
 4 | potential of a malingering injury, the suspect
 5 | indicators, and the reasoning for assigning
 6 | surveillance.
 7 |          **(Reporter clarification.)**
 8 | **BY MR. BENRUBI:**
 9 |      **Q.    Are there notes of this collaboration**
10 | **between Miss Fisher and Miss Janicek -- Mr. Janicek?**
11 |      A.    I believe the file notes indicate that
12 | Miss Fisher called Mr. Janicek.
13 |      **Q.    When did that occur?**
14 |      A.    Well, that would have been around that
15 | July 15th, 2013 time frame.
16 |      **Q.    Can you give me a page number?**
17 |      A.    Yeah, I'm looking.
18 |          **(Witness peruses document.)**
19 |      A.    So her file note from July 15th -- I don't
20 | -- 15291...
21 | **BY MR. BENRUBI:**
22 |      **Q.    Yes.**
23 |      A.    (Continuing) ...Plan of action I've
24 | assigned surveillance.
25 |          And then July 16th, 2013, 2:00 p.m. Mr.

**NAEGELI** **(800)528-3335**
DEPOSITION & TRIAL   NAEGELIUSA.COM

EXHIBIT "A"

1  Janicek has a file note, and that is on Page 15288.

2  He has asked Virginia for some more information.

3      Q.   But, if you would, where's the note that

4  memorializes their specific conversation, their

5  collaboration as you've described it?

6      A.   Well, the collaboration could have

7  occurred on the telephone.

8      Q.   It should be noted in the activity file,

9  shouldn't it?

10     A.   In some instances, yes.

11     Q.   Is it here?

12     A.   Lee Janicek makes a note on July 27, 2013

13  where he makes his assignment, identifies the red

14  flag indicators.

15     Q.   Yes, yes.  I'm with you --

16     A.   Mm-hmm.

17     Q.   -- I'm gonna get there.

18          But what I'm asking you is there any

19  documented note that memorializes the collaborative

20  discussion between Miss Fisher and Mr. Janicek

21  regarding suspicions surrounding Mr. Ackley's claim?

22     A.   So Lee Janicek's file note on July 17th of

23  2013 -- and it's 15286 -- where Lee documents SIU

24  review:  I've reviewed this and agree surveillance

25  is warranted, and I have advised Virginia, through

1  CS, which I mis- -- I'm -- I'm not quite sure of the

2  actual acronym.  The indication would be claims

3  system, which this is where he's documenting that he

4  has reviewed and advised Virginia he's accepting the

5  referral.

6      **Q.  No disrespect, but I'm not sure we're**

7  **talking on the same page.**

8      A.  Okay.

9      **Q.  Your policy states there should be a**

10  **collaborative discussion between the claims examiner**

11  **and the SIU investigator prior to putting SIU hold**

12  **on the file; is that correct?  Just answer that**

13  **question, please.**

14      A.  With regards to the SIU hold that there

15  would be a collaboration, but I'm referencing the

16  surveillance assignment, not the SIU hold.

17      **Q.  I know.  And what I'm --**

18      A.  Okay.

19      **Q.  -- asking you is, is there a note that**

20  **memorializes the collaborative discussion between**

21  **Virginia Fisher and Lee Janicek:  I spoke with**

22  **Virginia Fisher; I spoke with Lee Janicek.  Is that**

23  **note in the file?**

24      A.  I don't see those specific words.

25      **Q.  Okay.  Is that something you would expect**



NAEGELI
DEPOSITION & TRIAL
EXHIBIT "A"
(800)528-3335
NAEGELIUSA.COM

1    to see if two employees are discussing a claim

2    referral, that they would document what they

3    discussed?

4        A.   In most cases.  I attribute Mr. Janicek's

5    note under his SIU review...

6        Q.   Okay.

7        A.   (Continuing) ...that he's reviewed the

8    file and advised Virginia that that would suffice as

9    a collaboration.

10       Q.   Okay.  All right.  And the policy also

11   says:  Complete documentation for the SIU hold needs

12   to exist.

13            Is that the complete documentation, 7-17

14   note that you're referring to?

15       A.   So I'm not understanding.  Are you asking

16   about the surveillance assignment or the SIU hold

17   'cause the file note from July 17th is talking about

18   the surveillance assignment.

19       Q.   Okay.  Okay.  So -- you're right.  I'm

20   getting ahead of myself.  We'll get to that.

21       A.   Okay.

22       Q.   But, actually, the 7-17 note also talks

23   about an SIU hold.

24       A.   So the beginning of his note states: This

25   file is not to be settled, and no settlement

NAEGELI
DEPOSITION & TRIAL

EXHIBIT "A"

(800)528-3335
NAEGELIUSA.COM

 1  discussions are to be entered into with the subject

 2  or his counsel while there is an SIU hold in place.

 3       **Q.   Okay.  Yes.  Let's stop there for a**

 4  **minute.**

 5       A.   Sure.

 6       **Q.   The claims examiner and the fraud**

 7  **investigator are supposed to have a collaborative**

 8  **discussion --**

 9            (Reporter clarification.)

10            MR. BENRUBI:  And the fraud investigator.

11  BY MR. BENRUBI:

12       **Q.   (Continuing) -- are to have a**

13  **collaborative discussion to decide whether an SIU**

14  **hold should be placed; is that correct?**

15       A.   What document --

16            MS. BESVINICK:  Object to form.

17       A.   What document are you referencing?

18  BY MR. BENRUBI:

19       **Q.   One of the claims manuals.**

20            MS. BESVINICK:  Can you identify it?

21            MR. BENRUBI:  Yes.

22            MS. BESVINICK:  Thank you.

23            MR. BENRUBI:  It is 18031.

24            MS. BESVINICK:  Has that been marked?

25            MR. BENRUBI:  I will right now.



```
 1            MS. BESVINICK:  Okay.

 2            MR. BENRUBI:  Plaintiff's No. 9.

 3            (Exhibit 9 was marked for identification.)

 4            THE WITNESS:  Okay.

 5   BY MR. BENRUBI:

 6       Q.   It says:  If there is a difference in

 7   opinion about applying an SIU hold, the matter

 8   should be elevated to the vice president for the

 9   applicable line of business, correct?

10       A.   Are you reading up at the top?

11       Q.   Yes.

12       A.   Yeah.

13       Q.   And that --

14       A.   That is -- yes, that is --

15       Q.   Let me -- let me just finish.

16            (As read:)  Complete documentation to

17   support the reasoning for the SIU hold should exist

18   in the claim center, correct?

19       A.   That is correct.  And, for clarification,

20   I authored this document, and so this document

21   wasn't in place until 2017.

22       Q.   Okay.  Well, it was given to me as a '12

23   to '14 --

24       A.   Right.

25       Q.   -- document.
```

```
 1              MS. BESVINICK:  And so -- let me just
 2    explain, Counsel.  In preparation for deposition, we
 3    identified I think three documents --
 4              THE WITNESS:  Correct.
 5              MS. BESVINICK:  -- with Ms. Gall's
 6    assistance.  So even though it says 2012 at the
 7    bottom of that document, in the -- in the whatever
 8    -- the trademark area is what it's called --
 9              THE WITNESS:  Mm-hmm.
10              MS. BESVINICK:  -- which is why we
11    produced it to you.
12              MR. BENRUBI:  Okay.
13              MS. BESVINICK:  Ms. Gall was able to
14    explain to us that that and two other documents --
15    and I don't know if you plan on using them today --
16    were, in fact, generated during her time period --
17              THE WITNESS:  Right.
18              MS. BESVINICK:  -- and were not in place
19    at the time --
20              MR. BENRUBI:  I appreciate that.
21              MS. BESVINICK:  -- of 2012 to 2014.
22              THE WITNESS:  Mm-hmm.
23    BY MR. BENRUBI:
24         Q.   So forgetting about the document, do you
25    know if there was a difference in opinion between
```



1  Miss Jan- -- Mr. Janicek and Miss Fisher as to

2  whether or not the SIU hold should be applied?

3       A.   I do not know that.

4       Q.   There's nothing documented as far as that,

5  correct?

6       A.   Not that I saw.

7       Q.   All right.  If we could go to that note,

8  7-7-13 (sic) at 10:48 a.m.

9       A.   Okay.

10      Q.   What does Mr. Janicek outline as the

11  reasons supporting the SIU hold?

12      A.   Well, based on his file note, in summary,

13  it's based on the red flag indicators, the possible

14  malingering, more active than he portrays to be, and

15  the reasoning to observe -- the reasoning to assign

16  the surveillance is the potential malingering and

17  wanting to determine his physical ability.

18      Q.   And -- okay.

19           Do you know exactly what Mr. Janicek

20  reviewed leading up to this note?

21      A.   I wouldn't be able to answer that. You'd

22  have to ask Mr. Janicek.

23      Q.   Going back -- well, forget that.

24           Is this a note where Mr. Janicek documents

25  the reasons why for the SIU hold?

```
 1            MS. BESVINICK:  Object to form.

 2   BY MR. BENRUBI:

 3       Q.   Or is it located somewhere else?

 4       A.   I don't believe it's somewhere else

 5   because at the beginning of his file note on July

 6   17th he states that -- as I repeated earlier about

 7   the file not being settled or settlement discussions

 8   to be entered with the subject while there is an SIU

 9   hold in place.

10       Q.   Okay.  Now, Mr. Janicek says: Possible red

11   -- I'm sorry.

12            (As read:)  Red flag indicators are

13   possible malingering, more active than portraying to

14   be.  And then he says, No. 2:  Details are sketchy,

15   right?

16       A.   That is correct.

17       Q.   What details?

18       A.   I am not sure.  You would have to ask him

19   what he meant by that.  Outside of his continued

20   note that he says:  Restrictions, Ackley said he can

21   only walk with a cane, otherwise he is completely

22   disabled.

23            Those -- that would also be a part of what

24   he is classifying in the other page of the file note

25   as red flag indicators.
```



NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM
EXHIBIT "A"

1    Q.   So at this point you would agree with me

2  that it's still the malingering issue, correct?

3         MS. BESVINICK:   Object to form, misstates.

4  BY MR. BENRUBI:

5    Q.   That the SIU hold -- the reason for the

6  SIU hold was the thought that Mr. Ackley was

7  malingering, being more active than he was

8  portraying to be?

9    A.   So the purpose of the SIU hold is to put

10 an indicator on the file that there's an

11 investigation into a potential material

12 misrepresentation.  So it's not related to -- or in

13 cause of red flag indicators.  It is -- it's an

14 indication that there's more information to obtain

15 to be able to have a full understanding of the

16 plaintiff's disabilities, confirm injuries,

17 allegations that he's making based off of his

18 testimony.

19   Q.   Did you speak to anybody in preparing for

20 the deposition other than counsel?

21   A.   I did.

22   Q.   Who did you speak with?

23   A.   Lee Janicek, Andy Bryant, Marty Callahan.

24   Q.   Mr. Callahan is the only one that's still

25 employed by the company?

```
 1        A.   That is correct.

 2        Q.   Okay.  When did you speak to each of them?

 3        A.   Over the course of the last couple weeks.

 4        Q.   Okay.  What was the purpose of reaching

 5   out to them?

 6        A.   Preparing for the deposition.

 7        Q.   Did you have specific questions that you

 8   asked them?

 9        A.   I didn't have specific questions.

10        Q.   Counsel was on the call?

11        A.   Correct.

12        Q.   Okay.  Did you ever inquire of Mr. Janicek

13   what the "sketchy" details were?

14        A.   No, I did not.

15             MR. BENRUBI:  Let's go off the record for

16   a moment, please.

17             THE VIDEOGRAPHER:  Okay.  Please stand by.

18             MR. BENRUBI:  Let's take a short break

19   till 3:30 -- 2:30.

20             MS. BESVINICK:  2:30.  Okay.

21             THE VIDEOGRAPHER:  The time is 2:19.

22             We are off the record.

23             (Short recess.)

24             THE VIDEOGRAPHER:  Okay.  We are on the

25   record.  The time is 2:34 p.m.
```

 1  BY MR. BENRUBI:

 2       Q.   Okay.  Continuing on, if you would go to

 3  Page 15288.

 4            MS. BESVINICK:  What is the date,

 5  Counsel?

 6            MR. BENRUBI:  Actually, I don't know if

 7  that's the right number.  Hold on. 15288 -- oh.  It

 8  is -- it starts on 287, and it's dated July 16,

 9  2013.

10            MS. BESVINICK:  Thank you.

11            MR. BENRUBI:  It's the one at the top.

12  BY MR. BENRUBI:

13       Q.   It says -- correct me if I'm wrong -- I've

14  asked Virginia for more information about height,

15  weight, and race before we can consider

16  surveillance.

17       A.   Yes, I see that.

18       Q.   Do you know why that information was

19  required?

20       A.   Why the height, weight, and race --

21       Q.   Mm-hmm.

22       A.   -- is asked?

23            That's a typical piece of information that

24  we ask for when conducting surveillance to ensure we

25  surveil the right individual.

```
 1        Q.    All right.  And then three days of
 2   surveillance was conducted on Mr. Ackley?
 3        A.    Yes.
 4        Q.    Between what?  7-17-13 and 7-21-13?
 5        A.    I -- I believe the first surveillance date
 6   was July 18.
 7        Q.    Okay.
 8        A.    The second was July 19.
 9        Q.    Yeah.
10        A.    And the third was July 21 all in 2013.
11        Q.    Okay.  What is an informational referral?
12        A.    It is a referral to identify a claim that
13   has suspect indicators, confirmed information that
14   contradicts allegations or purported injuries on a
15   claim file.
16        Q.    Who is the referral made to?
17        A.    Are you referencing a file note?  I want
18   to make sure that I'm looking at a --
19        Q.    Yeah, 7- -- July 29, 2013.
20        A.    Okay.
21        Q.    Page 15278.
22        A.    Okay.  15278.
23        Q.    It's Lee Janicek, 10:01 a.m.
24        A.    Yeah, so I'm on that file note.  It's just
25   there's three pages.
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT "A"

1    Q.    It's right at the top.  I'm sorry.

2    A.    For July 29, 2013 --

3    Q.    Yes.

4    A.    -- 10:01?

5    Q.    No -- yes.  (As read:)  I've -- I have

6    received this final reported invoice...

7    A.    (Continuing) ...authorizing payment.

8    Q.    Keep going.

9    A.    (As read:)  Notified Virginia Fisher

10   informational referral has been made.  Before a

11   foundational referral is made, suggest the

12   following.

13          I don't know specifically who he would

14   have made the informational referral to.  My

15   understanding is it could have been one of two -- to

16   one of two entities, which would have been the

17   Department of Insurance, the State of Florida,

18   and/or the NICB, which is the National Insurance

19   Crime Bureau.

20   Q.    Is there a form that is used?

21   A.    I don't know at that time --

22   Q.    Okay.

23   A.    -- if there was a form.

24   Q.    Okay.  In any event, this is a report to

25   an agency outside the confines of Continental's

EXHIBIT "A"

1   claims unit, correct?

2        A.   That's correct.

3        Q.   **Did you see any document in the -- in the**

4   **files here that reflect the informational referral?**

5        A.   Not within these documents that I'm

6   looking at now, not within the file notes.

7        Q.   **No, I mean --**

8        A.   Are you --

9        Q.   **-- a review of your entire file.**

10       A.   I don't recall.

11       Q.   **Okay.**

12       A.   But, again, I don't know that there was a

13  form specifically.  It would have been a process

14  that would have been conducted online.

15       Q.   **Okay.**

16       A.   "Online" meaning there is a platform, a

17  resource, again, which is why I comment on the

18  National Insurance Crime Bureau.  They are a conduit

19  for the insurance industry.  It's a standard

20  practice that we utilize that platform.

21       Q.   **Yeah.**

22       A.   And they're authorized by the department

23  of insurance in specific jurisdictions to accept

24  referrals from the insurance industry when they're a

25  suspect insurance claim.

1     **Q.   Did NCIB (sic) have any involvement?**

2     A.   NICB?

3     **Q.   Yeah.**

4     A.   Involvement in the claim?

5     **Q.   Yeah.**

6     A.   Not that I saw.

7     **Q.   Okay.  What is a foundational referral?**

8     A.   A foundational referral would be when they

9 -- when the investigator has obtained evidence that

10 is contradictory and has been deemed a material

11 misrepresentation of the plaintiff's allegations,

12 whether it be bodily injury allegations or any other

13 claim that they would have made against us.

14     **Q.   You used two terms there:  Contradictory**

15 **and material misrepresentation?**

16     A.   Correct.

17     **Q.   Do you use those interchangeably?**

18     A.   No.

19     **Q.   Okay.  So those are two separate things,**

20 **evidence could be contradictory or it could contain**

21 **a material representation?**

22     A.   It could.

23     **Q.   Okay.**

24     A.   A material representation is information

25 that is false that the claim professional would rely

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT "A"

1  upon to make a claim decision.  And if the

2  information was truthful, they would have made a

3  different decision than what they would have with

4  that false information.

5      **Q.  Okay.  At this point did Continental have**

6  **sufficient evidence to conclude that Mr. Ackley was**

7  **committing insurance fraud?**

8          MS. BESVINICK:  Object to form.

9      A.  So, at this time, when Mr. Janicek

10 identified the need to complete an informational

11 referral --

12     **Q.  Yeah.**

13     A.  -- he felt he had enough information to

14 identify this claim as a suspicious claim --

15     **Q.  Yeah.**

16     A.  -- which is why it was an informational

17 referral.

18         And if you see, based on his notes

19 further, he is suggesting an additional deposition

20 of the --

21     **Q.  Yeah.**

22     A.  -- subject to make sure that the

23 information they obtained under their surveillance

24 was accurate --

25     **Q.  Okay.**



1    A.    -- and allow Mr. Ackley to explain what we

2    observed in the surveillance.

3    **Q.    Okay.  Mr. Janicek says in this note --**

4    **well, first, he says:  An investigative action plan**

5    **was formulated; do you see that?**

6    A.    I do.

7    **Q.    Okay.  Is that action plan in writing?**

8    A.    That would have been all of the content in

9    this file note before his --

10   **Q.    I see.**

11   A.    -- statement and investigative action plan

12   --

13   **Q.    Okay.**

14   A.    -- was formulated.  He's basically just

15   reiterating, hey, what I just noted in the file is

16   my investigative action plan.

17   **Q.    And what did that include, the action**

18   **plan?**

19   A.    The recommendation to conduct a second

20   deposition.

21   **Q.    Okay.  What else?**

22   A.    Requesting to provide additional

23   documentation for any medical.  So he says:  Ask

24   they provide documentation and any medical

25   ultimately submitted that may support the subject's

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM
EXHIBIT "A"

1  misrepresentations and a support of an inability to

2  move about that is contradicted on the video.

3       Q.   And then he says:  If the results are such

4  that contradict the video and medical presented to

5  doctors as ability, will consider referring to the

6  State of Florida Department of Financial Services

7  inquiry review, correct?

8       A.   That is correct.

9       Q.   When he says:  If the result are such that

10  contradict the videos, is he -- is he referring

11  there to the second deposition?

12       A.   I don't know specifically what he was

13  referring to.  My response would be speculation. I

14  -- I don't --

15       Q.   That's all right.

16       A.   Yeah, I don't know.

17       Q.   He notes that Mr. Ackley had multiple

18  arrests and was a convicted felon; do you see that?

19       A.   I do see that.

20       Q.   Was that a factor in Continental's

21  investigation regarding whether Mr. Ackley was

22  committing insurance fraud?

23       A.   No.

24       Q.   And in that note Mr. Janicek reviews the

25  videotape surveillance?

```
 1        A.    It appears that he does.

 2        Q.    Did you review the surveillance video?

 3        A.    I did not.

 4        Q.    If you would go forward to Page 15270.

 5             MS. BESVINICK:  Which date?

 6             MR. BENRUBI:  It actually starts on 15269,

 7  8-22-13 at the bottom.

 8             MS. BESVINICK:  8-22-13?

 9             MR. BENRUBI:  Yeah.

10             MS. BESVINICK:  Thank you.

11             THE WITNESS:  Okay.

12  BY MR. BENRUBI:

13        Q.    That note discusses a roundtable?

14        A.    The first one?  The 11:27?

15        Q.    Yes.

16        A.    It appears so, yes.

17        Q.    Who was present for the roundtable?

18        A.    I don't know.  It doesn't say.

19        Q.    All right.  And Miss Strong says:

20  Remember SIU hold.  And then she says:  Any chance

21  on a fraud action in courts in Florida?

22             Do you know what was meant by that?

23        A.    I -- I don't know specifically.  I didn't

24  ask Miss Strong, didn't talk to her about it, so I

25  don't know specifically what she means by that.
```

EXHIBIT "A"

```
 1        Q.    She says:  Liability will be with the

 2  insured, and risk transfer success is questionable

 3  and may have to be pursued later.

 4        A.    Yes, that's what it says.

 5        Q.    And she suggests that the reserves should

 6  be changed to about 50 percent of full value?

 7        A.    That is correct.

 8        Q.    And what is "CSD" in the last sentence?

 9        A.    I'm not sure what that acronym stands for.

10  It's not common to me.  At that time it might have

11  been though.

12            MR. BENRUBI:  It's very warm in here --

13        A.    Oh, actually, I do recall.  Client

14  Services Director.

15  BY MR. BENRUBI:

16        Q.    Okay.

17        A.    Apologize for that.  I do recall that.

18        Q.    That's okay.

19        A.    That was discussed.

20            So client services is a business unit that

21  works as a liaison for certain national accounts.

22  And in that situation she would have been required

23  to contact client services to discuss any reserve

24  changes.

25            MS. BESVINICK:  Off the record.  Off the
```

NAEGELI

DEPOSITION & TRIAL

(800)528-3335

NAEGELIUSA.COM

EXHIBIT "A"

```
 1  record.

 2              THE VIDEOGRAPHER:  Okay.  Hold one second.

 3              The time is 2:49 p.m., and we are off the

 4  record.

 5              (Discussion held off the record.)

 6              THE VIDEOGRAPHER:  The time is 2:52 p.m.,

 7  and we are on the record.

 8              (Exhibit 10 was marked for

 9  identification.)

10              MR. BENRUBI:  This is from the original

11  production.

12              MS. BESVINICK:  Is it different from the

13  regular production?

14              MR. BENRUBI:  Mm-hmm.  The regular

15  production is now redacted.

16              MS. BESVINICK:  Oh, this is from the

17  production that was made to the State.  Okay.

18              I didn't know what you meant by "original"

19  'cause we produced claim notes on two occasions.

20  That's why I asked.  Okay.

21              Is this an exhibit to the complaint?

22              MR. BENRUBI:  I'm not sure if that one is

23  or not.  I could check.

24              MS. BESVINICK:  So what are the Bates

25  numbers?
```



```
 1              MR. BENRUBI:  180- -- hold on. 181, 182.

 2              MS. BESVINICK:  Okay.

 3         Counsel.

 4              MR. BENRUBI:  Thanks.

 5   BY MR. BENRUBI:

 6         Q.   Go ahead and --

 7         A.   Thank you.

 8         Q.   -- take a look at that, please.

 9         A.   Okay.

10              MS. BESVINICK:  And what was that date of

11   that note just so I can be on the same page?

12              THE WITNESS:  9- -- well, the first page

13   is 9-23-2013 through 9-6-2013.

14              MS. BESVINICK:  Thank you.

15         A.   Okay.

16   BY MR. BENRUBI:

17         Q.   Do you see that note?

18         A.   Which one, the 9-23 or the 9-6?

19         Q.   Let me get there.  The 9-6 that starts on

20   Page 181...

21         A.   Okay.

22         Q.   (Continuing) ...at the bottom.

23              Virginia Fisher made this entry?

24         A.   It appears so, 9-6-2013 at 3:27 p.m. okay.

25         Q.   And what did she write?
```


NAEGELI DEPOSITION & TRIAL   (800)528-3335   NAEGELIUSA.COM

EXHIBIT "A"

1    A.    "TT Ros."

2    Q.    Would that be TT, "talked to" --

3    A.    Talked to.

4    Q.    -- Ros Milian?

5    A.    -- most likely.  Probably.

6    Q.    Okay.

7    A.    She pointed out that:  In light of SIU

8  hold, she's not steering this to mediation.  She and

9  I agreed that case still has a value.  We aren't

10 disputing an accident happened.  He was damaged.  He

11 did have surgery.  We just felt that he's grossly

12 exaggerated his current condition.  We agree I will

13 need to speak with SIU and find out what their plan

14 is regarding the hold.  We will have no choice but

15 to defend if SIU hold remains on the file.  Called

16 Lee Janicek and left a message for him to call me

17 back.

18    Q.    And that note memorializes a conversation

19 between Virginia Fisher and the claims adjuster

20 employed by Continental and Rosalind Milian, the --

21 the attorney that CNA retained to represent its

22 insured, Continental represent- -- to represent its

23 insured?

24    A.    That is correct.

25    Q.    You said before that you were very careful


NAEGELI
DEPOSITION & TRIAL
CELEBRATING
40
YEARS IN BUSINESS
EXHIBIT "A"
(800)528-3335
NAEGELIUSA.COM

```
 1   not to unnecessarily disclose privileged

 2   information...

 3           MS. BESVINICK:  Object to form.

 4   BY MR. BENRUBI:

 5       Q.   (Continuing) ...do you remember?

 6           THE WITNESS:  Hmm?

 7           MS. BESVINICK:  Go ahead.

 8   BY MR. BENRUBI:

 9       Q.   Do you remember that testimony?

10       A.   I remember stating that we didn't

11   voluntarily release client-privileged information.

12       Q.   Okay.  Well, wasn't this note voluntarily

13   provided to the Florida Department of Financial

14   Services?

15       A.   I didn't provide it, so I don't know if it

16   was voluntarily provided.

17       Q.   But it was provided?

18           MS. BESVINICK:  Objection to form.

19   BY MR. BENRUBI:

20       Q.   You do know that, right?

21       A.   Yes, I do know that.

22       Q.   Okay.  At any point did -- did Continental

23   ask any of the other potentially responsible parties

24   for them or their insurance company to take over the

25   defense of Equity One?
```

NAEGELI
DEPOSITION & TRIAL

EXHIBIT "A"

(800)528-3335
NAEGELIUSA.COM

```
 1        A.    To take over the defense of Equity One?  I
 2   don't recall.  I --
 3        Q.    Do you know what I'm speaking of?
 4        A.    Maybe not, so if you want to clarify.
 5        Q.    Yeah.  I mean, at the inception
 6   Continental agreed to attend to the defense to its
 7   insured?
 8        A.    Correct.
 9        Q.    At some point in time during the claim did
10   Continental tender the defense of the insured to
11   others?
12        A.    No.
13        Q.    Did Continental seek indemnification of
14   contribution from others?
15        A.    Yes.
16        Q.    And that would have been the GC and his or
17   her insurance company and the day porter?
18        A.    I believe that's correct.
19        Q.    Okay.  Now let's go to Page 15266.
20        MR. BENRUBI:  I'll take that.  Thank you.
21   BY MR. BENRUBI:
22        Q.    15266 there's a note at 9-23-13.
23        A.    15266?
24        Q.    256.
25        A.    Oh, 256, not 66.
```

1    Q.   Yeah.

2    A.   Okay.  Okay.

3    Q.   **It starts on the bottom, a note Virginia**

4  **Fisher, 8:52 p.m.**

5    A.   Okay.

6    Q.   **And she's writing to Lee Janicek?**

7    A.   That's correct.

8    Q.   **And what did she say?**

9    A.   (As read:)  Lee, I called you over a week

10 ago to discuss the SIU hold but haven't heard back

11 from you.  While I believe Mr. Ackley greatly

12 exaggerated his disability, he still had an injury

13 resulting in a surgery.  I'm in all week.  Will look

14 forward to hearing from you.

15    Q.   **Did Miss Fisher want to settle the Ackley**

16 **claim?**

17    A.   I don't know what Miss Fisher wanted, but,

18 based on claim handling guidelines, it's her

19 responsibility to resolve a claim efficiently and

20 effectively.  And it appears to me that she was

21 following those guidelines.

22    Q.   **But, as she said, because of the SIU hold**

23 **she had no choice but to defend, correct?**

24         MS. BESVINICK:  Object to form.

25    A.   So also based on guidelines, and with the

NAEGELI
DEPOSITION & TRIAL
EXHIBIT "A"
(800)528-3335
NAEGELIUSA.COM
CELEBRATING 40 YEARS IN BUSINESS

```
 1  SIU hold in place, she understood that she needed to
 2  collaborate with SIU and Lee Janicek --
 3  BY MR. BENRUBI:
 4       Q.    Mm-hmm.
 5       A.    -- before an SIU hold would be removed.
 6       Q.    Okay.  Do you know if Miss Fisher ever
 7  told Mr. Janicek than she disagrees that Mr. Ackley
 8  had a suspicious claim?
 9       A.    I do not know.
10       Q.    Did you ever speak to Miss Fisher?
11       A.    I did not.
12       Q.    Is there any reason why you didn't call
13  her before -- in preparation for this deposition?
14       A.    None that I can state.
15       Q.    Okay.  There's a note on 9-24-13 at 7:31
16  a.m., Page 256, Lee Janicek.
17       A.    Okay.
18       Q.    It just says:  Teamed with Virginia
19  Fisher.  Do you know what that means?
20       A.    I don't know.  You would have to ask Mr.
21  Janicek.
22            MS. BESVINICK:  I'm sorry, Counsel, which
23  date was that?
24            MR. BENRUBI:  9-24-13.
25  BY MR. BENRUBI:
```

NAEGELI
DEPOSITION & TRIAL

EXHIBIT "A"

(800)528-3335
NAEGELIUSA.COM

1    Q.   All right.  If you'd go to Page 15252.

2    A.   Okay.

3    Q.   At the top at 2:18 p.m. Miss Fisher wrote:

4    **Called Lee Janicek for his decision on the hold.  He**

5    **reviewed the depo summary of plaintiff and is going**

6    **to get back to me, correct?**

7    A.   Yes, I see that.

8    Q.   And then that same day, 42 minutes later,

9    **Mr. Janicek wrote another note?**

10   A.   10-29-2013, right, 3:00 p.m.?

11   Q.   Yep.

12   A.   Is that the one?

13   Q.   Yep.

14   A.   Yes, I see it.

15   Q.   And was this the date that the case was --

16   **the claim -- Ackley's claim was forwarded to Mr.**

17   **Bryant to consider a foundational referral --**

18   **referral?**

19   A.   It appears that Mr. Janicek is documenting

20   his intention to forward this claim over to Mr.

21   Bryant to consider a foundational referral, and he

22   wants to discuss it with Mr. Bryant.

23   Q.   Okay.  What was the basis, on October 29,

24   **2013, for the referral to Mr. Bryant to consider a**

25   **foundational referral?**

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT "A"

1    A.    Well, as the note states:  Mr. Ackley

2  alleges a bodily injury as a result of the insured's

3  negligence.  Under oath Mr. Ackley states he cannot

4  walk without a cane but leaves the door open by

5  saying on certain days.  Mr. Ackley attempts to

6  clarify when he is on meds he doesn't need a cane.

7         The video -- the surveillance video

8  depicts Mr. Ackley being very active and able to do

9  much more than what is explained in his -- the notes

10  and deposition and that Mr. Janicek is going to

11  forward it to Mr. Bryant to review and discuss.

12    **Q.    Okay.  What in the videotape concerned**

13  **Continental at this point in time?**

14    A.    Mr. Ackley's ability to ride a bicycle.

15    **Q.    Okay.**

16    A.    Mr. Ackley's ability to ride a bicycle and

17  hold a second bicycle in his arm.  I don't recall

18  which one he was holding with and which one he was

19  riding with.

20    **Q.    Mm-hmm.**

21    A.    In addition to the ability to carry and

22  lift two bicycles, the ability to be on a skateboard

23  and balance and function on a moving skateboard

24  while he is being pulled by his dog, over -- this

25  occurring over three days, physical activity over

NAEGELI
DEPOSITION & TRIAL
CELEBRATING
40
YEARS IN BUSINESS
(800) 528-3335
NAEGELIUSA.COM

EXHIBIT "A"

1   three days without the use of a cane, as noted in

2   his deposition, in addition to his statement in his

3   deposition that he was not able to do anything.

4      **Q.   The statement in the first deposition?**

5      A.   Mm-hmm.

6      **Q.   Yes?**

7      A.   As a part of it, yes.   Apologize, yes.

8      **Q.   In his second deposition, did Mr. Ackley**

9   **admit to riding a bicycle?**

10      A.   I'd have to look at the second deposition

11   transcript to confirm that, but I believe that is

12   the case.

13      **Q.   Okay.   So was that contradictory --**

14   **contradictory?**

15      A.   In part, no.

16      **Q.   In part, yes?**

17      A.   In part, yes.

18      **Q.   What part was "yes"?**

19      A.   The -- Mr. Ackley continued, in his second

20   deposition, to purport that he still was unable to

21   do anything and his wife had to take care of him,

22   which is contradictory to the surveillance video,

23   which was before the second deposition.

24      **Q.   All right.   So what was contradictory is**

25   **when he said he can't do anything and then he was**



NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT "A"

 1  **found riding a bike?**

 2       A.   And he was found --

 3            **MS. BESVINICK:**  Object to form.

 4            Go ahead.

 5            **THE WITNESS:**  Sorry.

 6  **BY MR. BENRUBI:**

 7       Q.   **Go ahead.**

 8       A.   He was found doing more than riding a

 9  bike.

10       Q.   **Yeah.**

11       A.   And lifting, carrying, riding a

12  skateboard, physically active beyond what he

13  purported.

14       Q.   **What did he purport?**

15       A.   That he was not able to do anything and

16  that in certain days he needed a cane and in other

17  days he didn't.

18       Q.   **And you believe that was his purported**

19  **testimony when taking -- in context of the whole**

20  **depositions?**

21            **MS. BESVINICK:**  Object to form.

22       A.   Yeah, I'm not quite sure I understand the

23  -- the direct question.

24  **BY MR. BENRUBI:**

25       Q.   **Okay.  In assessing these contradictions,**



NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT "A"

1  did -- did you consider the entire deposition

2  testimony that Mr. Ackley gave on both occasions?

3      A.   I don't believe I can answer that because

4  it wasn't my consideration 'cause -- you'd have to

5  ask Mr. Bryant that.

6      Q.   Okay.  Anything else about the

7  surveillance that CNA -- not CNA, Continental felt

8  was significant?

9      A.   Not that I recall at this time.

10     Q.   Okay.  Did Mr. Ackley testify in

11  deposition that he couldn't lift anything?

12     A.   I don't recall specifically.  I would need

13  to review the transcript.

14     Q.   Okay.  That would be an important thing to

15  know in deciding whether or not he was being

16  contradictory, right?

17          MS. BESVINICK:  Object to form.

18     A.   There's a lot of documents that I've

19  reviewed over the past few weeks, and some

20  information is more readily recalled than others.

21  BY MR. BENRUBI:

22     Q.   Mr. Janicek also talks about reviewing the

23  medical records to see if Mr. Ackley made any

24  misrepresentations to his physicians about his

25  physical abilities?

NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM
EXHIBIT "A"

1      A.    Is that a question, I'm sorry?

2      **Q.    Yes.   Correct?**

3      A.    I believe that is correct.

4      **Q.    Okay.   And what was the result of that**

5  **review?**

6      A.    Are you referencing something specific?

7      **Q.    Well, do you know -- do you know?**

8      A.    Not -- not offhand, not by memory right

9  now.

10     **Q.    So if I just asked did Continental find**

11  **any misrepresentations regarding his physical**

12  **abilities in the medical records, could you answer**

13  **yes or no?**

14     A.    I couldn't.   I do not know.

15     **Q.    That was one of the factors, though, that**

16  **Mr. Janicek was looking at in deciding whether to**

17  **continue on with this, correct?**

18          **MS. BESVINICK:**   Object to form.

19     A.    Mr. Janicek was able to review the medical

20  records and make that determination.   I did not

21  review the medical records.

22  **BY MR. BENRUBI:**

23     **Q.    Mr. Bryant talks about a foundational**

24  **referral request case log.**

25          **Do you know what that is?**

1          **MS. BESVINICK:**  Is there a note you're

2    referring to?

3          **MR. BENRUBI:**  Yeah, there is.  15251.

4          **MS. BESVINICK:**  Is there a date?

5          **MR. BENRUBI:**  10-29 -- nope, 11-8-13.

6      A.   2:30 p.m.?  Is that --

7    **BY MR. BENRUBI:**

8      **Q.   Yes.**

9      A.   Yeah?

10     **Q.   Yeah.**

11     A.   And what is your question?

12     **Q.   Do you know what he's referring to when he**

13   **says:  Foundational referral case log?**

14     A.   That would have been his documentation --

15   internal documentation to keep track of his referral

16   and the information that he's going to be sending to

17   the department of insurance, if applicable.

18     **Q.   Have you ever seen that document?**

19     A.   I have not.

20     **Q.   Do you know if that document is used as a**

21   **basis to report to the State of Florida when we**

22   **looked at those antifraud reporting plans?**

23     A.   Is it used as a basis?

24     **Q.   Yes, the information that he's compiling?**

25     A.   So it would be basically his -- his log



NAEGELI
DEPOSITION & TRIAL          EXHIBIT "A"          (800)528-3335
NAEGELIUSA.COM

 1   with a claim number, the date that he would have

 2   received the referral for his tracking purposes.  So

 3   there's -- there isn't information in that case log

 4   that would be a determining factor for a

 5   foundational referral.  It's just a log.

 6        **Q.   Okay.  Let's go to 15242, 12-4-13.**

 7        A.   Okay.

 8        **Q.   In this note Mr. Janicek is commenting on**

 9   **the content of Mr. Ackley's second deposition.**

10        A.   I'm looking at a medical records review

11   file note.

12        **Q.   Mm-hmm.  Yes.**

13        A.   He notes in here:  Review of the

14   deposition of Mr. Ackley taken in (sic) April 24th,

15   2013 reflects Page 5, Line 11.

16             "QUESTION:  And you've taken all these

17   medications today?

18             "ANSWER:  I take them every day, ma'am.

19             (As read:)  Found inside the medical

20   documents dated April 12, 2013 is a tox screen which

21   appears to be negative for any medications which

22   include oxy hydrocodone, et cetera.

23        **Q.   Okay.  So he's only commenting on the**

24   **first deposition, not on the second deposition?**

25        A.   It appears the first deposition.

1      Q.   Okay.  And he comments that the subject

2  deposition has some inconsistencies in it, middle of

3  the next page?

4      A.   The subject of the deposition has some

5  inconsistencies in it.

6      Q.   Yes.

7      A.   So, yes.

8      Q.   Okay.

9      A.   That is correct.

10     Q.   Was there anything that was in this note

11 that led Continental to conclude that -- strike

12 that.

13          Did anything in this note provide further

14 indication to Continental that Ackley was committing

15 insurance fraud?

16          MS. BESVINICK:  Object to form.

17     A.   Our position that a determination is fraud

18 is made by the courts.  Our responsibility is to

19 identify the potential material misrepresentation of

20 a plaintiff, Mr. Ackley at this -- in this instance.

21          Based on the information at this time --

22 so this note is December 4th...

23 BY MR. BENRUBI:

24     Q.   Mm-hmm.

25     A.   (Continuing) ...Mr. Janicek is reviewing



NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS

EXHIBIT "A"

(800)528-3335
NAEGELIUSA.COM

1  his medical records.  He has the information from

2  the surveillance video.  He has the information from

3  -- he's noting in here from the first deposition,

4  which are all in the -- what he's noting in here the

5  inconsistencies and the -- how that information then

6  leads to the referral to Andy Bryant for the review

7  for a foundational referral to the department of

8  insurance of the State of Florida.

9       **Q.   Okay.  For -- for instance, where it talks**

10  **about whether he was sitting on the ground or on the**

11  **bench when EMS arrived, was that part of the**

12  **suspected suspicious claim?**

13       A.   It's an indication that Mr. Ackley was

14  inconsistent with his statements.

15       **Q.   Okay.**

16       A.   Inconsistent statements, during the life

17  of the claim, can give an indication that there is

18  suspect insurance fraud occurring.

19       **Q.   There could be many other reasons for**

20  **inconsistent statements other than insurance fraud;**

21  **would you agree with that?**

22       A.   I don't know.  In this instance, based on

23  what Mr. Janicek was reviewing, he is documenting

24  the pattern of inconsistent statements being made by

25  Mr. Ackley.  That's what he's doing.

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS
EXHIBIT "A"
(800)528-3335
NAEGELIUSA.COM

 1      Q.   All right.  Did -- did Continental
 2   consider whether these, quote-unquote,
 3   inconsistencies could easily be explained as
 4   innocent conduct?
 5           MS. BESVINICK:  Object to form.
 6      A.   Mr. Janicek would have taken into
 7   consideration any possibility for an explanation for
 8   any of the information that would have been obtained
 9   during the claim file.
10   BY MR. BENRUBI:
11      Q.   I mean, would you agree with me that
12   medication -- the effects of medication can cause a
13   claimant to make inconsistent statements?
14      A.   I don't know.  I -- there's -- I don't
15   know what medication he -- Mr. Ackley would have
16   been on or may not have been on during this time, so
17   I can't -- I can't agree to that.
18      Q.   Okay.  Let me ask it this way.
19           Before reporting Mr. Ackley to the
20   authorities for insurance fraud, did Continental
21   consider any other possible explanations for what he
22   alleged to have been done was wrong?
23           MS. BESVINICK:  Object to form.
24      A.   So, again, when Lee Janicek or Andy Bryant
25   or the claim professionals assigned to this file

1 were reviewing all of the information, in its

2 totality, to make a determination as to whether or

3 not we were required by the Florida department of

4 insurance to meet our obligation based on the

5 statute and compliant with the regulations, they

6 took into consideration all of the information. And

7 with regards to his inconsistencies, on the date of

8 the incident for the fall, that would have been

9 taken into consideration.

10          The inconsistencies from his deposition,

11 they don't correlate with the medical records. The

12 pattern continued. And then when we obtained the

13 surveillance video and then had the second

14 deposition, all of that information is taken into

15 consideration.

16 **BY MR. BENRUBI:**

17     **Q.    So you know specifically that before Mr.**

18 **Ackley was reported to the authorities that**

19 **Continental considered causes other than an**

20 **intentional misrepresentation for the**

21 **inconsistencies?**

22     A.    We take everything into consideration.

23 I'm not sure how else you want me to answer.

24          All of the information that we obtained

25 during our claim investigation, an SIU

**NAEGELI**
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

EXHIBIT "A"

1  investigation, medical records --

2  **BY MR. BENRUBI:**

3      **Q.   I understand.**

4      A.   -- so we would have taken into

5  consideration any other mitigating factor.

6      **Q.   Where in the claim file does it -- is it**

7  **documented that Continental considered whether Mr.**

8  **Ackley's inconsistencies were caused by the effects**

9  **of the medication he was taking?**

10     A.   Well, based on medical records that are in

11  the file, his tox screen came out negative.

12     **Q.   Mm-hmm.**

13     A.   So I mean you'd have to ask Mr. Janicek,

14  but I -- just from reading this note, I would take

15  that out of the consideration because we have a

16  medical record that his tox screen came back

17  negative.

18     **Q.   All right.   The beginning of the note says**

19  **that:   This entry should be considered privileged as**

20  **it is made with the expectation of future litigation**

21  **and does contain some opinion; did I read that**

22  **correctly?**

23     A.   You did.

24     **Q.   What future litigation was Mr. Janicek**

25  **referring to?**

1      A.    I don't know.  You would have to ask Mr.

2  Janicek.

3      Q.    **You were on the phone with him; did you**

4  **ask him?**

5      A.    I did not.

6      Q.    **Why not?**

7      A.    I didn't ask him.

8      Q.    **Okay.  And Lee Janicek outlines his review**

9  **of Mr. Ackley's second deposition in his note dated**

10  **January 22nd, 2014, Page 15235?**

11      A.    So it starts on 235, correct --

12      Q.    **Yes.**

13      A.    -- with January 22, 2014.

14            So, yes, it appears the file note starts:

15  Reviewed updated deposition -- would you like me to

16  continue to read?

17      Q.    **No.  That's okay.**

18      A.    Okay.

19      Q.    **At the end he says:  I will team with Andy**

20  **Bryant to determine if this is sufficient to warrant**

21  **a foundational referral.**

22      A.    That is correct.

23      Q.    **Did there come a time when the insured**

24  **asked that the SIU hold be removed?**

25      A.    I don't recall.

1      Q.   If you look at 15234, 1-23-14?

2      A.   Okay.

3      Q.   Does that note refresh -- refresh your

4   recollection?

5      A.   It does.

6      Q.   What do you know about that issue?

7      A.   Outside of just reading the file note --

8      Q.   Yeah.

9      A.   -- and reviewing the file note, nothing

10   more than what it says.

11           Virginia Fisher file note 1-23 of 2014

12   states there's some initial -- it appears to be a

13   copy and paste of a -- of an email in the file note.

14      Q.   Okay.

15      A.   That's what it appears to be.

16           (As read:)  Lee and Ray, I have not had

17   this happen before.  Our client would like for the

18   SIU hold to be taken off the file.  Maybe we can

19   talk about how we handle this request.

20           So that -- that's what I know about the --

21   the insured asking for the SIU hold to be --

22      Q.   Why was the insured asking for that?

23      A.   I do not know.

24      Q.   Do you know how that issue was resolved?

25      A.   I do not, no.

1     Q.   Was the hold maintained in place?

2     A.   At that time the hold -- the SIU hold was

3 still in place.

4     Q.   If you go to 15231, January 27, 2014, Lee

5 Janicek?

6     A.   The 9:34 a.m.?

7     Q.   Yes.

8     A.   Yes.

9     Q.   The note speaks about determining whether

10 Mr. Ackley made any misrepresentations to his

11 doctors about his activities he claims he is unable

12 to do?

13       (Witness peruses document.)

14     A.   Okay.  I read the note.

15 BY MR. BENRUBI:

16     Q.   Okay.

17     A.   So Mr. Janicek is stating he is requesting

18 the medical records from a specific date.

19     Q.   Yep.

20     A.   A time frame so that he is able to analyze

21 those records and correlate them to the dates of the

22 surveillance --

23     Q.   Mm-hmm.

24     A.   -- to determine if there's any additional

25 contradictions or misrepresentations based on the

```
 1  activities that we observed Mr. Ackley performing in

 2  the surveillance video.

 3      Q.    And was there?

 4      A.    I don't know based off of this file note.

 5  I did not watch the videos, and I did not review the

 6  medical records.  So I can't tell you based on this

 7  file note what -- what that answer would be.  I

 8  don't know.

 9      Q.    Do you remember reading any file notes

10  where there was a discrepancy between the video and

11  what Mr. Ackley reported to his doctors regarding

12  the extent of his physical activities?

13      A.    I don't recall.

14          MR. BENRUBI:  Okay.  Let's take a bathroom

15  break, please.

16          MS. BESVINICK:  Okay.  Get some air, too.

17          MR. BENRUBI:  Yeah.

18          MS. BESVINICK:  We'll open the door up and

19  get some...

20          THE VIDEOGRAPHER:  Okay.  The time is 3:32

21  p.m.  We are off the record.

22          (Short recess.)

23          (Discussion held off the video record.)

24          MS. BESVINICK:  So we're back on the

25  record.  Plaintiff's counsel has suggested breaking
```

NAEGELI
DEPOSITION & TRIAL
EXHIBIT "A"
(800)528-3335
NAEGELIUSA.COM

1   for today, given the amount of questions he

2   anticipates with the witness.

3            And we have agreed to suspend the

4   deposition with the understanding that

5   Ms. Gall will return tomorrow at 11:00 and that her

6   deposition will conclude by 1:00 and that Mr.

7   Callahan, who was scheduled for tomorrow morning,

8   we'll start a lunch period of time after Ms. Gall's

9   deposition concludes, and that his deposition will

10  last no longer than two hours.

11           Is that fair, Counsel?

12           **MR. BENRUBI:**  The only thing I would say

13  is just a little wiggle room with

14  Miss Gall.

15           I intend to be done in two hours, but --

16  you know, I -- it's not gonna be an issue.  I

17  promise you.

18           **MS. BESVINICK:**  Okay.  'Cause that would

19  be -- maybe we should go longer today because -- I

20  mean, we need to have a hard stop -- not because

21  anybody's -- you can see we're not wasting time

22  during the deposition.

23           It's not that kind of a thing --

24           **MR. BENRUBI:**  We'll have a hard stop --

25           **MS. BESVINICK:**  But I -- but I want to

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT "A"

1  make sure that we have a hard stop so we get

2  Mr. Callahan done in an appropriate period of time.

3          **MR. BENRUBI:**  That won't be a problem.

4          **MS. BESVINICK:**  Okay.

5          **MR. BENRUBI:**  We'll get both of them done

6  with time to spare.

7          **MS. BESVINICK:**  All right.

8          **MR. BENRUBI:**  Thank you.

9          **MS. BESVINICK:**  Thank you.  You're

10  welcome.

11          **THE VIDEOGRAPHER:**  Okay.  We are on the

12  record.  The time is 2:47.  This is the end of the

13  deposition of Katie Gall.  The court reporter will

14  now take orders for the transcript.

15          **MS. BESVINICK:**  It's not the end of the

16  deposition.

17          **THE VIDEOGRAPHER:**  Sorry.

18          **MS. BESVINICK:**  It's not.  We're

19  suspending it for today.

20          **THE VIDEOGRAPHER:**  Okay.

21          **MS. BESVINICK:**  Just to correct the

22  record, we're suspending Ms. Gall's deposition for

23  today at the request of plaintiff's counsel to be

24  reconvened tomorrow morning at 11:00 for

25  approximately up to two hours.

1          **THE VIDEOGRAPHER:** Gotcha.

2          **MS. BESVINICK:** So I think you can wait

3    for the orders until tomorrow.

4          **MR. BENRUBI:** Yeah.

5          **THE VIDEOGRAPHER:** Okay.  Okay.

6          **MS. BESVINICK:** Okay?

7          **MR. BENRUBI:** Yeah.

8          **THE VIDEOGRAPHER:** Okay.  So the time is

9    2:48.  We're off the record.

10          **(Whereupon, the proceedings in the above-**

11    **entitled cause were adjourned until 11:00 a.m.,**

12    **March 8, 2023.)**

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          CERTIFICATE

 2

 3

 4        I, the undersigned, Tim Baron, am a videographer on

 5   behalf of NAEGELI Deposition & Trial. I do hereby certify

 6   that I have accurately made the video recording of the

 7   deposition of Katie Gall, in the above captioned matter

 8   on the 7th day of March, 2023, taken at the location of

 9   8745 W Higgins Rd., Ste. 110, Chicago, IL 60631.

10

11        No alterations, additions, or deletions were made

12   thereto.

13

14        I further certify that I am not related to any of

15   these parties in the matter and I have no financial

16   interest in the outcome of this matter.

17

18

19

20   /S/  Tim Baron

21

22

23

24

25
```

```
 1                            CERTIFICATE

 2

 3          I, Lucia R. Block, do hereby certify that I reported

 4     all proceedings adduced in the foregoing matter and that

       the foregoing transcript pages constitutes a full, true

 5     and accurate record of said proceedings to the best of my

 6     ability.

 7          I further certify that I am neither related to

       counsel or any party to the proceedings nor have any

 8     interest in the outcome of the proceedings.

 9          IN WITNESS HEREOF, I have hereunto set my hand this

10     16th day of March, 2023.

11

12

13

14     _____

15          Lucia R. Block, CSR #084-003160
            Notary Public, Cook County, Illinois
16

17

18

19

20

21

22

23

24

25
```

EXHIBIT "A"

1  Date:     March 16, 2023           Assignment #: 62947

2  Attorney: Laura E. Besvinivk, Esquire

3  Deponent: Katie Gall - 30(b)(6)

4  Case:     Charles Ackley vs. Continental Casualty Company

5

6  **ATTORNEY - TRANSCRIPT ENCLOSED:**  Signature of your client

7  is required.  Please have your client make any corrections

8  necessary.  Sign the Correction Sheet where indicated.

9  Forward a COPY of the executed Correction Sheet directly

10  to the attorney(s) listed below.  (The Address(es) can be

11  found on the Appearance page of the deposition.)  Also,

12  send a COPY of the executed Correction Sheet to our

13  corporation.

14

15

16

17

18

19

20

21

22  CC:  Naegeli Deposition & Trial

23       Richard Benrubi, Esquire

24

25

NAEGELI
DEPOSITION & TRIAL                (800)528-3335
                                  NAEGELIUSA.COM